## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

STEVE ADAMS,                            )
                                        )
    Plaintiff,                          )
                                        )    CIVIL ACTION NO.
v.                                      )    2:06-cv-00707-ID-CSC
                                        )
MERCHANTS FOODSERVICE, et al.,          )
                                        )
    Defendants.                         )

## DEFENDANT MERCHANTS FOODSERVICE'S BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Steve Adams ("plaintiff") filed this lawsuit against defendant Merchants Foodservice ("Merchants Foodservice" or "defendant"), alleging that defendant fraudulently induced him to accept a job with Merchants Foodservice as Operations Manager.[1] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant has moved this Court for summary judgment on all claims asserted by plaintiff. There are no material facts in dispute, and defendant is entitled to judgment as a matter of law.

---

[1] In his initial complaint, filed in the Circuit Court of Chilton County, plaintiff named Don Suber, Andy Mercier, and Hal Henson as defendants. However, plaintiff did not properly serve Suber and Mercier pursuant to Rule 4(c)(1) of the Alabama Rules of Civil Procedure; and plaintiff did not serve Henson with the Complaint at all. Defendant Merchants Foodservice removed the Complaint to this Court on August 9, 2006, and plaintiff has not made any efforts to properly serve Suber or Mercier or to serve Henson. Because well over 120 days have passed since defendant Merchants Foodservice removed plaintiff's complaint to federal court, any claims against Suber, Mercier, and Henson are due to be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

The essential facts are as follows: plaintiff accepted a job with Merchants Foodservice that resulted in an instant promotion and increase in pay. However, when the promotion and pay increase resulted in more responsibility and longer work hours, plaintiff quit.

## I
## SUMMARY JUDGMENT STANDARD

The legal standard for summary judgment is well settled and well known to the Court. Summary judgment is appropriate if this Court finds that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994).

## II
## STATEMENT OF FACTS[2]

**A.     Company Background**

Merchants Foodservice operates state-of-the-art distribution and warehousing centers in Clanton, Alabama and Jackson, Mississippi. (Mercier Dec. ¶ 1). Merchants Foodservice is a 103 year old company

---

[2] For purposes of this Motion and supporting Brief only, defendant accepts plaintiff's version of the facts.

headquartered in Hattiesburg, Mississippi. (Mercier Dec. ¶ 2).    Andy Mercier is the President and Chief Executive Officer of the Company. (Mercier Dec. ¶ 1). Each distribution and warehousing center has a General Manager, who is responsible for the entire center, an Operations Manager, who is responsible for the day and night shifts in the warehouse and transportation, an Inventory Control Manager, who is responsible for inventory on the day shift, a Transportation Manager, who is responsible for transportation, and a Night Manager, who is responsible for the night shift in the warehouse. (Mercier Dec. ¶ 4).

**B.    Clanton Center**

Merchants Foodservice opened its new facility in Clanton in July of 2000. (Mercier Dec. ¶ 5). Hal Henson became the General Manager on January 25, 2002, and promoted Todd Brooks to Operations Manager shortly thereafter. (Henson Dec. ¶ 1). However, on March 29, 2004, Brooks was discharged for misconduct, and the facility needed a new Operations Manager. (Henson Dec. ¶ 2). At the time of his discharge, Brooks was being paid $45,000 a year; and, in 2003, he received a bonus of about 26% of his salary. (Mercier Dec. ¶ 6).

The new operations manager hired in August 2004 would inherit a stable management staff because Randy Harrington, Inventory Control

Supervisor, had worked for the company since December 12, 2001; Jason Kelley, Transportation Manager, had been with the company since November 16, 2000; and Phillip Stitt, Night Manager, had worked for the company since February 9, 1997. (Mercier Dec. ¶ 7). Further, Rodney Ware had been night shift supervisor since April 23, 2000, and Sineca Kennsey was a day shift supervisor and had worked for the company since November 16, 2001. (Mercier Dec. ¶ 7). Additionally, while turnover among hourly employees in the food distribution business is high and the Clanton facility was no exception to the industry norm, there was a strong core of hourly employees in the warehouse and a good core of drivers. (Mercier Dec. ¶ 8; Henson Dec. ¶ 2). Also, Stitt, as Night Shift Manager, received a bonus of approximately 20% of his salary in 2003 and was on pace to receive a bonus of 13-15% of his salary in 2004. (Mercier Dec. ¶ 8; Henson Dec. ¶ 2). Moreover, sales in the Clanton facility rose from $53,518,040 in 2002 to $60,586,751 in 2003 and were continuing to rise in 2004. (Mercier Dec. ¶ 9).

Additionally, the facility consistently performed well on AIB (American Institute of Baking) Audits, which are bi-annual food safety audits conducted by professionally trained auditors to ensure compliance with food safety regulations and to ensure that Merchants Foodservice

provides safe, high quality food products to consumers. (Mercier Dec. ¶ 10). The Clanton facility received a Superior rating on its May 22, 2002, audit; a Superior rating on its October 11, 2002, audit; an Excellent rating on its May 22, 2003, audit; a Superior rating on its January 16, 2004, audit; and a Superior rating on its August 31, 2004, audit. (Mercier Dec. ¶ 10 & Exhs. 1-5).

Henson moved Randy Harrington, Inventory Control Supervisor, into the job of Operations Manager and intended for him to remain in the job. (Henson Dec. ¶ 3). However, Freedom Search, a search company, called plaintiff about the job opening. (Pl. Depo. p. 67, lines 16-23, p. 68, lines 1-8). At the time, plaintiff was working for Sysco, another wholesale food distributor, as a day shift supervisor in the warehouse. (Pl. Depo. p. 46, lines 16-23, p. 47, lines 1-16). At Sysco, Plaintiff typically worked from 5:45 a.m. until around 3:00 p.m., Monday through Friday, with no Saturday work, and two night shifts in 5 years.[3] (Pl. Depo. p. 47, lines 17-23, p. 48, lines 1-5; p. 53, lines 6-7, 18-23; p. 58, lines 15-19). Plaintiff understood that the

---

[3] As is indicative of his desire to work limited hours, when asked if he would stay late to fix problems, plaintiff responded "it wasn't like I was there after 5:00 putting fires out or anything like that." (Pl. Depo. p. 58, lines 12-14).

operations manager would need to stay until a problem was fixed, even if it meant staying later than anticipated.[4] (Pl. Depo. p. 59, lines 6-16).

Plaintiff asked who the company was and what they paid. (Pl. Depo. p. 68, lines 3-9). Freedom Search would not tell plaintiff the name of the company, other than it was within a 50-mile radius, and that they pay would be between $60,000 - $65,000, which was more than he was making in his current job, and plaintiff told him he was interested in interviewing. (Pl. Depo. p. 68, lines 3-16). A few days later, the recruiter called back and told plaintiff the company was Merchants Foodservice and they arranged an interview for him to meet with Henson, Mercier, and Suber. (Pl. Depo. p. 68, lines 20-23; p. 69, lines 18-22).

## C.   Plaintiff's Interview

When plaintiff arrived for the interview, Henson told him that Mercier and Suber were not going to be available and that he was going to conduct the interview. (Pl. Depo. p. 70, lines 12-23, p. 71, lines 1-2). Henson then asked plaintiff some background information, and they discussed plaintiff's job at Sysco and what he did on the day shift. (Pl. Depo. p. 72, lines 13-23;

---

[4] Plaintiff had previously worked as an Operations Manager for Alex City Provision Company, a wholesale food distributor about a third the size of defendant, for about three years. (Pl. Depo. p. 30, lines 16-20; p. 33, lines 6-8; p. 50, lines 9-15 & Exh. 6). As Operations Manager, plaintiff worked when he needed to work to fix any problems or issues that arose. (Pl. Depo. p. 34, lines 19-23, p. 35, lines 1-9, 22-23; p. 36, lines 17-20). Plaintiff left Alex City Provision Company for his job with Sysco, making more money and having better benefits. (Pl. Depo. p. 42, lines 13-23, p. 43, lines 1-6).

p. 73, lines 5-9).  Plaintiff further explained that he was not in charge of transportation or nights at Sysco.  (Pl. Depo. p. 73, lines 16-22).  During the interview, Henson told him that "they had all the right pieces to the puzzle in place and just needed the glue to hold them there."  (Pl. Depo. p. 101, lines 8-16; Henson Dec. ¶ 7).

### 1.    Hours / Schedule

Plaintiff questioned Henson about what hours he would work, and Henson asked plaintiff what he did at Sysco.  (Pl. Depo. p. 75, lines 2-12). Plaintiff told Henson that he went to work at 5:45 a.m. and left around 3:00 p.m. at Sysco, and plaintiff claims that Henson told him "that's what I could expect to **typically** work at Merchants was eight to eight and a half hours a day."  (Pl. Depo. p. 75, lines 12-20) (Emphasis added).  Henson never told plaintiff that he would not have to work more hours than that, and plaintiff understood that if there were problems in operations he would have to stay and fix them.  (Pl. Depo. p. 75, lines 21-23, p. 76, lines 1-13). Plaintiff claimed that Henson told him he would have flexibility in setting his schedule, but Henson also told plaintiff that the work needed to be  complete before he left.  (Pl. Depo. p. 84, lines 14-23; p. 85, lines 5-6; Henson Dec. ¶ 4).

## 2.    Night Shift Work

Plaintiff then asked Henson about night shift work, and Henson asked if plaintiff was opposed to working the night shift. (Pl. Depo. p. 76, lines 21-23, p. 77, line 1). Plaintiff told Henson that he was opposed to working the night shift on a regular basis. (Pl. Depo. p. 77, lines 1-3). As Operations Manager, plaintiff would be responsible for the night shift; and Henson told plaintiff that he would expect plaintiff to work a couple of shifts or a couple of nights to meet the guys and observe what was going on to determine if there were any improvements he could offer. (Pl. Depo. p. 77, lines 16-23, p. 78, lines 1-6).

## 3.    Saturday Work

Previously, the Operations Manager worked two Saturdays a year for inventory. (Henson Dec. ¶ 4). Therefore, while plaintiff did not ask about Saturday work, plaintiff claims that Henson told him that he would be required to work two Saturdays a year for inventory. (Pl. Depo. p. 78, lines 17-23). Plaintiff further claims that Henson continued by telling him that he would receive a day off after working a Saturday. (Pl. Depo. p. 78, line 23, p. 79, lines 1-3).

### 4.    Vacation

Next, plaintiff told Henson that he would receive 17 vacation days at Sysco within the coming year and asked about vacation. (Pl. Depo. p. 79, lines 9-17). Plaintiff claims that Henson told him that Merchants Foodservice's policy was that an employee receives a week's vacation after working a year and that plaintiff replied he was not going to give up three weeks of vacation. (Pl. Depo. p. 79, lines 18-23). Plaintiff claims that Henson told him that the vacation policy was "what the book" said but that, after he got his "feet wet" for a couple months, he would give him a Thursday and a Friday to go with a Saturday and Sunday and that, after that, he could just ask for a day here or there when he needed it. (Pl. Depo. p. 80, lines 2-14). Plaintiff claims that Henson said that "I'll give you all the time you want off," which Henson denies. (Pl. Depo. p. 80, lines 14-15; Henson Dec. ¶ 6).

### 5.    Workforce

Finally, plaintiff claims that he asked Henson about the stability of the workforce and that Henson told him that they had a great workforce, including a great day shift, an excellent night shift, and a good core group of drivers. (Pl. Depo. p. 81, lines 9-23, p. 82, line 1). Plaintiff claims that Henson then told him about the management team and that Henson raved

about the numbers on the night shift and that Stitt, the Night Manager, always maxed out his bonus. (Pl. Depo. p. 82, lines 2-23, p. 83, lines 1-11).

Henson told plaintiff that his pay was going to be between $60,000 - $65,000, with an opportunity for a thirty percent bonus to be paid out three times a year (i.e., ten percent each time). (Pl. Depo. p. 83, lines 16-23).

Henson left the interview; and, when he returned, Henson told plaintiff that Mercier and Suber were going to be available to meet plaintiff in about 45 minutes to an hour. (Pl. Depo. p. 90, lines 12-23, p. 91, line 1). Plaintiff allegedly asked to tour the facility, and Henson told him that would not be a good idea because the staff did not know they were hiring a new director of operations.[5] (Pl. Depo. p. 91, lines 3-12).

Next, plaintiff interviewed with Henson, Mercier, and Suber. (Pl. Depo. p. 92, lines 3-9). After making introductions and discussing his background again, Suber questioned plaintiff about his experience with the KFC account because Merchants Foodservice was trying to garner that account. (Pl. Depo. p. 92, lines 9-23). Plaintiff explained that he understood how Sysco handled the account from the day shift side but not from the night shift or transportation sides. (Pl. Depo. p. 93, lines 12-17). Plaintiff

---

[5] Plaintiff never asked nor made any other attempts to tour the warehouse. (Pl. Depo. p. 91, lines 20-23).

also claims that, during the interview, Mercier told him that Merchants Foodservice was family oriented. (Pl. Depo. p. 97, lines 6-15).

## D.    Plaintiff Accepts the Job

Several days later, Henson called plaintiff and told him he wanted to make a job offer but did not want to do so over the phone. (Pl. Depo. p. 101, lines 19-23). Plaintiff and his wife then met with Henson, and Henson offered plaintiff the job as Operations Manager. (Pl. Depo. p. 102, lines 2-13). Plaintiff claims that Henson again mentioned how family oriented Merchants Foodservice was. (Pl. Depo. p. 102, lines 14-17). Plaintiff decided to take the job because it was an instant promotion and because he would be making $80,000, best case scenario. (Pl. Depo. p. 103, lines 9-23, p. 104, lines 1-10).

On August 20, 2004, Henson sent plaintiff an offer letter offering him the job of operations manager at the Clanton facility. (Pl. Depo. p. 109, lines 7-21 & Exh. 7). Plaintiff's salary was to be $62,500, and he was eligible for a 30% bonus.[6] (Pl. Depo. p. 111, lines 13-23). The offer letter made no mention about the hours plaintiff would be working, whether he would work nights, the workforce, his schedule, or the terms of his vacation. (Pl. Depo. p. 112, lines 5-18 & Exh. 7). Instead, the offer letter provided that "[o]ur

---

[6] Plaintiff was paid $62,500 a year and admits that he was eligible for a 30% bonus. (Pl. Depo. p. 89, lines 15-20; p. 111, lines 19-23).

incentive program recognizes the personal sacrifice and commitment involved in providing leadership and the necessary supervision to improve on current standards." (Pl. Depo. p. 115, lines 5-12 & Exh. 7). Further, the offer letter indicated that plaintiff could be eligible for the 30% bonus based on improving sales and improving current operational and productivity standards. (Pl. Depo. p. 115, lines 19-22 & Exh. 7). Plaintiff accepted the offer on August 23, 2004.[7] (Pl. Depo. p. 113, line 23, p. 114, lines 1-6 & Exh. 7).

After plaintiff started working for Merchants Foodservice, he received a benefits memo providing that new employees were eligible to take vacation days on or after January 1 following their employment. (Pl. Depo. p. 117, lines 9-23, p. 118, lines 1-4 & Exh. 9). Plaintiff also received an Acknowledgment of Employment Status form on August 24, 2004, that provided, in part, as follows:

> I understand that Merchants Foodservice retains the right to alter, revise, change, and/or eliminate any of its policies, practices, or rules and/or any of its pay or benefits at its discretion at any time without necessarily giving me or any other employee advance or actual notice.

(Pl. Depo. p. 128, lines 2-23, p. 129, lines 1-13 & Exh. 13). Plaintiff also acknowledged receiving Merchants Foodservice's employee handbook dated

---

[7] Plaintiff submitted his resignation letter to Sysco on August 23, 2004. (Pl. Depo. p. 113, lines 14-22 & Exh. 8).

August 1, 2002. (Pl. Depo. p. 130, lines 1-10 & Exh. 14). Merchants Foodservice changed its employee handbook beginning January 1, 2005, and plaintiff acknowledged receiving the new handbook on January 27, 2005. (Pl. Depo. p. 131, lines 11-21 & Exh. 16). Both employee handbooks provide in part that:

> These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of The Merchants Company.

(Pl. Depo. p. 130, lines 11-20; p. 131, lines 1-9 & Exh. 15; p. 131, lines 22-23, p. 132, lines 1-5 & Exh. 17). During plaintiff's employment, Don Suber was the president of the Company; and plaintiff never obtained anything in writing from Suber about his employment, his hours, his vacation, or the workforce. (Pl. Depo. p. 134, lines 3-23, p. 135, line 1).

E.    **Plaintiff's Employment with Merchants Foodservice**

1.    **Schedule and Night Shifts**

When plaintiff started, he was working 7:30 a.m. to 4:30 p.m.[8] (Pl. Depo. p. 143, lines 4-8). After plaintiff started, he worked the day shift and worked a few nights to get to know the employees and process for the night shift, as discussed in the interview. (Pl. Depo. p. 150, lines 2-23, p. 151, line

---

[8] Plaintiff claims that Henson told him he needed to work longer hours. (Pl. Depo. p. 143, lines 13-17). Further, plaintiff did not think everything that needed to be done as Operations Manager could get done in 8 hours. (Pl. Depo. p. 143, lines 19-23, p. 144, lines 1-2). However, plaintiff never talked to Mercier or Suber about the hours he was working. (Pl. Depo. p. 145, lines 9-15).

1). However, after plaintiff started, several unexpected events occurred that affected the hours plaintiff worked. (Henson Dec. ¶ 10).

### a.    Changes in Night Shift Management

Merchants Foodservice terminated Rodney Ware's (night shift manager) employment on October 20, 2004, less than a month after plaintiff started. (Henson Dec. ¶ 10). As Operations Manager, plaintiff was ultimately responsible for the night shift, and it was expected that he would assume some of the responsibility on the night shift. (Henson Dec. ¶ 10). Therefore, plaintiff was asked to work some nights to see if he could help get a handle on improving the situation. (Pl. Depo. p. 150, lines 17-23, p. 151, line 1; Henson Dec. ¶ 10). As a result, plaintiff worked about four or five weeks on the night shift. (Pl. Depo. p. 151, lines 2-5).

Then, Phillip Stitt (Night Manager) resigned on March 4, 2005. (Pl. Depo. p. 141, lines 1-12; Henson Dec. ¶ 10; Casey Dep. ¶ 2). As a result, plaintiff started working more at night because he was responsible for the night shift as Operations Manager. (Pl. Depo. p. 151, lines 6-23, p. 152, lines 1-2). Merchants Foodservice hired James Tankersley as Night Manager on April 17, 2005; and as Operations Manager, plaintiff worked with him to show him how the facility operated. (Pl. Depo. p. 152, lines 3-14; Henson Dec. ¶ 10; Casey Dec. ¶ 2). As Operations Manager, plaintiff

was responsible for training James Tankersley on how the facility operated, which required his working more nights. (Henson Dec. ¶ 10; Casey Dec. ¶ 2). Further, Henson, and Scott Casey, Corporate Director of Operations, talked to plaintiff about the need for him to assist Tankersley on the night shift. (Henson Dec. ¶ 10; Casey Dec. ¶ 2). As a result, plaintiff had to work more night shifts than had been expected. (Henson Dec. ¶ 10). In total, plaintiff worked ten weeks of night shift through ten and a half months of employment.[9] (Pl. Depo. p. 151, lines 12-14). When Henson hired plaintiff, he did not expect that the night shift supervisor would be fired or that the night shift manager would resign while plaintiff was Operations Manager. (Henson Dec. ¶ 10).

The problems on the night shift also affected the day shift and caused more work on the day shift. (Henson Dec. ¶ 11). As such, plaintiff had to work more hours during the day than expected. (Henson Dec. ¶ 11).

### b.    YUM Audits

Typically, the Clanton facility had to pass bi-annual AIB Audits. (Henson Dec. ¶ 12). However, in 2005, Merchants Foodservice became a distributor for Kentucky Fried Chicken ("KFC"). (Casey Dec. ¶ 3). As a distributor for KFC, the Clanton facility had to undergo a YUM audit, which

---

[9] On many occasions, when plaintiff worked night shifts, he left well before the other employees. (Henson Dec. ¶ 9).

is a procedure required by the corporate owner of KFC that consists of an extensive review of the facility's recording keeping and an extensive on-site inspection (Casey Dec. ¶ 3).  To ensure that the record keeping was correct and to prepare for the inspection required significant work by the management in the facility.  (Casey Dec. ¶ 3).  The first YUM audit was in June 2005, and this resulted in additional work on inventory and paperwork. (Casey Dec. ¶ 3).  As Operations Manager, plaintiff was responsible for the YUM audit in the Clanton facility, so Casey had plaintiff go to Jackson for two days of training on how to prepare and handle the YUM audit.[10]  (Casey Dec. ¶ 3).  Having to prepare for the YUM audit required plaintiff to work longer hours and more weekends.  (Henson Dec. ¶ 12).  In total, plaintiff worked eight Saturdays for Merchants Foodservice involving inventories and other business related functions.  (Pl. Depo. p. 153, lines 19-23, p. 154, lines 1-13).

### c.    Scott Casey

Under plaintiff's supervision, the Clanton facility struggled with its performance, and with the changes in Night Shift management, the night

---

[10]  Plaintiff stayed for a half day of training; and, instead of returning to work the next day, plaintiff took the day off.  (Casey Dec. ¶ 3).

shift was struggling.[11] (Casey Dec. ¶ 5). Further, the Clanton facility was having difficulty preparing for the YUM audit. (Casey Dec. ¶ 5). As a result, Mr. Casey began visiting the facility more frequently in the Spring of 2005. (Casey Dec. ¶ 5). Further, with Casey's involvement, plaintiff began reporting to Casey instead of to Henson. (Casey Dec. ¶ 5; Henson Dec. ¶ 13). To improve the facility's performance, Casey expected his managers to work longer hours to ensure everything operated efficiently.[12] (Casey Dec. ¶ 6). In fact, Casey told plaintiff and the other managers in the Clanton facility that he expected them to work more hours. (Casey Dec. ¶ 6). Plaintiff was never willing and/or cooperative about working longer hours. (Casey Dec. ¶ 6). Then, on July 11, 2005, due to the continuing problems on the Night Shift and in training the new Night Shift Manager, Casey proposed to plaintiff that he work a staggered shift of 11 a.m. to 10 p.m., until Tankersley got a better grasp of the job. (Casey Dec. ¶ 7). A couple of hours later, plaintiff submitted a resignation letter, claiming that what he was

---

[11] Plaintiff does not know the numbers for the Night Shift before he started, but he thinks that the numbers on the Night Shift were worse while he was there. (Pl. Depo. p. 153, lines 5-17).
[12] At that point, according to plaintiff, he was working from 6:45 a.m. to 5:15-5:30 p.m. most days. (Pl. Depo. p. 164, lines 16-23).

told in the job interview was not accurate.[13]  (Pl. Depo. p. 178, lines 13-23; p. 181, lines 1-16 & Exh. 20; Casey Dec. ¶ 7).

### 2.    Vacation

On several occasions, Henson allowed plaintiff to leave early on Friday afternoons to go hunting.  (Henson Dec. ¶ 6).  On three occasions, plaintiff requested vacation days.  (Pl. Depo. p. 159, lines 18-23).  Plaintiff claims he twice asked for a Friday off and was told that he could not have the day off.  (Pl. Depo. p. 160, lines 2-5).  Then, in June 2005, plaintiff asked for two days off work; and he claims Henson told him that "now was not the time."  (Pl. Depo. p. 161, lines 6-18).  In fact, plaintiff admits that the facility was "in turmoil" at the time he asked for the two days off work.  (Pl. Depo. p. 161, lines 18-20).  Further, plaintiff's request for vacation was during the weeks preceding the first YUM audit.  (Casey Dec. ¶ 4; Henson Dec. ¶ 6).  As a result, it was not an opportune time for plaintiff to take a vacation.  (Casey Dec. ¶ 4).

---

[13] Plaintiff claims that Casey told him that he was going to have to work 60 hours a week and that he would rotate between day and night shift each week. (Pl. Depo. p. 177, line 23, p. 178, lines 1-12).

**F.    Plaintiff's Complaint**

On June 29, 2006, plaintiff filed his lawsuit, alleging that he was fraudulently induced to accept the job as Operations Manager with Merchants Foodservice.

**G.    Plaintiff's Evidence**

Plaintiff claims there was a 200-plus percent turnover of employees on days and a 400-plus percent turnover on nights. (Pl. Depo. p. 172, lines 22-23, p. 173, lines 1-6). Plaintiff claims hiring and keeping drivers was a constant problem. (Pl. Depo. p. 176, lines 5-13).

Plaintiff also claims that he did not have an avenue to control the workforce and that he was not told that in the interview. (Pl. Depo. p. 212, lines 1-17). In fact, plaintiff did not think anyone could have turned the facility around because of the low pay, which restricted his ability to discipline the employees.[14] (Pl. Depo. p. 146, lines 15-23, p. 147, lines 1-12).

Plaintiff complains that the equipment was "just awful" and that he did not expect it to be in that condition. (Pl. Depo. p. 167, lines 5-15). Henson did not say anything about the equipment during the interview and

---

[14] However, plaintiff felt that Mercier was not running a family-oriented company because he told plaintiff if he did not like his managers to "fire them." (Pl. Depo. p. 99, lines 2-18).

plaintiff did not ask about the equipment during the interview. (Pl. Depo. p. 171, lines 21-23, p. 172, lines 1-4).

## III
## LEGAL STANDARDS

Plaintiff alleges that Merchants Foodservice fraudulently induced him to accept a job by making fraudulent misrepresentations and by fraudulently suppressing information.

**A.    Fraudulent Misrepresentation**

Under Alabama law, a cause of action exists for fraud in the inducement based upon misrepresentations about working conditions. Kidder v. AmSouth Bank, N.A., 639 So. 2d 1361, 1362 (Ala. 1994). To prove a fraud in the inducement claim, plaintiff must show that (1) the defendant had a duty to speak the truth; (2) the defendant made a false representation of a material fact; (3) the plaintiff reasonably relied on the false representations; and (4) the plaintiff suffered loss, harm or damages as a proximate result of the false representation. Kidder, 639 So. 2d 1361, 1362; Jabour v. Aetna U.S. Healthcare, Inc., No. CIV. A. 98-D-900-N, 2000 WL 303639, at *7 (M.D. Ala. Feb. 15, 2000). The Alabama Supreme Court has held that it is fundamental to a claim of fraud in the inducement that the representee must have been deceived by and relied upon the representation as an inducement to his action or non-action. See Anderson v. Amberson,

905 So. 2d 811, 815-16 (Ala. Civ. App. 2004) (citing Ansley v. Bank of

Piedmont, 113 Ala. 467, 21 So. 59 (1896)).

The Alabama Supreme Court has adopted the "reasonable reliance"

standard, which is described as follows:

> "The 'reasonable reliance' standard is, in our view, a more
> practicable standard that will allow the factfinder greater
> flexibility in determining the issue of reliance based on all of
> the circumstances surrounding a transaction, including the
> mental capacity, educational background, relative
> sophistication, and bargaining power of the parties. In addition,
> a return to the 'reasonable reliance' standard will once again
> provide a mechanism . . . whereby the trial court can enter a
> judgment as a matter of law in a fraud case where the
> undisputed evidence indicates that the parties or parties
> claiming fraud in a particular transaction were fully capable of
> reading and understanding their documents, but nonetheless
> made a deliberate decision to ignore written contract terms.

Liberty Nat'l Life Ins. Co. v. Ingram, 887 So. 2d 222, 228 (Ala. 2004)

(quoting Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421 (Ala. 1997).

There is a heavier burden in a fraud in the inducement action where

the allegations involve a misrepresentation relating to an event to occur in

the future. Jabour, 2000 WL 303639, at *7 (citing National Sec. Ins. Co. v.

Donaldson, 664 So. 2d 871, 876 (Ala. 1995)). In those situations, the claim

is known as "promissory fraud," and "the material existing fact that is

misrepresented is the defendant's state of mind, when the defendant

represents that he intends to perform some act although he does not in fact

intend to perform it." Jabour, 2000 WL 303639, at *7 (quoting Spring Hill Lighting & Supply Co. v. Square D Co., 662 So. 2d 1141, 1149 (Ala. 1995)). As such, to prove promissory fraud, a plaintiff must additionally show that "at the time of the alleged misrepresentation (the promise), the defendant did not intend to do the act or acts promised and intended to deceive the plaintiff." Jabour, 2000 WL 303639, at *7 (citing McGriff v. Minnesota Mut. Life Ins. Co., 127 F.3d 1410, 1414 (11th Cir. 1997), and Goodyear Tire & Rubber Co. v. Washington, 719 So. 2d 774, 776 (Ala. 1998)). A plaintiff "must show more than that the defendant failed to fulfill the promised act." National Sec. Ins. Co. v. Donaldson, 664 So. 2d at 876 .

## B.    Fraudulent Suppression

Under Alabama law, to prove fraudulent suppression, plaintiff must show that Merchants Foodservice "failed to disclose a material fact, thereby creating a false impression on which [plaintiff] relied, believing it to be true, which proximately caused damages." McGriff v. Minnesota Mut. Life Ins. Co., 127 F.3d 1410, 1415 (11th Cir. 1997). To prove a *prima facie* case of fraudulent suppression, a plaintiff must show that: (1) the defendant had a duty to disclose an existing fact; (2) the defendant suppressed that existing material fact; (3) the defendant had actual knowledge of the fact; (4) the defendant's suppression of the fact induced the plaintiff to act; and (5) the

plaintiff suffered actual damage as a proximate result. <u>Johnson v. Sorensen</u>, 914 So. 2d 830, 837 (Ala. 2005) (citing <u>Waddell & Reed, Inc. v. United Investors Life Ins. Co.</u>, 875 So. 2d 1143, 1161 (Ala. 2003)).

## IV
## ARGUMENT

### A.    Plaintiff's Fraudulent Misrepresentation Claim Is Due to Be Dismissed.

Plaintiff claims that Henson misrepresented the number of hours he would work, the flexibility of his schedule, the number of Saturdays he would work, the amount of nights he would work, and the amount of vacation he would receive. (Pl. Depo. p. 172, lines 11-21). Additionally, plaintiff claims that Henson misrepresented the stability of the workforce and/or operations and that Suber and Mercier incorrectly told him that Merchants Foodservice was family oriented. (Pl. Depo. p. 81, lines 7-23, p. 82, line 1; p. 172, lines 22-23, p. 173, lines 1-6; p. 98, lines 7-23, p. 99, lines 1-18).

### 1.    Plaintiff's Working Conditions Claims Fail

In <u>Jabour</u>, this Court explained that "statements asserting that a person will be given a particular job or certain working conditions, including compensation and commission scheme at some future time are allegations of promissory fraud because the representation is a promise to take action in

the future." 2000 WL 303639, at *8 (quoting <u>Wade v. Chase Manhattan</u> <u>Mortgage Corp.</u>, 994 F. Supp. 1369, 1376 n.4 (N.D. Ala.), *aff'd mem.*, 132 F.3d 1461 (11th Cir. 1997)). As such, plaintiff's allegations regarding his work hours, his schedule, his night shift work, his vacation, and his Saturday work are claims of promissory fraud because they relate to his future working conditions.

Defendant denies that any false statements were made to plaintiff. Plaintiff was allegedly told that his typical day would be eight to eight and one-half hours a day but was not guaranteed an eight to eight and one-half-hour day every day; plaintiff was allowed a flexible schedule so long as the work was done; plaintiff was not regularly scheduled for nights; and plaintiff was allowed to leave early on Fridays, but his requests for vacation did not meet with business needs.

Further, plaintiff's reliance on Henson's alleged statements regarding his working conditions were not reasonable. Based on his past work experience, plaintiff knew that as Operations Manager he would be responsible for operations and would need to stay until any problems were fixed, even if it meant working later than anticipated. (Pl. Depo. p. 59, lines 6-16). Moreover, plaintiff accepted a promotion and higher pay when he went to work for defendant; and it is not reasonable for him to think that he

would work the same hours he had previously been working. (Pl. Depo. p. 103, lines 9-20). Additionally, as Operations Manager, plaintiff was responsible for the night shift, so it is not reasonable for plaintiff to think he would only have to work a few nights at the start of his employment.

Further, plaintiff received nothing in writing indicating that he would typically work eight to eight and one-half hours a day, could have a flexible schedule, would only work two Saturdays during a year, would not regularly have to work night shifts, and could take vacations whenever he wanted. Instead, plaintiff received an offer letter that provided "[o]ur incentive program recognizes the personal sacrifice and commitment involved in providing leadership and the necessary supervision to improve on current standards." (Pl. Depo. p. 115, lines 5-10 & Exh. 7). Furthermore, the offer letter indicated that plaintiff could be eligible for the 30% bonus based on improving sales and improving current operational and productivity standards. (Pl. Depo. p. 115, lines 19-23 & Exh. 7). It is not reasonable for plaintiff to view his offer letter as limiting his work day to eight or eight and one-half hours a day, with no regular nights, only two Saturdays during a year, and vacation whenever he wanted.[15]

---

[15] In fact, plaintiff requested vacation in the days leading up to the first YUM audit, and it is not reasonable to believe he could take a vacation right before such an audit. (Casey Dec. ¶ 4).

Moreover, plaintiff received employee handbooks and a benefit memo that explained his vacation time. Additionally, the employee handbooks provided that:

> These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of The Merchants Company.

(Pl. Depo. p. 130, lines 11-23, p. 131, line 1 & Exh. 15; p. 131, lines 22-23, p. 132, lines 1-5 & Exh. 17). During plaintiff's employment, Don Suber was the President of the Company; and plaintiff never obtained anything in writing from Suber about his employment, his hours, his vacation, or the workforce. (Pl. Depo. p. 134, lines 3-23, p. 135, line 1).

For these reasons, plaintiff's reliance on Henson's alleged statements regarding his working conditions were not reasonable.

Moreover, there is absolutely no evidence that Henson made any statements with the intent to deceive plaintiff. Plaintiff's allegations are similar to those made in Jabour. In Jabour, the plaintiff alleged, in part, that the defendant fraudulently induced him to accept a job by telling him, *inter alia*, that it would provide infrastructure support, that the plaintiff would have a long-term career opportunity, that the plaintiff would have professional growth, that the defendant had a compensation plan to reward the plaintiff, that the plaintiff would have long term employment, that it was

in the plaintiff's best interests to accept the job, and that the defendant would pay certain travel expenses for the plaintiff. 2000 WL 303639, at *7-8. This Court found that proof that the promises were not fulfilled was "alone insufficient to prove a fraudulent intent." Id. at *8. Further, the Court explained that "[p]laintiff . . . failed to present any evidence that Defendant did not intend to act as promised or intended to deceive him." Id. As such, the Court granted summary judgment to the defendant. Id. at *11.

In the instant case, when plaintiff started working for defendant, he was working eight to eight and one-half hours per day and worked the night shift to get an understanding of how it operated, like plaintiff claims Henson told him. (Pl. Depo. p. 143, lines 4-8; p. 150, lines 2-23, p. 151, line 1). Further, Henson allowed plaintiff to leave early on several Fridays to go hunting. (Henson Dec. ¶ 6). However, three events occurred that Henson had not anticipated when he interviewed plaintiff for the job: (1) the night supervisor was discharged and the night manager resigned; (2) the facility had to undergo a YUM audit; and (3) plaintiff began reporting to Scott Casey, who required all managers to work longer hours and more nights. (Henson Dec. ¶¶ 10-13; Casey Dec. ¶¶ 2-6). These changes resulted in an increased workload, longer hours, more Saturday work to prepare for the audit, and fewer vacation opportunities. (Henson Dec. ¶ 14). As such,

should plaintiff be able to show that any statements made by Henson regarding his working conditions were untrue, there is no evidence that Henson knew those statements were untrue when they were made. Simply believing that Henson "lied" to get plainitff to work at Merchants Foodservice does not show that Henson made any statements with the intent not perform a promise in the future.[16]    (Pl. Depo. p. 156, lines 8-12). Therefore, plaintiff's promissory fraud claims fail, and summary judgment is due to be granted.[17]    See Jabour; Cork v. Marriott Int'l, Inc., 426 F. Supp. 2d 1234, 1244 (N.D. Ala. 2006) (granting summary judgment in part because plaintiff presented no evidence  that any statement was made with the present intent to deceive plaintiff or that there was an intent by defendants not to perform); Hale v. Vencor Nursing Ctrs. E., LLC., 54 F. Supp. 2d

---

[16] Plaintiff believes that the whole process was contrived to get him to accept the job with Merchants Foodservice because the plant was mismanaged and they needed someone to get it running like it should have been. (Pl. Depo. p. 100, lines 2-23, p. 101, lines 1-7). There is no evidence that Merchants Foodservice targeted plaintiff or someone from Sysco for the job. Indeed, Henson did not intend to hire anyone outside of Merchants Foodservice for the job. (Henson Dec. ¶ 17).

[17] Plaintiff admits that Merchants Foodservice paid him the $62,500 per year he was offered and that he was eligible for the 30% bonus. (Pl. Depo. p. 89, lines 15-20; p. 111, lines 19-23). Plaintiff does not think it was possible under the conditions to make the full bonus. (Pl. Depo. p. 213, lines 21-23; p. 214, lines 4-17). Henson told plaintiff that his predecessor made 18 to 20 percent of his salary as a bonus and that there was no reason why he could not expect to do the same. (Pl. Depo. p. 214, lines 18-23, p. 215, lines 1-3). In fact, plaintiff's predecessor, Todd Brooks, made more than an 18-20% bonus. (Mercier Dec. ¶ 6). Therefore, to the extent plaintiff alleges any misrepresentations in his pay, those claims are due to be dismissed.

1272, 1280 (S.D. Ala. 1999) (granting summary judgment on plaintiff's' fraudulent inducement claim because there was no evidence of an intent by defendant to deceive or an intent not to perform the promises at any time prior to plaintiffs' acceptance of full-time employment); Condelles v. Alabama Telecasters, Inc., 530 So. 2d 201, 204 (Ala. 1988) (finding no evidence that defendants had any intention of deceiving plaintiff at the time of the alleged misrepresentations and that failure to perform was not in itself evidence of an intent to deceive).

### 2.    Plaintiff's Claims Regarding the Workforce Fail

Plaintiff also claims that Henson told him that they had a great workforce, including a great day shift, an excellent night shift, and a good core group of drivers. (Pl. Depo. p. 81, lines 9-23, p. 82, line 1). First, these statements are accurate. Henson believed he had a good workforce; and, while there was significant turnover, he had a good core of hourly employees in the warehouse and drivers on whom he relied. (Henson Dec. ¶ 7). Further, the night shift, along with the other shifts, had all the pieces in place but needed the glue to hold them together, which is what Henson told plaintiff. (Henson Dec. ¶ 7; Pl. Depo. p. 101, lines 8-16). Moreover, sales in the facility were increasing; and the facility consistently scored Superior on its AIB audits. (Mercier Dec. ¶¶ 9-10 & Exhs. 1-5). As for Phillip Stitt,

he had received approximately 20% of his salary as a bonus in 2003 and was on pace to receive a 13-15% bonus in 2004. (Mercier Dec. ¶ 8). Because plaintiff has not shown any false statements, his claim is due to be dismissed.

Further, any statements by Henson regarding the workforce and the stability of the workforce are more accurately defined as "puffery" and not statements of material fact. For example, in Cork v. Marriott Int'l, Inc., 426 F. Supp. 2d 1234 (N.D. Ala. 2006), the plaintiff alleged that officials of defendants told her that ExecuStay was the "biggest and best" temporary housing company and that the industry was growing. Id. at 1245. The defendants argued that the alleged statements were "properly viewed as statements 'of opinion amounting to nothing more than "puffery" or predictions as to events to occur in the future.'" Id. (quoting Wade v. Chase Manhattan Mortgage Co., 994 F. Supp. 1369, 1381 (N.D. Ala.), aff'd mem., 132 F.3d 1461 (11th Cir. 1997)). The court agreed and found that the statements were akin to a salesperson saying that "this is the best house in the neighborhood." Cork, 426 F. Supp. 2d at 1246. In fact, the court explained that:

> [T]he hiring of new employees is not unlike a sales pitch. It is understandable that an individual charged with hiring new staff members would want to portray the company in the best possible light. One way to do that would be to try to convince

> the recruit that the company is the best in its industry and that
> there are opportunities for advancement within the organization
> because it is growing.  Therefore, . . . Mr. Novia's alleged
> statements that ExecuStay is the "biggest and best" and that the
> industry is "growing" are mere opinions and cannot form the
> basis of a claim for fraud.

Id.  In the instant case, the alleged statements by Henson were part of a sales

pitch to recruit plaintiff to the job and cannot form the basis of a claim for

fraud.  See Wade v. Chase Manhattan Mortgage Corp., 994 F. Supp. at

1381-82 (finding that statements made as a "sales pitch" in recruiting

employees could not form the basis of a fraud claim).

Moreover, there is no evidence that any statements by Henson were

made willfully to deceive, recklessly without knowledge, or mistakenly.  See

Cork, 426 F. Supp. 2d at 1245.

For these reasons, any claims regarding Henson's statements about the

workforce and performance of the company are due to be dismissed.

### 3.    Any Claims Regarding Merchants Foodservice Being Family Oriented Are Due to Be Dismissed

Finally, plaintiff claims that Mercier and/or Suber misrepresented to

him that Merchants Foodservice was family oriented.  First, Mercier views

Merchants Foodservice as family oriented, and plaintiff admits that family

oriented means different things to different people.  (Pl. Depo. p. 98, lines

11-14; Mercier Dec. ¶ 3).    Therefore, there is no evidence of any false statement.

Second, any statement that Merchants Foodservice is family oriented is opinion and/or puffery and cannot form the basis for a fraud claim. See Cork v. Marriott Int'l, Inc., 426 F. Supp. 2d 1234, 1245-46 (N.D. Ala. 2006).

Finally, there is no evidence that any statements regarding Merchants Foodservice being family oriented were made willfully to deceive, recklessly, without knowledge, or mistakenly. See Cork, 426 F. Supp. 2d at 1245.

For these reasons, any claims regarding the alleged statements about Merchants Foodservice being family oriented are due to be dismissed.

**B.    Plaintiff's Fraudulent Suppression Claim Fails**

Plaintiff claims that Merchants Foodservice fraudulently suppressed the condition of the equipment, the condition of the warehouse, and his ability to discipline. (Pl. Depo. p. 167, lines 2-15; p. 212, lines 1-10; p. 213, lines 5-20).    Plaintiff essentially claims that he did not know Merchants Foodservice was a "mess" when he started working there and that, if he had, he would not have been the one to fix it. (Pl. Depo. p. 37, lines 11-17).

First, plaintiff asked questions during his interview, and defendant's officials answered those questions.[18]  Defendant had no duty to volunteer any additional information.

> "Generally, mere silence does not constitute fraud.  However, §
> 6-5-102, Ala. Code 1975, establishes two situations in which a
> duty to speak could arise: 'from the confidential relations of the
> parties or from the particular circumstances of the case.'  The
> [plaintiffs] do not contend that their relationship with [the
> defendant] was a confidential one.    Therefore, we must
> determine whether a duty to speak arose from the circumstances
> of this case.  In ascertaining whether the circumstances of the
> case created a duty to disclose, 'we must consider a number of
> factors: 1) the relationship of the parties; 2) the relative
> knowledge of the parties; 3) the value of the particular fact; 4)
> the plaintiff's opportunity to ascertain the fact; 5) customs of
> the trade; and 6) other relevant circumstances.'"

Ex parte Life Ins. Co. of Ga., 810 So. 2d 744, 748-49 (Ala. 2001) (quoting

State Farm Fire & Cas. Co. v. Owen, 729 So. 2d 834, 842-43 (Ala. 1998))

In the instant case, plaintiff asked no questions about the condition of the equipment, the condition of the warehouse, or his ability to discipline. There is no allegation that a confidential relationship existed between plaintiff and Merchants Foodservice.  Moreover, in Miller v. SCI Systems, Inc., 479 So. 2d 718, 720 (Ala. 1985), the Alabama Supreme Court explained that an employer is not the fiduciary of the employee. Additionally, the parties were at arms-length in the negotiations; and, while

---

[18] Defendant denies any misrepresentations were made, and defendant further denies that its equipment and facilities were a "mess."

defendant had knowledge of the condition of the equipment, the condition of the warehouse, and plaintiff's ability to discipline, plaintiff was in the position to ask about those areas and chose not to. While plaintiff asked during the first interview to view the warehouse and was not able to do so at that time, he could have asked a second time or refused to accept the job without viewing the warehouse and equipment. For these reasons, no duty existed for Merchants Foodservice to discuss the condition of the equipment, the condition of the warehouse, or his ability to discipline with plaintiff, and any fraudulent inducement claim is due to be dismissed. See Cork v. Marriott Int'l, Inc., 426 F. Supp. 2d 1234, 1247 (N.D. Ala. 2006) (noting, while granting summary judgment, that plaintiff had not even attempted to show that a duty to disclose existed between herself and her employer).

Further, at the time of the interview, Henson did not believe the warehouse or equipment were in poor condition. (Henson Dec. ¶ 7). Moreover, as Operations Manager, plaintiff had the authority to discipline the employees who reported to him; and Henson and Mercier told plaintiff to discipline and/or discharge managers who were not performing. (Henson Dec. ¶ 15; Mercier Dec. ¶ 11). As such, there was no material fact that defendant suppressed.

Finally, plaintiff prepared questions about the hours he would work, whether he would work nights, whether he would lose vacation time, and whether the workforce was stable. Plaintiff prepared no questions about the warehouse, the equipment, or disciplining, and plaintiff asked no such questions. If the condition of the warehouse, the condition of the equipment, or the ability to discipline had been material to plaintiff, he would have asked about them. Therefore, plaintiff cannot prove a *prima facie* case of fraudulent suppression, and his claim is due to be dismissed.

## V
## CONCLUSION

Merchants Foodservice offered the plaintiff a promotion and a raise in pay to work for them. Unfortunately, plaintiff was not prepared to accept the increased workload and responsibility that came with the promotion and pay increase. Therefore, instead of performing his job, plaintiff quit; and he has now claimed he was fraudulently induced to accept the job with Merchants Foodservice. For the reasons discussed above, defendant Merchants Foodservice respectfully requests that the Court grant its Motion for Summary Judgment and dismiss plaintiff's claims with prejudice.

Respectfully Submitted,

*/s/ J. Tobias Dykes*
J. Tobias Dykes (Bar No.: DYK002)
Direct Dial No.: (205) 226-5469
CONSTANGY, BROOKS & SMITH, LLC
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Facsimile:   (205) 323-7674

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Derrick Blythe, Esq.
126 Marshall Street
Alexander City, AL 35010

This 28th day of June 2007.

*/s/ J. Tobias Dykes*
J. Tobias Dykes