IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA
NOTHERN DIVISION

2007 JUL 13  A 9: 38

| | |
|---|---|
| STEVE ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.  2:06-cv-00707-ID-CSC |
| | ) |
| MERCHANTS FOODSERVICE, et al., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S EVIDENTIARY MATERIALS IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff in the above-styled cause and submits this, his Evidentiary

Submissions in Support of his Response in Opposition to Defendants' Motion for Summary

Judgment.

| Exhibit A | Deposition of Steve Adams, April 4, 2007, and attached Exhibits thereto |
|---|---|
| Exhibit B | Affidavit of Steve Adams |

Respectfully submitted this __12__ day of July, 2007.

_____
Derrick Blythe, [BLY 005]
Attorney for Plaintiffs
126 Marshall Street
Alexander City, AL  35010
(256)234-4101

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel of record by placing a copy of the same in the U.S. Mail, postage prepaid, on this __12__ day of July, 2007, addressed as follows:

Thomas A Davis, Esq.
J. Tobias Dykes, Esq.
CONSTANGY, BROOKS & SMITH, LLC
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

Derrick Blythe

*Exhibit A*

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4
5  CIVIL ACTION NO.: 2:06-CV-00707-ID-CSC
6
7  STEVE ADAMS,
8       Plaintiff,
9
10  vs.
11
12  MERCHANTS FOODSERVICE; et al.,
13       Defendants.
14
15
16  DEPOSITION TESTIMONY OF:
17       STEVE ADAMS
18
19
20       S T I P U L A T I O N S
21          IT IS STIPULATED AND
22  AGREED by and between the parties
23  through their respective counsel that

Page 2

1  the deposition of STEVE ADAMS
2  may be taken before Mandy Bryant, a
3  Court Reporter and Notary Public for the
4  State at Large, at the offices of
5  Constangy, Brooks & Smith, L.L.C., One
6  Federal Place, Suite 900, 1819 Fifth
7  Avenue North, Birmingham, Alabama 35203,
8  on the 4th day of April, 2007,
9  commencing at approximately 10:20 a.m.
10          IT IS FURTHER STIPULATED
11  AND AGREED that the signature to and the
12  reading of the deposition by the witness
13  is waived, the deposition to have the
14  same force and effect as if full
15  compliance had been had with all laws
16  and rules of Court relating to the
17  taking of the depositions.
18          IT IS FURTHER STIPULATED
19  AND AGREED that it shall not be
20  necessary for any objections to be made
21  by counsel to any questions except as to
22  form or leading questions and that
23  counsel for the parties may make

Page 3

1  objections and assign grounds at the
2  time of trial or at the time said
3  deposition is offered in evidence, or
4  prior thereto.
5          In accordance with Rule 5(d)
6  of the Alabama Rules of Civil Procedure,
7  as amended, effective May 15, 1998, I,
8  Mandy Bryant, am hereby delivering to J.
9  Tobias Dykes, Esq., the original
10  transcript of the oral testimony taken
11  the 4th day of April, 2007, along with
12  exhibits.
13          Please be advised that this is
14  the same and not retained by the Court
15  Reporter, nor filed with the Court.
16
17
18
19
20
21
22
23

Page 4

1
2
3       I N D E X
4  EXAMINATION BY:          PAGE NO.
5  Mr. Dykes              7
6  Mr. Blythe             210
7
8       E X H I B I T S
9
10  FOR THE DEFENDANTS:
11  1 - Notice of Deposition    61
12  2 - Document               64
13  3 - Social Security Statement 65
14  4 - Earnings Statement      66
15  5 - Photocopy of W-2s       67
16  6 - Application for
17       Employment           108
18  7 - Correspondence         109
19  8 - Resignation Letter and
20       Exit Interview       113
21  9 - Benefits Document      117
22  10 - Incentive Program      121
23  11 - Employee Check History 123

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

```
1        E X H I B I T S (continued)
2
3    12 - Photocopy of Paychecks  127
4    13 - Acknowledgment of Employment
5         Status        128
6    14 - Acknowledgment of Receipt
7         of Handbook        130
8    15 - Employee Handbook      130
9    16 - Acknowledgment of Receipt
10        of Handbook        131
11   17 - Employee Handbook      132
12   18 - E-Mail              168
13   19 - Employee Turnover Analysis
14        Report         174
15   20 - Letter of Resignation  181
16   21 - Complaint          182
17
18
19
20
21
22
23
```

Page 6

```
1       A P P E A R A N C E S
2
3    PRESENT FOR THE PLAINTIFF:
4    Derrick Blythe, Esq.
5    ATTORNEY AT LAW
6    126 Marshall Street
7    Alexander City, Alabama  35010
8
9
10   PRESENT FOR THE DEFENDANT MERCHANTS
11   FOODSERVICE:
12   J. Tobias Dykes, Esq.
13   CONSTANGY, BROOKS & SMITH, L.L.C.
14   One Federal Place, Suite 900
15   1819 Fifth Avenue North
16   Birmingham, Alabama  35203
17
18
19   ALSO PRESENT:
20   Mr. Andy Mercier
21
22
23
```

Page 7

```
1        I, Mandy Bryant, a Court
2    Reporter and Notary Public, State of
3    Alabama at Large, acting as
4    Commissioner, certify that on this date,
5    pursuant to the Alabama Rules of Civil
6    Procedure, and the foregoing stipulation
7    of counsel, there came before me at the
8    offices of Constangy, Brooks & Smith,
9    L.L.C., One Federal Place, Suite 900,
10   1819 Fifth Avenue North, Birmingham,
11   Alabama 35203, commencing at
12   approximately 10:20 a.m., on the 4th day
13   of April, 2007, STEVE ADAMS, witness in
14   the above cause, for oral examination,
15   whereupon the following proceedings were
16   had:
17
18           STEVE ADAMS,
19   being first duly sworn, was examined
20        and testified as follows:
21
22   EXAMINATION BY MR. DYKES:
23      Q.  Mr. Adams, we just introduced
```

Page 8

```
1    ourselves a minute ago.  I'm Toby Dykes.
2    For the record, can you just state your
3    name?
4       A.  Full name is Charles Steven
5    Adams.
6       Q.  Have you ever gone by any other
7    names?
8       A.  Most people call me Steve.  I
9    mean, that's -- you know, any legal
10   stuff as far as buying a home or a car,
11   I do Charles S. or Charles Steven.  But
12   just Steve Adams is what I normally go
13   by.
14      Q.  But no other legal names or
15   anything?
16      A.  No.
17      Q.  No aliases?
18      A.  Huh-uh (shaking head
19   negatively).
20      Q.  I represent Merchants
21   Foodservice in the claim that you have
22   filed against them that we're here about
23   today, and I'm going to be asking you
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 9 | Page 11 |
|---|---|
| 1 some questions about your claim. | 1 18 -- 18 and a half years. I don't |
| 2    A. Uh-huh. | 2 remember when we actually bought the |
| 3    Q. Do you understand that you've | 3 house or moved there, but it was before |
| 4 just been placed under oath? | 4 my son was born, shortly there before. |
| 5    A. I do. | 5    Q. Who lives in that house with |
| 6    Q. Do you understand that this | 6 you? |
| 7 deposition has the same force and effect | 7    A. My wife, son, and daughter. |
| 8 as it would -- as your testimony would | 8    Q. What is your wife's name? |
| 9 if we were sitting in court? | 9    A. Laura. |
| 10    A. I do. | 10    Q. And your son's name is Zac? |
| 11    Q. Now, I'm going to ask you a good | 11    A. Zac. And Hannah is my daughter. |
| 12 number of questions today. I don't | 12    Q. And Zac is 17? |
| 13 always ask the best questions. If you | 13    A. Uh-huh. |
| 14 don't understand a question, will you | 14    Q. How old is -- |
| 15 tell me? | 15    A. Yes. |
| 16    A. Uh-huh. | 16    Q. How old is Hannah? |
| 17    Q. One thing, just to help her job, | 17    A. She's 14. |
| 18 and I know you say uh-huh there, if | 18    Q. Are those your only children? |
| 19 you'll answer a yes or no. | 19    A. Yes. |
| 20    A. Okay. | 20    Q. I take it neither of them are |
| 21    Q. It's hard for her to type that | 21 married? |
| 22 out. | 22    A. No. |
| 23    A. Yes. All right. | 23    Q. Where does Laura work? |

| Page 10 | Page 12 |
|---|---|
| 1    Q. Have you ever given a deposition | 1    A. She works at Russell Medical |
| 2 before? | 2 Center. |
| 3    A. No, I haven't. | 3    Q. How long has she worked there? |
| 4    Q. Have you taken any medications | 4    A. This is just a guess, but I |
| 5 or had any beverages or anything that | 5 would say 14 months. She had her |
| 6 would prevent you from testifying | 6 anniversary there not long ago, so |
| 7 truthfully today? | 7 I'm -- 14 months. |
| 8    A. No. | 8    Q. What does she do at Russell |
| 9    Q. What's your Social Security | 9 Medical Center? |
| 10 number? | 10    A. She is the executive assistant |
| 11    A. 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. | 11 to the CEO of the hospital. |
| 12    Q. Your date of birth? | 12    Q. Is Russell Medical Center in |
| 13    A. 11/28/58. | 13 Alex City? |
| 14    Q. What's your driver's license | 14    A. Yes. |
| 15 number? | 15    Q. Where did she work prior to |
| 16    A. 3763951. | 16 that? |
| 17    Q. Where do you live? | 17    A. She worked for the Lake Martin |
| 18    A. Address? | 18 Regional Economic Development Alliance, |
| 19    Q. Yes. | 19 I believe is the correct name for it. |
| 20    A. 931 Overhill Drive, Alexander | 20    Q. What did she do there? |
| 21 City, Alabama. | 21    A. She was an administrative |
| 22    Q. How long have you lived there? | 22 assistant to the director. |
| 23    A. Zac is 17, so I'm going to say | 23    Q. Did she ever work at SYSCO? |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 13

1   A.  She did.
2   Q.  When did she work for SYSCO?
3   A.  From 1999 until she started at
4   the Economic Alliance, which I don't
5   remember the date on that, but --
6   Q.  What was her job at SYSCO?
7   A.  She was the executive assistant
8   to the president of SYSCO Central
9   Alabama.
10   Q.  Were you working at SYSCO when
11   she started there?
12   A.  I was.
13   Q.  Were you able to help her get
14   the job, or is that something she did on
15   her own?
16   A.  I told our HR director that she
17   would -- that Laura was looking for a
18   job, so to speak, and she asked me just
19   to tell Laura to send her resume.  I
20   guess that was my involvement in it.
21   The rest of it, she did on her own as
22   far as the interview and stuff.
23   Q.  How long did she continue

Page 14

1   working there at SYSCO after you left?
2   A.  Like I said, I don't remember
3   the date she started at the Economic
4   Alliance.  But it was, I'm going to say,
5   six months.  But that's totally a guess
6   and I don't guess that's -- you know.
7   Q.  I realize dates are hard and I'm
8   just trying to get an idea of generally
9   if it was a month or two or if it was a
10   year or what.  And that sounds like it
11   was somewhere in between.
12   A.  Uh-huh.
13   Q.  Did she leave SYSCO voluntarily?
14   A.  Yes.
15   Q.  How long have y'all been
16   married?  It's a tough question, I know.
17   A.  We were married -- I'm trying to
18   think.  I'm glad she's not sitting here.
19   But October the 25th, 1986.
20   Q.  Okay.
21   A.  Now, Laura and I separated for
22   two years or actually were divorced for
23   two years and then remarried.  So I

Page 15

1   don't know if -- overall, I guess, you
2   know, 18 years cumulatively.
3   Q.  When did y'all divorce for those
4   two years?
5   A.  '93 through '95, I guess.
6   Q.  Have you been married to anybody
7   other than Laura?
8   A.  No, I have not.
9   Q.  Ever been engaged to anybody
10   other than Laura?
11   A.  Nobody other than Laura.
12   Q.  Okay.  And I realize this is
13   going to be kind of a broad question,
14   but do you have any relatives that live
15   there in Alex City with y'all or in that
16   area?
17   A.  My mother lives there.  My
18   sister lives there.  Now, by relative,
19   do you mean blood relative to me or --
20   Q.  Well, let's start with --
21   A.  Okay.
22   Q.  Does your mom live by herself?
23   A.  She does.

Page 16

1   Q.  What is her name?
2   A.  Her -- Willie, W-I-L-L-I-E, Jo,
3   J-O, Adams.
4   Q.  And what's your sister's name?
5   A.  Her name is Nyla, N-Y-L-A,
6   Parrish.
7   Q.  Is that P-A-R-I-S-H?
8   A.  Two Rs.
9   Q.  Two Rs.  And does she live in
10   Alex City?
11   A.  She does.
12   Q.  What's her husband's name?
13   A.  She's not married.
14   Q.  Not married.  Okay.  Does she
15   have any children over 18?
16   A.  No children, period.
17   Q.  Do you have any other brothers
18   or sisters that live in the area?
19   A.  My brother lives in Montgomery.
20   Q.  What's his name?
21   A.  William.
22   Q.  Is he married?
23   A.  He is.

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    Q.  What's his wife's name?
2    A.  Carla.
3    Q.  Do they have any children?
4    A.  A daughter, Ashley Ann.
5    Q.  How old is she?
6    A.  11 or 12.
7    Q.  Any other brothers or sisters
8  that --
9    A.  No.  Just the two siblings.
10    Q.  Okay.  Have you got any other
11  blood relatives that live in the area?
12    A.  Got my uncle.  Eldridge Bolin
13  lives in Alex City.
14    Q.  Is he married?
15    A.  He is.
16    Q.  What's his wife's name?
17    A.  Willa Jean.
18    Q.  And as I said, the reason I ask,
19  this is just for a jury, just to know --
20  if we go to trial and we get a jury, I
21  just kind of need to know who your
22  family is.  Because I know for the most
23  part, you want them on the jury.  We

Page 18

1  wouldn't.  So I've got to ask those
2  questions.  Do Eldridge and Willa Jean
3  have any children over 18?
4    A.  Actually, it's -- Willa Jean is
5  his second wife.  My aunt died.
6    Q.  Okay.
7    A.  So uncle's got a daughter named
8  Gloria Payne that lives in -- or Gloria
9  Willis, excuse me, that lives in
10  Dadeville.
11    Q.  All right.  Have you got any
12  other blood relatives in the area?
13    A.  Not in the area, no.
14    Q.  And I guess when I say "in the
15  area," I kind of mean Montgomery, Alex
16  City.
17    A.  I've got an uncle and aunt that
18  live here in Birmingham.
19    Q.  Okay.  And that's fine.
20    A.  Okay.
21    Q.  We're in the Middle District of
22  Alabama, which would cover Montgomery
23  and --

Page 19

1    A.  Okay.
2    Q.  -- probably 90 miles or so
3  around there, I guess.  Well, 60,
4  somewhere in there.  Not as far north as
5  Birmingham.  No further north than
6  Clanton.
7       How about your wife, does she
8  have any family in the area?
9    A.  Uh-huh.  Her mom and dad both
10  live there.
11    Q.  What's their names?
12    A.  Larry and Joyce Peterson.
13    Q.  Does she have any other
14  siblings?
15    A.  Her sister Rhonda Langford.  Her
16  husband is Jerry.
17    Q.  Do they have any children over
18  18?
19    A.  Two.
20    Q.  Okay.  What are their names?
21    A.  Cameron Langford and their
22  daughter Casey.  Lambert is her married
23  name.  She -- actually, Casey lives in

Page 20

1  Atlanta.  Cameron lives in Opelika.
2    Q.  Okay.  Does your wife have any
3  other siblings?
4    A.  Sister Lisa Whitman lives in
5  Notasulga.
6    Q.  Where is that?
7    A.  Between Auburn and Montgomery.
8  It's in Macon County, I believe, but --
9    Q.  Okay.  Is she married?
10    A.  No.
11    Q.  Any other siblings your wife
12  has?
13    A.  A sister, Jean Peterson.
14    Q.  Where does she live?
15    A.  She lives in Alex City.
16    Q.  Is she married?
17    A.  No.
18    Q.  Any children over 18?
19    A.  No.  Now, Lisa does have two
20  daughters that are over 18.
21    Q.  Does she?  Okay.  What are their
22  names, or where do they live, I guess
23  first?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A.   Well, both live in Notasulga.
2    Q.   Okay.  What are their names, if
3    you remember?
4    A.   Kelly is -- Kelly Whitman and
5    Brittany Weldon.
6    Q.   All right.  Does your wife have
7    any other family in the area?
8    A.   Not in the area, no.
9    Q.   Do you go to church?
10   A.   (Witness nods head.)  Yes.
11   Q.   Where do you go?
12   A.   Calvary Heights Baptist.
13   Q.   Is that in Alex City?
14   A.   Yes.
15   Q.   Are you a member of any social
16   clubs or anything in Alex City?
17   A.   No.
18   Q.   Any hunting lodges or fishing
19   lodges or anything?
20   A.   No.  My brother and I, we've got
21   a farm in Coosa County, but --
22   Q.   Other than the lawsuit you filed
23   against Merchants Foodservice, have you

Page 22

1    filed any other lawsuits?
2    A.   No.
3    Q.   Have you ever been involved,
4    other than this one, in a lawsuit as a
5    witness or anything like that?
6    A.   No.
7    Q.   And I know you've got the
8    divorce.  I assume you went to court for
9    that.  But other than that, have you
10   ever been to court for anything?
11   A.   No.
12   Q.   Ever been called to a jury?
13   A.   I served on jury duty one time.
14   Q.   What kind of case was it?
15   A.   The case I actually got struck
16   for the jury on was a murder case.
17   Q.   Okay.  Any other time you've
18   been to court?
19   A.   Just traffic violations.
20   Q.   Traffic violations?
21   A.   Yeah.
22   Q.   Okay.  What type of traffic
23   violations?

Page 23

1    A.   I know one was speeding.  And, I
2    mean, all these were back 20, 25 years
3    ago.  I don't --
4    Q.   Ever been arrested?
5    A.   For a traffic violation, yes.
6    Q.   But other than the traffic?
7    A.   No.  No.  No.
8    Q.   Okay.  Have you ever filed
9    what's called a charge of discrimination
10   with the Equal Employment Opportunity
11   Commission?
12   A.   No.
13   Q.   Ever filed a workers' comp
14   claim?
15   A.   No.
16   Q.   So I take it you've never sought
17   Social Security disability or anything
18   like that?
19   A.   No.
20   Q.   Where did you go to high school?
21   A.   Benjamin Russell.
22   Q.   Where is that?
23   A.   There in Alex City.

Page 24

1    Q.   Have you pretty much lived in
2    Alex City all of your life?
3    A.   Other than the time I was at
4    school at Auburn, yeah.  I mean, I've
5    always been a full-time Alex City
6    resident, I guess.
7    Q.   What year did you graduate from
8    Benjamin Russell?
9    A.   1977.
10   Q.   Did you go to Auburn after you
11   graduated?
12   A.   No.  Actually, I went to the
13   junior college there in Alex City for
14   two years.
15   Q.   What junior college is that?
16   A.   Now it's called Central Alabama
17   Community College.  When I went, it was
18   Alexander City Junior College.
19   Q.   Did you get a degree from there?
20   A.   I think you call it an
21   associates or whatever, but --
22   Q.   Okay.  Was it in anything in
23   particular?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.   No.
2    Q.   **Where did you go after you got**
3 **that degree?**
4    A.   When I left the junior college,
5 I went to Auburn.  That's when I went to
6 Auburn.
7    Q.   **And the junior college was a**
8 **two-year program?**
9    A.   Two-year.
10    Q.   **Did you get a degree from**
11 **Auburn?**
12    A.   No, I did not.
13    Q.   **How long were you there?**
14    A.   Two quarters.
15    Q.   **Why did you leave?**
16    A.   I broke my collarbone during
17 spring break and didn't go to school
18 that quarter because of just being
19 incapacitated and --
20    Q.   **Just didn't go back?**
21    A.   Just didn't go back.
22    Q.   **Okay.  Any other schooling?**
23    A.   Actually, ten years later, I

Page 26

1 enrolled at Faulkner in Montgomery and
2 actually have my bachelor's degree from
3 Faulkner.
4    Q.   **How long did that take?**
5    A.   I think it was -- and, there
6 again, I'm going to say a year.
7    Q.   **Okay.  Is it in a particular**
8 **area, the bachelor's degree?**
9    A.   It's business administration, is
10 what my degree or diploma says.
11    Q.   **Any other type of any other**
12 **schooling?**
13    A.   No.
14    Q.   **Have you had any other type of**
15 **training or anything?  And I assume you**
16 **probably did with jobs that you were**
17 **hired into --**
18    A.   Yeah.
19    Q.   **-- you got some training.  But**
20 **anything outside --**
21    A.   Nothing as far as formal
22 education, no.
23    Q.   **And I guess talking about**

Page 27

1 **on-the-job training, let's kind of work**
2 **through your employment history.  When**
3 **you got out of school, when you left**
4 **Auburn, did you go to work after that?**
5    A.   Yes, I did.  I worked at Russell
6 Corporation.
7    Q.   **What did you do at Russell?**
8    A.   I don't remember the order in --
9 the chronological order.  But, I mean,
10 I've knitted there.  I worked in screen
11 printing.  Worked in the trim department
12 and --
13    Q.   **Were you ever a supervisor --**
14    A.   No.
15    Q.   **-- at Russell?**
16    A.   No.
17    Q.   **How long did you work there?**
18    A.   I guess until 1984 is when I
19 went in the car business, so --
20         (Interruption.)
21    Q.   **(BY MR. DYKES:)  What made you**
22 **decide to leave Russell and go into the**
23 **car business?**

Page 28

1    A.   The owner of the Ford dealership
2 was a good friend of mine and just made
3 it sound like something I'd want to do.
4    Q.   **Was it better pay?**
5    A.   I made more money there, yes.
6    Q.   **What did you do at the Ford**
7 **dealership?**
8    A.   New and used car sales.
9    Q.   **Do you have a schedule that you**
10 **worked?**
11    A.   We worked some form of Monday
12 through Friday and then a half a day on
13 Saturday.
14    Q.   **Were you ever a supervisor**
15 **there?**
16    A.   No.
17    Q.   **Did you notice if the**
18 **supervisors worked more than the**
19 **salesmen?**
20    A.   They didn't.
21    Q.   **Where did you go from the Ford**
22 **dealership?**
23    A.   I went to work for Everett

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

|  | Page 29 |
|---|---|
| 1 | Meadows Construction. |
| 2 | **Q.  Why did you leave and go to** |
| 3 | **Everett Meadows?** |
| 4 | A.  Just it got to where I could no |
| 5 | longer make a living in the car |
| 6 | business. |
| 7 | **Q.  Why was that?** |
| 8 | A.  I wasn't selling any cars. |
| 9 | **Q.  Did you leave voluntarily, or** |
| 10 | **were you asked to leave?** |
| 11 | A.  Yes -- no.  They asked me -- |
| 12 | tried to get me to stay and offered to |
| 13 | change my pay structure, but I'd already |
| 14 | committed to take this other job. |
| 15 | **Q.  When you were having trouble** |
| 16 | **selling cars, did you try to work longer** |
| 17 | **hours or anything to help with that?** |
| 18 | A.  I don't understand your |
| 19 | question. |
| 20 | **Q.  Well, did you try to be in the** |
| 21 | **store more in hopes of selling more** |
| 22 | **cars?** |
| 23 | A.  Well, the dealership had certain |

|  | Page 30 |
|---|---|
| 1 | hours they were open and that's the |
| 2 | hours I worked. |
| 3 | **Q.  Okay.  So you tried to be there** |
| 4 | **when the dealership was open to help** |
| 5 | **sell cars?** |
| 6 | A.  Yes, I guess, to answer your |
| 7 | question. |
| 8 | **Q.  At Everett Meadows, did you just** |
| 9 | **work as a carpenter?** |
| 10 | A.  Uh-huh. |
| 11 | **Q.  Okay.  Were you ever a** |
| 12 | **supervisor there?** |
| 13 | A.  No. |
| 14 | **Q.  Why did you leave Everett** |
| 15 | **Meadows?** |
| 16 | A.  I was offered the job at Alex |
| 17 | City Provision Company. |
| 18 | **Q.  What type of company is that?** |
| 19 | A.  They are a wholesale food |
| 20 | distributor. |
| 21 | **Q.  How does what they do compare to** |
| 22 | **what Merchants Foodservice does?** |
| 23 | A.  In essence, I guess they're the |

|  | Page 31 |
|---|---|
| 1 | same.  They, you know, warehouse |
| 2 | groceries during the day and select them |
| 3 | and ship them at night, so -- |
| 4 | **Q.  Did you say you went in as an** |
| 5 | **operations manager for them?** |
| 6 | A.  No, I did not. |
| 7 | **Q.  What job did you go into there** |
| 8 | **as?** |
| 9 | A.  I actually started -- they hired |
| 10 | me to be -- I'm going to call it a |
| 11 | relief salesperson -- |
| 12 | **Q.  Okay.** |
| 13 | A.  -- to learn the vacation routes |
| 14 | of the various salespeople, so when they |
| 15 | were off or whatever, I could fill in |
| 16 | and run those routes.  And the other |
| 17 | part of my time, I spent as a buyer |
| 18 | buying the retail grocery items and |
| 19 | candy and tobacco. |
| 20 | **Q.  Kind of walk me through your** |
| 21 | **progression there, in terms of what job** |
| 22 | **you went to next and so on.** |
| 23 | A.  Within that company? |

|  | Page 32 |
|---|---|
| 1 | **Q.  Yeah.** |
| 2 | A.  Just in that position till -- I |
| 3 | think they hired me with -- in mind of |
| 4 | me working my way into sales full-time |
| 5 | and that didn't transpire.  So when I |
| 6 | wasn't needed in the relief role of |
| 7 | sales, I actually worked in the |
| 8 | warehouse along with the operations |
| 9 | manager and just learning how the |
| 10 | warehouse works and that type stuff. |
| 11 | And the operations manager actually had |
| 12 | a heart attack in -- somewhere there, I |
| 13 | think -- don't recall the year.  But he |
| 14 | was out of work for a long period of |
| 15 | time.  He had open heart surgery.  When |
| 16 | he returned, he needed to be on |
| 17 | limited/light duty, so we just more or |
| 18 | less did a role reversal.  He became me |
| 19 | and I became him. |
| 20 | **Q.  When did you become the** |
| 21 | **operations manager there?  Do you know a** |
| 22 | **date or time frame?** |
| 23 | A.  When he returned to work is -- |

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1 and was given his limited ability or
2 what he could do because of his
3 condition, when that happened or time
4 frame on it as far as pinning it down, I
5 can't.
6     Q.  Do you know how long you worked
7 as an operations manager there?
8     A.  Probably three-plus years.
9     Q.  As the operations manager there,
10 who did you report to?
11     A.  The owner of the company.
12     Q.  So it was the owner and then it
13 was the ops manager.  Was there any
14 other type of manager there that was
15 higher than you or the same level as
16 you?
17     A.  Same level as me would have been
18 the sales manager who was over sales.
19     Q.  Okay.  What did you do as the
20 operations manager?
21     A.  Responsible for the day shift
22 operations, the night shift operations,
23 and transportation.

Page 34

1     Q.  As the ops manager, did you have
2 a set schedule that you worked?
3     A.  The last couple of years I
4 worked there, I did.  It was sort of --
5 when I first took over, it was sort of
6 as-needed.
7     Q.  What was the name of the owner?
8     A.  Hugh Nabors.
9     Q.  And who was the sales manager?
10     A.  Wayne Fuller, and then he was
11 followed up by John Spain.  John was the
12 sales manager when I left.
13     Q.  Okay.  You said the last couple
14 of years you had more of a set schedule.
15 Before that, you said it was kind of all
16 over the place?
17     A.  Uh-huh.
18     Q.  What do you mean by that?
19     A.  The warehouse didn't run as
20 smooth then as I would like.  It had
21 some problems, some issues, and I would
22 work when I needed to, you know, as far
23 as I've come in to help finish the

Page 35

1 morning shift, I've helped start the
2 night shift, and just in between.
3     Q.  As the operations manager, were
4 you kind of responsible to make sure
5 things got done?
6     A.  Well, actually, I had
7 supervisors who were responsible, but I
8 was ultimately -- the ultimate
9 responsible person, yes.
10     Q.  Did you work nights during that
11 time period?
12     A.  I did.
13     Q.  Did you work any Saturdays?
14     A.  Maybe once or -- one or two
15 Saturdays in a five-year period.  We
16 just didn't open on Saturdays. '
17     Q.  As the operations manager there,
18 if you were getting ready to go and
19 there was a problem that needed to be
20 fixed, would you stay to help fix the
21 problem or would you leave?
22     A.  When that happened, I would
23 stay.

Page 36

1     Q.  Is that something you think is
2 expected of an operations manager?
3     A.  Well, I'm going to say he should
4 have it running where he doesn't have
5 those problems come up.  But on given
6 limited times, then, yes, if it happened
7 every now and then, he should stay.  But
8 if it's happening more than
9 occasionally, he's got something wrong
10 with the way he's running the place or
11 there's something wrong with the way the
12 place is being run.
13     Q.  So let's say it's happening more
14 than occasionally, what would you -- I
15 mean, what do you think, as operations
16 manager, should be done to fix it?
17     A.  I guess find out what the --
18 what the problem is and address that.
19 And if you fix the problem, the problem
20 will go away.
21     Q.  And trying to fix the problem,
22 could that require more work for the
23 operations manager?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    A.  Yes, it could.
2    Q.  Would it be surprising if it
3  required more work to try to fix the
4  problem that was there in the
5  operations?
6    A.  I guess I want to say something
7  here that I --
8      MR. BLYTHE:  Go ahead and say
9  what you want to say.
10    A.  I mean, I see where you're
11  heading me or trying to point me.  My
12  whole point here is that I had no idea
13  the place was in the mess it was in when
14  I went to work there.  That's not what I
15  was told.  Had I known it was in a mess,
16  I wouldn't have been the one there
17  trying to fix it.
18    Q.  Okay.  And --
19    A.  So --
20    Q.  And I understand that.  But if
21  you're working as the operations manager
22  and there's a problem, it would be your
23  job as operations manager to try to fix

Page 38

1  it?
2    A.  Yes.
3    Q.  When you were not the operations
4  manager at Alex City Provision, did
5  your -- did the operations manager who
6  had the heart attack, when there were
7  problems, would he stay and fix them?
8    A.  He or myself, one, would, yes.
9    Q.  And what was the name of the
10  previous operations manager there?
11    A.  His name was Austin Roberson.
12    Q.  As operations manager there --
13  and I'm still talking about at Alex City
14  Provision -- did things always run as
15  smoothly as you anticipated?
16    A.  At what -- are you talking about
17  the entire time there?
18    Q.  When you were the operations
19  manager.
20    A.  At the beginning, no.  Like I
21  said, the last couple of years, they ran
22  real smooth.
23    Q.  Was there ever any turnover

Page 39

1  among your employees?
2    A.  Yes.
3    Q.  Did you ever lose any managers
4  or any supervisors while you worked
5  there?
6    A.  Not while I was employed there,
7  no.  I've had one guy that was my day
8  shift manager there.  George Bluestill
9  is still there.  And the night manager,
10  Mark Lightsey -- well, actually, he
11  replaced George, who died.  But the last
12  time I was by there, Mark was still
13  working there and they were there the
14  whole time I was operations manager.
15    Q.  Were you paid a salary there?
16    A.  I was.
17    Q.  Did you get the same salary no
18  matter how many hours you worked?
19    A.  I did.
20    Q.  How did your vacation work
21  there?
22    A.  After you'd been there a year,
23  you got a week.  I think it was two

Page 40

1  weeks after two years, and then three
2  after ten.
3    Q.  Could you always take vacation
4  when you wanted to?
5    A.  I was never denied a request,
6  no.
7    Q.  Did y'all have an employee
8  handbook at the facility?
9    A.  Alex City Provision?
10    Q.  Uh-huh.
11    A.  We did.
12    Q.  Okay.  Was it your understanding
13  that the policies in the employee
14  handbook were the policies that applied
15  to the employees?
16    A.  Yes.  I mean, they're there as a
17  guideline.  I mean, you can -- I guess
18  some human element factors in, in
19  certain circumstances.  But by and
20  large, they're there for that purpose,
21  yeah.
22    Q.  Okay.  Was the owner of the
23  facility a hands-on owner, or was he

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 41

1  somebody who was hands off?
2      A.  I don't understand your question
3  the way it's posed.  I mean, he was at
4  work every day, yes.
5      Q.  Okay.  That's what I'm just --
6  do you know what type of hours he
7  worked?
8      A.  I don't.
9      Q.  Did you have any type of an
10  incentive program?
11      A.  At Alex City Provision?
12      Q.  At Alex City Provision.
13      A.  No, I did not.
14      Q.  So did you make your salary and
15  then was there any possibility of
16  getting more pay per year than what your
17  annual salary was going to be?
18      A.  No.
19      Q.  Where did you go to work after
20  Alex City Provision?
21      A.  SYSCO Foods.
22      Q.  Is it still known as Alex City
23  Provision?

Page 42

1      A.  No.  Actually, it's -- they
2  changed the name.  It's Alabama Food
3  Group now.
4      Q.  Was that while you were working
5  there or --
6      A.  No.  It was after I left.
7      Q.  Okay.  What job did you go to
8  SYSCO as?
9      A.  Day shift supervisor.
10      Q.  Supervisor?  Okay.
11          Why did you leave Alex City
12  Provision?
13      A.  SYSCO announced they were going
14  to build a facility in Alabama.  I guess
15  anybody in the food service business --
16  or that's what I thought at that time.
17  You know, you see SYSCO in every trade
18  publication, blah-blah-blah.  I just,
19  exploratory more than anything, started
20  the process of trying to find out how to
21  go to work for them.  Then when I
22  learned more about the benefits, which
23  far outweighed what I had at Alex City

Page 43

1  Provision, the starting pay, as a
2  supervisor, was several thousand dollars
3  more than what I was making as the ops
4  manager at Alex City Provision.  So just
5  salary and benefits I guess, you know,
6  what that provided me to be able to do.
7      Q.  Where was the SYSCO plant built?
8      A.  Where?
9      Q.  Yes.
10      A.  Calera.
11      Q.  How close is that to Alex City?
12      A.  62 miles.
13      Q.  How long did it take you to get
14  there?
15      A.  On a good day, a little less
16  than an hour.  On a bad day, an hour and
17  five minutes.
18      Q.  Did SYSCO make you a formal
19  offer to come work for them?
20      A.  Yes, they did.
21      Q.  What was it?  Do you remember
22  what that was?
23      A.  As far as --

Page 44

1      Q.  What the amount was of the
2  offer?  What your pay was going to be?
3      A.  My salary was -- to start was
4  $40,000 a year.
5      Q.  Was there going to be an
6  incentive program there?
7      A.  There was.
8      Q.  How did that work?
9      A.  They would set forth a certain
10  criteria at the beginning of each fiscal
11  year.  And depending, you know, it was
12  six to eight categories that you could
13  excel in and there were certain levels
14  within those categories that you
15  achieved a certain percentage.  And
16  whatever percentage you got, that was --
17  times your salary was your bonus.
18      Q.  Did Alex City Provision make a
19  counteroffer to you or do anything to
20  try to get you to stay?
21      A.  He asked me -- Hugh, when I met
22  with him to tell him that I was leaving,
23  he offered to do whatever it would take

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 45

1  to keep me.
2  Q. What did you tell him?
3  A. That I'd already committed to
4  Eddie O'Connor that I would take the
5  job.
6  Q. What's the job title of Eddie
7  O'Connor?
8  A. When I first went to work for
9  him, he was director of operations and
10  during the interim a year or so later,
11  he was named vice president of
12  operations.
13  Q. I want to go back to the bonus
14  program there at SYSCO. What was the
15  maximum percent bonus you could earn at
16  SYSCO?
17  A. I don't remember exactly the
18  formula for what it was. The last year
19  I was there, my bonus was almost
20  $10,000, so you can equate that to an
21  annual salary of -- I made $992 a week,
22  so it was almost 52,000 a year and my
23  bonus was 10, so whatever that

Page 46

1  formula -- that works out to be.
2  Q. Was that the largest bonus you
3  got while you worked there?
4  A. It was.
5  Q. How did the 10,000 compare --
6  and I know it was your largest. But, I
7  mean, was it significantly larger than
8  you other bonuses or --
9  A. To the best of my recollection,
10  I have had as small a bonus as 4,200 and
11  then I've had some that were 5 and
12  7,000.
13  Q. Kind of depended on how the
14  operations were?
15  A. How my numbers were, yeah.
16  Q. In your job as day shift
17  supervisor at SYSCO, tell me what you
18  did.
19  A. On day shift, we actually --
20  that's when all the inbound freight came
21  in. We did receiving, is what it's
22  called. And we would actually unload
23  the trucks, palletize the merchandise to

Page 47

1  the tie and high, which is so many per
2  layer, so many high, so it would fit in
3  the correct slot. And then do the
4  put-aways, which is actually putting the
5  merchandise into the warehouse. And
6  once they scan the pallet complete,
7  that's what entered it into your
8  inventory. And then we also did
9  letdowns or replenishments, which is
10  preparing the warehouse for the night
11  shift to start their selection process
12  so they've got full slots to start
13  selecting on when they came in.
14  Q. Were you in that job the whole
15  time you worked at SYSCO?
16  A. I was.
17  Q. What were the day shift hours?
18  A. A normal day -- we started every
19  morning at 6:00. I tried to arrive 15
20  minutes early just so I could go ahead
21  and do the letdowns for the day, which
22  involved signing on the computer and
23  just going to a program and printing off

Page 48

1  the slots that were empty that could be
2  full. The crew would show up at 6:00
3  and we'd have a brief two to five
4  minutes -- a little preshift meeting,
5  then the shift would go to work.
6  Q. Okay. What was the typical
7  shift?
8  A. We tried to control our inbound
9  freight and we knew a certain number of
10  pallets, if everything showed up on
11  time, what we could do. But we tried to
12  keep our overtime to a minimum. So, you
13  know, we scheduled our day where
14  typically the crew was gone by 2:30 in
15  the afternoon, 2:45.
16  Q. How big a crew did you have?
17  A. On the dry side, there were
18  three and six. We started out -- when
19  we started, we had six receivers and 12
20  lift operators. When I left, we were --
21  just because the people had learned
22  their job, blah-blah-blah, whatever, and
23  we could handle more freight and do it

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  with less people, I think I had five
2  receivers and ten full-time lift
3  operators.
4      Of course, we had a recoup
5  person that would take care of the
6  damage we had. Had an inbound scheduler
7  and a will-call person who actually took
8  care of the phone-in orders for
9  customers that wanted to come pick a
10  case of this or that up through
11  will-call, so --
12  **Q. Okay.**
13  A. -- probably 15, 16 people.
14  **Q. Okay. At the Alex City**
15  **Provision, how many folks were you in**
16  **charge of?**
17  A. 12. No, don't -- let me add up.
18  I'm trying to think. 12 and eight is
19  20. Probably 28 to 35, something like
20  that. Then that's just strictly a
21  guess.
22  **Q. Size-wise, how did Alex City**
23  **Provision compare to Merchants**

Page 50

1  **Foodservice?**
2  A. Alex City Provision was
3  probably -- probably did -- and this is
4  a guess.
5  **Q. Right, I understand that.**
6  A. From the time I left till I went
7  to Merchants, a lot transpired in there,
8  but --
9  **Q. Well, just while you were**
10  **working at Alex City Provision, how did**
11  **it compare numbers-wise to when you**
12  **started at Merchants Foodservice?**
13  A. They probably did 35 to 40
14  percent of the business that Merchants
15  did.
16  **Q. Did that mean that there were**
17  **more trucks coming and going at**
18  **Merchants than there were at Alex City**
19  **while you were there?**
20  A. Yes.
21  **Q. Were there more people working**
22  **at Merchants Foodservice than there were**
23  **at Alex City Provision while you were**

Page 51

1  **there?**
2  A. Yes.
3  **Q. Who did you report to as day**
4  **shift supervisor at SYSCO?**
5  A. My direct report was Kenny
6  Bowman.
7  **Q. What was his job title?**
8  A. He was day shift manager.
9  **Q. And who did Kenny report to?**
10  A. His direct report would have
11  been Doug Vertein.
12  **Q. Do you know how to spell that?**
13  A. V-E-R-T-E-I-N.
14  **Q. What was his job?**
15  A. He was the operations manager.
16  **Q. What type of schedule did Kenny**
17  **Bowman work?**
18  A. Kenny normally got there
19  probably around 7:00 and then left after
20  me in the afternoon.
21  **Q. How about Doug Vertein?**
22  A. Doug was 8:00 to 5:00.
23  **Q. How do you know he was 8:00 to**

Page 52

1  **5:00?**
2  A. That's what he always said. He
3  couldn't wait on 5:00 to get there where
4  he could leave, so --
5  **Q. Who did Doug report to?**
6  A. He reported to Eddie O'Connor.
7  **Q. Who was the VP of ops?**
8  A. Uh-huh.
9  **Q. Do you know if Doug Vertein's**
10  **schedule changed depending on what was**
11  **going on at work?**
12  A. I can't -- I mean, to my
13  knowledge, no. I mean, if -- I'm not
14  saying that was his schedule,
15  verbatim, the whole time I was there.
16  It could have deviated from time to
17  time. But that was pretty much
18  predominantly his schedule.
19  **Q. But you left, most days, a**
20  **couple of hours before he would leave?**
21  A. Exactly.
22  **Q. So, typically, you weren't there**
23  **when he left?**

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 53

1  A.  No.
2  Q.  Okay.  So the way you know or
3  have knowledge of when he left is just
4  from him saying he was 8:00 to 5:00?
5  A.  Right.
6  Q.  Was SYSCO open on weekends?
7  A.  We're closed on Saturday.  Now,
8  we actually had a crew that would come
9  in on Sunday and work from 8:00 to 12:00
10 on Sunday to do fresh chicken and
11 produce so we'd have fresh product to go
12 out of the warehouse Monday morning.
13 Q.  Did you ever work on Sundays?
14 A.  I have, yes.
15 Q.  As a daytime manager, I assume
16 you probably didn't work nights at
17 SYSCO.
18 A.  The only nights I worked at
19 SYSCO were -- I think two different
20 years, we did a role reversal, so to
21 speak, where I would trade places with
22 one of the night shift supervisors and
23 work.

Page 54

1  Q.  Okay.
2  A.  And he would work days.
3  Q.  Was there ever any turnover
4  amongst the folks on your day shift at
5  SYSCO?
6  A.  During the course of my time
7  there, there were a few that left.
8  Q.  How many, do you think, left?
9  A.  Just a guess?
10 Q.  Yeah.
11 A.  While I was there, I would say
12 on day shift, probably less than six.
13 Q.  How about night shift, do you
14 know what kind of turnover they had?
15 A.  I don't.  I know they would talk
16 about in meetings that our night shift
17 turnover rate was lower than it had --
18 you know, than any other SYSCO house,
19 comparatively speaking.  But to put a
20 number on it, I can't.  I mean, I've
21 still got friends that work at SYSCO
22 that were forklift operators for me from
23 the very beginning of -- you know, of

Page 55

1  the house there that are still there
2  driving forklifts and still receiving.
3  I mean, probably three-fourths of the
4  crew that I started with is still there.
5  Q.  On the day shift?
6  A.  On the day shift.
7  Q.  Okay.  But you weren't
8  responsible for night shift?
9  A.  No.
10 Q.  So you don't personally know
11 what type of turnover there was at
12 night?
13 A.  No, I don't.
14 Q.  Do you know what type of
15 turnover there was among the drivers?
16 A.  No idea.  There again, like the
17 ones I knew, the drivers that actually
18 worked out of there, not shuttle
19 drivers, the same faces were there and
20 still are today, you know.  So I'm
21 assuming it's relatively low because the
22 same ones that were there when I started
23 were there when I left.

Page 56

1  Q.  Right.  But, again, you weren't
2  there so you weren't over
3  transportation?
4  A.  No.  No, sir.
5  Q.  At SYSCO, were you paid a
6  salary?
7  A.  I was.
8  Q.  Do you get the same salary every
9  paycheck?
10 A.  Until July the 1st when we got
11 our raise, yeah, my salary was the same.
12 Q.  Be no matter how many hours you
13 worked, you got the same salary?
14 A.  Right.  And that's -- I knew
15 that going in, so --
16 Q.  Okay.  So if you went on those
17 days you went in on a Sunday, that
18 didn't affect your salary?
19 A.  Well, it didn't.  But I'd get a
20 day off the next week for that.
21 Q.  Do you always get a day off the
22 next week?
23 A.  Yes.  They actually had it where

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 57

1  we would take the following Friday
2  because we gave up a day of our weekend.
3  The week we worked, they gave it to us
4  the following Friday to extend that
5  weekend to make up for it.
6      Q.  Do you know how many Sundays the
7  operations manager worked?
8      A.  None.
9      Q.  Never worked any?
10     A.  Not that I'm aware of.
11     Q.  If he worked a Sunday that you
12  weren't there, you wouldn't know if he
13  was there?
14     A.  I wouldn't know it.
15         MR. BLYTHE:  Is this a good
16  place to take a break?
17         MR. DYKES:  Yeah.  We can take a
18  break.  That's fine.
19         (A break was taken.)
20     Q.  (BY MR. DYKES:)  As the day
21  shift operator or day shift manager at
22  SYSCO, if there were problems that
23  happened on your shift, would you have

Page 58

1  to stay late to fix those?
2      A.  When we -- when we had problems,
3  we fixed them, yes.  I mean, you didn't
4  leave stuff unattended, so --
5      Q.  Do you know, was it the same way
6  for the ops manager?  If there were
7  problems, he would be responsible for
8  staying until they got fixed?
9      A.  Now, any responsible [sic] that
10  I had to stay for always happened within
11  the scope of his regular scheduled time
12  anyway.  I mean, it wasn't like I was
13  there after 5:00 putting fires out or
14  anything like that.  So I don't know.
15     Q.  But you typically left at 3:00,
16  so if a problem came up and you needed
17  to fix it, you might have to stay till
18  4:00?
19     A.  Yeah.
20     Q.  Okay.  And with the ops manager,
21  I know you weren't there when he left,
22  but would you have been surprised if a
23  problem came up at 5:00, if he might

Page 59

1  have to stay till 6:00 or later to fix a
2  problem?
3      A.  I -- no, I guess not.  I mean,
4  you're speaking in the hypothetical, I
5  guess, but --
6      Q.  It's not something that would --
7  if you're an operations manager of a
8  facility and there's a problem that
9  needs to be fixed, as operations
10  manager, you would want to make sure you
11  stayed to get it fixed?
12     A.  I would want it fixed, yes.
13     Q.  Yeah.  Okay.  Even if that meant
14  you're staying a little longer than you
15  had anticipated?
16     A.  Yes.
17     Q.  The Alex City Provision, was
18  that family owned?
19     A.  It was.
20     Q.  How did you like working for a
21  family-owned company?
22     A.  Hugh was always good to me as
23  far as -- you know, I didn't have a

Page 60

1  problem working for a family-owned
2  company, I guess, to answer your
3  question.
4      Q.  Was it a difference working for
5  SYSCO than Alex City Provision in that
6  SYSCO was not a family-owned company?
7      A.  I don't know that the ownership
8  made it any different.  I mean, you do
9  the same things regardless of who owns
10  it.
11     Q.  How did you like working for a
12  more corporate structure?
13     A.  I really enjoyed working for
14  SYSCO, so I never looked at them as a
15  corporate structure.
16     Q.  Did you tell folks at Merchants
17  Foodservice in your interview that you
18  really didn't like working for a
19  corporate structure and missed the
20  family-owned business at Alex City
21  Provision?
22     A.  No, I did not.
23     Q.  Have we talked about all of your

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 61

1  jobs up until the time that you went to
2  work at Merchants Foodservice?
3     A.  Yes, sir.
4     Q.  I'm going to mark as Defendant's
5  Exhibit 1 a notice of deposition.
6       (Defendant's Exhibit No. 1 was
7         marked for identification and
8         is attached.)
9     Q.  Have you seen that, Mr. Adams?
10    A.  I saw several things that looked
11  like this.  But as far as the heading of
12  this, I mean --
13    Q.  And I understand.
14    A.  To definitively say I have, I
15  can't because, I mean, Derrick forwarded
16  me everything and I've looked it over,
17  but --
18    Q.  And your attorney gave me
19  discovery responses this morning and had
20  faxed them to me last night that had
21  documents attached to them.  Other than
22  those documents, do you have -- and I
23  don't want to know anything that you've

Page 62

1  given to your attorney or that your
2  attorney's asked you to do.  But other
3  than those documents, have you got any
4  other documents that you believe support
5  your claims in this case?
6     A.  No, I don't.
7     Q.  Other than those documents that
8  your attorney has given me, have you got
9  any other documents related to your
10  employment at Merchants Foodservice?
11    A.  Not that I -- if -- something
12  may be stuck in a drawer somewhere, but
13  I don't know that it's privy to this
14  matter.  But to the best of my
15  knowledge, no.
16    Q.  Have you got any tape
17  recordings --
18    A.  No.
19    Q.  -- of conversations?  Any videos
20  of anything?
21    A.  No.
22    Q.  I know a lot of times I've got a
23  calendar that I jot stuff down on and

Page 63

1  keep notes on.  Do you have a calendar
2  or anything where you took notes about
3  conversations or things that happened at
4  Merchants Foodservice?
5     A.  Not in my possession anymore,
6  no.
7     Q.  Okay.  Is that something that
8  you gave to your attorney or something
9  that would still be at Merchants
10  Foodservice, or you just don't know?
11    A.  It is something that over time
12  as I began to seek legal advice, that I
13  put everything in one wad, so to speak.
14  And as I got it on my computer, what to
15  me was little tears and scrabbles of
16  paper, you know, once I had it in place,
17  that's -- I don't have them anymore.
18    Q.  I'm going to mark as Defendant's
19  Exhibit 2 a document that your attorney
20  sent me.  Is that something you prepared
21  on your computer, or is that what you're
22  talking about that you put everything
23  together in one spot?

Page 64

1       (Defendant's Exhibit No. 2 was
2         marked for identification and
3         is attached.)
4     A.  If this is the exact copy of
5  what I gave Derrick, then, yes, it is.
6     Q.  Okay.
7     A.  I mean, I'm not reading the
8  whole document.  But it looks exactly
9  like what I handed him, yes.
10    Q.  Okay.  And it's my understanding
11  that this is what was on your computer?
12    A.  Right.
13       MR. DYKES:  Is that --
14       MR. BLYTHE:  It is.
15       MR. DYKES:  Okay.
16    Q.  (BY MR. DYKES:)  So other than
17  what's in here would contain any other
18  writings or notes or anything else that
19  you would have kept, is all going to be
20  right in this document --
21    A.  Exactly.  Correct.
22    Q.  -- in Defendant's Exhibit 2?
23       Okay.  And we'll come back to

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  this because it -- well, let me ask you
2  this: Does this pretty much summarize
3  your allegations against Merchants
4  Foodservice in terms of what you were
5  told?
6      A.  That's it in a nutshell.
7      Q.  Okay.  I'm going to mark as
8  Defendant's Exhibit 3 a Social Security
9  statement that was provided to me
10  yesterday afternoon.
11         (Defendant's Exhibit No. 3 was
12         marked for identification and
13         is attached.)
14      Q.  How do you believe that that
15  supports your claims or is related to
16  the lawsuit?
17      A.  I was just -- the interrogatory
18  or ever how you say that, wanted my W-2s
19  or -- that's just pretty much here.
20      Q.  Okay.
21      A.  What my salary -- I guess just
22  to --
23      Q.  Is that the same information --

Page 66

1  and I've got your W-2s and the SYSCO
2  pay.  Is that the same reason you gave
3  those because it shows salary
4  information?  And you can look at that.
5      A.  Well, salary information, yeah.
6  This is just -- you can see that this
7  was for two days' vacation.  This was my
8  last check there and this is just --
9      Q.  And I'm going to mark -- not to
10  interrupt, but I'm going to mark as
11  Defendant's Exhibit 4 --
12      A.  Okay.
13      Q.  -- an earnings statement from
14  SYSCO, which is what we're talking
15  about.
16         (Defendant's Exhibit No. 4 was
17         marked for identification and
18         is attached.)
19      A.  Right.  And that shows my bonus
20  being the 10,531.50 rather than -- I
21  said around 10, but --
22      Q.  Okay.  And I'm going to mark as
23  Defendant's Exhibit 5 the W-2s from

Page 67

1  2006, 2005, 2004, and 2003.
2         (Defendant's Exhibit No. 5 was
3         marked for identification and
4         is attached.)
5      Q.  Those were provided in response
6  to our request for W-2 information?
7      A.  Correct.
8      Q.  Okay.  I want to talk now about
9  going to work for Merchants Foodservice.
10  How did that -- walk me through that
11  process.  What happened?
12      A.  As in?
13      Q.  Well, I mean, were you looking
14  for a job at Merchants Foodservice?
15      A.  No, I was not.
16      Q.  How were you contacted?
17      A.  By a company by the name of
18  Freedom Search out of Florida, I
19  believe.
20      Q.  Tell me what happened there.
21      A.  Just I was sitting at my desk
22  one day and the phone rang and the guy
23  identified -- told me his name, who he

Page 68

1  worked for, and that he wanted to know
2  if I'd be interested in going to work
3  for a local food company.  And I -- best
4  of my knowledge, my first question was
5  who is it, and he wouldn't tell me who
6  it was.  It was just for someone within
7  a 50-mile radius, blah-blah-blah.  And,
8  you know, I said, well, what does it
9  pay.  And he said, well, they haven't
10  quite determined that.  But he said -- I
11  think he said, I'm thinking it's going
12  to be around 60 or 65,000.  And I said,
13  well, if it's going to pay that, then I
14  would be interested, you know, in
15  talking to them.  And he said, well,
16  he'd get back to me.
17         And he called back a few days
18  later and wanted to know if I was still
19  interested and I said, "Well, what else
20  can you tell me.  And he said, "Well,
21  I'd like to set up an interview for
22  you."  And I don't -- I think that's
23  when I found out it was Merchants.  And,

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 69

1  of course, I had driven by Merchants.  I
2  had seen them -- I used to go to a
3  periodontist in Montgomery, so I'd drive
4  right by there from SYSCO to my dentist
5  in Montgomery.  And that's when the
6  interview was set up.
7      Q.  How long after your
8  conversations was the interview going to
9  be?
10     A.  I want to say 10 to 12 days, but
11  that's strictly a guess.  I have no
12  clue.
13     Q.  Other than this company who
14  called, have you gotten any other calls
15  from somebody asking you to go to
16  another food distributor company?
17     A.  No.
18     Q.  Who was the interview going to
19  be with?
20     A.  It was originally scheduled to
21  be with Hal Henson, Andy Mercier, and
22  Mr. Suber.
23     Q.  What was Hal Henson's job title?

Page 70

1      A.  Either general manager or branch
2  manager.
3      Q.  And what was your understanding
4  of Andy's?
5      A.  At the time, Andy was the vice
6  president.
7      Q.  Okay.  And Don Suber's?
8      A.  Was the president of the
9  company.
10     Q.  You said the interview was going
11  to be with them.  What happened?
12     A.  Well, I -- on the day the
13  interview was scheduled, I showed up
14  about 7:45.  The interview was supposed
15  to be at 8:00.  Hal actually walked out
16  to his car to get something out and, I
17  guess, saw me sitting out there.  He
18  walked over there and asked me if I was
19  Steve.  I told him, yes, I was.  He
20  said, "Well, come on, there's no need to
21  sit out here.  Come on inside."  So I
22  did.  And he told me that Andy and
23  Mr. Suber weren't going to be available

Page 71

1  that day; that he was going to conduct
2  the interview.  And, you know, if things
3  went further or they needed to see me,
4  that they would see me at a later date
5  and time.
6      Q.  Prior to going to the interview,
7  did you do any research on Merchants
8  Foodservice?
9      A.  Looked them up on the Internet,
10  just found out they had been in business
11  for, I think, almost 100 years, that
12  they had started in Mississippi and, you
13  know, from a small up to a top 20 at the
14  time, I think, distributor in the United
15  States.
16     Q.  Okay.
17     A.  Just some background stuff.
18     Q.  Did you know anybody who had
19  worked there?
20     A.  No, I did not.
21     Q.  So tell me what happened after
22  Hal told you that Andy and Don weren't
23  going to be there.

Page 72

1      A.  He said he was going to go on
2  and do the interview and if need be or
3  it progressed far enough, that -- or
4  they needed to see me at some later date
5  and time, then they would arrange that
6  then.
7      Q.  Okay.  What happened after --
8  what happened next?
9      A.  We did the interview.  And do
10  you want specifics on that?
11     Q.  Yeah.  Tell me what happened in
12  the interview.
13     A.  Okay.  On his end, you know, he
14  asked general questions as far as
15  background, where I'd worked, where I
16  worked now.  You know, he asked me to
17  explain some of the stuff we did at
18  SYSCO, how I handled certain situations.
19  Seems like he may have even had a
20  hypothetical, you know, how would you
21  handle this.  And, you know, I explained
22  to him that SYSCO had actually -- and I
23  was a small cog in this wheel and not

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  anything monstrous or big. But that we
2  had been awarded the Hall of Fame Award,
3  which is top recognition in all of 72,
4  at the time, SYSCO houses.
5      And, you know, I explained to
6  him how we did stuff on day shift and as
7  far as doing letdowns and preparing the
8  warehouse for night shift when they came
9  in. And, you know, he was just amazed
10 at this and seemed impressed because
11 that was not the way they were doing
12 things at Merchants. And, basically, he
13 got -- when we finished that, you know,
14 it got to the part did I have any
15 questions, and I did.
16     Q.  In talking about your experience
17 at SYSCO, did you let him know that you
18 weren't in charge of transportation?
19     A.  Yes.
20     Q.  You let him know that you
21 weren't in charge of nights?
22     A.  Yes.
23     Q.  What did you tell him about your

Page 74

1  experience and ability to do the job as
2  an operations manager?
3      A.  I'm not sure I follow you.
4      Q.  Well, just in terms of what --
5  I'm sure he asked you what your
6  background was and why you thought you
7  could be an operations manager for him.
8      A.  At Alex City Provision, I had
9  been the operations manager and I had
10 been involved in day shift, night shift,
11 and transportation. From SYSCO's point
12 of view or what I held at SYSCO, I was
13 strictly a day shift supervisor. But I
14 had the background or the experience
15 from Alex City Provision, my previous
16 job with SYSCO, of being an operations
17 manager.
18     Q.  Was Merchants Foodservice closer
19 to Alex City?
20     A.  Closer mile-wise. Time-wise, it
21 was almost identical because from Alex
22 City to Clanton, 22 is an awful ride.
23 Just -- it's just curvy and hilly and

Page 75

1  two-lane road the whole way, so --
2      Q.  All right. Well, let's talk
3  about the questions that you had for
4  Hal.
5      A.  Uh-huh.
6      Q.  What were those?
7      A.  The first one had to deal with
8  just what hours, you know, I would be
9  expected to work and Hal pretty much
10 answered that question with a question.
11 You know, "Well, tell me what you do at
12 SYSCO." And I explained to him that,
13 you know, the crew came at 5:45 -- I
14 mean, I came at 5:45, the crew at 6:00,
15 they normally finished at 2:30, 2:45,
16 and I was out the door shortly'
17 thereafter at 3:00. And he was like,
18 that's what I could expect to typically
19 work at Merchants was eight to eight and
20 a half hours a day.
21     Q.  Did he tell you you'd never have
22 to work more than that?
23     A.  He never told me I would either.

Page 76

1      Q.  But he did not tell you that you
2  would not work more than eight, eight
3  and a half hours a day?
4      A.  He said that would be a typical
5  day, was his answer.
6      Q.  Was it your understanding, as
7  operations manager, that if there was a
8  problem that needed to be fixed, you
9  might have to stay longer than that?
10     A.  I would think any operations
11 manager or anyone in charge of anything
12 at any given business, if there was a
13 problem, would stay and fix it.
14     Q.  Was anything else said about the
15 time that you would be working there?
16     A.  As far as hours?
17     Q.  As far as hours.
18     A.  No.
19     Q.  What else do you remember about
20 the interview?
21     A.  Well, after the time part was
22 covered, I asked him about night shift
23 work. And he's like, "Well, are you

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 77 | Page 79 |
|---|---|
| 1  opposed to working night shift." And I | 1  about that because when you work that |
| 2  told him that on any given regular | 2  Saturday, you'll receive a day off as |
| 3  basis, that I would be. And then I told | 3  compensation for it." |
| 4  him the reasons why as far as living | 4  **Q. Okay. Anything else about** |
| 5  like where I live and the commute that's | 5  **Saturday work that you remember during** |
| 6  involved and just it's not like you work | 6  **the interview?** |
| 7  in the food business. You don't work | 7  A. No. |
| 8  three eight-hour shifts. You work two | 8  **Q. Tell me what else you remember.** |
| 9  shifts and whatever. But if I was | 9  A. After that, I asked him about |
| 10  working nights, my family was home. | 10  vacation because I explained to him that |
| 11  When I was home sleeping, they were at | 11  at SYSCO right now, I had 12 days. I |
| 12  work or school and that, you know, I was | 12  had two weeks' vacation. And then SYSCO |
| 13  opposed to any regular night shift | 13  actually gave you two personal days |
| 14  schedule or any job that involved any | 14  of -- they called them SYSCO day and |
| 15  night shift schedule. And he said, no, | 15  your birthday. And I explained to him |
| 16  no, nothing like that. He says, "All I | 16  that within a year or in the coming |
| 17  expect you to do would be, you know, | 17  year, I would receive 17 days' vacation. |
| 18  work a couple of shifts or a couple of | 18  And he said, "Well, Merchants' policy |
| 19  nights on the night shift, meet the | 19  was you worked a year and then you got a |
| 20  guys, meet the staff, and just observe | 20  week's vacation." And I said, "Well, |
| 21  and see what's going on and see if there | 21  Hal, I'm not going to give up three |
| 22  are any improvements that you could | 22  weeks' vacation to come to work and work |
| 23  offer that we might want to implement to | 23  a year before I get a week off." And |

| Page 78 | Page 80 |
|---|---|
| 1  give a try." | 1  he's like, no, don't worry about that. |
| 2  **Q. As the operations manager, were** | 2  He says, that's what the book says or |
| 3  **you going to be responsible for the** | 3  what the manual says. He says, "I've |
| 4  **night shift?** | 4  never and wouldn't" -- he says, "I have |
| 5  A. I was going to be responsible | 5  never expected any of my managers and I |
| 6  for everything, yeah. | 6  certainly wouldn't expect you to come to |
| 7  **Q. Okay. When you say** | 7  work and not have any time off for a |
| 8  **"everything," what is -- tell me what --** | 8  year." He said, "You know, after you've |
| 9  A. Day shift, night shift, and | 9  been here and got your feet wet for a |
| 10  transportation. | 10  couple of months, I'll be happy to give |
| 11  **Q. What else do you remember about** | 11  you a Thursday and a Friday to go with a |
| 12  **the interview?** | 12  Saturday and Sunday. And then after |
| 13  A. He told me that -- let me think. | 13  that, if you need a day here or a day |
| 14  I had something and it jumped -- and | 14  there, just ask me." He said, "I'll |
| 15  then something else jumped in. But he | 15  give you all the time you want off." |
| 16  assured me that that wasn't the case | 16  **Q. You said that's what the book** |
| 17  with the night shift. And I didn't ask | 17  **says. What book were you referring to?** |
| 18  about Saturday. He just sort of, as an | 18  A. The handbook, I'm assuming, is |
| 19  afterthought, said, "Now, we will need | 19  what -- he said -- he said Merchants' |
| 20  you to work two Saturdays a year." He | 20  policy. |
| 21  said, "We do a physical inventory twice | 21  **Q. Okay.** |
| 22  a year and that requires working | 22  A. And then the book, I'm assuming, |
| 23  Saturday, you know. But don't worry | 23  is the handbook. |

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 81

1    Q.  And you got a copy of the
2  handbook when you started?
3    A.  I'm sure I must have.  I mean, I
4  signed all sorts of forms.
5    Q.  Okay.  All right.  And we talked
6  about you said Hal told you about
7  vacation.  What else do you remember
8  talking about during the interview?
9    A.  The last thing I really wanted
10 to -- other than, you know, what the job
11 was going to pay, I asked him about the
12 stability of the work force because I'd
13 worked in -- you know, at Alex City
14 Provision, at times, it wasn't always
15 that smooth.  And, you know, we had a
16 rough spot or two at SYSCO.  But, you
17 know, I wanted to know that there was at
18 least a secure steady work force in
19 place and he told me they had a great
20 work force.  I believe his exact thing
21 was a great day shift, an excellent
22 night shift, and a good core group of
23 drivers, best of my recollection is what

Page 82

1  he said.
2      Then he actually went to tell me
3  who was in place as far as department
4  heads or managers and he spoke of Randy
5  Harrington.  And Randy at the time was
6  the operations manager and he said Randy
7  was a super great guy, that, you know,
8  his forte was more in inventory control
9  more than it was running day shift.  But
10 that he expected, you know, the new
11 director of ops would be primarily
12 responsible for the day-to-day of the
13 day shift anyway.  That, you know, he
14 was going to let Randy keep the title of
15 operations manager.  That's something he
16 didn't want to take away from him, that
17 he thought he'd earned it.  But that I'd
18 primarily be running the day shift.
19     He told me Jason Kelly was
20 transportation manager.  He said Jason
21 had started with the company as a
22 driver, had worked his way through, and
23 been promoted to supervisor and then had

Page 83

1  been promoted to transportation manager.
2  He said Phillip Stitt was the night
3  manager and a guy by the name of Rodney
4  Ware was the night shift supervisor.
5  And he just raved about how great night
6  shift's numbers were, how Phillip always
7  maxed out on his bonus and stuff like
8  that and he expected me to do the same.
9  But, you know, he just gave me every
10 assurance that they had a great staff
11 and great work force.
12    Q.  Did y'all talk about salary or
13 pay during your interview?
14    A.  We did.
15    Q.  What did you discuss?
16    A.  I asked him what the job was
17 going to pay.  He said on the low end,
18 possibly 60.  On the high end, around 65
19 with an opportunity for a 30 percent
20 bonus, which was going to be paid out
21 three times a year, I guess.  So I had
22 the opportunity to earn ten percent of
23 my salary three times a year.

Page 84

1      And I remember saying, "Well,
2  you know, I'd certainly like it to be
3  the 65 rather than the 60."  And he
4  said, "Well, that would depend a lot on
5  who we select as the candidate and their
6  credentials and Mr. Suber would figure
7  into that."
8    Q.  Okay.  Anything else you
9  remember about the interview with Hal?
10    A.  Pretty much that was the body of
11 what transpired while I was there and
12 then thought the interview was
13 concluded, yeah.
14    Q.  Okay.  Did y'all talk about
15 having a flexible schedule or anything
16 like that."
17    A.  He mentioned that -- but given
18 the position that they were hiring for,
19 that that guy could actually set his own
20 windows, when he worked those eight
21 hours.  You know, like if I wanted to
22 come in at 6:00 and work till 2:00, that
23 should be fine or sometime I might want

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 85

1  to sleep in or do whatever, you know,
2  come in at 10:00 and work till 6:00,
3  maybe, you know, just to see the night
4  shift guys on occasion. But he told me
5  I, you know, would definitely have the
6  flexibility of setting my own schedule.
7      Q. Okay. And it's my understanding
8  that you're claiming in that lawsuit
9  that Hal Henson told you things during
10 that interview that weren't true. Are
11 there any other things that you claim
12 Hal told you during that interview that
13 were not true?
14     A. I'm not sitting here keeping
15 notes and don't really remember what
16 we've talked about and what we haven't.
17 But I don't recall anything right now.
18     Q. Okay. Well, I mean, we've
19 talked about the hours worked, your
20 schedule, vacations, weekends and
21 nights, and the work force and --
22     A. I do remember one other thing
23 now.

Page 86

1      Q. Okay.
2      A. That I asked what happened to
3  the last director of operations. And
4  Hal hinted that he shouldn't -- you
5  know, that it was something that
6  shouldn't be discussed, but he wanted me
7  to understand that Merchants had been
8  the one to let the guy go and not the
9  guy being dissatisfied or unhappy or
10 anything like that and him resigning,
11 that Merchants had to let him go. And
12 it had to deal with him sending
13 inappropriate e-mails to a female
14 coworker or an employee and --
15     Q. Okay.
16     A. Because he did want me to
17 understand that, you know, the guy had
18 been doing a good job and,
19 unfortunately, had just done some
20 things. Merchants had to let him go,
21 that he hadn't resigned.
22     Q. Did you find out that wasn't
23 true? I mean --

Page 87

1      A. Did I?
2      Q. Are you claiming that wasn't
3  true, that he had been let go because
4  of --
5      A. No. No. No. I thought you
6  were asking me if there was anything
7  else that happened during the interview.
8      Q. I'm just trying to make sure I
9  understand everything you're saying that
10 Hal -- that you claim Hal told you that
11 wasn't accurate.
12     A. Okay. Yeah. As far as -- from
13 what I hear after I went to work there,
14 that was accurate, so I guess that's not
15 a part of what I'm saying was inaccurate
16 or untrue.
17     Q. Okay. I'm just trying to make
18 sure I have -- you're talking about the
19 hours worked, your schedule.
20     A. Off time.
21     Q. The off time.
22     A. And the work force.
23     Q. And the work force. Okay.

Page 88

1      A. Exactly.
2      Q. Now, y'all talk about your pay.
3      A. We did.
4      Q. Are you claiming that anything
5  he told you about your pay was
6  inaccurate?
7      A. As far as the salary that I
8  started at, they actually offered me
9  62-5 to start.
10     Q. Right.
11     A. And that's what my salary -- if
12 you divide that into bimonthly
13 incrementals, that's what my check was
14 for.
15     Q. Okay. And then you got some
16 bonuses while you worked there; is that
17 right?
18     A. I got -- I got -- I was there
19 long enough to go through two bonus
20 periods. And the first one, I didn't --
21 I got something that I didn't earn, is
22 the way I understood it. Said I -- I
23 hadn't been there long enough to

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  qualify, but they were going to give it
2  to me anyway. And then the second time
3  around, I got nothing.
4  Q. Okay.
5  A. And as far as being -- my check
6  was for the amount -- it was supposed to
7  be -- but if you equate that for the
8  hours I was supposed to be working, and
9  I don't know how you want to break that
10  down, I was working more hours, but
11  being paid what I was told I'd be paid
12  to work less hours. So you -- you can
13  figure out if I was paid what I should
14  have been or not, but --
15  Q. You were told you would get paid
16  $62,500 a year?
17  A. Correct.
18  Q. And that's what you were getting
19  paid?
20  A. I did get that, correct.
21  Q. And you understood that you were
22  hired as what is called an exempt
23  employee. Did you understand that? And

Page 90

1  you understood you were going to get the
2  same paycheck each week?
3  A. I knew I was salaried, yeah.
4  Q. So you understood you were going
5  to get the same paycheck each week
6  whether you worked one hour or whether
7  you worked 100 hours?
8  A. The way you posed the question,
9  yeah, I understand that.
10  Q. So we've talked about your
11  interview with Hal. What happened next?
12  A. Hal excused himself from the
13  conference room and closed the door when
14  he left and he came back just a real
15  short time later and he said that Andy
16  and Mr. Suber were able to get away and
17  were on their way and they'd really like
18  to talk to me that day if it was
19  possible. And I told him that, you
20  know, I'd taken a day off from SYSCO, a
21  vacation day, so I really didn't have
22  anything planned. And he said, well, if
23  I could hang around 45 minutes to an

Page 91

1  hour, they should be here. And I told
2  him that would be fine.
3  I asked him would he carry me on
4  a warehouse tour, you know, let me meet
5  the guys that were there. And he said
6  that wouldn't be a good idea right now,
7  that they hadn't told any of the staff
8  that they had made the decision to hire
9  a new director of operations and rather
10  than -- thought it would be best just to
11  wait till that announcement had been
12  made before I came out. And at the
13  time, I understood that.
14  And, so, he suggested I run down
15  to the corner and just get a snack or
16  something and kill about 45 minutes and
17  then come back, which is what I did.
18  And at that time, Andy and Mr. Suber
19  joined the interview.
20  Q. At any time did you ask to go
21  back another time to take a tour of the
22  warehouse?
23  A. No.

Page 92

1  Q. Why not?
2  A. I just didn't.
3  Q. All right. Tell me what
4  happened when you came back and Andy and
5  Don were there.
6  A. Hal made the introductions and
7  we shook hands. Told them I was glad to
8  meet them. It was a pleasure to meet
9  them. Hal took the floor and briefly
10  filled them in on what had transpired
11  during, I think, as far as my background
12  and work history and stuff like that and
13  just, I guess, open the floor, so to
14  speak, for Mr. Suber and Andy.
15  And best I remember, Mr. Suber
16  was the first one to ask me a question
17  and he wanted to know about my
18  experience with KFC, Kentucky Fried
19  Chicken and the Foodservice contracts or
20  what goes on with handling the KFC
21  account. And he explained that
22  Merchants was in the process of trying
23  to garner that account. And I told him

23 (Pages 89 to 92)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 93

1  that at SYSCO, we had had that contract
2  for two years and that from a day shift
3  supervisor standpoint, I was familiar
4  with the warehouse tour that took place,
5  the records you have to keep, you know,
6  as far as on certain items that come in,
7  you have to record the received date,
8  the pack date, the expiration date. You
9  know, there's a lot of record keeping
10  involved in doing it the way they want
11  you to do it.
12      And I explained to him that I
13  was aware of what took place on the day
14  shift. You know, that night shift and
15  transportation-wise, I didn't. But from
16  the day shift point of view, I did, and
17  he was happy to hear that. And he asked
18  me if -- you know, at the time, I really
19  didn't understand why, but the next
20  question he asked me was he wanted my
21  assurance that I was 100 percent
22  anti-union and --
23      Q. What did you tell him?

Page 94

1      A. I told him that at SYSCO, we had
2  always gone out of our way to avoid any
3  union. I mean, SYSCO had union houses.
4  At SYSCO Alabama, we were non-union and
5  that's the way we liked it and I
6  preferred working in that type of
7  atmosphere, the non-union atmosphere.
8  Where actually from a discipline
9  standpoint, the supervisor can go
10  directly through the employee rather
11  than having to go through, you know, a
12  steward or something like that.
13      Q. Okay. What else do you remember
14  about the interview?
15      A. I remember Andy wanting to know
16  or asking me if I was HACCP certified or
17  if I knew about HACCP, which is -- I
18  guess layman's terms is hazard analysis
19  and critical control points. And that
20  has to do with proper procedures in
21  handling of fresh produce or primarily
22  seafood and poultry, but just fresh
23  refrigerated items coming into the

Page 95

1  warehouse.
2      And I told him that I was HACCP
3  certified, that, you know, with SYSCO
4  they required people on day shift to --
5  or in the receiving to be HACCP
6  certified. And I'd gone to Tampa and
7  recently gotten that HACCP
8  certification, but that I wasn't a
9  practicing HACCP coordinator or anything
10  like that.
11      We had a -- we had a guy in
12  inventory control that was -- actually
13  walked the floor on the cold dock that
14  was HACCP certified and it was his
15  responsibility to do everything. I was
16  just more or less certified as a backup.
17      Q. Okay. Anything else?
18      A. You talked earlier about a
19  corporate mandate or something. That
20  was Andy's terminology; not mine. He
21  seemed to think that, for some reason,
22  at SYSCO we're under extremely a lot of
23  pressure. You know, driven by the

Page 96

1  corporate mandate. And I was as candid
2  and honest with him. I said that wasn't
3  the case where I worked. That was not
4  the case at SYSCO. That, you know, we
5  did a great job. We won a lot of
6  awards, but we just had good people in
7  place that cared about their job and
8  with a little direction, they did their
9  job and did it right. That I'd never
10  experienced any pressure put on me to do
11  this or do that or whatever.
12      I made mention to the fact that,
13  you know, it could have been that way in
14  sales. It could have been that way in
15  marketing. You know, I couldn't speak
16  for those departments. I don't work
17  there. But it definitely wasn't that
18  way at SYSCO. I told him I had a great
19  boss in Eddie O'Connor. I enjoyed what
20  I did. I liked working there, but that
21  there wasn't any corporate mandate that
22  dictated how we did business.
23      Q. At least from your --

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 97

1    A. From my --
2    Q. -- from your perspective?
3    A. Yeah, from my perspective.
4    Q. As operations and the day shift
5  manager?
6    A. I think -- I know Andy and I
7  think Mr. Suber both talked about how
8  valuable family was to Merchants, you
9  know, and how it wouldn't be like
10  working at SYSCO. That, you know, they
11  were really in tune to the family aspect
12  of an employee and that I'd really enjoy
13  working there because, you know, of how
14  they thought, you know, family oriented
15  they were. And, you know, I'm like,
16  well, that can only be a good thing, you
17  know, so --
18    Q. Anything else you remember about
19  the interview?
20    A. Nothing other than it ended
21  with, you know, handshakes and thanking
22  them for letting me be there. I
23  appreciated the opportunity that they

Page 98

1  were affording me. You know, Hal said
2  they had one more guy to interview and
3  that they'd be in touch with me in a few
4  days.
5    Q. Okay.
6    A. And that's when I left.
7    Q. Is there anything you claim that
8  Don or Andy said that was incorrect
9  during y'all's interview?
10    A. The only thing -- and this,
11  again, is from my perspective, okay? I
12  guess family oriented to some people
13  means one thing and to others, it means
14  something else. But that point was
15  driven home to me during the course of
16  the interview and, trust me, from my
17  first day on the job, I knew I had made
18  a bad mistake because of what I was
19  expecting when I walked in the door and
20  what I actually walked in the door to.
21    But in several conversations
22  that ensued shortly after my employment
23  there, it had to do with day shift

Page 99

1  management, transportation management,
2  night shift management, you know. And
3  for whatever reason, Andy just, point
4  blank, told me if they're not who you
5  want there, fire them. And I'm like
6  okay. And when we'd hang up the -- you
7  know, fire them and put somebody in
8  there you want or somebody that can do
9  the job and when I'd hang the phone up
10  with him, that was always the first
11  thought that would come to my mind is
12  that's really family oriented, you know.
13  A man's got four or five, whatever,
14  years invested and don't talk to him or
15  try to do this, just fire him was the
16  answer. So I'm going to say from my
17  perspective, that was an untruth in the
18  interview that they're family oriented.
19    Q. Okay. But to your knowledge --
20  you don't know what Andy or Don
21  considered to be family oriented?
22    A. No, I don't. That's why I tried
23  to explain that when I made the

Page 100

1  statement.
2    Q. Do you think they were making
3  those statements to try to get you to
4  come to work there? I mean, is that
5  something you're claiming in this
6  lawsuit?
7    A. That's what I'm claiming, yes.
8  That's what I'm asserting, is that
9  everything that was contrived in that
10  interview was to entice me to come to
11  work for them.
12    Q. Why do you think they did that?
13    A. There again, are you wanting why
14  I think they did?
15    Q. Yeah.
16    A. I think, just from what I saw
17  the first day on the job, is that
18  warehouse could not have been more
19  mismanaged. I've never been in a
20  nastier facility. I mean, it was
21  downright nasty. The equipment was
22  abused and although it was new in age
23  year-wise, it looked ancient. I mean,

25 (Pages 97 to 100)

# FREEDOM COURT REPORTING

|  | Page 101 |
|---|---|

1  it just really had been mistreated.  And
2  I think they wanted someone to come in
3  there and snap their fingers, wave a
4  magic wand, do whatever, and turn it
5  into a warehouse that was running like
6  it should have been running instead of
7  the mess that it was.
8  **Q.  Well, didn't they tell you in**
9  **the interview they needed a strong**
10 **leader to kind of keep people going in**
11 **the right direction?**
12 A.  To continue what they had going,
13 yeah.  The way I think Hal put it was
14 they had all the right pieces to the
15 puzzle in place and just needed the glue
16 to hold them there.
17 **Q.  What happened next after the**
18 **interview?**
19 A.  I left and went back home.  And
20 a couple or three days later, Hal called
21 me and said he'd like to make me a job
22 offer, but really didn't want to make it
23 over the phone.  And I told him it would

|  | Page 102 |
|---|---|

1  be hard for me to get away from work.
2  And he said, well, what if we meet
3  halfway and we actually met -- I can't
4  remember the little town now that's
5  halfway between Calera and Clanton at a
6  little Jack's Restaurant there.  And I
7  asked him if I could bring my wife with
8  me, you know, because we were going to
9  do it at lunch.  And he said, "Yeah,
10 that would be fine.  I'd love to meet
11 her."
12      So we actually did and he told
13 me the job offer.  And, you know, there
14 again, even to Laura, the family
15 oriented, he's going to love working
16 here, you know, he's made the right
17 decision.  And, you know, he made
18 assurances to her that I wouldn't have
19 to worry, you know -- she wasn't losing
20 me forever, that he was going to give me
21 plenty of time off when I needed it.
22 So -- and, you know, when he made me the
23 job offer, I asked him to think -- you

|  | Page 103 |
|---|---|

1  know, I needed time to think about it.
2  And he said that I needed to do
3  something pretty quick because they were
4  ready to make a move and I asked him for
5  the weekend.  I said, "Well, can I let
6  you know something on Monday."  He said,
7  "Sure, that's fine.  But let me know
8  about it Monday."
9      And Laura and I talked about it
10 at length over the weekend and, you
11 know, you start putting numbers together
12 and potentials, you know, and $62,000
13 salary and 30 percent bonus, you know,
14 I'm looking at making 80 grand a year is
15 best case scenario.  And given what I
16 was making at SYSCO, that was an instant
17 promotion almost, you know, from day
18 shift supervisor to day shift manager or
19 somewhere between manager and operations
20 manager.  And just given what I could do
21 for my family with that income, you
22 know, and, like I said, it was going
23 from day shift supervisor to a director

|  | Page 104 |
|---|---|

1  of operations position.
2  **Q.  Which that would be a promotion**
3  **to go from a day shift supervisor to an**
4  **operations manager?**
5  A.  That's the way I viewed it,
6  yeah.
7  **Q.  Okay.**
8  A.  But just given financially what
9  I could do for my family, we decided to
10 do it.  It was still the hardest, I
11 think, decision I've ever done in my
12 life.  Just I loved what I did at SYSCO.
13 I loved working for SYSCO.  I loved my
14 employees.  They weren't employees to
15 me.  They were friends and like family.
16 I remember the day I left, I actually
17 had to leave early.  Eddie just told
18 me -- he said, "You just go on.  You're
19 killing yourself here trying to say
20 good-bye to them and crying and carrying
21 on."  And, you know, I just -- that was
22 the hardest decision I've ever made in
23 my life.  And hugging them and crying on

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  them and them crying with me and missing
2  me and me going to miss them and -- but
3  I could see past that a little ways to
4  what I could do for my family with
5  making this move, so I decided to do it
6  and I did it.
7      Q.  After you left Merchants
8  Foodservice, did you try to go back to
9  SYSCO?
10     A.  No, I did not.
11     Q.  Why not?
12     A.  I guess a couple or three months
13  into me being with Merchants, SYSCO
14  actually did a fold-out, which is
15  splitting off their existing business in
16  Calera.  And I think they gave almost a
17  third of it to the new house they were
18  opening in Geneva.  So they had an
19  abundance of management people, forklift
20  guys, receivers, you know, where they
21  were used to doing 200 million a year;
22  all of a sudden, they were going to be
23  down to 115 million a year and --

Page 106

1      Q.  Okay.
2      A.  So, I mean, there just wasn't a
3  place there.  And, you know, they tried
4  their best when I turned in my letter of
5  resignation to them to get me not to do
6  it.  You know, to get me to rethink it,
7  was I making a wise decision.  And, you
8  know, I guess from a pride standpoint,
9  early on, just didn't want to eat crow
10  and even go back and beg for my job
11  back.  But, you know, I figured maybe
12  make the best of it, try as hard as I
13  could do and, hopefully, I could turn it
14  around and make it somewhere where I
15  could work, but --
16     Q.  Why did your wife leave SYSCO?
17     A.  She left SYSCO -- and I don't
18  remember the time frames from me leaving
19  Merchants.  I don't know if that
20  happened before I left Merchants or
21  after I left Merchants.  But she was in
22  a -- her position, she sat on a -- not a
23  pedestal, but right outside in being the

Page 107

1  executive assistant to the president,
2  she was not held in confidence with a
3  lot of -- you know, afraid to go through
4  on up the chain.  And Laura's not a real
5  outgoing person anyway.  She's sort of a
6  loner and when I wasn't at SYSCO
7  anymore, she lost her lunch partner she
8  had every day.
9          And just eventually the job came
10  open in Alex City that, in essence, was
11  about the same salary she was making at
12  SYSCO without the commute.  And she was
13  back home with the kids, you know,
14  could -- we weren't pawning them off on
15  mother anymore to get them to school or
16  anything like that, you know.  Laura was
17  back home and could sleep late, could
18  get the kids to school.  She'd be there
19  if they had a need to leave school, you
20  know.  So she moved back just for a
21  logistical standpoint, especially since
22  I wasn't there anymore, but --
23     Q.  You knew, still, you were going

Page 108

1  to have a commute going back and forth
2  to Clanton when you took the job at
3  Merchants Foodservice?
4      A.  Sure.
5      Q.  Did you get an offer letter from
6  them?
7      A.  I did.
8      Q.  I guess first, in the scheme of
9  all this, when did you complete an
10  application?
11     A.  After they hired me.
12     Q.  Okay.
13     A.  Best I remember.
14     Q.  Okay.  I'm going to mark as
15  Defendant's Exhibit 6 an application for
16  employment.
17         (Defendant's Exhibit No. 6 was
18         marked for identification and
19         is attached.)
20     Q.  Do you recognize that,
21  Mr. Adams?
22     A.  Yeah.
23     Q.  If you'll turn to the last page,

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  is that your signature on the
2  applicant's signature?
3     A.  It is.
4     Q.  And is the date August the 11th,
5  2004?
6     A.  Looks like it is, yeah.
7     Q.  I'm going to mark as Defendant's
8  Exhibit 7 what I'm going to describe as
9  an offer letter, if you'll look at that
10  as well.
11      (Defendant's Exhibit No. 7 was
12      marked for identification and
13      is attached.)
14     Q.  Is Defendant's Exhibit 7 the
15  offer letter that you received?
16     A.  It is.
17     Q.  And I'm not trying to trick you.
18  I'm just trying to figure out the time
19  order.  The application is dated August
20  the 11th.  The offer letter is dated
21  August 20th and signed August the 23rd.
22  So do you think you probably
23  filled the application out before since

Page 110

1  it is dated August the 11th?
2     A.  No.  I mean, to the best of my
3  knowledge, I filled this out my first
4  day on the job.
5     Q.  Okay.
6     A.  Now, I could have postdated it
7  at Hal's request, but he says, you know,
8  this is something we should have already
9  done.  But I did not fill out the
10  application until I went to work for
11  Merchants.
12     Q.  Okay.  The August 11th, 2004, is
13  that your handwriting?
14     A.  It is.
15     Q.  And looking at the application,
16  you're asked do you have any -- this is
17  on page 2.  Do you have any special
18  circumstances which might prevent you
19  from working all scheduled work and
20  overtime, including weekends, and you
21  checked no; is that right?
22     A.  Uh-huh.
23     Q.  Was there anything that was

Page 111

1  preventing you from working longer hours
2  than you -- working more than eight
3  hours a day?
4     A.  Didn't anything prevent me from
5  working it.  I worked every hour they
6  wanted me to work.
7     Q.  And looking at the offer letter,
8  I know you just -- you just read through
9  it.  Is there anything in the offer
10  letter that you claim is not accurate?
11     A.  I mean, that's the offer letter
12  I received.
13     Q.  Okay.  Well, you received the
14  offer letter and we talked about your
15  pay was $62,500.
16     A.  Uh-huh.
17     Q.  And that's accurate, right?
18     A.  Yeah.
19     Q.  Okay.  You were eligible for a
20  30 percent bonus.  Do you dispute that
21  you were eligible for a 30 percent
22  bonus?
23     A.  No, I don't.

Page 112

1     Q.  It says the company has a
2  benefits program.  Did you receive the
3  information on the benefits program?
4     A.  I did.
5     Q.  Does this offer letter say
6  anything about the hours that you were
7  going to be working?
8     A.  The offer letter doesn't, no.
9     Q.  Does the offer letter say
10  anything about whether or not you'd have
11  to work nights?
12     A.  The offer letter doesn't.
13     Q.  Does the offer letter say
14  anything other than in terms of vacation
15  that you would be -- other than you'd be
16  provided the usual holidays, including
17  vacation days?
18     A.  No, it doesn't.  Can I add one
19  other point to that, though?  I didn't
20  make my determination to take this job
21  on this offer letter.  I made it based
22  on the interview.  So if I can say that,
23  then we'll go on.

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 113

1  Q.  Okay.  And this doesn't say
2  anything about anything -- you can
3  strike that.
4      I'm going to mark -- do you
5  remember, did you receive the offer
6  letter before you sent in your
7  resignation to SYSCO?
8      A.  I'm sure I did.  I wouldn't have
9  resigned before I knew I had a job.
10     Q.  I'm going to mark -- these are
11 some of the documents that you produced
12 that I got yesterday -- as Defendant's
13 Exhibit 8.
14         (Defendant's Exhibit No. 8 was
15         marked for identification and
16         is attached.)
17     Q.  Is that your resignation and
18 exit interview from SYSCO?
19     A.  It is.
20     Q.  The resignation letter is marked
21 August the 23rd of 2004; is that right?
22     A.  Uh-huh.
23     Q.  And you signed the acceptance

Page 114

1  letter to Merchants Foodservice on
2  August 23rd, 2004; is that right?
3      A.  Where is that?
4      Q.  On the second page.  It's got
5  your name and the date.
6      A.  Correct.  Best I remember, I
7  signed this at lunch and then when I
8  came back, having made my decision, is
9  when I actually sat down and hand wrote
10 the letter of resignation after I signed
11 the offer with Hal at lunch.
12     Q.  Okay.  Did you ask Hal why there
13 was no mention in the offer letter about
14 the hours you were going to be working?
15     A.  I've never seen that in an offer
16 letter.
17     Q.  Well, I'm just asking, did you
18 ask him?
19     A.  No, I did not.
20     Q.  Did you ask him why he didn't
21 put in here --
22     A.  No, I did not.
23     Q.  -- anything about your vacation?

Page 115

1      Did you ask him why he didn't
2  say anything in here about working
3  nights or Saturdays?
4      A.  No, I didn't.
5      Q.  Paragraph 2 of this offer letter
6  reads, "Our incentive program recognizes
7  the personal sacrifice and commitment
8  involved in providing leadership and the
9  necessary supervision to improve on
10 current standards."  Did you ask him
11 what was meant by that?
12     A.  No, I did not.
13     Q.  From this offer letter, did you
14 understand that to receive a bonus, that
15 sales would need to improve and
16 operational and productivity standards
17 would need to improve?
18     A.  That was not my understanding.
19     Q.  Well, it says you'll be eligible
20 for up to a 30 percent bonus based on
21 improving sales and improving current
22 operational and productivity standards.
23 What was your understanding of that?

Page 116

1      A.  What Hal told me during the
2  process was that -- and I don't remember
3  the guy's name who I replaced.  But he
4  told me, when he was explaining the
5  salary and bonus offer, that the former
6  individual that had been running things
7  routinely made 18 to 20 percent of his
8  bonus on a regular basis.  So he led me
9  to believe that that's what I could
10 expect to make going in.
11     Q.  Do you know --
12     A.  He didn't mention anything about
13 improving it.  That was just status quo.
14 Walk in the door and that's what I could
15 expect.
16     Q.  Do you know what the numbers
17 were for the operations manager before
18 you got there?
19     A.  I do not.
20     Q.  So you don't know if his numbers
21 were better than yours?
22     A.  I don't.
23     Q.  I'm going to mark as Defendant's

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  Exhibit 10 [sic] a memo to new employees
2  regarding -- from Merchants Foodservice
3  regarding benefits.
4      MR. BLYTHE:  You marked that as
5  9.
6      MR. DYKES:  Yeah.  I think it is
7  supposed to be 9.  9 is the benefits
8  memo.
9      Q.  (BY MR. DYKES:)  Do you remember
10  receiving this benefits memo from
11  Merchants Foodservice?
12      (Defendant's Exhibit No. 9 was
13      marked for identification and
14      is attached.)
15      A.  I do not remember receiving it,
16  but I'm sure I did just as part of their
17  package, I mean -- but I don't recall
18  this particular document.
19      Q.  And I realize you haven't
20  signed it.  I was just -- and I -- your
21  letter refers to a benefits program and
22  this seems to be the benefits memo that
23  explains what benefits you would be

Page 118

1  entitled to.  Would you agree with that?
2      A.  This is their benefits plan,
3  yes.  And what each employee, according
4  to this, will receive.
5      Q.  Okay.  And we've talked about
6  what you say Hal Henson told you about
7  vacation.
8      A.  Uh-huh.
9      Q.  But is this your understanding
10  of what the vacation was for other --
11  for employees when they were hired?
12      A.  It was my understanding this is
13  what an hourly employee would receive.
14  According to Hal, any new manager he
15  hired would not be expected to work a
16  year without any time off.
17      Q.  And I understand that's what you
18  are saying that Hal told you.
19      A.  Yeah.
20      Q.  This is your understanding of
21  what a new employee -- if they weren't
22  told anything beforehand, this is what
23  they would receive?

Page 119

1      A.  Right.
2      Q.  And that would be what their
3  vacation would be?
4      A.  Right.
5      Q.  Were these the holidays that
6  y'all received?
7      A.  To the best of my recollection,
8  yes.
9      Q.  I mean, were you eligible for
10  life insurance and the other benefits
11  that it indicates in here that you would
12  have been eligible for?
13      A.  Without reading and seeing what
14  they are, I don't know.  I know I
15  applied for short term and long-term
16  disability, I believe, but -- and I had
17  my health insurance with them.  Some of
18  the stuff, I wasn't interested in.  But,
19  yeah, I participated in some of these,
20  yes.
21      Q.  Okay.
22      MR. DYKES:  What time is it?  Do
23  you know?

Page 120

1      MR. BLYTHE:  12:30.
2      MR. DYKES:  Do y'all want to
3  take a quick break for lunch?
4      MR. BLYTHE:  Are you going to
5  go?
6      MR. DYKES:  I've still got a
7  decent amount to do.
8      MR. BLYTHE: Yeah, that's fine.
9      MR. DYKES:  Okay.  Now is a fine
10  time with me to take a break, if you
11  want to do that.  Maybe come back in 45
12  minutes or something, or an hour.  It
13  doesn't matter to me.
14      MR. BLYTHE:  Why don't we take
15  an hour if we're going to do it because
16  I have to find somewhere to eat.
17      MR. DYKES:  Okay.
18      (A break was taken.)
19      Q.  (BY MR. DYKES:)  Mr. Adams, we
20  were talking about your interview and
21  the process of getting hired on there at
22  Merchants Foodservice and we had talked
23  some about your salary and the bonus

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 121

```
1   structure. I am going to mark as
2   Defendant's Exhibit 10 the incentive
3   program for Steve Adams dated October 1,
4   2004 through September 30th, 2005. Do
5   you recognize that?
6         (Defendant's Exhibit No. 10 was
7          marked for identification and
8          is attached.)
9   A.  I do, yes.
10  Q.  Looking at the first page, does
11  this represent the potential for a 30
12  percent -- for a bonus for 30 percent
13  of -- 30 percent of your salary over the
14  course of a year, that potential?
15  A.  Unless I'm adding wrong, looks
16  like nine, but --
17  Q.  Well, if we got -- let's look at
18  it together. Because I've got one, two,
19  three, four, five, six, seven, eight,
20  nine, ten.
21  A.  Okay. I missed one of the ones
22  from the indentation there, I think.
23  Q.  Okay.
```

Page 122

```
1   A.  Okay.
2   Q.  Would that be potential for ten
3   percent --
4   A.  Right.
5   Q.  -- three times a year?
6   A.  Right.
7   Q.  Is that right?
8   A.  Uh-huh.
9   Q.  Okay. And that's what you were
10  told during your interview process that
11  you would be eligible for?
12  A.  Correct.
13  Q.  Then if we look at the second
14  page, it looks like for period three of
15  '04, that you received $734.78. That
16  was prorated for the one month you would
17  have worked in that period; is that
18  accurate?
19  A.  I don't remember the specifics,
20  but I do remember receiving one the
21  first time it rolled around. I remember
22  it seems like Hal said I shouldn't have
23  been eligible, but -- and that may be
```

Page 123

```
1   the prorated part or whatever. But,
2   yeah.
3   Q.  Okay. So you don't dispute that
4   you received it?
5   A.  No, I don't. Not at all.
6   Q.  Then looking for period one
7   2005, it looks like a 2,606.35 bonus for
8   period one of 2005. Does that sound
9   accurate to you?
10  A.  I don't remember ever receiving
11  anything other than the first one. Now,
12  I could be wrong, but --
13       MR. DYKES: Okay. Let's see.
14  If you'll give me one second, I'm going
15  to go print off a couple of things.
16       MR. BLYTHE: Sure.
17       (A break was taken.)
18  Q.  (BY MR. DYKES:) I'm going to
19  mark as Defendant's Exhibit 11 an
20  employee check history.
21       (Defendant's Exhibit No. 11 was
22          marked for identification and
23          is attached.)
```

Page 124

```
1   Q.  I'll represent this is a payment
2   history for your employment --
3   A.  Okay.
4   Q.  -- with Merchants Foodservice.
5   If you'll look for February 25th, 2005,
6   that shows a check for 2,606.34.
7   A.  Uh-huh.
8   Q.  Would that match the bonus for
9   period one, 2005?
10  A.  Uh-huh.
11  Q.  Okay. And do you just not
12  remember receiving the check or do you
13  say that you -- are you claiming you
14  didn't get a bonus check?
15  A.  I'm not claiming I didn't get
16  it.
17  Q.  Okay.
18  A.  I'm saying I don't remember
19  getting it. I remember getting the
20  first one.
21  Q.  Okay.
22  A.  And I was thinking that's all I
23  got. I'm not saying I didn't get it.
```

31 (Pages 121 to 124)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 125

1  I'm saying I don't remember it. And to
2  the best of my recollection, I got the
3  first one.
4      Q.  Okay.
5      A.  Can I ask you a question?
6      Q.  Yes.
7      A.  On this period two, 2005, what
8  dates are these through?
9      Q.  Period two goes through May 31
10 of '05.
11     A.  May 31 of '05.
12     MR. DYKES:  Isn't that -- is
13 that right?
14     MR. BLYTHE:  It would be
15 February 1 through May 31.
16     A.  I don't understand the -- what
17 I'm seeing on this -- the third page,
18 period two, and I guess I'm asking the
19 question -- maybe this is not my place,
20 but my numbers look better in period two
21 than they do in period three. And I see
22 percent bonus -- 109 percent of my bonus
23 equals zero and bonus percentage from

Page 126

1  period one, 104 was worth 2,606. I
2  mean, I know you are not here to explain
3  things to me, but I don't understand
4  that part of it, but --
5      Q.  For period two, 2005, it's your
6  understanding you didn't get a bonus
7  that period?
8      A.  To the best of my recollection,
9  I only received the one. I'm not saying
10 that's all I received. But I'm saying
11 that's all I remember receiving.
12     Q.  Okay.
13     A.  But I remember one where I
14 didn't get anything. Now, basically, I
15 don't remember a third period, so it
16 very well could be this one. I remember
17 one I got and I remember one I was told
18 I didn't get anything. I guess what I'm
19 not understanding is, if my bonus number
20 or percentage should have been 109.9, I
21 don't see how that equates to zero when
22 104.25 on the bonus percentage equates
23 to 2,606.

Page 127

1      Q.  Okay.
2      A.  But other than that, I concur
3  with what you are saying.
4      Q.  And then in terms of your -- of
5  your pay -- pay every two weeks, I'm
6  going to mark as Defendant's Exhibit 12
7  a document that I received yesterday,
8  which are two paychecks. Do you
9  recognize those?
10         (Defendant's Exhibit No. 12 was
11         marked for identification and
12         is attached.)
13     A.  I do.
14     Q.  Okay. And those show your
15 pay -- you received the same pay every
16 two weeks of --
17     A.  Correct.
18     Q.  -- of 26 -- well, 2,604.17?
19     A.  Uh-huh.
20     Q.  Okay. After you started working
21 for Merchants Foodservice, did you
22 receive an acknowledgment of employment
23 status from them?

Page 128

1      A.  Which is?
2      Q.  I'm going to mark as Defendant's
3  Exhibit 13 the Merchants Foodservice
4  acknowledgment of employment status.
5         (Defendant's Exhibit No. 13 was
6         marked for identification and
7         is attached.)
8      Q.  Do you recognize that,
9  Mr. Adams?
10     A.  Uh-huh.
11     Q.  Did you read that before signing
12 it?
13     A.  Yes. I mean --
14     Q.  Is that your signature at the
15 bottom?
16     A.  It is my signature.
17     Q.  And that's dated August 24th,
18 2004?
19     A.  Correct.
20     Q.  Did you read this before signing
21 it?
22     A.  I did.
23     Q.  The last paragraph of -- the

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

| Page 129 | Page 131 |
|---|---|
| 1   last sentence of paragraph 1 provides, | 1   2004 on it. But -- |
| 2   "In addition, I understand that | 2     Q. And I'm going to ask you a |
| 3   Merchants Foodservice retains the right | 3   question in a minute. But is that your |
| 4   to alter, revise, change, or eliminate | 4   signature there on the one that's got |
| 5   any of its policies, practices, or rules | 5   8/1/02 on the bottom? |
| 6   and any of its pay or benefits at its | 6     A. On -- |
| 7   discretion at any time without | 7     Q. Of employee's signature. |
| 8   necessarily giving me or any other | 8   Looking at Defendant's Exhibit 14? |
| 9   employee advance or actual notice." Did | 9     A. Yeah, this is my signature. |
| 10   you understand that -- | 10   Yes. |
| 11     A. I do. | 11     Q. Okay. And I want to mark as |
| 12     Q. -- when you signed that? | 12   Defendant's Exhibit 16 an acknowledgment |
| 13     A. Yes. | 13   of having received an employee handbook |
| 14     Q. Did you ask any questions of | 14   dated 1/27/05. Do you recognize |
| 15   anybody about this? | 15   Defendant's Exhibit 16? |
| 16     A. I did not. I guess -- this was | 16       (Defendant's Exhibit No. 16 was |
| 17   all filled out after I was hired, | 17       marked for identification and |
| 18   though; not prior. Just for your | 18       is attached.) |
| 19   information, if -- you know, I didn't | 19     A. I do. |
| 20   fill all this out as a prerequisite to | 20     Q. Is that your signature on there? |
| 21   being employed there. I was already an | 21     A. It is. |
| 22   employee when I filled all of this | 22     Q. I'm going to mark as Defendant's |
| 23   paperwork out. | 23   Exhibit 17 an employee handbook dated |

| Page 130 | Page 132 |
|---|---|
| 1     Q. I'm going to mark as Defendant's | 1   January 1, 2005. Do you recognize that? |
| 2   Exhibit 14 an acknowledgment of having | 2       (Defendant's Exhibit No. 17 was |
| 3   received the Merchants company handbook | 3       marked for identification and |
| 4   dated -- with an 8/1/02 date at the | 4       is attached.) |
| 5   bottom. Do you recognize that, | 5     A. I do. |
| 6   Mr. Adams? | 6     Q. If you will, look for the |
| 7       (Defendant's Exhibit No. 14 was | 7   employee handbook dated January 1, 2005. |
| 8       marked for identification and | 8   It has an acknowledgment form with it |
| 9       is attached.) | 9   that has the January 1, 2005 date that |
| 10     A. I do. | 10   you signed on January 27th, 2005. This |
| 11     Q. And this shows, for a handbook | 11   is Defendant's Exhibits 16 and 17. |
| 12   dated 8/1/02, an acknowledgment of | 12     A. Uh-huh. |
| 13   receipt that I'm going to mark as | 13     Q. Would you agree that the |
| 14   Defendant's Exhibit 15, an employee | 14   Defendant's Exhibit 15, which has the |
| 15   handbook dated 8/1/2002. Do you | 15   8/1/02 date on it, matches up with the |
| 16   recognize Defendant's Exhibit 15? | 16   employee handbook that has -- that's |
| 17       (Defendant's Exhibit No. 15 was | 17   Defendant's Exhibit 15 that has 8/1/02 |
| 18       marked for identification and | 18   on it? Let me start over. I may just |
| 19       is attached.) | 19   start that whole question over again. |
| 20     A. It's dated August 1, 2002. I'm | 20       Defendant's Exhibit 14 has an |
| 21   assuming -- I thought they updated this | 21   8/1/02 date at the bottom of it; would |
| 22   every year, so I'm assuming I was | 22   you agree? |
| 23   probably given one that probably had | 23     A. Yeah. I mean, that's what's |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 133

1  there, yeah.
2  **Q. And the employee handbook has**
3  **the date of 8/1/02 on it?**
4  A.  Okay.
5  **Q. Would you agree with that?**
6  A.  I'm looking at it, yeah.
7  **Q. Okay. So by signing the**
8  **acknowledgment from the employee**
9  **handbook dated 8/1/02, would you agree**
10  **that you received -- that this is the**
11  **employee handbook that you received, the**
12  **one dated 8/1/02? I'm not trying to**
13  **trick you.**
14  A.  Yeah. Yeah. I mean, and -- I
15  received a handbook on two different
16  occasions. You know, this has got
17  8/1/02 and that has got 8/1/02. So I'm
18  good to go with that.
19  **Q. Okay. Looking at Defendant's**
20  **Exhibit 15, which is the 8/1/02**
21  **handbook, would you have looked through**
22  **the handbook when you got it?**
23  A.  I'm sure I may have gazed

Page 134

1  through it. I'm sure I didn't read it
2  verbatim from start to finish.
3  **Q. When you started working for**
4  **Merchants, who was the president of the**
5  **company?**
6  A.  When I started for Merchants?
7  **Q. Uh-huh.**
8  A.  Don Suber.
9  **Q. Did you ever receive anything in**
10  **writing from Don Suber regarding your**
11  **employment?**
12  A.  No.
13  **Q. Okay. Did you receive anything**
14  **from Don about the hours that you were**
15  **going to work?**
16  A.  No.
17  **Q. Did you receive anything in**
18  **writing from Don about your vacation or**
19  **night work?**
20  A.  No.
21  **Q. Did you receive anything from**
22  **Don about the work force and the**
23  **stability of the work force?**

Page 135

1  A.  No.
2  **Q. Turn to page 5 of Defendant's**
3  **Exhibit 15, which is the 8/1/02**
4  **handbook. The vacation benefits, are**
5  **those the vacation benefits that are**
6  **described in the benefits package that**
7  **we looked at earlier?**
8  A.  Benefits package --
9  **Q. The benefits memo that we looked**
10  **at earlier --**
11  A.  Yeah. Yeah. Yeah.
12  **Q. -- which is Defendant's**
13  **Exhibit 9.**
14  A.  Yes.
15  **Q. I'm looking at Bates No. 17,**
16  **which is the employee handbook -- or**
17  **looking at Exhibit No. 17, which is an**
18  **employee handbook dated January 1, 2005.**
19  **Would you have looked at this handbook**
20  **when you received it?**
21  A.  Probably not, other than just
22  the fact that I got it and knew it was a
23  handbook. And, there again, I may have

Page 136

1  scanned it to see if there were anything
2  different from the prior handbook. But
3  as far as reading it cover to cover,
4  word for word, no.
5  **Q. If you look at page 4 for**
6  **employment status category, would you**
7  **agree that you would be categorized as**
8  **an exempt employee -- as a salaried**
9  **employee who is not subject to the**
10  **overtime provisions of the Fair Labor**
11  **Standards Act?**
12  MR. BLYTHE:  What page you on?
13  MR. DYKES:  Page 4.
14  THE WITNESS:  4.
15  A.  Yes, I would.
16  **Q. (BY MR. DYKES:)  I think I'm**
17  **done with the handbook, so no more**
18  **confusing exhibits.**
19  **So we've gotten up to the time**
20  **that you were hired and you signed the**
21  **policies and have gone in and are**
22  **starting as an operations manager. As**
23  **an operations -- as the operations**

34  (Pages 133 to 136)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  manager at Merchants Foodservice, just
2  tell me what you did.
3      A.  As far as?
4      Q.  What were your job duties?
5      A.  Just the day-to-day operation of
6  the inbound freight on day shift, the
7  selection process and shipping at night
8  and the transportation or the delivery
9  process the following morning.
10     Q.  And who did you report to?
11     A.  Hal Henson would have been my
12  direct report.
13     Q.  What was his job title?
14     A.  There again, I'm thinking it was
15  branch manager, but it could have been
16  general manager.
17     Q.  Do you know how long Hal had
18  been with Merchants Foodservice when he
19  started?
20     A.  To the best of my recollection,
21  approximately two years.  But that's a
22  guess.  That's --
23     Q.  Who would have been the other

Page 138

1  managers that you would have worked --
2  that would have been under you as -- who
3  would have been the managers under you
4  as operations manager?
5      A.  Would have been Randy Harrington
6  on day shift, Jason Kelly in
7  transportation, and Phillip Stitt was
8  the night manager.
9      Q.  Was Rodney Ware a supervisor?
10     A.  Supervisor, yeah.  I thought you
11  asked for managers.
12     Q.  I did.  I did.
13     A.  Okay.
14     Q.  Who were your other supervisors?
15     A.  Seneca Kinsey on day shift and
16  Rodney Ware on nights.
17     Q.  How long had Randy Harrington
18  been with the company?
19     A.  Here again, I'm pulling from --
20     Q.  Just to the best of your
21  knowledge.  I mean --
22     A.  Four years.
23     Q.  Was Randy still working there

Page 139

1  when you left?
2      A.  He was.
3      Q.  Jason Kelly, how long had he
4  been with the company?
5      A.  About the same length of time I
6  think in -- that's employment with the
7  company as a driver, supervisor, and
8  manager.
9      Q.  Do you know how long he had been
10  transportation manager?
11     A.  He was named that during my
12  predecessor's tenure.  So to be honest
13  with you, I'm going to say less than two
14  years.
15     Q.  Well, how long had that facility
16  been in Clanton?
17     A.  We built the facility in --
18  SYSCO in Calera, I went to work for them
19  in '98.  We started shipping groceries.
20  It was under construction and then
21  completed in January of '99.  Clanton
22  Merchants was, best of my
23  recollection -- like I said, I wasn't up

Page 140

1  and down that road a lot -- that
2  facility broke ground after we were up
3  and operating in '99.
4      Q.  Okay.
5      A.  So it was a newer facility than
6  the -- and had been there less time at
7  that location than the one -- the SYSCO
8  place in Calera.
9      Q.  Was Jason Kelly still working
10  there when your employment with
11  Merchants --
12     A.  He was.
13     Q.  How long had Phillip Stitt been
14  with the company when you started?
15     A.  There again, you're -- three
16  years, four years.  I think Phillip
17  actually may have been there longer than
18  that.  I think he actually worked --
19  they had a place in Montgomery, I
20  believe, that he worked at before he
21  came.  So Phillip probably had more time
22  than either Jason or Randy, but --
23     Q.  Was Phillip still working there

35 (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 141 | Page 143 |
|---|---|
| 1   when your employment ended? | 1     Q.  Was he still there when you |
| 2     A.  No, he was not. | 2   left? |
| 3     Q.  Why not? | 3     A.  He was. |
| 4     A.  He was on the verge of being | 4     Q.  When you started at Merchants |
| 5   fired for absenteeism when he resigned. | 5   Foodservice, what hours were you |
| 6     Q.  Were you going to fire him for | 6   working? |
| 7   absenteeism? | 7     A.  I started out going in at 7:30 |
| 8     A.  Yes. | 8   and getting off at 4:30. |
| 9     Q.  How long had he been there when | 9     Q.  How long did you do that? |
| 10   this happened -- when he resigned? | 10     A.  Extremely short period of time. |
| 11     A.  I want to say seven to eight | 11   I can't give you a time frame, but it |
| 12   months. | 12   was extremely short. |
| 13     Q.  How about Rodney Ware, how long | 13     Q.  Why did your hours change? |
| 14   had he been at the company when you | 14     A.  Just I was told that I needed to |
| 15   started? | 15   be there longer. |
| 16     A.  Rodney, I don't know. A couple | 16     Q.  Who told you that? |
| 17   of years, I'm guessing. He was a | 17     A.  Hal did. |
| 18   selector that they had moved up to | 18     Q.  Did he tell you why? |
| 19   supervisor. | 19     A.  Just from day one when I -- like |
| 20     Q.  Was Rodney still there when you | 20   I said when I went to work there, just |
| 21   left? | 21   everything about that place was a mess; |
| 22     A.  No, he was not. | 22   day shift, night shift, transportation, |
| 23     Q.  What happened to him? | 23   shorthanded. Just -- there was just no |

| Page 142 | Page 144 |
|---|---|
| 1     A.  He was fired for sexual | 1   way to do what needed doing in an |
| 2   discrimination. | 2   eight-hour period. And, I mean, just |
| 3     Q.  When did that happen? | 3   after a short indoctrination, that's |
| 4     A.  The incidence that he was fired | 4   what he told me to do, you know. And |
| 5   for happened -- I don't remember his | 5   it -- he didn't look at what time I came |
| 6   termination date. But when it came to | 6   to work, which was always before him. |
| 7   my -- it was less than a week after I | 7   He looked at what time I left, which if |
| 8   found out about it, was when he was | 8   it was before him, he always had |
| 9   fired. | 9   something to say to me. And, I mean, |
| 10     Q.  Okay. Was it around the same | 10   somebody doesn't have to say something |
| 11   time that Phillip Stitt left, or was it | 11   to you -- you know, even on a day where |
| 12   before? | 12   we actually had a good day and things |
| 13     A.  No. It was a couple of | 13   went smooth, if I walked by his office |
| 14   months -- I'm thinking it was a couple | 14   and he was still sitting in his office |
| 15   of months before Phillip. | 15   before 5:00, he'd say, "You leaving |
| 16     Q.  Is it Seneca? | 16   already." And, I mean, you get the |
| 17     A.  Seneca. | 17   message. You understand that, you know, |
| 18     Q.  Kinsey? | 18   you need to stay here longer. |
| 19     A.  Uh-huh. | 19     Q.  Could you have come in later? |
| 20     Q.  How long had he been with | 20     A.  Could I have? |
| 21   Merchants? | 21     Q.  Yeah. |
| 22     A.  I want to say Seneca had been | 22     A.  No. |
| 23   there a couple of years. | 23     Q.  Why not? |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 145

1    A.  Because what we were doing at
2    that time as far as trying to get the
3    employees to be there on time and not
4    come in when they wanted to be, Seneca
5    had to start part of the day shift and
6    we had other things that I needed to do
7    just with the assisting the day shift
8    starting.
9    **Q.  Did you ever call Don Suber and**
10   **talk to him about the hours you were**
11   **working?**
12   A.  No, I did not.
13   **Q.  Did you call Andy about the**
14   **hours you were working?**
15   A.  No, I did not.
16   **Q.  As operations manager, were you**
17   **responsible for making sure the**
18   **operations worked smoothly?**
19   A.  I was.
20   **Q.  From what you found when you got**
21   **there, did you think you were going to**
22   **be able to get things to work smoothly?**
23   A.  I don't understand what you're

Page 146

1    saying.  I -- at some point in time, I
2    hoped I would, yes.  Just because I -- I
3    had no other choice.  I had given up
4    what I had at SYSCO to go to work there.
5    I mean, my alternative was make this
6    work or do something else.
7    **Q.  Did you think you were qualified**
8    **to get things turned around with what**
9    **you found?**
10   A.  I think I was -- had I been
11   given what I needed to turn it around, I
12   would have been qualified, yes.  I don't
13   think anybody, given what I had to work
14   with, was qualified to turn it around.
15   **Q.  What do you think you should**
16   **have been given?**
17   A.  Well, Andy and I talked on
18   numerous occasions about what we paid
19   our employees and it was a minimal
20   amount.  I mean, they could make at
21   McDonald's what our forklift guys were
22   making.  And compared to what we paid at
23   SYSCO, it was five or six dollars an

Page 147

1    hour less.  So my employees, they didn't
2    care whether they came to work.  They
3    didn't -- you know, if they missed work,
4    there were no repercussions.  My hands
5    were pretty much tied where I couldn't
6    discipline them.  And, you know, if they
7    lost their job, they could go to work
8    and a lot of them did.  You go by
9    Hardee's sometime early in the morning
10   and get a biscuit and I'd see one of my
11   ex-employees working in the Hardee's
12   drive-through window.
13   **Q.  I don't know why you said your**
14   **hands were tied in terms of discipline.**
15   **Why couldn't you discipline anybody?**
16   A.  Because the shift -- the '
17   turnover rate, we worked so shorthanded,
18   that I actually did, during the course
19   of my short tenure there, terminated two
20   or three employees and we had some
21   repercussions on night shift with some
22   trucks leaving later than we thought
23   they should have.  And I was, point

Page 148

1    blank, told not to fire anybody else.  I
2    could not fire anybody else.
3    **Q.  Who told you that?**
4    A.  Hal did.  But I'm wanting to
5    think that Andy was -- I don't remember.
6    I had several conversations with Andy
7    about the way things were running and
8    not running.  But I was, point blank,
9    told by Hal, I know, that just -- I
10   needed to just work given the
11   constraints I had, that we couldn't
12   afford to lose anymore people because we
13   just were running now.
14   **Q.  Now, I thought you testified**
15   **earlier that Andy had told you to fire**
16   **several managers if they weren't doing**
17   **they jobs.  Is that --**
18   A.  He did.  That was at an earlier
19   point in time.
20   **Q.  Okay.**
21   A.  That was early on.  That was --
22   that was two to three months into the --
23   into it.  I mean, like I said, from day

37  (Pages 145 to 148)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 149 | Page 151 |
|---|---|
| 1  one, it was screwed up and Andy would<br>2  call and question something about<br>3  transportation, you know.  Why this<br>4  wasn't happening or why we were having<br>5  trouble hiring drivers or why we were<br>6  losing drivers or something like that.<br>7  And if I ever indicated that it might be<br>8  something to do with Jason or -- and<br>9  this is the same way with Phillip or<br>10  Randy, he'd say, "Well, fire their ass<br>11  and get whoever you want.  Get you<br>12  somebody in there that can do the job."<br>13  **Q.  As the operations manager,**<br>14  **wasn't it your responsibility to find**<br>15  **managers who could do the work?**<br>16  A.  Well, I thought coming in what I<br>17  was told that I had managers in place<br>18  that could do the job.  I mean, just<br>19  like I can't fire -- I mean, I can't be<br>20  there 24 hours a day.  We actually did<br>21  start searching for a night warehouse<br>22  manager when we made the determination<br>23  to fire Phillip and then he quit and | 1  errors we were having.<br>2  **Q.  Was this before or after Phillip**<br>3  **Stitt quit?**<br>4  A.  Before -- before he quit, I<br>5  worked probably four or five weeks.<br>6  When Phillip quit, I actually had to<br>7  start working nights, you know, because<br>8  I had no manager to work night shift.<br>9  Randy and I -- Randy actually worked a<br>10  few weeks at night.  He and I would<br>11  alternate where I wasn't continually on<br>12  night shift.  But throughout the course<br>13  of the ten and a half months, I worked<br>14  ten weeks on night shift.<br>15  **Q.  Without a night manager, as**<br>16  **operations manager, were your -- I mean,**<br>17  **was it expected that you would be the**<br>18  **one to work at night until you had a**<br>19  **night manager?**<br>20  A.  Somebody had to.<br>21  **Q.  Well, if it wasn't you, who**<br>22  **would it be?**<br>23  A.  Well, like I said, I worked |

| Page 150 | Page 152 |
|---|---|
| 1  then --<br>2  **Q.  When you started working there,**<br>3  **were you working nights?**<br>4  A.  When I started?<br>5  **Q.  Yeah.**<br>6  A.  No.  I did -- first couple of<br>7  weeks, I worked day shift.<br>8  **Q.  Okay.  Did you start working**<br>9  **nights at some point?**<br>10  A.  I did the couple of days that<br>11  I -- you know, I said I was told during<br>12  the interview process I should do.  And,<br>13  like I said, our numbers from the very<br>14  start -- way before I got there up until<br>15  now, just our shorts on trucks, our<br>16  mispicks, that type stuff was just<br>17  through the roof, so to speak.  And<br>18  that's when it was suggested that I<br>19  needed to start working -- or not<br>20  suggested.  I was just told I needed to<br>21  start working nights to see if we<br>22  couldn't get a handle on how to get our<br>23  numbers better and solve some of the | 1  one -- Randy and I rotated out.<br>2  Somebody had to be there.<br>3  **Q.  Had y'all hired another night**<br>4  **manager before you stopped working at**<br>5  **Merchants Foodservice?**<br>6  A.  We had.<br>7  **Q.  Who did y'all hire?**<br>8  A.  His name was -- I think his<br>9  first name was James.  His last name was<br>10  Tankersley.<br>11  **Q.  As operations manager, did you**<br>12  **have to work with James Tankersley to**<br>13  **who him how things operated?**<br>14  A.  I did.<br>15  **Q.  Was that out of the ordinary for**<br>16  **an operations manager to have to do**<br>17  **that?**<br>18  A.  No.<br>19  **Q.  Before Phillip quit, the four**<br>20  **weeks or so that you worked nights, why**<br>21  **did you work nights those weeks?**<br>22  A.  Just because the night shift was<br>23  in such disarray.  I mean, we were late |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

| Page 153 |
|---|

1  trucks, short on employees, just -- I
2  mean, it was just horrendous the way it
3  was -- we were functioning on night
4  shift.
5      Q.  Do you know what the numbers for
6  the night shift were before you started?
7      A.  I don't have any recollection of
8  any numbers, what they were before I
9  started or what they were while I was
10 there.
11     Q.  Do you know how they compared
12 while you were there to before you were
13 there?
14     A.  I think they were actually worse
15 while I was there, but I don't know
16 that.  Just I didn't make my bonus, so
17 something must have been wrong.
18     Q.  How many Saturdays did you have
19 to work?
20     A.  Worked a total of eight.
21     Q.  Why did you work those
22 Saturdays?
23     A.  A couple of them were for

| Page 154 |
|---|

1  inventory, scheduled inventories.  Our
2  inventory was so messed up, we
3  actually -- they called a different
4  inventory or our numbers from one
5  inventory didn't match up.  You know,
6  something was wrong and we were required
7  to do another inventory, and that was a
8  Saturday.  One Saturday, we had a -- I
9  think they had a rodeo or something like
10 that.  And one Saturday, we had some
11 truck -- truck drivers meetings and I
12 don't think that adds up to -- I don't
13 remember why -- why I was there.
14     Q.  I don't understand what you mean
15 you had a rodeo.
16     A.  For the truck drivers.  They
17 participate in an obstacle course type
18 deal and then whoever wins that rodeo
19 actually gets a trip to go to
20 participate in the national rodeo.
21     Q.  Okay.
22     A.  So it was just a function for
23 the drivers.

| Page 155 |
|---|

1      Q.  As an operations manager, is
2  that something that you would be
3  expected to be at?
4      A.  I'm sure you would be, yes.
5      Q.  How about the truck drivers
6  meetings, as the operations manager over
7  transportation, is that something you
8  needed to be at?
9      A.  They thought I did.
10     Q.  Who is "they"?
11     A.  Merchants.  Hal.
12     Q.  Were there any Saturdays that
13 you went up on your own just because you
14 felt like you needed to get some stuff
15 done?
16     A.  No.
17     Q.  Do you think Hal was a good
18 boss?
19     A.  Good in which way?
20     Q.  I mean, just in general did you
21 think he was a good boss?
22     MR. BLYTHE:  I'm going to object
23 to the form of that question.  Go ahead

| Page 156 |
|---|

1  and answer it.
2      A.  On a scale of one to ten -- and
3  this may not be the way you want me to
4  answer it -- I would say Hal was
5  probably a three.
6      Q.  Okay.  Why would you say he was
7  a three?
8      A.  One, I never had -- and this is
9  me personally.  From all I had been told
10 beforehand to what I found out from day
11 one, I knew he had out-and-out lied to
12 me to get me to come to work there.  So
13 I'm not going to put a whole lot of
14 faith in that individual from the
15 get-go.  To disrupt my life and alter my
16 life -- it wasn't just a disruption.  It
17 altered my life forever.  What he told
18 me and what he led me to believe and the
19 basis for my coming to work there, it's
20 hard to pat that man on the back and
21 say, yeah, he's a great guy.
22     Q.  In terms of his leadership for
23 the folks working there, how did he do

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 157

1  at that?
2      A.  I think everybody liked Hal.
3  Hal wanted -- Hal wanted to be liked.  I
4  think he sometimes may have made
5  promises to the sales staff, that's what
6  he thought they wanted them to hear and
7  not necessarily what he thought he could
8  deliver.  So, there again, from an
9  integrity standpoint, I'm not sure.  You
10  know, I know he wanted to be liked and
11  everybody did, for the most part.  The
12  other employees did like Hal.
13      Q.  The things that you say were
14  told to you to make you decide to come
15  to Merchants, were those things -- are
16  those things that were primarily made by
17  Hal, or are they things you're saying
18  were also made by Don and Andy?
19      A.  Predominately, like I said, Hal
20  conducted the nuts and bolts of the
21  interview.  Andy and Don came in, more
22  or less, in a mop-up effort just to meet
23  and greet.  And, you know, the few

Page 158

1  questions I've already mentioned that
2  they asked, they asked, but I think they
3  were relying on Hal's recommendation
4  from what transpired.  And that's just
5  the way I see it.
6      Q.  You're claiming here that you
7  were fraudulently induced to come to
8  work at Merchants Foodservice.
9      A.  Uh-huh.
10      Q.  I'm just trying to figure out
11  who you think are the folks that
12  fraudulently -- I mean, how you were
13  fraudulently induced to come here in
14  terms of what was said.
15      A.  In terms of what was said?
16      Q.  Yeah.
17      A.  Hal Henson.
18      Q.  Okay.  All right.
19      A.  He's the one that made the
20  promises, the statements, the deviation
21  from -- you know, you keep going back to
22  handbooks and all that.  I didn't base
23  any of my decision to come to work for

Page 159

1  Merchants on any of this material right
2  here.  It was all based on what I was
3  told during the interview by Hal Henson.
4  And, like I said, you throw in the
5  family orientation stuff and all like
6  that from Andy.  But by and large, Hal
7  Henson told me everything I relied on to
8  base my decision on.
9      Q.  When you started there, did Hal
10  give you -- and throughout while you
11  worked there, did Hal give you guidance
12  in how to run the operation?
13      A.  No, he did not.
14      Q.  What did he do?
15      A.  He let me know what was wrong or
16  what he thought was wrong and told me I
17  needed to fix it.
18      Q.  We talked about vacation days
19  and what you were told.  How many
20  vacations days did you request while you
21  worked there?
22      A.  I asked off three particular
23  instances.  The first two was just a

Page 160

1  day.
2      Q.  Okay.  What happened on those
3  two instances when you asked off?
4      A.  I was just told that now, you
5  know, I couldn't have them.  One was --
6  and then I tried to tie it all with the
7  weekend, you know, to -- I didn't want
8  one isolated day on a Tuesday or
9  Wednesday, but I was just told that I
10  couldn't have them.  The last time I
11  asked off was in June, I think, and this
12  was in a meeting I had with Scott Casey
13  and Hal Henson.  And we had something
14  coming up, a family deal down in Florida
15  that I wanted to -- you know.
16      And at this point in time, I
17  wasn't asking for just a day off I had
18  been promised and never got.  I actually
19  in January 1 -- according to the
20  handbook and I think maybe it states
21  this and in my statement I said what Hal
22  told me was a year after -- five days
23  after a year, which is what he told me.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 161

1  But if you had been there a certain
2  amount of time, you got prorated like
3  when the year started in January '05, I
4  actually accrued two days' vacation
5  then.
6  And this was in June that I made
7  this request for two days off to go to
8  Florida with my family for a reunion and
9  I was just told I couldn't have them.
10  And at the time, I told Hal -- I said,
11  "Well, Hal, I've been here for over ten
12  months. You told me I could have off.
13  You told me all I ever had to do was ask
14  off and you'd give me time off. All I
15  want is two days and I'll use my
16  vacation days. But I would like to have
17  off. I haven't been off in ten months."
18  He said now is not the time. And the
19  place was in turmoil. I'm not denying
20  that. It was in a shambles. But I was
21  mentally, physically beat, frustrated
22  and asked for two days off for a little
23  R and R and spend some time with my

Page 162

1  family and was told I couldn't have it.
2  Now was not the time to be asking off.
3  Q. The other two times that you had
4  asked for a day off to go at the
5  weekend, were you told why you couldn't
6  have those days off?
7  A. I don't recall why -- the reason
8  why. I just -- that I was told I could
9  not have them.
10  Q. Do you know how operations were
11  going around that time when you asked to
12  be off on those Fridays or Mondays?
13  A. An overview of how it ran the
14  whole time I was there, it was awful, to
15  be honest with you. It never got any
16  better. It just gradually continued to
17  get worse despite my efforts.
18  Q. At some point, did Scott Casey
19  come over to help out in the operations?
20  A. I'm not going to say he was so
21  much there to help as he was to observe.
22  Q. Okay. What --
23  A. I don't remember him ever

Page 163

1  pitching in and helping or offering
2  any -- you know, other than needing to
3  work longer was how he helped me. You
4  know, telling me I needed to work
5  longer.
6  Q. When did he come over?
7  A. I don't know when he actually --
8  he came to work after I came to work
9  there and the -- my counterpart in
10  Jackson -- and I'm trying to think of
11  his name -- he replaced him. He was
12  fired and Scott replaced him. And
13  sometime shortly thereafter, he was
14  named something else. I don't recall
15  what his title was, but he was given
16  another --
17  Q. Director of operations? Does
18  that sound --
19  A. No. I think that's what he was
20  hired as, but --
21  Q. When did he come over there to
22  Clanton to observe?
23  A. He came -- during some period in

Page 164

1  time, he would come almost every other
2  week.
3  Q. Okay.
4  A. He was a regular there the last
5  six or eight weeks that I worked there.
6  Q. Did he ever stay for an extended
7  period of time, or was it just to come
8  for a day and then go back?
9  A. No. He would spend the night.
10  Sometimes a couple of nights.
11  Q. While he was there, did you tend
12  to work more?
13  A. Did I --
14  Q. Tend to have longer hours?
15  A. No.
16  Q. By this point, what hours were
17  you working in a typical day?
18  A. In a typical day, from 6:45 in
19  the morning till 5:15, 5:30 in the
20  afternoon..
21  Q. About how long of your
22  employment were those the hours that you
23  were typically working?

41  (Pages 161 to 164)

# FREEDOM COURT REPORTING

**Page 165**

1   A.  I started working that when
2  Phillip's absenteeism got to where it
3  was a problem.  I was still coming in
4  the 6:45 to 7:00 clock-ish for day shift
5  reasons, but then I needed to stay and
6  be there.  The night shift normally came
7  in -- depending on -- you know, we would
8  know the day beforehand what our
9  schedule basically looked like for the
10  next day and we tried to keep our night
11  shift from coming in too early if day
12  shift wasn't going to be through, so you
13  didn't have all your selectors around on
14  the clock being nonproductive.  But when
15  Phillip's absenteeism got to be a
16  problem, I had to stay there and ensure
17  that he showed up.  And in the interim,
18  Rodney had been fired and we had
19  promoted two of the lead men to
20  supervisors and they were green as grass
21  as far as running a shift or dealing
22  with employees, you know.  They were
23  used to being an employee; not a

**Page 166**

1  supervisor.  So to give you a specific
2  from this date to that date, I can't.
3  But that's about the time those hours
4  started.
5   Q.  When you worked at SYSCO or Alex
6  City doing the food distribution, did
7  you ever have a manager quit or get
8  fired, or supervisor?
9   A.  Never had one fired at Alex City
10  Provision.  Like I said, we were smaller
11  than Merchants and I basically only had
12  the one guy on days and the one guy on
13  nights.  When George died on nights and
14  Mark moved up to take his spot and, like
15  I said, he was there, so I didn't.  And
16  the whole time I was at SYSCO as far as
17  day shift, night shift, never had one
18  leave for any reason.  As our business
19  grew, they actually promoted, you know,
20  one of the night sups to assistant night
21  manager and hired one of the lead men
22  off of nights to be a supervisor.  So
23  they actually increased the staff, but I

**Page 167**

1  never saw one leave.
2   Q.  Any other problems at the plant
3  that you were not expecting when you
4  started working there?
5   A.  Well, I wasn't expecting the
6  equipment to be in the shape it was in,
7  given it was a newer facility than what
8  I came from.  But the equipment was just
9  awful.  Breakdowns constantly, no
10  scheduled PMs on it, no -- preventive
11  maintenance is what a PM is.  No
12  nothing.  It was just -- when it got to
13  where it wasn't operational and would
14  not run anymore, that's when they would
15  fix it.
16   Q.  Did you talk to Hal or did Hal
17  talk to you about the machinery during
18  the interview?
19   A.  I talked to Hal and Hal told me
20  I needed to be talking to Jimmy Triggs;
21  not to him.  That Jimmy Triggs was
22  corporate maintenance and he controlled
23  the pursestrings, so to speak, on what

**Page 168**

1  could and could not be done with the
2  equipment.
3   Q.  I'm going to mark as Defendant's
4  Exhibit 18 -- is this an e-mail dated
5  May 26th, 2005 to Jimmy Triggs?  Was
6  that what you were talking about in
7  terms of getting in touch with Jimmy
8  Triggs about the equipment?
9   (Defendant's Exhibit No. 18 was
10   marked for identification and
11   is attached.)
12   A.  This particular e-mail was after
13  we -- I had eventually convinced Jimmy
14  to start a scheduled maintenance
15  program.  Our repairs -- and I don't
16  remember exactly and I may be off here
17  or there.  But not our maintenance, but
18  our repair bills on our equipment
19  averaged an excess of $10,000 a month
20  for repairs.  So I finally convinced him
21  it would be -- and I think Andy was part
22  of this decision-making process, that it
23  would be cheaper and more effective from

# FREEDOM COURT REPORTING

Page 169

1  the long-run standpoint, one, to get the
2  stuff up and running so we weren't
3  working half the night with half our
4  equipment broke down; two, from a safety
5  standpoint, we had the equipment out
6  there that was just totally unsafe to be
7  on.
8         And they finally bought into the
9  preventive maintenance and I believe the
10  company we got to come in was Carolina
11  Handling, I believe is who we got to
12  come in and do the scheduled
13  maintenance.  And when they started
14  working on the equipment, of course, we
15  wanted to get everything up and going.
16  So they came in and over the course of
17  several weeks did a checkup, so to
18  speak, on each piece of equipment.  And
19  they fixed the simple stuff then.  Some
20  of them needed the whole carriages
21  replaced on.  I mean, expensive,
22  expensive repairs, that given the years
23  of neglect, I mean, it was going to take

Page 170

1  to get them back in shape.
2         And the guy came in and I had to
3  sign off on all this stuff just before I
4  could send it to Jimmy to be paid and he
5  had red-flagged on each invoice on
6  particular pieces of equipment things
7  that the tech had to point out these are
8  safety violations.  And I was signing
9  that I was being made aware of these
10  safety violations.  This e-mail to Jimmy
11  was making him aware that I was
12  forwarding some stuff because he said we
13  can't afford to do all this at once.
14  We're going to need to factor it in over
15  a several-month period of time and
16  spread it out over the budget over
17  several months so we don't take such a
18  big hit in one month on our numbers.
19         And I wanted to make Jimmy aware
20  of the fact that I was signing off and
21  putting my name on this that I am aware
22  these pieces of equipment have safety
23  issues with them and I wasn't

Page 171

1  comfortable with that since I wasn't the
2  one that controlled whether they were
3  going to be fixed or not.  And I copied
4  Merle Rester who was the corporate
5  safety director on this also.
6     Q.  Okay.
7     A.  And what I was told in phone
8  conversations by both of them, neither
9  one responded back via e-mail or I would
10  have had that for you.  But they just
11  called me back on the telephone and told
12  me not to worry about it.  That
13  Merchants had good insurance, that I
14  wasn't an entity or an officer of the
15  company.  I couldn't be held liable for
16  anything that happened.  And that they
17  were going to work on it and get
18  everything up to snuff and just quick as
19  they could and for me not to worry about
20  it, so --
21     Q.  Did Hal say anything to you
22  about the machinery during your
23  interview?

Page 172

1     A.  No, he did not.
2     Q.  Did you ask him anything about
3  the machinery during your interview?
4     A.  No, I did not.
5     Q.  Anything else that you found
6  working there that you were not
7  expecting?
8     A.  Well, I guess -- can I synopsis
9  this?
10     Q.  Sure.
11     A.  And this goes back to what
12  you've got there in front of you.  But
13  the things I found out when I went to
14  work there were, one, I definitely was
15  going to work a lot more hours than they
16  told me; two, I wasn't going to have any
17  time off; three, I was going to work
18  night shift and Saturdays; four -- and
19  this is real important -- is the staff
20  just totally, totally, totally was
21  terrible.
22         I've never worked anywhere in my
23  life that had a turnover rate -- I

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 173

1  didn't know places existed that had
2  turnover rates this high. Never heard
3  of it in the food service industry
4  before or any other industry. With a
5  200-plus percent turnover on days and
6  400-plus on nights. So that, the
7  condition of the warehouse, the
8  uncleanliness of the warehouse, the --
9  like I said, a five-year-old facility
10  looking 20 years old, the equipment,
11  like I said, looked just like the
12  facility. I didn't expect to find any
13  of that when I went to work there.
14      Q.  Okay. We've already talked --
15  you and Hal did not talk about the
16  equipment during your interview?
17      A.  No, we didn't.
18      Q.  Did y'all talk about the
19  condition or cleanliness of the
20  warehouse during your interview?
21      A.  No, I did not. That's when I --
22  you know, I asked for a warehouse tour,
23  but the way he explained it about not

Page 174

1  making the announcement yet or anything
2  like that, I -- and I assumed, so
3  that's -- you know, I know what that
4  does. But I assumed that it was going
5  to be real similar to what SYSCO was,
6  given it was a newer facility than what
7  we had there.
8      Q.  But Hal didn't make any
9  statements about that?
10      A.  No. He didn't say I've got an
11  excellent facility or real clean, brand
12  new equipment. He didn't make that
13  statement like he did about the staff.
14      Q.  I'm going to mark as Defendant's
15  Exhibit 19 -- you talked about turnover
16  rates on the day and the night shift.
17  This is a document that your attorney
18  sent me yesterday. I've only got one
19  other copy over here. Is that what you
20  were referring to?
21          (Defendant's Exhibit No. 19 was
22          marked for identification and
23          is attached.)

Page 175

1      A.  Yes.
2      Q.  Where did you get this?
3      A.  From Melanie Allstage, the HR
4  director.
5      Q.  When did you get it?
6      A.  Should be dated. 7/1/2005 is
7  what I'm assuming. That's when she ran
8  the report, so --
9      Q.  Were you still working for the
10  company when you got it?
11      A.  I was.
12      Q.  Why did you take it with you?
13      A.  I had it in my belongings when I
14  left.
15      Q.  Anything else you had in your
16  belongings from Merchants when you left?
17      A.  Just I've given you everything
18  that I knowingly have.
19      Q.  What would drivers be considered
20  in terms of employment? Would they be
21  listed as drivers?
22      A.  I think they would. I think
23  this is just the -- it's broken down by

Page 176

1  day shift and night shift.
2      Q.  So transportation is not on
3  here?
4      A.  Transportation is not on here.
5      Q.  What was the turnover like in
6  transportation?
7      A.  I don't have the numbers in
8  front of me. But I know hiring and
9  keeping drivers was a constant problem
10  for us. That's something -- we were
11  trying to hire drivers when I went to
12  work there. We were trying to hire
13  drivers when I left, so --
14      Q.  Okay.
15      A.  We had actually taken back
16  drivers that had been terminated for
17  whatever reason. We'd actually gone out
18  and asked them to come back to work for
19  us, so that's how bad it was.
20      Q.  What made you decide to leave
21  Merchants Foodservice?
22      A.  It's stated in my thing, the day
23  I left, which was July the 12th, I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 177

1  believe. That was one of Scott's
2  days -- that's the day he arrived, best
3  I remember, and we had had a meeting
4  that morning discussing a few things.
5  And he got there at 10:30, 10:45,
6  something like that. So we broke for
7  lunch and we were going to continue
8  after lunch when we got through. And
9  after lunch at 1:00 or so, came back in,
10 went to the conference room. Scott,
11 Hal, and myself sat down and Hal told me
12 that Scott was fixing to discuss a few
13 things with him and that I could just
14 deem him being the one -- I was always
15 told that Hal was my boss. He was my
16 supervisor. He -- you know, Hal was who
17 I answered to. But Hal made the
18 statement that Scott was fixing to make
19 a few statements and what he said, I
20 could consider it coming from him
21 because he and Scott had already talked
22 about it.
23 And Scott told me that -- Scott

Page 178

1  had told me on more than one occasion
2  that I needed to be working 11, 12 hours
3  a day. That's what he did all the same
4  time in Jackson and -- but when we first
5  got started, he said, "Steve, I've got
6  to lay out some things for you." He
7  said, "From now on, I expect you to work
8  60 hours a week." And he said, "You're
9  going to work day shift one week and
10 night shift the next." And he said,
11 "Until I tell you different, that's
12 going to be your schedule."
13 And I immediately stood up,
14 handed in my keys or put them on the
15 desk. I didn't hand them to anybody. I
16 laid my keys and my cell phone on the
17 desk and told them I quit. I could do
18 them a letter of resignation if they
19 wanted me to, but I was through. I told
20 them I had been fed up from the get-go
21 from being lied to, that nothing I was
22 told was like it was when I was coming
23 to work here. It progressively had

Page 179

1  gotten worse. And, like I said just a
2  couple weeks earlier, Scott had denied
3  me being off any time. And, you know,
4  even after I explained to him that I was
5  mentally and physically had all I could
6  have and take with just bumping your
7  head up against a brick wall and then
8  for him to come in and tell me that I'm
9  going to start working 60 hours a week,
10 that's mandatory, and I'm going to work
11 nights one week and day shift the next
12 week, that was just the proverbial
13 straw.
14 I gave them my stuff and I don't
15 think -- I don't remember writing a
16 letter of resignation. I don't
17 remember -- I know I didn't clean my
18 desk out. I didn't do anything. I was
19 just -- just shaking. I was -- I don't
20 know if I was mad, distraught, what, but
21 I'd had it.
22 I've never left a job in my life
23 without already having one in place to

Page 180

1  go to. But I walked out that facility
2  not having a clue what I was going to
3  do. When I got in the car, I got my
4  cell phone and my wife knew the pressure
5  I was under and what I was going through
6  and she told me many times just quit.
7  Tell them to kiss your ass and leave.
8  But I didn't. I had to have a job and I
9  was hoping for a long time I could make
10 that work, but I couldn't.
11 And I called her and I told her
12 I quit and she said, "How do you feel."
13 I said, "Baby, believe it or not, I feel
14 like the weight of the world has been
15 lifted off my shoulders." And she said,
16 "Well, good for you." And I've just
17 been -- you know, two months without
18 working, couldn't --
19 Q. If you need to take a break, we
20 can.
21 A. Yeah, if I can. Yeah.
22 MR. DYKES: That's fine.
23 (A break was taken.)

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 181

1    Q. (BY MR. DYKES:) I'm going to
2 mark as Defendant's Exhibit 20 a
3 resignation letter.
4        (Defendant's Exhibit No. 20 was
5        marked for identification and
6        is attached.)
7    Q. Do you recognize this,
8 Mr. Adams?
9    A. I do.
10    Q. Have we talked today about the
11 things in the letter that you were
12 saying nothing I was told during the
13 interview process has turned out to be
14 truthful? Have we talked about all of
15 those things?
16    A. We have.
17    Q. Okay. Have we talked about the
18 problems that you had in the facility
19 once you started working there?
20    A. Uh-huh.
21    Q. Any area that we haven't talked
22 about that you can remember?
23    A. I can't remember any other that

Page 182

1 I need to talk about or bring up.
2    Q. And I understand that you're not
3 a lawyer, and I know that your attorney
4 drafted your complaint, which I'm going
5 to mark as Defendant's Exhibit 21.
6        (Defendant's Exhibit No. 21 was
7        marked for identification and
8        is attached.)
9    Q. This is a copy of the complaint
10 that was filed in the case.
11        MR. DYKES: I figured you
12 probably have got one.
13        MR. BLYTHE: Yeah, I've got it.
14    Q. (BY MR. DYKES:) Can you just
15 tell me in your own words why you filed
16 this lawsuit?
17    A. In my own words, I was, for lack
18 of a better term, lured away from a job
19 I had, a good job I had, a job that I
20 really enjoyed, a job with great
21 benefits, a good salary. Just the
22 financial end of working at SYSCO
23 compared to where I had come from or

Page 183

1 where I had ever been in my life, you
2 know, was something like I'd never seen.
3        But I was lured away from that
4 by what turned out to be just
5 out-and-out fraudulent statements, lies,
6 deceit, ever how you want to phrase it.
7 And I felt like that ought to be against
8 the law. And, so, I put on paper my
9 experience best I could remember from
10 initial contact through the day I left
11 and contacted Derrick. And upon his
12 recommendation --
13    Q. I don't want to know what
14 Derrick told you.
15        MR. BLYTHE: Yeah. Don't --
16    Q. Yeah. I don't want to know
17 that.
18    A. Okay. Just I think I had a
19 case, a real good case, because I know
20 what happened to me, I know what was
21 told to me, and I know what I walked in
22 and found out to actually be the case.
23 I know what I gave up leaving SYSCO and

Page 184

1 I know at a bare minimum what I could
2 have had at retirement. Their policy
3 was three percent minimum annual raise.
4 I never received less than, less than,
5 four in my tenure there. As much as
6 eight in a year's time, but a minimum of
7 three. It was guaranteed to me. And
8 you expound that out to the age I retire
9 and what that would have been, worse
10 case scenario, against what I can
11 expect, given my certain circumstances,
12 then you do the same thing with my
13 pension plan I had there.
14        They had a pension plan that was
15 based solely on longevity. It wasn't
16 anything I contributed to. It wasn't
17 anything -- you know, wasn't 401-K or
18 something like that they matched. This
19 was an employee benefit they gave their
20 employees for long-term service. That's
21 a finite. That's written in stone what
22 their policy is. I know what I'm
23 drawing now. I was vested fortunately

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 185

1  and I'll draw a small pension, but it's
2  a penance compared to what I would have
3  drawn had I completed my career at
4  SYSCO. It's substantial in both cases,
5  the difference in salary, plus my
6  pension are substantial. And I filed
7  the lawsuit to recoup what I had, and
8  pardon the French, or I won't -- I'll
9  phrase it a different way, that I had
10 been wronged out of.
11     Q. How much do you think you were
12 wronged out of in salary?
13     A. The way I put it together was
14 taking my base salary at SYSCO, no
15 bonus, just my base salary, and did that
16 out exponentially three percent per
17 year. So this is worse case scenario.
18 Against what I hope to go to work for.
19 Actually, before I -- a couple of weeks
20 I was unemployed mulling over what to do
21 and, you know, I spent some time on the
22 Internet looking at what constitutes
23 fraud or breach of contract, you know.

Page 186

1  I researched best I could in layman's
2  terms on the Internet. And to put a
3  dollar figure on it, I went -- worse
4  case scenario with SYSCO, I applied for
5  several jobs that the position I was
6  applying for started out at 35 or less a
7  year. Where I actually went to work, I
8  started at $700 a week, so that's -- or
9  not 700 a week. I started at 35,000 a
10 year, which is a little less than 700 a
11 year [sic]. But I didn't know where I
12 was going to be working when I put the
13 figures together.
14     But doing it worse case scenario
15 like that in salary, I'm going to lose
16 in excess of $400,000 over what I would
17 have had bare minimum. And, like I
18 said, that's assuming I stayed a day
19 shift supervisor at SYSCO for the next
20 20 years and was never promoted. That's
21 staying in the same position till I was
22 67 years old.
23     The same with the pension. The

Page 187

1  pension's pretty much etched in stone.
2  It's based on your five years highest
3  salary average time a percent and a half
4  for every year worked. So that's -- you
5  know, that could vary some. But, again,
6  I put my number together worse case
7  scenario and that's -- I don't remember,
8  but it was over $300,000 according -- I
9  think I gave you a thing that details
10 that.
11     But I'm looking to recoup what I
12 was wronged out of. And I would be
13 willing and -- to send a statement, so
14 to speak, from a punitive standpoint,
15 you know. I don't know whether that's
16 fair or right or whatever. But I feel
17 like I've been wronged and wronged in a
18 bad way and the message needs to be sent
19 to Merchants as well as any other
20 business, I guess, doing business in the
21 State of Alabama that this is against
22 the law. And as far as a punitive
23 standpoint, I would seek whatever a jury

Page 188

1  thought the case merited and I hope that
2  would be substantial.
3     Q. If another company in the food
4  distribution business had come along and
5  offered you more than you were making at
6  SYSCO like Merchants Foodservice did,
7  would you have interviewed with them and
8  talked to them about it?
9     A. While I was at SYSCO?
10    Q. Well, I mean, you talked to
11 Merchants.
12    A. Yeah.
13    Q. Because somebody called offering
14 you more money and a better bonus.
15    A. Yes.
16    Q. If somebody else had called
17 while you were working at SYSCO and
18 offered you more money and a better
19 bonus, would you have talked to them
20 about a job?
21    A. Since they never called, I
22 really don't -- don't know.
23    Q. Well, let's say that U.S.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 189

1  Foodservice had been the one calling
2  instead of --
3      MR. BLYTHE: I'm going to object
4  to the form of the question. I'm going
5  to let him go ahead and answer it.
6      Q.  Say U.S. Foodservice had called
7  in August of 2004 instead of Merchants
8  Foodservice, would you have talked to
9  them about a job?
10     A.  If they had given me the
11  information -- you know, I would have
12  asked what it paid.  Just --
13     Q.  Right.
14     A.  You know, if it had been equal
15  or just that much more, absolutely not.
16  Had it been a substantial salary
17  increase, then, yes, I would have --
18  would have interviewed or pursued it to
19  see where it led and what, in actuality,
20  would be offered, yes.
21     Q.  Have we talked about all the
22  ways you think you have been defrauded
23  today?

Page 190

1      A.  Yes.
2      Q.  Okay.  Now, you have a complaint
3  that you were told things that were
4  wrong and we've talked about all those,
5  is my understanding; is that right?
6      A.  Uh-huh.
7      Q.  There's also a claim that there
8  were things that you were not told that
9  you claim you should have been told.  Is
10  there anything that you -- is there
11  anything that you claim you should have
12  been told that you weren't told?  Let me
13  strike that question.
14      Other than the statements that
15  you think that you say were told that
16  were wrong, is there any other way that
17  you are claiming that you were defrauded
18  in this case?
19     A.  If I understand the question and
20  I think I do, no.  I mean, I asked
21  questions, I was answered, and that's
22  what I based my decision on.  That's all
23  the information at the time I had to go

Page 191

1  on.
2      Q.  Okay.
3      A.  So what we've talked about is
4  the basis for the fraud, yes.
5      Q.  Okay.  We've talked monetarily
6  how you believe you've been damaged.
7  What other ways do you claim that you've
8  been damaged?
9      A.  From a -- like I said, and I
10  don't know how this factors in to
11  anything, I'm just going to tell you my
12  mental state, you know, and when I
13  finally resigned, wasn't eating, wasn't
14  sleeping, just not -- I knew it couldn't
15  go on much longer, not given the way
16  things were.  I had no foreseeable light
17  at the end of the tunnel that things
18  were going to get better.
19      And from a financial standpoint,
20  a man with a house, truck payment, car
21  payment, all those sort of things, I
22  didn't know what I was going to do.  But
23  I knew I couldn't keep on doing what I

Page 192

1  was doing, so just -- you know, I don't
2  really know what mental anguish is or
3  anything like that.  I was physically
4  and mentally distraught, I guess, is the
5  best way to put it.  Couldn't eat,
6  couldn't sleep.
7      My wife would probably tell you
8  I couldn't do something else.  But, you
9  know, I figured that would heal in time.
10  You know, just like I said, when I quit
11  and walked out the door and called my
12  wife, I felt better immediately.  The
13  weight of the world lifted off my
14  shoulders temporarily.  But then the two
15  months I was there living off cashing
16  CDs and cashing in my 401-K and living
17  off money I'd worked hard to save
18  because the bills kept on coming in, you
19  know, they didn't care whether I was
20  working or not.  They didn't stop.  So
21  that plays on you wondering what you're
22  going to do when that money runs out.
23  And I started trying to find a job two

48 (Pages 189 to 192)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 193

1 days after I left and it took me two
2 months to find a job.
3      Q.  Where all did you look for a
4 job?
5      A.  Locally, I tried Samlip, which
6 they make automotive parts for -- I
7 think it's a Honda or Hyundai
8 dealership.  Honda dealership.  Wellborn
9 Cabinet has a real nice facility there.
10 They hire about 400 people or employ
11 about 400 people.  They build custom
12 cabinetry.  Tried Wellborn.  The brother
13 has got a competing plant there in
14 Ashland, which is about 35 miles away.
15 I tried Wellborn Cabinet.  I did try the
16 Honda plant in Lincoln.  I tried the
17 State of Alabama in Montgomery, Auburn
18 University in Auburn.
19      Q.  What did you try at the State of
20 Alabama?
21      A.  They have just -- if you go
22 online to their Web site, they've
23 actually got a list of positions that

Page 194

1 are available.  Some are merit positions
2 that only existing employees can apply
3 for.  Some are at-large and you actually
4 fill out an application, three or
5 four-page application that lists your
6 qualifications, your education.  And,
7 you know, they give you the criteria --
8 minimum criteria to be eligible for the
9 job that you are applying for.  And
10 actually, my brother works with the
11 Highway Department.  He's a State of
12 Alabama employee.  He gave me the
13 directory and told me to how to do it.
14      I went through the positions
15 that I was qualified for and filled out
16 aps and sent in for every one of those
17 and they actually put you on a list and
18 grade you by your application.  And I
19 made two lists for the two of the --
20 three of the jobs I applied for, I
21 actually made a list, but it's a list
22 that encompasses -- you know, I don't
23 know how many names go on there.  But

Page 195

1 it's sort of a wait and see type deal.
2 We'll call you.
3      And, actually, I did get
4 contacted -- this was after I went to
5 work for Russell Lands.  But they
6 contacted me and told me I'd been moved
7 up the list and if I was interested, I
8 needed to respond.  And I never
9 responded because I was already
10 gainfully employed again, but --
11      Q.  Okay.  Where else did you --
12 you got the State of Alabama.  What did
13 you apply for at Auburn University?
14      A.  I don't remember the position.
15 There again, you can go online there and
16 they list, you know, employment
17 opportunities.  It was something to do
18 in a supervisory role.  I don't remember
19 the exact department that it was.
20      Q.  Did you get any interviews with
21 any of these folks or any of these
22 companies?
23      A.  No, I did not.

Page 196

1      Q.  Where was your first interview
2 after -- after you left Merchants
3 Foodservice?
4      A.  Formal interview was with
5 Russell Lands.
6      Q.  What was that for or what was
7 that job for?
8      A.  For the position I hold now,
9 which is assistant manager at the Ridge
10 Marina.
11      Q.  What are you doing as the
12 assistant manager?
13      A.  As assistant manager when I
14 started and currently, it's -- my actual
15 job description changes May 1.  But the
16 day-to-day running of the marina, which
17 we're a full service owned water marina.
18 We have gas pumps, you know, on the
19 docks and we've got dry storage, stack
20 storage in back.  We've got 100 wet
21 slips where we keep our -- customers
22 have larger cruisers in water, you know,
23 cabin cruisers, stuff like that.  And a

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 197

1  dealership -- service department, so
2  it's just managing all those aspects.
3        And I actually did -- when I
4  started there, we had one full-time
5  salesperson who retired. I started in
6  September. Rick actually retired in
7  November and I actually was our
8  full-time salesperson till we hired
9  another salesperson, you know. Along
10  with my responsibilities as assistant
11  manager, I actually was our sales force
12  for a short period of time.
13        We hired another full-time
14  salesman shortly after Rick left and a
15  couple of -- almost a month ago, I
16  guess, we hired another full-time
17  salesperson. So we've got a sales staff
18  of two now that work in the dealership
19  and they're going to be predominantly
20  sales. And we've actually -- our
21  business has grown. We're in the
22  process of adding an additional 450
23  slips now, dry slot slips.

Page 198

1        We're in a development that is a
2  hot spot on Lake Martin, I guess, and
3  it's growing by leaps and bounds. But
4  we've never had a true service manager,
5  parts manager, service writer,
6  blah-blah-blah-blah-blah. Jeff and I
7  sort of split those details; Jeff being
8  the marina manager.
9        But starting in May, I'm totally
10  out of sales and going to be still
11  assistant manager, but my thing is going
12  to be service and storage. I'll
13  actually order the parts, do the service
14  write-ups, distribute those to the
15  techs. And then when they're through
16  with them, I'll bill out the parts to
17  the work order and close the work orders
18  and they get, in turn, passed on to
19  accounts receivable where we send out
20  the statements and get our bills paid.
21        Q.  What's your salary with them
22  now?
23        A.  My salary is -- like I said, I

Page 199

1  started out at 35,000 a year,
2  whichever -- I don't know how that
3  breaks down --
4        Q.  Yeah.
5        A.  -- weekly. Now, I don't really
6  know what my annual salary is. But I
7  did get an increase and my salary now is
8  721.15 a week. So whatever that equates
9  to annually.
10        Q.  Are you eligible for any bonuses
11  or anything like that or --
12        A.  No bonuses now. When I do sell
13  a boat, I get paid a commission on it.
14        Q.  Are there any benefits with the
15  job?
16        A.  As far as?
17        Q.  401-K?
18        A.  Yeah. They do have a 401-K.
19        Q.  Were you able to roll over any
20  benefits from SYSCO or Merchants
21  Foodservice to your job now?
22        A.  If I had had any, I could have,
23  yes.

Page 200

1        Q.  Okay.
2        A.  But I used those when I was
3  unemployed, so I didn't have any to roll
4  over.
5        Q.  Was your wife working when you
6  left Merchants Foodservice?
7        A.  She was.
8        Q.  How much was she making?
9        A.  Without looking at her W-2 or
10  our taxes, I'm just going to say 35,000
11  a year also. That's mighty close.
12        Q.  Do you go to any doctors or
13  therapists as a result of what happened
14  at Merchants Foodservice?
15        A.  The only doctors I've been to, I
16  mean, I go for annual checkups or stuff
17  like that. But as far as seeking, you
18  know, therapy or psychiatric help or --
19  you know, no.
20        Q.  Okay. And we've talked about
21  all the documents you're aware of that
22  you have that support your case; is that
23  right?

50 (Pages 197 to 200)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 201

1    A.  Uh-huh.
2    Q.  Other than your lawyer, and I
3    don't want to know anything you talked
4    to your lawyer about, and your wife, who
5    I know you've talked to about the case,
6    have you talked to anybody else about
7    the case?
8    A.  The only -- and by talk about
9    it, I'm not sure -- only two other
10   people that I've told -- and I held
11   Laura in confidence and I'm sure she's
12   been true to that -- is my boss Jeff
13   Ellis knows because I've had to take
14   time off from work to prepare for this
15   and other things, so Jeff knows.  And
16   then Seneca Kinsey who was my day shift
17   supervisor and friend.  Seneca and I
18   have talked several times since I've
19   left.  He's aware that I was going to
20   file a lawsuit.
21   Q.  What have you and Seneca talked
22   about in terms of your case?
23   A.  In terms of the case, not a

Page 202

1    whole lot.  Just -- you know, we talked
2    a good bit while I was at Merchants and
3    he was aware of how I was hired and
4    stuff like that, to some degree.  I
5    didn't go into every aspect of
6    everything with him.  But when I called
7    him after I'd left and, you know, most
8    of our conversations have had nothing to
9    do with the case.  It's more just
10   friendly chitchat and keeping up with
11   each other.
12   Q.  Okay.  What did you tell your
13   boss now why you left Merchants
14   Foodservice?
15   A.  I told him exactly what I've
16   told you.
17   Q.  Okay.
18   A.  I mean, he's aware of
19   everything.
20   Q.  Did Seneca make any comments or
21   talk to you about any recovery you might
22   get in the case?
23   A.  He hoped I got a ton of money,

Page 203

1    is what he told me.  Said it would serve
2    them right for screwing me.
3    Q.  Was Seneca in the interview with
4    you when you interviewed for the job?
5    A.  No, he wasn't.
6    Q.  Does he know anything about what
7    Hal told you other than what you told
8    him that Hal told you?
9    A.  No, he doesn't.  Not unless Hal
10   told him something.  I didn't tell him
11   anything.  I mean, other than what I've
12   told him, I have no way of knowing what
13   he knows.
14   Q.  And, again, I don't want to know
15   what you talked to your lawyer about.
16   But are there any folks that work for
17   Merchants Foodservice that you think
18   have knowledge that would support your
19   case or that worked at Merchants
20   Foodservice with you?
21   A.  Hal Henson would have full
22   knowledge of it.  Scott Casey can
23   testify to the conversations about me

Page 204

1    needing to work longer hours and about
2    my 60-hour schedule and on and off.
3    Nights on and off, you know.  Nights one
4    week and days one week.
5    Q.  What hours are you working now?
6    A.  I work 8:00 to 5:00.
7    Q.  Monday to Friday?
8    A.  Well, actually, it varies with
9    the season of the year.  You know, we
10   have winter hours when we're not busy.
11   Being a local lake, the climate's not
12   conducive to boating in the wintertime,
13   so we actually shut down on Sunday and
14   Monday during the winter months.  And
15   then like right now, I'm off on Friday
16   and Saturday.  And then as we move past
17   May and, actually, are -- you know,
18   Saturday and Sunday is our busiest time,
19   so everybody at the marina works
20   Saturday and Sunday May through Labor
21   Day.  And then I'm off -- you know, my
22   weekend may be a Thursday, Friday or
23   Wednesday, Thursday.  We normally try

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 205

1  and set that out where you've got the
2  same off days. But it's a five-day
3  schedule.
4  **Q.  Okay.**
5  A.  But it rotates with the season.
6  **Q.  I jumped off talking about other**
7  **folks who you think have knowledge that**
8  **would help your case.**
9  A.  No.
10  **Q.  Anything we haven't talked about**
11  **today that you want to add to support**
12  **your claims?**
13  A.  Can't think of anything.
14  **Q.  Have you ever filed for**
15  **bankruptcy?**
16  A.  No, I have not.
17  **Q.  Ever had any repossessions or**
18  **foreclosure actions against you?**
19  A.  Never have.
20  **Q.  IRS ever placed a levy on your**
21  **wages?**
22  A.  No. I'm shaking my head. But,
23  no.

Page 206

1  MR. DYKES:  Can we take just a
2  quick break? I think I'm about done.
3  MR. BLYTHE:  Sure.
4  (A break was taken.)
5  **Q.  (BY MR. DYKES:)  Do you like**
6  **where you're working now?**
7  A.  I'm happy to have a job.
8  **Q.  Are you looking at other --**
9  **looking for other jobs now as well?**
10  A.  No, I'm not now.  I mean, based
11  on what I found when I was looking for
12  what I've got now, the economy around
13  Alex City and, you know, if anything's
14  gotten worse, I think the job market
15  picture there is more bleak now than it
16  was when I was looking, so --
17  **Q.  I know we talked earlier that**
18  **you didn't go back and look at SYSCO**
19  **after you left Merchants Foodservice.**
20  A.  Uh-huh (nodding head
21  affirmatively).
22  **Q.  Did many managers lose their job**
23  **there at the Calera branch as a result**

Page 207

1  of the changes?
2  A.  As far as I'm aware of, no
3  manager lost their job there.  The way
4  SYSCO handles their fold-out is their
5  surplus they've got left and that's
6  going to be short-term because they're
7  going to go out and replace that lost
8  business with new business.  But they
9  offer -- say, they take a night shift
10  selector and may offer him a night
11  shift -- if he's qualified, a
12  supervisory position at the new
13  facility.  They pay their expenses to
14  move and all like that.  So they get a
15  promotion and a free move to where
16  they're going.
17  And the only guy I know -- I had
18  a guy that used to be one of my day
19  shift forklift operators, took the job
20  as day shift supervisor down there.  My
21  counterpart on days, which was Scott
22  Baggett, who was -- we sort of shared
23  duties or whatever.  But Scott actually

Page 208

1  took the job as the day shift manager
2  down at Geneva.  Those were the -- as
3  far as losing jobs, no.  Some actually
4  left that facility with, you know, a
5  promotion in hand and to take a job at
6  the new facility.
7  **Q.  Where is Geneva?**
8  A.  It's down in -- I think -- I
9  want to say southeast Alabama right on
10  the -- right on the Florida line almost.
11  Get -- you know, 20 or 30 miles.
12  Because we were shuttling -- from SYSCO,
13  we were shuttling trucks to south
14  Alabama and working the panhandle of
15  Florida and just given the current scope
16  of things, it was easier and over the
17  long run, more financially conducive to
18  do the expense of starting a new plant
19  and then absorb that over the next few
20  years and what you save in
21  transportation costs and shuttling --
22  you know, deadheading groceries down
23  there to turn them over to another

52 (Pages 205 to 208)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 209

1  driver to start delivering them.
2  **Q.  If you had stayed at SYSCO and**
3  **been asked to move to Geneva, is that**
4  **something you would have done?**
5  MR. BLYTHE:  I'm going to object
6  to the form.  Go ahead and answer.
7  A.  There again, it would have been
8  not a sole decision based on me.  That
9  would have been something my wife and I
10  would have talked about.  Now, her
11  family -- her grandparents being from
12  Geneva may have factored in on that
13  highly, you know.  So chances are had I
14  been offered the promotion and the job,
15  chances are I might have.
16  **Q.  Okay.**
17  A.  But, there again, like I said,
18  that's a hypothetical.  It never
19  happened, so I don't know.  So I can't
20  truthfully tell you yes or no what I
21  would have done.
22  MR. DYKES:  Okay.  All right.  I
23  don't have any other questions.

Page 210

1  MR. BLYTHE:  I'm going to
2  follow-up just with a couple of little
3  things.
4
5  EXAMINATION BY MR. BLYTHE:
6  **Q.  Steve, tell me -- sometimes on**
7  **these follow-ups, I get to shotgunning**
8  **questions.  Tell me if I get to cutting**
9  **you off or going too fast.**
10  **Just briefly, were the working**
11  **conditions different at Alex City**
12  **Provision and Merchants?**
13  A.  I mean, when I left Alex City
14  Provision, the warehouse ran like a
15  sewing machine, if that's what you're
16  asking.  When I went to work at
17  Merchants, it was just terrible.
18  **Q.  Okay.  And were the management**
19  **styles, for instance, of Alex City**
20  **Provision and SYSCO different than at**
21  **Merchants?**
22  A.  At Alex City Provision and
23  SYSCO, the employees knew what was

Page 211

1  expected of them and the management
2  expected it of them and if they didn't
3  do what was expected of them, then they
4  suffered the consequences in terms, to
5  start with, in written disciplinary
6  action and then possibly followed by a
7  suspension or, worse case scenario, they
8  would lose their job.  But they knew it
9  was coming.
10  You know, I never fired -- I
11  never fired but one person the whole
12  time I worked at SYSCO.  And I don't
13  remember -- it was very few I ever let
14  go at SYSCO or Alex City Provision once
15  I became operations manager.  But they
16  all knew what was coming because it was
17  spelled out in the form of a written
18  discipline their action.  If this
19  happens again, this is what's going to
20  happen.  So one of my statements I've
21  always made is I've never fired anybody.
22  You fired yourself.  So that's the way
23  I've always looked at that.

Page 212

1  But it was totally different
2  because I couldn't -- I didn't have
3  that -- that avenue at Merchants to
4  control the work force because I
5  couldn't discipline them.
6  **Q.  And is that something that you**
7  **were told when you were interviewed and**
8  **hired for that job?**
9  A.  No.  I -- we didn't discuss
10  discipline or --
11  **Q.  But they didn't come out and**
12  **say, "Hey, by the way, we're not going**
13  **to let you discipline or fire any of**
14  **these people.  We need to hang on to as**
15  **many as we can."  Did they tell you**
16  **anything about that?**
17  A.  No.
18  **Q.  And I guess just briefly, Steve,**
19  **the working conditions at Merchants were**
20  **different than the way they were**
21  **presented or described to you by Hal; is**
22  **that correct?  Is that a correct**
23  **statement?**

53  (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 213

1  A. That's absolutely 100 percent
2  correct.
3  Q. Okay. And would that same
4  statement be true as Andy and Don were
5  involved in the interview process? I
6  mean, were there things that they
7  omitted to tell you during that process?
8  A. The omission, I guess, would
9  have been, you know, when I asked
10 something, they answered it. And they
11 didn't volunteer anything as far as --
12 I'll put it like that. They didn't tell
13 me the warehouse was a shambles, that it
14 looked like a 20-year-old facility, that
15 the equipment was terrible or in need
16 of -- you know, they didn't volunteer
17 anything. I'll put it like -- they
18 answered my questions or gave me an
19 answer to the questions I asked, but
20 they never volunteered anything, no.
21 Q. Okay. Now, was it possible to
22 make as much in bonus as Hal had told
23 you with the conditions at Merchants as

Page 214

1  they were?
2  MR. DYKES: Object to the form.
3  Q. Go ahead and answer.
4  A. I don't think the way the
5  conditions were and -- you know, it
6  factored into cases per hour, mistakes.
7  Profit factored in. So just given the
8  scope of the -- what I walked into, I
9  don't think anybody could -- at that
10 point in time -- not before and not
11 after, but at that point in time, given
12 to contend with what I had to contend
13 with and was up against, I don't think
14 anybody -- and that's my opinion, but I
15 don't think anybody could have made any
16 of the bonus, much less assume that you
17 were going to make 30 percent of it.
18 Q. Okay. And that's what Hal had
19 presented to you in the interview
20 process?
21 A. He told me that my
22 predecessor -- and, there again, I don't
23 know his name -- routinely made 18 to 20

Page 215

1  percent of his numbers and there was no
2  reason why I couldn't expect to do the
3  same.
4  Q. Okay. What has been previously
5  marked and entered as Defendant's
6  Exhibit 1 is the summary of -- and if
7  you would, look at that.
8  MR. DYKES: Actually, 1 is the
9  deposition notice.
10 Q. Well, 2. As Defendant's Exhibit
11 2, does that pretty much sum up
12 everything that's happened and why you
13 feel this case should proceed?
14 A. Absolutely.
15 Q. Now, when you were interviewing,
16 did -- and I'm going to give this to you
17 in two parts -- did Hal talk to you
18 about your job at SYSCO and what those
19 duties were and what you were doing and
20 making and everything there during the
21 interview?
22 A. At SYSCO?
23 Q. Yes.

Page 216

1  A. Yes. He -- he wanted to know
2  what I was currently making and what I
3  actually did on a day-to-day basis
4  there.
5  Q. And, here again, this is a
6  two-part question. Did Andy and Don,
7  when they came in and interviewed you,
8  talk to you about that some?
9  A. Andy -- I don't know if Hal
10 mentioned, but it came up about how we
11 did replenishments at SYSCO on day
12 shift. I mentioned earlier that's
13 stocking the pick slots for night shift
14 when they come in, so they don't start
15 selecting with, you know, a bunch of
16 empty pick slots. And that was totally
17 different from the way Merchants was
18 doing it. And I don't know if Andy
19 seemed intrigued or -- that was
20 something that he was interested in
21 because when you come in and you don't
22 have to back -- you're not backing your
23 selectors up waiting on letdown

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 217

1 operators on night to fill the pick
2 slots, the first couple of passes go
3 real easy because the picking slots are
4 full.
5      **Q.  Let me ask you this way, Steve:**
6 **Once you described what you had done at**
7 **SYSCO to Andy and Don, did they indicate**
8 **how you would fit into their company?**
9      A.  Not -- not sure I understand
10 your question, Derrick.
11      **Q.  All right.  Well, it might not**
12 **be very artfully asked.**
13          **Once you told them what you did,**
14 **did they indicate that it was any**
15 **different at Merchants other than the**
16 **way you had described the difference in**
17 **these?  What did you call them; pick**
18 **slots?**
19      A.  Yeah.
20      MR. DYKES:  Object to the form.
21      A.  No.  I mean, they seemed to
22 think I was -- you know, of course they
23 didn't offer me the job on the spot.

Page 218

1 But they liked everything they heard,
2 impressed with some of the things I had
3 to say as far as letdowns, that the
4 awards we had, you know.  And we were
5 proud of that.  That's something we were
6 extremely proud of and I made a point of
7 that during the interview because I was
8 proud of our accomplishments.
9          And, you know, they didn't lead
10 me to believe that I wasn't -- you know,
11 they didn't say, well, I wish you could
12 do this or I wish you could do that or I
13 wish you were better at this or better
14 at that.  I mean, I left with the
15 impression that they were fully
16 impressed with me and I was definitely
17 capable of doing the job.
18      **Q.  During the interview, did Hal,**
19 **Andy, or Don ever tell you the problems**
20 **that they were having?**
21      A.  None whatsoever.
22      **Q.  Okay.  Does the offer letter --**
23 **if you'll look at it.  I forget which**

Page 219

1 number it is.  I didn't write that one
2 down.  Somewhere around 6.
3      MR. DYKES:  6 or 7.  Somewhere
4 in there.  7.
5      **Q.  Okay.  What was previously**
6 **marked and entered as Defendant's**
7 **Exhibit 7, does that offer letter**
8 **contain anything that was discussed with**
9 **you by Hal, Andy, or Don about the job**
10 **or the working conditions there at**
11 **Merchants?**
12      A.  No, it does not.
13      **Q.  Okay.  Anything specifically**
14 **about the company, any of the problems**
15 **it's having or anything like that?**
16      A.  No.  No mention of anything
17 other than what I mentioned earlier
18 that, you know -- I went in really
19 expected -- expecting to go to work in a
20 warehouse just like SYSCO, only with the
21 Merchants name on it.  I had no reason
22 to not believe that was going to be the
23 case.

Page 220

1      MR. BLYTHE:  I got you.  I think
2 we've covered everything I need.  I
3 think I'm just rehashing some of what
4 Steve's already covered; if I just keep
5 beating the horse.  I don't think I've
6 got anything else to ask.
7      MR. DYKES:  I don't either.
8      (Whereupon, the deposition was
9           adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

55  (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 221

**A**

ability 33:1 74:1
able 13:13 43:6
90:16 145:22
199:19
absenteeism
141:5,7 165:2
165:15
absolutely
189:15 213:1
215:14
absorb 208:19
abundance
105:19
abused 100:22
acceptance
113:23
accomplishme...
218:8
account 92:21
92:23
accounts 198:19
accrued 161:4
accurate 87:11
87:14 111:10
111:17 122:18
123:9
achieved 44:15
acknowledgm...
5:4,6,9 127:22
128:4 130:2,12
131:12 132:8
133:8
Act 136:11
acting 7:3
action 1:5 211:6
211:18
actions 205:18
actual 129:9
196:14
actuality 189:19
Adams 1:7,17
2:1 7:13,18,23
8:5,12 16:3

61:9 108:21
120:19 121:3
128:9 130:6
181:8
add 49:17
112:18 205:11
adding 121:15
197:22
addition 129:2
additional
197:22
address 10:18
36:18
adds 154:12
adjourned 220:9
administration
26:9
administrative
12:21
advance 129:9
advice 63:12
advised 3:13
affect 56:18
affirmatively
206:21
afford 148:12
170:13
affording 98:1
afraid 107:3
afternoon 48:15
51:20 65:10
164:20
afterthought
78:19
age 100:22
184:8
ago 8:1 12:6
23:3 197:15
agree 118:1
132:13,22
133:5,9 136:7
AGREED 1:22
2:11,19
ahead 37:8

47:20 155:23
189:5 209:6
214:3
al 1:12
Alabama 1:2 2:7
3:6 6:7,16 7:3
7:5,11 10:21
13:9 18:22
24:16 42:2,14
94:4 187:21
193:17,20
194:12 195:12
208:9,14
Alex 12:13
15:15 16:10
17:13 18:15
20:15 21:13,16
23:23 24:2,5
24:13 30:16
38:4,13 40:9
41:11,12,20,22
42:11,23 43:4
43:11 44:18
49:14,22 50:2
50:10,18,23
59:17 60:5,20
74:8,15,19,21
81:13 107:10
166:5,9 206:13
210:11,13,19
210:22 211:14
Alexander 6:7
10:20 24:18
aliases 8:17
allegations 65:3
Alliance 12:18
13:4 14:4
Allstage 175:3
alter 129:4
156:15
altered 156:17
alternate 151:11
alternative
146:5

amazed 73:9
amended 3:7
amount 44:1
89:6 120:7
146:20 161:2
analysis 5:13
94:18
ancient 100:23
Andy 6:20 69:21
70:5,22 71:22
90:15 91:18
92:4,14 94:15
97:6 98:8 99:3
99:20 145:13
146:17 148:5,6
148:15 149:1
157:18,21
159:6 168:21
213:4 216:6,9
216:18 217:7
218:19 219:9
Andy's 70:4
95:20
anguish 192:2
Ann 17:4
anniversary
12:6
announced
42:13
announcement
91:11 174:1
annual 41:17
45:21 184:3
199:6 200:16
annually 199:9
answer 9:19
30:6 60:2 76:5
99:16 156:1,4
189:5 209:6
213:19 214:3
answered 75:10
177:17 190:21
213:10,18
anticipated

38:15 59:15
anti-union
93:22
anybody 15:6,9
42:15 71:18
129:15 146:13
147:15 148:1,2
178:15 201:6
211:21 214:9
214:14,15
anymore 63:5
63:17 107:7,15
107:22 148:12
167:14
anything's
206:13
anyway 58:12
82:13 89:2
107:5
applicant's
109:2
application 4:16
108:10,15
109:19,23
110:10,15
194:4,5,18
applied 40:14
119:15 186:4
194:20
apply 194:2
195:13
applying 186:6
194:9
appreciated
97:23
approximately
2:9 7:12
137:21
April 2:8 3:11
7:13
aps 194:16
area 15:16 16:18
17:11 18:12,13
18:15 19:8

# FREEDOM COURT REPORTING

Page 222

21:7,8 26:8
181:21
**arrange** 72:5
**arrested** 23:4
**arrive** 47:19
**arrived** 177:2
**artfully** 217:12
**Ashland** 193:14
**Ashley** 17:4
**asked** 13:18
29:10,11 44:21
62:2 70:18
72:14,16 74:5
76:22 79:9
81:11 83:16
86:2 91:3
93:17,20 102:7
102:23 103:4
110:16 138:11
158:2,2 159:22
160:3,11
161:22 162:4
162:11 173:22
176:18 189:12
190:20 209:3
213:9,19
217:12
**asking** 8:23
69:15 87:6
94:16 114:17
125:18 160:17
162:2 210:16
**aspect** 97:11
202:5
**aspects** 197:2
**ass** 149:10 180:7
**asserting** 100:8
**assign** 3:1
**assistant** 12:10
12:22 13:7
107:1 166:20
196:9,12,13
197:10 198:11
**assisting** 145:7

**associates** 24:21
**assume** 22:8
26:15 53:15
214:16
**assumed** 174:2,4
**assuming** 55:21
80:18,22
130:21,22
175:7 186:18
**assurance** 83:10
93:21
**assurances**
102:18
**assured** 78:16
**as-needed** 34:6
**Atlanta** 20:1
**atmosphere**
94:7,7
**attached** 61:8,21
64:3 65:13
66:18 67:4
108:19 109:13
113:16 117:14
121:8 123:23
127:12 128:7
130:9,19
131:18 132:4
168:11 174:23
181:6 182:8
**attack** 32:12
38:6
**attorney** 6:5
61:18 62:1,8
63:8,19 174:17
182:3
**attorney's** 62:2
**at-large** 194:3
**Auburn** 20:7
24:4,10 25:5,6
25:11 27:4
193:17,18
195:13
**August** 109:4,19
109:21,21

110:1,12
113:21 114:2
128:17 130:20
189:7
**aunt** 18:5,17
**Austin** 38:11
**automotive**
193:6
**available** 70:23
194:1
**avenue** 2:7 6:15
7:10 212:3
**average** 187:3
**averaged** 168:19
**avoid** 94:2
**Award** 73:2
**awarded** 73:2
**awards** 96:6
218:4
**aware** 57:10
93:13 170:9,11
170:19,21
200:21 201:19
202:3,18 207:2
**awful** 74:22
162:14 167:9
**a.m** 2:9 7:12

---

## B

**B** 4:8 5:1
**Baby** 180:13
**bachelor's** 26:2
26:8
**back** 23:2 25:20
25:21 45:13
64:23 68:16,17
90:14 91:17,21
92:4 101:19
105:8 106:10
106:11 107:13
107:17,20
108:1 114:8
120:11 156:20
158:21 164:8

170:1 171:9,11
172:11 176:15
176:18 177:9
196:20 206:18
216:22
**background**
71:17 72:15
74:6,14 92:11
**backing** 216:22
**backup** 95:16
**bad** 43:16 98:18
176:19 187:18
**Baggett** 207:22
**bankruptcy**
205:15
**Baptist** 21:12
**bare** 184:1
186:17
**base** 158:22
159:8 185:14
185:15
**based** 112:21
115:20 159:2
184:15 187:2
190:22 206:10
209:8
**basically** 73:12
126:14 165:9
166:11
**basis** 77:3 116:8
156:19 191:4
216:3
**Bates** 135:15
**beat** 161:21
**beating** 220:5
**beg** 106:10
**began** 63:12
**beginning** 38:20
44:10 54:23
**believe** 12:19
20:8 62:4
65:14 67:19
81:20 116:9
119:16 140:20

156:18 169:9
169:11 177:1
180:13 191:6
218:10 219:22
**belongings**
175:13,16
**benefit** 184:19
**benefits** 4:21
42:22 43:5
112:2,3 117:3
117:7,10,21,22
117:23 118:2
119:10 129:6
135:4,5,6,8,9
182:21 199:14
199:20
**Benjamin** 23:21
24:8
**best** 9:13 46:9
62:14 68:3
81:23 91:10
92:15 103:15
106:4,12
108:13 110:2
114:6 119:7
125:2 126:8
137:20 138:20
139:22 177:2
183:9 186:1
192:5
**better** 28:4
116:21 125:20
150:23 162:16
182:18 188:14
188:18 191:18
192:12 218:13
218:13
**beverages** 10:5
**big** 48:16 73:1
170:18
**bill** 198:16
**bills** 168:18
192:18 198:20
**bimonthly** 88:12

# FREEDOM COURT REPORTING

Page 223

| | | | | |
|---|---|---|---|---|
| **Birmingham** 2:7 | 153:16 185:15 | 177:6 | 139:18 140:8 | 103:15 182:10 |
| 6:16 7:10 | 188:14,19 | **broken** 175:23 | 206:23 | 183:19,19,22 |
| 18:18 19:5 | 213:22 214:16 | **Brooks** 2:5 6:13 | **call** 8:8 24:20 | 184:10 185:17 |
| **birth** 10:12 | **bonuses** 46:8 | 7:8 | 31:10 145:9,13 | 186:4,14 187:6 |
| **birthday** 79:15 | 88:16 199:10 | **brother** 16:19 | 149:2 195:2 | 188:1 190:18 |
| **biscuit** 147:10 | 199:12 | 21:20 193:12 | 217:17 | 200:22 201:5,7 |
| **bit** 202:2 | **book** 80:2,16,17 | 194:10 | **called** 22:12 | 201:22,23 |
| **blah-blah-blah** | 80:22 | **brothers** 16:17 | 23:9 24:16 | 202:9,22 |
| 42:18 48:22 | **born** 11:4 | 17:7 | 46:22 68:17 | 203:19 205:8 |
| 68:7 | **boss** 96:19 | **Bryant** 2:2 3:8 | 69:14 79:14 | 211:7 215:13 |
| **blah-blah-bla...** | 155:18,21 | 7:1 | 89:22 101:20 | 219:23 |
| 198:6 | 177:15 201:12 | **budget** 170:16 | 154:3 171:11 | **cases** 185:4 |
| **blank** 99:4 | 202:13 | **build** 42:14 | 180:11 188:13 | 214:6 |
| 148:1,8 | **bottom** 128:15 | 193:11 | 188:16,21 | **Casey** 19:22,23 |
| **bleak** 206:15 | 130:5 131:5 | **built** 43:7 | 189:6 192:11 | 160:12 162:18 |
| **blood** 15:19 | 132:21 | 139:17 | 202:6 | 203:22 |
| 17:11 18:12 | **bought** 11:2 | **bumping** 179:6 | **calling** 189:1 | **cashing** 192:15 |
| **Bluestill** 39:8 | 169:8 | **bunch** 216:15 | **calls** 69:14 | 192:16 |
| **Blythe** 4:5 6:4 | **bounds** 198:3 | **busiest** 204:18 | **Calvary** 21:12 | **categories** 44:12 |
| 37:8 57:15 | **Bowman** 51:6 | **business** 26:9 | **Cameron** 19:21 | 44:14 |
| 64:14 117:4 | 51:17 | 27:19,23 29:6 | 20:1 | **categorized** |
| 120:1,4,8,14 | **branch** 70:1 | 42:15 50:14 | **candid** 96:1 | 136:7 |
| 123:16 125:14 | 137:15 206:23 | 60:20 71:10 | **candidate** 84:5 | **category** 136:6 |
| 136:12 155:22 | **brand** 174:11 | 76:12 77:7 | **candy** 31:19 | **cause** 7:14 |
| 182:13 183:15 | **breach** 185:23 | 96:22 105:15 | **capable** 218:17 | **CDs** 192:16 |
| 189:3 206:3 | **break** 25:17 | 166:18 187:20 | **car** 8:10 27:19 | **cell** 178:16 |
| 209:5 210:1,5 | 57:16,18,19 | 187:20 188:4 | 27:23 28:8 | 180:4 |
| 220:1 | 89:9 120:3,10 | 197:21 207:8,8 | 29:5 70:16 | **Center** 12:2,9,12 |
| **boat** 199:13 | 120:18 123:17 | **busy** 204:10 | 180:3 191:20 | **Central** 13:8 |
| **boating** 204:12 | 180:19,23 | **buyer** 31:17 | **care** 49:5,8 | 24:16 |
| **body** 84:10 | 206:2,4 | **buying** 8:10 | 147:2 192:19 | **CEO** 12:11 |
| **Bolin** 17:12 | **Breakdowns** | 31:18 | **cared** 96:7 | **certain** 29:23 |
| **bolts** 157:20 | 167:9 | | **career** 185:3 | 40:19 44:9,13 |
| **bonus** 44:17 | **breaks** 199:3 | ───── **C** ───── | **Carla** 17:2 | 44:15 48:9 |
| 45:13,15,19,23 | **brick** 179:7 | **C** 6:1 | **Carolina** 169:10 | 72:18 93:6 |
| 46:2,10 66:19 | **brief** 48:3 | **cabin** 196:23 | **carpenter** 30:9 | 161:1 184:11 |
| 83:7,20 88:19 | **briefly** 92:9 | **Cabinet** 193:9 | **carriages** 169:20 | **certainly** 80:6 |
| 103:13 111:20 | 210:10 212:18 | 193:15 | **carry** 91:3 | 84:2 |
| 111:22 115:14 | **bring** 102:7 | **cabinetry** | **carrying** 104:20 | **certification** |
| 115:20 116:5,8 | 182:1 | 193:12 | **cars** 29:8,16,22 | 95:8 |
| 120:23 121:12 | **Brittany** 21:5 | **calendar** 62:23 | 30:5 | **certified** 94:16 |
| 123:7 124:8,14 | **broad** 15:13 | 63:1 | **case** 22:14,15,16 | 95:3,6,14,16 |
| 125:22,22,23 | **broke** 25:16 | **Calera** 43:10 | 49:10 62:5 | **certify** 7:4 |
| 126:6,19,22 | 140:2 169:4 | 102:5 105:16 | 78:16 96:3,4 | **chain** 107:4 |

# FREEDOM COURT REPORTING

Page 224

chances 209:13
209:15
change 29:13
129:4 143:13
changed 42:2
52:10
changes 196:15
207:1
charge 23:9
49:16 73:18,21
76:11
Charles 8:4,11
8:11
cheaper 168:23
check 4:23 66:8
88:13 89:5
123:20 124:6
124:12,14
checked 110:21
checkup 169:17
checkups 200:16
chicken 53:10
92:19
children 11:18
16:15,16 17:3
18:3 19:17
20:18
chitchat 202:10
choice 146:3
chronological
27:9
church 21:9
circumstances
40:19 110:18
184:11
City 6:7 10:21
12:13 15:15
16:10 17:13
18:16 20:15
21:13,16 23:23
24:2,5,13,18
30:17 38:4,13
40:9 41:11,12
41:20,22 42:11

42:23 43:4,11
44:18 49:14,22
50:2,10,18,23
59:17 60:5,20
74:8,15,19,22
81:13 107:10
166:6,9 206:13
210:11,13,19
210:22 211:14
Civil 1:5 3:6 7:5
claim 8:21 9:1
23:14 85:11
87:10 98:7
111:10 190:7,9
190:11 191:7
claiming 85:8
87:2 88:4
100:5,7 124:13
124:15 158:6
claims 62:5
65:15 205:12
Clanton 19:6
74:22 102:5
108:2 139:16
139:21 163:22
clean 174:11
179:17
cleanliness
173:19
climate's 204:11
clock 165:14
clock-ish 165:4
close 43:11
198:17 200:11
closed 53:7
90:13
closer 74:18,20
clubs 21:16
clue 69:12 180:2
cog 72:23
cold 95:13
collarbone
25:16

college 24:13,15
24:17,18 25:4
25:7
come 34:23 36:5
43:19 49:9
53:8 64:23
70:20,21 79:22
80:6 84:22
85:2 91:17
93:6 99:11
100:4,10 101:2
120:11 144:19
145:4 156:12
157:14 158:7
158:13,23
162:19 163:6
163:21 164:1,7
169:10,12
176:18 179:8
182:23 188:4
212:11 216:14
216:21
comfortable
171:1
coming 50:17
79:16 94:23
149:16 156:19
160:14 165:3
165:11 177:20
178:22 192:18
211:9,16
commencing 2:9
7:11
comments
202:20
commission
23:11 199:13
Commissioner
7:4
commitment
115:7
committed
29:14 45:3
Community

24:17
commute 77:5
107:12 108:1
comp 23:13
companies
195:22
company 30:17
30:18 31:23
33:11 59:21
60:2,6 67:17
68:3 69:13,16
70:9 82:21
112:1 130:3
134:5 138:18
139:4,7 140:14
141:14 169:10
171:15 175:10
188:3 217:8
219:14
comparatively
54:19
compare 30:21
46:5 49:23
50:11
compared
146:22 153:11
182:23 185:2
compensation
79:3
competing
193:13
complaint 5:16
182:4,9 190:2
complete 47:6
108:9
completed
139:21 185:3
compliance 2:15
computer 47:22
63:14,21 64:11
concluded 84:13
concur 127:2
condition 33:3
173:7,19

conditions
210:11 212:19
213:23 214:5
219:10
conducive
204:12 208:17
conduct 71:1
conducted
157:20
conference
90:13 177:10
confidence
107:2 201:11
confusing
136:18
consequences
211:4
consider 177:20
considered
99:21 175:19
Constancy 2:5
6:13 7:8
constant 176:9
constantly 167:9
constitutes
185:22
constraints
148:11
construction
29:1 139:20
contact 183:10
contacted 67:16
183:11 195:4,6
contain 64:17
219:8
contend 214:12
214:12
continually
151:11
continue 13:23
101:12 177:7
continued 5:1
162:16
contract 93:1

# FREEDOM COURT REPORTING

Page 225

| | | | | |
|---|---|---|---|---|
| 185:23 | 44:19 | **current** 115:10 | 47:21 48:13 | 162:6 166:12 |
| **contracts** 92:19 | **counterpart** | 115:21 208:15 | 51:3,8 54:4,12 | 173:5 177:2 |
| **contributed** | 163:9 207:21 | **currently** | 55:5,6 56:20 | 193:1 204:4 |
| 184:16 | **County** 20:8 | 196:14 216:2 | 56:21 57:2,20 | 205:2 207:21 |
| **contrived** 100:9 | 21:21 | **curvy** 74:23 | 57:21 67:22 | **daytime** 53:15 |
| **control** 48:8 | **couple** 34:3,13 | **custom** 193:11 | 70:12 71:1 | **day-to-day** |
| 82:8 94:19 | 38:21 52:20 | **customers** 49:9 | 73:6 74:10,13 | 82:12 137:5 |
| 95:12 212:4 | 77:18,18 80:10 | 196:21 | 75:20 76:3,5 | 196:16 216:3 |
| **controlled** | 101:20 105:12 | **cutting** 210:8 | 78:9 79:2,14 | **deadheading** |
| 167:22 171:2 | 123:15 141:16 | ——————— | 80:13,13 81:21 | 208:22 |
| **conversations** | 142:13,14,23 | **D** | 82:9,13,18 | **deal** 75:7 86:12 |
| 62:19 63:3 | 150:6,10 | **D** 4:1 | 90:18,20,21 | 154:18 160:14 |
| 69:8 98:21 | 153:23 164:10 | **dad** 19:9 | 93:2,13,16 | 195:1 |
| 148:6 171:8 | 179:2 185:19 | **Dadeville** 18:10 | 95:4 97:4 | **dealership** 28:1 |
| 202:8 203:23 | 197:15 210:2 | **damage** 49:6 | 98:17,23 | 28:7,22 29:23 |
| **convinced** | 217:2 | **damaged** 191:6 | 100:17 103:17 | 30:4 193:8,8 |
| 168:13,20 | **course** 49:4 54:6 | 191:8 | 103:18,23 | 197:1,18 |
| **coordinator** | 69:1 98:15 | **date** 7:4 10:12 | 104:3,16 107:8 | **dealing** 165:21 |
| 95:9 | 121:14 147:18 | 13:5 14:3 | 110:4 111:3 | **deceit** 183:6 |
| **Coosa** 21:21 | 151:12 154:17 | 32:22 71:4 | 137:6 138:6,15 | **decent** 120:7 |
| **copied** 171:3 | 169:14,16 | 72:4 93:7,8,8 | 143:19,22 | **decide** 27:22 |
| **copy** 64:4 81:1 | 217:22 | 109:4 114:5 | 144:11,12 | 157:14 176:20 |
| 174:19 182:9 | **court** 1:1 2:3,16 | 130:4 132:9,15 | 145:5,7 148:23 | **decided** 104:9 |
| **core** 81:22 | 3:14,15 7:1 9:9 | 132:21 133:3 | 149:20 150:7 | 105:5 |
| **corner** 91:15 | 22:8,10,18 | 142:6 166:2,2 | 156:10 160:1,8 | **decision** 91:8 |
| **corporate** 60:12 | **cover** 18:22 | **dated** 109:19,20 | 160:17 162:4 | 102:17 104:11 |
| 60:15,19 95:19 | 136:3,3 | 110:1 121:3 | 164:8,17,18 | 104:22 106:7 |
| 96:1,21 167:22 | **covered** 76:22 | 128:17 130:4 | 165:4,8,10,11 | 114:8 158:23 |
| 171:4 | 220:2,4 | 130:12,15,20 | 166:17 174:16 | 159:8 190:22 |
| **Corporation** | **coworker** 86:14 | 131:14,23 | 176:1,22 177:2 | 209:8 |
| 27:6 | **credentials** 84:6 | 132:7 133:9,12 | 178:3,9 179:11 | **decision-maki...** |
| **correct** 12:19 | **crew** 48:2,14,16 | 135:18 168:4 | 183:10 186:18 | 168:22 |
| 47:3 64:21 | 53:8 55:4 | 175:6 | 201:16 204:21 | **deem** 177:14 |
| 67:7 89:17,20 | 75:13,14 | **dates** 14:7 125:8 | 207:18,20 | **DEFENDANT** |
| 114:6 122:12 | **criteria** 44:10 | **daughter** 11:7 | 208:1 216:11 | 6:10 |
| 127:17 128:19 | 194:7,8 | 11:11 17:4 | **days** 52:19 54:2 | **Defendants** 1:13 |
| 212:22,22 | **critical** 94:19 | 18:7 19:22 | 56:17 66:7 | 4:10 |
| 213:2 | **crow** 106:9 | **daughters** 20:20 | 68:17 69:10 | **Defendant's** |
| **Corresponden...** | **cruisers** 196:22 | **day** 2:8 3:11 | 79:11,13,17 | 61:4,6 63:18 |
| 4:18 | 196:23 | 7:12 28:12 | 98:4 101:20 | 64:1,22 65:8 |
| **costs** 208:21 | **crying** 104:20 | 31:2 33:21 | 112:17 150:10 | 65:11 66:11,16 |
| **counsel** 1:23 | 104:23 105:1 | 39:7 41:4 42:9 | 159:18,20 | 66:23 67:2 |
| 2:21,23 7:7 | **cumulatively** | 43:15,16 46:16 | 160:22 161:4,7 | 108:15,17 |
| **counteroffer** | 15:2 | 46:19 47:17,18 | 161:15,16,22 | 109:7,11,14 |

# FREEDOM COURT REPORTING

113:12,14
116:23 117:12
121:2,6 123:19
123:21 127:6
127:10 128:2,5
130:1,7,14,16
130:17 131:8
131:12,15,16
131:22 132:2
132:11,14,17
132:20 133:19
135:2,12 168:3
168:9 174:14
174:21 181:2,4
182:5,6 215:5
215:10 219:6
**definitely** 85:5
96:17 172:14
218:16
**definitively**
61:14
**defrauded**
189:22 190:17
**degree** 24:19
25:3,10 26:2,8
26:10 202:4
**deliver** 157:8
**delivering** 3:8
209:1
**delivery** 137:8
**denied** 40:5
179:2
**dentist** 69:4
**denying** 161:19
**department**
27:11 82:3
194:11 195:19
197:1
**departments**
96:16
**depend** 84:4
**depended** 46:13
**depending**
44:11 52:10

165:7
**deposition** 1:16
2:1,12,13 3:3
4:11 9:7 10:1
61:5 215:9
220:8
**depositions** 2:17
**Derrick** 6:4
61:15 64:5
183:11,14
217:10
**describe** 109:8
**described** 135:6
212:21 217:6
217:16
**description**
196:15
**desk** 67:21
178:15,17
179:18
**despite** 162:17
**details** 187:9
198:7
**determination**
112:20 149:22
**determined**
68:10
**development**
12:18 198:1
**deviated** 52:16
**deviation** 158:20
**dictated** 96:22
**died** 18:5 39:11
166:13
**difference** 60:4
185:5 217:16
**different** 53:19
60:8 133:15
136:2 154:3
178:11 185:9
210:11,20
212:1,20
216:17 217:15
**diploma** 26:10

**direct** 51:5,10
137:12
**direction** 96:8
101:11
**directly** 94:10
**director** 12:22
13:16 45:9
82:11 86:3
91:9 103:23
163:17 171:5
175:4
**directory** 194:13
**disability** 23:17
119:16
**disarray** 152:23
**disciplinary**
211:5
**discipline** 94:8
147:6,14,15
211:18 212:5
212:10,13
**discovery** 61:19
**discretion** 129:7
**discrimination**
23:9 142:2
**discuss** 83:15
177:12 212:9
**discussed** 86:6
219:8
**discussing** 177:4
**dispute** 111:20
123:3
**disrupt** 156:15
**disruption**
156:16
**dissatisfied** 86:9
**distraught**
179:20 192:4
**distribute**
198:14
**distribution**
166:6 188:4
**distributor**
30:20 69:16

71:14
**District** 1:1,2
18:21
**divers** 149:5
**divide** 88:12
**DIVISION** 1:3
**divorce** 15:3
22:8
**divorced** 14:22
**dock** 95:13
**docks** 196:19
**doctors** 200:12
200:15
**document** 4:12
4:21 63:19
64:8,20 117:18
127:7 174:17
**documents**
61:21,22 62:3
62:4,7,9
113:11 200:21
**doing** 73:7,11
86:18 93:10
105:21 144:1
145:1 148:16
166:6 186:14
187:20 191:23
192:1 196:11
215:19 216:18
218:17
**dollar** 186:3
**dollars** 43:2
146:23
**Don** 70:7 71:22
92:5 98:8
99:20 134:8,10
134:14,18,22
145:9 157:18
157:21 213:4
216:6 217:7
218:19 219:9
**door** 75:16
90:13 98:19,20
116:14 192:11

**Doug** 51:11,21
51:22 52:5,9
**downright**
100:21
**drafted** 182:4
**draw** 185:1
**drawer** 62:12
**drawing** 184:23
**drawn** 185:3
**drive** 10:20 69:3
**driven** 69:1
95:23 98:15
**driver** 82:22
139:7 209:1
**drivers** 55:15,17
55:19 81:23
149:6 154:11
154:16,23
155:5 175:19
175:21 176:9
176:11,13,16
**driver's** 10:14
**drive-through**
147:12
**driving** 55:2
**dry** 48:17
196:19 197:23
**duly** 7:19
**duties** 137:4
207:23 215:19
**duty** 22:13
32:17
**Dykes** 3:9 4:4
6:12 7:22 8:1
27:21 57:17,20
64:13,15,16
117:6,9 119:22
120:2,6,9,17
120:19 123:13
123:18 125:12
136:13,16
180:22 181:1
182:11,14
206:1,5 209:22

# FREEDOM COURT REPORTING

214:2 215:8
217:20 219:3
220:7

**E**

E 4:1,8 5:1 6:1,1
**earlier** 95:18
135:7,10
148:15,18
179:2 206:17
216:12 219:17
**early** 47:20
104:17 106:9
147:9 148:21
165:11
**earn** 45:15
83:22 88:21
**earned** 82:17
**earnings** 4:14
66:13
**easier** 208:16
**easy** 217:3
**eat** 106:9 120:16
192:5
**eating** 191:13
**Economic** 12:18
13:4 14:3
**economy** 206:12
**Eddie** 45:4,6
52:6 96:19
104:17
**education** 26:22
194:6
**effect** 2:14 9:7
**effective** 3:7
168:23
**effort** 157:22
**efforts** 162:17
**eight** 44:12
49:18 75:19,19
76:2,2 84:20
111:2 121:19
141:11 153:20
164:5 184:6

**eight-hour** 77:8
144:2
**either** 70:1
75:23 140:22
220:7
**Eldridge** 17:12
18:2
**element** 40:18
**eligible** 111:19
111:21 115:19
119:9,12
122:11,23
194:8 199:10
**eliminate** 129:4
**Ellis** 201:13
**employ** 193:10
**employed** 39:6
129:21 195:10
**employee** 4:23
5:8,11,13 40:7
40:13 86:14
89:23 94:10
97:12 118:3,13
118:21 123:20
129:9,22
130:14 131:13
131:23 132:7
132:16 133:2,8
133:11 135:16
135:18 136:8,9
165:23 184:19
194:12
**employees** 39:1
40:15 104:14
104:14 117:1
118:11 145:3
146:19 147:1
147:20 153:1
157:12 165:22
184:20 194:2
210:23
**employee's**
131:7
**employment**

4:17 5:4 23:10
27:2 62:10
98:22 108:16
124:2 127:22
128:4 134:11
136:6 139:6
140:10 141:1
164:22 175:20
195:16
**empty** 48:1
216:16
**encompasses**
194:22
**ended** 97:20
141:1
**engaged** 15:9
**enjoy** 97:12
**enjoyed** 60:13
96:19 182:20
**enrolled** 26:1
**ensued** 98:22
**ensure** 165:16
**entered** 47:7
215:5 219:6
**entice** 100:10
**entire** 38:17
**entitled** 118:1
**entity** 171:14
**equal** 23:10
189:14
**equals** 125:23
**equate** 45:20
89:7
**equates** 126:21
126:22 199:8
**equipment**
100:21 167:6,8
168:2,8,18
169:4,5,14,18
170:6,22
173:10,16
174:12 213:15
**errors** 151:1
**especially**

107:21
**Esq** 3:9 6:4,12
**essence** 30:23
107:10
**et** 1:12
**etched** 187:1
**eventually** 107:9
168:13
**Everett** 28:23
29:3 30:8,14
**everybody** 157:2
157:11 204:19
**evidence** 3:3
**exact** 64:4 81:20
195:19
**exactly** 45:17
52:21 64:8,21
88:1 168:16
202:15
**examination** 4:3
7:14,22 210:5
**examined** 7:19
**excel** 44:13
**excellent** 81:21
174:11
**excess** 168:19
186:16
**excuse** 18:9
**excused** 90:12
**executive** 12:10
13:7 107:1
**exempt** 89:22
136:8
**Exhibit** 61:5,6
63:19 64:1,22
65:8,11 66:11
66:16,23 67:2
108:15,17
109:8,11,14
113:13,14
117:1,12 121:2
121:6 123:19
123:21 127:6
127:10 128:3,5

130:2,7,14,16
130:17 131:8
131:12,15,16
131:23 132:2
132:14,17,20
133:20 135:3
135:13,17
168:4,9 174:15
174:21 181:2,4
182:5,6 215:6
215:10 219:7
**exhibits** 3:12
132:11 136:18
**existed** 173:1
**existing** 105:15
194:2
**exit** 4:20 113:18
**expect** 75:18
77:17 80:6
116:10,15
173:12 178:7
184:11 215:2
**expected** 36:2
75:9 80:5
82:10 83:8
118:15 151:17
155:3 211:1,2
211:3 219:19
**expecting** 98:19
167:3,5 172:7
219:19
**expense** 208:18
**expenses** 207:13
**expensive**
169:21,22
**experience**
73:16 74:1,14
92:18 183:9
**experienced**
96:10
**expiration** 93:8
**explain** 72:17
99:23 126:2
**explained** 72:21

# FREEDOM COURT REPORTING

Page 228

| | | | | |
|---|---|---|---|---|
| 73:5 75:12 79:10,15 92:21 93:12 173:23 179:4 **explaining** 116:4 **explains** 117:23 **exploratory** 42:19 **exponentially** 185:16 **expound** 184:8 **extend** 57:4 **extended** 164:6 **extremely** 95:22 143:10,12 218:6 **ex-employees** 147:11 **e-mail** 5:12 168:4,12 170:10 171:9 **e-mails** 86:13 ──────── **F** **faces** 55:19 **facility** 40:8,23 42:14 59:8 100:20 139:15 139:17 140:2,5 167:7 173:9,12 174:6,11 180:1 181:18 193:9 207:13 208:4,6 213:14 **fact** 96:12 135:22 170:20 **factor** 170:14 **factored** 209:12 214:6,7 **factors** 40:18 191:10 **fair** 136:10 187:16 | **faith** 156:14 **Fame** 73:2 **familiar** 93:3 **family** 17:22 19:8 21:7 59:18 77:10 97:8,11,14 98:12 99:12,18 99:21 102:14 103:21 104:9 104:15 105:4 159:5 160:14 161:8 162:1 209:11 **family-owned** 59:21 60:1,6 60:20 **far** 8:10 13:22 19:4 26:21 33:4 34:22 42:23 43:23 59:23 61:11 72:3,14 73:7 76:16,17 77:4 82:3 87:12 88:7 89:5 92:11 93:6 136:3 137:3 145:2 165:21 166:16 187:22 199:16 200:17 207:2 208:3 213:11 218:3 **farm** 21:21 **fast** 210:9 **Faulkner** 26:1,3 **faxed** 61:20 **February** 124:5 125:15 **fed** 178:20 **Federal** 2:6 6:14 7:9 **feel** 180:12,13 187:16 215:13 | **feet** 80:9 **felt** 155:14 183:7 192:12 **female** 86:13 **Fifth** 2:6 6:15 7:10 **figure** 84:6 89:13 109:18 158:10 186:3 **figured** 106:11 182:11 192:9 **figures** 186:13 **file** 201:20 **filed** 3:15 8:22 21:22 22:1 23:8,13 182:10 182:15 185:6 205:14 **fill** 31:15 110:9 129:20 194:4 217:1 **filled** 92:10 109:23 110:3 129:17,22 194:15 **finally** 168:20 169:8 191:13 **financial** 182:22 191:19 **financially** 104:8 208:17 **find** 36:17 42:20 86:22 120:16 149:14 173:12 192:23 193:2 **fine** 18:19 57:18 84:23 91:2 102:10 103:7 120:8,9 180:22 **fingers** 101:3 **finish** 34:23 134:2 **finished** 73:13 75:15 | **finite** 184:21 **fire** 99:5,7,15 141:6 148:1,2 148:15 149:10 149:19,23 212:13 **fired** 141:5 142:1,4,9 163:12 165:18 166:8,9 211:10 211:11,21,22 **fires** 58:13 **first** 7:19 20:23 34:5 45:8 68:4 75:7 88:20 92:16 98:17 99:10 100:17 108:8 110:3 121:10 122:21 123:11 124:20 125:3 150:6 152:9 159:23 178:4 196:1 217:2 **fiscal** 44:10 **fishing** 21:18 **fit** 47:2 217:8 **five** 43:17 48:3 49:1 99:13 121:19 146:23 151:5 160:22 187:2 **five-day** 205:2 **five-year** 35:15 **five-year-old** 173:9 **fix** 35:20 36:16 36:19,21 37:3 37:17,23 38:7 58:1,17 59:1 76:13 159:17 167:15 **fixed** 35:20 58:3 58:8 59:9,11 | 59:12 76:8 169:19 171:3 **fixing** 177:12,18 **flexibility** 85:6 **flexible** 84:15 **floor** 92:9,13 95:13 **Florida** 67:18 160:14 161:8 208:10,15 **fold-out** 105:14 207:4 **folks** 49:15 54:4 60:16 156:23 158:11 195:21 203:16 205:7 **follow** 74:3 **followed** 34:11 211:6 **following** 7:15 57:1,4 137:9 **follows** 7:20 **follow-up** 210:2 **follow-ups** 210:7 **food** 30:19 42:2 42:15 68:3 69:16 77:7 166:6 173:3 188:3 **Foods** 41:21 **Foodservice** 1:12 6:11 8:21 21:23 30:22 50:1,12,22 60:17 61:2 62:10 63:4,10 65:4 67:9,14 71:8 74:18 92:19 105:8 108:3 114:1 117:2,11 120:22 124:4 127:21 128:3 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 229

| | | | | |
|---|---|---|---|---|
| 129:3 137:1,18 | 61:15 | 161:21 | **given** 10:1 33:1 | 200:16 202:5 |
| 143:5 152:5 | **forwarding** | **full** 2:14 8:4 | 36:5 62:1,8 | 206:18 207:7 |
| 158:8 176:21 | 170:12 | 47:12 48:2 | 76:12 77:2 | 209:6 211:14 |
| 188:6 189:1,6 | **found** 68:23 | 196:17 203:21 | 84:17 103:15 | 214:3 217:2 |
| 189:8 196:3 | 71:10 142:8 | 217:4 | 103:20 104:8 | 219:19 |
| 199:21 200:6 | 145:20 146:9 | **Fuller** 34:10 | 130:23 146:3 | **goes** 92:20 125:9 |
| 200:14 202:14 | 156:10 172:5 | **fully** 218:15 | 146:11,13,16 | 172:11 |
| 203:17,20 | 172:13 183:22 | **full-time** 24:5 | 148:10 163:15 | **going** 8:23 9:11 |
| 206:19 | 206:11 | 32:4 49:2 | 167:7 169:22 | 10:23 14:4 |
| **force** 2:14 9:7 | **four** 99:13 | 197:4,8,13,16 | 174:6 175:17 | 15:13 26:6 |
| 81:12,18,20 | 121:19 138:22 | **function** 154:22 | 184:11 189:10 | 31:10 36:3 |
| 83:11 85:21 | 140:16 151:5 | **functioning** | 191:15 208:15 | 41:17 42:13 |
| 87:22,23 | 152:19 172:18 | 153:3 | 214:7,11 | 44:2,5 47:23 |
| 134:22,23 | 184:5 | **further** 2:10,18 | **giving** 129:8 | 50:17 52:11 |
| 197:11 212:4 | **four-page** 194:5 | 19:5 71:3 | **glad** 14:18 92:7 | 56:15 61:4 |
| **Ford** 28:1,6,21 | **frame** 32:22 | _____ | **Gloria** 18:8,8 | 63:18 64:19 |
| **foreclosure** | 33:4 143:11 | **G** | **glue** 101:15 | 65:7 66:9,10 |
| 205:18 | **frames** 106:18 | **gainfully** 195:10 | **go** 8:12 17:20 | 66:22 67:9 |
| **foregoing** 7:6 | **fraud** 185:23 | **garner** 92:23 | 21:9,11 23:20 | 68:2,11,13 |
| **foreseeable** | 191:4 | **gas** 196:18 | 24:10 25:2,17 | 69:8,18 70:10 |
| 191:16 | **fraudulent** | **gazed** 133:23 | 25:20,21 27:4 | 70:23 71:1,6 |
| **forever** 102:20 | 183:5 | **general** 70:1 | 27:22 28:21 | 71:23 72:1 |
| 156:17 | **fraudulently** | 72:14 137:16 | 29:2 31:7 | 77:21 78:3,5 |
| **forget** 218:23 | 158:7,12,13 | 155:20 | 35:18 36:20 | 79:21 81:11 |
| **forklift** 54:22 | **free** 207:15 | **generally** 14:8 | 37:8 41:19 | 82:14 83:17,20 |
| 105:19 146:21 | **Freedom** 67:18 | **Geneva** 105:18 | 42:7,21 45:13 | 89:1 90:1,4 |
| 207:19 | **freight** 46:20 | 208:2,7 209:3 | 47:20 48:5 | 99:16 101:10 |
| **forklifts** 55:2 | 48:9,23 137:6 | 209:12 | 53:11 69:2,15 | 101:12 102:8 |
| **form** 2:22 28:11 | **French** 185:8 | **George** 39:8,11 | 72:1 80:11 | 102:15,20 |
| 132:8 155:23 | **fresh** 53:10,11 | 166:13 | 86:8,11,20 | 103:22 105:2 |
| 189:4 209:6 | 94:21,22 | **getting** 35:18 | 87:3 88:19 | 105:22 107:23 |
| 211:17 214:2 | **Friday** 28:12 | 41:16 89:18 | 91:20 94:9,11 | 108:1,14 109:7 |
| 217:20 | 57:1,4 80:11 | 120:21 124:19 | 104:3,18 105:8 | 109:8 112:7 |
| **formal** 26:21 | 204:7,15,22 | 124:19 143:8 | 106:10 107:3 | 113:4,10 |
| 43:18 196:4 | **Fridays** 162:12 | 168:7 | 112:23 120:5 | 114:14 116:10 |
| **former** 116:5 | **Fried** 92:18 | **get-go** 156:15 | 123:15 133:18 | 116:23 120:4 |
| **forms** 81:4 | **friend** 28:2 | 178:20 | 146:4 147:7,8 | 120:15 121:1 |
| **formula** 45:18 | 201:17 | **give** 78:1 79:21 | 154:19 155:23 | 123:14,18 |
| 46:1 | **friendly** 202:10 | 80:10,15 89:1 | 161:7 162:4 | 127:6 128:2 |
| **forte** 82:8 | **friends** 54:21 | 102:20 123:14 | 164:8 180:1 | 130:1,13 131:2 |
| **forth** 44:9 108:1 | 104:15 | 143:11 159:10 | 185:18 189:5 | 131:22 134:15 |
| **fortunately** | **front** 172:12 | 159:11 161:14 | 190:23 191:15 | 139:13 141:6 |
| 184:23 | 176:8 | 166:1 194:7 | 193:21 194:23 | 143:7 145:21 |
| **forwarded** | **frustrated** | 215:16 | 195:15 200:12 | 155:22 156:13 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

158:21 162:11
162:20 165:12
168:3 169:15
169:23 170:14
171:3,17
172:15,16,17
174:4,14 177:7
178:9,12 179:9
179:10 180:2,5
181:1 182:4
186:12,15
189:3,4 191:11
191:18,22
192:22 197:19
198:10,11
200:10 201:19
207:6,7,16
209:5 210:1,9
211:19 212:12
214:17 215:16
219:22
**good** 9:11 28:2
43:15 57:15
59:22 81:22
86:18 91:6
96:6 97:16
133:18 144:12
155:17,19,21
171:13 180:16
182:19,21
183:19 202:2
**good-bye** 104:20
**gotten** 69:14
95:7 136:19
179:1 206:14
**grade** 194:18
**gradually**
162:16
**graduate** 24:7
**graduated** 24:11
**grand** 103:14
**grandparents**
209:11
**grass** 165:20

**great** 81:19,21
82:7 83:5,10
83:11 96:5,18
156:21 182:20
**green** 165:20
**greet** 157:23
**grew** 166:19
**groceries** 31:2
139:19 208:22
**grocery** 31:18
**ground** 140:2
**grounds** 3:1
**group** 42:3
81:22
**growing** 198:3
**grown** 197:21
**guaranteed**
184:7
**guess** 12:4 13:20
14:5,6 15:1,5
18:14 19:3
20:22 24:6
26:23 27:18
30:6,23 36:17
37:6 40:17
42:14 43:5
49:21 50:4
54:9 59:3,5
60:2 65:21
69:11 70:17
83:21 87:14
92:13 94:18
98:12 105:12
106:8 108:8
125:18 126:18
129:16 137:22
172:8 187:20
192:4 197:16
198:2 212:18
213:8
**guessing** 141:17
**guidance** 159:11
**guideline** 40:17
**guy** 39:7 67:22

82:7 83:3
84:19 86:8,9
86:17 95:11
98:2 156:21
166:12,12
170:2 207:17
207:18
**guys** 77:20 85:4
91:5 105:20
146:21
**guy's** 116:3

_____

## H

**H** 4:8 5:1
**HACCP** 94:16
94:17 95:2,5,7
95:9,14
**Hal** 69:21,23
70:15 71:22
75:4,9 79:21
81:6 84:9 85:9
85:12 86:4
87:10,10 90:11
90:12 92:6,9
98:1 101:13,20
114:11,12
116:1 118:6,14
118:18 122:22
137:11,17
143:17 148:4,9
155:11,17
156:4 157:2,3
157:3,12,17,19
158:17 159:3,6
159:9,11
160:13,21
161:10,11
167:16,16,19
167:19 171:21
173:15 174:8
177:11,11,15
177:16,17
203:7,8,9,21
212:21 213:22

214:18 215:17
216:9 218:18
219:9
**half** 11:1 28:12
75:20 76:3
151:13 169:3,3
187:3
**halfway** 102:3,5
**Hall** 73:2
**Hal's** 110:7
158:3
**hand** 114:9
178:15 208:5
**handbook** 5:7,8
5:10,11 40:8
40:14 80:18,23
81:2 130:3,11
130:15 131:13
131:23 132:7
132:16 133:2,9
133:11,15,21
133:22 135:4
135:16,18,19
135:23 136:2
136:17 160:20
**handbooks**
158:22
**handed** 64:9
178:14
**handle** 48:23
72:21 150:22
**handled** 72:18
**handles** 207:4
**handling** 92:20
94:21 169:11
**hands** 41:1 92:7
147:4,14
**handshakes**
97:21
**hands-on** 40:23
**handwriting**
110:13
**hang** 90:23 99:6
99:9 212:14

**Hannah** 11:11
11:16
**happen** 142:3
211:20
**happened** 33:3
35:22 36:6
57:23 58:10
63:3 67:11,20
70:11 71:21
72:7,8,11 86:2
87:7 90:11
92:4 101:17
106:20 141:10
141:23 142:5
160:2 171:16
183:20 200:13
209:19 215:12
**happening** 36:8
36:13 149:4
**happens** 211:19
**happy** 80:10
93:17 206:7
**hard** 9:21 14:7
102:1 106:12
156:20 192:17
**Hardee's** 147:9
147:11
**hardest** 104:10
104:22
**Harrington** 82:5
138:5,17
**hazard** 94:18
**head** 8:18 21:10
179:7 205:22
206:20
**heading** 37:11
61:11
**heads** 82:4
**heal** 192:9
**health** 119:17
**hear** 87:13
93:17 157:6
**heard** 173:2
218:1

# FREEDOM COURT REPORTING

heart 32:12,15 38:6
Heights 21:12
held 74:12 107:2 171:15 201:10
help 9:17 13:13 29:17 30:4 34:23 35:20 162:19,21 200:18 205:8
helped 35:1 163:3
helping 163:1
Henson 69:21 85:9 118:6 137:11 158:17 159:3,7 160:13 203:21
Henson's 69:23
Hey 212:12
high 23:20 47:1 47:2 83:18 173:2
higher 33:15
highest 187:2
highly 209:13
Highway 194:11
hilly 74:23
hinted 86:4
hire 91:8 152:7 176:11,12 193:10
hired 26:17 31:9 32:3 89:22 108:11 118:11 118:15 120:21 129:17 136:20 152:3 163:20 166:21 197:8 197:13,16 202:3 212:8
hiring 84:18 149:5 176:8
history 4:23

27:2 92:12 123:20 124:2
hit 170:18
hold 101:16 196:8
holidays 112:16 119:5
home 8:10 77:10 77:11 98:15 101:19 107:13 107:17
Honda 193:7,8 193:16
honest 96:2 139:12 162:15
hope 185:18 188:1
hoped 146:2 202:23
hopefully 106:13
hopes 29:21
hoping 180:9
horrendous 153:2
horse 220:5
hospital 12:11
hot 198:2
hour 43:16,16 90:6 91:1 111:5 120:12 120:15 147:1 214:6
hourly 118:13
hours 29:17 30:1,2 39:18 41:6 47:17 52:20 56:12 75:8,20 76:3 76:16,17 84:21 85:19 87:19 89:8,10,12 90:7 111:1,3 112:6 114:14

134:14 143:5 143:13 145:10 145:14 149:20 164:14,16,22 166:3 172:15 178:2,8 179:9 204:1,5,10
house 11:3,5 54:18 55:1 105:17 191:20
houses 73:4 94:3
HR 13:16 175:3
hugging 104:23
Hugh 34:8 44:21 59:22
Huh-uh 8:18
human 40:18
hunting 21:18
husband 19:16
husband's 16:12
hypothetical 59:4 72:20 209:18
Hyundai 193:7

———— I ————
idea 14:8 37:12 55:16 91:6
identical 74:21
identification 61:7 64:2 65:12 66:17 67:3 108:18 109:12 113:15 117:13 121:7 123:22 127:11 128:6 130:8,18 131:17 132:3 168:10 174:22 181:5 182:7
identified 67:23
immediately 178:13 192:12
implement

77:23
important 172:19
impressed 73:10 218:2,16
impression 218:15
improve 115:9 115:15,17
improvements 77:22
improving 115:21,21 116:13
inaccurate 87:15 88:6
inappropriate 86:13
inbound 46:20 48:8 49:6 137:6
incapacitated 25:19
incentive 4:22 41:10 44:6 115:6 121:2
incidence 142:4
including 110:20 112:16
income 103:21
incorrect 98:8
increase 189:17 199:7
increased 166:23
incrementals 88:13
indentation 121:22
indicate 217:7 217:14
indicated 149:7
indicates 119:11
individual 116:6

156:14
indoctrination 144:3
induced 158:7 158:13
industry 173:3,4
information 65:23 66:4,5 67:6 112:3 129:19 189:11 190:23
initial 183:10
inside 70:21
instance 210:19
instances 159:23 160:3
instant 103:16
insurance 119:10,17 171:13
integrity 157:9
interested 68:2 68:14,19 119:18 195:7 216:20
interim 45:10 165:17
Internet 71:9 185:22 186:2
interrogatory 65:17
interrupt 66:10
Interruption 27:20
interview 4:20 13:22 60:17 68:21 69:6,8 69:18 70:10,13 70:14 71:2,6 72:2,9,12 76:20 78:12 79:6 81:8 83:13 84:9,12 85:10,12 87:7

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 90:11 91:19 | 170:23 | 147:7 149:12 | 93:9 176:9 | 55:10,14,20 |
| 94:14 97:19 | **items** 31:18 93:6 | 149:18 179:22 | 202:10 | 57:6,12,14 |
| 98:2,9,16 | 94:23 | 180:8 182:18 | **Kelly** 21:4,4 | 58:5,14,21 |
| 99:18 100:10 | | 182:19,19,20 | 82:19 138:6 | 59:23 60:7 |
| 101:9,18 | ——— **J** ——— | 188:20 189:9 | 139:3 140:9 | 61:23 62:13,22 |
| 112:22 113:18 | **J** 3:8 6:12 | 192:23 193:2,4 | **Kenny** 51:5,9,16 | 63:10,16 68:1 |
| 120:20 122:10 | **Jackson** 163:10 | 194:9 196:7,15 | 51:18 | 68:8,14,18 |
| 150:12 157:21 | 178:4 | 199:15,21 | **Kentucky** 92:18 | 71:2,13,18 |
| 159:3 167:18 | **Jack's** 102:6 | 203:4 206:7,14 | **kept** 64:19 | 72:13,16,20,21 |
| 171:23 172:3 | **James** 152:9,12 | 206:22 207:3 | 192:18 | 73:5,9,13,17 |
| 173:16,20 | **January** 132:1,7 | 207:19 208:1,5 | **keys** 178:14,16 | 73:20 75:8,11 |
| 181:13 196:1,4 | 132:9,10 | 209:14 211:8 | **KFC** 92:18,20 | 75:13 77:12,17 |
| 203:3 213:5 | 135:18 139:21 | 212:8 215:18 | **kids** 107:13,18 | 78:23 80:8 |
| 214:19 215:21 | 160:19 161:3 | 217:23 218:17 | **kill** 91:16 | 81:10,13,15,17 |
| 218:7,18 | **Jason** 82:19,20 | 219:9 | **killing** 104:19 | 81:17 82:7,10 |
| **interviewed** | 138:6 139:3 | **jobs** 26:16 61:1 | **kind** 15:13 | 82:13 83:9 |
| 188:7 189:18 | 140:9,22 149:8 | 148:17 186:5 | 17:21 18:15 | 84:2,21 85:1,3 |
| 203:4 212:7 | **Jean** 17:17 18:2 | 194:20 206:9 | 22:14 27:1 | 85:5 86:5,17 |
| 216:7 | 18:4 20:13 | 208:3 | 31:20 34:15 | 89:9 90:20 |
| **interviewing** | **Jeff** 198:6,7 | **John** 34:11,11 | 35:4 46:13 | 91:4 92:17 |
| 215:15 | 201:12,15 | **joined** 91:19 | 54:14 101:10 | 93:5,9,14,18 |
| **interviews** | **Jerry** 19:16 | **jot** 62:23 | **Kinsey** 138:15 | 94:11,15 95:3 |
| 195:20 | **Jimmy** 167:20 | **Joyce** 19:12 | 142:18 201:16 | 95:23 96:4,13 |
| **intrigued** 216:19 | 167:21 168:5,7 | **July** 56:10 | **kiss** 180:7 | 96:15 97:6,9 |
| **introduced** 7:23 | 168:13 170:4 | 176:23 | **knew** 48:9 55:17 | 97:10,13,14,15 |
| **introductions** | 170:10,19 | **jumped** 78:14 | 56:14 90:3 | 97:17,21 98:1 |
| 92:6 | **Jo** 16:2 | 78:15 205:6 | 94:17 98:17 | 99:2,7,12,20 |
| **inventories** | **job** 9:17 13:6,14 | **June** 160:11 | 107:23 113:9 | 102:8,13,16,17 |
| 154:1 | 13:18 29:14 | 161:6 | 135:22 156:11 | 102:19,22 |
| **inventory** 47:8 | 30:16 31:7,21 | **junior** 24:13,15 | 180:4 191:14 | 103:1,6,7,11 |
| 78:21 82:8 | 37:23 42:7 | 24:18 25:4,7 | 191:23 210:23 | 103:12,13,17 |
| 95:12 154:1,2 | 45:5,6 46:16 | **jury** 17:19,20,23 | 211:8,16 | 103:22 104:21 |
| 154:4,5,7 | 47:14 48:22 | 22:12,13,16 | **knitted** 27:10 | 105:20 106:3,6 |
| **invested** 99:14 | 51:7,14 67:14 | 187:23 | **know** 8:9 9:18 | 106:8,11,19 |
| **invoice** 170:5 | 69:23 74:1,16 | **J-O** 16:3 | 14:6,16 15:1,2 | 107:3,13,16,20 |
| **involved** 22:3 | 77:14 81:10 | | 17:19,21,22 | 110:7 111:8 |
| 47:22 74:10 | 83:16 86:18 | ——— **K** ——— | 22:7 23:1 31:1 | 116:11,16,20 |
| 77:6,14 93:10 | 96:5,7,9 98:17 | **keep** 45:1 48:12 | 32:21 33:6 | 119:14,14,23 |
| 115:8 213:5 | 99:9 100:17 | 63:1 82:14 | 34:22 41:6 | 126:2 129:19 |
| **involvement** | 101:21 102:13 | 93:5 101:10 | 42:17 43:5 | 133:16 137:17 |
| 13:20 | 102:23 106:10 | 158:21 165:10 | 44:11 46:6 | 139:9 141:16 |
| **IRS** 205:20 | 107:9 108:2 | 191:23 196:21 | 48:13 51:12,23 | 144:4,11,17 |
| **isolated** 160:8 | 110:4 112:20 | 220:4 | 52:9 53:2 | 147:3,6,13 |
| **issues** 34:21 | 113:9 137:4,13 | **keeping** 85:14 | 54:14,15,18,23 | 148:9 149:3 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

150:11 151:7
153:5,11,15
154:5 157:10
157:10,23
158:21 159:15
160:5,7,15
162:10 163:2,4
163:7 165:7,8
165:22 166:19
173:1,22 174:3
174:3 176:8
177:16 179:3
179:17,20
180:17 182:3
183:2,13,16,19
183:20,21,23
184:1,17,22
185:21,23
186:11 187:5
187:15,15
188:22 189:11
189:14 191:10
191:12,22
192:1,2,9,10
192:19 194:7
194:22,23
195:16 196:18
196:22 197:9
199:2,6 200:18
200:19 201:3,5
202:1,7 203:6
203:14 204:3,9
204:17,21
206:13,17
207:17 208:4
208:11,22
209:13,19
211:10 213:9
213:16 214:5
214:23 216:1,9
216:15,18
217:22 218:4,9
218:10 219:18
knowing 203:12

knowingly
175:18
knowledge
52:13 53:3
62:15 68:4
99:19 110:3
138:21 203:18
203:22 205:7
known 37:15
41:22
knows 201:13
201:15 203:13

### L

L 1:20
Labor 136:10
204:20
lack 182:17
laid 178:16
lake 12:17 198:2
204:11
Lambert 19:22
Lands 195:5
196:5
Langford 19:15
19:21
large 2:4 7:3
40:20 159:6
larger 46:7
196:22
largest 46:2,6
Larry 19:12
late 58:1 107:17
152:23
Laura 11:9,23
13:17,19 14:21
15:7,10,11
102:14 103:9
107:16 201:11
Laura's 107:4
law 6:5 183:8
187:22
laws 2:15
lawsuit 21:22

22:4 65:16
85:8 100:6
182:16 185:7
201:20
lawsuits 22:1
lawyer 182:3
201:2,4 203:15
lay 178:6
layer 47:2
layman's 94:18
186:1
lead 165:19
166:21 218:9
leader 101:10
leadership 115:8
156:22
leading 2:22
leaps 198:3
learn 31:13
learned 42:22
48:21
learning 32:9
leave 14:13
25:15 27:22
29:2,9,10
30:14 35:21
42:11 52:4,20
58:4 104:17
106:16 107:19
166:18 167:1
176:20 180:7
leaving 44:22
106:18 144:15
147:22 183:23
led 116:8 156:18
189:19
left 14:1 25:4
27:3 34:12
42:6 48:20
50:6 51:19
52:19,23 53:3
54:7,8 55:23
58:15,21 90:14
98:6 101:19

104:16 105:7
106:17,20,21
139:1 141:21
142:11 143:2
144:7 175:14
175:16 176:13
176:23 179:22
183:10 193:1
196:2 197:14
200:6 201:19
202:7,13
206:19 207:5
208:4 210:13
218:14
legal 8:9,14
63:12
length 103:10
139:5
letdown 216:23
letdowns 47:9
47:21 73:7
218:3
letter 4:19 5:15
106:4 108:5
109:9,15,20
111:7,10,11,14
112:5,8,9,12
112:13,21
113:6,20 114:1
114:10,13,16
115:5,13
117:21 178:18
179:16 181:3
181:11 218:22
219:7
letting 97:22
let's 15:20 27:1
36:13 75:2
121:17 123:13
188:23
level 33:15,17
levels 44:13
levy 205:20
liable 171:15

license 10:14
lied 156:11
178:21
lies 183:5
life 24:2 104:12
104:23 119:10
156:15,16,17
172:23 179:22
183:1
lift 48:20 49:2
lifted 180:15
192:13
light 191:16
Lightsey 39:10
liked 94:5 96:20
157:2,3,10
218:1
limited 33:1
36:6
limited/light
32:17
Lincoln 193:16
line 208:10
Lisa 20:4,19
list 193:23
194:17,21,21
195:7,16
listed 175:21
lists 194:5,19
little 43:15 48:4
59:14 63:15
96:8 102:4,6
105:3 161:22
186:10 210:2
live 10:17 15:14
15:22 16:9,18
17:11 18:18
19:10 20:14,22
21:1 77:5
lived 10:22 24:1
lives 11:5 15:17
15:18 16:19
17:13 18:8,9
19:23 20:1,4

# FREEDOM COURT REPORTING

Page 234

| | | | | |
|---|---|---|---|---|
| 20:15 | 144:7 165:9 | machinery | 136:22 137:1 | 66:17 67:3 |
| living 29:5 77:4 | 173:11 211:23 | 167:17 171:22 | 137:15,16 | 108:18 109:12 |
| 192:15,16 | 213:14 | 172:3 | 138:4,8 139:8 | 113:15,20 |
| local 68:3 | looking 13:17 | Macon 20:8 | 139:10 145:16 | 117:4,13 121:7 |
| 204:11 | 67:13 103:14 | mad 179:20 | 149:13,22 | 123:22 127:11 |
| Locally 193:5 | 110:15 111:7 | magic 101:4 | 151:8,15,16,19 | 128:6 130:8,18 |
| location 140:7 | 121:10 123:6 | maintenance | 152:4,11,16 | 131:17 132:3 |
| lodges 21:18,19 | 131:8 133:6,19 | 167:11,22 | 155:1,6 166:7 | 168:10 174:22 |
| logistical 107:21 | 135:15,17 | 168:14,17 | 166:21 196:9 | 181:5 182:7 |
| loner 107:6 | 173:10 185:22 | 169:9,13 | 196:12,13 | 215:5 219:6 |
| long 10:22 12:3 | 187:11 200:9 | making 43:3 | 197:11 198:4,5 | market 206:14 |
| 12:6 13:23 | 206:8,9,11,16 | 100:2 103:14 | 198:8,11 207:3 | marketing 96:15 |
| 14:15 25:13 | looks 64:8 109:6 | 103:16 105:5 | 208:1 211:15 | married 11:21 |
| 26:4 27:17 | 121:15 122:14 | 106:7 107:11 | managers 39:3 | 14:16,17 15:6 |
| 32:14 33:6 | 123:7 | 145:17 146:22 | 80:5 82:4 | 16:13,14,22 |
| 43:13 69:7 | lose 39:3 148:12 | 170:11 174:1 | 138:1,3,11 | 17:14 19:22 |
| 88:19,23 | 186:15 206:22 | 188:5 200:8 | 148:16 149:15 | 20:9,16 |
| 137:17 138:17 | 211:8 | 215:20 216:2 | 149:17 206:22 | Marshall 6:6 |
| 139:3,9,15 | losing 102:19 | man 156:20 | managing 197:2 | Martin 12:17 |
| 140:13 141:9 | 149:6 208:3 | 191:20 | mandate 95:19 | 198:2 |
| 141:13 142:20 | lost 107:7 147:7 | management | 96:1,21 | match 124:8 |
| 143:9 164:21 | 207:3,7 | 99:1,1,2 | mandatory | 154:5 |
| 180:9 208:17 | lot 50:7 62:22 | 105:19 210:18 | 179:10 | matched 184:18 |
| longer 29:5,16 | 84:4 93:9 | 211:1 | Mandy 2:2 3:8 | matches 132:15 |
| 59:14 76:9 | 95:22 96:5 | manager 31:5 | 7:1 | material 159:1 |
| 111:1 140:17 | 107:3 140:1 | 32:9,11,21 | manual 80:3 | matter 39:18 |
| 143:15 144:18 | 147:8 156:13 | 33:7,9,13,14 | man's 99:13 | 56:12 62:14 |
| 163:3,5 164:14 | 172:15 202:1 | 33:18,20 34:1 | marina 196:10 | 120:13 |
| 191:15 204:1 | love 102:10,15 | 34:9,12 35:3 | 196:16,17 | maxed 83:7 |
| longevity 184:15 | loved 104:12,13 | 35:17 36:2,16 | 198:8 204:19 | maximum 45:15 |
| long-run 169:1 | 104:13 | 36:23 37:21,23 | mark 39:10,12 | McDonald's |
| long-term | low 55:21 83:17 | 38:4,5,10,12 | 61:4 63:18 | 146:21 |
| 119:15 184:20 | lower 54:17 | 38:19 39:8,9 | 65:7 66:9,10 | Meadows 29:1,3 |
| look 66:4 109:9 | lunch 102:9 | 39:14 43:4 | 66:22 108:14 | 30:8,15 |
| 121:17 122:13 | 107:7 114:7,11 | 51:8,15 53:15 | 109:7 113:4,10 | mean 8:9 15:19 |
| 124:5 125:20 | 120:3 177:7,8 | 57:7,21 58:6 | 116:23 121:1 | 18:15 23:2 |
| 132:6 136:5 | 177:9 | 58:20 59:7,10 | 123:19 127:6 | 24:4 27:9 |
| 144:5 193:3 | lured 182:18 | 70:1,2 74:2,7,9 | 128:2 130:1,13 | 34:18 36:15 |
| 206:18 215:7 | 183:3 | 74:17 76:7,11 | 131:11,22 | 37:10 40:16,17 |
| 218:23 | L.L.C 2:5 6:13 | 78:2 82:6,15 | 166:14 168:3 | 41:3 46:7 |
| looked 60:14 | 7:9 | 82:20 83:1,3 | 174:14 181:2 | 50:16 52:12,13 |
| 61:10,16 71:9 | | 97:5 103:18,19 | 182:5 | 54:20 55:3 |
| 100:23 133:21 | **M** | 103:20 104:4 | marked 61:7 | 58:3,12 59:3 |
| 135:7,9,19 | machine 210:15 | 116:17 118:14 | 64:2 65:12 | 60:8 61:12,15 |

# FREEDOM COURT REPORTING

Page 235

| | | | | |
|---|---|---|---|---|
| 64:7 67:13 | mental 191:12 | 196:2 199:20 | 121:21 147:3 | 107:15 |
| 75:14 81:3 | 192:2 | 200:6,14 202:2 | missing 105:1 | move 103:4 |
| 85:18 86:23 | mentally 161:21 | 202:13 203:17 | Mississippi | 105:5 204:16 |
| 94:3 100:4,20 | 179:5 192:4 | 203:19 206:19 | 71:12 | 207:14,15 |
| 100:23 106:2 | mention 96:12 | 210:12,17,21 | mistake 98:18 | 209:3 |
| 110:2 111:11 | 114:13 116:12 | 212:3,19 | mistakes 214:6 | moved 11:3 |
| 117:17 119:9 | 219:16 | 213:23 216:17 | mistreated | 107:20 141:18 |
| 126:2 128:13 | mentioned | 217:15 219:11 | 101:1 | 166:14 195:6 |
| 132:23 133:14 | 84:17 158:1 | 219:21 | mom 15:22 19:9 | mulling 185:20 |
| 138:21 144:2,9 | 216:10,12 | Mercier 6:20 | Monday 28:11 | murder 22:16 |
| 144:16 146:5 | 219:17 | 69:21 | 53:12 103:6,8 | |
| 146:20 148:23 | merchandise | merit 194:1 | 204:7,14 | _____ |
| 149:18,19 | 46:23 47:5 | merited 188:1 | Mondays 162:12 | N |
| 151:16 152:23 | Merchants 1:12 | Merle 171:4 | monetarily | N 1:20 4:1 6:1 |
| 153:2 154:14 | 6:10 8:20 | mess 37:13,15 | 191:5 | Nabors 34:8 |
| 155:20 158:12 | 21:23 30:22 | 101:7 143:21 | money 28:5 | name 8:3,4 11:8 |
| 169:21,23 | 49:23 50:7,12 | message 144:17 | 188:14,18 | 11:10 12:19 |
| 188:10 190:20 | 50:14,18,22 | 187:18 | 192:17,22 | 16:1,4,5,12,20 |
| 200:16 202:18 | 60:16 61:2 | messed 154:2 | 202:23 | 17:1,16 19:23 |
| 203:11 206:10 | 62:10 63:4,9 | met 44:21 102:3 | monstrous 73:1 | 34:7 38:9,11 |
| 210:13 213:6 | 65:3 67:9,14 | Middle 1:2 | Montgomery | 42:2 67:17,23 |
| 217:21 218:14 | 68:23 69:1 | 18:21 | 16:19 18:15,22 | 83:3 114:5 |
| means 98:13,13 | 71:7 73:12 | mighty 200:11 | 20:7 26:1 69:3 | 116:3 152:8,9 |
| meant 59:13 | 74:18 75:19 | miles 19:2 43:12 | 69:5 140:19 | 152:9 163:11 |
| 115:11 | 79:18 80:19 | 193:14 208:11 | 193:17 | 170:21 214:23 |
| Medical 12:1,9 | 86:7,11,20 | mile-wise 74:20 | month 14:9 | 219:21 |
| 12:12 | 92:22 97:8 | million 105:21 | 122:16 168:19 | named 18:7 |
| medications | 105:7,13 | 105:23 | 170:18 197:15 | 45:11 139:11 |
| 10:4 | 106:19,20,21 | mind 32:3 99:11 | months 12:5,7 | 163:14 |
| meet 77:19,20 | 108:3 110:11 | mine 28:2 95:20 | 14:5 80:10 | names 8:7,14 |
| 91:4 92:8,8 | 114:1 117:2,11 | minimal 146:19 | 105:12 141:12 | 19:11,20 20:22 |
| 102:2,10 | 120:22 124:4 | minimum 48:12 | 142:14,15 | 21:2 194:23 |
| 157:22 | 127:21 128:3 | 184:1,3,6 | 148:22 151:13 | nastier 100:20 |
| meeting 48:4 | 129:3 130:3 | 186:17 194:8 | 161:12,17 | nasty 100:21 |
| 160:12 177:3 | 134:4,6 137:1 | minute 8:1 | 170:17 180:17 | national 154:20 |
| meetings 54:16 | 137:18 139:22 | 131:3 | 192:15 193:2 | necessarily |
| 154:11 155:6 | 140:11 142:21 | minutes 43:17 | 204:14 | 129:8 157:7 |
| Melanie 175:3 | 143:4 152:5 | 47:20 48:4 | mop-up 157:22 | necessary 2:20 |
| member 21:15 | 155:11 157:15 | 90:23 91:16 | morning 35:1 | 115:9 |
| memo 117:1,8 | 158:8 159:1 | 120:12 | 47:19 53:12 | need 17:21 |
| 117:10,22 | 166:11 171:13 | mismanaged | 61:19 137:9 | 70:20 72:2 |
| 135:9 | 175:16 176:21 | 100:19 | 147:9 164:19 | 78:19 80:13 |
| men 165:19 | 187:19 188:6 | mispicks 150:16 | 177:4 | 107:19 115:15 |
| 166:21 | 188:11 189:7 | missed 60:19 | mother 15:17 | 115:17 144:18 |
| | | | | 170:14 180:19 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 182:1 212:14 | 174:12 207:8 | nods 21:10 | oath 9:4 | 18:20 19:1,20 |
| 213:15 220:2 | 207:12 208:6 | nonproductive | object 155:22 | 20:2,9,21 21:2 |
| needed 32:6,16 | 208:18 | 165:14 | 189:3 209:5 | 22:17,22 23:8 |
| 34:22 35:19 | newer 140:5 | non-union 94:4 | 214:2 217:20 | 24:22 25:22 |
| 58:16 71:3 | 167:7 174:6 | 94:7 | objections 2:20 | 26:7 30:3,11 |
| 72:4 76:8 | nice 193:9 | normal 47:18 | 3:1 | 31:12 33:19 |
| 101:9,15 | night 31:3 33:22 | normally 8:12 | observe 77:20 | 34:13 37:18 |
| 102:21 103:1,2 | 35:2 39:9 | 51:18 75:15 | 162:21 163:22 | 40:12,22 41:5 |
| 143:14 144:1 | 47:10 53:22 | 165:6 204:23 | obstacle 154:17 | 42:7,10 48:6 |
| 145:6 146:11 | 54:13,16 55:8 | north 2:7 6:15 | occasion 85:4 | 49:12,14 53:2 |
| 148:10 150:19 | 55:12 61:20 | 7:10 19:4,5 | 178:1 | 54:1 55:7 |
| 150:20 155:8 | 73:8 74:10 | NORTHERN | occasionally | 56:16 58:20 |
| 155:14 159:17 | 76:22 77:1,13 | 1:3 | 36:9,14 | 59:13 63:7 |
| 163:4 165:5 | 77:15,19 78:4 | Notary 2:3 7:2 | occasions | 64:6,10,15,23 |
| 167:20 169:20 | 78:9,17 81:22 | Notasulga 20:5 | 133:16 146:18 | 65:7,20 66:12 |
| 178:2 195:8 | 83:2,4,5 85:3 | 21:1 | October 14:19 | 66:22 67:8 |
| needing 163:2 | 93:14 99:2 | notes 63:1,2 | 121:3 | 70:7 71:16 |
| 204:1 | 134:11 137:7 | 64:18 85:15 | offer 43:19 44:2 | 72:7,13 78:7 |
| needs 59:9 | 138:8 143:22 | notice 4:11 | 77:23 101:22 | 79:4 80:21 |
| 187:18 | 147:21 149:21 | 28:17 61:5 | 102:13,23 | 81:5 84:8,14 |
| negatively 8:19 | 151:8,10,12,14 | 129:9 215:9 | 108:5 109:9,15 | 85:7,18 86:1 |
| neglect 169:23 | 151:15,18,19 | November 197:7 | 109:20 111:7,9 | 86:15 87:12,17 |
| neither 11:20 | 152:3,22 153:3 | number 9:12 | 111:11,14 | 87:23 88:15 |
| 171:8 | 153:6 164:9 | 10:10,15 48:9 | 112:5,8,9,12 | 89:4 94:13 |
| never 23:16 40:5 | 165:6,10 | 54:20 126:19 | 112:13,21 | 95:17 98:5,11 |
| 57:9 60:14 | 166:17,20,20 | 187:6 219:1 | 113:5 114:11 | 99:6,19 104:7 |
| 75:21,23 80:4 | 169:3 172:18 | numbers 46:15 | 114:13,15 | 106:1 108:12 |
| 80:5 96:9 | 174:16 176:1 | 83:6 103:11 | 115:5,13 116:5 | 108:14 110:5 |
| 100:19 114:15 | 178:10 207:9 | 116:16,20 | 207:9,10 | 110:12 111:13 |
| 156:8 160:18 | 207:10 216:13 | 125:20 150:13 | 217:23 218:22 | 111:19 113:1 |
| 162:15 166:9 | 217:1 | 150:23 153:5,8 | 219:7 | 114:12 117:19 |
| 166:17 167:1 | nights 35:10 | 154:4 170:18 | offered 3:3 | 118:5 119:21 |
| 172:22 173:2 | 53:16,18 73:21 | 176:7 215:1 | 29:12 30:16 | 120:9,17 |
| 179:22 183:2 | 77:10,19 85:21 | numbers-wise | 44:23 88:8 | 121:21,23 |
| 184:4 186:20 | 112:11 115:3 | 50:11 | 188:5,18 | 122:1,9 123:3 |
| 188:21 195:8 | 138:16 150:3,9 | numerous | 189:20 209:14 | 123:13 124:3 |
| 198:4 205:19 | 150:21 151:7 | 146:18 | offering 163:1 | 124:11,17,21 |
| 209:18 211:10 | 152:20,21 | nuts 157:20 | 188:13 | 125:4 126:12 |
| 211:11,21 | 164:10 166:13 | nutshell 65:6 | office 144:13,14 | 127:1,14,20 |
| 213:20 | 166:13,22 | Nyla 16:5 | officer 171:14 | 131:11 133:4,7 |
| new 28:8 82:10 | 173:6 179:11 | N-Y-L-A 16:5 | offices 2:4 7:8 | 133:19 134:13 |
| 91:9 100:22 | 204:3,3 | —————— | okay 9:20 14:20 | 138:13 140:4 |
| 105:17 117:1 | nine 121:16,20 | **O** | 15:12,21 16:14 | 142:10 148:20 |
| 118:14,21 | nodding 206:20 | O 1:20 | 17:10 18:6,19 | 150:8 154:21 |

# FREEDOM COURT REPORTING

Page 237

| | | | | |
|---|---|---|---|---|
| 156:6 158:18 | 33:22 35:3,17 | 98:12 99:12,18 | pallet 47:6 | 127:5,5,15,15 |
| 160:2 162:22 | 36:2,15,23 | 99:21 102:15 | palletize 46:23 | 129:6 207:13 |
| 164:3 171:6 | 37:5,21,23 | original 3:9 | pallets 48:10 | paycheck 56:9 |
| 173:14 176:14 | 38:3,5,10,12 | originally 69:20 | panhandle | 90:2,5 |
| 181:17 183:18 | 38:18 39:14 | ought 183:7 | 208:14 | paychecks 5:3 |
| 190:2 191:2,5 | 45:9,12 46:14 | outgoing 107:5 | paper 63:16 | 127:8 |
| 195:11 200:1 | 51:15 57:7 | outside 26:20 | 183:8 | payment 124:1 |
| 200:20 202:12 | 59:7,9 74:2,7,9 | 106:23 | paperwork | 191:20,21 |
| 202:17 205:4 | 74:16 76:7,10 | outweighed | 129:23 | Payne 18:8 |
| 209:16,22 | 78:2 82:6,15 | 42:23 | paragraph | pedestal 106:23 |
| 210:18 213:3 | 86:3 91:9 97:4 | out-and-out | 115:5 128:23 | penance 185:2 |
| 213:21 214:18 | 103:19 104:1,4 | 156:11 183:5 | 129:1 | pension 184:13 |
| 215:4 218:22 | 116:17 136:22 | overall 15:1 | pardon 185:8 | 184:14 185:1,6 |
| 219:5,13 | 136:23,23 | Overhill 10:20 | Parrish 16:6 | 186:23 |
| old 11:14,16 | 138:4 145:16 | overtime 48:12 | part 17:23 31:17 | pension's 187:1 |
| 17:5 173:10 | 145:18 149:13 | 110:20 136:10 | 73:14 76:21 | people 8:8 48:21 |
| 186:22 | 151:16 152:11 | overview 162:13 | 87:15 117:16 | 49:1,13 50:21 |
| omission 213:8 | 152:16 155:1,6 | owned 59:18 | 123:1 126:4 | 95:4 96:6 |
| omitted 213:7 | 162:10,19 | 196:17 | 145:5 157:11 | 98:12 101:10 |
| once 35:14 47:6 | 163:17 211:15 | owner 28:1 | 168:21 | 105:19 148:12 |
| 63:16 170:13 | operator 57:21 | 33:11,12 34:7 | participate | 193:10,11 |
| 181:19 211:14 | operators 48:20 | 40:22,23 | 154:17,20 | 201:10 212:14 |
| 217:6,13 | 49:3 54:22 | ownership 60:7 | participated | percent 45:15 |
| ones 55:17,22 | 207:19 217:1 | owns 60:9 | 119:19 | 50:14 83:19,22 |
| 121:21 | opinion 214:14 | O'Connor 45:4 | particular 24:23 | 93:21 103:13 |
| online 193:22 | opportunities | 45:7 52:6 | 26:7 117:18 | 111:20,21 |
| 195:15 | 195:17 | 96:19 | 159:22 168:12 | 115:20 116:7 |
| on-the-job 27:1 | opportunity | | 170:6 | 121:12,12,13 |
| Opelika 20:1 | 23:10 83:19,22 | **P** | parties 1:22 | 122:3 125:22 |
| open 30:1,4 | 97:23 | P 1:20 6:1,1 | 2:23 | 125:22 173:5 |
| 32:15 35:16 | opposed 77:1,13 | pack 93:8 | partner 107:7 | 184:3 185:16 |
| 53:6 92:13 | ops 33:13 34:1 | package 117:17 | parts 193:6 | 187:3 213:1 |
| 107:10 | 43:3 52:7 58:6 | 135:6,8 | 198:5,13,16 | 214:17 215:1 |
| opening 105:18 | 58:20 82:11 | page 4:3 108:23 | 215:17 | percentage |
| operated 152:13 | oral 3:10 7:14 | 110:17 114:4 | passed 198:18 | 44:15,16 |
| operating 140:3 | order 27:8,9 | 121:10 122:14 | passes 217:2 | 125:23 126:20 |
| operation 137:5 | 109:19 198:13 | 125:17 135:2 | pat 156:20 | 126:22 |
| 159:12 | 198:17 | 136:5,12,13 | pawning 107:14 | period 16:16 |
| operational | orders 49:8 | paid 39:15 56:5 | pay 28:4 29:13 | 32:14 35:11,15 |
| 115:16,22 | 198:17 | 83:20 89:11,11 | 41:16 43:1 | 122:14,17 |
| 167:13 | ordinary 152:15 | 89:13,15,19 | 44:2 66:2 68:9 | 123:6,8 124:9 |
| operations 31:5 | orientation | 146:18,22 | 68:13 81:11 | 125:7,9,18,20 |
| 32:8,11,21 | 159:5 | 170:4 189:12 | 83:13,17 88:2 | 125:21 126:1,5 |
| 33:7,9,20,22 | oriented 97:14 | 198:20 199:13 | 88:5 111:15 | 126:7,15 |

# FREEDOM COURT REPORTING

Page 238

143:10 144:2 163:23 164:7 170:15 197:12
**periodontist** 69:3
**periods** 88:20
**person** 35:9 49:5 49:7 107:5 211:11
**personal** 79:13 115:7
**personally** 55:10 156:9
**perspective** 97:2 97:3 98:11 99:17
**Peterson** 19:12 20:13
**Phillip** 83:2,6 138:7 140:13 140:16,21,23 142:11,15 149:9,23 151:2 151:6 152:19
**Phillip's** 165:2 165:15
**phone** 67:22 99:9 101:23 171:7 178:16 180:4
**phone-in** 49:8
**Photocopy** 4:15 5:3
**phrase** 183:6 185:9
**physical** 78:21
**physically** 161:21 179:5 192:3
**pick** 49:9 216:13 216:16 217:1 217:17
**picking** 217:3
**picture** 206:15

**piece** 169:18
**pieces** 101:14 170:6,22
**pinning** 33:4
**pitching** 163:1
**place** 2:6 6:14 7:9 34:16 36:10,12 37:13 57:16 63:16 81:19 82:3 93:4,13 96:7 101:15 106:3 125:19 140:8 140:19 143:21 149:17 161:19 179:23
**placed** 9:4 205:20
**places** 53:21 173:1
**Plaintiff** 1:8 6:3
**plan** 118:2 184:13,14
**planned** 90:22
**plant** 43:7 167:2 193:13,16 208:18
**plays** 192:21
**Please** 3:13
**pleasure** 92:8
**plenty** 102:21
**plus** 185:5
**PM** 167:11
**PMs** 167:10
**point** 37:11,12 74:11 93:16 98:14 99:3 112:19 146:1 147:23 148:8 148:19 150:9 160:16 162:18 164:16 170:7 214:10,11 218:6

**points** 94:19
**policies** 40:13,14 129:5 136:21
**policy** 79:18 80:20 184:2,22
**posed** 41:3 90:8
**position** 32:2 84:18 104:1 106:22 186:5 186:21 195:14 196:8 207:12
**positions** 193:23 194:1,14
**possession** 63:5
**possibility** 41:15
**possible** 90:19 213:21
**possibly** 83:18 211:6
**postdated** 110:6
**potential** 121:11 121:14 122:2
**potentials** 103:12
**poultry** 94:22
**practices** 129:5
**practicing** 95:9
**predecessor** 214:22
**predecessor's** 139:12
**predominantly** 52:18 197:19
**Predominately** 157:19
**preferred** 94:6
**prepare** 201:14
**prepared** 63:20
**preparing** 47:10 73:7
**prerequisite** 129:20
**PRESENT** 6:3 6:10,19

**presented** 212:21 214:19
**preshift** 48:4
**president** 13:8 45:11 70:6,8 107:1 134:4
**pressure** 95:23 96:10 180:4
**pretty** 24:1 52:17 65:2,19 75:9 84:10 103:3 147:5 187:1 215:11
**prevent** 10:6 110:18 111:4
**preventing** 111:1
**preventive** 167:10 169:9
**previous** 38:10 74:15
**previously** 215:4 219:5
**pride** 106:8
**primarily** 82:11 82:18 94:21 157:16
**print** 123:15
**printing** 27:11 47:23
**prior** 3:4 12:15 71:6 129:18 136:2
**privy** 62:13
**probably** 19:2 26:16 33:8 49:13,19 50:3 50:3,13 51:19 53:16 54:12 55:3 109:22 130:23,23 135:21 140:21 151:5 156:5 182:12 192:7

**problem** 35:19 35:21 36:18,19 36:19,21 37:4 37:22 58:16,23 59:2,8 60:1 76:8,13 165:3 165:16 176:9
**problems** 34:21 36:5 38:7 57:22 58:2,7 167:2 181:18 218:19 219:14
**Procedure** 3:6 7:6
**procedures** 94:20
**proceed** 215:13
**proceedings** 7:15
**process** 42:20 47:11 67:11 92:22 116:2 120:21 122:10 137:7,9 150:12 168:22 181:13 197:22 213:5,7 214:20
**produce** 53:11 94:21
**produced** 113:11
**product** 53:11
**productivity** 115:16,22
**Profit** 214:7
**program** 4:22 25:8 41:10 44:6 45:14 47:23 112:2,3 115:6 117:21 121:3 168:15
**progressed** 72:3
**progression** 31:21

# FREEDOM COURT REPORTING

progressively 178:23
promised 160:18
promises 157:5 158:20
promoted 82:23 83:1 165:19 166:19 186:20
promotion 103:17 104:2 207:15 208:5 209:14
proper 94:20
prorated 122:16 123:1 161:2
proud 218:5,6,8
proverbial 179:12
provided 43:6 65:9 67:5 112:16
provides 129:1
providing 115:8
Provision 30:17 38:4,14 40:9 41:11,12,20,23 42:12 43:1,4 44:18 49:15,23 50:2,10,23 59:17 60:5,21 74:8,15 81:14 166:10 210:12 210:14,20,22 211:14
provisions 136:10
psychiatric 200:18
Public 2:3 7:2
publication 42:18
pulling 138:19
pumps 196:18

punitive 187:14 187:22
purpose 40:20
pursestrings 167:23
pursuant 7:5
pursued 189:18
put 54:19 63:13 63:22 96:10 99:7 101:13 114:21 156:13 178:14 183:8 185:13 186:2 186:12 187:6 192:5 194:17 213:12,17
putting 47:4 58:13 103:11 170:21
put-aways 47:4
puzzle 101:15
P-A-R-I-S-H 16:7

## Q

qualifications 194:6
qualified 146:7 146:12,14 194:15 207:11
qualify 89:1
quarter 25:18
quarters 25:14
question 9:14 14:16 15:13 29:19 30:7 41:2 60:3 68:4 75:10,10 90:8 92:16 93:20 125:5,19 131:3 132:19 149:2 155:23 189:4 190:13,19 216:6 217:10

questions 2:21 2:22 9:1,12,13 18:2 72:14 73:15 75:3 129:14 158:1 190:21 209:23 210:8 213:18 213:19
quick 103:3 120:3 171:18 206:2
quit 149:23 151:3,4,6 152:19 166:7 178:17 180:6 180:12 192:10
quite 68:10
quo 116:13

## R

R 6:1 161:23,23
radius 68:7
raise 56:11 184:3
ran 38:21 162:13 175:7 210:14
Randy 82:4,5,6 82:14 138:5,17 138:23 140:22 149:10 151:9,9 152:1
rang 67:22
rate 54:17 147:17 172:23
rates 173:2 174:16
raved 83:5
read 111:8 128:11,20 134:1
reading 2:12 64:7 119:13 136:3

reads 115:6
ready 35:18 103:4
real 38:22 90:14 107:4 172:19 174:5,11 183:19 193:9 217:3
realize 14:7 15:12 117:19
really 60:13,18 81:9 85:15 90:17,21 93:18 97:11,12 99:12 101:1,22 182:20 188:22 192:2 199:5 219:18
reason 17:18 66:2 95:21 99:3 162:7 166:18 176:17 215:2 219:21
reasons 77:4 165:5
recall 32:13 85:17 117:17 162:7 163:14
receipt 5:6,9 130:13
receivable 198:19
receive 79:2,17 112:2 113:5 115:14 118:4 118:13,23 127:22 134:9 134:13,17,21
received 93:7 109:15 111:12 111:13 119:6 122:15 123:4 126:9,10 127:7 127:15 130:3

131:13 133:10 133:11,15 135:20 184:4
receivers 48:19 49:2 105:20
receiving 46:21 55:2 95:5 117:10,15 122:20 123:10 124:12 126:11
recognition 73:3
recognize 108:20 121:5 127:9 128:8 130:5,16 131:14 132:1 181:7
recognizes 115:6
recollection 46:9 81:23 119:7 125:2 126:8 137:20 139:23 153:7
recommendati... 158:3 183:12
record 8:2 93:7 93:9
recordings 62:17
records 93:5
recoup 49:4 185:7 187:11
recovery 202:21
red-flagged 170:5
referring 80:17 174:20
refers 117:21
refrigerated 94:23
regarding 117:2 117:3 134:10
regardless 60:9
Regional 12:18

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 240

| | | | | |
|---|---|---|---|---|
| **regular** 58:11 | **repercussions** | **response** 67:5 | 101:11,14 | 82:9,18 101:5 |
| 77:2,13 116:8 | 147:4,21 | **responses** 61:19 | 102:16 106:23 | 101:6 116:6 |
| 164:4 | **replace** 207:7 | **responsibilities** | 110:21 111:17 | 148:7,8,13 |
| **rehashing** 220:3 | **replaced** 39:11 | 197:10 | 113:21 114:2 | 165:21 169:2 |
| **related** 62:9 | 116:3 163:11 | **responsibility** | 119:1,4 122:4 | 196:16 |
| 65:15 | 163:12 169:21 | 95:15 149:14 | 122:6,7 125:13 | **runs** 192:22 |
| **relating** 2:16 | **replenishments** | **responsible** | 129:3 158:18 | **Russell** 12:1,8 |
| **relative** 15:18 | 47:9 216:11 | 33:21 35:4,7,9 | 159:1 187:16 | 12:12 23:21 |
| 15:19 | **report** 5:14 | 55:8 58:7,9 | 189:13 190:5 | 24:8 27:5,7,15 |
| **relatively** 55:21 | 33:10 51:3,5,9 | 78:3,5 82:12 | 200:23 203:2 | 27:22 195:5 |
| **relatives** 15:14 | 51:10 52:5 | 145:17 | 204:15 208:9 | 196:5 |
| 17:11 18:12 | 137:10,12 | **rest** 13:21 | 208:10 209:22 | |
| **relied** 159:7 | 175:8 | **Restaurant** | 217:11 | |
| **relief** 31:11 32:6 | **reported** 52:6 | 102:6 | **road** 75:1 140:1 | **S** |
| **relying** 158:3 | **Reporter** 2:3 | **Rester** 171:4 | **Roberson** 38:11 | **S** 1:20,20 4:8 5:1 |
| **remarried** 14:23 | 3:15 7:2 | **result** 200:13 | **rodeo** 154:9,15 | 6:1 8:11 |
| **remember** 11:2 | **repossessions** | 206:23 | 154:18,20 | **sacrifice** 115:7 |
| 13:5 14:2 21:3 | 205:17 | **resume** 13:19 | **Rodney** 83:3 | **safety** 169:4 |
| 27:8 43:21 | **represent** 8:20 | **retail** 31:18 | 138:9,16 | 170:8,10,22 |
| 45:17 76:19 | 121:11 124:1 | **retained** 3:14 | 141:13,16,20 | 171:5 |
| 78:11 79:5,8 | **request** 40:5 | **retains** 129:3 | 165:18 | **salaried** 90:3 |
| 81:7 84:1,9 | 67:6 110:7 | **rethink** 106:6 | **role** 32:6,18 | 136:8 |
| 85:15,22 92:15 | 159:20 161:7 | **retire** 184:8 | 53:20 195:18 | **salary** 39:15,17 |
| 94:13,15 97:18 | **require** 36:22 | **retired** 197:5,6 | **roll** 199:19 | 41:14,17 43:5 |
| 102:4 104:16 | **required** 37:3 | **retirement** | 200:3 | 44:3,17 45:21 |
| 106:18 108:13 | 95:4 154:6 | 184:2 | **rolled** 122:21 | 56:6,8,11,13 |
| 113:5 114:6 | **requires** 78:22 | **returned** 32:16 | **roof** 150:17 | 56:18 65:21 |
| 116:2 117:9,15 | **research** 71:7 | 32:23 | **room** 90:13 | 66:3,5 83:12 |
| 122:19,20,21 | **researched** | **reunion** 161:8 | 177:10 | 83:23 88:7,11 |
| 123:10 124:12 | 186:1 | **reversal** 32:18 | **rotated** 152:1 | 103:13 107:11 |
| 124:18,19 | **resident** 24:6 | 53:20 | **rotates** 205:5 | 116:5 120:23 |
| 125:1 126:11 | **resignation** 4:19 | **revise** 129:4 | **rough** 81:16 | 121:13 182:21 |
| 126:13,15,16 | 5:15 106:5 | **Rhonda** 19:15 | **routes** 31:13,16 | 185:5,12,14,15 |
| 126:17 142:5 | 113:7,17,20 | **Rick** 197:6,14 | **routinely** 116:7 | 186:15 187:3 |
| 148:5 154:13 | 114:10 178:18 | **ride** 74:22 | 214:23 | 189:16 198:21 |
| 162:23 168:16 | 179:16 181:3 | **Ridge** 196:9 | **Rs** 16:8,9 | 198:23 199:6,7 |
| 177:3 179:15 | **resigned** 86:21 | **right** 9:23 18:11 | **Rule** 3:5 | **sales** 28:8 32:4,7 |
| 179:17 181:22 | 113:9 141:5,10 | 21:6 50:5 53:5 | **rules** 2:16 3:6 | 33:18,18 34:9 |
| 181:23 183:9 | 191:13 | 56:1,14 64:12 | 7:5 129:5 | 34:12 96:14 |
| 187:7 195:14 | **resigning** 86:10 | 64:20 66:19 | **run** 31:16 34:19 | 115:15,21 |
| 195:18 211:13 | **respective** 1:23 | 69:4 75:2 | 36:12 38:14 | 157:5 197:11 |
| **repair** 168:18 | **respond** 195:8 | 79:11 81:5 | 91:14 159:12 | 197:17,20 |
| **repairs** 168:15 | **responded** 171:9 | 85:17 88:10,17 | 167:14 208:17 | 198:10 |
| 168:20 169:22 | 195:9 | 91:6 92:3 96:9 | **running** 36:4,10 | **salesman** 197:14 |
| | | | | **salesmen** 28:19 |

# FREEDOM COURT REPORTING

Page 241

salespeople 31:14
salesperson 31:11 197:5,8 197:9,17
Samlip 193:5
sat 106:22 114:9 177:11
Saturday 28:13 53:7 78:18,23 79:2,5 80:12 154:8,8,10 204:16,18,20
Saturdays 35:13 35:15,16 78:20 115:3 153:18 153:22 155:12 172:18
save 192:17 208:20
saw 61:10 70:17 100:16 167:1
saying 52:14 53:4 84:1 87:9 87:15 118:18 124:18,23 125:1 126:9,10 127:3 146:1 157:17 181:12
says 26:10 77:16 80:2,2,3,3,4,17 110:7 112:1 115:19
scale 156:2
scan 47:6
scanned 136:1
scenario 103:15 184:10 185:17 186:4,14 187:7 211:7
schedule 28:9 34:2,14 51:16 52:10,14,18 77:14,15 84:15

85:6,20 87:19 165:9 178:12 204:2 205:3
scheduled 48:13 58:11 69:20 70:13 110:19 154:1 167:10 168:14 169:12
scheduler 49:6
scheme 108:8
school 23:20 24:4 25:17 27:3 77:12 107:15,18,19
schooling 25:22 26:12
scope 58:11 208:15 214:8
Scott 160:12 162:18 163:12 177:10,12,18 177:21,23,23 179:2 203:22 207:21,23
Scott's 177:1
scrabbles 63:15
screen 27:10
screwed 149:1
screwing 203:2
seafood 94:22
Search 67:18
searching 149:21
season 204:9 205:5
second 18:5 89:2 114:4 122:13 123:14
secure 81:18
Security 4:13 10:9 23:17 65:8
see 37:10 42:17 66:6 71:3,4

72:4 77:21,21 85:3 105:3 123:13 125:21 126:21 136:1 147:10 150:21 158:5 189:19 195:1
seeing 119:13 125:17
seek 63:12 187:23
seeking 200:17
seen 61:9 69:2 114:15 183:2
select 31:2 84:5
selecting 47:13 216:15
selection 47:11 137:7
selector 141:18 207:10
selectors 165:13 216:23
sell 30:5 199:12
selling 29:8,16 29:21
send 13:19 170:4 187:13 198:19
sending 86:12
Seneca 138:15 142:16,17,22 145:4 201:16 201:17,21 202:20 203:3
sent 63:20 113:6 174:18 187:18 194:16
sentence 129:1
separated 14:21
September 121:4 197:6
serve 203:1
served 22:13

service 42:15 173:3 184:20 196:17 197:1 198:4,5,12,13
set 34:2,14 44:9 68:21 69:6 84:19 205:1
setting 85:6
seven 121:19 141:11
several-month 170:15
sewing 210:15
sexual 142:1
shaking 8:18 179:19 205:22
shambles 161:20 213:13
shape 167:6 170:1
shared 207:22
She'd 107:18
shift 33:21,22 35:1,2 39:8 42:9 46:16,19 47:11,17 48:5 48:7 51:4,8 53:22 54:4,12 54:13,16 55:5 55:6,8 57:21 57:21,23 73:6 73:8 74:10,10 74:13 76:22 77:1,13,15,19 78:4,9,9,17 81:21,22 82:9 82:13,18 83:4 85:4 93:2,14 93:14,16 95:4 97:4 98:23 99:2 103:18,18 103:23 104:3 137:6 138:6,15 143:22,22

145:5,7 147:16 147:21 150:7 151:8,12,14 152:22 153:4,6 165:4,6,11,12 165:21 166:17 166:17 172:18 174:16 176:1,1 178:9,10 179:11 186:19 201:16 207:9 207:11,19,20 208:1 216:12 216:13
shifts 77:8,9,18
shift's 83:6
ship 31:3
shipping 137:7 139:19
shook 92:7
short 90:15 119:15 143:10 143:12 144:3 147:19 153:1 197:12
shorthanded 143:23 147:17
shortly 11:4 75:16 98:22 163:13 197:14
shorts 150:15
short-term 207:6
shotgunning 210:7
shoulders 180:15 192:14
show 48:2 127:14
showed 48:10 70:13 165:17
shows 66:3,19 124:6 130:11
shut 204:13

# FREEDOM COURT REPORTING

Page 242

| | | | | |
|---|---|---|---|---|
| shuttle 55:18 | sleeping 77:11 | south 208:13 | 169:1,5 187:14 | 212:23 213:4 |
| shuttling 208:12 | 191:14 | southeast 208:9 | 187:23 191:19 | statements |
| 208:13,21 | slips 196:21 | Spain 34:11 | start 15:20 35:1 | 100:3 158:20 |
| siblings 17:9 | 197:23,23 | speak 13:18 | 44:3 47:11,12 | 174:9 177:19 |
| 19:14 20:3,11 | slot 47:3 197:23 | 53:21 63:13 | 88:9 103:11 | 183:5 190:14 |
| sic 58:9 117:1 | slots 47:12 48:1 | 92:14 96:15 | 132:18,19 | 198:20 211:20 |
| 186:11 | 216:13,16 | 150:17 167:23 | 134:2 145:5 | states 1:1 71:15 |
| side 48:17 | 217:2,3,18 | 169:18 187:14 | 149:21 150:8 | 160:20 |
| sign 170:3 | small 46:10 | speaking 54:19 | 150:14,19,21 | status 5:5 |
| signature 2:11 | 71:13 72:23 | 59:4 | 151:7 168:14 | 116:13 127:23 |
| 109:1,2 128:14 | 185:1 | special 110:17 | 179:9 209:1 | 128:4 136:6 |
| 128:16 131:4,7 | smaller 166:10 | specific 166:1 | 211:5 216:14 | stay 29:12 35:20 |
| 131:9,20 | Smith 2:5 6:13 | specifically | started 13:3,11 | 35:23 36:7 |
| signed 81:4 | 7:8 | 219:13 | 14:3 31:9 | 38:7 44:20 |
| 109:21 113:23 | smooth 34:20 | specifics 72:10 | 42:19 47:18 | 58:1,10,17 |
| 114:7,10 | 38:22 81:15 | 122:19 | 48:18,19 50:12 | 59:1 76:9,13 |
| 117:20 129:12 | 144:13 | speeding 23:1 | 55:4,22 71:12 | 144:18 164:6 |
| 132:10 136:20 | smoothly 38:15 | spell 51:12 | 81:2 82:21 | 165:5,16 |
| significantly | 145:18,22 | spelled 211:17 | 88:8 127:20 | stayed 59:11 |
| 46:7 | snack 91:15 | spend 161:23 | 134:3,6 137:19 | 186:18 209:2 |
| signing 47:22 | snap 101:3 | 164:9 | 139:19 140:14 | staying 58:8 |
| 128:11,20 | snuff 171:18 | spent 31:17 | 141:15 143:4,7 | 59:14 186:21 |
| 133:7 170:8,20 | social 4:13 10:9 | 185:21 | 150:2,4 153:6 | steady 81:18 |
| similar 174:5 | 21:15 23:17 | split 198:7 | 153:9 159:9 | Steve 1:7,17 2:1 |
| simple 169:19 | 65:8 | splitting 105:15 | 161:3 165:1 | 7:13,18 8:8,12 |
| sir 56:4 61:3 | sole 209:8 | spoke 82:4 | 166:4 167:4 | 70:19 121:3 |
| sister 15:18 | solely 184:15 | spot 63:23 81:16 | 169:13 178:5 | 178:5 210:6 |
| 19:15 20:4,13 | solve 150:23 | 166:14 198:2 | 181:19 186:6,8 | 212:18 217:5 |
| sisters 16:18 | somebody 41:1 | 217:23 | 186:9 192:23 | Steven 8:4,11 |
| 17:7 | 69:15 99:7,8 | spread 170:16 | 196:14 197:4,5 | Steve's 220:4 |
| sister's 16:4 | 144:10 149:12 | spring 25:17 | 199:1 | steward 94:12 |
| sit 70:21 | 151:20 152:2 | stability 81:12 | starting 43:1 | STIPULATED |
| site 193:22 | 188:13,16 | 134:23 | 136:22 145:8 | 1:21 2:10,18 |
| sitting 9:9 14:18 | son 11:4,7 | stack 196:19 | 198:9 208:18 | stipulation 7:6 |
| 67:21 70:17 | son's 11:10 | staff 77:20 83:10 | state 2:4 7:2 8:2 | Stitt 83:2 138:7 |
| 85:14 144:14 | sort 34:4,5 78:18 | 91:7 157:5 | 187:21 191:12 | 140:13 142:11 |
| situations 72:18 | 107:5 191:21 | 166:23 172:19 | 193:17,19 | 151:3 |
| six 14:5 44:12 | 195:1 198:7 | 174:13 197:17 | 194:11 195:12 | stocking 216:13 |
| 48:18,19 54:12 | 207:22 | standards | stated 176:22 | stone 184:21 |
| 121:19 146:23 | sorts 81:4 | 115:10,16,22 | statement 4:13 | 187:1 |
| 164:5 | sought 23:16 | 136:11 | 4:14 65:9 | stood 178:13 |
| Size-wise 49:22 | sound 28:3 | standpoint 93:3 | 66:13 100:1 | stop 192:20 |
| sleep 85:1 | 123:8 163:18 | 94:9 106:8 | 160:21 174:13 | stopped 152:4 |
| 107:17 192:6 | sounds 14:10 | 107:21 157:9 | 177:18 187:13 | storage 196:19 |

# FREEDOM COURT REPORTING

Page 243

196:20 198:12
store 29:21
straw 179:13
Street 6:6
strictly 49:20
69:11 74:13
strike 113:3
190:13
strong 101:9
struck 22:15
structure 29:13
60:12,15,19
121:1
stuck 62:12
stuff 8:10 13:22
32:10 58:4
62:23 71:17
72:17 73:6
83:7 92:12
119:18 150:16
155:14 159:5
169:2,19 170:3
170:12 179:14
196:23 200:16
202:4
styles 210:19
Suber 69:22
70:23 84:6
90:16 91:18
92:14,15 97:7
134:8,10 145:9
Suber's 70:7
subject 136:9
substantial
185:4,6 188:2
189:16
sudden 105:22
suffered 211:4
suggested 91:14
150:18,20
Suite 2:6 6:14
7:9
sum 215:11
summarize 65:2

summary 215:6
Sunday 53:9,10
56:17 57:11
80:12 204:13
204:18,20
Sundays 53:13
57:6
super 82:7
supervision
115:9
supervisor
27:13 28:14
30:12 42:9,10
43:2 46:17
51:4 74:13
82:23 83:4
93:3 94:9
103:18,23
104:3 138:9,10
139:7 141:19
166:1,8,22
177:16 186:19
201:17 207:20
supervisors
28:18 35:7
39:4 53:22
138:14 165:20
supervisory
195:18 207:12
support 62:4
200:22 203:18
205:11
supports 65:15
supposed 70:14
89:6,8 117:7
sups 166:20
sure 35:4 59:10
74:3,5 81:3
87:8,18 103:7
108:4 113:8
117:16 123:16
133:23 134:1
145:17 155:4
157:9 172:10

201:9,11 206:3
217:9
surgery 32:15
surplus 207:5
surprised 58:22
surprising 37:2
suspension
211:7
sworn 7:19
synopsis 172:8
SYSCO 12:23
13:2,6,8,10
14:1,13 41:21
42:8,13,17
43:7,18 45:14
45:16 46:17
47:15 51:4
53:6,17,19
54:5,18,21
56:5 57:22
60:5,6,14 66:1
66:14 69:4
72:18,22 73:4
73:17 74:12,16
75:12 79:11,12
79:14 81:16
90:20 93:1
94:1,3,4 95:3
95:22 96:4,18
97:10 103:16
104:12,13
105:9,13
106:16,17
107:6,12 113:7
113:18 139:18
140:7 146:4,23
166:5,16 174:5
182:22 183:23
185:4,14 186:4
186:19 188:6,9
188:17 199:20
206:18 207:4
208:12 209:2
210:20,23

211:12,14
215:18,22
216:11 217:7
219:20
SYSCO's 74:11

_____

**T**

T 1:20,20 4:8
5:1
take 11:20 23:16
26:4 29:14
40:3 43:13
44:23 45:4
49:5 57:1,16
57:17 82:16
91:21 112:20
120:3,10,14
166:14 169:23
170:17 175:12
179:6 180:19
201:13 206:1
207:9 208:5
taken 2:2 3:10
10:4 57:19
90:20 120:18
123:17 176:15
180:23 206:4
talk 54:15 67:8
75:2 83:12
84:14 88:2
90:18 99:14
145:10 167:16
167:17 173:15
173:18 182:1
201:8 202:21
215:17 216:8
talked 60:23
81:5 85:16,19
90:10 95:18
97:7 103:9
111:14 118:5
120:22 146:17
159:18 167:19
173:14 174:15

177:21 181:10
181:14,17,21
188:8,10,19
189:8,21 190:4
191:3,5 200:20
201:3,5,6,18
201:21 202:1
203:15 205:10
206:17 209:10
talking 26:23
38:13,16 63:22
66:14 68:15
73:16 81:8
87:18 120:20
167:20 168:6
205:6
Tampa 95:6
Tankersley
152:10,12
tape 62:16
taxes 200:10
tears 63:15
tech 170:7
techs 198:15
telephone
171:11
tell 9:15 13:19
44:22 45:2
46:17 60:16
67:20 68:5,20
71:21 72:11
73:23 75:11,21
76:1 78:8 79:8
82:2 92:3
93:23 101:8
137:2 143:18
178:11 179:8
180:7 182:15
191:11 192:7
202:12 203:10
209:20 210:6,8
212:15 213:7
213:12 218:19
telling 163:4

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 244

| | | | | |
|---|---|---|---|---|
| temporarily 192:14 | 97:16 98:10,13 176:22 184:12 187:9 198:11 | 158:2,11 160:11,20 163:10,19 | throw 159:4 Thursday 80:11 204:22,23 | 179:3 180:9 184:6 185:21 187:3 190:23 |
| ten 25:23 40:2 49:2 83:22 121:20 122:2 151:13,14 156:2 161:11 161:17 | things 35:5 38:14 60:9 61:10 63:3 71:2 73:12 85:9,11 86:20 116:6 123:15 | 168:21 175:22 175:22 179:15 183:18 184:4 185:11 187:9 189:22 190:15 190:20 193:7 | tie 47:1 160:6 tied 147:5,14 till 32:2 50:6 58:17 59:1 84:22 85:2 91:11 164:19 186:21 197:8 | 192:9 197:12 201:14 204:18 211:12 214:10 214:11 times 36:6 44:17 62:22 81:14 83:21,23 122:5 |
| tend 164:11,14 tenure 139:12 147:19 184:5 term 119:15 182:18 | 126:3 144:12 145:6,22 146:8 148:7 152:13 157:13,15,16 157:17 170:6 | 203:17 205:7 205:13 206:2 206:14 208:8 214:4,9,13,15 217:22 220:1,3 220:5 | time 3:2,2 22:13 22:17 24:3 31:17 32:15,22 33:3 35:11 38:17 39:12,14 | 162:3 180:6 201:18 Time-wise 74:20 title 45:6 51:7 69:23 82:14 137:13 163:15 |
| terminated 147:19 176:16 termination 142:6 terminology 95:20 | 172:13 177:4 177:13 178:6 181:11,15 190:3,8 191:16 191:17,21 | thinking 68:11 124:22 137:14 142:14 third 105:17 | 42:16 47:15 48:11 50:6 52:15,16,17 54:6 58:11 61:1 63:11 | tobacco 31:19 Tobias 3:9 6:12 Toby 8:1 today 8:23 9:12 |
| terms 31:21 65:4 74:4 94:18 112:14 127:4 147:14 156:22 158:14,15 | 201:15 208:16 210:3 213:6 218:2 think 14:18 24:20 26:5 | 125:17 126:15 thought 42:16 74:6 82:17 84:12 87:5 91:10 97:14 | 70:5 71:5,14 72:5 73:4 76:15,21 80:7 80:15 82:5 87:20,21 89:2 | 10:7 55:20 181:10 189:23 205:11 told 13:16 37:15 65:5 67:23 |
| 168:7 175:20 186:2 201:22 201:23 211:4 terrible 172:21 210:17 213:15 | 32:3,13 36:1 36:15 39:23 49:1,18 53:19 54:8 68:11,22 71:11,14 76:10 | 99:11 130:21 138:10 147:22 148:14 149:16 155:9 157:6,7 159:16 188:1 | 90:15 91:13,18 91:20,21 93:18 102:21 103:1 106:18 109:18 118:16 119:22 | 70:19,22 71:22 75:23 77:2,3 78:13 81:6,19 82:19 85:4,9 85:12 87:10 |
| testified 7:20 148:14 testify 203:23 testifying 10:6 testimony 1:16 | 78:13 92:11 95:21 97:6,7 100:2,12,14,16 101:2,13 102:23 103:1 | thousand 43:2 three 40:1 48:18 77:8 79:21 83:21,23 101:20 105:12 | 120:10 122:21 129:7 136:19 139:5 140:6,21 142:11 143:10 143:11 144:5,7 | 88:5 89:11,15 90:19 91:1,7 92:7,23 94:1 95:2 96:18 99:4 101:23 |
| 3:10 9:8 thanking 97:21 therapists 200:13 therapy 200:18 | 104:11 105:16 109:22 117:6 121:22 136:16 139:6 140:16 140:18 145:21 | 121:19 122:5 122:14 125:21 140:15 147:20 148:22 156:5,7 159:22 172:17 | 145:2,3 146:1 148:19 160:10 160:16 161:2 161:10,14,18 161:23 162:2 | 102:12 104:17 116:1,4 118:6 118:18,22 122:10 126:17 143:14,16 |
| thereto 3:4 they'd 90:17 98:3 thing 9:17 81:9 81:20 85:22 | 146:7,10,13,15 148:5 152:8 153:14 154:9 154:12 155:17 155:21 157:2,4 | 184:3,7 185:16 194:4,20 three-fourths 55:3 three-plus 33:8 | 162:11,14 164:1,7 166:3 166:16 170:15 172:17 178:4 | 144:4 148:1,3 148:9,15 149:17 150:11 150:20 156:9 |

# FREEDOM COURT REPORTING

156:17 157:14 159:3,7,16,19 160:4,9,22,23 161:9,10,12,13 162:1,5,8 167:19 171:7 171:11 172:16 177:11,15,23 178:1,17,19,22 180:6,11 181:12 183:14 183:21 190:3,8 190:9,12,12,15 194:13 195:6 201:10 202:15 202:16 203:1,7 203:7,8,10,12 212:7 213:22 214:21 217:13
**ton** 202:23
**top** 71:13 73:3
**total** 153:20
**totally** 14:5 169:6 172:20 172:20,20 198:9 212:1 216:16
**touch** 98:3 168:7
**tough** 14:16
**tour** 91:4,21 93:4 173:22
**town** 102:4
**trade** 42:17 53:21
**traffic** 22:19,20 22:22 23:5,6
**training** 26:15 26:19 27:1
**transcript** 3:10
**transpire** 32:5
**transpired** 50:7 84:11 92:10 158:4
**transportation**

33:23 56:3 73:18 74:11 78:10 82:20 83:1 99:1 137:8 138:7 139:10 143:22 149:3 155:7 176:2,4,6 208:21
**transportatio...** 93:15
**trial** 3:2 17:20
**trick** 109:17 133:13
**tried** 29:12 30:3 47:19 48:8,11 99:22 106:3 160:6 165:10 193:5,12,15,16
**Triggs** 167:20 167:21 168:5,8
**trim** 27:11
**trip** 154:19
**trouble** 29:15 149:5
**truck** 154:11,11 154:16 155:5 191:20
**trucks** 46:23 50:17 147:22 150:15 153:1 208:13
**true** 85:10,13 86:23 87:3 198:4 201:12 213:4
**trust** 98:16
**truthful** 181:14
**truthfully** 10:7 209:20
**try** 29:16,20 37:3,23 44:20 78:1 99:15 100:3 105:8

106:12 193:15 193:19 204:23
**trying** 14:8,17 36:21 37:11,17 42:20 49:18 87:8,17 92:22 104:19 109:17 109:18 133:12 145:2 158:10 163:10 176:11 176:12 192:23
**Tuesday** 160:8
**tune** 97:11
**tunnel** 191:17
**turmoil** 161:19
**turn** 101:4 106:13 108:23 135:2 146:11 146:14 198:18 208:23
**turned** 106:4 146:8 181:13 183:4
**turnover** 5:13 38:23 54:3,14 54:17 55:11,15 147:17 172:23 173:2,5 174:15 176:5
**twice** 78:21
**two** 14:9,22,23 15:4 16:8,9 17:9 19:19 20:19 24:14 25:14 35:14 39:23 40:1 48:3 53:19 66:7 77:8 78:20 79:12,13 81:16 88:19 93:2 121:18 125:7,9,18,20 126:5 127:5,8 127:16 133:15

137:21 139:13 147:19 148:22 159:23 160:3 161:4,7,15,22 162:3 165:19 169:4 172:16 180:17 192:14 192:23 193:1 194:19,19 197:18 201:9 215:17
**two-lane** 75:1
**two-part** 216:6
**two-year** 25:8,9
**type** 9:21 22:22 26:11,14 30:18 32:10 33:14 41:6,9 51:16 55:11,14 94:6 150:16 154:17 195:1
**typical** 48:6 76:4 164:17,18
**typically** 48:14 52:22 58:15 75:18 164:23

_____

**U**

**U** 1:20
**uh-huh** 9:2,16 9:18 11:13 14:12 19:9 30:10 34:17 40:10 52:8 75:5 110:22 111:16 113:22 118:8 122:8 124:7,10 127:19 128:10 132:12 134:7 142:19 158:9 181:20 190:6 201:1 206:20
**ultimate** 35:8

**ultimately** 35:8
**unattended** 58:4
**uncle** 17:12 18:17
**uncleanliness** 173:8
**uncle's** 18:7
**understand** 9:3 9:6,14 29:18 37:20 41:2 50:5 61:13 86:7,17 87:9 89:23 90:9 93:19 115:14 118:17 125:16 126:3 129:2,10 144:17 145:23 154:14 182:2 190:19 217:9
**understanding** 40:12 64:10 70:3 76:6 85:7 115:18,23 118:9,12,20 126:6,19 190:5
**understood** 88:22 89:21 90:1,4 91:13
**unemployed** 185:20 200:3
**unfortunately** 86:19
**unhappy** 86:9
**union** 94:3,3
**United** 1:1 71:14
**University** 193:18 195:13
**unload** 46:22
**unsafe** 169:6
**untrue** 87:16
**untruth** 99:17
**updated** 130:21
**use** 161:15
**usual** 112:16

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 246

| | | | | |
|---|---|---|---|---|
| **U.S** 188:23 189:6 | **vs** 1:10 **V-E-R-T-E-I-N** 51:13 | 157:3,3,6,10 160:15 169:15 170:19 178:19 216:1 | 94:2,5 96:13 96:14,18 101:13 104:5 144:1 148:7 | 192:13 **Weldon** 21:5 **Wellborn** 193:8 193:12,15 |

**U.S** 188:23 189:6

**V**

**vacation** 31:13 39:20 40:3 66:7 79:10,12 79:17,20,22 81:7 90:21 112:14,17 114:23 118:7 118:10 119:3 134:18 135:4,5 159:18 161:4 161:16
**vacations** 85:20 159:20
**valuable** 97:8
**varies** 204:8
**various** 31:14
**vary** 187:5
**verbatim** 52:15 134:2
**verge** 141:4
**Vertein** 51:11 51:21
**Vertein's** 52:9
**vested** 184:23
**vice** 45:11 70:5
**videos** 62:19
**view** 74:12 93:16
**viewed** 104:5
**violation** 23:5
**violations** 22:19 22:20,23 170:8 170:10
**voluntarily** 14:13 29:9
**volunteer** 213:11,16
**volunteered** 213:20
**VP** 52:7

**vs** 1:10
**V-E-R-T-E-I-N** 51:13

**W**

**wad** 63:13
**wages** 205:21
**wait** 52:3 91:11 195:1
**waiting** 216:23
**waived** 2:13
**walk** 31:20 67:10 116:14
**walked** 70:15,18 95:13 98:19,20 144:13 180:1 183:21 192:11 214:8
**wall** 179:7
**wand** 101:4
**want** 17:23 28:3 37:6,9 45:13 59:10,12 61:23 67:8 69:10 72:10 77:23 80:15 82:16 84:23 86:16 89:9 93:10 99:5,8 101:22 106:9 120:2,11 131:11 141:11 142:22 149:11 156:3 160:7 161:15 183:6 183:13,16 201:3 203:14 205:11 208:9
**wanted** 40:4 49:9 65:18 68:1,18 81:9 81:17 84:21 86:6 92:17 93:20 101:2 111:6 145:4

157:3,3,6,10 160:15 169:15 170:19 178:19 216:1
**wanting** 94:15 100:13 148:4
**Ware** 83:4 138:9 138:16 141:13
**warehouse** 31:1 32:8,10 34:19 47:5,10 53:12 73:8 91:4,22 93:4 95:1 100:18 101:5 149:21 173:7,8 173:20,22 210:14 213:13 219:20
**wasn't** 29:8 32:6 58:12 78:16 81:14 86:22 87:2,11 95:8 96:2,17,21 102:19 106:2 107:6,22 119:18 139:23 149:4,14 151:11,21 156:16 160:17 165:12 167:5 167:13 170:23 171:1,14 172:16 184:15 184:16,17 191:13,13 203:5 218:10
**water** 196:17,22
**wave** 101:3
**way** 32:4 36:10 36:11 41:3 53:2 58:5 73:11 75:1 82:22 88:22 90:8,17 93:10

94:2,5 96:13 96:14,18 101:13 104:5 144:1 148:7 149:9 150:14 153:2 155:19 156:3 158:5 173:23 185:9 185:13 187:18 190:16 191:15 192:5 203:12 207:3 211:22 212:12,20 214:4 216:17 217:5,16
**Wayne** 34:10
**ways** 105:3 189:22 191:7
**Web** 193:22
**Wednesday** 160:9 204:23
**week** 39:23 45:21 56:20,22 57:3 79:23 90:2,5 142:7 164:2 178:8,9 179:9,11,12 186:8,9 199:8 204:4,4
**weekend** 57:2,5 103:5,10 160:7 162:5 204:22
**weekends** 53:6 85:20 110:20
**weekly** 199:5
**weeks** 40:1 79:12,22 127:5 127:16 150:7 151:5,10,14 152:20,21 164:5 169:17 179:2 185:19
**week's** 79:20
**weight** 180:14

192:13
**Weldon** 21:5
**Wellborn** 193:8 193:12,15
**went** 22:8 24:12 24:17 25:5,5 27:19 28:23 31:4,22 37:14 45:8 50:6 56:16,17 61:1 71:3 82:2 87:13 101:19 110:10 139:18 143:20 144:13 155:13 172:13 173:13 176:11 177:10 186:3,7 194:14 195:4 210:16 219:18
**weren't** 52:22 55:7 56:1,2 57:12 58:21 70:23 71:22 73:18,21 85:10 104:14 107:14 118:21 148:16 169:2 190:12
**wet** 80:9 196:20
**we'll** 64:23 112:23 195:2
**we're** 8:22 18:21 53:7 66:14 95:22 120:15 170:14 196:17 197:21 198:1 204:10 212:12
**we've** 21:20 85:16,18 90:10 118:5 136:19 173:14 190:4 191:3,5 196:15 196:20 197:17 197:20 198:4 200:20 220:2

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| whatsoever 218:21 | 30:9 32:14,23 | 198:17 201:14 | 114:14 115:2 | 134:18 179:15 |
| wheel 72:23 | 34:22 35:10,13 | 203:16 204:1,6 | 127:20 134:3 | writings 64:18 |
| whichever 199:2 | 36:22 37:3,14 | 210:16 212:4 | 138:23 140:9 | written 184:21 |
| Whitman 20:4 | 39:20 41:4,19 | 219:19 | 140:23 143:6 | 211:5,17 |
| 21:4 | 42:21 43:19 | worked 12:3,17 | 145:11,14 | wrong 36:9,11 |
| wholesale 30:19 | 44:8 45:8 48:5 | 27:5,10,11 | 147:11 150:2,3 | 121:15 123:12 |
| wife 11:7 18:5 | 51:17 52:11 | 28:10,11,18 | 150:8,19,21 | 153:17 154:6 |
| 19:7 20:2,11 | 53:9,13,16,23 | 30:2 32:7 33:6 | 151:7 152:4 | 159:15,16 |
| 21:6 102:7 | 54:2,21 61:2 | 34:2,4 39:4,18 | 156:23 164:17 | 190:4,16 |
| 106:16 180:4 | 67:9 68:2 75:9 | 41:7 46:3 | 164:23 165:1 | wronged 185:10 |
| 192:7,12 200:5 | 75:19,22 76:2 | 47:15 53:18 | 167:4 169:3,14 | 185:12 187:12 |
| 201:4 209:9 | 76:23 77:6,7,8 | 55:18 56:13 | 172:6 175:9 | 187:17,17 |
| wife's 11:8 17:1 | 77:12,18 78:20 | 57:3,7,9,11 | 178:2 179:9 | wrote 114:9 |
| 17:16 | 79:1,5,22,22 | 68:1 71:19 | 180:18 181:19 | W-I-L-L-I-E |
| Willa 17:17 18:2 | 80:7 81:12,18 | 72:15,16 79:19 | 182:22 186:12 | 16:2 |
| 18:4 | 81:20 83:11 | 81:13 82:22 | 188:17 192:20 | W-2 67:6 200:9 |
| William 16:21 | 84:22 85:2,21 | 84:20 85:19 | 200:5 204:5 | W-2s 4:15 65:18 |
| Willie 16:2 | 87:13,22,23 | 87:19 88:16 | 206:6 208:14 | 66:1,23 |
| willing 187:13 | 89:12 92:12 | 90:6,7 96:3 | 210:10 212:19 | |
| Willis 18:9 | 96:16 100:4,11 | 111:5 122:17 | 219:10 | **X** |
| will-call 49:7,11 | 102:1 106:15 | 138:1 140:18 | works 12:1 | X 4:1,8 5:1 |
| window 147:12 | 110:10,19 | 140:20 145:18 | 32:10 46:1 | |
| windows 84:20 | 111:6 112:11 | 147:17 150:7 | 194:10 204:19 | **Y** |
| wins 154:18 | 118:15 134:15 | 151:5,9,13,23 | world 180:14 | yeah 22:21 24:4 |
| winter 204:10 | 134:19,22,23 | 152:20 153:20 | 192:13 | 26:18 32:1 |
| 204:14 | 139:18 143:20 | 159:11,21 | worry 78:23 | 40:21 46:15 |
| wintertime | 144:6 145:22 | 164:5 166:5 | 80:1 102:19 | 54:10 56:11 |
| 204:12 | 146:4,6,13 | 172:22 187:4 | 171:12,19 | 57:17 58:19 |
| wise 106:7 | 147:2,3,7 | 192:17 203:19 | worse 153:14 | 59:13 66:5 |
| wish 218:11,12 | 148:10 149:15 | 211:12 | 162:17 179:1 | 72:11 78:6 |
| 218:13 | 151:8,18 | workers 23:13 | 184:9 185:17 | 84:13 87:12 |
| witness 2:12 | 152:12,21 | working 13:10 | 186:3,14 187:6 | 90:3,9 97:3 |
| 7:13 21:10 | 153:19,21 | 14:1 32:4 | 206:14 211:7 | 100:15 101:13 |
| 22:5 136:14 | 156:12,19 | 37:21 39:13 | worth 126:1 | 102:9 104:6 |
| won 96:5 | 158:8,23 163:3 | 42:4 50:10,21 | wouldn't 18:1 | 108:22 109:6 |
| wondering | 163:4,8,8 | 59:20 60:1,4 | 37:16 57:12,14 | 111:18 117:6 |
| 192:21 | 164:12 171:17 | 60:11,13,18 | 68:5 80:4,6 | 118:19 119:19 |
| word 136:4,4 | 172:14,15,17 | 76:15 77:1,10 | 91:6 97:9 | 120:8 123:2 |
| words 182:15,17 | 173:13 176:12 | 78:22 89:8,10 | 102:18 113:8 | 131:9 132:23 |
| work 11:23 | 176:18 178:7,9 | 94:6 96:20 | write 219:1 | 133:1,6,14,14 |
| 12:15,23 13:2 | 178:23 179:10 | 97:10,13 | writer 198:5 | 135:11,11,11 |
| 27:1,4,17 | 180:10 185:18 | 102:15 104:13 | write-ups | 138:10 144:21 |
| 28:23 29:16 | 186:7 195:5 | 110:19 111:1,2 | 198:14 | 150:5 156:21 |
| | 197:18 198:17 | 111:5 112:7 | writing 134:10 | 158:16 180:21 |
| | | | | 180:21 182:13 |

# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

183:15,16
188:12 199:4
199:18 217:19
**year** 14:10 24:7
26:6 32:13
39:22 41:16
44:4,11 45:10
45:18,22 78:20
78:22 79:16,17
79:19,23 80:8
83:21,23 89:16
103:14 105:21
105:23 118:16
121:14 122:5
130:22 160:22
160:23 161:3
185:17 186:7
186:10,11
187:4 199:1
200:11 204:9
**years** 11:1 14:22
14:23 15:2,4
23:2 24:14
25:23 33:8
34:3,14 38:21
40:1 53:20
71:11 93:2
99:14 137:21
138:22 139:14
140:16,16
141:17 142:23
169:22 173:10
186:20,22
187:2 208:20
**year's** 184:6
**year-wise**
100:23
**yesterday** 65:10
113:12 127:7
174:18
**y'all** 14:15 15:3
15:15 40:7
83:12 84:14
88:2 119:6

120:2 152:3,7
173:18
**y'all's** 98:9

_____

**Z**

**Zac** 10:23 11:10
11:11,12
**zero** 125:23
126:21

_____

**$**

**$10,000** 45:20
168:19
**$300,000** 187:8
**$40,000** 44:4
**$400,000** 186:16
**$62,000** 103:12
**$62,500** 89:16
111:15
**$700** 186:8
**$734.78** 122:15
**$992** 45:21

_____

**0**

**04** 122:15
**05** 125:10,11
161:3

_____

**1**

**1** 4:11 61:5,6
121:3 125:15
129:1 130:20
132:1,7,9
135:18 160:19
196:15 215:6,8
**1st** 56:10
**1/27/05** 131:14
**1:00** 177:9
**10** 4:22 45:23
66:21 69:10
117:1 121:2,6
**10,000** 46:5
**10,531.50** 66:20
**10:00** 85:2
**10:20** 2:9 7:12

**10:30** 177:5
**10:45** 177:5
**100** 71:11 90:7
93:21 196:20
213:1
**104** 126:1
**104.25** 126:22
**108** 4:17
**109** 4:18 125:22
**109.9** 126:20
**11** 4:23 17:6
123:19,21
178:2
**11th** 109:4,20
110:1,12
**11/28/58** 10:13
**113** 4:20
**115** 105:23
**117** 4:21
**12** 5:3 17:6
48:19 49:17,18
69:10 79:11
127:6,10 178:2
**12th** 176:23
**12:00** 53:9
**12:30** 120:1
**121** 4:22
**123** 4:23
**126** 6:6
**127** 5:3
**128** 5:5
**13** 5:4 128:3,5
**130** 5:7,8
**131** 5:10
**132** 5:11
**14** 5:6 11:17
12:5,7 130:2,7
131:8 132:20
**15** 3:7 5:8 47:19
49:13 130:14
130:16,17
132:14,17
133:20 135:3
**16** 5:9 49:13

**131:**12,15,16
132:11
**168** 5:12
**17** 5:11 10:23
11:12 79:17
131:23 132:2
132:11 135:15
135:17
**174** 5:14
**18** 5:12 11:1,1
15:2 16:15
18:3 19:18
20:18,20 116:7
168:4,9 214:23
**181** 5:15
**1819** 2:6 6:15
7:10
**182** 5:16
**19** 5:13 174:15
174:21
**1977** 24:9
**1984** 27:18
**1986** 14:19
**1998** 3:7
**1999** 13:3

_____

**2**

**2** 4:12 63:19
64:1,22 110:17
115:5 215:10
215:11
**2,604.17** 127:18
**2,606** 126:1,23
**2,606.34** 124:6
**2,606.35** 123:7
**2:00** 84:22
**2:06-CV-0070...**
1:5
**2:30** 48:14 75:15
**2:45** 48:15 75:15
**20** 5:15 23:2
49:19 71:13
116:7 173:10
181:2,4 186:20

**208:11** 214:23
**20th** 109:21
**20-year-old**
213:14
**200** 105:21
**200-plus** 173:5
**2002** 130:20
**2003** 67:1
**2004** 67:1 109:5
110:12 113:21
114:2 121:4
128:18 131:1
189:7
**2005** 67:1 121:4
123:7,8 124:5
124:9 125:7
126:5 132:1,7
132:9,10
135:18 168:5
**2006** 67:1
**2007** 2:8 3:11
7:13
**21** 5:16 182:5,6
**210** 4:5
**22** 74:22
**23rd** 109:21
113:21 114:2
**24** 149:20
**24th** 128:17
**25** 23:2
**25th** 14:19 124:5
**26** 127:18
**26th** 168:5
**27th** 132:10
**28** 49:19

_____

**3**

**3** 4:13 65:8,11
**3:00** 58:15 75:17
**30** 83:19 103:13
111:20,21
115:20 121:11
121:12,13
208:11 214:17

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

**FREEDOM COURT REPORTING**

Page 249

| | | |
|---|---|---|
| **30th** 121:4 | **6** | **8:00** 51:22,23 |
| **31** 125:9,11,15 | **6** 4:16 108:15,17 | 53:4,9 70:15 |
| **35** 49:19 50:13 | 219:2,3 | 204:6 |
| 186:6 193:14 | **6:00** 47:19 48:2 | **80** 103:14 |
| **35,000** 186:9 | 59:1 75:14 | |
| 199:1 200:10 | 84:22 85:2 | **9** |
| **35010** 6:7 | **6:45** 164:18 | **9** 4:21 117:5,7,7 |
| **35203** 2:7 6:16 | 165:4 | 117:12 135:13 |
| 7:11 | **60** 19:3 68:12 | **90** 19:2 |
| **3763951** 10:16 | 83:18 84:3 | **900** 2:6 6:14 7:9 |
| | 178:8 179:9 | **93** 15:5 |
| **4** | **60-hour** 204:2 | **931** 10:20 |
| **4** 4:14 66:11,16 | **61** 4:11 | **95** 15:5 |
| 136:5,13,14 | **62** 43:12 | **98** 139:19 |
| **4th** 2:8 3:11 7:12 | **62-5** 88:9 | **99** 139:21 140:3 |
| **4,200** 46:10 | **64** 4:12 | |
| **4:00** 58:18 | **65** 4:13 83:18 | |
| **4:30** 143:8 | 84:3 | |
| **40** 50:13 | **65,000** 68:12 | |
| **400** 193:10,11 | **66** 4:14 | |
| **400-plus** 173:6 | **67** 4:15 186:22 | |
| **401-K** 184:17 | | |
| 192:16 199:17 | **7** | |
| 199:18 | **7** 4:4,18 109:8 | |
| **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** | 109:11,14 | |
| 10:11 | 219:3,4,7 | |
| **45** 90:23 91:16 | **7,000** 46:12 | |
| 120:11 | **7/1/2005** 175:6 | |
| **450** 197:22 | **7:00** 51:19 165:4 | |
| | **7:30** 143:7 | |
| **5** | **7:45** 70:14 | |
| **5** 4:15 46:11 | **700** 186:9,10 | |
| 66:23 67:2 | **72** 73:3 | |
| 135:2 | **721.15** 199:8 | |
| **5(d)** 3:5 | | |
| **5:00** 51:22 52:1 | **8** | |
| 52:3 53:4 | **8** 4:19 113:13,14 | |
| 58:13,23 | **8/1/02** 130:4,12 | |
| 144:15 204:6 | 131:5 132:15 | |
| **5:15** 164:19 | 132:17,21 | |
| **5:30** 164:19 | 133:3,9,12,17 | |
| **5:45** 75:13,14 | 133:17,20 | |
| **50-mile** 68:7 | 135:3 | |
| **52,000** 45:22 | **8/1/2002** 130:15 | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

STEVE ADAMS,                              )
                                          )
        Plaintiff,                )
                                          )
v.                                        )     CIVIL ACTION NO.
                                          )     2:06-cv-00707-ID-CSC
MERCHANTS FOODSERVICE, et al.,            )
                                          )
        Defendants.               )

**DEFENDANT'S EXHIBIT**

**/**

## NOTICE OF DEPOSITION AND
## REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

Please take notice that, beginning at 10:00 A.M. on April 4, 2007, defendant

Merchants Foodservice will take the deposition of plaintiff **Steve Adams** before an

officer authorized by law to administer oaths and record testimony at the office of

Constangy, Brooks and Smith, LLC, 1819 Fifth Avenue North, Birmingham,

Alabama 35203.

Pursuant to the Federal Rules of Civil Procedure, defendant requests that

plaintiff bring the following documents with him to the deposition:

    1.    Any documents, writings, notes, tapes (video or audio), or

correspondence which plaintiff contends support his claims.

150464.1

2.      Any documents, writings, notes, tapes (video or audio), or correspondence which plaintiff has that relate to or concern his employment with defendant.

3.      Any and all documents, writings, notes, or correspondence reviewed by plaintiff or utilized by plaintiff to refresh his recollection in preparation for his deposition and/or the allegations in his Complaint.

4.      All income tax returns filed by plaintiff for the last four years or any and all other documents or writings, including but not limited to W-2 forms, which show plaintiff's wages, earnings and hours worked for the last four years.

Thomas A. Davis (ASB-5877-S56T)
E-mail: tdavis@constangy.com
Direct Dial No.: (205) 226-5465
J. Tobias Dykes (ASB-0483-E66J)
E-mail: tdykes@constangy.com
Direct Dial No.: (205) 226-5469
**CONSTANGY, BROOKS & SMITH, LLC**
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Facsimile:   (205) 323-7674

**Attorneys for Defendant**

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record by United States Mail, postage prepaid, and addressed as follows:

> Derrick Blythe, Esq.
> 126 Marshall Street
> Alexander City, AL 35010

This 15th day of February, 2007.

Counsel for Defendant

150464.1

DEFENDANT'S
EXHIBIT
2

What I am sure we can accomplish is to prove that I was lured away from a good job, (
**a job that I was secure in, well compensated for, a career from which I could have
retired from, reaped the benefits of annual raises & the financial security of a good
pension when I did retire. A job that I really enjoyed, the hours worked, the
working conditions, my employees, etc.... In essence, a job I could have worked at
& enjoyed until retirement** ) under fraudulent pretense, false promises, lies & deceit.
Nothing I was told during the interview or job offer turned out to be true.

I was first contacted about the position at Merchants FoodService by Freedom Search (
a head hunter org. ) working on behalf of Merchants. I was contacted while at work ( for
SYSCO ). I had never entertained the idea of working anywhere but SYSCO until
contacted by Freedom Search. All contacts about the Merchants job were instituted by or
on behalf of Merchants. They actively pursued me to come to work for them. I agreed to
an interview once Freedom told me the potential salary range and " lucrative" bonus '
potential. If certain CRITERIA WERE THE SAME, I thought I could better provide for
my family financially if I took this position. This was the only reason I ever considered
leaving SYSCO.

An interview was scheduled for me to meet with Hal Henson – Branch Manager, Andy
Mercier – VP, & Don Suber – Pres. I was to meet them @ Merchants in Clanton @ 8:00
AM. When I arrived Hal greeted me and told me that Andy & Mr. Suber had been
delayed and that he would conduct the interview by himself. He said if necessary, I could
meet with them at a later date. During the interview ( approx. 60 mins. ) Hal questioned
me on my experience, qualifications, etc.... I answered all of his questions as thoroughly
as possible, giving examples of how I had addressed certain situations in the past. I
explained how at SYSCO, we did most of our let-downs on dayshift and alleviated night
shift from becoming bottle-necked at the start of a shift. This was different from how
Merchants was doing it and he seemed impressed at our (SYSCO's) success and cases
per selection hour. I told Hal of the numerous corporate wide awards our warehouse had
received at the Calera facility. Again he was impressed and said so.

Hal concluded his questions and asked if there any questions or concerns on my part.
Since I was gainfully & happily employed I had prepared a short list of important
questions I did need answered. The answers to these questions would be the basis for my
decision if I were offered the job. I needed every assurance that I was making a sound
decision if I chose to leave SYSCO.

(1ST)What hours would this job require? Hal answered my question with a question.
Asked me to describe my typical day at SYSCO. I answered that I arrive for work @
5:45, the crew @ 6:00. The crew normally finished at 2:30 – 2:45 and I was gone by
3:00. Hal's reply – so you normally work 8 to 8 ½ hours per day. Answer- Yes. Hal –
that would be a typical day at Merchants. Hal also stated that given this position I
would have the flexibility of scheduling my own working time. Neither came to
fruition during my tenure with Merchants. From the beginning I worked 9 – 9 ½ hrs a
day. Progressively Merchants became more and more demanding and my week
became longer and longer. I would arrive @ 6:45 – 7:00 AM and when I would start to
leave at 5:00 PM, Hal (if he saw me walking out) would say – you leaving already. I
eventually started trying to stay until Hal left, even though he seldom came to work

before 7:30 or 8:00. I was told on 6/28/05 (Scott Casey and Hal Henson) that if I was not willing to work 55-60 hrs / week then I was not committed enough or loyal enough to work at Merchants. That schedule would be 11-12 hrs / day. Living in Alex City, I have a 2 hr round trip commute. That plus 12 hrs a day would require me to be away from my family for 14 hrs a day, five days a week. I would never for any amount of money knowingly accept a job that required this much time. Had Hal been truthful this would have taken me out of the running for the Merchants' job. While we were discussing hours, I asked Hal about night shift and if he ever saw me needing to work at night. Hal asked if I were opposed to working night shift. I explained that I had worked all the night shift (on a regular basis) that I cared to. I stated that when I worked nights I never saw my wife or children. They would be at home while I was working, and they would be at work/school when I was home. I was upfront and told Hal that I would not be interested in a position that required any regular night shift schedule. Hal – No, no, nothing like that. All that would be necessary would be a couple of nights to get acquainted with the night shift staff and observe the night shift operation to see if there were any improvements that I could recommend. I stated that I certainly didn't have a problem with that. During my 10 ½ months of employment at Merchants I was required to work 10 complete weeks on night shift. The day I quit 7/12/05 I was told by Hal & Scott that beginning immediately I would be required to work 60 hours a week. I would work dayshift one week then nightshift the next. That would be my schedule until I was told different. I immediately informed them that I was turning in my resignation. Gave them my keys and cell phone and walked out. Hal mentioned in the interview that I would be required to work 2 Saturdays a year for inventory. He stated that when I worked one of these Saturdays that I would receive a day off the following week as compensation. I worked a total of 8 Saturdays during my tenure and never received a single comp day for these Saturdays. Every pay check (see enclosed) I received shows 87.00 hours per pay period. I was bi – monthly (paid on 1st & 15th) so this should back up the promise of 40 hrs per week. Again, I would never have considered, much less accepted a job that required this much time per week or night shift work…**under any circumstances.**

(2**ND**) The next question I asked Hal had to do with vacation. I told Hal that I currently received 12 days vacation with SYSCO and that in little over a year I would receive 17 days. Hal stated that Merchants' policy was 5 days after 1 year. I stated that I would not give up 17 days to wait a year before I received any time off. Hal told me not to worry about time off. He stated that he had always (for managers) in the past and certainly would for me give me plenty of time off. He stated that after a couple of months, he would give me a couple of days to go with a weekend. After that I could have a day here and a day there. All I had to do was ask. Hal seemed so sincere and honest, I had no reason at the time not to believe him. He stated that he didn't expect any new member of his management team not to have time off for a year. During 10 ½ months I was given 0000 days off. I was turned down on all 3 requests for time off. The last time I asked off (2days) with a weekend, I was told that now was not the time to be asking off. When I stated that I hadn't had a day in 10 months, I was told that maybe I could get 1 day in August. I actually had accrued 2 vacation days at the start

of 2005, (showed on my check stub), but was never allowed any time off. As previously stated, I would have never have considered a job that does not allow any time off for this length of time.

(3rd)  My other concern and question was the stability of the workforce. This would weigh heavily in my decision making process. I asked Hal if Merchants had a steady, secure workforce. Hal's reply – Yes we do. We have a very good dayshift, an excellent nightshift, and a good core group of driver's. How about management was my follow up. Randy Harrington was in charge of dayshift – better at inventory control than running dayshift but all in all an excellent employee. Hal stated that the new Director of Ops would primarily be responsible for dayshift day to day and that while Randy would keep the title of ops mgr he would primarily be inventory control. Jason Kelley was the trans mgr. Started as a driver, then promo to spvr., then assumed mgr position. Philip Stitt was night mgr and Rodney Ware was spvr. Hal stated that night shift numbers were excellent and that Philip routinely maxed out on his bonus potentials. Hal further stated that Merchants had all the right pieces to the puzzle in place and that all that was needed was the glue (dir of ops) to hold them in place. I asked if Hal could tell me what had happened to the last director of operations. He said he would even though he shouldn't. He wanted me to understand that Merchants had to let him go, and that he had not resigned but was fired. Hal stated that he had been sending inappropriate e-mails to a female co-worker and had to be released. He stated that he had done a good job but had to be released for fear of Merchants being involved in a discrimination lawsuit. After accepting the job I found out that the workforce was anything but stable. Discipline was basically non existent. Turnover rate was atrocious*** See attached turnover analysis report. Both Philip and Rodney had been suspended themselves for sexual harassment. Rodney was subsequently fired for repeat offense. Philip was on the verge of being fired for absenteeism when he resigned. Night shift was a shambles. Had the stability of the work force been remotely conveyed to me with any accuracy, I would have never even considered, much less accepted this position. I would still be happily and gainfully employed with SYSCO Foods.

Hal asked if I had any other questions and I asked about the salary range. He said somewhere between 60 and 65k with a 30% bonus potential. I said that sounds good but I hope its 65 rather than 60. He said the ultimate decision would lie with the right candidate's qualifications and Andy and Mr. Suber. I said well that's all I've got. Hal asked if I would excuse him for just a second and that he would be right back. I said sure. When he returned he said that Andy and Mr. Suber were on their way and that they would really like to talk to me today if possible. I explained that I had taken a vacation day from SYSCO and that I could hang around until they got there. He said it would probably be about 45 min to an hour and suggested that I could go get a snack down the road. I asked if he could take me on a tour of the warehouse and meet the guys that were there that day. Hal stated that he would prefer not to do that just yet. He said that no one had been told that they were hiring a new director and it would be better to wait until after the announcement. I said I understood. After I was hired I then

realized the real reason he didn't want me to see the facility. Although it was newer than the SYSCO facility (in Calcera) that was built in 1998, it was a mess. I have never seen a nastier facility. This would have been a dead give away as to the mismanagement and lack of care and pride on the part of the employees.

When I returned from my break, Hal met me and escorted me back to the conference room. I met Andy Mercier and Don Suber at this time. After pleasantries were exchanged, Hal filled them in on my experience, present employment, and opened the floor for their questions. Mr. Suber asked about my experience with KFC (knowing that SYSCO had once held the contract to service all KFC accounts). I stated that I had the knowledge of participating in the whse inspections, the record keeping process that KFC requires of its vendors, etc...Most of my knowledge dealt with dayshift ops. He mentioned that Merchants was on a short list to become their next supplier and that they wanted to land and keep this large account. (Merchants had recently sought a similar account with the U S military. I knew this because SYSCO Alabama had also interviewed and been awarded this contract instead of Merchants). Mr. Suber seemed pleased that I indeed had KFC experience. His next statement was a comment rather than a question. He wanted my assurance that I was 100% anti-union. Andy asked about my experience with HACCP – ( hazard analysis & critical control points – safe handling procedures for fresh seafood & meat products ). He was happy to hear that I was currently HACCP certified. Next Andy asked me how I liked working for SYSCO. I told him that they were a great company and that I really enjoyed working there. He questioned me about the amount of pressure exerted on management by the "Corporate driven mandate" that all SYSCO houses operated under. He stated that I would really enjoy working for Merchants, because unlike SYSCO and their corporate mandate, Merchants was extremely family oriented. He said that Merchants realizes the value an employee places on their family and the need to spend time with them. An employee needs security in their employment and peace of mind while at work. Yes, we expect our employees to do their best, but we don't put undue demands or put pressure on our employees to get our desired results. For some reason Andy thought SYSCO's work environment was extremely high pressure and he went out of his way to convince me that Merchants was not that way. I again stated that was not the case, at least not in my experience with the ops. dept. where I worked. I stated that it might be that way in sales or marketing but not in operations. I told him that I had a great boss in Eddie O'Coonor. I've never felt pressured or driven by any mandate, but did tell him that we had been extremely successful in distinguishing ourselves as one of the best operating warehouses in all of SYSCO. But if Merchants is very family oriented, then that can only be a positive. Again, he assured me that was the case.

As mentioned in several examples above Merchants could have cared less about my family or the quality of the life we had together. All they were concerned with was somehow turning a mess of a company around at any cost to any and all employees. After accepting this position I had many conversations with Andy about the management team at the Clanton facility. He told me on numerous occasions that if Randy, Jason, or Philip were not the right man for the job, "fire them" and hire someone who is. Andy concluded by saying that Merchants had all the right people in

place & that they just needed a strong leader to keep everyone headed in the right direction. Amazingly similar to what Hal had said just a couple of hours earlier. At the time I thought this was just coincidental, but after accepting the job and seeing what I had stepped into, I believe that the whole interview had been orchestrated in advance. I believe Merchants was desperate to hire a director who they thought could straighten out all the problems that were prevalent at the Clanton facility. I believe they thought that hiring a SYSCO guy would somehow miraculously solve all their problems. Every time I was introduced during my first few weeks of employment. Hal or Andy (whoever was making the introduction) would always say he's from SYSCO and he's going to have us running just like them in no time. This was really stressed at the first monthly sales meeting I attended. Sales people peppered Hal with constant problems of mis-picks and items short on orders. Hal introduced me as the guy from the "Evil Empire" then laughed and said but they do do it right and now so will we. When I was introduced to Mr. Tatum ( principal owner ), Andy said this is the guy we hired away from SYSCO.

Interview Concluded with handshakes, thanks, and we will be in touch after interviewing one more candidate. Hal called a few days later with a job and salary offer. $62.5k plus 30% bonus potential. I asked if I could have a few days to discuss and think it over. Hal agreed but asked me to do it quickly. I said I would let him know on Monday after the weekend. Laura and I discussed this for hours on end and ultimately decided based on all that I had been told that this was indeed a great offer for me. It would provide me with even more financial security and opportunities to better provide for my family. So I did the hardest thing I've done in my working career and said goodbye to SYSCO ( See attached letter of resignation and exit interview ) and accepted the job at Merchants.

a revem identity theft—protect your Social Security number

# Your Social Security Statement

DEFENDANT'S
EXHIBIT

3



**Prepared especially for Charles S. Adams**

July 13, 2005

SO R 0192        000551278 01 AT  0.292
CHARLES S. ADAMS
931 OVERHILL DR
ALEX CITY AL 35010-4425

See inside for your personal information  →

## What's inside ...

▼ Your Estimated Benefits .................. 2
▼ Your Earnings Record .................... 3
▼ Some Facts About Social Security .......... 4
▼ If You Need More Information ............. 4
▼ To Request This *Statement* In Spanish ...... 4
  (*Para Solicitar Una Declaración en Español*)

## ▼ What Social Security Means to You

This *Social Security Statement* will help you understand what Social Security means to you and your family. This *Statement* can help you better plan for your financial future. It gives you estimates of your Social Security benefits under current law. Each year, we will send you an updated *Statement* including your latest reported earnings.

Be sure to read this *Statement* carefully. If you think there may be a mistake, please let us know. That's important because your benefits will be based on our record of your lifetime earnings. We recommend you keep a copy of this *Statement* with your financial records.

**Social Security is for people of all ages ...**
It can help you whether you're young or old, male or female, single or with a family. It's there for you when you retire, but it's more than a retirement program. Social Security also can provide benefits if you become disabled and help support your family when you die.

**Work to build a secure future ...**
Social Security is the largest source of income for most elderly Americans today. It is very important to remember that Social Security was never intended to be your only source of income when you retire. Social Security can't do it all. You also will need other savings, investments, pensions or retirement accounts to make sure you have enough money to live comfortably when you retire.

**About Social Security's future ...**
Social Security is a compact between generations. For more than 60 years, America has kept the promise of security for its workers and their families. But now, the Social Security system is facing serious future financial problems, and action is needed soon to make sure that the system is sound when today's younger workers are ready for retirement.

Today there are almost 36 million Americans age 65 or older. Their Social Security retirement benefits are funded by today's workers and their employers who jointly pay Social Security taxes — just as the money they paid into Social Security was used to pay benefits to those who retired before them. Unless action is taken soon to strengthen Social Security, in just 12 years we will begin paying more in benefits than we collect in taxes. Without changes, by 2041 the Social Security Trust Fund will be exhausted.* By then, the number of Americans 65 or older is expected to have doubled. There won't be enough younger people working to pay all of the benefits owed to those who are retiring. At that point, there will be enough money to pay only about 74 cents for each dollar of scheduled benefits. We will need to resolve these issues soon to make sure Social Security continues to provide a foundation of protection for future generations as it has done in the past.

**Social Security On The Net ...**
Visit *www.socialsecurity.gov* on the Internet to learn more about Social Security. You can read our publications, use the *Social Security Benefit Calculators* to calculate future benefits, apply for retirement, spouse's or disability benefits, or subscribe to *eNews* for up-to-date information about Social Security.

*Jo Anne B. Barnhart*
Jo Anne B. Barnhart
Commissioner

* These estimates of the future financial status of the Social Security program were produced by the actuaries at the Social Security Administration based on the intermediate assumptions from the Social Security Trustees' Annual Report to the Congress.

04/03/2007  16:21    2562342044    DERRICK BLYTHE    PAGE  14

# ▼ Your Estimated Benefits

To qualify for benefits, you earn "credits" through your work — up to four each year. This year, for example, you earn one credit for each $920 of wages or self-employment income. When you've earned $3,680, you've earned your four credits for the year. Most people need 40 credits, earned over their working lifetime, to receive retirement benefits. For disability and survivors benefits, young people need fewer credits to be eligible .

We checked your records to see whether you have earned enough credits to qualify for benefits. If you haven't earned enough yet to qualify for any type of benefit, we can't give you a benefit estimate now. If you continue to work, we'll give you a benefit estimate when you do qualify.

**What we assumed** — If you have enough work credits, we estimated your benefit amounts using your average earnings over your working lifetime. For 2005 and later (up to retirement age), we assumed you'll continue to work and make about the same as you did in 2003 and 2004. We also included credits we assumed you earned last year and this year.

We can't provide your actual benefit amount until you apply for benefits. And that amount may differ from the estimates stated below because:
(1) Your earnings may increase or decrease in the future.
(2) Your estimated benefits are based on current law. **The law governing benefit amounts may change.**
(3) Your benefit amount may be affected by **military service, railroad employment or pensions earned through work on which you did not pay Social Security tax. Visit www.socialsecurity.gov/mystatement to see whether your Social Security benefit amount will be affected.**

Generally, estimates for older workers are more accurate than those for younger workers because they're based on a longer earnings history with fewer uncertainties such as earnings fluctuations and future law changes.

These estimates are in today's dollars. After you start receiving benefits, they will be adjusted for cost-of-living increases.

▼ *Retirement  You have earned enough credits to qualify for benefits. At your current earnings rate, if you stop working and start receiving benefits...

At age 62, your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   1,202   a month
If you continue working until. . .
   your full retirement age (66 and 8 months), your payment would be about . . $   1,738   a month
   age 70, your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   2,247   a month

▼ *Disability  You have earned enough credits to qualify for benefits. If you become disabled right now...

Your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   1,480   a month

▼ *Family  If you get retirement or disability benefits, your spouse and children also may qualify for benefits.

▼ *Survivors  You have earned enough credits for your family to receive the following benefits if you die this year.

Your child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   1,152   a month
Your spouse who is caring for your child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   1,152   a month
Your spouse who reaches full retirement age . . . . . . . . . . . . . . . . . . . . . . . . . . $   1,536   a month
Total family benefits cannot be more than . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   2,687   a month

Your spouse or minor child may be eligible for a special one-time death benefit of $255.

▼ Medicare  You have earned enough credits to qualify for Medicare at age 65. Even if you do not retire at age 65, be sure to contact Social Security three months before your 65th birthday to enroll in Medicare.

**\*Your estimated benefits are based on current law. Congress has made changes to the law in the past and can do so at any time. The law governing benefit amounts may change because, by 2041, the payroll taxes collected will be enough to pay only about 74 percent of scheduled benefits.**

**We based your benefit estimates on these facts:**

Your date of birth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . November 28, 1958
Your estimated taxable earnings per year after 2004 . . . . . . . . . . . $67,874
Your Social Security number (only the last four digits
   are shown to help prevent identity theft) . . . . . . . . . . . XXX-XX-1240

▼ # Help Us Keep Your Earnings Record Accurate

You, your employer and Social Security share responsibility for the accuracy of your earnings record. Since you began working, we recorded your reported earnings under your name and Social Security number. We have updated your record each time your employer (or you, if you're self-employed) reported your earnings.

Remember, it's your earnings, not the amount of taxes you paid or the number of credits you've earned, that determine your benefit amount. When we figure that amount, we base it on your average earnings over your lifetime. If our records are wrong, you may not receive all the benefits to which you are entitled.

▼ **Review this chart carefully** using your own records to make sure our information is correct and that we've recorded each year you worked. You're the only person who can look at the earnings chart and know whether it is complete and correct.

Some or all of your earnings from **last year** may not be shown on your *Statement*. It could be that we still were processing last year's earnings reports when your *Statement* was prepared. Your complete earnings for last year will be shown on next year's *Statement*. **Note:** If you worked for more than one employer during any year, or if you had both earnings and self-employment income, we combined your earnings for the year.

▼ **There's a limit on the amount of earnings on which you pay Social Security taxes each year.** The limit increases yearly. Earnings above the limit will not appear on your earnings chart as Social Security earnings. (For Medicare taxes, the maximum earnings amount began rising in 1991. Since 1994, **all** of your earnings are taxed for Medicare.)

▼ **Call us right away** at 1-800-772-1213 (7 a.m.–7 p.m. your local time) if any earnings for years **before last year** are shown incorrectly. If possible, have your W-2 or tax return for those years available. (If you live outside the U.S., follow the directions at the bottom of Page 4.)

**Your Earnings Record at a Glance**

| Years You Worked | Your Taxed Social Security Earnings | Your Taxed Medicare Earnings | Years You Worked | Your Taxed Social Security Earnings | Your Taxed Medicare Earnings |
|---|---|---|---|---|---|
| 1975 | $ 873 | $ 873 | 1990 | $ 14,180 | $ 14,180 |
| 1976 | 2,156 | 2,156 | 1991 | 18,194 | 18,194 |
| 1977 | 3,596 | 3,596 | 1992 | 20,800 | 20,800 |
| 1978 | 4,380 | 4,380 | 1993 | 21,560 | 21,560 |
| 1979 | 5,164 | 5,164 | 1994 | 25,510 | 25,610 |
|  |  |  | 1995 | 29,950 | 29,950 |
| 1980 | 6,689 | 6,689 | 1996 | 31,710 | 31,710 |
| 1981 | 11,801 | 11,801 | 1997 | 33,610 | 33,610 |
| 1982 | 10,904 | 10,904 | 1998 | 35,170 | 35,170 |
| 1983 | 11,574 | 11,574 | 1999 | 45,373 | 45,373 |
| 1984 | 12,085 | 12,085 |  |  |  |
| 1985 | 13,018 | 13,018 | 2000 | 53,773 | 53,773 |
| 1986 | 14,907 | 14,907 | 2001 | 50,726 | 50,726 |
| 1987 | 22,818 | 22,818 | 2002 | 54,872 | 54,872 |
| 1988 | 23,023 | 23,023 | 2003 | 57,141 | 57,141 |
| 1989 | 20,668 | 20,668 | 2004 | 67,874 | 67,874 |

**Total Social Security and Medicare taxes paid over your working career through the last year reported on the chart above:**

| Estimated taxes paid for Social Security: | | Estimated taxes paid for Medicare: | |
|---|---|---|---|
| You paid: | $43,923 | You paid: | $10,298 |
| Your employers paid: | $43,923 | Your employers paid: | $10,298 |

**Note: You currently pay 6.2 percent of your salary, up to $90,000, in Social Security taxes and 1.45 percent in Medicare taxes on your entire salary. Your employer also pays 6.2 percent in Social Security taxes and 1.45 percent in Medicare taxes for you. If you are self-employed, you pay the combined employee and employer amount of 12.4 percent in Social Security taxes and 2.9 percent in Medicare taxes on your net earnings.**

# ▼ Some Facts About Social Security

## About Social Security and Medicare ...

Social Security pays retirement, disability, family and
survivors benefits. Medicare, a separate program run by the
Centers for Medicare and Medicaid Services, helps pay for
inpatient hospital care, nursing care, doctors' fees and other
medical services and supplies to people age 65 and older, or
to people who have been receiving Social Security disability
benefits for two years or more. Your Social Security
covered earnings qualify you for both programs. For more
information about Medicare, visit *www.medicare.gov* or
call **1-800-633-4227 (TTY 1-877-486-2048** if you are
deaf or hard of hearing).

*Here are some facts about Social Security benefits:*

▼ **Retirement** — If you were born before 1938, your
full retirement age is 65. Because of a 1983 change
in the law, the full retirement age will increase
gradually to 67 for people born in 1960 or later.

Some people retire before their full retirement age.
You can retire as early as age 62 and take your
benefits at a reduced rate. If you continue working
after your full retirement age, you can receive higher
benefits because of additional earnings and special
credits for delayed retirement.

▼ **Disability** — If you become disabled before full
retirement age, you can receive disability benefits
after six months if you have:
— enough credits from earnings (depending on your
age, you must have earned six to 20 of your credits
in the three to 10 years before you became
disabled); and
— a physical or mental impairment that's expected
to prevent you from doing "substantial" work
for a year or more or result in death.

▼ **Family** — If you're eligible for disability or
retirement benefits, your current or divorced
spouse, minor children or adult children disabled
before age 22 also may receive benefits. Each may
qualify for up to about 50 percent of your benefit
amount. The total amount depends on how many
family members qualify.

▼ **Survivors** — When you die, certain members of
your family may be eligible for benefits:
— your spouse age 60 or older (50 or older if
disabled, or any age if caring for your children
younger than age 16); and
— your children if unmarried and younger than age
18, still in school and younger than 19 years old,
or adult children disabled before age 22.

If you are divorced, your ex-spouse could be eligible
for a widow's or widower's benefit on your record
when you die.

## Receive benefits and still work ...

You can continue to work and still get retirement or
survivors benefits. If you're younger than your full
retirement age, there are limits on how much you can
earn without affecting your benefit amount. The
limits change each year. When you apply for benefits,
we'll tell you what the limits are at that time and whether
work would affect your monthly benefits. When you reach
full retirement age, the earnings limits no longer apply.

## Before you decide to retire ...

Think about your benefits for the long term. Everyone's
situation is different. For example, be sure to consider
the advantages and disadvantages of early retirement. If
you choose to receive benefits before you reach full
retirement age, your benefits will be permanently
reduced. However, you'll receive benefits for a longer
period of time.

To help you decide when is the best time for you to
retire, we offer a free booklet, *Social Security —
Retirement Benefits* (Publication No. 05-10035), that
provides specific information about retirement. You
can calculate future retirement benefits on our website
at *www.socialsecurity.gov* by using the *Social Security
Benefit Calculators.* There are other free publications that
you may find helpful, including:

▼ *Understanding The Benefits* (No. 05-10024) — a
general explanation of all Social Security benefits;

▼ *How Your Retirement Benefit Is Figured*
(No. 05-10070) — an explanation of how you can
calculate your benefit;

▼ *The Windfall Elimination Provision* (No. 05-10045) —
how it affects your retirement or disability benefits;

▼ *Government Pension Offset* (No. 05-10007) —
explanation of a law that affects spouse's or
widow(er)'s benefits; and

▼ *Identity Theft And Your Social Security Number*
(No. 05-10064) — what to do if you're a victim of
identity theft.

We also have other leaflets and fact sheets with
information about specific topics such as military service,
self-employment or foreign employment. You can request
Social Security publications at *www.socialsecurity.gov*
or by calling us at **1-800-772-1213.**

---

**If you need more information**—Visit *www.socialsecurity.gov/mystatement* on the Internet, contact any Social Security office,
call **1-800-772-1213** or write to Social Security Administration, Office of Earnings Operations, P.O. Box 33026, Baltimore,
MD 21290-3026. If you're deaf or hard of hearing, **call TTY 1-800-325-0778.** If you have questions about your personal
information, you must provide your complete Social Security number. If your address is incorrect on this *Statement*, ask the
Internal Revenue Service to send you a Form 8822. We don't keep your address if you're not receiving Social Security benefits.

**Para solicitar una *Declaración* en español, llame al 1-800-772-1213**

04/03/2007  16:21  2562342044                    DERRICK BLYTHE                              PAGE  12



SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA, AL 35040

**Earnings Statement**

| | |
|---|---|
| Period Ending: | 09/04/20 |
| Pay Date: | 09/10/20 |

DEFENDANT'S
EXHIBIT
4

Taxable Marital Status:  Married
Exemptions/Allowances:
Federal:      1
AL:

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010

Social Security Number: ▇▇▇▇

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Vacation | | 16.00 | 397.17 | 397.17 |
| Regular | | | | 34,964.28 |
| Bonus | | | | 10,531.50 |
| **Gross Pay** | | | **$397.17** | 45,892.95 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | | 44.89 |
| Float Balance | | 8.00 |
| Vacation Bal | | 0.00 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -15.19 | 4,587.86 |
| | Social Security Tax | -24.62 | 2,844.06 |
| | Medicare Tax | -5.76 | 665.14 |
| | AL State Income Tax | -14.82 | 1,912.47 |
| | Other | | |
| | Direct Deposit | -305.01 | |
| | 401K % Matched | -23.83* | 2,287.83 |
| | 401K(Unmatched) | -7.94* | 205.96 |
| | A D & D Ins | | 65.90 |
| | **Net Pay** | **$0.00** | |

*LAST - SYSCO
CHECK - FOR 2 DAYS
FOR
VACATION*

\* Excluded from federal taxable wages
  Your federal taxable wages this period are $365.40

*Ⓧ - BONUS NOT
    INCLUDED IN SALARY
    EXPOUNDMENT - ONLY USED BASE SALARY*

VERIFY DOCUMENT AUTHENTICITY. COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM    © 2000 ADP, Inc.

SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA, AL 35040

Advice number:  00000370281
Pay date:       09/10/2004

Deposited to the account of
CHARLES S ADAMS

| account number | transit ABA | amount |
|---|---|---|
| 91633 | 2622 8551 | $305.01 |

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

**DEFENDANT'S EXHIBIT**

5

| | |
|---|---|
| 1 Wages, tips, other comp. 55116.54 | 2 Federal income tax withheld 7589.46 |
| 3 Social security wages 55812.32 | 4 Social security tax withheld 3460.36 |
| 5 Medicare wages and tips 55812.32 | 6 Medicare tax withhold 809.28 |

| a Control number 026546 15/M8P | Dept. 431001 | Corp. | Employer use only A | 6 |

c  Employer's name, address, and ZIP code

RUSSELL LANDS INC &
SUBSIDIARY
2544 WILLOW POINT ROAD
ALEXANDER CITY AL 35010-6218

| b Employer's FED ID number 63-0455368 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12  D  695.78 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp./Ret. plan/3rd party sick pay  X |

e/f Employee's name, address and ZIP code

STEVE ADAMS
931 OVERHILL DR
ALEXANDER CITY, AL 35010

| 15 State AL | Employer's state ID no. 058397 | 16 State wages, tips, etc. 55116.54 |
| 17 State income tax 1940.90 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

**W-2** Wage and Tax Statement **2006**

Federal Filing Copy
Copy B to be filed with employee's Federal Income Tax Return.    OMB No. 1545-0008

04/03/2007  16:21    2562342044    DERRICK BLYTHE    PAGE  09

## Left Form

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 43378.15 | 4587.86 |
| 3 Social security wages | 4 Social security tax withheld |
| 45871.94 | 2844.06 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 45871.94 | 665.14 |

| a Control Number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000135 70/SB1 | 707210 | T | 525 |

c Employer's name, address, and ZIP code

SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA AL 35040

2004

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 76-0527338 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 44.89 |
| 14 Other | 12b D 2493.79 |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay X |

a/f Employee's name, address and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| AL 359516 | 43378.15 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 1912.47 | |
| 19 Local income tax | 20 Locality name |

**Federal Filing Copy**
**W-2** Wage and Tax Statement **2004**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

## Right Form

Copy C For EMPLOYEE'S RECORDS
(See Notice to Employee on back of Copy B.)
**2004** OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 15908 | 22002.16 | 2625.91 |
| b Employer ID number | 3 Social security wages | 4 Social security tax withheld |
| 64-0202800 | 22002.16 | 1364.13 |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 22002.16 | 319.03 |

c Employer's name, address, and ZIP code

MERCHANTS FOODSERVICE
1100 EDWARDS STREET
P O BOX 1351
HATTIESBURG, MS 39403-1351

2004

d Employee's social security number
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

e Employee's name, address, and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE

ALEXANDER CITY, AL 35010

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan X | | 12c Code |
| Third-party sick pay | | 12d Code |

| AL 197494 | 22002.16 | 888.19 |
|---|---|---|
| 15 State Emplr's state I.D. # | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement    Dept. of the Treasury - IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty/other sanction may be imposed on you if this income is taxable and you fail to report it.

**Left form:**

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 8960.39 | 890.38 |
| 3 Social security wages | 4 Social security tax withheld |
| 8960.39 | 555.54 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 8960.39 | 129.93 |

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 026546 15/M8P | 431001 | A | 5 |

c Employer's name, address, and ZIP code

RUSSELL LANDS INC &
SUBSIDIARY
2544 WILLOW POINT ROAD
ALEXANDER CITY AL 35010-6218

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 63-0455398 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See Instructions for box 12 |
| 14 Other | 12b |
| 2005 | 12c |
|  | 12d |
|  | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STEVE ADAMS
931 OVERHILL DR
ALEXANDER CITY,AL 35010

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 058397 | 8960.39 |
| 17 State income tax | | 19 Local wages, tips, etc. |
| 276.30 | | |
| 18 Local income tax | | 20 Locality name |

**W-2** Federal Filing Copy
Wage and Tax
Statement **2005**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

**Right form:**

Copy B To Be Filed With Employee's
Federal Tax Return

| | **2005** | OMB No. 1545-0008 |
|---|---|---|
| a Control number 15908 | 1 Wages, tips, other comp. 34833.00 | 2 Federal income tax withheld 4099.05 |
| b Employer ID number (EIN) 64-0202800 | 3 Social security wages 34833.00 | 4 Social security tax withheld 2159.65 |
| | 5 Medicare wages and tips 34833.00 | 6 Medicare tax withheld 505.08 |

c Employer's name, address, and ZIP code

MERCHANTS FOODSERVICE
1100 EDWARDS STREET
P O BOX 1351
HATTIESBURG, MS 39403-1351

| d Employee's social security number |
|---|
| 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 |

e Employee's name, address, and ZIP code

CHARLES W ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010          *2005*

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code  See Inst. for box 12 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | | 12c Code |
| Third-party sick pay | | 12d Code |
| AL  197494 | 34833.00 | 1411.24 |
| 15 State  Empl'r's state I.D. # | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement
This information is being furnished to the Internal Revenue Service.                    Dept. of the Treasury - IRS

04/03/2007  16:21     2562342044              DERRICK BLYTHE                    PAGE  11

| | | | |
|---|---|---|---|
| 1 Wages, tips, other comp. 54618.94 | | 2 Federal income tax withheld 5893.74 | |
| 3 Social security wages 57141.60 | | 4 Social security tax withheld 3542.78 | |
| 5 Medicare wages and tips 57141.60 | | 6 Medicare tax withheld 828.55 | |

| a Control Number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000135 70/SB1 | 707210 | A | 606 |

c  Employer's name, address, and ZIP code

SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA AL 35040

*2003*

| b Employer's FED ID number 76-0527338 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 59.40 |
| 14 Other | 12b D 2522.66 |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay X |

e/f  Employee's name, address and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY,AL 35010

| 15 State Employer's state ID no. AL 359516 | 16 State wages, tips, etc. 54618.94 |
|---|---|
| 17 State income tax 2372.12 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

Federal Filing Copy
**W-2** Wage and Tax **2003**
Statement   OMB No. 1545-0008
Copy B to be filed with employee's  Federal Income Tax Return.

DEFENDANT'S EXHIBIT


6



# THE MERCHANTS COMPANY
## APPLICATION FOR EMPLOYMENT
(The Merchants Company is an Equal Opportunity Employer)

1. *This application must be completed by the applicant.*
2. *All Questions must be fully answered.*

(STEVE)

Your Name In Full: _ADAMS      CHARLES      STEVEN_
                    (Last)             (First)          (Middle)

Telephone #: _205 668 7025   256 329 0179_   Social Security # _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_
               (Day)        (Night)

Address: _931 OVERHILL DR.   ALEXANDER CITY, AL.   35010_
          (Street Address)      (City)      (State)      (Zip Code)

*Please Note: The fact that you have been asked to complete this detailed application indicates our interest in your qualifications. You can aid us in making a fair appraisal of those qualifications by answering each questions as accurately as possible. We assure you that this application will be considered a confidential record.*

Are you at least 18 years old? (✓)Yes  ( ) No

Are you eligible to be employed in the United States? (✓)Yes ( ) No

How do you plan to get to work? _PERSONAL VEHICLE_

Have you ever been convicted of a crime other than a minor traffic violation: ( ) Yes (✓)No

If so, please give the details, including dates, location and circumstances: _____

_____

How many days have you missed from scheduled work during the past two years? _1_

If you are employed by The Merchants Company, will you work a second job at any time? ( ) Yes (✓)No

If so, detail: _____

Do you have any relatives, friends, or acquaintances employed with The Merchants Company, if so, please list their names and department working in below: _NO_

_____

In case of an emergency, who will always know how to get in touch with you (give name, address, and telephone number):
_LAURA ADAMS (WIFE)_
_981 OVERHILL DR._
_ALEXANDER CITY, AL. 35010     256-329-0179_

Position applied for: _OPERATIONS MANAGER_

Do you want to work full time? _YES_ _____ Or part time? _____

If hired, on what date will you be available to start work? _2 WEEKS NOTICE_ Rate of Pay Expected? _OPEN_

What made you decide to work with The Merchants Company? OPPORTUNITY FOR GROWTH WITH A WELL ESTABLISHED INDUSTRY LEADER

Have you ever worked for The Merchants Company before? ( ) Yes (✓) No. If so, when and why did you leave?
_____

Do you have any special circumstances which might prevent you from working all scheduled work and overtime including weekends? ( ) Yes (✓) No. If so, please detail: _____

Do you have any special skills or experience which would make you more qualified to work for The Merchants Company than other applicants? (X) Yes ( ) No. If so, please detail: ALMOST 14 YEARS MGMT EXPERIENCE IN FOOD SERVICE OPERATIONS

| INSTITUTION | NAME & LOCATION OF SCHOOL | NUMBER OF YEARS ATTENDED | COURSES TAKEN | DEGREES ACQUIRED |
|---|---|---|---|---|
| Grade School | ALEX CITY MIDDLE ALEX CITY, AL | 3 | | XXXXXXXX |
| High School | BENJAMIN RUSSELL ALEX CITY, AL | 3 | | XXXXXXXX |
| College | CENTRAL ALABAMA | 2 | | ASSOC. |
| | FAULKNER UNIVERSITY MONTGOMERY, AL | 2 | | BACHELOR |
| Other Training | | | | XXXXXXXX |

Did you work outside of school hours? ( ) Yes ( ) No   Describe: _____

Do you attend school now? ( ) Yes (✓) No   If not, do you intend to? ( ) Yes ( ) No
If so, when?
Employment: Please list all previous employment and begin by listing your last or present employment first.
(IF MORE SPACE IS NEEDED, PLEASE USE BACK OF APPLICATION FORM)

| EMPLOYMENT DATE FROM | TO | Company Name & Location & Immediate Supervisor's Name | Give Your Title & Specific Duties of Position | Rate of Pay | Reason for Leaving |
|---|---|---|---|---|---|
| 12-98 | PRESENT | SYSCO FOOD - CHELM KENNY BOWMAN | WHSE SUPVR | | CURRENTLY EMPLOYEED |
| 2-91 | 12-98 | ALABAMA FOOD GROUP ALEX CITY, AL HUGH NEIGHBORS III | OPERATIONS MGR | | EMPLOYMENT WITH SYSCO |
| | | | | | |
| | | | | | |
| | | | | | |

Unemployment: Account for all unemployed time of two months or more after leaving school and between positions held.

| UNEMPLOYMENT DATES FROM    TO: | STATE WHAT YOU WERE DOING | PERSONAL REFERENCE WHO CAN VERIFY THIS INFORMATION: NAME AND ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Have you ever served in the Armed Forces of the U.S.? ( ) Yes  ✓ No  If so:

Branch of service: _____    From: _____  to: _____

Rank or rating: _____

Reason for leaving the Armed Forces: _____

References (Other than relatives or former employers):

| | Name | Address | Occupation | Years Known |
|---|---|---|---|---|
| 1. | HELEN MARTIN | 1713 PINEVIEW DR ALEX CITY, AL | RETIRED | 45 |
| 2. | BOBBY SCOTT | ELKAHATCHEE RD ALEX CITY, AL | OWNER- SCOTT ACCOUNTING | 25 |
| 3. | HOWARD BISHOP | HWY 22 W ALEX CITY, AL | INDUSTRIAL ENGINEER | 31 |

I represent that each answer to a question in this application and all other information otherwise furnished is true and correct. I further represent that such answers and information constitute a full and complete disclosure of my knowledge with respect to the question or subject to which the answer or information relates. I understand that any incorrect, incomplete, or false statement or information furnished by me will subject me to discharge at any time, in the event that I am employed by The Merchants Company. I agree to abide by all its orders, rules, and regulations, and agree not to disclose any confidential information regarding operating and trade secrets. I authorize my former employers to give any information regarding my employment with them, and in addition, to furnish any other information they may have concerning me.

_____
Applicant's Signature

8-11-04
_____
Date

*THANK YOU for completing this application form and for your interest in employment with The Merchants Company. We would like to assure you that your opportunity for employment with The Merchants Company would be based only on your merit without regard to race, creed, color, religion, sex, age, national origin, or handicap/disabled status. In particular, we wish to note that, although we have asked you for information on your age, we conform to all laws prohibiting discrimination. To be kept active, this application must be renewed every sixty days from the date completed.*

# MERCHANTS FOODSERVICE

## Serving Your Favorite Restaurants!

Post Office Box 2096
Clanton, AL 35046
(800) 844-0633 Fax: (205) 280-1748

August 20, 2004

**DEFENDANT'S EXHIBIT**

7

Steve Adams
Alexander City, AL

Dear Steve:

I enjoyed having you visit our Clanton Distribution Center and am pleased that you took the time to do so. Without exception, each of the individuals with whom you spoke during your visit feel that you will do very well at Merchants Foodservice. I hope you found your visit interesting and worthwhile, and you were able to gather the information you desired about Merchants Foodservice, our potential and how it matches your individual goals.

I am pleased to extend you an offer to join our company as Operations Manager of the Clanton Distribution Center. Your annualized salary will be $62,500. In addition to your base salary, you will be eligible for up to a 30% bonus based on improving sales and improving current operational and productivity standards. Our incentive program recognizes the personal sacrifice and commitment involved in providing leadership and the necessary supervision to improve on current standards. Bonuses are paid three times a year within 30 days after physical inventory.

The Company offers a benefits program which in addition to the usual holidays, includes vacation days, group health and dental insurance, life insurance, short term and long term disability plan, pension plan and a matching 401(K) plan.

When you combine our starting salary, bonus program and benefits package, I think you'll agree we offer a very attractive financial package.

We are very interested in having you join us for what we hope will be a long and successful career. Your future professional development should parallel with the development and expansion of Merchants Foodservice.



# MERCHANTS FOODSERVICE
## Serving Your Favorite Restaurants!

Mr. Steve Adams
August 20, 2004
Page Two

Post Office Box 2096
Clanton, AL 35046
(800) 844-0633 Fax: (205) 280-1748

As you consider this offer, keep in mind that Merchants Foodservice is a family owned company offering you a personal relationship with your employer while offering the growth of a much larger corporation.

Steve, I sincerely hope you will decide to join us and look forward to hearing from you in the near future regarding your decision. If you have any further questions or desire additional information about Merchants Foodservice or the benefits we offer, please call me at (205) 280-1710.

Very truly yours,

MERCHANTS FOODSERVICE


Hal Henson
General Manager
Clanton Distribution Center


HH/mra


**TO INDICATE ACCEPTANCE** of our offer, please sign and date the attached copy of this letter and return in the enclosed envelope.

I accept your offer as outlined above.

_____
STEVE ADAMS

8-23-04
_____
DATE



DEFENDANT'S
EXHIBIT
8


SYSCO Food Services of Central Alabama



## EXIT INTERVIEW

It is our company policy to conduct an exit interview with each employee upon separation. We would appreciate your honest opinions about your employment with our company. Your objective feedback can help us to improve workplace conditions and make this company a better place to work for. Please complete the front page of this questionnaire and return it to the administrator. Thank you for your valued opinion.

Employee Name  STEVE ADAMS                    Separation Date  9-24-04
Position title  DAYSHIFT WHSE SUPVR          DEPT  OPERATIONS

Check which best describes your feelings about the following aspects of your employment important at our company.

|  | Very Important | Neutral | Disoriented | Very Disoriented |
|---|---|---|---|---|
| Nature of the Job | X | | | |
| Professionalism of skills and experience | X | | | |
| Professional Appraisals | X | | | |
| Training, orientation and development programs | X | X | | |
| Opportunities for advancement | X | | | |
| Salary treatment | X | | | |
| Supervisors | X | | | |
| Company policies | X | X | | |
| Workload | X | | | |
| Benefits programs | X | | | |
| Overall, as a place to work | X | | | |

If you have marked disoriented or very disoriented please explain why. _____

The main reason(s) I am leaving this company are IMMEDIATE PROMOTION - ALLENS ARE TO BETTER PLACE FINANCIALLY FOR MY FAMILY

If you are leaving to accept other employment, please list the new employer's name, the title of your new position, your starting salary and any benefits that you will be receiving that you did not receive at our company: ALLENS ASSISTANT PRESIDENT - DIRECTOR OF OPERATIONS - SUBSTANTIAL SALARY INCREASE - BENEFITS THE SAME

If you are leaving to accept other employment, describe how your new position will be different from the job you held at our company. SYSCO - DAYSHIFT RECEIVING  ALLENS - DAYSHIFT NIGHTSHIFT, TRANSPORTATION

Please describe your relationship with your supervisor and how it could have been improved. FOR 4 NO IMPROVEMENT NEEDED FOR KENNY - BETTER FINANCIAL WORKING WITH AND FOR HIM  KENNY, DOUG, EDDIE

Has our company and/or your supervisor provided enough recognition for your work achievement? If not, please describe how you would have preferred to have been recognized. _____

Would you recommend this company as a place to work?  Yes ✓  No ___  If not, why? ___

Employee Signature  Steve Adams          Date  9-13-04

LEAVING SYSCO WAS THE HARDEST DECISION I'VE EVER HAD TO MAKE REALLY CARE FOR ALL MY CO-WORKERS (SYSCO FAMILY), SYSCO "S" A GREAT PLACE TO WORK. TAKES GREAT CARE OF

---

August 23, 2004

EDDIE, DOUG, KENNY

I WOULD LIKE TO THANK EACH OF YOU FOR THE OPPORTUNITY YOU GAVE ME ALMOST 6 YEARS AGO WHEN YOU HIRED ME TO WORK FOR SYSCO FOOD SERVICES OF CENTRAL ALABAMA. I HAVE REALLY ENJOYED WORKING WITH YOU AND FOR YOU OVER THAT PERIOD OF TIME. IT'S ALWAYS HARD TO LEAVE SOMETHING YOU REALLY CARE ABOUT, AND I DO REALLY CARE ABOUT MY SYSCO FAMILY. EACH OF YOU HAS BEEN ROCK SOLID, GOOD AS GOLD, TO ME AND I APPRECIATE THAT. HOWEVER; I'VE BEEN OFFERED AN OPPORTUNITY WITH ANOTHER COMPANY, AND AFTER MUCH CONSIDERATION AND PRAYER HAVE DECIDED IT'S TIME FOR ME TO MOVE ON. PLEASE ACCEPT THIS LETTER AS MY NOTICE OF RESIGNATION EFFECTIVE 9-7-04. MAY GOD CONTINUE TO BLESS EACH AND EVERYONE OF YOU HERE AT SYSCO.
SINCERELY,
Steve Adams

# MERCHANTS FOODSERVICE

## *Serving Your Favorite Restaurants!*

**To:**       **New Employees**
**From:**    **Human Resources**
**Subject:**  Benefits

DEFENDANT'S EXHIBIT

9

---

**PERSONNEL FILES:** These files are kept in the Hattiesburg Office.  If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify the Human Resource Department in writing.

**VACATION:**  Vacation benefits are as follows:  5 days after January 1st of the first full year, 10 days after 3 years, and 15 days after 15 years.  Vacation time does accrue the first month you are employed and you will be eligible to take vacation time on or after January 1st following date of employment.

**HOLIDAYS:**  Merchants Foodservice observes the following holidays:

   **New Years Day (January 1)**
   **Memorial Day (Last Monday in May)**
   **Independence Day (July 4)**
   **Thanksgiving (Fourth Thursday in November)**
   **Christmas (2 days – to be scheduled by supervisor)**

**BEREAVEMENT:**  Merchants Foodservice does grant 2 days bereavement leave in case of death in the immediate family.  See handbook for definition of "immediate family."

**LIFE INSURANCE (HM Life Insurance Co.):**  You automatically have a life insurance policy with Merchants Foodservice after you have been employed 30 days.  Merchants Foodservice pays the premium for you.  Your life insurance is based on your annual salary.  This amount is limited to $50,000.00.  Your life insurance includes accidental death on yourself only.  The amount of your accidental death insurance is equal to the amount of your life insurance.

There is no accidental death on dependents.  Spouse insurance is $2,000.00 and children are $1,000.00.

**VOLUNTARY LIFE INSURANCE (Aetna):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  You may elect up to $100,000 of coverage without answering health questions or having a physical.  You may also cover your spouse for $35,000 and your children for $5,000 or $10,000 of coverage.  You may choose to go over those amounts on yourself or your spouse but would be subject to answering health questions and possibly a physical.  The cost of this coverage is based on your age.

**HEALTH INSURANCE (Blue Cross Blue Shield of MS):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment. Your premium will begin to be deducted the first pay check of that month.  Family coverage is $323.20 per month and single coverage is $145.88 per month.  You will receive a summary plan description, welcome packet, and health insurance card (which includes prescription card) when your coverage takes effect.    This is deducted from pre-tax dollars under the cafeteria plan.

**DENTAL INSURANCE (Genworth Financial):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Family coverage is 52.04 per month, employee and spouse is 35.92 per month, employee and child(ren) is 32.00 per month and employee only is 14.60 per month.  You will receive a dental card and plan description after you become eligible.    This is deducted from pre-tax dollars under the cafeteria plan.

**SHORT TERM DISABILITY (UNUM Provident):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Our STD policy is also through UNUM Insurance.  The premium for this benefit is based on your annual salary.  In the case of an illness, surgery, etc, this benefit will start paying 60% of your salary on the 8th day of doctor approved leave and will pay for up to 90 days.

**LONG TERM DISABILITY (UNUM Provident):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Our LTD policy is through UNUM Insurance.  The premium for this benefit is based on your annual salary.  In the case of disability, this benefit will start paying after you have been out of work for 90 days and will pay 60% of your salary.

**FLEXIBLE SPENDING ACCOUNT (Ceridian):**  If you elect this benefit it will go into effect the first day of the month following 3 months of employment.  We have a medical reimbursement plan with maximum election of $2000 annually.  This is deducted from pre-tax dollars under the cafeteria plan.  This is basically a savings account for you to use on un-reimbursed medical or dental expenses, such as co-pays, deductibles and non-covered expenses.

**401K PLAN (Principal Financial Group):**  Enrollment dates for 401K are January 1 and July 1.  You become eligible after your have been employed for one year prior to these dates.  Merchants Foodservice will match 50% of your contribution up to 6% of your salary.  You must be employed for 5 years to be 100% vested.

**SCHOLARSHIPS:**  Tatum Development Corporation and its subsidiaries offer forty (40) $1,000 scholarships to be awarded to students meeting certain eligibility requirements.  Your children or relatives may be eligible to receive a scholarship to the school of their choice.  If you have an interest, please ask for an application.



**STEVE ADAMS**

**DIRECTOR OF OPERATIONS - INCENTIVE PROGRAM**

**OCTOBER 1, 2004 THROUGH SEPTEMBER 30, 2005**

- For attaining period budget, you will earn as follows: 1% annual salary for attaining goal on throughput per warehouse hour.

|      | 1st Period | 2nd Period | 3rd Period |
|------|------------|------------|------------|
| 1%   | 38         | 38         | 38         |
| 1%   | 40         | 40         | 40         |

- 1% annual salary for averaging 2-5 errors per 1000 or less shipping accuracy.

  Additional 1% for averaging 2 errors per 1000 or less shipping accuracy.

- 2% for having less warehouse overtime dollars than prior year.

- 1% annual salary for not exceeding budget for inventory shrinkage/damage (0.5% of sales)

- 2% annual salary for attainment of company wide net profit budget.

- 1% annual salary for attaining AIB Inspection Score 900.

- Paid 3 times a year on previous 4-month performance.

PAYMENT: Payment will be made based on the amount earned as outlined above multiplied by the % of branch sales achieved compared to budget.

NOTE: You must be employed throughout the entire period to receive payment of any incentive compensation.



DEFENDANT'S
EXHIBIT

*10*

**Steve Adams**
**Clanton Operations Manager**

Period 3 - 2004

| | Budget | Actual | Bonus Percentage | | Bonus |
|---|---|---|---|---|---|
| Throughput per hour | 35.0 | 34.4 | 2.00% | | |
| Second Level | 38.0 | 34.4 | 1.00% | | |
| | | | | | |
| Shipping Accuracy Per 1,000 | 3.00 | 2.10 | 1.00% | Y | $625.00 |
| Second Level | 2.00 | 2.10 | 1.00% | | |
| | | | | | |
| DSR Sales @97% | $11,836,991 | $11,698,471 | 1.00% | | |
| | | | | | |
| Inventory Losses | 0.50% | 0.63% | 1.00% | | |
| | | | | | |
| AIB Score | 860 | 910 | 1.00% | Y | $625.00 |
| Second Level | 900 | 910 | 1.00% | Y | $625.00 |
| | | | | | |
| Company Wide Profit | | | 2.00% | Y | $1,250.00 |
| | | | | | |
| Total Bonus | | | | | $3,125.00 |
| | | | | | |
| Branch Sales | $20,766,859 | $19,531,496 | 94.1% | | $2,939.11 |
| | | | | | |
| Pro-rated for one month @ 25% | | | | | $734.78 |

Steve Adams
**Clanton Operations Manager**

Period 1 - 2005

| | Budget | Actual | Bonus Percent | | Bonus Dollars |
|---|---|---|---|---|---|
| Whse Throughput per hour | 38.00 | 36.47 | 1.00% | | |
| Second Level | 40.00 | 36.47 | 1.00% | | |
| | | | | | |
| Shipping Accuracy Per 1,000 | 2.50 | 2.10 | 1.00% | Y | $625.00 |
| Second Level | 2.00 | 2.10 | 1.00% | | |
| | | | | | |
| Reduced Whse O/Time $ | $54,434 | $33,369 | 2.00% | Y | $1,250.00 |
| | | | | | |
| Inventory Shrink / Damage | 0.50% | 0.68% | 1.00% | | |
| | | | | | |
| AIB Score | 900 | 900 | 1.00% | Y | $625.00 |
| | | | | | |
| Company Wide Profit | | | 2.00% | | |
| | | | | | |
| Total Bonus | | | | | $2,500.00 |
| | | | | | |
| Branch Sales | $21,603,708 | $22,522,670 | 104.25% | | $2,606.35 |

**Steve Adams**
**Clanton Operations Manager**

**Period 2 - 2005**

| | Budget | Actual | Bonus Percentage | Bonus |
|---|---|---|---|---|
| Throughput per hour | 38.0 | 37.1 | 1.00% | |
| Second Level | 40.0 | 37.1 | 1.00% | |
| Shipping Accuracy Per 1,000 | 2.50 | 2.72 | 1.00% | |
| Second Level | 2.00 | 2.72 | 1.00% | |
| Less Whse OT Dollars vs PY | $22,415 | $56,476 | 2.00% | |
| Inventory Losses | 0.50% | 0.51% | 1.00% | |
| AIB Score | 900 | 0 | 1.00% | |
| Company Wide Profit | | | 2.00% | |
| Total Bonus | | | | $0.00 |
| Branch Sales | $24,082,571 | $26,469,557 | 109.9% | $0.00 |

Incentive  7/5/05

DATE  3/29/2007   2:29 PM
PR0RS7RPT

MERCHANTS FOODSERVICE
EMPLOYEE CHECK HISTORY
FROM  1/01/2004  TO  12/31/2005

COMPANY : 01                                   PAGE   1
                                               OS,Inc!

EMPLOYEE   15908   CHARLES S ADAMS          DIV/DEPT: 12619  RECEIVING & SHIPPING

| CHECK NUMBER | CHECK DATE | PAY PERIOD DATE | GROSS EARNINGS | FEDERAL TAXES | FICA/MEDC TAXES | STATE/ SUI W/H | OTHER TAXES | MISC DEDS | NET AMOUNT | HOURS PAID | PAY RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 108194 | 9/15/04 | 9/15/04 | 3,038.19 | 409.96 | 232.42 | 122.45 | .00 | .00 | 2,273.36 | 87.00 | 2,604.170 |
| | 9/30/04 | 9/30/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | | .00 | 1,988.41 | 87.00 | 2,604.170 |
| 108270 | 10/15/04 | 10/15/04 | 2,604.17 | 310.83 | 199.21 | 105.71 | | .00 | 1,988.42 | 87.00 | 2,604.170 |
| | 10/27/04 | 10/15/04 | 734.78 | 40.14 | 25.77 | | | 518.01- | 612.66 | 87.00 | 2,604.170 |
| | 10/29/04 | 10/31/04 | 2,604.17 | 310.83 | 199.23 | 105.77 | | .00 | 2,506.91 | 87.00 | 2,604.170 |
| | 11/15/04 | 11/15/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | | .00 | 1,986.41 | 87.00 | 2,604.170 |
| | 11/30/04 | 11/30/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | | .00 | 1,988.41 | 87.00 | 2,604.170 |
| | 12/15/04 | 12/15/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | | 23.12 | 1,965.29 | 87.00 | 2,604.170 |
| | 12/31/04 | 12/31/04 | 2,604.17 | 310.20 | 199.21 | 105.74 | | 117.11- | 2,105.53 | 87.00 | 2,604.170 |
| 108558 | 1/15/05 | 1/15/05 | 2,604.17 | 310.20 | 199.22 | 105.74 | .00 | 28.12 | 1,960.89 | 87.00 | 2,604.170 |
| | 1/31/05 | 1/31/05 | 2,604.17 | 310.20 | 199.22 | 105.74 | .00 | 2.20 | 1,986.81 | 87.00 | 2,604.170 |
| | 2/15/05 | 2/15/05 | 2,606.35 | 310.53 | 199.39 | 105.83 | .00 | 9.49 | 1,979.52 | 87.00 | 2,604.170 |
| | 2/25/05 | 2/25/05 | 2,604.17 | 310.20 | 199.21 | 105.74 | .00 | 28.12 | 1,950.60 | 87.00 | 2,604.170 |
| | 2/28/05 | 2/28/05 | 2,604.17 | 310.20 | 199.39 | 105.74 | .00 | 1.20 | 2,069.82 | 87.00 | 2,604.170 |
| | 3/15/05 | 3/15/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 28.12 | 1,828.69 | 87.00 | 2,604.170 |
| | 3/31/05 | 3/31/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 26.10 | 1,828.69 | 87.00 | 2,604.170 |
| | 4/15/05 | 4/15/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.70 | 87.00 | 2,604.170 |
| | 4/30/05 | 4/30/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
| | 5/13/05 | 5/13/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 208.96 | 2,228.69 | 87.00 | 2,604.170 |
| | 5/31/05 | 5/31/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 73.50- | 2,111.16 | 87.00 | 2,604.170 |
| | 5/31/05 | 5/31/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 150.64 | 1,887.02 | 87.00 | 2,604.170 |
| | 6/15/05 | 6/15/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
| | 6/30/05 | 6/30/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
| | 7/15/05 | 7/15/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
| EMPLOYEE TOTALS: | | | 58,462.72 | 6,724.96 | 4,347.89 | 2,299.43 | .00 | 760.17 | 44,330.27 | 1,827.00 | 1,827.00 |

END OF COMPANY 1

DEFENDANT'S
EXHIBIT
____

THE MERCHANTS COMPANY
P O BOX 1351
HATTIESBURG, MS 39401



**DEFENDANT'S EXHIBIT**

12

NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE
                                          Direct Deposit Information

CHARLES S ADAMS                    Account              Amount
931 OVERHILL DRIVE                 00009163317          $1,828.69
ALEXANDER CITY, AL 35010

# NON-NEGOTIABLE

|  |  |  |  |
|---|---|---|---|
| CO# | Div/Loc | Dept | Shift |
| 01 | 19 | 12619 | 1 |

Period Date:    6/30/2005
Check Date:     6/30/2005

                                              Emp #:    15908

MERCHANTS FOODSERVICE              CHARLES S ADAMS
1100 EDWARDS STREET                931 OVERHILL DRIVE
P O BOX 1351                       ALEXANDER CITY, AL 35010
HATTIESBURG, MS 39403-1351

                                   Exemptions/Allowances
                                   Federal: M/00 State: AL: S/00

| Earnings | Hours | Current | | Current | YTD |
|---|---|---|---|---|---|
| SALARY | 87.00 | 2604.17 | | | |
| | | | Benefits | | |
| | | | HLTH-FAMILY   154.82 | | 1238.56 |
| | | | LIFE INS        5.97 | | 71.64 |
| | | | | | |
| | | | Ben Ttl       160.79 | | 1310.20 |

| GROSS HOURS/PAY | 87.00 | 2604.17 |
|---|---|---|

| Taxable Earnings | Current | YTD | | Vac/Sick/Pers/Other | | |
|---|---|---|---|---|---|---|
| Gross | 2604.17 | 33856.39 | | VACATION | | 16.00 |
| Fed | 2423.33 | 32409.67 | | | | |
| FICA | 2423.33 | 32409.67 | | | | |
| State | 2423.33 | 32409.67 | | | | |

| Deductions | Current | YTD | | Deductions Cont | Current | YTD |
|---|---|---|---|---|---|---|
| Federal | 283.08 | 3815.97 | | | | |
| FICA | 185.39 | 2479.34 | | | | |
| State | 98.05 | 1313.19 | | | | |
| HLTH | 154.82 | 1238.56 | | | | |
| Dental | 26.02 | 208.16 | | | | |
| STD | 10.10 | 121.20 | | | | |
| LTD | 13.02 | 156.24 | | | | |
| United Way | 5.00 | 60.00 | | | | |
| MEALS | | 51.42- | | | | |
| HOTEL/TRAVEL | | 569.03- | | | | |

| | | | | | Current | YTD |
|---|---|---|---|---|---|---|
| | | | | Ded Ttl | $775.48 | $8,772.21 |
| Net Pay: | $1,828.69 | Dir Dep | $1,828.69 | Chk Amt | $.00 | |

04/03/2007  16:12    2562342044                    DERRICK BLYTHE                         PAGE  15

THE MERCHANTS COMPANY
P O BOX 1351
HATTIESBURG, MS 39401

NON-NEGOTIABLE     NON-NEGOTIABLE     NON-NEGOTIABLE     NON-NEGOTIABLE
                                                Direct Deposit Information

CHARLES S ADAMS                         Account              Amount
931 OVERHILL DRIVE                      00009163317          $1,986.81
ALEXANDER CITY, AL 35010

# NON-NEGOTIABLE

| | |
|---|---|
| Period Date: | 1/31/2005 |
| Check Date: | 1/31/2005 |

| COH | Div/Loc | Dept | Shift |
|---|---|---|---|
| 01 | 19 | 12619 | 1 |

Emp #:        15908

MERCHANTS FOODSERVICE
1100 EDWARDS STREET
P O BOX 1351
HATTIESBURG, MS 39403-1351

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010

Exemptions/Allowances
  Federal: M/00 State: AL: S/00

| Earnings | Hours | Current |
|---|---|---|
| SALARY | 87.00 | 2604.17 |

| Benefits | Current | YTD |
|---|---|---|
| LIFE INS | 5.97 | 11.94 |
| Ben Ttl | 5.97 | 11.94 |

| GROSS HOURS/PAY | 87.00 | 2604.17 |
|---|---|---|

| Taxable Earnings | Current | YTD |
|---|---|---|
| Gross | 2604.17 | 5208.34 |
| Fed | 2604.17 | 5208.34 |
| FICA | 2604.17 | 5208.34 |
| State | 2604.17 | 5208.34 |

| Vac/Sick/Pers/Other | | |
|---|---|---|
| VACATION | | 16.00 |

| Deductions | Current | YTD |
|---|---|---|
| Federal | 310.20 | 620.40 |
| FICA | 199.22 | 398.44 |
| State | 105.74 | 211.48 |
| STD | 10.10 | 20.20 |
| LTD | 13.02 | 26.04 |
| United Way | 5.00 | 10.00 |
| HOTEL/TRAVEL | 25.92- | 25.92- |

| Deductions Cont | Current | YTD |
|---|---|---|

| | | | | |
|---|---|---|---|---|
| Net Pay: | $1,986.81 | Dir Dep | $1,986.81 | |

| | Current | YTD |
|---|---|---|
| Ded Ttl | $617.36 | $1,260.64 |
| Chk Amt | $.00 | |



**MERCHANTS FOODSERVICE**

*Serving Your Favorite Restaurants!*

Post Office Box 1351
Hattiesburg, MS 39403-1351
(800) 844-FOOD  Fax: (601) 582-5333

**DEFENDANT'S EXHIBIT**

*13*

# MERCHANTS FOOD SERVICE
# ACKNOWLEDGMENT OF EMPLOYMENT STATUS

I understand that as a condition of my being employed with Merchants Foodservice, I am being employed on an at-will basis for an indefinite period of time without any type of contract of employment (excepting the sales representatives agreement for sales persons), either actual or implied. I further understand that as an at-will employee, my employment can be terminated at any time by either me' or by Merchants Foodservice with or without cause and/or with or without notice. In addition, I understand that Merchants Foodservice retains the right to alter, revise, change, and/or eliminate any of its policies, practices, or rules and/or any of its pay or benefits at its discretion at any time without necessarily giving me or any other employee advance or actual notice.

I also understand that I may be required to take and pass a physical examination including screening for alcohol and drugs in a manner no inconsistent with any applicable law, as a part of the employment process and at any time during my employment with Merchants Foodservice and its representatives and/or agents.

I also understand that any property or possession, including my automobile, which I bring onto the property of Merchants Foodservice, or into any vehicle owned or operated by Merchants Foodservice, is subject to search by Merchants Foodservice with or without notice and/or with or without reasonable or probable cause.

I have read, or had read to me, the above Acknowledgment of Employment Status in its entirety; I fully understand all of its provisions and/or I have had the opportunity to ask any questions which I might have about any of its provisions; and I agree to abide by all of its provisions as a condition of being employed by and continuing to be employed by Merchants Foodservice.

_8-24-04_
Date

_Chul S A_
Signature

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED THE MERCHANTS COMPANY HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT PERSONNEL MANAGER LOCATED IN THE HATTIESBURG OFFICE.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

DEFENDANT'S
EXHIBIT

14

8/01/02

19

# THE MERCHANTS COMPANY
## FOOD SERVICE DISTRIBUTOR
*Delivering an extra measure of service since 1904*



# EMPLOYEE HANDBOOK

### August 1, 2002

DEFENDANT'S
EXHIBIT

15

# INTRODUCTION

This handbook is designed to acquaint you with The Merchants Company and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by The Merchants Company to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As The Merchants Company continues to grow, the need may arise to change policies described in the handbook. The Merchants Company, therefore, reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. Employees will, of course, be notified of such changes as they occur.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of The Merchants Company.

1

# EMPLOYMENT CLASSIFICATION

**Regular Full Time Employees:**
Employees who are regularly scheduled to work The Merchants Company's full time schedule generally, are eligible for The Merchants Company's benefit package, subject to the terms, conditions, and limitations of each benefit program.

**Regular Part Time Employees:**
Employees who are not assigned to a part time status and who are regularly scheduled to work less than the full time work schedule but at least 20 hours per week are eligible for some of The Merchants Company's benefits.

**Part Time Employees:**
Employees who work less than 20 hours per week and are hired as interim replacements to temporarily supplement the work force, or to assist in the completion of a specific project retain that status of part-time unless and until notified of a change. While part-time employees receive all legally-mandated benefits (such as workers' compensation insurance and Social Security), they are ineligible for The Merchants Company's other benefit programs.

# PROBATIONARY PERIOD

All new and rehired employees work on a probationary basis for the first 90 calendar days after their date of hire. The Merchants Company uses this period to evaluate employee capabilities, work habits, and overall performance. Either the employee or The Merchants Company may end the employment relationship at will at any time during or after the probationary period, with or without cause or advance notice.

3

# GENERAL EMPLOYMENT POLICY

The Merchants Company believes that the work conditions, wages, and benefits it offers to its employees are competitive with those offered by other employers in this area and in this industry. If employees have concerns about work conditions or compensation, they are strongly encouraged to voice these concerns openly and directly to their supervisors.

Our experience has shown that when employees deal openly and directly with supervisors, the work environment can be excellent, communications can be clear, and attitudes can be positive. We believe that The Merchants Company amply demonstrates its commitment to employees by responding effectively to employee concerns.

# EQUAL EMPLOYMENT OPPORTUNITY

In order to provide equal employment and advancement opportunities to all individuals, employment decisions at The Merchants Company will be based on merit, qualifications, and abilities. Except where required by law, employment practices will not be influenced or affected by an applicant's or employee's race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law.

# EMPLOYMENT AND PERSONNEL RECORDS

An employment and personnel record is maintained for each employee. All new employees must complete the necessary personnel forms in the personnel office before starting work.

To insure you are receiving the benefits to which you are entitled under all conditions of employment, it is important your records be kept up-to-date at all times. If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify the personnel office in writing.

2

# EMPLOYMENT BENEFITS AND ALLOW...NCES

Eligible employees at The Merchants Company are provided a wide range of benefits. A number of the programs (such as Social Security, workers' compensation, and unemployment insurance) cover all employees in the manner prescribed by the law.

Benefits eligibility is dependent upon a variety of factors, including employee's classification, and your supervisor can identify the programs for which you are eligible. Details of many of these programs can be found in the original policy manual located in the Personnel Office. Some benefit programs require contributions from the employee (such as Medical Insurance, 401K plan, long term disability) but most are full paid by The Merchants Company, including Life Insurance.

## VACATION BENEFITS

Vacation time off with pay is available to eligible employees to provide opportunities for rest, relaxation and personal pursuits. Employees in the following employment classification(s) are eligible to earn and use vacation time as described in this policy:

Regular full-time employees
Regular part-time employees

The amount of paid vacation time employees receive each year increases with the length of their continuous employment as shown below:

Upon initial eligibility..........5 days
After 3 years ...............10 days
After 15 years ................15 days

The length of eligible service is based on the number of years you are employed with The Merchants Company. With The Merchants Company, you will be eligible to take vacation time on or after January 1st following date of employment. Anyone hired before April 1st will have a full 5 days vacation which they may take any time in the following calendar year. Anyone hired during April or May will have 4 days which they may take any time in the follow-

5

# PERFORMANCE EVALUATION

Supervisors and employees are strongly encouraged to discuss job performance and goals on an informal, day-to-day basis. Additional formal performance reviews are conducted to provide both supervisors and employees the opportunity to discuss job task, identify and correct weaknesses, encourage and recognize strengths, and discuss positive, purposeful approaches for meeting goals.

The performance of all employees is generally evaluated according to an ongoing 12-month cycle.

# EMPLOYMENT TERMINATION

Termination of employment is an inevitable part of personnel activity within any organization. Since employment with The Merchants Company is based on mutual consent, both the employee and The Merchants Company have the right to terminate employment at will, with or without cause, at any time. Employee benefits will be affected by employment termination in the following manner. All accrued, vested benefits that are due and payable at termination will be paid. If the terminated employee is eligible under the COBRA law, then it will be at the expense of the employee. The employee will be notified in writing of the benefits that may be continued and of the terms, conditions, and limitations of such continuance.

# RESIGNATION

Resignation is a voluntary act initiated by the employee to terminate employment with The Merchants Company. Although advance notice is not required, The Merchants Company requests at least two weeks' written resignation notice from all employees.

If an employee does not provide advance notice as requested, the employee will be considered ineligible for rehire and may not be paid any accrued vacation time.

4

## BEREAVEMENT LEAVE

An eligible employee, (Regular full-time and Regular part-time) may be granted up to two days, at the time of the death, of paid bereavement leave in case of death in the immediate family. The Merchants Company defines "immediate family" as the employee's spouse, parent, child, sibling; the employee's spouse's parent, child or sibling; the employee's child's spouse; grandparents or grandchildren.

## LEAVES SUBJECT TO FAMILY AND MEDICAL LEAVE ACT OF 1993

The Family and Medical Leave Act of 1993 allows The Merchants Company to grant unpaid family or medical leave for specific circumstances. For an employee to be eligible to take leave, the employee must have worked for The Merchants Company for at least 12 months and for at least 1,250 hours during the year preceding the start of the leave and the employee must request the leave for one of the following reasons:

1. Because of the birth of a son or daughter of the employee and in order to care for such son or daughter;

2. Because of the placement of a son or daughter with the employee for adoption or foster care;

3. In order to care for the spouse, or a son, daughter or a parent of the employee, if such spouse, son, daughter or parent has a serious health condition; or

4. Because of a serious health condition that makes the employee unable to perform the functions of his or her position.

Depending on the circumstances, employees requesting leaves for one of these reasons may be eligible for up to 12 weeks of unpaid leave during any twelve-month period. Employees must give 30 days' notice to their immediate supervisor of need for unpaid leave when leave is foreseeable for birth, placement, foster care, or planned medical treatment. If 30 days' notice is not practicable, notice must be given "as soon as practicable," meaning one or two

7

---

ing cale...ar year. Anyone hired during June or July will have 3 days which they may take any time in the following calendar year. Any one hired in August or September will have 2 days which they may take any time in the following calendar year. Anyone hired in October or November will have 1 day which they may take any time in the following calendar year. Anyone hired in December will not have any vacation until January 1st of the second year. Vacation time will not be earned during leave of absence except military leave of absence. (See individual leave of absence policies for more information.)

Paid vacation time can be used in minimum increments of one day. To take vacation, employees should request advance approval from their supervisors at least two weeks prior to taking vacation time. Requests will be reviewed based on a number of factors, including business needs and staffing requirements.

Upon termination of employment, employees will be paid for unused vacation time that has been earned through the last day of work. (However, if The Merchants Company, in its sole discretion, terminated employment for cause, or if an employee does not give a two week notice, forfeiture of unused vacation time may result.)

## LEGAL HOLIDAYS

The Merchants Company will grant holiday time off to all eligible employees, regular full-time and regular part-time, on the holidays listed below:

New Years Day (January 1)
Memorial Day
Independence Day (July 4)
Labor Day (first Monday in September)
Thanksgiving (fourth Thursday in November)
Christmas (December 25)

To be eligible for holiday pay, nonexempt employees must work the last scheduled day immediately proceeding and the first scheduled day immediately following the holiday. If the day before or after holiday is a scheduled day off Branch Manager can approve pay for holiday.

6

working ways. Requests covered by the Family and Medical Leave Act will be administered in accordance with the terms of such act.

## BENEFIT PROGRAM PARTICIPATION

Employees on approved leave of absence under any of the foregoing provisions may continue to be covered by The Merchants Company's health and life insurance plans, provided that any insurance premiums or contributions due from the employee are kept current during the approved leave.

## LEAVE OF ABSENCE

The Merchants Company provides medical leaves of absence without pay to eligible employees who are temporarily unable to work due to a medical disability, up to a maximum of 90 calendar days every two years.

A military leave of absence will be granted to employees to attend scheduled drills or training, or if called to active duty with the U.S. Armed Services. The leave will be unpaid. However, employees may use any accrued vacation time off for the absence.

## WAGES AND SALARIES

Salespersons and nonexempt employees are paid weekly every Friday for the week ending on the previous Saturday at midnight. EXEMPT employees are paid semi-monthly on the 15th and LAST day of the month. Each paycheck will include earnings for all work performed through the end of the previous payroll period.

In the event that a regularly scheduled payday falls on a day off (e.g., a weekend or holiday), employees will receive pay on the last day of work before the regularly scheduled payday.

8

## PAY DEDUCTIONS AND SETOFFS

The law requires that The Merchants Company make certain deductions from every employee's compensation. Among these are applicable federal, state, and local income taxes. The Merchants Company also must deduct Social Security taxes on each employee's earnings up to a specified limit that is called the Social Security "wage base." The Merchants Company matches the amount of Social Security taxes paid by each employee.

The Merchants Company offers programs and benefits beyond those required by law. Eligible employees may voluntarily authorize deductions from their paychecks to cover the cost of participation in these programs.

Pay setoffs are pay deductions taken by The Merchants Company, usually to help pay off a debt or obligation to The Merchants Company or others.

If you have questions concerning why deductions were made from your paycheck, or how they were calculated, your supervisor can assist in having your questions answered.

## REST AND MEAL PERIODS

Each workday, nonexempt employees are provided with two rest periods of 15 minutes in length. Since this time is counted and paid as time worked, employees must not be absent from their workstations beyond the allotted rest period time.

All full-time OFFICE employees are provided with one meal period of 60 minutes in length each workday. Eating will not be permitted at desk. Snacks or drinks occasionally will be permitted, but full course meals, such as breakfast or lunch are to be eaten in the designated areas provided. The only item permitted at the receptionist desk in the lobby will be a drink such as coffee or a soft drink.

All full-time night WAREHOUSE employees will have one meal period of 30 minutes in length each workday. All full-time day WAREHOUSE employees will have one meal period of 60 minutes in length each workday. Supervisors will schedule meal periods to

9

accomm... .te operating requirements. All full-time DRIVER employees will have one meal period of 30 minutes in length each workday. It will be up to the Driver as to what time of day he takes it.

Employees will be relieved of all active responsibilities and restrictions during meal periods and will not be compensated for that time.

## SAFETY

SAFETY IS EVERYBODY'S BUSINESS! Make everyday a safe day.

To provide a safe and healthful work environment for employees, customers, and visitors, The Merchants Company has established a workplace safety program. This program is a top priority for The Merchants Company. The Safety Director has responsibility for implementing, administering, and evaluating the safety program. Its success depends on the alertness and personal commitment of all.

The Merchants Company provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, memos, or other written communications.

Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment. Two (2) worker's compensation incidents that are the employee's fault results in a 3-day suspension without pay. Three (3) worker's compensation incidents that are the employee's fault result in termination.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the Safety Director or the appropriate supervisor. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

10

## USE OF E-MAIL AND INTERNET

1. Use of both systems should be for business only. Private use of the Internet or the e-mail system should be done on personal time, not company time. Corresponding with relatives that live at a distance is not prohibited but should be done on personal time.

2. E-mail containing joke material are considered inappropriate and should not be passed around or sent to other parties in or out of the office.

3. Use of company equipment to view, access or distribute pornographic material is strictly forbidden.

4. Employees with access to e-mail must complete an acceptable use policy agreement.

## USE OF PHONE AND MAIL SYSTEMS

Employees will be required to reimburse The Merchants Company for any charges resulting from their personal use of the telephone.

The use of The Merchants Company paid postage for personal correspondence is permitted, if you reimburse THE MERCHANTS COMPANY for postage costs.

## SMOKING

In keeping with The Merchants Company's intent to provide a safe and healthful work environment, smoking is prohibited except in pre-designated areas. Smoking is only allowed on personal time or break time.

This policy applies equally to all employees, customers, and visitors.

11

## PROGRESSIVE DISCIPLINE POLICY

The purpose of this policy is to state The Merchants Company's position on administering equitable and consistent discipline for unsatisfactory conduct in the work place. The best disciplinary measure is the one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.

The Merchants Company's own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.

Disciplinary action may call for any of four steps – verbal warnings, written warnings, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of occurrences. There may be circumstances when one or more steps are bypassed.

Progressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed:  a first offense may call for a verbal or written warning; a second offense may be followed by a written warning or suspension; and still another offense may then lead to termination of employment. The Merchants Company recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or in extreme situations, termination of employment, without going through the usual progressive discipline steps.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both employee and The Merchants Company.

12

## ATTENDANCE AND PUNCTUALITY

It is expected that all employees report to work every workday, and it is also expected that they report to work at the scheduled reporting time.

The Merchants Company also realizes that at times employees will not be able to work because of illness or injury or will be late for some unforeseen reason.

When employees are going to be late or absent, it is their responsibility to call in **personally** and report the reason to their immediate supervisor. If an employee needs to leave early, they must notify their supervisor.

Excess or continued tardiness, early departures and absenteeism can result in disciplinary action up to and including discharge, based upon the following guidelines.

Employee's absences during probationary period:

1st absence – verbal warning
2nd absence – written notice
3rd absence – termination

Full time or part time employee's tardies, early departures and absences in a rolling calendar year. Example: Occurrence in June 2001 would drop off in June 2002. Absences will be treated separately for early departures and tardies.

1 occurrence – verbal warning
2-3 occurrences – written warning
4 occurrences – 3-day suspension
5 occurrences – termination

If an employee fails to call his/her supervisor for two consecutive days, the employee will be considered to have voluntarily quit.

13

# EMPLOYEE CONDUCT AND WORK RULES

To assure orderly operations and provide the best possible work environment, The Merchants Company's expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment.

- Theft or inappropriate removal or possession of property
- Falsification of time keeping records
- Fighting or threatening violence
- Boisterous or disruptive activity
- Negligence or improper conduct leading to damage of employer owned or customer-owned property
- Insubordination or other disrespectful conduct
- Violation of safety or health rules
- Smoking in prohibited areas
- Sexual or other unlawful harassment
- Possession of dangerous or unauthorized materials, such as explosives or firearms
- Excessive absenteeism or any absences without notice
- Unauthorized use of telephones, mail system, or other employer owned equipment
- Unauthorized disclosure of business "secrets" or confidential information
- Violation of personnel policies
- Distribution of pornographic materials
- Unsatisfactory performance or conduct

14

# SEXUAL HARASSMENT POLICY

The Merchants Company believes sexual harassment is a form of employee misconduct, which undermines the integrity of the employment relationship. It is the policy of The Merchants Company that sexual harassment will not be tolerated. Violators of this policy are subject to severe disciplines, up to and including discharge of the offending employee or employees.

Sexual harassment occurs when sexual advances, request for sexual favors, or any conduct of a sexual nature is made a condition of employment, results in advantages if agreed to or losses if rejected, interferes with job performance, or results in a hostile, intimidating or offensive work environment. The Merchants Company's expressly prohibits sexual harassment of any nature.

Any complaints or inquires regarding sexual harassment should be brought to the immediate attention of the Human Resources Department or the appropriate Supervisor and the company will fully investigate such claims promptly, without regard to the identities or positions held by either the complaining employee or the employee charged with the sexual harassment. If for any reason an employee wishes to complain or inquire regarding sexual harassment but feels it would not be appropriate to raise such issues with the Human Resources Department or Supervisor, such employee may inquire or complain to any management level employee of the company, and such inquires or complaints will receive the same prompt investigation.

Employees will not be disciplined or discriminated against in any way for sexual harassment inquiries or complaints made in good faith.

15

# DRUG AND ALCOHOL POLICY

Employees are The Merchants Company's greatest assets. The Merchants Company loses when a valued employee is hurt or must be terminated for drug abuse. To protect the reputation of the Company as a good corporate citizen, drug trafficking or use by employees cannot be tolerated.

The illegal use, possessions of, or trafficking in illegal drugs or controlled substances (drugs) on the job or on the Company's property (owned or leased) is a violation of federal law, as well as against the policies of the company. It is an offense which can lead to dismissal. The consumption of alcoholic beverages by employees during the workday shall constitute grounds for disciplinary action, which may include suspension and/or dismissal.

## PERSONAL APPEARANCE

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image The Merchants Company presents to customers and visitors.

During business hours, employees are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Employees who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, employees will not be compensated for the time away from work.

The following will apply to all employees:

1. All wearing apparel must be neat and clean, whether it is required uniform or otherwise.

2. All shirttails must be worn inside trousers.

3. If an employee has a beard, it must be kept neatly trimmed and clean. If an employee has long hair, it must be kept clean.

4. Every employee should realize the importance of personal hygiene, since we are handling and selling food product. Body odors, dirty hands, faces, even fingernails, can be an indicator of

the quality of our products. Personal pride alon... ...ould prevent any of these from reflecting on our product. Extreme care should be taken to prevent such.

## UNIFORMS

The following will apply to Drivers, Warehouse and Shipping Personnel:

1. Delivery Drivers must wear The Merchants Company uniform shirts during work hours.

2. Shoes should be a dress or work shoe. Certain canvas shoes are acceptable if made on the order of a work shoe. Tennis shoes, sneakers, track shoes, etc., are not permissible.

3. Shoes, like uniforms should be clean.

4. Employees who prefer to wear caps, should wear Merchants Company Caps.

## OFFICE DRESS CODE

The following will not be permitted as office attire:

1. Midriff tops or tops that do not meet your pants or shirt.

2. Shorts (Professional Business Skort Sets are okay)

3. T-shirts (with or without writings or slogans)

4. Tennis Shoes

5. Shirts with no collar (Men)

6. Blue Jeans

Friday has usually been a relaxed day in the office and will continue to be. Neatness is still required. Blue jeans may be worn on Fridays only as long as they are neat in appearance.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED THE MERCHANTS COMPANY HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT PERSONNEL MANAGER LOCATED IN THE HATTIESBURG OFFICE.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

8/01/02

19

18

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED MERCHANTS FOODSERVICE HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT HUMAN RESOURCES LOCATED IN THE HATTIESBURG OFFICE AT 601-584-4046.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

_____ 1-27-05 _____
DATE

**DEFENDANT'S EXHIBIT**
16

1/01/05

23



# MERCHANTS FOODSERVICE

**Serving Your Favorite Restaurants!**

# EMPLOYEE HANDBOOK

## January 1, 2005

www.merchantsfoodservice.com



DEFENDANT'S EXHIBIT

17

# INTRODUCTION

This handbook is designed to acquaint you with Merchants Foodservice (hereinafter referred to as "Merchants" and/or the "Company") and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. This handbook will serve as a guideline for decision-making. Therefore, you should read, understand, and comply with all provisions of the handbook.

No employee handbook can anticipate every circumstance or question about policy. As Merchants continues to grow, the need may arise to change policies described in the handbook. Therefore, Merchants reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. Employees will be notified of such changes as they occur.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of Merchants.

1

## EQUAL EMPLOYMENT OPPORTU. .TY

Merchants is an Equal Employment Opportunity Employer. The Company affords equal employment opportunity in all of our employment practices, including the selection, hiring, promotion, transfer and compensation of all qualified applicants and employees without regard to race, color, religion, sex, national origin, age, marital status, citizenship status, disability, or any other protected status in accordance with the requirements of all federal, state, and local laws. Merchants expects every employee and manager to reflect the spirit of this commitment and philosophy with our fellow employees, our customers and our vendors.

## EMPLOYMENT AND PERSONNEL RECORDS

An employment and personnel record is maintained for each employee. All new employees must complete the necessary personnel forms in the personnel office before starting work.

To insure your receiving the benefits to which you are entitled under all conditions of employment, it is important your records be kept up-to-date at all times. If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify Human Resources in writing.

3

## EMPLOYEE RELATIONS PHILOSOPHY

Merchants is committed to achieving outstanding operating results. We believe these results can best be achieved by:

• Providing employees with the opportunity to succeed

• Providing employees with the tools and resources necessary to complete their jobs

• Managing employees fairly and impartially

• Requiring employees to be accountable for their own success

The Company places a high value on the desire to work, on the ability to produce the desired results with efficiency and high quality, and on the willingness of employees to accept responsibility for their own success.

## EMPLOYMENT AT-WILL

It is the Company's policy that all employees are employed at the will of the Company for an indefinite period. Merchants may terminate the employment relationship at any time, for any reason, with or without notice or cause. Employees may resign from the Company at any time, for any reason, and with or without notice. Employment with the Company does not constitute a contractual relationship and may be terminated according to applicable local, state and federal laws.

Completion of the ninety (90) day introductory period does not change the employee's status as an at-will employee or in any way restrict the Company's right to terminate such an employee or change its terms of employment.

2

## ...MPLOYMENT STATUS CATEGORIES

Merchant's employees are categorized into a particular status to define their job and the type of work that they perform. These statuses determine several important performance criteria (e.g., benefit eligibility, etc.). Merchant's employees are classified in *one of* the following categories:

- **Exempt Employee** – a salaried employee who is not subject to the overtime provisions of the *Federal Fair Labor Standards Act of 1938*, as amended.

- **Non-Exempt Employee** – an hourly employee who is eligible to be paid for overtime pay hours worked in excess of 40 hours per week and whose overtime pay is calculated at one and a half times their regular hourly rate ("time-and-a-half").

  Note: Overtime pay provisions may vary due to state laws.

- **Regular Full-time Employee** - An employee who is normally scheduled to work forty (40) or more hours a week. Regular Full Time Employees are eligible for all Company benefits.

- **Regular Part-Time Employee** – an employee who is normally scheduled to work twenty (20) hours or more per week but not more than forty (40) hours. Regular Part-Time employees may be eligible for some of the Company's benefits.

- **Part-Time Employee** – An employee who is normally scheduled to work less than twenty (20) hours per week. Part-Time Employees are not eligible for Company benefits.

These statuses do not guarantee employment for any specific length of time. Employment is at the mutual consent of the employee and the Company and can be terminated at will by the employee or the Company.

## INTRODUCTORY PERIOD

For every new employee, the first ninety (90) days of employment are an introductory period for both the employee and the Company. During this time, you will have the opportunity to learn about the Company, your job, and your new surroundings. The Company will then evaluate your performance and make a decision concerning your continued employment.

While we are optimistic and hopeful that your time with us will be long and mutually beneficial, it may be that you or the Company will decide during the introductory period that the relationship is not satisfactory. If so, the employee or the Company may terminate the relationship for any reason without prior notice.

## PERFORMANCE EVALUATION

Merchants believes that every employee should receive objective, accurate feedback regarding their job performance. Performance reviews are one the tools the Company uses to formalize and document employee performance. The employee's annual evaluation provides a vehicle for effective communication between the employee and management.

## EMPLOYMENT TERMINATION AND RESIGNATION

It is the Company's policy that all employees are employed at the will of the Company for an indefinite period. Merchants or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

In cases of resignation, the employee must give two weeks notice if they expect to receive severance benefits. Vacation time may not be used to advance the termination date. On the last work day employees must return all Company property in their possession to the supervisor.

4

5

## EM.   ÖYMENT BENEFITS AND ALLOWANCES

Eligible employees at Merchants are provided a wide range of benefits. Eligibility for these benefits is dependent upon a variety of factors, including but not limited to the employee's classification. A supervisor can identify the programs for which you are eligible. Please contact Human Resources to learn the details of these programs.

The Company reserves the right, in its sole discretion, at any time to change, modify, delete, add, or discontinue without prior notice any of the employee benefits currently being offered to its employees.

## VACATION BENEFITS

Eligible employees (Regular full-time and Regular part-time) will earn and can use vacation time. Vacation time is calculated, as set forth below, based upon the employee's continuous employment with the Company:

```
Upon initial eligibility.........5 days
After 3 years ...................10 days
After 15 years ..................15 days
```

The length of eligible service is based on the number of years you are employed with Merchants. With Merchants, you will be eligible to take vacation time on or after January 1st following date of employment. Anyone hired before April 1st will have a full 5 days vacation which they may take any time in the following calendar year. Anyone hired during June or July will have 3 days which they may take any time in the following calendar year. Any one hired in August or September will have 2 days which they may take any time in the following calendar year. Anyone hired in October or November will have 1 day which they may take any time in the following calendar year. Anyone hired in December will not have any vacation until January 1st of the second year. Vacation time will not be earned during leave of absence except military leave of absence. (See individual leave of absence policies for more information.)

Paid vacation time is encouraged to be used in wee.   ncrements, however, may be used in minimum increments of one day. To take vacation, employees should request advance approval from their supervisors. Requests will be reviewed based on a number of factors, including business needs and staffing requirements.

Upon termination of employment, employees will be paid for unused vacation time that has been earned through the last day of work.  (However, if Merchants, in its sole discretion, terminated employment for cause, or if an employee does not give a two-week notice, forfeiture of unused vacation time may result.)

## LEGAL HOLIDAYS

Merchants will grant holiday time off to all eligible employees (regular full-time and regular part-time) on the holidays listed below:

Effective January 1, 2005:

* New Years Day (January 1)
* Memorial Day (Last Monday in May)
* Independence Day (July 4)
* Thanksgiving (fourth Thursday in November)
* Christmas (2 days, as scheduled by your shift supervisor)

To be eligible for holiday pay, nonexempt employees must work the last scheduled day immediately proceeding and the first scheduled day immediately following the holiday. If the day before or after holiday is a scheduled day off your General Manager can approve pay for holiday.

## BEREAVEMENT LEAVE

An eligible employee, (Regular full-time and Regular part-time) may be granted up to two days, at the time of the death, of paid bereavement leave in case of death in the employee's immediate family. Merchants defines "immediate family" as the employee's spouse, parent, child, sibling; the employee's spouse's parent, child or sibling; the employee's child's spouse; grandparents or grandchildren.

7

6

## MILY AND MEDICAL LEAVE POLICY

### GENERAL STATEMENT

The Company's Family and Medical Leave policy is intended to provide employees a greater opportunity to balance their work and family responsibilities. Under the Family and Medical Leave Act ("FMLA"), all eligible employees are entitled to 12 weeks of leave during a defined 12 month period. In order to be eligible for FMLA leave, the employee must have worked for the Company for at least 12 months since the most recent hire date, and the employee must have worked at least 1,250 hours during the preceding 12-month period. In some situations, employees may use the FMLA leave intermittently (e.g., take a day or partial day periodically when needed during the year) to reduce the work week or work day, resulting in a reduced schedule. In all cases, the FMLA leave may not exceed a total of 12 weeks over a 12-month period. Intermittent or reduced leave under the FMLA require prior approval by Human Resources.

### TYPES OF LEAVE COVERED

In order to qualify as FMLA leave under this policy, the employee must be taking leave for one of the following reasons:

1. The birth and care of a newborn child;

2. The placement of a child for adoption or foster care;

3. The care for a spouse, child, or parent with a serious health condition; or

4. The employee's own serious health condition renders him or her incapable of performing the essential functions of the job.

Employees with questions about what illnesses or situations are covered under this FMLA policy should contact Human Resources.

### APPLICATION FOR LEAVE

Employees requesting leave must complete a "Request for Family and Medical Leave" form and return it to Human Resources. The completed application must include the reason for and expected duration of the requested leave.

8

### NOTICE OF LEAVE

An employee intending to take Family and Medical Leave because of an expected birth or placement of a child, or because of a planned medical treatment, must submit an application for leave at least 30 days before the leave is to begin. If a 30-day notice is not possible, an employee must give notice to Human Resources as soon as practical.

### MEDICAL CERTIFICATION OF LEAVE

An application for Family and Medical Leave must also be accompanied by a "Physician's Certification Statement" form completed by the applicable health care provider. The certification must state the date on which the health condition commenced, the probable duration of the condition, and the appropriate medical facts regarding the condition.

Failure to comply with the medical certification requirements of this policy may result in the denial of FMLA leave request. Employees must provide certification no later than 15 days after being requested. The Company may request that additional certification be provided every 30 days during the leave period.

### RETURN TO WORK

After the 12-week leave period allotted under the FMLA expires, the employee will be expected to return to work. Merchants Foodservice may require the employee to provide medical certification that the employee is able to perform the essential functions of his or her job at this time. If the employee does not return to work upon expiration of their FMLA leave, his/her re-employment rights under the FMLA terminate.

9

# REST AND MEAL PERIODS

Each workday, nonexempt employees are provided with two rest periods of 15 minutes in length. The shift supervisor determines the specific time for the rest period. Since this time is counted and paid as time worked, employees must not be absent from their workstations beyond the allotted rest period time.

The meal period time allotments are as follows:

## OFFICE

Full time employees are provided with one meal period of sixty (60) minutes each workday. Eating full course meals, such as breakfast or lunch, is not permitted at an employee's workstation. These meals are to be eaten in the designated areas provided. Snacks and/or drinks are occasionally permitted at an employee's workstation.

## WAREHOUSE

Full time night employees will have one meal period of thirty (30) minutes each workday.

Full time day employees will have one meal period of thirty (30) minutes each workday. Supervisors will schedule meal periods to accommodate operating requirements.

## TRANSPORTATION

Full time driver will have one meal period of thirty (30) minutes each workday. It will be up to the driver as to when he/she take this period.

Employees will be relieved of all active responsibilities and restrictions during meal periods and will not be compensated for that time.

11

# MILITARY LEAVE OF ABSENCE

A military leave of absence will be granted to employees to attend scheduled drills or training, or if called to active duty with the U.S. Armed Services. At the completion of the military leave period, the employee may return to the Company, subject to the requirements set forth in the Uniformed Services Employment and Reemployment Act ("USERRA"). If you have questions, please contact Human Resources.

# WAGES AND SALARIES

Salespersons and nonexempt employees are paid weekly every Friday for the week ending on the previous Saturday at midnight. EXEMPT employees are paid semi-monthly on the 15th and last day of the month. Each paycheck will include earnings for all work performed through the end of the previous payroll period.

In the event that a regularly scheduled payday falls on a day off (e.g., a weekend or holiday), employees will receive pay on the last day of work before the regularly scheduled payday.

10

## USE OF THE COMPUTER SYSTEM NETWORK

The Company's computer system and e-mail network are the property of the Company and are only to be used for business purposes. Examples of prohibited, non-business purposes include, but are not limited to:

- Use of the Company's computer system to write personal letters, resumes or other documents unrelated to the Company's business

- Use of the Company's computer system to run computer games or other personal software

- Use of the Company's computer system to copy software

- Use of the Company's e-mail network as a forum for gossip or personal communications

- Use of the Company's e-mail network to convey insensitive, improper, derogatory, offensive, insulting, threatening, or harassing language and remarks

All information, data and communications prepared or stored in the computer system or on the e-mail network are assumed to be business-related. The Company reserves the right to monitor, and will periodically monitor, the computer system and e-mail network to ensure compliance with this policy and to maintain efficient use of the computer system and e-mail network. Employees should not consider any materials stored in the computer system or any e-mail communications to be private.

## USE OF PHONE AND MAIL SYSTEMS

Employees will be required to reimburse Merchants for any charges resulting from their personal use of the telephone.

The use of the Company's paid postage for personal correspondence is permitted, if you reimburse Merchants for postage costs.

13

## SAFETY

SAFETY IS EVERYBODY'S BUSINESS! Make everyday a safe day.

To provide a safe and healthful work environment for employees, customers, and visitors, Merchants has established a workplace safety program. Its success depends on the alertness and personal commitment of all.

Merchants provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, memos, or other written communications.

All employees should observe all posted safety rules, adhere to all safety instructions provided by your supervisor and use safety equipment where required. Your workplace should be kept neat, clean and orderly. Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify an appropriate supervisor or Human Resources. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

12

# SMOKING

In keeping with the Company's intent to provide a safe and healthful work environment, smoking is prohibited except in pre-designated areas. Smoking is only allowed on personal time or break time.

This policy applies equally to all employees, customers, and visitors.

# PROGRESSIVE DISCIPLINE POLICY

Merchants recognizes that its own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.

Disciplinary action may call for any of four steps – verbal warnings, written warnings, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of occurrences.

Progressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal or written warning; a second offense may be followed by a written warning or suspension; and still another offense may then lead to termination of employment. Merchants recognizes that there are certain types of employee problems that are serious enough to justify either a suspension or termination of employment, without going through the usual progressive discipline steps.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both employee and Merchants.

14

# ATTENDANCE AND PUNCTUALITY

It is expected that all employees report to work every workday, and it is also expected that they report to work at the scheduled reporting time.

Merchants also realizes that at times employees will not be able to work because of illness or injury or will be late for some unforeseen reason.

When employees are going to be late or absent, it is their responsibility to personally call the Company and report the reason to their immediate supervisor. Certain special circumstances may exist that prevent an employee to personally call their immediate supervisor. In these special instances, the employee should make sure someone notifies his or her immediate supervisor of the absence. If an employee needs to leave early, they must notify their supervisor prior to leaving the work premises.

Excess or continued tardiness, early departures and absenteeism can result in disciplinary action up to and including discharge, based upon the following guidelines.

Employee's absences during introductory period:

1st absence – verbal warning
2nd absence – written notice
3rd absence – termination

Full time or part time employee's tardies, early departures and absences are calculated in a rolling calendar year. Example: Occurrence in November 2004 would drop off in November 2005. Absences will be treated separately from early departures and tardies.

1st occurrence – verbal warning
2 occurrences – written warning
3 occurrences – 3-day suspension
4 occurrences – termination

If an employee fails to call his/her supervisor for two consecutive days, the employee will be considered to have voluntarily quit.

15

# EM... LOYEE CONDUCT AND WORK RULES

To assure orderly operations and provide the best possible work environment, Merchants expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment. Please note that this is not an exhaustive list.

- Theft or inappropriate removal or possession of property

- Falsification of time keeping records

- Fighting or threatening violence

- Boisterous or disruptive activity

- Negligence or improper conduct leading to damage of employer owned or customer-owned property

- Insubordination or other disrespectful conduct

- Violation of safety or health rules

- Smoking in prohibited areas

- Sexual or other unlawful harassment

- Possession of dangerous or unauthorized materials, such as explosives or firearms

- Excessive absenteeism or any absences without notice

- Unauthorized use of telephones, mail system, or other employer owned equipment

- Unauthorized disclosure of business "secrets" or confidential information

- Violation of personnel policies

- Distribution of pornographic materials

- Unsatisfactory performance or conduct

16

# NO HARASSMENT

Merchants does not and will not tolerate any type of harassment of our employees, applicants, customers, or vendors. The term "harassment" includes, but is not limited to, slurs, jokes, and other verbal, graphic, physical, or electronic (e-mail) conduct relating to an individual's race, color, gender, religion, national origin, citizenship, age, or disability. "Harassment" also includes sexual advances, requests for sexual favors, offensive touching, and other verbal, graphic, physical, or electronic (e-mail) actions of a sexual nature involving either members of the opposite or the same sex.

Note: Employees who violate this policy are subject to disciplinary action up to, and including the termination of their employment.

Note: Even if an employee does not complain, it is a manager's responsibility to investigate any conduct that is reported to the manager, or of which the manager is aware, if there is any possibility that this conduct violates our policy. All such incidents should be immediately reported to Human Resources.

If an employee feels that they are being harassed in any way by an employee, manager, customer, or vendor, they must immediately make their feelings known to their manager or Human Resources:

- The matter will be thoroughly investigated, and where appropriate, disciplinary action will be taken.

- If the employee does not feel they can discuss the matter with their manager, or if they are not satisfied with the way the complaint has been handled, they may contact Human Resources.

- The employee will not be penalized in any way for reporting such conduct concerning themselves or another person.

Employees should not assume that the Company is aware of the problem. It is the employee's responsibility to bring complaints and concerns to the attention of management so that they may be resolved. Note the following:

17

- The C....pany understands that there are issues that affect an employee's work environment that they may not be comfortable reporting to their manager. For these issues, employees can report these issues directly to Human Resources or to any other manager at the Company.

- Managers who receive complaints must immediately inform Human Resources.

- Human Resources will investigate the allegation and take the appropriate action to protect the rights of the charging employee and the charged employee, and to carry out the legal obligations of Merchants.

- Investigations will be conducted as quickly as possible and all concerned parties will be notified of the findings in writing.

If an investigation confirms that harassment has occurred, Merchants will take corrective action, up to and including the immediate termination of the offending employee(s). Findings of assault or the threat of assault will result in immediate termination.

Note that certain information, including the identity of principle parties and specific allegations raised, will likely be disclosed during the course of investigation to potential witnesses, Human Resources Department employees, and Merchants management team.

Note: Merchants will not tolerate retaliation against any employee for cooperating in an investigation or for reporting an incident of harassment.

State laws vary with regard to posting, training, and reporting avenues for harassment. If you have any questions regarding these issues in your area, please contact Human Resources.

18

# WORKPLACE VIOLENCE

Merchants recognizes that workplace violence is a growing concern across the country. The Company is committed to providing a safe, violence-free workplace and strictly prohibits employees, consultants, customers, visitors or anyone else on Company property or engaging in a Company-related activity from behaving in a violent or threatening manner.

Workplace violence includes:

- Threats of any kind

- Threatening, physically aggressive, or violent behavior (e.g., intimidation of or attempts to instill fear in others, etc.)

- Other behavior that suggests a propensity towards violence, including belligerent speech, excessive arguing or swearing, sabotage, or threats of sabotage of Company property, or a refusal to follow Company policies and procedures

- Defacing Company property or causing physical damage to the facilities

- Bringing weapons or firearms of any kind on Company property, or while conducting Company business

Employees are required to report any instances of workplace violence to their supervisors or Human Resources. All reports will be taken seriously and will be promptly and thoroughly investigated.

19

# DRUG AND ALCOHOL POLICY

Merchants' is concerned about the effect of illegal drug use and the abuse of alcohol (commonly defined as "substance abuse") upon the health and safety of its employees. Substance abuse leads to increased accidents, theft, unnecessary medical claims, and inattention to work duties and responsibilities. Substance abuse also leads to the destruction of an employee's health and adversely affects their personal life.

Merchants' employees are prohibited from possessing, using, selling, or purchasing any alcoholic beverages or other mind-altering substances on Company property. In light of these concerns, the Company intends to maintain a work place that is free of the problems associated with substance abuse. The Company also encourages the rehabilitation of employees and applicants with problems associated with the abuse of drugs and alcohol.

All drivers must comply with the Federal Motor Carrier Safety Regulations.

# PERSONAL APPEARANCE

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image Merchants presents to customers and visitors.

During business hours, employees are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Employees who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, employees will not be compensated for the time away from work.

The following will apply to all employees:

1. All wearing apparel must be neat and clean, whether it is required uniform or otherwise.

2. All shirttails must be worn inside trousers.

3. If an employee has a beard, it must be kept neatly trimmed and clean. If an employee has long hair, it must be kept clean.

4. Every employee should realize the importance of personal hygiene, since we are handling and selling food product. Body odors, dirty hands, faces, even fingernails, can be an indicator of the quality of our products. Personal pride alone should prevent any of these from reflecting on our product. Extreme care should be taken to prevent such.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED MERCHANTS FOODSERVICE HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT HUMAN RESOURCES LOCATED IN THE HATTIESBURG OFFICE AT 601-584-4046.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

_____
DATE

23

1/01/05

---

# UNIFORMS

The following will apply to Drivers, Warehouse and Shipping Personnel:

1. Delivery Drivers must wear Merchants uniform shirts during work hours.

2. Shoes should be a dress or work shoe. Certain canvas shoes are acceptable if made on the order of a work shoe. Tennis shoes, sneakers, track shoes, etc., are not permissible.

3. Shoes, like uniforms should be clean.

4. Employees who prefer to wear caps, should wear Merchants Caps.

## OFFICE DRESS CODE

The following will not be permitted as office attire:

1. Midriff tops or tops that do not meet your pants or skirt.

2. Shorts (Professional Business Skort Sets are okay)

3. T-shirts (with or without writings or slogans)

4. Tennis Shoes

5. Shirts with no collar (Men)

6. Blue Jeans

Friday has usually been a relaxed day in the office and will continue to be. Neatness is still required. Blue jeans may be worn on Fridays only as long as they are neat in appearance.

22

04/03/2007  16:21    2562342044                DERRICK BLYTHE                        PAGE  06

Page 1 of 1

## Steve Adams

| | |
|---|---|
| **From:** | Steve Adams |
| **Sent:** | Thursday, May 26, 2005 11:03 AM |
| **To:** | Jimmy Triggs; Merle Rester |
| **Cc:** | Hal Henson |
| **Subject:** | Equipment Needs |

Jimmy,

I sent you the information (Interdepartmental Mail) from Carolina Handling on what has been done so far and what remains to be done on our equipment. As we discussed yesterday, some items can wait to be repaired, while all safety issues need to be addressed ASAP. However, when I signed the write-ups, the Safety Issues are high-lighted in red and I had to initial that I was made aware of them. Since I am not the person responsible for making the call on these expenditures, I need you to instruct me on how to proceed in the continued use or non-use of these pieces of equipment. Please respond.

Thanks,
Steve

**DEFENDANT'S EXHIBIT**

*18*

/



7/7/2005

**DEFENDANT'S EXHIBIT**

19

DATE 7/01/2005 10:49 AM
PROR78    USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE    1
OS.Inci

** DIV :

DEPT#- 12719 Receiving

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16076 | WILLIAM P CARTER | | BUILDING MAINT. | FULL-TIME | 7/16/03 H | 6/15/04 | 12 | FIRED-ATTENDANCE |
| 16778 | RANDY M DAVIS | | LIFT-FIR | FULL-TIME | 2/18/05 H | 3/23/05 | 1 | QUIT-NO NOTICE |
| 19702 | CASSAUNDRA S DENTON | | RECCLERK | FULL-TIME | 7/22/02 H | 12/12/03 | 17 | FIRED-ATTENDANCE |
| 16792 | TERRI E DEVER | | RECEIVING | FULL-TIME | 2/25/05 H | 5/25/05 | 3 | QUIT-NO NOTICE |
| 16342 | ANGELIA M DIXON | | INV CONTROL CLE | FULL-TIME | 2/20/04 H | 3/04/05 | 13 | RESIGNED W/NOTICE |
| 16760 | BRADFORD H EDWARDS | | RETURNS | FULL-TIME | 1/30/05 H | 2/20/05 | 1 | QUIT-NO NOTICE |
| 16630 | JERRY B ESTRADA | | RECEIVING | FULL-TIME | 10/05/04 H | 3/18/05 | 6 | RESIGNED W/NOTICE |
| 16077 | DAVE P GALASSI | | RECEIVING | FULL-TIME | 7/16/03 H | 9/07/03 | 2 | QUIT NO CALL/NO SHOW |
| 19617 | LLOYD C GODWIN | | DAY SUP | FULL-TIME | 10/02/01 H | 7/23/03 | 22 | FIRED |
| 16770 | STEPHANIE M GRAY | | LIFT-FIR | FULL-TIME | 2/08/05 H | 2/14/05 | 0 | QUIT-NO NOTICE |
| 16848 | CYNTHIA M HATCHER | | LIFT-FRZ | FULL-TIME | 4/06/05 H | 5/23/05 | 1 | FIRED-ATTENDANCE |
| 15946 | YVONNE HUGGINS | | RECEIVING | FULL-TIME | 2/10/03 H | 3/04/03 | 1 | FIRED-ATTENDANCE |
| 19713 | TRAVIS W JACKSON | | BLDMAINT | FULL-TIME | 8/28/02 H | 4/28/03 | 9 | QUIT NO CALL/NO SHOW |
| 16078 | THOMAS B KELLEY | | RECEIVING | FULL-TIME | 7/16/03 H | 1/03/05 | 19 | QUIT-NO NOTICE |
| 15996 | TERRANCE KENNEDY | | RECEIVING | FULL-TIME | 4/07/03 H | 7/20/04 | 15 | |
| 19639 | SENECA KINSEY | | TMLDR | FULL-TIME | 11/26/01 H | 9/16/03 | 23 | TRANSFER TO SALARY |
| 16259 | TRAVIS E MARLER | | LIFT-FRZ | FULL-TIME | 12/08/03 H | 1/23/04 | 2 | QUIT-NO NOTICE |
| 16144 | JERIE L MCDANIEL | | RECEIVING | FULL-TIME | 9/15/03 H | 11/13/03 | 2 | FIRED-ATTENDANCE |
| 26584 | DANTE G MILLINER | | LIFT-DRY | FULL-TIME | 9/07/04 H | 3/02/05 | 7 | QUIT-NO NOTICE |
| 16814 | MATTHEW C MORGAN | | LIFT-DRY | FULL-TIME | 3/15/05 H | 5/23/05 | 2 | RESIGNED W/NOTICE |
| 16430 | CHRISTOPHER H POWELL | | RETURNS | FULL-TIME | 6/21/04 H | 1/07/05 | 8 | RESIGNED W/NOTICE |
| 19696 | LINDA S REEVES | | RECEIVING | FULL-TIME | 7/09/02 H | 1/30/03 | 7 | FIRED-INSUBORDINANT |
| 16085 | CHRISTOPHER E REID | | RECEIVING | FULL-TIME | 7/21/03 H | 11/14/03 | 4 | QUIT-NO NOTICE |

101

```
DATE 7/01/2005 10:49 AM                    MERCHANTS FOODSERVICE                              COMPANY#: 02                            PAGE    2
PROR78             USER: MELANIE            EMPLOYEE TURNOVER ANALYSIS REPORT                                                        DS,Inc!
                                            FROM 1/01/2003 TO 6/30/2005
```

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| ** DIV : 19 | | | | | | | | |
| DEPT- 12719 Receiving | | | | | | | | |
| 19608 | DONALD C RUSH | | RECEIVING | FULL-TIME | 9/17/01 H | 3/30/03 | 19 | QUIT-NO NOTICE |
| 16596 | EARNEST D SCOTT | | DRIVER CHECK IN | FULL-TIME | 9/12/04 H | 6/06/05 | 10 | FIRED-THEFT |
| 16650 | KEVIN D SELIX | | LIFT-DRY | FULL-TIME | 10/18/04 H | 1/03/05 | 4 | QUIT-NO NOTICE |
| 16251 | VANESSA N SOWELL | | RECEIVING | FULL-TIME | 12/03/03 H | 2/23/05 | 15 | FIRED-ATTENDANCE |
| 16239 | TREMAYNE A STOUDEMIRE | | LIFT-DRY | FULL-TIME | 11/18/03 H | 12/15/03 | 1 | FIRED--DRUG SCREEN |
| 16212 | JOHN T TINSLEY JR. | | RECEIVING | FULL-TIME | 10/27/03 H | 10/13/04 | 12 | QUIT NO CALL/NO SHOW |
| 16652 | DEFERIO M VARNER | | RECEIVING | FULL-TIME | 10/18/04 H | 2/09/05 | 5 | QUIT-NO NOTICE |
| 16331 | CHRISTOPHER WALDEN | | FORKLIFT | FULL-TIME | 2/09/04 H | 2/20/04 | 0 | QUIT NO CALL/NO SHOW |
| 16540 | SATACO WARE | | SEL-PIR | FULL-TIME | 8/12/04 H | 10/01/04 | 2 | FIRED-ATTENDANCE |
| 16573 | FRANKLIN L WASHINGTON | | FORKLIFT | FULL-TIME | 9/02/04 H | 9/14/04 | 0 | QUIT-NO NOTICE |
| 16381 | WENDELL K WRIGHT | | LIFT-FRZ | FULL-TIME | 3/29/04 H | 8/27/04 | 5 | RESIGNED W/NOTICE |
| 19559 | RHONDA ZAFFINA | | RECCLERK | FULL-TIME | 6/05/01 H | 1/29/03 | 20 | QUIT-NO NOTICE |
| ** DEPT: 12719 TOTALS ** ACTIVE EMPLOYEES = 15 | | | | TERMINATED EMPLOYEES = 35 | | | PERCENT TURNOVER = 233.33 % | |
| ** DIV : 19 TOTALS ** ACTIVE EMPLOYEES = 15 | | | | TERMINATED EMPLOYEES = 35 | | | PERCENT TURNOVER = 233.33 % | |
| *** COMPANY 02 TOTALS *** ACTIVE EMPLOYEES = 15 | | | | TERMINATED EMPLOYEES = 35 | | | PERCENT TURNOVER = 233.33 % | |

*** 

(11)

```
DATE 7/01/2005 10:49 AM                          MERCHANTS FOODSERVICE          COMPANY#: 02                    PAGE        1
PROR78                                      EMPLOYEE TURNOVER ANALYSIS REPORT                                   OS,Inc1
        USER: MELANIE                          FROM 1/01/2003 TO 6/30/2005
```

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|

**\*\* DIV :**

**DEPT#- 13419 Shipping**

| 19715 | AARON T AKERS | | SEL-DRY | FULL-TIME | 8/29/02 H | 5/12/03 | 10 | QUIT NO CALL/NO SHOW |
| 16858 | AGNES E ANELLO | | CHECKER | FULL-TIME | 4/12/05 H | 4/24/05 | 0 | FIRED-ATTENDANCE |
| 19437 | JOSEPH P BARBOUR | | TM LDR | FULL-TIME | 8/15/00 H | 12/31/04 | 52 | TRANSFER TO SALARY |
| 15930 | LEON BARLEY JR. | | LOADER | FULL-TIME | 1/18/03 H | 2/17/03 | 1 | FIRED-ATTENDANCE |
| 16859 | CASSANDRA A BOGAN | | CHECKER | FULL-TIME | 4/12/05 H | 5/24/05 | 1 | QUIT NO CALL/NO SHOW |
| 16050 | CHARLES D BOLDING | | LOADER | FULL-TIME | 7/09/03 H | 8/10/03 | 1 | QUIT NO CALL/NO SHOW |
| 16288 | SOLOMON T BOSTIC | | SEL-FRZ | FULL-TIME | 2/11/04 H | 3/07/04 | 2 | QUIT-NO NOTICE |
| 16404 | MARK A BRADLEY | | SEL-FRZ | FULL-TIME | 4/18/04 H | 5/09/04 | 1 | QUIT-NO NOTICE |
| 19725 | BILLY J BRADSHAW | | SEL-FRZ | FULL-TIME | 9/22/02 H | 1/12/03 | 5 | QUIT-NO NOTICE |
| 16668 | BILLY J BRADSHAW | | SEL-FRZ | FULL-TIME | 10/25/04 H | 12/16/04 | 2 | FIRED-COMPANY POLICY |
| 15977 | JONATHAN L BROWN | | SEL-DRY | FULL-TIME | 3/16/03 H | 4/21/03 | 1 | QUIT NO CALL/NO SHOW |
| 16119 | MARION K BROWN | | SEL-DRY | FULL-TIME | 8/14/03 H | 1/29/04 | 6 | QUIT NO CALL/NO SHOW |
| 16200 | RONALD D BROWN | | LOADER | FULL-TIME | 10/19/03 H | 10/24/03 | 0 | FIRED-POOR PERFORMAN |
| 16071 | SONYA R BRYANT | | CHECKER | FULL-TIME | 7/14/03 H | 9/05/03 | 2 | RESIGNED W/NOTICE |
| 15907 | MARK A CALLINES | | SEL-DRY | FULL-TIME | 1/05/03 H | 1/31/03 | 0 | QUIT-NO NOTICE |
| 16797 | TERRANCE A CASH | | SEL-FRZ | FULL-TIME | 3/02/05 H | 3/07/05 | 0 | QUIT NO CALL/NO SHOW |
| 16516 | GREGORY L CASON | | SEL-FRZ | FULL-TIME | 7/25/04 H | 8/17/04 | 1 | QUIT NO CALL/NO SHOW |
| 16796 | RICHARD K CHAMBERS | | SEL-FRZ | FULL-TIME | 2/28/05 H | 3/14/05 | 0 | QUIT-NO NOTICE |
| 16442 | ROBERT L CHANEY, JR | | LOADER | FULL-TIME | 7/01/04 H | 7/08/04 | 0 | FIRED-ATTENDANCE |
| 16720 | WILLIE L CHATTMAN | | LOADER | FULL-TIME | 12/06/04 H | 4/21/05 | 5 | QUIT-NO NOTICE |
| 16222 | WILLIE L CHATTMAN JR. | | LOADER | FULL-TIME | 11/02/03 H | 4/14/04 | 6 | QUIT NO CALL/NO SHOW |
| 16484 | COREY L CHILDERS | | LOADER | FULL-TIME | 7/19/04 H | 9/09/04 | 2 | FIRED-ATTENDANCE |
| 16714 | DANNY C COOPER | | LIFT-FRZ | FULL-TIME | 12/02/04 H | 4/04/05 | 5 | QUIT-NO NOTICE |

12

DATE 7/01/2005 10:49 AM
PRGR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 2
OS.Incl

**, DIV : 19
DEPT#- 13919 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16515 | CHARLES E COTTRELL | | SEL-FRZ | FULL-TIME | 7/26/04 H | 1/02/05 | 7 | QUIT-NO NOTICE |
| 16070 | CHRISTINE N CRAIG | | CHECKER | FULL-TIME | 7/15/03 H | 9/23/03 | 2 | QUIT-NO NOTICE |
| 15912 | DEDERICK A CROOM | | SEL-DRY | FULL-TIME | 1/14/03 X | 3/05/03 | 2 | QUIT NO CALL/NO SHOW |
| 16758 | JAMES M DAVIS | | SEL-FRZ | FULL-TIME | 1/23/05 H | 2/06/05 | 1 | QUIT-NO NOTICE |
| 16049 | THOMAS C DAVIS | | SEL-DRY | FULL-TIME | 7/09/03 H | 10/15/03 | 3 | QUIT-NO NOTICE |
| 16667 | THOMAS C DAVIS | | SEL-DRY | FULL-TIME | 10/24/04 H | 2/09/05 | 5 | FIRED-INSUBORDINANT |
| 16817 | THOMAS C DAVIS | | SEL-DRY | FULL-TIME | 3/14/05 H | 6/08/05 | 3 | QUIT-NO NOTICE |
| 19396 | KATHY L DEAVERS | | SEL-FRZ | FULL-TIME | 7/09/00 H | 9/25/03 | 38 | QUIT NO CALL/NO SHOW |
| 16177 | WARREN DENNIS | | LOADER | FULL-TIME | 10/07/03 H | 11/11/03 | 1 | QUIT-NO NOTICE |
| 16088 | MICHAEL C DERAMUS | | SEL-FRZ | FULL-TIME | 7/21/03 H | 8/10/03 | 1 | QUIT NO CALL/NO SHOW |
| 16755 | PHILLIP R DOWNS | | LOADER | FULL-TIME | 1/23/05 H | 6/20/05 | 5 | QUIT NO CALL/NO SHOW |
| 16029 | JAMES M DUTTON | | SEL-FRZ | FULL-TIME | 6/22/03 H | 8/13/03 | 2 | FIRED-PREV ACCIDENT |
| 16340 | JAMES E EDWARDS | | LOADER | FULL-TIME | 9/11/03 H | 10/01/03 | 1 | FIRED-POOR PERFORMAN |
| 16340 | JAMIE L EDWARDS | | SEL-DRY | FULL-TIME | 2/18/04 H | 4/04/04 | 2 | QUIT NO CALL/NO SHOW |
| 19744 | MICHAEL W FAY | | SHIPCLK | FULL-TIME | 12/01/02 H | 6/10/03 | 7 | QUIT NO CALL/NO SHOW |
| 16407 | ANTROINE L FEAGIN | | LOADER | FULL-TIME | 4/20/04 H | 5/31/04 | 1 | FIRED-ATTENDANCE |
| 16256 | GREGORY S FLOYD | | LOADER | FULL-TIME | 12/04/03 H | 12/14/03 | 0 | QUIT-NO NOTICE |
| 16763 | JACOB P FOSTER | | LOADER | FULL-TIME | 2/01/05 H | 2/24/05 | 0 | FIRED-POOR PERFORMAN |
| 16730 | ADRIAN T FREEMAN | | SEL-DRY | FULL-TIME | 12/13/04 H | 1/26/05 | 2 | QUIT-NO NOTICE |
| 16143 | CONSTANCE R FREEMAN | | CHECKER | FULL-TIME | 9/09/03 H | 9/15/03 | 0 | QUIT NO CALL/NO SHOW |
| 15994 | JERRY L FULMER | | LOADER | FULL-TIME | 3/30/03 H | 6/13/05 | 27 | RESIGNED W/NOTICE |
| 16122 | READIS J GARNER III | | SANITATI | FULL-TIME | 8/20/03 H | 2/04/05 | 19 | RESIGNED W/NOTICE |
| 16197 | BRET GILMORE | | CHECKER | FULL-TIME | 10/15/03 X | 11/10/03 | 1 | FIRED-ABANDONED JOB |

DATE 7/01/2005 10:49 AM
PROR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE    3
OS.Incl

** DIV : 19
DEPT#- 13419 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16079 | HOWARD A GILMORE | | SEL-DRY | FULL-TIME | 7/20/03 H | 7/31/03 | 0 | FIRED-ATTENDANCE |
| 16464 | DANIEL J GLOVER | | LOADER | FULL-TIME | 7/11/04 H | 8/05/04 | 1 | FIRED-POOR PERFORMAN |
| 19695 | IVAN E GORDON | | SEL-DRY | FULL-TIME | 7/08/02 K | 3/09/03 | 9 | FIRED-ATTENDANCE |
| 16158 | MICAH A GRISHAM | | LOADER | FULL-TIME | 9/23/03 H | 11/13/03 | 2 | QUIT-NO NOTICE |
| 16027 | DULCE M GUTIERARZ | | CHECKER | FULL-TIME | 6/22/03 H | 10/13/03 | 4 | QUIT-NO NOTICE |
| 16445 | ROBERT J GUYON | | SEL-FRZ | FULL-TIME | 7/05/04 H | 8/11/04 | 1 | FIRED-ATTENDANCE |
| 16296 | KEVIN V HARRIS | | SEL-FIR | FULL-TIME | 1/11/04 H | 2/11/04 | 1 | QUIT NO CALL/NO SHOW |
| 16884 | RODNEY C HARTLEY | | SEL-FRZ | FULL-TIME | 4/24/05 H | 5/10/05 | 1 | QUIT NO CALL/NO SHOW |
| 19440 | WILLIAM R HAYES | | SEL-FIR | FULL-TIME | 8/27/00 H | 9/12/03 | 37 | RESIGNED W/NOTICE |
| 15995 | JAMES R HEADLEY | | LOADER | FULL-TIME | 3/31/03 H | 6/09/03 | 1 | QUIT NO CALL/NO SHOW |
| 16028 | BRADLEY D HODGES | | LOADER | FULL-TIME | 6/22/03 H | 7/07/03 | 1 | QUIT-NO NOTICE |
| 16824 | THOMAS HOSECLOTH | | SEL-DRY | FULL-TIME | 3/09/05 H | 3/29/05 | 0 | QUIT-NO NOTICE |
| 19746 | ERIC M HOWARD | | SEL-FRZ | FULL-TIME | 12/01/02 K | 2/27/04 | 15 | RESIGNED W/NOTICE |
| 16851 | ANTWAN D HUDSON | | SEL-FRZ | FULL-TIME | 4/07/05 H | 5/08/05 | 1 | FIRED-POOR PERFORMAN |
| 16490 | JEREMY C INGRAM | | SEL-FRZ | FULL-TIME | 7/20/04 H | 10/27/04 | 3 | QUIT-NO NOTICE |
| 16253 | NATHAN V JEFFERSON | | SEL-FRZ | FULL-TIME | 12/03/03 H | 12/08/03 | 0 | QUIT NO CALL/NO SHOW |
| 16264 | NATHANIAL V JEFFERSON | | LOADER | FULL-TIME | 12/03/03 H | 12/08/03 | 0 | QUIT NO CALL/NO SHOW |
| 16299 | CEDRIC W JOHNSON | | SEL-FRZ | FULL-TIME | 1/13/04 H | 4/04/04 | 3 | QUIT NO CALL/NO SHOW |
| 16401 | JOHANTHAN JOHNSON | | SEL-FRZ | FULL-TIME | 4/15/04 H | 5/03/04 | 1 | QUIT-NO NOTICE |
| 16333 | WILLIAM B JOHNSON III | | LOADER | FULL-TIME | 2/11/04 H | 4/11/04 | 2 | QUIT NO CALL/NO SHOW |
| 16553 | FREDTON T JONES | | LOADER | TEMPORARY | 8/18/04 H | 12/12/04 | 4 | QUIT NO CALL/NO SHOW |
| 19674 | JIMMY L KENDRICK | | TMLDR | FULL-TIME | 6/27/02 K | 12/31/04 | 30 | TRANSFER TO SALARY |
| 16278 | JOE L KENNEDY | | SEL-FRZ | FULL-TIME | 1/04/04 H | 4/27/04 | 3 | QUIT-NO NOTICE |

```
DATE 7/01/2005 10:49 AM                      MERCHANTS FOODSERVICE                        COMPANY#: 02                PAGE       4
PROR78      USER: MELANIE              EMPLOYEE TURNOVER ANALYSIS REPORT                                              05.Inc!
                                         FROM 1/01/2005 TO 6/30/2005
EMPLOYEE                              JOB                                                          NUMBER
NUMBER    EMPLOYEE NAME              CLASS   TITLE      EMPLOYEE STATUS     DATE      TERM DATE    MONTHS   TERMINATION REASON

** DIV : 19

DEPT#- 13419 Shipping

16595   JOE L KENNEDY                      SEL-FRZ     TEMPORARY         9/13/04 H   2/07/05     6   QUIT-NO NOTICE
16258   LEON KENNEDY                       SEL-DRY     FULL-TIME         12/09/03 H  8/12/04     9   RESIGNED W/NOTICE
16169   FRANKIE L KNIGHT                   SEL-FRZ     FULL-TIME         9/28/03 H   10/01/03    1   FIRED-ATTENDANCE
16159   CARMEN M LAMAR                     SHIPCLK     PART-TIME         9/21/03 H   10/26/03    1   QUIT NO CALL/NO SHOW
15953   ANTHONY M LAM                      LOADER      FULL-TIME         2/28/03 H   5/29/03     3   RESIGNED W/NOTICE
16565   SAMMY L LEWIS                      SEL-DRY     FULL-TIME         8/25/04 H   9/27/04     1   QUIT NO CALL/NO SHOW
16138   JAMES B LYKES                      CHECKER     FULL-TIME         9/10/03 H   10/13/03    1   FIRED-POOR PERFORMAN
16010   BRANDON H MATHIS                   SEL-DRY     FULL-TIME         5/21/03 H   2/05/04    10   QUIT-NO NOTICE
19747   ELLIS R MCMILLIAN                  LOADER      FULL-TIME         12/10/02 H  1/13/03     2   FIRED-POOR PERFORMAN
16707   CATHY A MIMS                       LIFT-DRY    FULL-TIME         11/21/04 H  3/20/05     5   QUIT-NO NOTICE
16587   MICHAEL B MOORE                    SEL-DRY     FULL-TIME         9/05/04 H   10/03/04    1   QUIT-NO NOTICE
16362   BRANDON G MORROW                   SEL-DRY     FULL-TIME         3/09/04 H   6/22/04     3   QUIT-NO NOTICE
16872   JAMES L MORROW                     LIFT-FRZ    FULL-TIME         4/17/05 H   4/25/05     0   FIRED-PROPERTY DAMAG
16489   HENRY T NUNN                       LOADER      FULL-TIME         7/19/04 H   1/19/05     7   FIRED-COMPANY POLICY
16564   JASON PARKER                       SEL-DRY     FULL-TIME         8/23/04 H   8/29/04     0   QUIT NO CALL/NO SHOW
16719   JEROME PARKER                      SEL-DRY     FULL-TIME         12/05/04 H  2/17/05     3   QUIT NO CALL/NO SHOW
19496   SANDRA G PARKER                    SEL-PIR     FULL-TIME         11/13/00 H  1/05/04    39   QUIT NO CALL/NO SHOW
16335   RONALD PETTWAY                     SEL-DRY     FULL-TIME         2/16/04 H   3/15/04     1   QUIT-NO NOTICE
16757   PATRICK J PHELPS                   LIFT-FRZ    FULL-TIME         1/24/05 H   2/01/05     1   QUIT-NO NOTICE
15916   CEDRIC D PRICE                     LOADER      FULL-TIME         1/20/03 H   2/24/03     1   FIRED-ATTENDANCE
16527   ERIK RAY                           LIFT-FRZ    FULL-TIME         8/01/04 H   10/03/04    2   QUIT-NO NOTICE
16807   CHRIS G REDMON                     CHECKER     FULL-TIME         3/08/05 H   3/11/05     0   QUIT NO CALL/NO SHOW
16867   FARRIN D REED                      SEL-FRZ     FULL-TIME         4/14/05 H   3/25/05     1   QUIT NO CALL/NO SHOW
```

```
DATE 7/01/2005 10:49 AM                    MERCHANTS FOODSERVICE                       COMPANY#: 02              PAGE   5
PROR78        USER: MELANIE          EMPLOYEE TURNOVER ANALYSIS REPORT                                          OS,Inc.
                                       FROM 1/01/2003 TO 6/30/2005

                                JOB
EMPLOYEE                       CLASS                                              TERM             NUMBER
NUMBER    EMPLOYEE NAME                 TITLE      EMPLOYEE STATUS      DATE       DATE            MONTHS   TERMINATION REASON

** DIV : 19

DEPT#-  13419 Shipping

15989  KEINO S REED                     LOADER     FULL-TIME         3/23/03 H   6/15/03            3  FIRED-ABANDONED JOB
19739  CHRISTOPHER B ROBERTS SR.        LOADER     FULL-TIME        11/10/02 H   1/13/03            3  QUIT NO CALL/NO SHOW
19550  CHARLES ROBINSON                 LIFT-DRY   FULL-TIME         3/20/01 H  10/16/03           31  QUIT-NO NOTICE
16485  NEAL ROBINSON                    LOADER     FULL-TIME         8/23/04 H   9/26/04            1  FIRED-POOR PERFORMAN
16575  TYRONE ROBINSON                  LOADER     FULL-TIME         7/19/04 H   7/25/04            0  FIRED-POOR PERFORMAN
16653  DONALD R ROLLINS                 SEL-DRY    FULL-TIME         9/01/04 H   9/12/04            0  QUIT NO CALL/NO SHOW
16254  KELVIN ROLLINS                   SEL-DRY    FULL-TIME        10/17/04 H  10/31/04            0  QUIT NO CALL/NO SHOW
16815  DARRICK S SATCHER                LOADER     FULL-TIME        12/02/03 H  12/05/03            0  QUIT NO CALL/NO SHOW
16267  MORGAN W SCARBROUGH              LIFT-FRZ   FULL-TIME         3/07/05 H   3/25/05            0  QUIT NO CALL/NO SHOW
19724  EARNEST D SCOTT                  SEL-FRZ    FULL-TIME        12/17/03 H   5/09/04            4  RESIGNED W/NOTICE
16109  JAMES A SECKMAN                  SEL-FRZ    FULL-TIME         9/22/02 H  11/28/03           14  QUIT-NO NOTICE
16216  JASON L SHELL                    SEL-FRZ    FULL-TIME         7/31/03 H   8/24/03            1  RESIGNED W/NOTICE
19647  STEVEN M SHIMEK                  CHECKER    FULL-TIME        10/28/03 H  11/24/03            1  QUIT NO CALL/NO SHOW
16777  JOHN W SHIVER                    LIFT-FRZ   FULL-TIME        12/11/01 H   3/07/03           16  RESIGNED W/NOTICE
19679  KRISTI G SHUFF                   CHECKER    FULL-TIME         2/13/05 H   4/07/05            2  FIRED-ABANDONED JOB
19735  TERRY A SIMS                     LIFT-FRZ   FULL-TIME         6/30/02 H  10/02/03           16  QUIT-NO NOTICE
16463  JAMES M SMART                    SEL-FRZ    FULL-TIME         3/09/05 H   3/09/05           30  QUIT-NO NOTICE
15947  JAMES M SMART                    SEL-FRZ    FULL-TIME        11/11/04 F   4/06/05            6  QUIT-NO NOTICE
16679  GREGORY T SMITH                  SEL-FRZ    FULL-TIME         2/13/03 H   5/12/03            3  QUIT NO CALL/NO SHOW
16176  PATRICK SMITH                    FORKLIFT   FULL-TIME        10/31/04 H  12/29/04            2  QUIT-NO NOTICE
19736  SCOTT T SMITH                    CHECKER    FULL-TIME        10/05/03 H   1/25/04            4  RESIGNED W/NOTICE
15912  TERRY A SMITH                    LOADER     FULL-TIME        10/28/02 H   5/12/03            8  QUIT-NO NOTICE
       PAUL K SOLTISHICK                CHECKER    FULL-TIME         2/03/03 H   4/20/03            2  QUIT NO CALL/NO SHOW
```

DATE 7/01/2005 10:49 AM
PROR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 6
OS.Inc|

** DIV : 19
DEPT#- 13419 Shipping

| EMPLOYER NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16127 | MARTY D SPENCE | | SEL-PIR | FULL-TIME | 8/28/03 H | 2/18/04 | 7 | QUIT NO CALL/NO SHOW |
| 16297 | MICHAEL P SPIGNER | | LIFT-FRZ | FULL-TIME | 1/11/04 H | 6/06/05 | 17 | FIRED-THEFT |
| 15951 | MICHAEL R STIGER | | LIFT-DRY | FULL-TIME | 2/23/03 H | 5/04/03 | 3 | QUIT-NO NOTICE |
| 16849 | KYLE L STRENGTH | | SEL-DRY | FULL-TIME | 4/03/05 H | 5/02/05 | 1 | QUIT NO CALL/NO SHOW |
| 16030 | SUE A TAYLOR | | SHIPCLK | FULL-TIME | 6/22/03 H | 9/05/03 | 3 | QUIT NO CALL/NO SHOW |
| 16059 | LONZA B TINSLEY | | LOADER | FULL-TIME | 7/13/03 H | 5/29/04 | 11 | QUIT-NO NOTICE |
| 16756 | LATASHIA V TUCKER | | CHECKER | FULL-TIME | 1/23/05 H | 2/01/05 | 1 | FIRED-ATTENDANCE |
| 16444 | JERRY J TYUS | | LOADER | FULL-TIME | 7/05/04 H | 7/30/04 | 0 | QUIT-NO NOTICE |
| 19594 | RODERICK M UNDERWOOD | | SEL-DRY | FULL-TIME | 8/07/01 H | 1/21/04 | 30 | QUIT NO CALL/NO SHOW |
| 16405 | LEROY K VARNER | | LOADER | FULL-TIME | 4/18/04 H | 12/05/04 | 8 | QUIT-NO NOTICE |
| 15957 | PATRICK M VINSON | | LOADER | FULL-TIME | 3/02/03 H | 3/09/03 | 0 | FIRED-POOR PERFORMAN |
| 19371 | RODNEY O WARE | | SEL-FRZ | FULL-TIME | 4/23/00 H | 2/14/03 | 35 | TRANSFER TO SALARY |
| 16268 | JARVIS L WATKINS | | LOADER | FULL-TIME | 12/17/03 H | 1/09/04 | 2 | FIRED-ABANDONED JOB |
| 16346 | VEARDELL WATKINS | | SEL-FRZ | FULL-TIME | 2/22/04 H | 5/20/04 | 3 | QUIT-NO NOTICE |
| 16214 | MARCUS C WEAVER | | LIFT-FRZ | FULL-TIME | 10/27/03 H | 5/04/04 | 8 | QUIT NO CALL/NO SHOW |
| 15913 | HENRY J WHITE | | SEL-DRY | FULL-TIME | 1/15/03 H | 2/09/03 | 1 | QUIT NO CALL/NO SHOW |
| 16369 | DONNELL WILLIAMS | | LIFT-DRY | FULL-TIME | 3/15/04 H | 5/13/04 | 2 | FIRED-POOR PERFORMAN |
| 16185 | PHILLIP D WILLIAMS | | CHECKER | FULL-TIME | 10/14/03 H | 6/29/04 | 9 | RESIGNED W/NOTICE |
| 19619 | CEDRIC K WORKS | | CHECKER | FULL-TIME | 10/14/01 H | 7/09/03 | 22 | FIRED |
| 16117 | BRODERICK S WRIGHT | | LOADER | FULL-TIME | 8/13/03 H | 2/18/04 | 7 | MEDICAL REASONS |
| 16186 | CURTIS W WYATT | | LOADER | FULL-TIME | 10/14/03 H | 4/07/05 | 19 | FIRED-ABANDONED JOB |

** DEPT: 13419 TOTALS ** ACTIVE EMPLOYEES = 32    TERMINATED EMPLOYEES = 136    PERCENT TURNOVER = 425.00 %

** DIV : 19 TOTALS ** ACTIVE EMPLOYEES = 32    TERMINATED EMPLOYEES = 136    PERCENT TURNOVER = 425.00 %

*** COMPANY 02 TOTALS *** ACTIVE EMPLOYEES = 32    TERMINATED EMPLOYEES = 136    PERCENT TURNOVER = 425.00 %

**DEFENDANT'S EXHIBIT**

**20**

July 11, 2005

PLEASE ACCEPT THIS LETTER AS MY NOTICE OF RESIGNATION. I WILL WORK WHATEVER NOTICE YOU REQUIRE.

I CAN NO LONGER TOLERATE WORKING UNDER THE STRESS & PRESSURE THAT SEEMS TO BE A DAILY OCCURRENCE. NOTHING I WAS TOLD DURING THE INTERVIEW PROCESS HAS TURNED OUT TO BE TRUTHFUL. HOURS EXPECTED OR REQUIRED TO BE WORKED, TIME OFF, STEADINESS & SECURE WORKFORCE. ETC... LEAVING SYSCO TO COME TO WORK HERE WAS THE BIGGEST MISTAKE I'VE EVER MADE.

Steve Adam

IN THE CIRCUIT COURT OF CHILTON COUNTY
AT CLANTON, ALABAMA

STEVE ADAMS,                    )
                               )
        Plaintiff,             )
                               )
v.                             )
                               )      Case No. _CV-06-204 B_
                               )
MERCHANTS FOOD SERVICES,       )
DON SUBER, ANDY MERCIER,       )
AND HAL HENSON,                )
                               )
        Defendants.            )



**DEFENDANT'S EXHIBIT**

21

## COMPLAINT

COMES NOW the Plaintiff, Steve Adams, who shows unto this Honorable Court the following, to wit:

1. On or about the 15th day of August, 2004, the Plaintiff was contacted by Defendant Merchants Food Services (herein Defendant Merchants) about possible employment with Defendant Merchants. Defendant Merchants contacted Plaintiff while he was still employed with Sysco Foods.

2. Defendant Merchants persistently pursued Plaintiff, and Plaintiff finally agreed to an interview once he learned of the potential salary with the new position.

3. Defendant Hal Henson (herein Defendant Henson), General Manager, Defendant Andy Mercier (herein Defendant Mercier), Corporate Vice President, and Don Suber (herein Defendant Suber), Corporate President, interviewed Plaintiff on or about the 28th day of August, 2004. During the interview, Defendants Henson, Mercier, and Suber made certain representations about certain aspects of the employment to Plaintiff, including, but not limited to, the following:

a. Plaintiff would only be required to work 8 to 8.5 hours a day or 40 to 42 hours a week;

b. Plaintiff would have flexibility in setting his own hours;

c. Plaintiff would only have to work a few nights on the night shift to get acquainted with that shift and the crew working that shift;

d. Plaintiff would only have to work two (2) Saturdays per year for the purpose of physical inventory, and if Plaintiff did have to work a Saturday for anything other than the purpose of the inventory, he would be compensated with a day off; and

e. Plaintiff was told that he would not have to worry about vacation time at Merchants and that he would not have to wait the usual 12 months before receiving time off, since he was giving up 17 days of vacation a year with his then current employer, Sysco – Defendant Henson told Plaintiff that he would allow him to take vacation time.

4.  After an official offer of employment, including salary, was made to Plaintiff, he decided to accept the offer extended by Defendant Merchants, based on the aforementioned representations made by the Defendants to Plaintiff.

5.  Once Plaintiff accepted employment with Defendant Merchants and began his tenure there, he learned that the representations that Defendants had made to him during his interview (¶ 3, supra) were false and misleading, as evidenced by, but not limited to, the following:

a. Throughout his 10.5 month employment with Merchants, Plaintiff was required to work 9 to 9.5 hours a day;

b. Plaintiff was not allowed the flexibility of setting his own hours;

c. Throughout his employment with Merchants, Plaintiff worked a total of 10 weeks on the night shift;

d. Throughout his employment with Merchants, Plaintiff was required to work a total of 8 Saturdays (6 more than what Plaintiff was told

during his interview), without being compensated either monetarily or with any time off from work, as he was promised; and

e. Throughout his employment with Merchants, Plaintiff was not allowed any time off, as was promised during his interview.

### COUNT I

6. Plaintiff hereby adopts those statements contained in the previous paragraphs and incorporates them herein as though set out in their entirety.

7. At all times relevant hereto, Defendants had a duty to Plaintiff to speak the truth regarding his possible employment with Defendant Merchants and the aforementioned aspects of his employment.

8. Defendants intentionally, recklessly, and/or innocently made certain false representations of material existing facts prior to Plaintiff's employment with Defendant Merchants, in an effort to induce Plaintiff's action on the false representations.

9. In fact, Plaintiff did act on the false representations of material existing facts.

10. As a proximate result of Defendants' false representations, Plaintiff has suffered, and continues to suffer, harm, loss, and/or damage.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount determined by an enlightened trier of fact, plus costs and interest. In addition, Plaintiff seeks any other remedies at law or equity that are available to him but not specifically set out herein.

### COUNT II

11. Plaintiff hereby adopts those statements contained in the previous paragraphs one through 10 and incorporates them herein as though set out in their entirety.

12. A confidential relationship and/or special relationship existed between Plaintiff and Defendants by virtue of the superiority of Defendants' knowledge

concerning the true facts surrounding the inducement of Plaintiff and the truth concerning the aspects of Plaintiff's employment with Defendant Merchants.

13. As a result of this relationship, Defendants had a duty to disclose the aforementioned material facts (¶¶ 3 and 5, supra).

14. As a proximate consequence of the suppression and/or misrepresentation of material facts as alleged and Plaintiff's reliance on such, Plaintiff was caused to suffer pecuniary loss, missed employment opportunities, expenses, and mental anguish.

15. Plaintiff demands punitive damages of the Defendants due to the intentional, reckless, and gross actions and/or omissions of the Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount determined by an enlightened trier of fact, plus costs and interest. In addition, Plaintiff seeks any other remedies at law or equity that are available to him but not specifically set out herein.

DATED this the _____13_____ day of _____June_____, 2006.

Derrick Blythe (BLY 002)
Attorney for Plaintiff
126 Marshall Street
Alexander City, Alabama 35010
(256) 234-4101

*Exhibit B*

# AFFIDAVIT

| TALLAPOOSA COUNTY | ) |
| | ) |
| STATE OF ALABAMA | ) |

I, STEVE ADAMS, the undersigned, hereby swear and affirm that the following is true and correct to the best of my knowledge:

On or about August 15, 2004, I was contacted by the Defendant, Merchants Food Services (herein Defendant Merchants) about possible employment with Defendant Merchants. Defendant Merchants contacted me while I was still employed with Sysco Foods.

Defendant Merchants persistently pursued me, and I finally agreed to an interview once I learned of the potential salary with the new position.

Defendant Hal Henson (herein Defendant Henson), General Manager, Defendant Andy Mercier (herein Defendant Mercier), Corporate Vice President, and Don Suber (herein Defendant Suber), Corporate President, interviewed me on August 28, 2004. During the interview, Defendants Henson, Mercier, and Suber made representations about certain aspects of the employment to me, including, but not limited to, the following:

a. I would only be required to work 8 to 8.5 hours a day or 40 to 42 hours a week;

b. I would have flexibility in setting my own hours;

c. I would only have to work a few nights on the night shift to get acquainted with that shift and the crew working that shift;

d. I would only have to work two (2) Saturdays per year for the purpose of physical inventory, and if I did have to work a Saturday for anything other than the purpose of the inventory, I would be compensated with a day off; and

e. I was told that I would not have to worry about vacation time at Merchants and that I would not have to wait the usual 12 months before receiving time off, since I was giving up 17 days of vacation a year with my then current employer, Sysco – Defendant Henson told me that he would allow me to take vacation time.

After an official offer of employment, including salary, was made to me, I decided to accept the offer extended by Defendant Merchants, based on the aforementioned representations made by the Defendants to me.

Once I accepted employment with Defendant Merchants and began my tenure there, I learned that the representations that Defendants had made to me during my interview were false and misleading, as evidenced by, but not limited to, the following:

a. Throughout my 10.5 month employment with Merchants, I was required to work 9 to 9.5 hours a day;

b. I was not allowed the flexibility of setting my own hours;

c. Throughout my employment with Merchants, I worked a total of 10 weeks on the night shift;

d. Throughout my employment with Merchants, I was required to work a total of 8 Saturdays (6 more than what I was told during my interview), without being compensated either monetarily or with any time off from work, as I was promised; and

e. Throughout my employment with Merchants, I was not allowed any time off, as was promised during my interview.

Put plainly, I was lied to about the job and its conditions. These lies made me give up a great job.

Further the affiant sayeth not.

_Steve Adams_
STEVE ADAMS

STATE OF ALABAMA

COUNTY OF TALLAPOOSA

I, Ronda H. Blythe the undersigned authority, a Notary Public in and for said State and County, do hereby certify that STEVE ADAMS whose name is signed to the foregoing instrument and who is known to me, acknowledged before me this day, that being informed of the contents of this instrument he executed the same voluntarily on the day same bears date.

Witness my hand and seal this the 11th day of July, 2007.

_Ronda H. Blythe_
Notary Public
Expiration: 03-10-08