# UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

July 16, 2007

# NOTICE OF CORRECTION

**From:   Clerk's Office**

**Case Style: Steve Adams vs. Merchants Foodservice, et al**
**Case Number: 2:06cv707-ID**

**Pleading : #14 - Evidentiary Submission w/Exhibit A-B**

**Notice of Correction is being  filed this date to advise that  the referenced  pleading was docketed on July 16, 2007 without "Exhibit B" attached.**

**The corrected pdf document is attached to this notice.**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NOTHERN DIVISION

2007 JUL 13  A 9: 38

| | |
|---|---|
| STEVE ADAMS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.  2:06-cv-00707-ID-CSC |
| | ) |
| MERCHANTS FOODSERVICE, et al., | ) |
| | ) |
|     Defendants. | ) |

## PLAINTIFF'S EVIDENTIARY MATERIALS IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff in the above-styled cause and submits this, his Evidentiary Submissions in Support of his Response in Opposition to Defendants' Motion for Summary Judgment.

| | |
|---|---|
| Exhibit A | Deposition of Steve Adams, April 4, 2007, and attached Exhibits thereto |
| Exhibit B | Affidavit of Steve Adams |

Respectfully submitted this _12_ day of July, 2007.

_____
Derrick Blythe, [BLY 005]
Attorney for Plaintiffs
126 Marshall Street
Alexander City, AL  35010
(256)234-4101

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel

of record by placing a copy of the same in the U.S. Mail, postage prepaid, on this __12__ day of

July, 2007, addressed as follows:

Thomas A Davis, Esq.
J. Tobias Dykes, Esq.
CONSTANGY, BROOKS & SMITH, LLC
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

_____
Derrick Blythe

# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3      NORTHERN DIVISION
4
5  CIVIL ACTION NO.: 2:06-CV-00707-ID-CSC
6
7  STEVE ADAMS,
8      Plaintiff,
9
10 vs.
11
12 MERCHANTS FOODSERVICE; et al.,
13     Defendants.
14
15
16 DEPOSITION TESTIMONY OF:
17     STEVE ADAMS
18
19
20  S T I P U L A T I O N S
21      IT IS STIPULATED AND
22 AGREED by and between the parties
23 through their respective counsel that

**Page 2**

1  the deposition of STEVE ADAMS
2  may be taken before Mandy Bryant, a
3  Court Reporter and Notary Public for the
4  State at Large, at the offices of
5  Constangy, Brooks & Smith, L.L.C., One
6  Federal Place, Suite 900, 1819 Fifth
7  Avenue North, Birmingham, Alabama 35203,
8  on the 4th day of April, 2007,
9  commencing at approximately 10:20 a.m.
10     IT IS FURTHER STIPULATED
11 AND AGREED that the signature to and the
12 reading of the deposition by the witness
13 is waived, the deposition to have the
14 same force and effect as if full
15 compliance had been had with all laws
16 and rules of Court relating to the
17 taking of the depositions.
18     IT IS FURTHER STIPULATED
19 AND AGREED that it shall not be
20 necessary for any objections to be made
21 by counsel to any questions except as to
22 form or leading questions and that
23 counsel for the parties may make

**Page 3**

1  objections and assign grounds at the
2  time of trial or at the time said
3  deposition is offered in evidence, or
4  prior thereto.
5      In accordance with Rule 5(d)
6  of the Alabama Rules of Civil Procedure,
7  as amended, effective May 15, 1998, I,
8  Mandy Bryant, am hereby delivering to J.
9  Tobias Dykes, Esq., the original
10 transcript of the oral testimony taken
11 the 4th day of April, 2007, along with
12 exhibits.
13     Please be advised that this is
14 the same and not retained by the Court
15 Reporter, nor filed with the Court.
16
17
18
19
20
21
22
23

**Page 4**

1
2
3  I N D E X
4  EXAMINATION BY:          PAGE NO.
5  Mr. Dykes              7
6  Mr. Blythe           210
7
8      E X H I B I T S
9
10 FOR THE DEFENDANTS:
11 1 - Notice of Deposition    61
12 2 - Document            64
13 3 - Social Security Statement 65
14 4 - Earnings Statement      66
15 5 - Photocopy of W-2s       67
16 6 - Application for
17     Employment         108
18 7 - Correspondence       109
19 8 - Resignation Letter and
20    Exit Interview      113
21 9 - Benefits Document     117
22 10 - Incentive Program     121
23 11 - Employee Check History 123

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 5

1   E X H I B I T S (continued)
2
3   12 - Photocopy of Paychecks  127
4   13 - Acknowledgment of Employment
5        Status        128
6   14 - Acknowledgment of Receipt
7        of Handbook      130
8   15 - Employee Handbook      130
9   16 - Acknowledgment of Receipt
10       of Handbook      131
11  17 - Employee Handbook      132
12  18 - E-Mail        168
13  19 - Employee Turnover Analysis
14       Report        174
15  20 - Letter of Resignation  181
16  21 - Complaint      182
17
18
19
20
21
22
23

Page 6

1   A P P E A R A N C E S
2
3   PRESENT FOR THE PLAINTIFF:
4   Derrick Blythe, Esq.
5   ATTORNEY AT LAW
6   126 Marshall Street
7   Alexander City, Alabama  35010
8
9
10  PRESENT FOR THE DEFENDANT MERCHANTS
11  FOODSERVICE:
12  J. Tobias Dykes, Esq.
13  CONSTANGY, BROOKS & SMITH, L.L.C.
14  One Federal Place, Suite 900
15  1819 Fifth Avenue North
16  Birmingham, Alabama  35203
17
18
19  ALSO PRESENT:
20  Mr. Andy Mercier
21
22
23

Page 7

1        I, Mandy Bryant, a Court
2   Reporter and Notary Public, State of
3   Alabama at Large, acting as
4   Commissioner, certify that on this date,
5   pursuant to the Alabama Rules of Civil
6   Procedure, and the foregoing stipulation
7   of counsel, there came before me at the
8   offices of Constangy, Brooks & Smith,
9   L.L.C., One Federal Place, Suite 900,
10  1819 Fifth Avenue North, Birmingham,
11  Alabama 35203, commencing at
12  approximately 10:20 a.m., on the 4th day
13  of April, 2007, STEVE ADAMS, witness in
14  the above cause, for oral examination,
15  whereupon the following proceedings were
16  had:
17
18        STEVE ADAMS,
19  being first duly sworn, was examined
20      and testified as follows:
21
22  EXAMINATION BY MR. DYKES:
23      Q.  Mr. Adams, we just introduced

Page 8

1   ourselves a minute ago.  I'm Toby Dykes.
2   For the record, can you just state your
3   name?
4       A.  Full name is Charles Steven
5   Adams.
6       Q.  Have you ever gone by any other
7   names?
8       A.  Most people call me Steve.  I
9   mean, that's -- you know, any legal
10  stuff as far as buying a home or a car,
11  I do Charles S. or Charles Steven.  But
12  just Steve Adams is what I normally go
13  by.
14      Q.  But no other legal names or
15  anything?
16      A.  No.
17      Q.  No aliases?
18      A.  Huh-uh (shaking head
19  negatively).
20      Q.  I represent Merchants
21  Foodservice in the claim that you have
22  filed against them that we're here about
23  today, and I'm going to be asking you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  some questions about your claim.
2  A.  Uh-huh.
3  Q.  Do you understand that you've
4  just been placed under oath?
5  A.  I do.
6  Q.  Do you understand that this
7  deposition has the same force and effect
8  as it would -- as your testimony would
9  if we were sitting in court?
10  A.  I do.
11  Q.  Now, I'm going to ask you a good
12  number of questions today.  I don't
13  always ask the best questions.  If you
14  don't understand a question, will you
15  tell me?
16  A.  Uh-huh.
17  Q.  One thing, just to help her job,
18  and I know you say uh-huh there, if
19  you'll answer a yes or no.
20  A.  Okay.
21  Q.  It's hard for her to type that
22  out.
23  A.  Yes.  All right.

Page 10

1  Q.  Have you ever given a deposition
2  before?
3  A.  No, I haven't.
4  Q.  Have you taken any medications
5  or had any beverages or anything that
6  would prevent you from testifying
7  truthfully today?
8  A.  No.
9  Q.  What's your Social Security
10  number?
11  A.  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.
12  Q.  Your date of birth?
13  A.  11/28/58.
14  Q.  What's your driver's license
15  number?
16  A.  3763951.
17  Q.  Where do you live?
18  A.  Address?
19  Q.  Yes.
20  A.  931 Overhill Drive, Alexander
21  City, Alabama.
22  Q.  How long have you lived there?
23  A.  Zac is 17, so I'm going to say

Page 11

1  18 -- 18 and a half years.  I don't
2  remember when we actually bought the
3  house or moved there, but it was before
4  my son was born, shortly there before.
5  Q.  Who lives in that house with
6  you?
7  A.  My wife, son, and daughter.
8  Q.  What is your wife's name?
9  A.  Laura.
10  Q.  And your son's name is Zac?
11  A.  Zac.  And Hannah is my daughter.
12  Q.  And Zac is 17?
13  A.  Uh-huh.
14  Q.  How old is --
15  A.  Yes.
16  Q.  How old is Hannah?
17  A.  She's 14.
18  Q.  Are those your only children?
19  A.  Yes.
20  Q.  I take it neither of them are
21  married?
22  A.  No.
23  Q.  Where does Laura work?

Page 12

1  A.  She works at Russell Medical
2  Center.
3  Q.  How long has she worked there?
4  A.  This is just a guess, but I
5  would say 14 months.  She had her
6  anniversary there not long ago, so
7  I'm -- 14 months.
8  Q.  What does she do at Russell
9  Medical Center?
10  A.  She is the executive assistant
11  to the CEO of the hospital.
12  Q.  Is Russell Medical Center in
13  Alex City?
14  A.  Yes.
15  Q.  Where did she work prior to
16  that?
17  A.  She worked for the Lake Martin
18  Regional Economic Development Alliance,
19  I believe is the correct name for it.
20  Q.  What did she do there?
21  A.  She was an administrative
22  assistant to the director.
23  Q.  Did she ever work at SYSCO?

3  (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 13

1    A.   She did.
2    Q.   When did she work for SYSCO?
3    A.   From 1999 until she started at
4    the Economic Alliance, which I don't
5    remember the date on that, but --
6    Q.   What was her job at SYSCO?
7    A.   She was the executive assistant
8    to the president of SYSCO Central
9    Alabama.
10   Q.   Were you working at SYSCO when
11   she started there?
12   A.   I was.
13   Q.   Were you able to help her get
14   the job, or is that something she did on
15   her own?
16   A.   I told our HR director that she
17   would -- that Laura was looking for a
18   job, so to speak, and she asked me just
19   to tell Laura to send her resume. I
20   guess that was my involvement in it.
21   The rest of it, she did on her own as
22   far as the interview and stuff.
23   Q.   How long did she continue

Page 14

1    working there at SYSCO after you left?
2    A.   Like I said, I don't remember
3    the date she started at the Economic
4    Alliance. But it was, I'm going to say,
5    six months. But that's totally a guess
6    and I don't guess that's -- you know.
7    Q.   I realize dates are hard and I'm
8    just trying to get an idea of generally
9    if it was a month or two or if it was a
10   year or what. And that sounds like it
11   was somewhere in between.
12   A.   Uh-huh.
13   Q.   Did she leave SYSCO voluntarily?
14   A.   Yes.
15   Q.   How long have y'all been
16   married? It's a tough question, I know.
17   A.   We were married -- I'm trying to
18   think. I'm glad she's not sitting here.
19   But October the 25th, 1986.
20   Q.   Okay.
21   A.   Now, Laura and I separated for
22   two years or actually were divorced for
23   two years and then remarried. So I

Page 15

1    don't know if -- overall, I guess, you
2    know, 18 years cumulatively.
3    Q.   When did y'all divorce for those
4    two years?
5    A.   '93 through '95, I guess.
6    Q.   Have you been married to anybody
7    other than Laura?
8    A.   No, I have not.
9    Q.   Ever been engaged to anybody
10   other than Laura?
11   A.   Nobody other than Laura.
12   Q.   Okay. And I realize this is
13   going to be kind of a broad question,
14   but do you have any relatives that live
15   there in Alex City with y'all or in that
16   area?
17   A.   My mother lives there. My
18   sister lives there. Now, by relative,
19   do you mean blood relative to me or --
20   Q.   Well, let's start with --
21   A.   Okay.
22   Q.   Does your mom live by herself?
23   A.   She does.

Page 16

1    Q.   What is her name?
2    A.   Her -- Willie, W-I-L-L-I-E, Jo,
3    J-O, Adams.
4    Q.   And what's your sister's name?
5    A.   Her name is Nyla, N-Y-L-A,
6    Parrish.
7    Q.   Is that P-A-R-I-S-H?
8    A.   Two Rs.
9    Q.   Two Rs. And does she live in
10   Alex City?
11   A.   She does.
12   Q.   What's her husband's name?
13   A.   She's not married.
14   Q.   Not married. Okay. Does she
15   have any children over 18?
16   A.   No children, period.
17   Q.   Do you have any other brothers
18   or sisters that live in the area?
19   A.   My brother lives in Montgomery.
20   Q.   What's his name?
21   A.   William.
22   Q.   Is he married?
23   A.   He is.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  Q.  What's his wife's name?
2  A.  Carla.
3  Q.  Do they have any children?
4  A.  A daughter, Ashley Ann.
5  Q.  How old is she?
6  A.  11 or 12.
7  Q.  Any other brothers or sisters
8  that --
9  A.  No.  Just the two siblings.
10  Q.  Okay.  Have you got any other
11  blood relatives that live in the area?
12  A.  Got my uncle.  Eldridge Bolin
13  lives in Alex City.
14  Q.  Is he married?
15  A.  He is.
16  Q.  What's his wife's name?
17  A.  Willa Jean.
18  Q.  And as I said, the reason I ask,
19  this is just for a jury, just to know --
20  if we go to trial and we get a jury, I
21  just kind of need to know who your
22  family is.  Because I know for the most
23  part, you want them on the jury.  We

Page 18

1  wouldn't.  So I've got to ask those
2  questions.  Do Eldridge and Willa Jean
3  have any children over 18?
4  A.  Actually, it's -- Willa Jean is
5  his second wife.  My aunt died.
6  Q.  Okay.
7  A.  So uncle's got a daughter named
8  Gloria Payne that lives in -- or Gloria
9  Willis, excuse me, that lives in
10  Dadeville.
11  Q.  All right.  Have you got any
12  other blood relatives in the area?
13  A.  Not in the area, no.
14  Q.  And I guess when I say "in the
15  area," I kind of mean Montgomery, Alex
16  City.
17  A.  I've got an uncle and aunt that
18  live here in Birmingham.
19  Q.  Okay.  And that's fine.
20  A.  Okay.
21  Q.  We're in the Middle District of
22  Alabama, which would cover Montgomery
23  and --

Page 19

1  A.  Okay.
2  Q.  -- probably 90 miles or so
3  around there, I guess.  Well, 60,
4  somewhere in there.  Not as far north as
5  Birmingham.  No further north than
6  Clanton.
7      How about your wife, does she
8  have any family in the area?
9  A.  Uh-huh.  Her mom and dad both
10  live there.
11  Q.  What's their names?
12  A.  Larry and Joyce Peterson.
13  Q.  Does she have any other
14  siblings?
15  A.  Her sister Rhonda Langford.  Her
16  husband is Jerry.
17  Q.  Do they have any children over
18  18?
19  A.  Two.
20  Q.  Okay.  What are their names?
21  A.  Cameron Langford and their
22  daughter Casey.  Lambert is her married
23  name.  She -- actually, Casey lives in

Page 20

1  Atlanta.  Cameron lives in Opelika.
2  Q.  Okay.  Does your wife have any
3  other siblings?
4  A.  Sister Lisa Whitman lives in
5  Notasulga.
6  Q.  Where is that?
7  A.  Between Auburn and Montgomery.
8  It's in Macon County, I believe, but --
9  Q.  Okay.  Is she married?
10  A.  No.
11  Q.  Any other siblings your wife
12  has?
13  A.  A sister, Jean Peterson.
14  Q.  Where does she live?
15  A.  She lives in Alex City.
16  Q.  Is she married?
17  A.  No.
18  Q.  Any children over 18?
19  A.  No.  Now, Lisa does have two
20  daughters that are over 18.
21  Q.  Does she?  Okay.  What are their
22  names, or where do they live, I guess
23  first?

5 (Pages 17 to 20)

## FREEDOM COURT REPORTING

Page 21

1    A.  Well, both live in Notasulga.
2    Q.  Okay.  What are their names, if
3  you remember?
4    A.  Kelly is -- Kelly Whitman and
5  Brittany Weldon.
6    Q.  All right.  Does your wife have
7  any other family in the area?
8    A.  Not in the area, no.
9    Q.  Do you go to church?
10    A.  (Witness nods head.)  Yes.
11    Q.  Where do you go?
12    A.  Calvary Heights Baptist.
13    Q.  Is that in Alex City?
14    A.  Yes.
15    Q.  Are you a member of any social
16  clubs or anything in Alex City?
17    A.  No.
18    Q.  Any hunting lodges or fishing
19  lodges or anything?
20    A.  No.  My brother and I, we've got
21  a farm in Coosa County, but --
22    Q.  Other than the lawsuit you filed
23  against Merchants Foodservice, have you

Page 22

1  filed any other lawsuits?
2    A.  No.
3    Q.  Have you ever been involved,
4  other than this one, in a lawsuit as a
5  witness or anything like that?
6    A.  No.
7    Q.  And I know you've got the
8  divorce.  I assume you went to court for
9  that.  But other than that, have you
10  ever been to court for anything?
11    A.  No.
12    Q.  Ever been called to a jury?
13    A.  I served on jury duty one time.
14    Q.  What kind of case was it?
15    A.  The case I actually got struck
16  for the jury on was a murder case.
17    Q.  Okay.  Any other time you've
18  been to court?
19    A.  Just traffic violations.
20    Q.  Traffic violations?
21    A.  Yeah.
22    Q.  Okay.  What type of traffic
23  violations?

Page 23

1    A.  I know one was speeding.  And, I
2  mean, all these were back 20, 25 years
3  ago.  I don't --
4    Q.  Ever been arrested?
5    A.  For a traffic violation, yes.
6    Q.  But other than the traffic?
7    A.  No.  No.  No.
8    Q.  Okay.  Have you ever filed
9  what's called a charge of discrimination
10  with the Equal Employment Opportunity
11  Commission?
12    A.  No.
13    Q.  Ever filed a workers' comp
14  claim?
15    A.  No.
16    Q.  So I take it you've never sought
17  Social Security disability or anything
18  like that?
19    A.  No.
20    Q.  Where did you go to high school?
21    A.  Benjamin Russell.
22    Q.  Where is that?
23    A.  There in Alex City.

Page 24

1    Q.  Have you pretty much lived in
2  Alex City all of your life?
3    A.  Other than the time I was at
4  school at Auburn, yeah.  I mean, I've
5  always been a full-time Alex City
6  resident, I guess.
7    Q.  What year did you graduate from
8  Benjamin Russell?
9    A.  1977.
10    Q.  Did you go to Auburn after you
11  graduated?
12    A.  No.  Actually, I went to the
13  junior college there in Alex City for
14  two years.
15    Q.  What junior college is that?
16    A.  Now it's called Central Alabama
17  Community College.  When I went, it was
18  Alexander City Junior College.
19    Q.  Did you get a degree from there?
20    A.  I think you call it an
21  associates or whatever, but --
22    Q.  Okay.  Was it in anything in
23  particular?

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.   No.
2    Q.   Where did you go after you got
3  that degree?
4    A.   When I left the junior college,
5  I went to Auburn.  That's when I went to
6  Auburn.
7    Q.   And the junior college was a
8  two-year program?
9    A.   Two-year.
10    Q.   Did you get a degree from
11  Auburn?
12    A.   No, I did not.
13    Q.   How long were you there?
14    A.   Two quarters.
15    Q.   Why did you leave?
16    A.   I broke my collarbone during
17  spring break and didn't go to school
18  that quarter because of just being
19  incapacitated and --
20    Q.   Just didn't go back?
21    A.   Just didn't go back.
22    Q.   Okay.  Any other schooling?
23    A.   Actually, ten years later, I

Page 26

1  enrolled at Faulkner in Montgomery and
2  actually have my bachelor's degree from
3  Faulkner.
4    Q.   How long did that take?
5    A.   I think it was -- and, there
6  again, I'm going to say a year.
7    Q.   Okay.  Is it in a particular
8  area, the bachelor's degree?
9    A.   It's business administration, is
10  what my degree or diploma says.
11    Q.   Any other type of any other
12  schooling?
13    A.   No.
14    Q.   Have you had any other type of
15  training or anything?  And I assume you
16  probably did with jobs that you were
17  hired into --
18    A.   Yeah.
19    Q.   -- you got some training.  But
20  anything outside --
21    A.   Nothing as far as formal
22  education, no.
23    Q.   And I guess talking about

Page 27

1  on-the-job training, let's kind of work
2  through your employment history.  When
3  you got out of school, when you left
4  Auburn, did you go to work after that?
5    A.   Yes, I did.  I worked at Russell
6  Corporation.
7    Q.   What did you do at Russell?
8    A.   I don't remember the order in --
9  the chronological order.  But, I mean,
10  I've knitted there.  I worked in screen
11  printing.  Worked in the trim department
12  and --
13    Q.   Were you ever a supervisor --
14    A.   No.
15    Q.   -- at Russell?
16    A.   No.
17    Q.   How long did you work there?
18    A.   I guess until 1984 is when I
19  went in the car business, so --
20       (Interruption.)
21    Q.   (BY MR. DYKES:)  What made you
22  decide to leave Russell and go into the
23  car business?

Page 28

1    A.   The owner of the Ford dealership
2  was a good friend of mine and just made
3  it sound like something I'd want to do.
4    Q.   Was it better pay?
5    A.   I made more money there, yes.
6    Q.   What did you do at the Ford
7  dealership?
8    A.   New and used car sales.
9    Q.   Do you have a schedule that you
10  worked?
11    A.   We worked some form of Monday
12  through Friday and then a half a day on
13  Saturday.
14    Q.   Were you ever a supervisor
15  there?
16    A.   No.
17    Q.   Did you notice if the
18  supervisors worked more than the
19  salesmen?
20    A.   They didn't.
21    Q.   Where did you go from the Ford
22  dealership?
23    A.   I went to work for Everett

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1   Meadows Construction.
2   Q.  Why did you leave and go to
3   Everett Meadows?
4   A.  Just it got to where I could no
5   longer make a living in the car
6   business.
7   Q.  Why was that?
8   A.  I wasn't selling any cars.
9   Q.  Did you leave voluntarily, or
10  were you asked to leave?
11  A.  Yes -- no.  They asked me --
12  tried to get me to stay and offered to
13  change my pay structure, but I'd already
14  committed to take this other job.
15  Q.  When you were having trouble
16  selling cars, did you try to work longer
17  hours or anything to help with that?
18  A.  I don't understand your
19  question.
20  Q.  Well, did you try to be in the
21  store more in hopes of selling more
22  cars?
23  A.  Well, the dealership had certain

Page 30

1   hours they were open and that's the
2   hours I worked.
3   Q.  Okay.  So you tried to be there
4   when the dealership was open to help
5   sell cars?
6   A.  Yes, I guess, to answer your
7   question.
8   Q.  At Everett Meadows, did you just
9   work as a carpenter?
10  A.  Uh-huh.
11  Q.  Okay.  Were you ever a
12  supervisor there?
13  A.  No.
14  Q.  Why did you leave Everett
15  Meadows?
16  A.  I was offered the job at Alex
17  City Provision Company.
18  Q.  What type of company is that?
19  A.  They are a wholesale food
20  distributor.
21  Q.  How does what they do compare to
22  what Merchants Foodservice does?
23  A.  In essence, I guess they're the

Page 31

1   same.  They, you know, warehouse
2   groceries during the day and select them
3   and ship them at night, so --
4   Q.  Did you say you went in as an
5   operations manager for them?
6   A.  No, I did not.
7   Q.  What job did you go into there
8   as?
9   A.  I actually started -- they hired
10  me to be -- I'm going to call it a
11  relief salesperson --
12  Q.  Okay.
13  A.  -- to learn the vacation routes
14  of the various salespeople, so when they
15  were off or whatever, I could fill in
16  and run those routes.  And the other
17  part of my time, I spent as a buyer
18  buying the retail grocery items and
19  candy and tobacco.
20  Q.  Kind of walk me through your
21  progression there, in terms of what job
22  you went to next and so on.
23  A.  Within that company?

Page 32

1   Q.  Yeah.
2   A.  Just in that position till -- I
3   think they hired me with -- in mind of
4   me working my way into sales full-time
5   and that didn't transpire.  So when I
6   wasn't needed in the relief role of
7   sales, I actually worked in the
8   warehouse along with the operations
9   manager and just learning how the
10  warehouse works and that type stuff.
11  And the operations manager actually had
12  a heart attack in -- somewhere there, I
13  think -- don't recall the year.  But he
14  was out of work for a long period of
15  time.  He had open heart surgery.  When
16  he returned, he needed to be on
17  limited/light duty, so we just more or
18  less did a role reversal.  He became me
19  and I became him.
20  Q.  When did you become the
21  operations manager there?  Do you know a
22  date or time frame?
23  A.  When he returned to work is --

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 33

1 and was given his limited ability or
2 what he could do because of his
3 condition, when that happened or time
4 frame on it as far as pinning it down, I
5 can't.
6     Q.   Do you know how long you worked
7 as an operations manager there?
8     A.   Probably three-plus years.
9     Q.   As the operations manager there,
10 who did you report to?
11     A.   The owner of the company.
12     Q.   So it was the owner and then it
13 was the ops manager.  Was there any
14 other type of manager there that was
15 higher than you or the same level as
16 you?
17     A.   Same level as me would have been
18 the sales manager who was over sales.
19     Q.   Okay.  What did you do as the
20 operations manager?
21     A.   Responsible for the day shift
22 operations, the night shift operations,
23 and transportation.

Page 34

1     Q.   As the ops manager, did you have
2 a set schedule that you worked?
3     A.   The last couple of years I
4 worked there, I did.  It was sort of --
5 when I first took over, it was sort of
6 as-needed.
7     Q.   What was the name of the owner?
8     A.   Hugh Nabors.
9     Q.   And who was the sales manager?
10     A.   Wayne Fuller, and then he was
11 followed up by John Spain.  John was the
12 sales manager when I left.
13     Q.   Okay.  You said the last couple
14 of years you had more of a set schedule.
15 Before that, you said it was kind of all
16 over the place?
17     A.   Uh-huh.
18     Q.   What do you mean by that?
19     A.   The warehouse didn't run as
20 smooth then as I would like.  It had
21 some problems, some issues, and I would
22 work when I needed to, you know, as far
23 as I've come in to help finish the

Page 35

1 morning shift, I've helped start the
2 night shift, and just in between.
3     Q.   As the operations manager, were
4 you kind of responsible to make sure
5 things got done?
6     A.   Well, actually, I had
7 supervisors who were responsible, but I
8 was ultimately -- the ultimate
9 responsible person, yes.
10     Q.   Did you work nights during that
11 time period?
12     A.   I did.
13     Q.   Did you work any Saturdays?
14     A.   Maybe once or -- one or two
15 Saturdays in a five-year period.  We
16 just didn't open on Saturdays. '
17     Q.   As the operations manager there,
18 if you were getting ready to go and
19 there was a problem that needed to be
20 fixed, would you stay to help fix the
21 problem or would you leave?
22     A.   When that happened, I would
23 stay.

Page 36

1     Q.   Is that something you think is
2 expected of an operations manager?
3     A.   Well, I'm going to say he should
4 have it running where he doesn't have
5 those problems come up.  But on given
6 limited times, then, yes, if it happened
7 every now and then, he should stay.  But
8 if it's happening more than
9 occasionally, he's got something wrong
10 with the way he's running the place or
11 there's something wrong with the way the
12 place is being run.
13     Q.   So let's say it's happening more
14 than occasionally, what would you -- I
15 mean, what do you think, as operations
16 manager, should be done to fix it?
17     A.   I guess find out what the --
18 what the problem is and address that.
19 And if you fix the problem, the problem
20 will go away.
21     Q.   And trying to fix the problem,
22 could that require more work for the
23 operations manager?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

1    A.  Yes, it could.
2    Q.  Would it be surprising if it
3  required more work to try to fix the
4  problem that was there in the
5  operations?
6    A.  I guess I want to say something
7  here that I --
8        MR. BLYTHE:  Go ahead and say
9  what you want to say.
10   A.  I mean, I see where you're
11  heading me or trying to point me.  My
12  whole point here is that I had no idea
13  the place was in the mess it was in when
14  I went to work there.  That's not what I
15  was told.  Had I known it was in a mess,
16  I wouldn't have been the one there
17  trying to fix it.
18   Q.  Okay.  And --
19   A.  So --
20   Q.  And I understand that.  But if
21  you're working as the operations manager
22  and there's a problem, it would be your
23  job as operations manager to try to fix

1  it?
2    A.  Yes.
3    Q.  When you were not the operations
4  manager at Alex City Provision, did
5  your -- did the operations manager who
6  had the heart attack, when there were
7  problems, would he stay and fix them?
8    A.  He or myself, one, would, yes.
9    Q.  And what was the name of the
10  previous operations manager there?
11   A.  His name was Austin Roberson.
12   Q.  As operations manager there --
13  and I'm still talking about at Alex City
14  Provision -- did things always run as
15  smoothly as you anticipated?
16   A.  At what -- are you talking about
17  the entire time there?
18   Q.  When you were the operations
19  manager.
20   A.  At the beginning, no.  Like I
21  said, the last couple of years, they ran
22  real smooth.
23   Q.  Was there ever any turnover

1  among your employees?
2    A.  Yes.
3    Q.  Did you ever lose any managers
4  or any supervisors while you worked
5  there?
6    A.  Not while I was employed there,
7  no.  I've had one guy that was my day
8  shift manager there.  George Bluestill
9  is still there.  And the night manager,
10  Mark Lightsey -- well, actually, he
11  replaced George, who died.  But the last
12  time I was by there, Mark was still
13  working there and they were there the
14  whole time I was operations manager.
15   Q.  Were you paid a salary there?
16   A.  I was.
17   Q.  Did you get the same salary no
18  matter how many hours you worked?
19   A.  I did.
20   Q.  How did your vacation work
21  there?
22   A.  After you'd been there a year,
23  you got a week.  I think it was two

1  weeks after two years, and then three
2  after ten.
3    Q.  Could you always take vacation
4  when you wanted to?
5    A.  I was never denied a request,
6  no.
7    Q.  Did y'all have an employee
8  handbook at the facility?
9    A.  Alex City Provision?
10   Q.  Uh-huh.
11   A.  We did.
12   Q.  Okay.  Was it your understanding
13  that the policies in the employee
14  handbook were the policies that applied
15  to the employees?
16   A.  Yes.  I mean, they're there as a
17  guideline.  I mean, you can -- I guess
18  some human element factors in, in
19  certain circumstances.  But by and
20  large, they're there for that purpose,
21  yeah.
22   Q.  Okay.  Was the owner of the
23  facility a hands-on owner, or was he

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 41

1  somebody who was hands off?
2  A. I don't understand your question
3  the way it's posed. I mean, he was at
4  work every day, yes.
5  Q. Okay. That's what I'm just --
6  do you know what type of hours he
7  worked?
8  A. I don't.
9  Q. Did you have any type of an
10 incentive program?
11 A. At Alex City Provision?
12 Q. At Alex City Provision.
13 A. No, I did not.
14 Q. So did you make your salary and
15 then was there any possibility of
16 getting more pay per year than what your
17 annual salary was going to be?
18 A. No.
19 Q. Where did you go to work after
20 Alex City Provision?
21 A. SYSCO Foods.
22 Q. Is it still known as Alex City
23 Provision?

Page 42

1  A. No. Actually, it's -- they
2  changed the name. It's Alabama Food
3  Group now.
4  Q. Was that while you were working
5  there or --
6  A. No. It was after I left.
7  Q. Okay. What job did you go to
8  SYSCO as?
9  A. Day shift supervisor.
10 Q. Supervisor? Okay.
11    Why did you leave Alex City
12 Provision?
13 A. SYSCO announced they were going
14 to build a facility in Alabama. I guess
15 anybody in the food service business --
16 or that's what I thought at that time.
17 You know, you see SYSCO in every trade
18 publication, blah-blah-blah. I just,
19 exploratory more than anything, started
20 the process of trying to find out how to
21 go to work for them. Then when I
22 learned more about the benefits, which
23 far outweighed what I had at Alex City

Page 43

1  Provision, the starting pay, as a
2  supervisor, was several thousand dollars
3  more than what I was making as the ops
4  manager at Alex City Provision. So just
5  salary and benefits I guess, you know,
6  what that provided me to be able to do.
7  Q. Where was the SYSCO plant built?
8  A. Where?
9  Q. Yes.
10 A. Calera.
11 Q. How close is that to Alex City?
12 A. 62 miles.
13 Q. How long did it take you to get
14 there?
15 A. On a good day, a little less
16 than an hour. On a bad day, an hour and
17 five minutes.
18 Q. Did SYSCO make you a formal
19 offer to come work for them?
20 A. Yes, they did.
21 Q. What was it? Do you remember
22 what that was?
23 A. As far as --

Page 44

1  Q. What the amount was of the
2  offer? What your pay was going to be?
3  A. My salary was -- to start was
4  $40,000 a year.
5  Q. Was there going to be an
6  incentive program there?
7  A. There was.
8  Q. How did that work?
9  A. They would set forth a certain
10 criteria at the beginning of each fiscal
11 year. And depending, you know, it was
12 six to eight categories that you could
13 excel in and there were certain levels
14 within those categories that you
15 achieved a certain percentage. And
16 whatever percentage you got, that was --
17 times your salary was your bonus.
18 Q. Did Alex City Provision make a
19 counteroffer to you or do anything to
20 try to get you to stay?
21 A. He asked me -- Hugh, when I met
22 with him to tell him that I was leaving,
23 he offered to do whatever it would take

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 45

1  to keep me.
2      Q.  What did you tell him?
3      A.  That I'd already committed to
4  Eddie O'Connor that I would take the
5  job.
6      Q.  What's the job title of Eddie
7  O'Connor?
8      A.  When I first went to work for
9  him, he was director of operations and
10  during the interim a year or so later,
11  he was named vice president of
12  operations.
13      Q.  I want to go back to the bonus
14  program there at SYSCO.  What was the
15  maximum percent bonus you could earn at
16  SYSCO?
17      A.  I don't remember exactly the
18  formula for what it was.  The last year
19  I was there, my bonus was almost
20  $10,000, so you can equate that to an
21  annual salary of -- I made $992 a week,
22  so it was almost 52,000 a year and my
23  bonus was 10, so whatever that

Page 46

1  formula -- that works out to be.
2      Q.  Was that the largest bonus you
3  got while you worked there?
4      A.  It was.
5      Q.  How did the 10,000 compare --
6  and I know it was your largest.  But, I
7  mean, was it significantly larger than
8  you other bonuses or --
9      A.  To the best of my recollection,
10  I have had as small a bonus as 4,200 and
11  then I've had some that were 5 and
12  7,000.
13      Q.  Kind of depended on how the
14  operations were?
15      A.  How my numbers were, yeah.
16      Q.  In your job as day shift
17  supervisor at SYSCO, tell me what you
18  did.
19      A.  On day shift, we actually --
20  that's when all the inbound freight came
21  in.  We did receiving, is what it's
22  called.  And we would actually unload
23  the trucks, palletize the merchandise to

Page 47

1  the tie and high, which is so many per
2  layer, so many high, so it would fit in
3  the correct slot.  And then do the
4  put-aways, which is actually putting the
5  merchandise into the warehouse.  And
6  once they scan the pallet complete,
7  that's what entered it into your
8  inventory.  And then we also did
9  letdowns or replenishments, which is
10  preparing the warehouse for the night
11  shift to start their selection process
12  so they've got full slots to start
13  selecting on when they came in.
14      Q.  Were you in that job the whole
15  time you worked at SYSCO?
16      A.  I was.
17      Q.  What were the day shift hours?
18      A.  A normal day -- we started every
19  morning at 6:00.  I tried to arrive 15
20  minutes early just so I could go ahead
21  and do the letdowns for the day, which
22  involved signing on the computer and
23  just going to a program and printing off

Page 48

1  the slots that were empty that could be
2  full.  The crew would show up at 6:00
3  and we'd have a brief two to five
4  minutes -- a little preshift meeting,
5  then the shift would go to work.
6      Q.  Okay.  What was the typical
7  shift?
8      A.  We tried to control our inbound
9  freight and we knew a certain number of
10  pallets, if everything showed up on
11  time, what we could do.  But we tried to
12  keep our overtime to a minimum.  So, you
13  know, we scheduled our day where
14  typically the crew was gone by 2:30 in
15  the afternoon, 2:45.
16      Q.  How big a crew did you have?
17      A.  On the dry side, there were
18  three and six.  We started out -- when
19  we started, we had six receivers and 12
20  lift operators.  When I left, we were --
21  just because the people had learned
22  their job, blah-blah-blah, whatever, and
23  we could handle more freight and do it

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 49

1  with less people, I think I had five
2  receivers and ten full-time lift
3  operators.
4      Of course, we had a recoup
5  person that would take care of that
6  damage we had. Had an inbound scheduler
7  and a will-call person who actually took
8  care of the phone-in orders for
9  customers that wanted to come pick a
10 case of this or that up through
11 will-call, so --
12     Q.  Okay.
13     A.  -- probably 15, 16 people.
14     Q.  Okay.  At the Alex City
15 Provision, how many folks were you in
16 charge of?
17     A.  12.  No, don't -- let me add up.
18 I'm trying to think.  12 and eight is
19 20.  Probably 28 to 35, something like
20 that.  Then that's just strictly a
21 guess.
22     Q.  Size-wise, how did Alex City
23 Provision compare to Merchants

Page 50

1  Foodservice?
2      A.  Alex City Provision was
3  probably -- probably did -- and this is
4  a guess.
5      Q.  Right, I understand that.
6      A.  From the time I left till I went
7  to Merchants, a lot transpired in there,
8  but --
9      Q.  Well, just while you were
10 working at Alex City Provision, how did
11 it compare numbers-wise to when you
12 started at Merchants Foodservice?
13     A.  They probably did 35 to 40
14 percent of the business that Merchants
15 did.
16     Q.  Did that mean that there were
17 more trucks coming and going at
18 Merchants than there were at Alex City
19 while you were there?
20     A.  Yes.
21     Q.  Were there more people working
22 at Merchants Foodservice than there were
23 at Alex City Provision while you were

Page 51

1  there?
2      A.  Yes.
3      Q.  Who did you report to as day
4  shift supervisor at SYSCO?
5      A.  My direct report was Kenny
6  Bowman.
7      Q.  What was his job title?
8      A.  He was day shift manager.
9      Q.  And who did Kenny report to?
10     A.  His direct report would have
11 been Doug Vertein.
12     Q.  Do you know how to spell that?
13     A.  V-E-R-T-E-I-N.
14     Q.  What was his job?
15     A.  He was the operations manager.
16     Q.  What type of schedule did Kenny
17 Bowman work?
18     A.  Kenny normally got there
19 probably around 7:00 and then left after
20 me in the afternoon.
21     Q.  How about Doug Vertein?
22     A.  Doug was 8:00 to 5:00.
23     Q.  How do you know he was 8:00 to

Page 52

1  5:00?
2      A.  That's what he always said.  He
3  couldn't wait on 5:00 to get there where
4  he could leave, so --
5      Q.  Who did Doug report to?
6      A.  He reported to Eddie O'Connor.
7      Q.  Who was the VP of ops?
8      A.  Uh-huh.
9      Q.  Do you know if Doug Vertein's
10 schedule changed depending on what was
11 going on at work?
12     A.  I can't -- I mean, to my
13 knowledge, no.  I mean, if -- I'm not
14 saying that that was his schedule,
15 verbatim, the whole time I was there.
16 It could have deviated from time to
17 time.  But that was pretty much
18 predominantly his schedule.
19     Q.  But you left, most days, a
20 couple of hours before he would leave?
21     A.  Exactly.
22     Q.  So, typically, you weren't there
23 when he left?

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 53

1 　A. No.
2 　Q. Okay. So the way you know or
3 have knowledge of when he left is just
4 from him saying he was 8:00 to 5:00?
5 　A. Right.
6 　Q. Was SYSCO open on weekends?
7 　A. We're closed on Saturday. Now,
8 we actually had a crew that would come
9 in on Sunday and work from 8:00 to 12:00
10 on Sunday to do fresh chicken and
11 produce so we'd have fresh product to go
12 out of the warehouse Monday morning.
13 　Q. Did you ever work on Sundays?
14 　A. I have, yes.
15 　Q. As a daytime manager, I assume
16 you probably didn't work nights at
17 SYSCO.
18 　A. The only nights I worked at
19 SYSCO were -- I think two different
20 years, we did a role reversal, so to
21 speak, where I would trade places with
22 one of the night shift supervisors and
23 work.

Page 54

1 　Q. Okay.
2 　A. And he would work days.
3 　Q. Was there ever any turnover
4 amongst the folks on your day shift at
5 SYSCO?
6 　A. During the course of my time
7 there, there were a few that left.
8 　Q. How many, do you think, left?
9 　A. Just a guess?
10 　Q. Yeah.
11 　A. While I was there, I would say
12 on day shift, probably less than six.
13 　Q. How about night shift, do you
14 know what kind of turnover they had?
15 　A. I don't. I know they would talk
16 about in meetings that our night shift
17 turnover rate was lower than it had --
18 you know, than any other SYSCO house,
19 comparatively speaking. But to put a
20 number on it, I can't. I mean, I've
21 still got friends that work at SYSCO
22 that were forklift operators for me from
23 the very beginning of -- you know, of

Page 55

1 the house there that are still there
2 driving forklifts and still receiving.
3 I mean, probably three-fourths of the
4 crew that I started with is still there.
5 　Q. On the day shift?
6 　A. On the day shift.
7 　Q. Okay. But you weren't
8 responsible for night shift?
9 　A. No.
10 　Q. So you don't personally know
11 what type of turnover there was at
12 night?
13 　A. No, I don't.
14 　Q. Do you know what type of
15 turnover there was among the drivers?
16 　A. No idea. There again, like the
17 ones I knew, the drivers that actually
18 worked out of there, not shuttle
19 drivers, the same faces were there and
20 still are today, you know. So I'm
21 assuming it's relatively low because the
22 same ones that were there when I started
23 were there when I left.

Page 56

1 　Q. Right. But, again, you weren't
2 there so you weren't over
3 transportation?
4 　A. No. No, sir.
5 　Q. At SYSCO, were you paid a
6 salary?
7 　A. I was.
8 　Q. Do you get the same salary every
9 paycheck?
10 　A. Until July the 1st when we got
11 our raise, yeah, my salary was the same.
12 　Q. Be no matter how many hours you
13 worked, you got the same salary?
14 　A. Right. And that's -- I knew
15 that going in, so --
16 　Q. Okay. So if you went on those
17 days you went in on a Sunday, that
18 didn't affect your salary?
19 　A. Well, it didn't. But I'd get a
20 day off the next week for that.
21 　Q. Do you always get a day off the
22 next week?
23 　A. Yes. They actually had it where

14 (Pages 53 to 56)

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 57

1  we would take the following Friday
2  because we gave up a day of our weekend.
3  The week we worked, they gave it to us
4  the following Friday to extend that
5  weekend to make up for it.
6      Q.  Do you know how many Sundays the
7  operations manager worked?
8      A.  None.
9      Q.  Never worked any?
10     A.  Not that I'm aware of.
11     Q.  If he worked a Sunday that you
12  weren't there, you wouldn't know if he
13  was there?
14     A.  I wouldn't know it.
15        MR. BLYTHE:  Is this a good
16  place to take a break?
17        MR. DYKES:  Yeah.  We can take a
18  break.  That's fine.
19        (A break was taken.)
20     Q.  (BY MR. DYKES:)  As the day
21  shift operator or day shift manager at
22  SYSCO, if there were problems that
23  happened on your shift, would you have

Page 58

1  to stay late to fix those?
2      A.  When we -- when we had problems,
3  we fixed them, yes.  I mean, you didn't
4  leave stuff unattended, so --
5      Q.  Do you know, was it the same way
6  for the ops manager?  If there were
7  problems, he would be responsible for
8  staying until they got fixed?
9      A.  Now, any responsible [sic] that
10  I had to stay for always happened within
11  the scope of his regular scheduled time
12  anyway.  I mean, it wasn't like I was
13  there after 5:00 putting fires out or
14  anything like that.  So I don't know.
15     Q.  But you typically left at 3:00,
16  so if a problem came up and you needed
17  to fix it, you might have to stay till
18  4:00?
19     A.  Yeah.
20     Q.  Okay.  And with the ops manager,
21  I know you weren't there when he left,
22  but would you have been surprised if a
23  problem came up at 5:00, if he might

Page 59

1  have to stay till 6:00 or later to fix a
2  problem?
3      A.  I -- no, I guess not.  I mean,
4  you're speaking in the hypothetical, I
5  guess, but --
6      Q.  It's not something that would --
7  if you're an operations manager of a
8  facility and there's a problem that
9  needs to be fixed, as operations
10  manager, you would want to make sure you
11  stayed to get it fixed?
12     A.  I would want it fixed, yes.
13     Q.  Yeah.  Okay.  Even if that meant
14  you're staying a little longer than you
15  had anticipated?
16     A.  Yes.
17     Q.  The Alex City Provision, was
18  that family owned?
19     A.  It was.
20     Q.  How did you like working for a
21  family-owned company?
22     A.  Hugh was always good to me as
23  far as -- you know, I didn't have a

Page 60

1  problem working for a family-owned
2  company, I guess, to answer your
3  question.
4      Q.  Was it a difference working for
5  SYSCO than Alex City Provision in that
6  SYSCO was not a family-owned company?
7      A.  I don't know that the ownership
8  made it any different.  I mean, you do
9  the same things regardless of who owns
10  it.
11     Q.  How did you like working for a
12  more corporate structure?
13     A.  I really enjoyed working for
14  SYSCO, so I never looked at them as a
15  corporate structure.
16     Q.  Did you tell folks at Merchants
17  Foodservice in your interview that you
18  really didn't like working for a
19  corporate structure and missed the
20  family-owned business at Alex City
21  Provision?
22     A.  No, I did not.
23     Q.  Have we talked about all of your

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 61

1 jobs up until the time that you went to
2 work at Merchants Foodservice?
3    A.  Yes, sir.
4    Q.  I'm going to mark as Defendant's
5 Exhibit 1 a notice of deposition.
6        (Defendant's Exhibit No. 1 was
7        marked for identification and
8        is attached.)
9    Q.  Have you seen that, Mr. Adams?
10    A.  I saw several things that looked
11 like this.  But as far as the heading of
12 this, I mean --
13    Q.  And I understand.
14    A.  To definitively say I have, I
15 can't because, I mean, Derrick forwarded
16 me everything and I've looked it over,
17 but --
18    Q.  And your attorney gave me
19 discovery responses this morning and had
20 faxed them to me last night that had
21 documents attached to them.  Other than
22 those documents, do you have -- and I
23 don't want to know anything that you've

Page 62

1 given to your attorney or that your
2 attorney's asked you to do.  But other
3 than those documents, have you got any
4 other documents that you believe support
5 your claims in this case?
6    A.  No, I don't.
7    Q.  Other than those documents that
8 your attorney has given me, have you got
9 any other documents related to your
10 employment at Merchants Foodservice?
11    A.  Not that I -- if -- something
12 may be stuck in a drawer somewhere, but
13 I don't know that it's privy to this
14 matter.  But to the best of my
15 knowledge, no.
16    Q.  Have you got any tape
17 recordings --
18    A.  No.
19    Q.  -- of conversations?  Any videos
20 of anything?
21    A.  No.
22    Q.  I know a lot of times I've got a
23 calendar that I jot stuff down on and

Page 63

1 keep notes on.  Do you have a calendar
2 or anything where you took notes about
3 conversations or things that happened at
4 Merchants Foodservice?
5    A.  Not in my possession anymore,
6 no.
7    Q.  Okay.  Is that something that
8 you gave to your attorney or something
9 that would still be at Merchants
10 Foodservice, or you just don't know?
11    A.  It is something that over time
12 as I began to seek legal advice, that I
13 put everything in one wad, so to speak.
14 And as I got it on my computer, what to
15 me was little tears and scrabbles of
16 paper, you know, once I had it in place,
17 that's -- I don't have them anymore.
18    Q.  I'm going to mark as Defendant's
19 Exhibit 2 a document that your attorney
20 sent me.  Is that something you prepared
21 on your computer, or is that what you're
22 talking about that you put everything
23 together in one spot?

Page 64

1        (Defendant's Exhibit No. 2 was
2        marked for identification and
3        is attached.)
4    A.  If this is the exact copy of
5 what I gave Derrick, then, yes, it is.
6    Q.  Okay.
7    A.  I mean, I'm not reading the
8 whole document.  But it looks exactly
9 like what I handed him, yes.
10    Q.  Okay.  And it's my understanding
11 that this is what was on your computer?
12    A.  Right.
13        MR. DYKES:  Is that --
14        MR. BLYTHE:  It is.
15        MR. DYKES:  Okay.
16    Q.  (BY MR. DYKES:)  So other than
17 what's in here would contain any other
18 writings or notes or anything else that
19 you would have kept, is all going to be
20 right in this document --
21    A.  Exactly.  Correct.
22    Q.  -- in Defendant's Exhibit 2?
23        Okay.  And we'll come back to

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 65

1 this because it -- well, let me ask you
2 this: Does this pretty much summarize
3 your allegations against Merchants
4 Foodservice in terms of what you were
5 told?
6    A.  That's it in a nutshell.
7    Q.  Okay.  I'm going to mark as
8 Defendant's Exhibit 3 a Social Security
9 statement that was provided to me
10 yesterday afternoon.
11        (Defendant's Exhibit No. 3 was
12         marked for identification and
13         is attached.)
14    Q.  How do you believe that that
15 supports your claims or is related to
16 the lawsuit?
17    A.  I was just -- the interrogatory
18 or ever how you say that, wanted my W-2s
19 or -- that's just pretty much here.
20    Q.  Okay.
21    A.  What my salary -- I guess just
22 to --
23    Q.  Is that the same information --

Page 66

1 and I've got your W-2s and the SYSCO
2 pay.  Is that the same reason you gave
3 those because it shows salary
4 information?  And you can look at that.
5    A.  Well, salary information, yeah.
6 This is just -- you can see that this
7 was for two days' vacation.  This was my
8 last check there and this is just --
9    Q.  And I'm going to mark -- not to
10 interrupt, but I'm going to mark as
11 Defendant's Exhibit 4 --
12    A.  Okay.
13    Q.  -- an earnings statement from
14 SYSCO, which is what we're talking
15 about.
16        (Defendant's Exhibit No. 4 was
17         marked for identification and
18         is attached.)
19    A.  Right.  And that shows my bonus
20 being the 10,531.50 rather than -- I
21 said around 10, but --
22    Q.  Okay.  And I'm going to mark as
23 Defendant's Exhibit 5 the W-2s from

Page 67

1 2006, 2005, 2004, and 2003.
2        (Defendant's Exhibit No. 5 was
3         marked for identification and
4         is attached.)
5    Q.  Those were provided in response
6 to our request for W-2 information?
7    A.  Correct.
8    Q.  Okay.  I want to talk now about
9 going to work for Merchants Foodservice.
10 How did that -- walk me through that
11 process.  What happened?
12    A.  As in?
13    Q.  Well, I mean, were you looking
14 for a job at Merchants Foodservice?
15    A.  No, I was not.
16    Q.  How were you contacted?
17    A.  By a company by the name of
18 Freedom Search out of Florida, I
19 believe.
20    Q.  Tell me what happened there.
21    A.  Just I was sitting at my desk
22 one day and the phone rang and the guy
23 identified -- told me his name, who he

Page 68

1 worked for, and that he wanted to know
2 if I'd be interested in going to work
3 for a local food company.  And I -- best
4 of my knowledge, my first question was
5 who is it, and he wouldn't tell me who
6 it was.  It was just for someone within
7 a 50-mile radius, blah-blah-blah.  And,
8 you know, I said, well, what does it
9 pay.  And he said, well, they haven't
10 quite determined that.  But he said -- I
11 think he said, I'm thinking it's going
12 to be around 60 or 65,000.  And I said,
13 well, if it's going to pay that, then I
14 would be interested, you know, in
15 talking to them.  And he said, well,
16 he'd get back to me.
17        And he called back a few days
18 later and wanted to know if I was still
19 interested and I said, "Well, what else
20 can you tell me.  And he said, "Well,
21 I'd like to set up an interview for
22 you."  And I don't -- I think that's
23 when I found out it was Merchants.  And,

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

Page 69

1 of course, I had driven by Merchants. I
2 had seen them -- I used to go to a
3 periodontist in Montgomery, so I'd drive
4 right by there from SYSCO to my dentist
5 in Montgomery. And that's when the
6 interview was set up.
7    Q. How long after your
8 conversations was the interview going to
9 be?
10    A. I want to say 10 to 12 days, but
11 that's strictly a guess. I have no
12 clue.
13    Q. Other than this company who
14 called, have you gotten any other calls
15 from somebody asking you to go to
16 another food distributor company?
17    A. No.
18    Q. Who was the interview going to
19 be with?
20    A. It was originally scheduled to
21 be with Hal Henson, Andy Mercier, and
22 Mr. Suber.
23    Q. What was Hal Henson's job title?

Page 70

1    A. Either general manager or branch
2 manager.
3    Q. And what was your understanding
4 of Andy's?
5    A. At the time, Andy was the vice
6 president.
7    Q. Okay. And Don Suber's?
8    A. Was the president of the
9 company.
10    Q. You said the interview was going
11 to be with them. What happened?
12    A. Well, I -- on the day the
13 interview was scheduled, I showed up
14 about 7:45. The interview was supposed
15 to be at 8:00. Hal actually walked out
16 to his car to get something out and, I
17 guess, saw me sitting out there. He
18 walked over there and asked me if I was
19 Steve. I told him, yes, I was. He
20 said, "Well, come on, there's no need to
21 sit out here. Come on inside." So I
22 did. And he told me that Andy and
23 Mr. Suber weren't going to be available

Page 71

1 that day; that he was going to conduct
2 the interview. And, you know, if things
3 went further or they needed to see me,
4 that they would see me at a later date
5 and time.
6    Q. Prior to going to the interview,
7 did you do any research on Merchants
8 Foodservice?
9    A. Looked them up on the Internet,
10 just found out they had been in business
11 for, I think, almost 100 years, that
12 they had started in Mississippi and, you
13 know, from a small up to a top 20 at the
14 time, I think, distributor in the United
15 States.
16    Q. Okay.
17    A. Just some background stuff.
18    Q. Did you know anybody who had
19 worked there?
20    A. No, I did not.
21    Q. So tell me what happened after
22 Hal told you that Andy and Don weren't
23 going to be there.

Page 72

1    A. He said he was going to go on
2 and do the interview and if need be or
3 it progressed far enough, that -- or
4 they needed to see me at some later date
5 and time, then they would arrange that
6 then.
7    Q. Okay. What happened after --
8 what happened next?
9    A. We did the interview. And do
10 you want specifics on that?
11    Q. Yeah. Tell me what happened in
12 the interview.
13    A. Okay. On his end, you know, he
14 asked general questions as far as
15 background, where I'd worked, where I
16 worked now. You know, he asked me to
17 explain some of the stuff we did at
18 SYSCO, how I handled certain situations.
19 Seems like he may have even had a
20 hypothetical, you know, how would you
21 handle this. And, you know, I explained
22 to him that SYSCO had actually -- and I
23 was a small cog in this wheel and not

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1 anything monstrous or big. But that we
2 had been awarded the Hall of Fame Award,
3 which is top recognition in all of 72,
4 at the time, SYSCO houses.
5 And, you know, I explained to
6 him how we did stuff on day shift and as
7 far as doing letdowns and preparing the
8 warehouse for night shift when they came
9 in. And, you know, he was just amazed
10 at this and seemed impressed because
11 that was not the way they were doing
12 things at Merchants. And, basically, he
13 got -- when we finished that, you know,
14 it got to the part did I have any
15 questions, and I did.
16 **Q. In talking about your experience**
17 **at SYSCO, did you let him know that you**
18 **weren't in charge of transportation?**
19 A. Yes.
20 **Q. You let him know that you**
21 **weren't in charge of nights?**
22 A. Yes.
23 **Q. What did you tell him about your**

Page 74

1 experience and ability to do the job as
2 an operations manager?
3 A. I'm not sure I follow you.
4 **Q. Well, just in terms of what --**
5 **I'm sure he asked you what your**
6 **background was and why you thought you**
7 **could be an operations manager for him.**
8 A. At Alex City Provision, I had
9 been the operations manager and I had
10 been involved in day shift, night shift,
11 and transportation. From SYSCO's point
12 of view or what I held at SYSCO, I was
13 strictly a day shift supervisor. But I
14 had the background or the experience
15 from Alex City Provision, my previous
16 job with SYSCO, of being an operations
17 manager.
18 **Q. Was Merchants Foodservice closer**
19 **to Alex City?**
20 A. Closer mile-wise. Time-wise, it
21 was almost identical because from Alex
22 City to Clanton, 22 is an awful ride.
23 Just -- it's just curvy and hilly and

Page 75

1 two-lane road the whole way, so --
2 **Q. All right. Well, let's talk**
3 **about the questions that you had for**
4 **Hal.**
5 A. Uh-huh.
6 **Q. What were those?**
7 A. The first one had to deal with
8 just what hours, you know, I would be
9 expected to work and Hal pretty much
10 answered that question with a question.
11 You know, "Well, tell me what you do at
12 SYSCO." And I explained to him that,
13 you know, the crew came at 5:45 -- I
14 mean, I came at 5:45, the crew at 6:00,
15 they normally finished at 2:30, 2:45,
16 and I was out the door shortly'
17 thereafter at 3:00. And he was like,
18 that's what I could expect to typically
19 work at Merchants was eight to eight and
20 a half hours a day.
21 **Q. Did he tell you you'd never have**
22 **to work more than that?**
23 A. He never told me I would either.

Page 76

1 **Q. But he did not tell you that you**
2 **would not work more than eight, eight**
3 **and a half hours a day?**
4 A. He said that would be a typical
5 day, was his answer.
6 **Q. Was it your understanding, as**
7 **operations manager, that if there was a**
8 **problem that needed to be fixed, you**
9 **might have to stay longer than that?**
10 A. I would think any operations
11 manager or anyone in charge of anything
12 at any given business, if there was a
13 problem, would stay and fix it.
14 **Q. Was anything else said about the**
15 **time that you would be working there?**
16 A. As far as hours?
17 **Q. As far as hours.**
18 A. No.
19 **Q. What else do you remember about**
20 **the interview?**
21 A. Well, after the time part was
22 covered, I asked him about night shift
23 work. And he's like, "Well, are you

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  opposed to working night shift." And I
2  told him that on any given regular
3  basis, that I would be. And then I told
4  him the reasons why as far as living
5  like where I live and the commute that's
6  involved and just it's not like you work
7  in the food business. You don't work
8  three eight-hour shifts. You work two
9  shifts and whatever. But if I was
10 working nights, my family was home.
11 When I was home sleeping, they were at
12 work or school and that, you know, I was
13 opposed to any regular night shift
14 schedule or any job that involved any
15 night shift schedule. And he said, no,
16 no, nothing like that. He says, "All I
17 expect you to do would be, you know,
18 work a couple of shifts or a couple of
19 nights on the night shift, meet the
20 guys, meet the staff, and just observe
21 and see what's going on and see if there
22 are any improvements that you could
23 offer that we might want to implement to

Page 78

1  give a try."
2  Q. As the operations manager, were
3  you going to be responsible for the
4  night shift?
5  A. I was going to be responsible
6  for everything, yeah.
7  Q. Okay. When you say
8  "everything," what is -- tell me what --
9  A. Day shift, night shift, and
10 transportation.
11 Q. What else do you remember about
12 the interview?
13 A. He told me that -- let me think.
14 I had something and it jumped -- and
15 then something else jumped in. But he
16 assured me that that wasn't the case
17 with the night shift. And I didn't ask
18 about Saturday. He just sort of, as an
19 afterthought, said, "Now, we will need
20 you to work two Saturdays a year." He
21 said, "We do a physical inventory twice
22 a year and that requires working
23 Saturday, you know. But don't worry

Page 79

1  about that because when you work that
2  Saturday, you'll receive a day off as
3  compensation for it."
4  Q. Okay. Anything else about
5  Saturday work that you remember during
6  the interview?
7  A. No.
8  Q. Tell me what else you remember.
9  A. After that, I asked him about
10 vacation because I explained to him that
11 at SYSCO right now, I had 12 days. I
12 had two weeks' vacation. And then SYSCO
13 actually gave you two personal days
14 of -- they called them SYSCO day and
15 your birthday. And I explained to him
16 that within a year or in the coming
17 year, I would receive 17 days' vacation.
18 And he said, "Well, Merchants' policy
19 was you worked a year and then you got a
20 week's vacation." And I said, "Well,
21 Hal, I'm not going to give up three
22 weeks' vacation to come to work and work
23 a year before I get a week off." And

Page 80

1  he's like, no, don't worry about that.
2  He says, that's what the book says or
3  what the manual says. He says, "I've
4  never and wouldn't" -- he says, "I have
5  never expected any of my managers and I
6  certainly wouldn't expect you to come to
7  work and not have any time off for a
8  year." He said, "You know, after you've
9  been here and got your feet wet for a
10 couple of months, I'll be happy to give
11 you a Thursday and a Friday to go with a
12 Saturday and Sunday. And then after
13 that, if you need a day here or a day
14 there, just ask me." He said, "I'll
15 give you all the time you want off."
16 Q. You said that's what the book
17 says. What book were you referring to?
18 A. The handbook, I'm assuming, is
19 what -- he said -- he said Merchants'
20 policy.
21 Q. Okay.
22 A. And then the book, I'm assuming,
23 is the handbook.

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 81

1    Q.  And you got a copy of the
2  handbook when you started?
3    A.  I'm sure I must have.  I mean, I
4  signed all sorts of forms.
5    Q.  Okay.  All right.  And we talked
6  about you said Hal told you about
7  vacation.  What else do you remember
8  talking about during the interview?
9    A.  The last thing I really wanted
10  to -- other than, you know, what the job
11  was going to pay, I asked him about the
12  stability of the work force because I'd
13  worked in -- you know, at Alex City
14  Provision, at times, it wasn't always
15  that smooth.  And, you know, we had a
16  rough spot or two at SYSCO.  But, you
17  know, I wanted to know that there was at
18  least a secure steady work force in
19  place and he told me they had a great
20  work force.  I believe his exact thing
21  was a great day shift, an excellent
22  night shift, and a good core group of
23  drivers, best of my recollection is what

Page 82

1  he said.
2    Then he actually went to tell me
3  who was in place as far as department
4  heads or managers and he spoke of Randy
5  Harrington.  And Randy at the time was
6  the operations manager and he said Randy
7  was a super great guy, that, you know,
8  his forte was more in inventory control
9  more than it was running day shift.  But
10  that he expected, you know, the new
11  director of ops would be primarily
12  responsible for the day-to-day of the
13  day shift anyway.  That, you know, he
14  was going to let Randy keep the title of
15  operations manager.  That's something he
16  didn't want to take away from him, that
17  he thought he'd earned it.  But that I'd
18  primarily be running the day shift.
19    He told me Jason Kelly was
20  transportation manager.  He said Jason
21  had started with the company as a
22  driver, had worked his way through, and
23  been promoted to supervisor and then had

Page 83

1  been promoted to transportation manager.
2  He said Phillip Stitt was the night
3  manager and a guy by the name of Rodney
4  Ware was the night shift supervisor.
5  And he just raved about how great night
6  shift's numbers were, how Phillip always
7  maxed out on his bonus and stuff like
8  that and he expected me to do the same.
9  But, you know, he just gave me every
10  assurance that they had a great staff
11  and great work force.
12    Q.  Did y'all talk about salary or
13  pay during your interview?
14    A.  We did.
15    Q.  What did you discuss?
16    A.  I asked him what the job was
17  going to pay.  He said on the low end,
18  possibly 60.  On the high end, around 65
19  with an opportunity for a 30 percent
20  bonus, which was going to be paid out
21  three times a year, I guess.  So I had
22  the opportunity to earn ten percent of
23  my salary three times a year.

Page 84

1    And I remember saying, "Well,
2  you know, I'd certainly like it to be
3  the 65 rather than the 60." And he
4  said, "Well, that would depend a lot on
5  who we select as the candidate and their
6  credentials and Mr. Suber would figure
7  into that."
8    Q.  Okay.  Anything else you
9  remember about the interview with Hal?
10    A.  Pretty much that was the body of
11  what transpired while I was there and
12  then thought the interview was
13  concluded, yeah.
14    Q.  Okay.  Did y'all talk about
15  having a flexible schedule or anything
16  like that?"
17    A.  He mentioned that -- but given
18  the position that they were hiring for,
19  that that guy could actually set his own
20  windows, when he worked those eight
21  hours.  You know, like if I wanted to
22  come in at 6:00 and work till 2:00, that
23  should be fine or sometime I might want

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 85

1  to sleep in or do whatever, you know,
2  come in at 10:00 and work till 6:00,
3  maybe, you know, just to see the night
4  shift guys on occasion. But he told me
5  I, you know, would definitely have the
6  flexibility of setting my own schedule.
7     Q. Okay. And it's my understanding
8  that you're claiming in that lawsuit
9  that Hal Henson told you things during
10 that interview that weren't true. Are
11 there any other things that you claim
12 Hal told you during that interview that
13 were not true?
14    A. I'm not sitting here keeping
15 notes and don't really remember what
16 we've talked about and what we haven't.
17 But I don't recall anything right now.
18    Q. Okay. Well, I mean, we've
19 talked about the hours worked, your
20 schedule, vacations, weekends and
21 nights, and the work force and --
22    A. I do remember one other thing
23 now.

Page 86

1     Q. Okay.
2     A. That I asked what happened to
3  the last director of operations. And
4  Hal hinted that he shouldn't -- you
5  know, that it was something that
6  shouldn't be discussed, but he wanted me
7  to understand that Merchants had been
8  the one to let the guy go and not the
9  guy being dissatisfied or unhappy or
10 anything like that and him resigning,
11 that Merchants had to let him go. And
12 it had to deal with him sending
13 inappropriate e-mails to a female
14 coworker or an employee and --
15    Q. Okay.
16    A. Because he did want me to
17 understand that, you know, the guy had
18 been doing a good job and,
19 unfortunately, had just done some
20 things. Merchants had to let him go,
21 that he hadn't resigned.
22    Q. Did you find out that wasn't
23 true? I mean --

Page 87

1     A. Did I?
2     Q. Are you claiming that wasn't
3  true, that he had been let go because
4  of --
5     A. No. No. No. I thought you
6  were asking me if there was anything
7  else that happened during the interview.
8     Q. I'm just trying to make sure I
9  understand everything you're saying that
10 Hal -- that you claim Hal told you that
11 wasn't accurate.
12    A. Okay. Yeah. As far as -- from
13 what I hear after I went to work there,
14 that was accurate, so I guess that's not
15 a part of what I'm saying was inaccurate
16 or untrue.
17    Q. Okay. I'm just trying to make
18 sure I have -- you're talking about the
19 hours worked, your schedule.
20    A. Off time.
21    Q. The off time.
22    A. And the work force.
23    Q. And the work force. Okay.

Page 88

1     A. Exactly.
2     Q. Now, y'all talk about your pay.
3     A. We did.
4     Q. Are you claiming that anything
5  he told you about your pay was
6  inaccurate?
7     A. As far as the salary that I
8  started at, they actually offered me
9  62-5 to start.
10    Q. Right.
11    A. And that's what my salary -- if
12 you divide that into bimonthly
13 incrementals, that's what my check was
14 for.
15    Q. Okay. And then you got some
16 bonuses while you worked there; is that
17 right?
18    A. I got -- I got -- I was there
19 long enough to go through two bonus
20 periods. And the first one, I didn't --
21 I got something that I didn't earn, is
22 the way I understood it. Said I -- I
23 hadn't been there long enough to

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  qualify, but they were going to give it
2  to me anyway. And then the second time
3  around, I got nothing.
4      Q.  Okay.
5      A.  And as far as being -- my check
6  was for the amount -- it was supposed to
7  be -- but if you equate that for the
8  hours I was supposed to be working, and
9  I don't know how you want to break that
10  down, I was working more hours, but
11  being paid what I was told I'd be paid
12  to work less hours. So you -- you can
13  figure out if I was paid what I should
14  have been or not, but --
15      Q.  You were told you would get paid
16  $62,500 a year?
17      A.  Correct.
18      Q.  And that's what you were getting
19  paid?
20      A.  I did get that, correct.
21      Q.  And you understood that you were
22  hired as what is called an exempt
23  employee. Did you understand that? And

Page 90

1  you understood you were going to get the
2  same paycheck each week?
3      A.  I knew I was salaried, yeah.
4      Q.  So you understood you were going
5  to get the same paycheck each week
6  whether you worked one hour or whether
7  you worked 100 hours?
8      A.  The way you posed the question,
9  yeah, I understand that.
10      Q.  So we've talked about your
11  interview with Hal. What happened next?
12      A.  Hal excused himself from the
13  conference room and closed the door when
14  he left and he came back just a real
15  short time later and he said that Andy
16  and Mr. Suber were able to get away and
17  were on their way and they'd really like
18  to talk to me that day if it was
19  possible. And I told him that, you
20  know, I'd taken a day off from SYSCO, a
21  vacation day, so I really didn't have
22  anything planned. And he said, well, if
23  I could hang around 45 minutes to an

Page 91

1  hour, they should be here. And I told
2  him that would be fine.
3      I asked him would he carry me on
4  a warehouse tour, you know, let me meet
5  the guys that were there. And he said
6  that wouldn't be a good idea right now,
7  that they hadn't told any of the staff
8  that they had made the decision to hire
9  a new director of operations and rather
10  than -- thought it would be best just to
11  wait till that announcement had been
12  made before I came out. And at the
13  time, I understood that.
14      And, so, he suggested I run down
15  to the corner and just get a snack or
16  something and kill about 45 minutes and
17  then come back, which is what I did.
18  And at that time, Andy and Mr. Suber
19  joined the interview.
20      Q.  At any time did you ask to go
21  back another time to take a tour of the
22  warehouse?
23      A.  No.

Page 92

1      Q.  Why not?
2      A.  I just didn't.
3      Q.  All right. Tell me what
4  happened when you came back and Andy and
5  Don were there.
6      A.  Hal made the introductions and
7  we shook hands. Told them I was glad to
8  meet them. It was a pleasure to meet
9  them. Hal took the floor and briefly
10  filled them in on what had transpired
11  during, I think, as far as my background
12  and work history and stuff like that and
13  just, I guess, open the floor, so to
14  speak, for Mr. Suber and Andy.
15      And best I remember, Mr. Suber
16  was the first one to ask me a question
17  and he wanted to know about my
18  experience with KFC, Kentucky Fried
19  Chicken and the Foodservice contracts or
20  what goes on with handling the KFC
21  account. And he explained that
22  Merchants was in the process of trying
23  to garner that account. And I told him

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  that at SYSCO, we had had that contract
2  for two years and that from a day shift
3  supervisor standpoint, I was familiar
4  with the warehouse tour that took place,
5  the records you have to keep, you know,
6  as far as on certain items that come in,
7  you have to record the received date,
8  the pack date, the expiration date. You
9  know, there's a lot of record keeping
10 involved in doing it the way they want
11 you to do it.
12        And I explained to him that I
13 was aware of what took place on the day
14 shift. You know, that night shift and
15 transportation-wise, I didn't. But from
16 the day shift point of view, I did, and
17 he was happy to hear that. And he asked
18 me if -- you know, at the time, I really
19 didn't understand why, but the next
20 question he asked me was he wanted my
21 assurance that I was 100 percent
22 anti-union and --
23        Q. What did you tell him?

Page 94

1        A. I told him that at SYSCO, we had
2  always gone out of our way to avoid any
3  union. I mean, SYSCO had union houses.
4  At SYSCO Alabama, we were non-union and
5  that's the way we liked it and I
6  preferred working in that type of
7  atmosphere, the non-union atmosphere.
8  Where actually from a discipline
9  standpoint, the supervisor can go
10 directly through the employee rather
11 than having to go through, you know, a
12 steward or something like that.
13        Q. Okay. What else do you remember
14 about the interview?
15        A. I remember Andy wanting to know
16 or asking me if I was HACCP certified or
17 if I knew about HACCP, which is -- I
18 guess layman's terms is hazard analysis
19 and critical control points. And that
20 has to do with proper procedures in
21 handling of fresh produce or primarily
22 seafood and poultry, but just fresh
23 refrigerated items coming into the

Page 95

1  warehouse.
2        And I told him that I was HACCP
3  certified, that, you know, with SYSCO
4  they required people on day shift to --
5  or in the receiving to be HACCP
6  certified. And I'd gone to Tampa and
7  recently gotten that HACCP
8  certification, but that I wasn't a
9  practicing HACCP coordinator or anything
10 like that.
11        We had a -- we had a guy in
12 inventory control that was -- actually
13 walked the floor on the cold dock that
14 was HACCP certified and it was his
15 responsibility to do everything. I was
16 just more or less certified as a backup.
17        Q. Okay. Anything else?
18        A. You talked earlier about a
19 corporate mandate or something. That
20 was Andy's terminology; not mine. He
21 seemed to think that, for some reason,
22 at SYSCO we're under extremely a lot of
23 pressure. You know, driven by the

Page 96

1  corporate mandate. And I was as candid
2  and honest with him. I said that wasn't
3  the case where I worked. That was not
4  the case at SYSCO. That, you know, we
5  did a great job. We won a lot of
6  awards, but we just had good people in
7  place that cared about their job and
8  with a little direction, they did their
9  job and did it right. That I'd never
10 experienced any pressure put on me to do
11 this or do that or whatever.
12        I made mention to the fact that,
13 you know, it could have been that way in
14 sales. It could have been that way in
15 marketing. You know, I couldn't speak
16 for those departments. I don't work
17 there. But it definitely wasn't that
18 way at SYSCO. I told him I had a great
19 boss in Eddie O'Connor. I enjoyed what
20 I did. I liked working there, but that
21 there wasn't any corporate mandate that
22 dictated how we did business.
23        Q. At least from your --

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 97

1    A.  From my --
2    Q.  -- from your perspective?
3    A.  Yeah, from my perspective.
4    Q.  As operations and the day shift
5  manager?
6    A.  I think -- I know Andy and I
7  think Mr. Suber both talked about how
8  valuable family was to Merchants, you
9  know, and how it wouldn't be like
10  working at SYSCO.  That, you know, they
11  were really in tune to the family aspect
12  of an employee and that I'd really enjoy
13  working there because, you know, of how
14  they thought, you know, family oriented
15  they were.  And, you know, I'm like,
16  well, that can only be a good thing, you
17  know, so --
18    Q.  Anything else you remember about
19  the interview?
20    A.  Nothing other than it ended
21  with, you know, handshakes and thanking
22  them for letting me be there.  I
23  appreciated the opportunity that they

Page 98

1  were affording me.  You know, Hal said
2  they had one more guy to interview and
3  that they'd be in touch with me in a few
4  days.
5    Q.  Okay.
6    A.  And that's when I left.
7    Q.  Is there anything you claim that
8  Don or Andy said that was incorrect
9  during y'all's interview?
10    A.  The only thing -- and this,
11  again, is from my perspective, okay?  I
12  guess family oriented to some people
13  means one thing and to others, it means
14  something else.  But that point was
15  driven home to me during the course of
16  the interview and, trust me, from my
17  first day on the job, I knew I had made
18  a bad mistake because of what I was
19  expecting when I walked in the door and
20  what I actually walked in the door to.
21    But in several conversations
22  that ensued shortly after my employment
23  there, it had to do with day shift

Page 99

1  management, transportation management,
2  night shift management, you know.  And
3  for whatever reason, Andy just, point
4  blank, told me if they're not who you
5  want there, fire them.  And I'm like
6  okay.  And when we'd hang up the -- you
7  know, fire them and put somebody in
8  there you want or somebody that can do
9  the job and when I'd hang the phone up
10  with him, that was always the first
11  thought that would come to my mind is
12  that's really family oriented, you know.
13  A man's got four or five, whatever,
14  years invested and don't talk to him or
15  try to do this, just fire him was the
16  answer.  So I'm going to say from my
17  perspective, that was an untruth in the
18  interview that they're family oriented.
19    Q.  Okay.  But to your knowledge --
20  you don't know what Andy or Don
21  considered to be family oriented?
22    A.  No, I don't.  That's why I tried
23  to explain that when I made the

Page 100

1  statement.
2    Q.  Do you think they were making
3  those statements to try to get you to
4  come to work there?  I mean, is that
5  something you're claiming in this
6  lawsuit?
7    A.  That's what I'm claiming, yes.
8  That's what I'm asserting, is that
9  everything that was contrived in that
10  interview was to entice me to come to
11  work for them.
12    Q.  Why do you think they did that?
13    A.  There again, are you wanting why
14  I think they did?
15    Q.  Yeah.
16    A.  I think, just from what I saw
17  the first day on the job, is that
18  warehouse could not have been more
19  mismanaged.  I've never been in a
20  nastier facility.  I mean, it was
21  downright nasty.  The equipment was
22  abused and although it was new in age
23  year-wise, it looked ancient.  I mean,

25 (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  it just really had been mistreated. And
2  I think they wanted someone to come in
3  there and snap their fingers, wave a
4  magic wand, do whatever, and turn it
5  into a warehouse that was running like
6  it should have been running instead of
7  the mess that it was.
8  **Q. Well, didn't they tell you in**
9  **the interview they needed a strong**
10  **leader to kind of keep people going in**
11  **the right direction?**
12  A. To continue what they had going,
13  yeah. The way I think Hal put it was
14  they had all the right pieces to the
15  puzzle in place and just needed the glue
16  to hold them there.
17  **Q. What happened next after the**
18  **interview?**
19  A. I left and went back home. And
20  a couple or three days later, Hal called
21  me and said he'd like to make me a job
22  offer, but really didn't want to make it
23  over the phone. And I told him it would

Page 102

1  be hard for me to get away from work.
2  And he said, well, what if we meet
3  halfway and we actually met -- I can't
4  remember the little town now that's
5  halfway between Calera and Clanton at a
6  little Jack's Restaurant there. And I
7  asked him if I could bring my wife with
8  me, you know, because we were going to
9  do it at lunch. And he said, "Yeah,
10  that would be fine. I'd love to meet
11  her."
12  So we actually did and he told
13  me the job offer. And, you know, there
14  again, even to Laura, the family
15  oriented, he's going to love working
16  here, you know, he's made the right
17  decision. And, you know, he made
18  assurances to her that I wouldn't have
19  to worry, you know -- she wasn't losing
20  me forever, that he was going to give me
21  plenty of time off when I needed it.
22  So -- and, you know, when he made me the
23  job offer, I asked him to think -- you

Page 103

1  know, I needed time to think about it.
2  And he said that I needed to do
3  something pretty quick because they were
4  ready to make a move and I asked him for
5  the weekend. I said, "Well, can I let
6  you know something on Monday." He said,
7  "Sure, that's fine. But let me know
8  about it Monday."
9  And Laura and I talked about it
10  at length over the weekend and, you
11  know, you start putting numbers together
12  and potentials, you know, and $62,000
13  salary and 30 percent bonus, you know,
14  I'm looking at making 80 grand a year is
15  best case scenario. And given what I
16  was making at SYSCO, that was an instant
17  promotion almost, you know, from day
18  shift supervisor to day shift manager or
19  somewhere between manager and operations
20  manager. And just given what I could do
21  for my family with that income, you
22  know, and, like I said, it was going
23  from day shift supervisor to a director

Page 104

1  of operations position.
2  **Q. Which that would be a promotion**
3  **to go from a day shift supervisor to an**
4  **operations manager?**
5  A. That's the way I viewed it,
6  yeah.
7  **Q. Okay.**
8  A. But just given financially what
9  I could do for my family, we decided to
10  do it. It was still the hardest, I
11  think, decision I've ever done in my
12  life. Just I loved what I did at SYSCO.
13  I loved working for SYSCO. I loved my
14  employees. They weren't employees to
15  me. They were friends and like family.
16  I remember the day I left, I actually
17  had to leave early. Eddie just told
18  me -- he said, "You just go on. You're
19  killing yourself here trying to say
20  good-bye to them and crying and carrying
21  on." And, you know, I just -- that was
22  the hardest decision I've ever made in
23  my life. And hugging them and crying on

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  them and them crying with me and missing
2  me and me going to miss them and -- but
3  I could see past that a little ways to
4  what I could do for my family with
5  making this move, so I decided to do it
6  and I did it.
7      Q.  After you left Merchants
8  Foodservice, did you try to go back to
9  SYSCO?
10     A.  No, I did not.
11     Q.  Why not?
12     A.  I guess a couple or three months
13 into me being with Merchants, SYSCO
14 actually did a fold-out, which is
15 splitting off their existing business in
16 Calera.  And I think they gave almost a
17 third of it to the new house they were
18 opening in Geneva.  So they had an
19 abundance of management people, forklift
20 guys, receivers, you know, where they
21 were used to doing 200 million a year;
22 all of a sudden, they were going to be
23 down to 115 million a year and --

Page 106

1      Q.  Okay.
2      A.  So, I mean, there just wasn't a
3  place there.  And, you know, they tried
4  their best when I turned in my letter of
5  resignation to them to get me not to do
6  it.  You know, to get me to rethink it,
7  was I making a wise decision.  And, you
8  know, I guess from a pride standpoint,
9  early on, just didn't want to eat crow
10 and even go back and beg for my job
11 back.  But, you know, I figured maybe
12 make the best of it, try as hard as I
13 could do and, hopefully, I could turn it
14 around and make it somewhere where I
15 could work, but --
16     Q.  Why did your wife leave SYSCO?
17     A.  She left SYSCO -- and I don't
18 remember the time frames from me leaving
19 Merchants.  I don't know if that
20 happened before I left Merchants or
21 after I left Merchants.  But she was in
22 a -- her position, she sat on a -- not a
23 pedestal, but right outside in being the

Page 107

1  executive assistant to the president,
2  she was not held in confidence with a
3  lot of -- you know, afraid to go through
4  on up the chain.  And Laura's not a real
5  outgoing person anyway.  She's sort of a
6  loner and when I wasn't at SYSCO
7  anymore, she lost her lunch partner she
8  had every day.
9          And just eventually the job came
10 open in Alex City that, in essence, was
11 about the same salary she was making at
12 SYSCO without the commute.  And she was
13 back home with the kids, you know,
14 could -- we weren't pawning them off on
15 mother anymore to get them to school or
16 anything like that, you know.  Laura was
17 back home and could sleep late, could
18 get the kids to school.  She'd be there
19 if they had a need to leave school, you
20 know.  So she moved back just for a
21 logistical standpoint, especially since
22 I wasn't there anymore, but --
23     Q.  You knew, still, you were going

Page 108

1  to have a commute going back and forth
2  to Clanton when you took the job at
3  Merchants Foodservice?
4      A.  Sure.
5      Q.  Did you get an offer letter from
6  them?
7      A.  I did.
8      Q.  I guess first, in the scheme of
9  all this, when did you complete an
10 application?
11     A.  After they hired me.
12     Q.  Okay.
13     A.  Best I remember.
14     Q.  Okay.  I'm going to mark as
15 Defendant's Exhibit 6 an application for
16 employment.
17         (Defendant's Exhibit No. 6 was
18          marked for identification and
19          is attached.)
20     Q.  Do you recognize that,
21 Mr. Adams?
22     A.  Yeah.
23     Q.  If you'll turn to the last page,

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  is that your signature on the
2  applicant's signature?
3      A.  It is.
4      Q.  And is the date August the 11th,
5  2004?
6      A.  Looks like it is, yeah.
7      Q.  I'm going to mark as Defendant's
8  Exhibit 7 what I'm going to describe as
9  an offer letter, if you'll look at that
10 as well.
11         (Defendant's Exhibit No. 7 was
12         marked for identification and
13         is attached.)
14     Q.  Is Defendant's Exhibit 7 the
15 offer letter that you received?
16     A.  It is.
17     Q.  And I'm not trying to trick you.
18 I'm just trying to figure out the time
19 order.  The application is dated August
20 the 11th.  The offer letter is dated
21 August 20th and signed August the 23rd.
22 So do you think you probably
23 filled the application out before since

Page 110

1  it is dated August the 11th?
2      A.  No.  I mean, to the best of my
3  knowledge, I filled this out my first
4  day on the job.
5      Q.  Okay.
6      A.  Now, I could have postdated it
7  at Hal's request, but he says, you know,
8  this is something we should have already
9  done.  But I did not fill out the
10 application until I went to work for
11 Merchants.
12     Q.  Okay.  The August 11th, 2004, is
13 that your handwriting?
14     A.  It is.
15     Q.  And looking at the application,
16 you're asked do you have any -- this is
17 on page 2.  Do you have any special
18 circumstances which might prevent you
19 from working all scheduled work and
20 overtime, including weekends, and you
21 checked no; is that right?
22     A.  Uh-huh.
23     Q.  Was there anything that was

Page 111

1  preventing you from working longer hours
2  than you -- working more than eight
3  hours a day?
4      A.  Didn't anything prevent me from
5  working it.  I worked every hour they
6  wanted me to work.
7      Q.  And looking at the offer letter,
8  I know you just -- you just read through
9  it.  Is there anything in the offer
10 letter that you claim is not accurate?
11     A.  I mean, that's the offer letter
12 I received.
13     Q.  Okay.  Well, you received the
14 offer letter and we talked about your
15 pay was $62,500.
16     A.  Uh-huh.
17     Q.  And that's accurate, right?
18     A.  Yeah.
19     Q.  Okay.  You were eligible for a
20 30 percent bonus.  Do you dispute that
21 you were eligible for a 30 percent
22 bonus?
23     A.  No, I don't.

Page 112

1      Q.  It says the company has a
2  benefits program.  Did you receive the
3  information on the benefits program?
4      A.  I did.
5      Q.  Does this offer letter say
6  anything about the hours that you were
7  going to be working?
8      A.  The offer letter doesn't, no.
9      Q.  Does the offer letter say
10 anything about whether or not you'd have
11 to work nights?
12     A.  The offer letter doesn't.
13     Q.  Does the offer letter say
14 anything other than in terms of vacation
15 that you would be -- other than you'd be
16 provided the usual holidays, including
17 vacation days?
18     A.  No, it doesn't.  Can I add one
19 other point to that, though?  I didn't
20 make my determination to take this job
21 on this offer letter.  I made it based
22 on the interview.  So if I can say that,
23 then we'll go on.

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 113

1 Q. Okay. And this doesn't say
2 anything about anything -- you can
3 strike that.
4 I'm going to mark -- do you
5 remember, did you receive the offer
6 letter before you sent in your
7 resignation to SYSCO?
8 A. I'm sure I did. I wouldn't have
9 resigned before I knew I had a job.
10 Q. I'm going to mark -- these are
11 some of the documents that you produced
12 that I got yesterday -- as Defendant's
13 Exhibit 8.
14 (Defendant's Exhibit No. 8 was
15 marked for identification and
16 is attached.)
17 Q. Is that your resignation and
18 exit interview from SYSCO?
19 A. It is.
20 Q. The resignation letter is marked
21 August the 23rd of 2004; is that right?
22 A. Uh-huh.
23 Q. And you signed the acceptance

Page 114

1 letter to Merchants Foodservice on
2 August 23rd, 2004; is that right?
3 A. Where is that?
4 Q. On the second page. It's got
5 your name and the date.
6 A. Correct. Best I remember, I
7 signed this at lunch and then when I
8 came back, having made my decision, is
9 when I actually sat down and hand wrote
10 the letter of resignation after I signed
11 the offer with Hal at lunch.
12 Q. Okay. Did you ask Hal why there
13 was no mention in the offer letter about
14 the hours you were going to be working?
15 A. I've never seen that in an offer
16 letter.
17 Q. Well, I'm just asking, did you
18 ask him?
19 A. No, I did not.
20 Q. Did you ask him why he didn't
21 put in here --
22 A. No, I did not.
23 Q. -- anything about your vacation?

Page 115

1 Did you ask him why he didn't
2 say anything in here about working
3 nights or Saturdays?
4 A. No, I didn't.
5 Q. Paragraph 2 of this offer letter
6 reads, "Our incentive program recognizes
7 the personal sacrifice and commitment
8 involved in providing leadership and the
9 necessary supervision to improve on
10 current standards." Did you ask him
11 what was meant by that?
12 A. No, I did not.
13 Q. From this offer letter, did you
14 understand that to receive a bonus, that
15 sales would need to improve and
16 operational and productivity standards
17 would need to improve?
18 A. That was not my understanding.
19 Q. Well, it says you'll be eligible
20 for up to a 30 percent bonus based on
21 improving sales and improving current
22 operational and productivity standards.
23 What was your understanding of that?

Page 116

1 A. What Hal told me during the
2 process was that -- and I don't remember
3 the guy's name who I replaced. But he
4 told me, when he was explaining the
5 salary and bonus offer, that the former
6 individual that had been running things
7 routinely made 18 to 20 percent of his
8 bonus on a regular basis. So he led me
9 to believe that that's what I could
10 expect to make going in.
11 Q. Do you know --
12 A. He didn't mention anything about
13 improving it. That was just status quo.
14 Walk in the door and that's what I could
15 expect.
16 Q. Do you know what the numbers
17 were for the operations manager before
18 you got there?
19 A. I do not.
20 Q. So you don't know if his numbers
21 were better than yours?
22 A. I don't.
23 Q. I'm going to mark as Defendant's

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  Exhibit 10 [sic] a memo to new employees
2  regarding -- from Merchants Foodservice
3  regarding benefits.
4      MR. BLYTHE:  You marked that as
5  9.
6      MR. DYKES:  Yeah.  I think it is
7  supposed to be 9.  9 is the benefits
8  memo.
9      Q.  (BY MR. DYKES:)  Do you remember
10  receiving this benefits memo from
11  Merchants Foodservice?
12      (Defendant's Exhibit No. 9 was
13         marked for identification and
14         is attached.)
15      A.  I do not remember receiving it,
16  but I'm sure I did just as part of their
17  package, I mean -- but I don't recall
18  this particular document.
19      Q.  And I realize you haven't
20  signed it.  I was just -- and I -- your
21  letter refers to a benefits program and
22  this seems to be the benefits memo that
23  explains what benefits you would be

Page 118

1  entitled to.  Would you agree with that?
2      A.  This is their benefits plan,
3  yes.  And what each employee, according
4  to this, will receive.
5      Q.  Okay.  And we've talked about
6  what you say Hal Henson told you about
7  vacation.
8      A.  Uh-huh.
9      Q.  But is this your understanding
10  of what the vacation was for other --
11  for employees when they were hired?
12      A.  It was my understanding this is
13  what an hourly employee would receive.
14  According to Hal, any new manager he
15  hired would not be expected to work a
16  year without any time off.
17      Q.  And I understand that's what you
18  are saying that Hal told you.
19      A.  Yeah.
20      Q.  This is your understanding of
21  what a new employee -- if they weren't
22  told anything beforehand, this is what
23  they would receive?

Page 119

1      A.  Right.
2      Q.  And that would be what their
3  vacation would be?
4      A.  Right.
5      Q.  Were these the holidays that
6  y'all received?
7      A.  To the best of my recollection,
8  yes.
9      Q.  I mean, were you eligible for
10  life insurance and the other benefits
11  that it indicates in here that you would
12  have been eligible for?
13      A.  Without reading and seeing what
14  they are, I don't know.  I know I
15  applied for short term and long-term
16  disability, I believe, but -- and I had
17  my health insurance with them.  Some of
18  the stuff, I wasn't interested in.  But,
19  yeah, I participated in some of these,
20  yes.
21      Q.  Okay.
22      MR. DYKES:  What time is it?  Do
23  you know?

Page 120

1      MR. BLYTHE:  12:30.
2      MR. DYKES:  Do y'all want to
3  take a quick break for lunch?
4      MR. BLYTHE:  Are you going to
5  go?
6      MR. DYKES:  I've still got a
7  decent amount to do.
8      MR. BLYTHE: Yeah, that's fine.
9      MR. DYKES:  Okay.  Now is a fine
10  time with me to take a break, if you
11  want to do that.  Maybe come back in 45
12  minutes or something, or an hour.  It
13  doesn't matter to me.
14      MR. BLYTHE:  Why don't we take
15  an hour if we're going to do it because
16  I have to find somewhere to eat.
17      MR. DYKES:  Okay.
18      (A break was taken.)
19      Q.  (BY MR. DYKES:)  Mr. Adams, we
20  were talking about your interview and
21  the process of getting hired on there at
22  Merchants Foodservice and we had talked
23  some about your salary and the bonus

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 121

1 structure. I am going to mark as
2 Defendant's Exhibit 10 the incentive
3 program for Steve Adams dated October 1,
4 2004 through September 30th, 2005. Do
5 you recognize that?
6     (Defendant's Exhibit No. 10 was
7     marked for identification and
8     is attached.)
9     A. I do, yes.
10     Q. Looking at the first page, does
11 this represent the potential for a 30
12 percent -- for a bonus for 30 percent
13 of -- 30 percent of your salary over the
14 course of a year, that potential?
15     A. Unless I'm adding wrong, looks
16 like nine, but --
17     Q. Well, if we got -- let's look at
18 it together. Because I've got one, two,
19 three, four, five, six, seven, eight,
20 nine, ten.
21     A. Okay. I missed one of the ones
22 from the indentation there, I think.
23     Q. Okay.

Page 122

1     A. Okay.
2     Q. Would that be potential for ten
3 percent --
4     A. Right.
5     Q. -- three times a year?
6     A. Right.
7     Q. Is that right?
8     A. Uh-huh.
9     Q. Okay. And that's what you were
10 told during your interview process that
11 you would be eligible for?
12     A. Correct.
13     Q. Then if we look at the second
14 page, it looks like for period three of
15 '04, that you received $734.78. That
16 was prorated for the one month you would
17 have worked in that period; is that
18 accurate?
19     A. I don't remember the specifics,
20 but I do remember receiving one the
21 first time it rolled around. I remember
22 it seems like Hal said I shouldn't have
23 been eligible, but -- and that may be

Page 123

1 the prorated part or whatever. But,
2 yeah.
3     Q. Okay. So you don't dispute that
4 you received it?
5     A. No, I don't. Not at all.
6     Q. Then looking for period one
7 2005, it looks like a 2,606.35 bonus for
8 period one of 2005. Does that sound
9 accurate to you?
10     A. I don't remember ever receiving
11 anything other than the first one. Now,
12 I could be wrong, but --
13     MR. DYKES: Okay. Let's see.
14 If you'll give me one second, I'm going
15 to go print off a couple of things.
16     MR. BLYTHE: Sure.
17     (A break was taken.)
18     Q. (BY MR. DYKES:) I'm going to
19 mark as Defendant's Exhibit 11 an
20 employee check history.
21     (Defendant's Exhibit No. 11 was
22     marked for identification and
23     is attached.)

Page 124

1     Q. I'll represent this is a payment
2 history for your employment --
3     A. Okay.
4     Q. -- with Merchants Foodservice.
5 If you'll look for February 25th, 2005,
6 that shows a check for 2,606.34.
7     A. Uh-huh.
8     Q. Would that match the bonus for
9 period one, 2005?
10     A. Uh-huh.
11     Q. Okay. And do you just not
12 remember receiving the check or do you
13 say that you -- are you claiming you
14 didn't get a bonus check?
15     A. I'm not claiming I didn't get
16 it.
17     Q. Okay.
18     A. I'm saying I don't remember
19 getting it. I remember getting the
20 first one.
21     Q. Okay.
22     A. And I was thinking that's all I
23 got. I'm not saying I didn't get it.

31 (Pages 121 to 124)

## FREEDOM COURT REPORTING

Page 125

1  I'm saying I don't remember it. And to
2  the best of my recollection, I got the
3  first one.
4    **Q.  Okay.**
5    A.  Can I ask you a question?
6    **Q.  Yes.**
7    A.  On this period two, 2005, what
8  dates are these through?
9    **Q.  Period two goes through May 31**
10  **of '05.**
11    A.  May 31 of '05.
12    MR. DYKES:  Isn't that -- is
13  that right?
14    MR. BLYTHE:  It would be
15  February 1 through May 31.
16    A.  I don't understand the -- what
17  I'm seeing on this -- the third page,
18  period two, and I guess I'm asking the
19  question -- maybe this is not my place,
20  but my numbers look better in period two
21  than they do in period three. And I see
22  percent bonus -- 109 percent of my bonus
23  equals zero and bonus percentage from

Page 126

1  period one, 104 was worth 2,606. I
2  mean, I know you are not here to explain
3  things to me, but I don't understand
4  that part of it, but --
5    **Q.  For period two, 2005, it's your**
6  **understanding you didn't get a bonus**
7  **that period?**
8    A.  To the best of my recollection,
9  I only received the one. I'm not saying
10  that's all I received. But I'm saying
11  that's all I remember receiving.
12    **Q.  Okay.**
13    A.  But I remember one where I
14  didn't get anything. Now, basically, I
15  don't remember a third period, so it
16  very well could be this one. I remember
17  one I got and I remember one I was told
18  I didn't get anything. I guess what I'm
19  not understanding is, if my bonus number
20  or percentage should have been 109.9, I
21  don't see how that equates to zero when
22  104.25 on the bonus percentage equates
23  to 2,606.

Page 127

1    **Q.  Okay.**
2    A.  But other than that, I concur
3  with what you are saying.
4    **Q.  And then in terms of your -- of**
5  **your pay -- pay every two weeks, I'm**
6  **going to mark as Defendant's Exhibit 12**
7  **a document that I received yesterday,**
8  **which are two paychecks. Do you**
9  **recognize those?**
10    (Defendant's Exhibit No. 12 was
11    marked for identification and
12    is attached.)
13    A.  I do.
14    **Q.  Okay. And those show your**
15  **pay -- you received the same pay every**
16  **two weeks of --**
17    A.  Correct.
18    **Q.  -- of 26 -- well, 2,604.17?**
19    A.  Uh-huh.
20    **Q.  Okay. After you started working**
21  **for Merchants Foodservice, did you**
22  **receive an acknowledgment of employment**
23  **status from them?**

Page 128

1    A.  Which is?
2    **Q.  I'm going to mark as Defendant's**
3  **Exhibit 13 the Merchants Foodservice**
4  **acknowledgment of employment status.**
5    (Defendant's Exhibit No. 13 was
6    marked for identification and
7    is attached.)
8    **Q.  Do you recognize that,**
9  **Mr. Adams?**
10    A.  Uh-huh.
11    **Q.  Did you read that before signing**
12  **it?**
13    A.  Yes. I mean --
14    **Q.  Is that your signature at the**
15  **bottom?**
16    A.  It is my signature.
17    **Q.  And that's dated August 24th,**
18  **2004?**
19    A.  Correct.
20    **Q.  Did you read this before signing**
21  **it?**
22    A.  I did.
23    **Q.  The last paragraph of -- the**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 129

1  last sentence of paragraph 1 provides,
2  "In addition, I understand that
3  Merchants Foodservice retains the right
4  to alter, revise, change, or eliminate
5  any of its policies, practices, or rules
6  and any of its pay or benefits at its
7  discretion at any time without
8  necessarily giving me or any other
9  employee advance or actual notice." Did
10 you understand that --
11     A.  I do.
12     Q.  -- when you signed that?
13     A.  Yes.
14     Q.  Did you ask any questions of
15 anybody about this?
16     A.  I did not.  I guess -- this was
17 all filled out after I was hired,
18 though; not prior.  Just for your
19 information, if -- you know, I didn't
20 fill all this out as a prerequisite to
21 being employed there.  I was already an
22 employee when I filled all of this
23 paperwork out.

Page 130

1     Q.  I'm going to mark as Defendant's
2  Exhibit 14 an acknowledgment of having
3  received the Merchants company handbook
4  dated -- with an 8/1/02 date at the
5  bottom.  Do you recognize that,
6  Mr. Adams?
7        (Defendant's Exhibit No. 14 was
8         marked for identification and
9         is attached.)
10     A.  I do.
11     Q.  And this shows, for a handbook
12 dated 8/1/02, an acknowledgment of
13 receipt that I'm going to mark as
14 Defendant's Exhibit 15, an employee
15 handbook dated 8/1/2002.  Do you
16 recognize Defendant's Exhibit 15?
17        (Defendant's Exhibit No. 15 was
18         marked for identification and
19         is attached.)
20     A.  It's dated August 1, 2002.  I'm
21 assuming -- I thought they updated this
22 every year, so I'm assuming I was
23 probably given one that probably had

Page 131

1  2004 on it.  But --
2     Q.  And I'm going to ask you a
3  question in a minute.  But is that your
4  signature there on the one that's got
5  8/1/02 on the bottom?
6     A.  On --
7     Q.  Of employee's signature.
8  Looking at Defendant's Exhibit 14?
9     A.  Yeah, this is my signature.
10     Q.  Okay.  And I want to mark as
11 Defendant's Exhibit 16 an acknowledgment
12 of having received an employee handbook
13 dated 1/27/05.  Do you recognize
14 Defendant's Exhibit 16?
15        (Defendant's Exhibit No. 16 was
16         marked for identification and
17         is attached.)
18     A.  I do.
19     Q.  Is that your signature on there?
20     A.  It is.
21     Q.  I'm going to mark as Defendant's
22 Exhibit 17 an employee handbook dated

Page 132

1  January 1, 2005.  Do you recognize that?
2        (Defendant's Exhibit No. 17 was
3         marked for identification and
4         is attached.)
5     A.  I do.
6     Q.  If you will, look for the
7  employee handbook dated January 1, 2005.
8  It has an acknowledgment form with it
9  that has the January 1, 2005 date that
10 you signed on January 27th, 2005.  This
11 is Defendant's Exhibits 16 and 17.
12     A.  Uh-huh.
13     Q.  Would you agree that the
14 Defendant's Exhibit 15, which has the
15 8/1/02 date on it, matches up with the
16 employee handbook that has -- that's
17 Defendant's Exhibit 15 that has 8/1/02
18 on it?  Let me start over.  I may just
19 start that whole question over again.
20        Defendant's Exhibit 14 has an
21 8/1/02 date at the bottom of it; would
22 you agree?
23     A.  Yeah.  I mean, that's what's

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1 there, yeah.
2    Q.  And the employee handbook has
3 the date of 8/1/02 on it?
4    A.  Okay.
5    Q.  Would you agree with that?
6    A.  I'm looking at it, yeah.
7    Q.  Okay.  So by signing the
8 acknowledgment from the employee
9 handbook dated 8/1/02, would you agree
10 that you received -- that this is the
11 employee handbook that you received, the
12 one dated 8/1/02?  I'm not trying to
13 trick you.
14    A.  Yeah.  Yeah.  I mean, and -- I
15 received a handbook on two different
16 occasions.  You know, this has got
17 8/1/02 and that has got 8/1/02.  So I'm
18 good to go with that.
19    Q.  Okay.  Looking at Defendant's
20 Exhibit 15, which is the 8/1/02
21 handbook, would you have looked through
22 the handbook when you got it?
23    A.  I'm sure I may have gazed

Page 135

1    A.  No.
2    Q.  Turn to page 5 of Defendant's
3 Exhibit 15, which is the 8/1/02
4 handbook.  The vacation benefits, are
5 those the vacation benefits that are
6 described in the benefits package that
7 we looked at earlier?
8    A.  Benefits package --
9    Q.  The benefits memo that we looked
10 at earlier --
11    A.  Yeah.  Yeah.  Yeah.
12    Q.  -- which is Defendant's
13 Exhibit 9.
14    A.  Yes.
15    Q.  I'm looking at Bates No. 17,
16 which is the employee handbook -- or
17 looking at Exhibit No. 17, which is an
18 employee handbook dated January 1, 2005.
19 Would you have looked at this handbook
20 when you received it?
21    A.  Probably not, other than just
22 the fact that I got it and knew it was a
23 handbook.  And, there again, I may have

Page 134

1 through it.  I'm sure I didn't read it
2 verbatim from start to finish.
3    Q.  When you started working for
4 Merchants, who was the president of the
5 company?
6    A.  When I started for Merchants?
7    Q.  Uh-huh.
8    A.  Don Suber.
9    Q.  Did you ever receive anything in
10 writing from Don Suber regarding your
11 employment?
12    A.  No.
13    Q.  Okay.  Did you receive anything
14 from Don about the hours that you were
15 going to work?
16    A.  No.
17    Q.  Did you receive anything in
18 writing from Don about your vacation or
19 night work?
20    A.  No.
21    Q.  Did you receive anything from
22 Don about the work force and the
23 stability of the work force?

Page 136

1 scanned it to see if there were anything
2 different from the prior handbook.  But
3 as far as reading it cover to cover,
4 word for word, no.
5    Q.  If you look at page 4 for
6 employment status category, would you
7 agree that you would be categorized as
8 an exempt employee -- as a salaried
9 employee who is not subject to the
10 overtime provisions of the Fair Labor
11 Standards Act?
12       MR. BLYTHE:  What page you on?
13       MR. DYKES:  Page 4.
14       THE WITNESS:  4.
15    A.  Yes, I would.
16    Q.  (BY MR. DYKES:)  I think I'm
17 done with the handbook, so no more
18 confusing exhibits.
19       So we've gotten up to the time
20 that you were hired and you signed the
21 policies and have gone in and are
22 starting as an operations manager.  As
23 an operations -- as the operations

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 137

1  manager at Merchants Foodservice, just
2  tell me what you did.
3      A.  As far as?
4      Q.  What were your job duties?
5      A.  Just the day-to-day operation of
6  the inbound freight on day shift, the
7  selection process and shipping at night
8  and the transportation or the delivery
9  process the following morning.
10      Q.  And who did you report to?
11      A.  Hal Henson would have been my
12  direct report.
13      Q.  What was his job title?
14      A.  There again, I'm thinking it was
15  branch manager, but it could have been
16  general manager.
17      Q.  Do you know how long Hal had
18  been with Merchants Foodservice when he
19  started?
20      A.  To the best of my recollection,
21  approximately two years.  But that's a
22  guess.  That's --
23      Q.  Who would have been the other

Page 138

1  managers that you would have worked --
2  that would have been under you as -- who
3  would have been the managers under you
4  as operations manager?
5      A.  Would have been Randy Harrington
6  on day shift, Jason Kelly in
7  transportation, and Phillip Stitt was
8  the night manager.
9      Q.  Was Rodney Ware a supervisor?
10      A.  Supervisor, yeah.  I thought you
11  asked for managers.
12      Q.  I did.  I did.
13      A.  Okay.
14      Q.  Who were your other supervisors?
15      A.  Seneca Kinsey on day shift and
16  Rodney Ware on nights.
17      Q.  How long had Randy Harrington
18  been with the company?
19      A.  Here again, I'm pulling from --
20      Q.  Just to the best of your
21  knowledge.  I mean --
22      A.  Four years.
23      Q.  Was Randy still working there

Page 139

1  when you left?
2      A.  He was.
3      Q.  Jason Kelly, how long had he
4  been with the company?
5      A.  About the same length of time I
6  think in -- that's employment with the
7  company as a driver, supervisor, and
8  manager.
9      Q.  Do you know how long he had been
10  transportation manager?
11      A.  He was named that during my
12  predecessor's tenure.  So to be honest
13  with you, I'm going to say less than two
14  years.
15      Q.  Well, how long had that facility
16  been in Clanton?
17      A.  We built the facility in --
18  SYSCO in Calera, I went to work for them
19  in '98.  We started shipping groceries.
20  It was under construction and then
21  completed in January of '99.  Clanton
22  Merchants was, best of my
23  recollection -- like I said, I wasn't up

Page 140

1  and down that road a lot -- that
2  facility broke ground after we were up
3  and operating in '99.
4      Q.  Okay.
5      A.  So it was a newer facility than
6  the -- and had been there less time at
7  that location than the one -- the SYSCO
8  place in Calera.
9      Q.  Was Jason Kelly still working
10  there when your employment with
11  Merchants --
12      A.  He was.
13      Q.  How long had Phillip Stitt been
14  with the company when you started?
15      A.  There again, you're -- three
16  years, four years.  I think Phillip
17  actually may have been there longer than
18  that.  I think he actually worked --
19  they had a place in Montgomery, I
20  believe, that he worked at before he
21  came.  So Phillip probably had more time
22  than either Jason or Randy, but --
23      Q.  Was Phillip still working there

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 141

1  when your employment ended?
2  A. No, he was not.
3  **Q. Why not?**
4  A. He was on the verge of being
5  fired for absenteeism when he resigned.
6  **Q. Were you going to fire him for**
7  **absenteeism?**
8  A. Yes.
9  **Q. How long had he been there when**
10  **this happened -- when he resigned?**
11  A. I want to say seven to eight
12  months.
13  **Q. How about Rodney Ware, how long**
14  **had he been at the company when you**
15  **started?**
16  A. Rodney, I don't know. A couple
17  of years, I'm guessing. He was a
18  selector that they had moved up to
19  supervisor.
20  **Q. Was Rodney still there when you**
21  **left?**
22  A. No, he was not.
23  **Q. What happened to him?**

Page 142

1  A. He was fired for sexual
2  discrimination.
3  **Q. When did that happen?**
4  A. The incidence that he was fired
5  for happened -- I don't remember his
6  termination date. But when it came to
7  my -- it was less than a week after I
8  found out about it, was when he was
9  fired.
10  **Q. Okay. Was it around the same**
11  **time that Phillip Stitt left, or was it**
12  **before?**
13  A. No. It was a couple of
14  months -- I'm thinking it was a couple
15  of months before Phillip.
16  **Q. Is it Seneca?**
17  A. Seneca.
18  **Q. Kinsey?**
19  A. Uh-huh.
20  **Q. How long had he been with**
21  **Merchants?**
22  A. I want to say Seneca had been
23  there a couple of years.

Page 143

1  **Q. Was he still there when you**
2  **left?**
3  A. He was.
4  **Q. When you started at Merchants**
5  **Foodservice, what hours were you**
6  **working?**
7  A. I started out going in at 7:30
8  and getting off at 4:30.
9  **Q. How long did you do that?**
10  A. Extremely short period of time.
11  I can't give you a time frame, but it
12  was extremely short.
13  **Q. Why did your hours change?**
14  A. Just I was told that I needed to
15  be there longer.
16  **Q. Who told you that?**
17  A. Hal did.
18  **Q. Did he tell you why?**
19  A. Just from day one when I -- like
20  I said when I went to work there, just
21  everything about that place was a mess;
22  day shift, night shift, transportation,
23  shorthanded. Just -- there was just no

Page 144

1  way to do what needed doing in an
2  eight-hour period. And, I mean, just
3  after a short indoctrination, that's
4  what he told me to do, you know. And
5  it -- he didn't look at what time I came
6  to work, which was always before him.
7  He looked at what time I left, which if
8  it was before him, he always had
9  something to say to me. And, I mean,
10  somebody doesn't have to say something
11  to you -- you know, even on a day where
12  we actually had a good day and things
13  went smooth, if I walked by his office
14  and he was still sitting in his office
15  before 5:00, he'd say, "You leaving
16  already." And, I mean, you get the
17  message. You understand that, you know,
18  you need to stay here longer.
19  **Q. Could you have come in later?**
20  A. Could I have?
21  **Q. Yeah.**
22  A. No.
23  **Q. Why not?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 145

1    A.  Because what we were doing at
2  that time as far as trying to get the
3  employees to be there on time and not
4  come in when they wanted to be, Seneca
5  had to start part of the day shift and
6  we had other things that I needed to do
7  just with the assisting the day shift
8  starting.
9    **Q.  Did you ever call Don Suber and**
10  **talk to him about the hours you were**
11  **working?**
12    A.  No, I did not.
13    **Q.  Did you call Andy about the**
14  **hours you were working?**
15    A.  No, I did not.
16    **Q.  As operations manager, were you**
17  **responsible for making sure the**
18  **operations worked smoothly?**
19    A.  I was.
20    **Q.  From what you found when you got**
21  **there, did you think you were going to**
22  **be able to get things to work smoothly?**
23    A.  I don't understand what you're

Page 146

1  saying. I -- at some point in time, I
2  hoped I would, yes. Just because I -- I
3  had no other choice. I had given up
4  what I had at SYSCO to go to work there.
5  I mean, my alternative was make this
6  work or do something else.
7    **Q.  Did you think you were qualified**
8  **to get things turned around with what**
9  **you found?**
10    A.  I think I was -- had I been
11  given what I needed to turn it around, I
12  would have been qualified, yes. I don't
13  think anybody, given what I had to work
14  with, was qualified to turn it around.
15    **Q.  What do you think you should**
16  **have been given?**
17    A.  Well, Andy and I talked on
18  numerous occasions about what we paid
19  our employees and it was a minimal
20  amount. I mean, they could make at
21  McDonald's what our forklift guys were
22  making. And compared to what we paid at
23  SYSCO, it was five or six dollars an

Page 147

1  hour less. So my employees, they didn't
2  care whether they came to work. They
3  didn't -- you know, if they missed work,
4  there were no repercussions. My hands
5  were pretty much tied where I couldn't
6  discipline them. And, you know, if they
7  lost their job, they could go to work
8  and a lot of them did. You go by
9  Hardee's sometime early in the morning
10  and get a biscuit and I'd see one of my
11  ex-employees working in the Hardee's
12  drive-through window.
13    **Q.  I don't know why you said your**
14  **hands were tied in terms of discipline.**
15  **Why couldn't you discipline anybody?**
16    A.  Because the shift -- the
17  turnover rate, we worked so shorthanded,
18  that I actually did, during the course
19  of my short tenure there, terminated two
20  or three employees and we had some
21  repercussions on night shift with some
22  trucks leaving later than we thought
23  they should have. And I was, point

Page 148

1  blank, told not to fire anybody else. I
2  could not fire anybody else.
3    **Q.  Who told you that?**
4    A.  Hal did. But I'm wanting to
5  think that Andy was -- I don't remember.
6  I had several conversations with Andy
7  about the way things were running and
8  not running. But I was, point blank,
9  told by Hal, I know, that just -- I
10  needed to just work given the
11  constraints I had, that we couldn't
12  afford to lose anymore people because we
13  just were running now.
14    **Q.  Now, I thought you testified**
15  **earlier that Andy had told you to fire**
16  **several managers if they weren't doing**
17  **they jobs. Is that --**
18    A.  He did. That was at an earlier
19  point in time.
20    **Q.  Okay.**
21    A.  That was early on. That was --
22  that was two to three months into the --
23  into it. I mean, like I said, from day

37 (Pages 145 to 148)

## FREEDOM COURT REPORTING

Page 149

1  one, it was screwed up and Andy would
2  call and question something about
3  transportation, you know. Why this
4  wasn't happening or why we were having
5  trouble hiring drivers or why we were
6  losing drivers or something like that.
7  And if I ever indicated that it might be
8  something to do with Jason or -- and
9  this is the same way with Phillip or
10  Randy, he'd say, "Well, fire their ass
11  and get whoever you want. Get you
12  somebody in there that can do the job."
13     Q.  As the operations manager,
14  wasn't it your responsibility to find
15  managers who could do the work?
16     A.  Well, I thought coming in what I
17  was told that I had managers in place
18  that could do the job. I mean, just
19  like I can't fire -- I mean, I can't be
20  there 24 hours a day. We actually did
21  start searching for a night warehouse
22  manager when we made the determination
23  to fire Phillip and then he quit and

Page 150

1  then --
2     Q.  When you started working there,
3  were you working nights?
4     A.  When I started?
5     Q.  Yeah.
6     A.  No. I did -- first couple of
7  weeks, I worked day shift.
8     Q.  Okay. Did you start working
9  nights at some point?
10     A.  I did the couple of days that
11  I -- you know, I said I was told during
12  the interview process I should do. And,
13  like I said, our numbers from the very
14  start -- way before I got there up until
15  now, just our shorts on trucks, our
16  mispicks, that type stuff was just
17  through the roof, so to speak. And
18  that's when it was suggested that I
19  needed to start working -- or not
20  suggested. I was just told I needed to
21  start working nights to see if we
22  couldn't get a handle on how to get our
23  numbers better and solve some of the

Page 151

1  errors we were having.
2     Q.  Was this before or after Phillip
3  Stitt quit?
4     A.  Before -- before he quit, I
5  worked probably four or five weeks.
6  When Phillip quit, I actually had to
7  start working nights, you know, because
8  I had no manager to work night shift.
9  Randy and I -- Randy actually worked a
10  few weeks at night. He and I would
11  alternate where I wasn't continually on
12  night shift. But throughout the course
13  of the ten and a half months, I worked
14  ten weeks on night shift.
15     Q.  Without a night manager, as
16  operations manager, were your -- I mean,
17  was it expected that you would be the
18  one to work at night until you had a
19  night manager?
20     A.  Somebody had to.
21     Q.  Well, if it wasn't you, who
22  would it be?
23     A.  Well, like I said, I worked

Page 152

1  one -- Randy and I rotated out.
2  Somebody had to be there.
3     Q.  Had y'all hired another night
4  manager before you stopped working at
5  Merchants Foodservice?
6     A.  We had.
7     Q.  Who did y'all hire?
8     A.  His name was -- I think his
9  first name was James. His last name was
10  Tankersley.
11     Q.  As operations manager, did you
12  have to work with James Tankersley to
13  who him how things operated?
14     A.  I did.
15     Q.  Was that out of the ordinary for
16  an operations manager to have to do
17  that?
18     A.  No.
19     Q.  Before Phillip quit, the four
20  weeks or so that you worked nights, why
21  did you work nights those weeks?
22     A.  Just because the night shift was
23  in such disarray. I mean, we were late

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 153 | Page 155 |
|---|---|
| 1 trucks, short on employees, just -- I | 1 **Q. As an operations manager, is** |
| 2 mean, it was just horrendous the way it | 2 **that something that you would be** |
| 3 was -- we were functioning on night | 3 **expected to be at?** |
| 4 shift. | 4 A. I'm sure you would be, yes. |
| 5 **Q. Do you know what the numbers for** | 5 **Q. How about the truck drivers** |
| 6 **the night shift were before you started?** | 6 **meetings, as the operations manager over** |
| 7 A. I don't have any recollection of | 7 **transportation, is that something you** |
| 8 any numbers, what they were before I | 8 **needed to be at?** |
| 9 started or what they were while I was | 9 A. They thought I did. |
| 10 there. | 10 Q. Who is "they"? |
| 11 **Q. Do you know how they compared** | 11 A. Merchants. Hal. |
| 12 **while you were there to before you were** | 12 **Q. Were there any Saturdays that** |
| 13 **there?** | 13 **you went up on your own just because you** |
| 14 A. I think they were actually worse | 14 **felt like you needed to get some stuff** |
| 15 while I was there, but I don't know | 15 **done?** |
| 16 that. Just I didn't make my bonus, so | 16 A. No. |
| 17 something must have been wrong. | 17 Q. Do you think Hal was a good |
| 18 **Q. How many Saturdays did you have** | 18 boss? |
| 19 **to work?** | 19 A. Good in which way? |
| 20 A. Worked a total of eight. | 20 **Q. I mean, just in general did you** |
| 21 **Q. Why did you work those** | 21 **think he was a good boss?** |
| 22 **Saturdays?** | 22 MR. BLYTHE: I'm going to object |
| 23 A. A couple of them were for | 23 to the form of that question. Go ahead |

| Page 154 | Page 156 |
|---|---|
| 1 inventory, scheduled inventories. Our | 1 and answer it. |
| 2 inventory was so messed up, we | 2 A. On a scale of one to ten -- and |
| 3 actually -- they called a different | 3 this may not be the way you want me to |
| 4 inventory or our numbers from one | 4 answer it -- I would say Hal was |
| 5 inventory didn't match up. You know, | 5 probably a three. |
| 6 something was wrong and we were required | 6 **Q. Okay. Why would you say he was** |
| 7 to do another inventory, and that was a | 7 **a three?** |
| 8 Saturday. One Saturday, we had a -- I | 8 A. One, I never had -- and this is |
| 9 think they had a rodeo or something like | 9 me personally. From all I had been told |
| 10 that. And one Saturday, we had some | 10 beforehand to what I found out from day |
| 11 truck -- truck drivers meetings and I | 11 one, I knew he had out-and-out lied to |
| 12 don't think that adds up to -- I don't | 12 me to get me to come to work there. So |
| 13 remember why -- why I was there. | 13 I'm not going to put a whole lot of |
| 14 **Q. I don't understand what you mean** | 14 faith in that individual from the |
| 15 **you had a rodeo.** | 15 get-go. To disrupt my life and alter my |
| 16 A. For the truck drivers. They | 16 life -- it wasn't just a disruption. It |
| 17 participate in an obstacle course type | 17 altered my life forever. What he told |
| 18 deal and then whoever wins that rodeo | 18 me and what he led me to believe and the |
| 19 actually gets a trip to go to | 19 basis for my coming to work there, it's |
| 20 participate in the national rodeo. | 20 hard to pat that man on the back and |
| 21 **Q. Okay.** | 21 say, yeah, he's a great guy. |
| 22 A. So it was just a function for | 22 **Q. In terms of his leadership for** |
| 23 the drivers. | 23 **the folks working there, how did he do** |

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 157

1 at that?
2    A.  I think everybody liked Hal.
3 Hal wanted -- Hal wanted to be liked.  I
4 think he sometimes may have made
5 promises to the sales staff, that's what
6 he thought they wanted them to hear and
7 not necessarily what he thought he could
8 deliver.  So, there again, from an
9 integrity standpoint, I'm not sure.  You
10 know, I know he wanted to be liked and
11 everybody did, for the most part.  The
12 other employees did like Hal.
13    Q.  The things that you say were
14 told to you to make you decide to come
15 to Merchants, were those things -- are
16 those things that were primarily made by
17 Hal, or are they things you're saying
18 were also made by Don and Andy?
19    A.  Predominately, like I said, Hal
20 conducted the nuts and bolts of the
21 interview.  Andy and Don came in, more
22 or less, in a mop-up effort just to meet
23 and greet.  And, you know, the few

Page 158

1 questions I've already mentioned that
2 they asked, they asked, but I think they
3 were relying on Hal's recommendation
4 from what transpired.  And that's just
5 the way I see it.
6    Q.  You're claiming here that you
7 were fraudulently induced to come to
8 work at Merchants Foodservice.
9    A.  Uh-huh.
10    Q.  I'm just trying to figure out
11 who you think are the folks that
12 fraudulently -- I mean, how you were
13 fraudulently induced to come here in
14 terms of what was said.
15    A.  In terms of what was said?
16    Q.  Yeah.
17    A.  Hal Henson.
18    Q.  Okay.  All right.
19    A.  He's the one that made the
20 promises, the statements, the deviation
21 from -- you know, you keep going back to
22 handbooks and all that.  I didn't base
23 any of my decision to come to work for

Page 159

1 Merchants on any of this material right
2 here.  It was all based on what I was
3 told during the interview by Hal Henson.
4 And, like I said, you throw in the
5 family orientation stuff and all like
6 that from Andy.  But by and large, Hal
7 Henson told me everything I relied on to
8 base my decision on.
9    Q.  When you started there, did Hal
10 give you -- and throughout while you
11 worked there, did Hal give you guidance
12 in how to run the operation?
13    A.  No, he did not.
14    Q.  What did he do?
15    A.  He let me know what was wrong or
16 what he thought was wrong and told me I
17 needed to fix it.
18    Q.  We talked about vacation days
19 and what you request.  How many
20 vacations days did you request while you
21 worked there?
22    A.  I asked off three particular
23 instances.  The first two was just a

Page 160

1 day.
2    Q.  Okay.  What happened on those
3 two instances when you asked off?
4    A.  I was just told that now, you
5 know, I couldn't have them.  One was --
6 and then I tried to tie it all with the
7 weekend, you know, to -- I didn't want
8 one isolated day on a Tuesday or
9 Wednesday, but I was just told that I
10 couldn't have them.  The last time I
11 asked off was in June, I think, and this
12 was in a meeting I had with Scott Casey
13 and Hal Henson.  And we had something
14 coming up, a family deal down in Florida
15 that I wanted to -- you know.
16        And at this point in time, I
17 wasn't asking for just a day off I had
18 been promised and never got.  I actually
19 in January 1 -- according to the
20 handbook and I think maybe it states
21 this and in my statement I said what Hal
22 told me was a year after -- five days
23 after a year, which is what he told me.

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

<table>
<tr><td valign="top">

Page 161

1  But if you had been there a certain
2  amount of time, you got prorated like
3  when the year started in January '05, I
4  actually accrued two days' vacation
5  then.
6          And this was in June that I made
7  this request for two days off to go to
8  Florida with my family for a reunion and
9  I was just told I couldn't have them.
10 And at the time, I told Hal -- I said,
11 "Well, Hal, I've been here for over ten
12 months. You told me I could have off.
13 You told me all I ever had to do was ask
14 off and you'd give me time off. All I
15 want is two days and I'll use my
16 vacation days. But I would like to have
17 off. I haven't been off in ten months."
18 He said now is not the time. And the
19 place was in turmoil. I'm not denying
20 that. It was in a shambles. But I was
21 mentally, physically beat, frustrated
22 and asked for two days off for a little
23 R and R and spend some time with my

</td><td valign="top">

Page 163

1  pitching in and helping or offering
2  any -- you know, other than needing to
3  work longer was how he helped me. You
4  know, telling me I needed to work
5  longer.
6      Q.  When did he come over?
7      A.  I don't know when he actually --
8  he came to work after I came to work
9  there and the -- my counterpart in
10 Jackson -- and I'm trying to think of
11 his name -- he replaced him. He was
12 fired and Scott replaced him. And
13 sometime shortly thereafter, he was
14 named something else. I don't recall
15 what his title was, but he was given
16 another --
17     Q.  Director of operations? Does
18 that sound --
19     A.  No. I think that's what he was
20 hired as, but --
21     Q.  When did he come over there to
22 Clanton to observe?
23     A.  He came -- during some period in

</td></tr>
<tr><td valign="top">

Page 162

1  family and was told I couldn't have it.
2  Now was not the time to be asking off.
3      Q.  The other two times that you had
4  asked for a day off to go at the
5  weekend, were you told why you couldn't
6  have those days off?
7      A.  I don't recall why -- the reason
8  why. I just -- that I was told I could
9  not have them.
10     Q.  Do you know how operations were
11 going around that time when you asked to
12 be off on those Fridays or Mondays?
13     A.  An overview of how it ran the
14 whole time I was there, it was awful, to
15 be honest with you. It never got any
16 better. It just gradually continued to
17 get worse despite my efforts.
18     Q.  At some point, did Scott Casey
19 come over to help out in the operations?
20     A.  I'm not going to say he was so
21 much there to help as he was to observe.
22     Q.  Okay. What --
23     A.  I don't remember him ever

</td><td valign="top">

Page 164

1  time, he would come almost every other
2  week.
3      Q.  Okay.
4      A.  He was a regular there the last
5  six or eight weeks that I worked there.
6      Q.  Did he ever stay for an extended
7  period of time, or was it just to come
8  for a day and then go back?
9      A.  No. He would spend the night.
10 Sometimes a couple of nights.
11     Q.  While he was there, did you tend
12 to work more?
13     A.  Did I --
14     Q.  Tend to have longer hours?
15     A.  No.
16     Q.  By this point, what hours were
17 you working in a typical day?
18     A.  In a typical day, from 6:45 in
19 the morning till 5:15, 5:30 in the
20 afternoon.
21     Q.  About how long of your
22 employment were those the hours that you
23 were typically working?

</td></tr>
</table>

41  (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 165

1   A.  I started working that when
2   Phillip's absenteeism got to where it
3   was a problem.  I was still coming in
4   the 6:45 to 7:00 clock-ish for day shift
5   reasons, but then I needed to stay and
6   be there.  The night shift normally came
7   in -- depending on -- you know, we would
8   know the day beforehand what our
9   schedule basically looked like for the
10  next day and we tried to keep our night
11  shift from coming in too early if day
12  shift wasn't going to be through, so you
13  didn't have all your selectors around on
14  the clock being nonproductive.  But when
15  Phillip's absenteeism got to be a
16  problem, I had to stay there and ensure
17  that he showed up.  And in the interim,
18  Rodney had been fired and we had
19  promoted two of the lead men to
20  supervisors and they were green as grass
21  as far as running a shift or dealing
22  with employees, you know.  They were
23  used to being an employee; not a

Page 166

1   supervisor.  So to give you a specific
2   from this date to that date, I can't.
3   But that's about the time those hours
4   started.
5   Q.  When you worked at SYSCO or Alex
6   City doing the food distribution, did
7   you ever have a manager quit or get
8   fired, or supervisor?
9   A.  Never had one fired at Alex City
10  Provision.  Like I said, we were smaller
11  than Merchants and I basically only had
12  the one guy on days and the one guy on
13  nights.  When George died on nights and
14  Mark moved up to take his spot and, like
15  I said, he was there, so I didn't.  And
16  the whole time I was at SYSCO as far as
17  day shift, night shift, never had one
18  leave for any reason.  As our business
19  grew, they actually promoted, you know,
20  one of the night sups to assistant night
21  manager and hired one of the lead men
22  off of nights to be a supervisor.  So
23  they actually increased the staff, but I

Page 167

1   never saw one leave.
2   Q.  Any other problems at the plant
3   that you were not expecting when you
4   started working there?
5   A.  Well, I wasn't expecting the
6   equipment to be in the shape it was in,
7   given it was a newer facility than what
8   I came from.  But the equipment was just
9   awful.  Breakdowns constantly, no
10  scheduled PMs on it, no -- preventive
11  maintenance is what a PM is.  No
12  nothing.  It was just -- when it got to
13  where it wasn't operational and would
14  not run anymore, that's when they would
15  fix it.
16  Q.  Did you talk to Hal or did Hal
17  talk to you about the machinery during
18  the interview?
19  A.  I talked to Hal and Hal told me
20  I needed to be talking to Jimmy Triggs;
21  not to him.  That Jimmy Triggs was
22  corporate maintenance and he controlled
23  the pursestrings, so to speak, on what

Page 168

1   could and could not be done with the
2   equipment.
3   Q.  I'm going to mark as Defendant's
4   Exhibit 18 -- is this an e-mail dated
5   May 26th, 2005 to Jimmy Triggs?  Was
6   that what you were talking about in
7   terms of getting in touch with Jimmy
8   Triggs about the equipment?
9       (Defendant's Exhibit No. 18 was
10          marked for identification and
11          is attached.)
12  A.  This particular e-mail was after
13  we -- I had eventually convinced Jimmy
14  to start a scheduled maintenance
15  program.  Our repairs -- and I don't
16  remember exactly and I may be off here
17  or there.  But not our maintenance, but
18  our repair bills on our equipment
19  averaged an excess of $10,000 a month
20  for repairs.  So I finally convinced him
21  it would be -- and I think Andy was part
22  of this decision-making process, that it
23  would be cheaper and more effective from

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 169

1  the long-run standpoint, one, to get the
2  stuff up and running so we weren't
3  working half the night with half our
4  equipment broke down; two, from a safety
5  standpoint, we had the equipment out
6  there that was just totally unsafe to be
7  on.
8      And they finally bought into the
9  preventive maintenance and I believe the
10 company we got to come in was Carolina
11 Handling, I believe is who we got to
12 come in and do the scheduled
13 maintenance.  And when they started
14 working on the equipment, of course, we
15 wanted to get everything up and going.
16 So they came in and over the course of
17 several weeks did a checkup, so to
18 speak, on each piece of equipment.  And
19 they fixed the simple stuff then.  Some
20 of them needed the whole carriages
21 replaced on.  I mean, expensive,
22 expensive repairs, that given the years
23 of neglect, I mean, it was going to take

Page 170

1  to get them back in shape.
2      And the guy came in and I had to
3  sign off on all this stuff just before I
4  could send it to Jimmy to be paid and he
5  had red-flagged on each invoice on
6  particular pieces of equipment things
7  that the tech had to point out these are
8  safety violations.  And I was signing
9  that I was being made aware of these
10 safety violations.  This e-mail to Jimmy
11 was making him aware that I was
12 forwarding some stuff because he said we
13 can't afford to do all this at once.
14 We're going to need to factor it in over
15 a several-month period of time and
16 spread it out over the budget over
17 several months so we don't take such a
18 big hit in one month on our numbers.
19     And I wanted to make Jimmy aware
20 of the fact that I was signing off and
21 putting my name on this that I am aware
22 these pieces of equipment have safety
23 issues with them and I wasn't

Page 171

1  comfortable with that since I wasn't the
2  one that controlled whether they were
3  going to be fixed or not.  And I copied
4  Merle Rester who was the corporate
5  safety director on this also.
6     Q.  Okay.
7     A.  And what I was told in phone
8  conversations by both of them, neither
9  one responded back via e-mail or I would
10 have had that for you.  But they just
11 called me back on the telephone and told
12 me not to worry about it.  That
13 Merchants had good insurance, that I
14 wasn't an entity or an officer of the
15 company.  I couldn't be held liable for
16 anything that happened.  And that they
17 were going to work on it and get
18 everything up to snuff and just quick as
19 they could and for me not to worry about
20 it, so --
21    Q.  Did Hal say anything to you
22 about the machinery during your
23 interview?

Page 172

1     A.  No, he did not.
2     Q.  Did you ask him anything about
3  the machinery during your interview?
4     A.  No, I did not.
5     Q.  Anything else that you found
6  working there that you were not
7  expecting?
8     A.  Well, I guess -- can I synopsis
9  this?
10    Q.  Sure.
11    A.  And this goes back to what
12 you've got there in front of you.  But
13 the things I found out when I went to
14 work there were, one, I definitely was
15 going to work a lot more hours than they
16 told me; two, I wasn't going to have any
17 time off; three, I was going to work
18 night shift and Saturdays; four -- and
19 this is real important -- is the staff
20 just totally, totally, totally was
21 terrible.
22      I've never worked anywhere in my
23 life that had a turnover rate -- I

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1 didn't know places existed that had
2 turnover rates this high. Never heard
3 of it in the food service industry
4 before or any other industry. With a
5 200-plus percent turnover on days and
6 400-plus on nights. So that, the
7 condition of the warehouse, the
8 uncleanliness of the warehouse, the --
9 like I said, a five-year-old facility
10 looking 20 years old, the equipment,
11 like I said, looked just like the
12 facility. I didn't expect to find any
13 of that when I went to work there.
14    **Q. Okay. We've already talked --**
15 **you and Hal did not talk about the**
16 **equipment during your interview?**
17    A. No, we didn't.
18    **Q. Did y'all talk about the**
19 **condition or cleanliness of the**
20 **warehouse during your interview?**
21    A. No, I did not. That's when I --
22 you know, I asked for a warehouse tour,
23 but the way he explained it about not

Page 174

1 making the announcement yet or anything
2 like that, I -- and I assumed, so
3 that's -- you know, I know what that
4 does. But I assumed that it was going
5 to be real similar to what SYSCO was,
6 given it was a newer facility than what
7 we had there.
8    **Q. But Hal didn't make any**
9 **statements about that?**
10    A. No. He didn't say I've got an
11 excellent facility or real clean, brand
12 new equipment. He didn't make that
13 statement like he did about the staff.
14    **Q. I'm going to mark as Defendant's**
15 **Exhibit 19 -- you talked about turnover**
16 **rates on the day and the night shift.**
17 **This is a document that your attorney**
18 **sent me yesterday. I've only got one**
19 **other copy over here. Is that what you**
20 **were referring to?**
21      (Defendant's Exhibit No. 19 was
22      marked for identification and
23      is attached.)

Page 175

1    A. Yes.
2    **Q. Where did you get this?**
3    A. From Melanie Allstage, the HR
4 director.
5    **Q. When did you get it?**
6    A. Should be dated. 7/1/2005 is
7 what I'm assuming. That's when she ran
8 the report, so --
9    **Q. Were you still working for the**
10 **company when you got it?**
11    A. I was.
12    **Q. Why did you take it with you?**
13    A. I had it in my belongings when I
14 left.
15    **Q. Anything else you had in your**
16 **belongings from Merchants when you left?**
17    A. Just I've given you everything
18 that I knowingly have.
19    **Q. What would drivers be considered**
20 **in terms of employment? Would they be**
21 **listed as drivers?**
22    A. I think they would. I think
23 this is just the -- it's broken down by

Page 176

1 day shift and night shift.
2    **Q. So transportation is not on**
3 **here?**
4    A. Transportation is not on here.
5    **Q. What was the turnover like in**
6 **transportation?**
7    A. I don't have the numbers in
8 front of me. But I know hiring and
9 keeping drivers was a constant problem
10 for us. That's something -- we were
11 trying to hire drivers when I went to
12 work there. We were trying to hire
13 drivers when I left, so --
14    **Q. Okay.**
15    A. We had actually taken back
16 drivers that had been terminated for
17 whatever reason. We'd actually gone out
18 and asked them to come back to work for
19 us, so that's how bad it was.
20    **Q. What made you decide to leave**
21 **Merchants Foodservice?**
22    A. It's stated in my thing, the day
23 I left, which was July the 12th, I

44 (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1  believe. That was one of Scott's
2  days -- that's the day he arrived, best
3  I remember, and we had had a meeting
4  that morning discussing a few things.
5  And he got there at 10:30, 10:45,
6  something like that. So we broke for
7  lunch and we were going to continue
8  after lunch when we got through. And
9  after lunch at 1:00 or so, came back in,
10  went to the conference room. Scott,
11  Hal, and myself sat down and Hal told me
12  that Scott was fixing to discuss a few
13  things with him and that I could just
14  deem him being the one -- I was always
15  told that Hal was my boss. He was my
16  supervisor. He -- you know, Hal was who
17  I answered to. But Hal made the
18  statement that Scott was fixing to make
19  a few statements and what he said, I
20  could consider it coming from him
21  because he and Scott had already talked
22  about it.
23        And Scott told me that -- Scott

Page 178

1  had told me on more than one occasion
2  that I needed to be working 11, 12 hours
3  a day. That's what he did all the same
4  time in Jackson and -- but when we first
5  got started, he said, "Steve, I've got
6  to lay out some things for you." He
7  said, "From now on, I expect you to work
8  60 hours a week." And he said, "You're
9  going to work day shift one week and
10  night shift the next." And he said,
11  "Until I tell you different, that's
12  going to be your schedule."
13        And I immediately stood up,
14  handed in my keys or put them on the
15  desk. I didn't hand them to anybody. I
16  laid my keys and my cell phone on the
17  desk and told them I quit. I could do
18  them a letter of resignation if they
19  wanted me to, but I was through. I told
20  them I had been fed up from the get-go
21  from being lied to, that nothing I was
22  told was like it was when I was coming
23  to work here. It progressively had

Page 179

1  gotten worse. And, like I said just a
2  couple weeks earlier, Scott had denied
3  me being off any time. And, you know,
4  even after I explained to him that I was
5  mentally and physically had all I could
6  have and take with just bumping your
7  head up against a brick wall and then
8  for him to come in and tell me that I'm
9  going to start working 60 hours a week,
10  that's mandatory, and I'm going to work
11  nights one week and day shift the next
12  week, that was just the proverbial
13  straw.
14        I gave them my stuff and I don't
15  think -- I don't remember writing a
16  letter of resignation. I don't
17  remember -- I know I didn't clean my
18  desk out. I didn't do anything. I was
19  just -- just shaking. I was -- I don't
20  know if I was mad, distraught, what, but
21  I'd had it.
22        I've never left a job in my life
23  without already having one in place to

Page 180

1  go to. But I walked out that facility
2  not having a clue what I was going to
3  do. When I got in the car, I got my
4  cell phone and my wife knew the pressure
5  I was under and what I was going through
6  and she told me many times just quit.
7  Tell them to kiss your ass and leave.
8  But I didn't. I had to have a job and I
9  was hoping for a long time I could make
10  that work, but I couldn't.
11        And I called her and I told her
12  I quit and she said, "How do you feel."
13  I said, "Baby, believe it or not, I feel
14  like the weight of the world has been
15  lifted off my shoulders." And she said,
16  "Well, good for you." And I've just
17  been -- you know, two months without
18  working, couldn't --
19  **Q. If you need to take a break, we**
20  **can.**
21  A. Yeah, if I can. Yeah.
22        MR. DYKES: That's fine.
23        (A break was taken.)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 181

1  Q.  (BY MR. DYKES:)  I'm going to
2  mark as Defendant's Exhibit 20 a
3  resignation letter.
4        (Defendant's Exhibit No. 20 was
5        marked for identification and
6        is attached.)
7  Q.  Do you recognize this,
8  Mr. Adams?
9  A.  I do.
10  Q.  Have we talked today about the
11  things in the letter that you were
12  saying nothing I was told during the
13  interview process has turned out to be
14  truthful?  Have we talked about all of
15  those things?
16  A.  We have.
17  Q.  Okay.  Have we talked about the
18  problems that you had in the facility
19  once you started working there?
20  A.  Uh-huh.
21  Q.  Any area that we haven't talked
22  about that you can remember?
23  A.  I can't remember any other that

Page 182

1  I need to talk about or bring up.
2  Q.  And I understand that you're not
3  a lawyer, and I know that your attorney
4  drafted your complaint, which I'm going
5  to mark as Defendant's Exhibit 21.
6        (Defendant's Exhibit No. 21 was
7        marked for identification and
8        is attached.)
9  Q.  This is a copy of the complaint
10  that was filed in the case.
11        MR. DYKES:  I figured you
12  probably have got one.
13        MR. BLYTHE:  Yeah, I've got it.
14  Q.  (BY MR. DYKES:)  Can you just
15  tell me in your own words why you filed
16  this lawsuit?
17  A.  In my own words, I was, for lack
18  of a better term, lured away from a job
19  I had, a good job I had, a job that I
20  really enjoyed, a job with great
21  benefits, a good salary.  Just the
22  financial end of working at SYSCO
23  compared to where I had come from or

Page 183

1  where I had ever been in my life, you
2  know, was something like I'd never seen.
3        But I was lured away from that
4  by what turned out to be just
5  out-and-out fraudulent statements, lies,
6  deceit, ever how you want to phrase it.
7  And I felt like that ought to be against
8  the law.  And, so, I put on paper my
9  experience best I could remember from
10  initial contact through the day I left
11  and contacted Derrick.  And upon his
12  recommendation --
13  Q.  I don't want to know what
14  Derrick told you.
15        MR. BLYTHE:  Yeah.  Don't --
16  Q.  Yeah.  I don't want to know
17  that.
18  A.  Okay.  Just I think I had a
19  case, a real good case, because I know
20  what happened to me, I know what was
21  told to me, and I know what I walked in
22  and found out to actually be the case.
23  I know what I gave up leaving SYSCO and

Page 184

1  I know at a bare minimum what I could
2  have had at retirement.  Their policy
3  was three percent minimum annual raise.
4  I never received less than, just
5  four in my tenure there.  As much as
6  eight in a year's time, but a minimum of
7  three.  It was guaranteed to me.  And
8  you expound that out to the age I retire
9  and what that would have been, worse
10  case scenario, against what I can
11  expect, given my certain circumstances,
12  then you do the same thing with my
13  pension plan I had there.
14        They had a pension plan that was
15  based solely on longevity.  It wasn't
16  anything I contributed to.  It wasn't
17  anything -- you know, wasn't 401-K or
18  something like that they matched.  This
19  was an employee benefit they gave their
20  employees for long-term service.  That's
21  a finite.  That's written in stone what
22  their policy is.  I know what I'm
23  drawing now.  I was vested fortunately

46  (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  and I'll draw a small pension, but it's
2  a penance compared to what I would have
3  drawn had I completed my career at
4  SYSCO. It's substantial in both cases,
5  the difference in salary, plus my
6  pension are substantial. And I filed
7  the lawsuit to recoup what I had, and
8  pardon the French, or I won't -- I'll
9  phrase it a different way, that I had
10  been wronged out of.
11     Q. How much do you think you were
12  wronged out of in salary?
13     A. The way I put it together was
14  taking my base salary at SYSCO, no
15  bonus, just my base salary, and did that
16  out exponentially three percent per
17  year. So this is worse case scenario.
18  Against what I hope to go to work for.
19  Actually, before I -- a couple of weeks
20  I was unemployed mulling over what to do
21  and, you know, I spent some time on the
22  Internet looking at what constitutes
23  fraud or breach of contract, you know.

Page 186

1  I researched best I could in layman's
2  terms on the Internet. And to put a
3  dollar figure on it, I went -- worse
4  case scenario with SYSCO, I applied for
5  several jobs that the position I was
6  applying for started out at 35 or less a
7  year. Where I actually went to work, I
8  started at $700 a week, so that's -- or
9  not 700 a week. I started at 35,000 a
10  year, which is a little less than 700 a
11  year [sic]. But I didn't know where I
12  was going to be working when I put the
13  figures together.
14     But doing it worse case scenario
15  like that in salary, I'm going to lose
16  in excess of $400,000 over what I would
17  have had bare minimum. And, like I
18  said, that's assuming I stayed a day
19  shift supervisor at SYSCO for the next
20  20 years and was never promoted. That's
21  staying in the same position till I was
22  67 years old.
23     The same with the pension. The

Page 187

1  pension's pretty much etched in stone.
2  It's based on your five years highest
3  salary average time a percent and a half
4  for every year worked. So that's -- you
5  know, that could vary some. But, again,
6  I put my number together worse case
7  scenario and that's -- I don't remember,
8  but it was over $300,000 according -- I
9  think I gave you a thing that details
10  that.
11     But I'm looking to recoup what I
12  was wronged out of. And I would be
13  willing and -- to send a statement, so
14  to speak, from a punitive standpoint,
15  you know. I don't know whether that's
16  fair or right or whatever. But I feel
17  like I've been wronged and wronged in a
18  bad way and the message needs to be sent
19  to Merchants as well as any other
20  business, I guess, doing business in the
21  State of Alabama that this is against
22  the law. And as far as a punitive
23  standpoint, I would seek whatever a jury

Page 188

1  thought the case merited and I hope that
2  would be substantial.
3     Q. If another company in the food
4  distribution business had come along and
5  offered you more than you were making at
6  SYSCO like Merchants Foodservice did,
7  would you have interviewed with them and
8  talked to them about it?
9     A. While I was at SYSCO?
10     Q. Well, I mean, you talked to
11  Merchants.
12     A. Yeah.
13     Q. Because somebody called offering
14  you more money and a better bonus.
15     A. Yes.
16     Q. If somebody else had called
17  while you were working at SYSCO and
18  offered you more money and a better
19  bonus, would you have talked to them
20  about a job?
21     A. Since they never called, I
22  really don't -- don't know.
23     Q. Well, let's say that U.S.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 189

1 Foodservice had been the one calling
2 instead of --
3       MR. BLYTHE: I'm going to object
4 to the form of the question. I'm going
5 to let him go ahead and answer it.
6    Q.  Say U.S. Foodservice had called
7 in August of 2004 instead of Merchants
8 Foodservice, would you have talked to
9 them about a job?
10    A.  If they had given me the
11 information -- you know, I would have
12 asked what it paid. Just --
13    Q.  Right.
14    A.  You know, if it had been equal
15 or just that much more, absolutely not.
16 Had it been a substantial salary
17 increase, then, yes, I would have --
18 would have interviewed or pursued it to
19 see where it led and what, in actuality,
20 would be offered, yes.
21    Q.  Have we talked about all the
22 ways you think you have been defrauded
23 today?

Page 190

1    A.  Yes.
2    Q.  Okay. Now, you have a complaint
3 that you were told things that were
4 wrong and we've talked about all those,
5 is my understanding; is that right?
6    A.  Uh-huh.
7    Q.  There's also a claim that there
8 were things that you were not told that
9 you claim you should have been told. Is
10 there anything that you -- is there
11 anything that you claim you should have
12 been told that you weren't told? Let me
13 strike that question.
14       Other than the statements that
15 you think that you say were told that
16 were wrong, is there any other way that
17 you are claiming that you were defrauded
18 in this case?
19    A.  If I understand the question and
20 I think I do, no. I mean, I asked
21 questions, I was answered, and that's
22 what I based my decision on. That's all
23 the information at the time I had to go

Page 191

1 on.
2    Q.  Okay.
3    A.  So what we've talked about is
4 the basis for the fraud, yes.
5    Q.  Okay. We've talked monetarily
6 how you believe you've been damaged.
7 What other ways do you claim that you've
8 been damaged?
9    A.  From a -- like I said, and I
10 don't know how this factors in to
11 anything, I'm just going to tell you my
12 mental state, you know, and when I
13 finally resigned, wasn't eating, wasn't
14 sleeping, just not -- I knew it couldn't
15 go on much longer, not given the way
16 things were. I had no foreseeable light
17 at the end of the tunnel that things
18 were going to get better.
19       And from a financial standpoint,
20 a man with a house, truck payment, car
21 payment, all those sort of things, I
22 didn't know what I was going to do. But
23 I knew I couldn't keep on doing what I

Page 192

1 was doing, so just -- you know, I don't
2 really know what mental anguish is or
3 anything like that. I was physically
4 and mentally distraught, I guess, is the
5 best way to put it. Couldn't eat,
6 couldn't sleep.
7       My wife would probably tell you
8 I couldn't do something else. But, you
9 know, I figured that would heal in time.
10 You know, just like I said, when I quit
11 and walked out the door and called my
12 wife, I felt better immediately. The
13 weight of the world lifted off my
14 shoulders temporarily. But then the two
15 months I was there living off cashing
16 CDs and cashing in my 401-K and living
17 off money I'd worked hard to save
18 because the bills kept on coming in, you
19 know, they didn't care whether I was
20 working or not. They didn't stop. So
21 that plays on you wondering what you're
22 going to do when that money runs out.
23 And I started trying to find a job two

48  (Pages 189 to 192)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 193

1  days after I left and it took me two
2  months to find a job.
3      Q.  **Where all did you look for a**
4  **job?**
5      A.  Locally, I tried Samlip, which
6  they make automotive parts for -- I
7  think it's a Honda or Hyundai
8  dealership.  Honda dealership.  Wellborn
9  Cabinet has a real nice facility there.
10  They hire about 400 people or employ
11  about 400 people.  They build custom
12  cabinetry.  Tried Wellborn.  The brother
13  has got a competing plant there in
14  Ashland, which is about 35 miles away.
15  I tried Wellborn Cabinet.  I did try the
16  Honda plant in Lincoln.  I tried the
17  State of Alabama in Montgomery, Auburn
18  University in Auburn.
19      Q.  **What did you try at the State of**
20  **Alabama?**
21      A.  They have just -- if you go
22  online to their Web site, they've
23  actually got a list of positions that

Page 194

1  are available.  Some are merit positions
2  that only existing employees can apply
3  for.  Some are at-large and you actually
4  fill out an application, three or
5  four-page application that lists your
6  qualifications, your education.  And,
7  you know, they give you the criteria --
8  minimum criteria to be eligible for the
9  job that you are applying for.  And
10  actually, my brother works with the
11  Highway Department.  He's a State of
12  Alabama employee.  He gave me the
13  directory and told me to how to do it.
14      I went through the positions
15  that I was qualified for and filled out
16  aps and sent in for every one of those
17  and they actually put you on a list and
18  grade you by your application.  And I
19  made two lists for the two of the --
20  three of the jobs I applied for, I
21  actually made a list, but it's a list
22  that encompasses -- you know, I don't
23  know how many names go on there.  But

Page 195

1  it's sort of a wait and see type deal.
2  We'll call you.
3      And, actually, I did get
4  contacted -- this was after I went to
5  work for Russell Lands.  But they
6  contacted me and told me I'd been moved
7  up the list and if I was interested, I
8  needed to respond.  And I never
9  responded because I was already
10  gainfully employed again, but --
11      Q.  **Okay.  Where else did you --**
12  **you got the State of Alabama.  What did**
13  **you apply for at Auburn University?**
14      A.  I don't remember the position.
15  There again, you can go online there and
16  they list, you know, employment
17  opportunities.  It was something to do
18  in a supervisory role.  I don't remember
19  the exact department that it was.
20      Q.  **Did you get any interviews with**
21  **any of these folks or any of these**
22  **companies?**
23      A.  No, I did not.

Page 196

1      Q.  **Where was your first interview**
2  **after -- after you left Merchants**
3  **Foodservice?**
4      A.  Formal interview was with
5  Russell Lands.
6      Q.  **What was that for or what was**
7  **that job for?**
8      A.  For the position I hold now,
9  which is assistant manager at the Ridge
10  Marina.
11      Q.  **What are you doing as the**
12  **assistant manager?**
13      A.  As assistant manager when I
14  started and currently, it's -- my actual
15  job description changes May 1.  But the
16  day-to-day running of the marina, which
17  we're a full service owned water marina.
18  We have gas pumps, you know, on the
19  docks and we've got dry storage, stack
20  storage in back.  We've got 100 wet
21  slips where we keep our -- customers
22  have larger cruisers in water, you know,
23  cabin cruisers, stuff like that.  And a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 197

1 dealership -- service department, so
2 it's just managing all those aspects.
3         And I actually did -- when I
4 started there, we had one full-time
5 salesperson who retired. I started in
6 September. Rick actually retired in
7 November and I actually was our
8 full-time salesperson till we hired
9 another salesperson, you know. Along
10 with my responsibilities as assistant
11 manager, I actually was our sales force
12 for a short period of time.
13         We hired another full-time
14 salesman shortly after Rick left and a
15 couple of -- almost a month ago, I
16 guess, we hired another full-time
17 salesperson. So we've got a sales staff
18 of two now that work in the dealership
19 and they're going to be predominantly
20 sales. And we've actually -- our
21 business has grown. We're in the
22 process of adding an additional 450
23 slips now, dry slot slips.

Page 198

1         We're in a development that is a
2 hot spot on Lake Martin, I guess, and
3 it's growing by leaps and bounds. But
4 we've never had a true service manager,
5 parts manager, service writer,
6 blah-blah-blah-blah-blah. Jeff and I
7 sort of split those details; Jeff being
8 the marina manager.
9         But starting in May, I'm totally
10 out of sales and going to be still
11 assistant manager, but my thing is going
12 to be service and storage. I'll
13 actually order the parts, do the service
14 write-ups, distribute those to the
15 techs. And then when they're through
16 with them, I'll bill out the parts to
17 the work order and close the work orders
18 and they get, in turn, passed on to
19 accounts receivable where we send out
20 the statements and get our bills paid.
21    Q.  What's your salary with them
22 now?
23    A.  My salary is -- like I said, I

Page 199

1 started out at 35,000 a year,
2 whichever -- I don't know how that
3 breaks down --
4    Q.  Yeah.
5    A.  -- weekly. Now, I don't really
6 know what my annual salary is. But I
7 did get an increase and my salary now is
8 721.15 a week. So whatever that equates
9 to annually.
10    Q.  Are you eligible for any bonuses
11 or anything like that or --
12    A.  No bonuses now. When I do sell
13 a boat, I get paid a commission on it.
14    Q.  Are there any benefits with the
15 job?
16    A.  As far as?
17    Q.  401-K?
18    A.  Yeah. They do have a 401-K.
19    Q.  Were you able to roll over any
20 benefits from SYSCO or Merchants
21 Foodservice to your job now?
22    A.  If I had had any, I could have,
23 yes.

Page 200

1    Q.  Okay.
2    A.  But I used those when I was
3 unemployed, so I didn't have any to roll
4 over.
5    Q.  Was your wife working when you
6 left Merchants Foodservice?
7    A.  She was.
8    Q.  How much was she making?
9    A.  Without looking at her W-2 or
10 our taxes, I'm just going to say 35,000
11 a year also. That's mighty close.
12    Q.  Do you go to any doctors or
13 therapists as a result of what happened
14 at Merchants Foodservice?
15    A.  The only doctors I've been to, I
16 mean, I go for annual checkups or stuff
17 like that. But as far as seeking, you
18 know, therapy or psychiatric help or --
19 you know, no.
20    Q.  Okay. And we've talked about
21 all the documents you're aware of that
22 you have that support your case; is that
23 right?

50  (Pages 197 to 200)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 201

1    A.  Uh-huh.
2    Q.  Other than your lawyer, and I
3  don't want to know anything you talked
4  to your lawyer about, and your wife, who
5  I know you've talked to about the case,
6  have you talked to anybody else about
7  the case?
8    A.  The only -- and by talk about
9  it, I'm not sure -- only two other
10  people that I've told -- and I held
11  Laura in confidence and I'm sure she's
12  been true to that -- is my boss Jeff
13  Ellis knows because I've had to take
14  time off from work to prepare for this
15  and other things, so Jeff knows.  And
16  then Seneca Kinsey who was my day shift
17  supervisor and friend.  Seneca and I
18  have talked several times since I've
19  left.  He's aware that I was going to
20  file a lawsuit.
21    Q.  What have you and Seneca talked
22  about in terms of your case?
23    A.  In terms of the case, not a

Page 202

1  whole lot.  Just -- you know, we talked
2  a good bit while I was at Merchants and
3  he was aware of how I was hired and
4  stuff like that, to some degree.  I
5  didn't go into every aspect of
6  everything with him.  But when I called
7  him after I'd left and, you know, most
8  of our conversations have had nothing to
9  do with the case.  It's more just
10  friendly chitchat and keeping up with
11  each other.
12    Q.  Okay.  What did you tell your
13  boss now why you left Merchants
14  Foodservice?
15    A.  I told him exactly what I've
16  told you.
17    Q.  Okay.
18    A.  I mean, he's aware of
19  everything.
20    Q.  Did Seneca make any comments or
21  talk to you about any recovery you might
22  get in the case?
23    A.  He hoped I got a ton of money,

Page 203

1  is what he told me.  Said it would serve
2  them right for screwing me.
3    Q.  Was Seneca in the interview with
4  you when you interviewed for the job?
5    A.  No, he wasn't.
6    Q.  Does he know anything about what
7  Hal told you other than what you told
8  him that Hal told you?
9    A.  No, he doesn't.  Not unless Hal
10  told him something.  I didn't tell him
11  anything.  I mean, other than what I've
12  told him, I have no way of knowing what
13  he knows.
14    Q.  And, again, I don't want to know
15  what you talked to your lawyer about.
16  But are there any folks that work for
17  Merchants Foodservice that you think
18  have knowledge that would support your
19  case or that worked at Merchants
20  Foodservice with you?
21    A.  Hal Henson would have full
22  knowledge of it.  Scott Casey can
23  testify to the conversations about me

Page 204

1  needing to work longer hours and about
2  my 60-hour schedule and on and off.
3  Nights on and off, you know.  Nights one
4  week and days one week.
5    Q.  What hours are you working now?
6    A.  I work 8:00 to 5:00.
7    Q.  Monday to Friday?
8    A.  Well, actually, it varies with
9  the season of the year.  You know, we
10  have winter hours when we're not busy.
11  Being a local lake, the climate's not
12  conducive to boating in the wintertime,
13  so we actually shut down on Sunday and
14  Monday during the winter months.  And
15  then like right now, I'm off on Friday
16  and Saturday.  And then as we move past
17  May and, actually, are -- you know,
18  Saturday and Sunday is our busiest time,
19  so everybody at the marina works
20  Saturday and Sunday May through Labor
21  Day.  And then I'm off -- you know, my
22  weekend may be a Thursday, Friday or
23  Wednesday, Thursday.  We normally try

51 (Pages 201 to 204)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

Page 205

1  and set that out where you've got the
2  same off days. But it's a five-day
3  schedule.
4     Q.  Okay.
5     A.  But it rotates with the season.
6     Q.  I jumped off talking about other
7  folks who you think have knowledge that
8  would help your case.
9     A.  No.
10    Q.  Anything we haven't talked about
11 today that you want to add to support
12 your claims?
13    A.  Can't think of anything.
14    Q.  Have you ever filed for
15 bankruptcy?
16    A.  No, I have not.
17    Q.  Ever had any repossessions or
18 foreclosure actions against you?
19    A.  Never have.
20    Q.  IRS ever placed a levy on your
21 wages?
22    A.  No. I'm shaking my head. But,
23 no.

Page 206

1     MR. DYKES:  Can we take just a
2  quick break? I think I'm about done.
3     MR. BLYTHE:  Sure.
4     (A break was taken.)
5     Q.  (BY MR. DYKES:)  Do you like
6  where you're working now?
7     A.  I'm happy to have a job.
8     Q.  Are you looking at other --
9  looking for other jobs now as well?
10    A.  No, I'm not now. I mean, based
11 on what I found when I was looking for
12 what I've got now, the economy around
13 Alex City and, you know, if anything's
14 gotten worse, I think the job market
15 picture there is more bleak now than it
16 was when I was looking, so --
17    Q.  I know we talked earlier that
18 you didn't go back and look at SYSCO
19 after you left Merchants Foodservice.
20    A.  Uh-huh (nodding head
21 affirmatively).
22    Q.  Did many managers lose their job
23 there at the Calera branch as a result

Page 207

1  of the changes?
2     A.  As far as I'm aware of, no
3  manager lost their job there. The way
4  SYSCO handles their fold-out is their
5  surplus they've got left and that's
6  going to be short-term because they're
7  going to go out and replace that lost
8  business with new business. But they
9  offer -- say, they take a night shift
10 selector and may offer him a night
11 shift -- if he's qualified, a
12 supervisory position at the new
13 facility. They pay their expenses to
14 move and all like that. So they get a
15 promotion and a free move to where
16 they're going.
17    And the only guy I know -- I had
18 a guy that used to be one of my day
19 shift forklift operators, took the job
20 as day shift supervisor down there. My
21 counterpart on days, which was Scott
22 Baggett, who was -- we sort of shared
23 duties or whatever. But Scott actually

Page 208

1  took the job as the day shift manager
2  down at Geneva. Those were the -- as
3  far as losing jobs, no. Some actually
4  left that facility with, you know, a
5  promotion in hand and to take a job at
6  the new facility.
7     Q.  Where is Geneva?
8     A.  It's down in -- I think -- I
9  want to say southeast Alabama right on
10 the -- right on the Florida line almost.
11 Get -- you know, 20 or 30 miles.
12 Because we were shuttling -- from SYSCO,
13 we were shuttling trucks to south
14 Alabama and working the panhandle of
15 Florida and just given the current scope
16 of things, it was easier and over the
17 long run, more financially conducive to
18 do the expense of starting a new plant
19 and then absorb that over the next few
20 years and what you save in
21 transportation costs and shuttling --
22 you know, deadheading groceries down
23 there to turn them over to another

52 (Pages 205 to 208)

# FREEDOM COURT REPORTING

Page 209

1 driver to start delivering them.
2 **Q. If you had stayed at SYSCO and**
3 **been asked to move to Geneva, is that**
4 **something you would have done?**
5 MR. BLYTHE: I'm going to object
6 to the form. Go ahead and answer.
7 A. There again, it would have been
8 not a sole decision based on me. That
9 would have been something my wife and I
10 would have talked about. Now, her
11 family -- her grandparents being from
12 Geneva may have factored in on that
13 highly, you know. So chances are had I
14 been offered the promotion and the job,
15 chances are I might have.
16 **Q. Okay.**
17 A. But, there again, like I said,
18 that's a hypothetical. It never
19 happened, so I don't know. So I can't
20 truthfully tell you yes or no what I
21 would have done.
22 MR. DYKES: Okay. All right. I
23 don't have any other questions.

Page 210

1 MR. BLYTHE: I'm going to
2 follow-up just with a couple of little
3 things.
4
5 EXAMINATION BY MR. BLYTHE:
6 **Q. Steve, tell me -- sometimes on**
7 **these follow-ups, I get to shotgunning**
8 **questions. Tell me if I get to cutting**
9 **you off or going too fast.**
10 **Just briefly, were the working**
11 **conditions different at Alex City**
12 **Provision and Merchants?**
13 A. I mean, when I left Alex City
14 Provision, the warehouse ran like a
15 sewing machine, if that's what you're
16 asking. When I went to work at
17 Merchants, it was just terrible.
18 **Q. Okay. And were the management**
19 **styles, for instance, of Alex City**
20 **Provision and SYSCO different than at**
21 **Merchants?**
22 A. At Alex City Provision and
23 SYSCO, the employees knew what was

Page 211

1 expected of them and the management
2 expected it of them and if they didn't
3 do what was expected of them, then they
4 suffered the consequences in terms, to
5 start with, in written disciplinary
6 action and then possibly followed by a
7 suspension or, worse case scenario, they
8 would lose their job. But they knew it
9 was coming.
10 You know, I never fired -- I
11 never fired but one person the whole
12 time I worked at SYSCO. And I don't
13 remember -- it was very few I ever let
14 go at SYSCO or Alex City Provision once
15 I became operations manager. But they
16 all knew that was coming because it was
17 spelled out in the form of a written
18 discipline their action. If this
19 happens again, this is what's going to
20 happen. So one of my statements I've
21 always made is I've never fired anybody.
22 You fired yourself. So that's the way
23 I've always looked at that.

Page 212

1 But it was totally different
2 because I couldn't -- I didn't have
3 that -- that avenue at Merchants to
4 control the work force because I
5 couldn't discipline them.
6 **Q. And is that something that you**
7 **were told when you were interviewed and**
8 **hired for that job?**
9 A. No. I -- we didn't discuss
10 discipline or --
11 **Q. But they didn't come out and**
12 **say, "Hey, by the way, we're not going**
13 **to let you discipline or fire any of**
14 **these people. We need to hang on to as**
15 **many as we can." Did they tell you**
16 **anything about that?**
17 A. No.
18 **Q. And I guess just briefly, Steve,**
19 **the working conditions at Merchants were**
20 **different than the way they were**
21 **presented or described to you by Hal; is**
22 **that correct? Is that a correct**
23 **statement?**

53 (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 213

1    A. That's absolutely 100 percent
2  correct.
3    Q. Okay. And would that same
4  statement be true as Andy and Don were
5  involved in the interview process? I
6  mean, were there things that they
7  omitted to tell you during that process?
8    A. The omission, I guess, would
9  have been, you know, when I asked
10  something, they answered it. And they
11  didn't volunteer anything as far as --
12  I'll put it like that. They didn't tell
13  me the warehouse was a shambles, that it
14  looked like a 20-year-old facility, that
15  the equipment was terrible or in need
16  of -- you know, they didn't volunteer
17  anything. I'll put it like -- they
18  answered my questions or gave me an
19  answer to the questions I asked, but
20  they never volunteered anything, no.
21    Q. Okay. Now, was it possible to
22  make as much in bonus as Hal had told
23  you with the conditions at Merchants as

Page 215

1  percent of his numbers and there was no
2  reason why I couldn't expect to do the
3  same.
4    Q. Okay. What has been previously
5  marked and entered as Defendant's
6  Exhibit 1 is the summary of -- and if
7  you would, look at that.
8    MR. DYKES: Actually, 1 is the
9  deposition notice.
10    Q. Well, 2. As Defendant's Exhibit
11  2, does that pretty much sum up
12  everything that's happened and why you
13  feel this case should proceed?
14    A. Absolutely.
15    Q. Now, when you were interviewing,
16  did -- and I'm going to give this to you
17  in two parts -- did Hal talk to you
18  about your job at SYSCO and what those
19  duties were and what you were doing and
20  making and everything there during the
21  interview?
22    A. At SYSCO?
23    Q. Yes.

Page 214

1  they were?
2    MR. DYKES: Object to the form.
3    Q. Go ahead and answer.
4    A. I don't think the way the
5  conditions were and -- you know, it
6  factored into cases per hour, mistakes.
7  Profit factored in. So just given the
8  scope of the -- what I walked into, I
9  don't think anybody could -- at that
10  point in time -- not before and not
11  after, but at that point in time, given
12  to contend with what I had to contend
13  with and was up against, I don't think
14  anybody -- and that's my opinion, but I
15  don't think anybody could have made any
16  of the bonus, much less assume that you
17  were going to make 30 percent of it.
18    Q. Okay. And that's what Hal had
19  presented to you in the interview
20  process?
21    A. He told me that my
22  predecessor -- and, there again, I don't
23  know his name -- routinely made 18 to 20

Page 216

1    A. Yes. He -- he wanted to know
2  what I was currently making and what I
3  actually did on a day-to-day basis
4  there.
5    Q. And, here again, this is a
6  two-part question. Did Andy and Don,
7  when they came in and interviewed you,
8  talk to you about that some?
9    A. Andy -- I don't know if Hal
10  mentioned, but it came up about how we
11  did replenishments at SYSCO on day
12  shift. I mentioned earlier that's
13  stocking the pick slots for night shift
14  when they come in, so they don't start
15  selecting with, you know, a bunch of
16  empty pick slots. And that was totally
17  different from the way Merchants was
18  doing it. And I don't know if Andy
19  seemed intrigued or -- that was
20  something that he was interested in
21  because when you come in and you don't
22  have to back -- you're not backing your
23  selectors up waiting on letdown

54 (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1 operators on night to fill the pick
2 slots, the first couple of passes go
3 real easy because the picking slots are
4 full.
5 **Q. Let me ask you this way, Steve:**
6 **Once you described what you had done at**
7 **SYSCO to Andy and Don, did they indicate**
8 **how you would fit into their company?**
9 A. Not -- not sure I understand
10 your question, Derrick.
11 **Q. All right. Well, it might not**
12 **be very artfully asked.**
13 **Once you told them what you did,**
14 **did they indicate that it was any**
15 **different at Merchants other than the**
16 **way you had described the difference in**
17 **these? What did you call them; pick**
18 **slots?**
19 A. Yeah.
20 MR. DYKES: Object to the form.
21 A. No. I mean, they seemed to
22 think I was -- you know, of course they
23 didn't offer me the job on the spot.

Page 218

1 But they liked everything they heard,
2 impressed with some of the things I had
3 to say as far as letdowns, that the
4 awards we had, you know. And we were
5 proud of that. That's something we were
6 extremely proud of and I made a point of
7 that during the interview because I was
8 proud of our accomplishments.
9 And, you know, they didn't lead
10 me to believe that I wasn't -- you know,
11 they didn't say, well, I wish you could
12 do this or I wish you could do that or I
13 wish you were better at this or better
14 at that. I mean, I left with the
15 impression that they were fully
16 impressed with me and I was definitely
17 capable of doing the job.
18 **Q. During the interview, did Hal,**
19 **Andy, or Don ever tell you the problems**
20 **that they were having?**
21 A. None whatsoever.
22 **Q. Okay. Does the offer letter --**
23 **if you'll look at it. I forget which**

Page 219

1 **number it is. I didn't write that one**
2 **down. Somewhere around 6.**
3 MR. DYKES: 6 or 7. Somewhere
4 in there. 7.
5 **Q. Okay. What was previously**
6 **marked and entered as Defendant's**
7 **Exhibit 7, does that offer letter**
8 **contain anything that was discussed with**
9 **you by Hal, Andy, or Don about the job**
10 **or the working conditions there at**
11 **Merchants?**
12 A. No, it does not.
13 **Q. Okay. Anything specifically**
14 **about the company, any of the problems**
15 **it's having or anything like that?**
16 A. No. No mention of anything
17 other than what I mentioned earlier
18 that, you know -- I went in really
19 expected -- expecting to go to work in a
20 warehouse just like SYSCO, only with the
21 Merchants name on it. I had no reason
22 to not believe that was going to be the
23 case.

Page 220

1 MR. BLYTHE: I got you. I think
2 we've covered everything I need. I
3 think I'm just rehashing some of what
4 Steve's already covered; if I just keep
5 beating the horse. I don't think I've
6 got anything else to ask.
7 MR. DYKES: I don't either.
8 (Whereupon, the deposition was
9 adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

55  (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

## A

**ability** 33:1 74:1
**able** 13:13 43:6
90:16 145:22
199:19
**absenteeism**
141:5,7 165:2
165:15
**absolutely**
189:15 213:1
215:14
**absorb** 208:19
**abundance**
105:19
**abused** 100:22
**acceptance**
113:23
**accomplishme...**
218:8
**account** 92:21
92:23
**accounts** 198:19
**accrued** 161:4
**accurate** 87:11
87:14 111:10
111:17 122:18
123:9
**achieved** 44:15
**acknowledgm...**
5:4,6,9 127:22
128:4 130:2,12
131:12 132:8
133:8
**Act** 136:11
**acting** 7:3
**action** 1:5 211:6
211:18
**actions** 205:18
**actual** 129:9
196:14
**actuality** 189:19
**Adams** 1:7,17
2:1 7:13,18,23
8:5,12 16:3

61:9 108:21
120:19 121:3
128:9 130:6
181:8
**add** 49:17
112:18 205:11
**adding** 121:15
197:22
**addition** 129:2
**additional**
197:22
**address** 10:18
36:18
**adds** 154:12
**adjourned** 220:9
**administration**
26:9
**administrative**
12:21
**advance** 129:9
**advice** 63:12
**advised** 3:13
**affect** 56:18
**affirmatively**
206:21
**afford** 148:12
170:13
**affording** 98:1
**afraid** 107:3
**afternoon** 48:15
51:20 65:10
164:20
**afterthought**
78:19
**age** 100:22
184:8
**ago** 8:1 12:6
23:3 197:15
**agree** 118:1
132:13,22
133:5,9 136:7
**AGREED** 1:22
2:11,19
**ahead** 37:8

47:20 155:23
189:5 209:6
214:3
**al** 1:12
**Alabama** 1:2 2:7
3:6 6:7,16 7:3
7:5,11 10:21
13:9 18:22
24:16 42:2,14
94:4 187:21
193:17,20
194:12 195:12
208:9,14
**Alex** 12:13
15:15 16:10
17:13 18:15
20:15 21:13,16
23:23 24:2,5
24:13 30:16
38:4,13 40:9
41:11,12,20,22
42:11,23 43:4
43:11 44:18
49:14,22 50:2
50:10,18,23
59:17 60:5,20
74:8,15,19,21
81:13 107:10
166:5,9 206:13
210:11,13,19
210:22 211:14
**Alexander** 6:7
10:20 24:18
**aliases** 8:17
**allegations** 65:3
**Alliance** 12:18
13:4 14:4
**Allstage** 175:3
**alter** 129:4
156:15
**altered** 156:17
**alternate** 151:11
**alternative**
146:5

**amazed** 73:9
**amended** 3:7
**amount** 44:1
89:6 120:7
146:20 161:2
**analysis** 5:13
94:18
**ancient** 100:23
**Andy** 6:20 69:21
70:5,22 71:22
90:15 91:18
92:4,14 94:15
97:6 98:8 99:3
99:20 145:13
146:17 148:5,6
148:15 149:1
157:18,21
159:6 168:21
213:4 216:6,9
216:18 217:7
218:19 219:9
**Andy's** 70:4
95:20
**anguish** 192:2
**Ann** 17:4
**anniversary**
12:6
**announced**
42:13
**announcement**
91:11 174:1
**annual** 41:17
45:21 184:3
199:6 200:16
**annually** 199:9
**answer** 9:19
30:6 60:2 76:5
99:16 156:1,4
189:5 209:6
213:19 214:3
**answered** 75:10
177:17 190:21
213:10,18
**anticipated**

38:15 59:15
**anti-union**
93:22
**anybody** 15:6,9
42:15 71:18
129:15 146:13
147:15 148:1,2
178:15 201:6
211:21 214:9
214:14,15
**anymore** 63:5
63:17 107:7,15
107:22 148:12
167:14
**anything's**
206:13
**anyway** 58:12
82:13 89:2
107:5
**applicant's**
109:2
**application** 4:16
108:10,15
109:19,23
110:10,15
194:4,5,18
**applied** 40:14
119:15 186:4
194:20
**apply** 194:2
195:13
**applying** 186:6
194:9
**appreciated**
97:23
**approximately**
2:9 7:12
137:21
**April** 2:8 3:11
7:13
**aps** 194:16
**area** 15:16 16:18
17:11 18:12,13
18:15 19:8

**FREEDOM COURT REPORTING**

Page 222

| | | | | |
|---|---|---|---|---|
| 21:7,8 26:8 | **associates** 24:21 | 110:1,12 | 170:1 171:9,11 | 156:18 169:9 |
| 181:21 | **assume** 22:8 | 113:21 114:2 | 172:11 176:15 | 169:11 177:1 |
| **arrange** 72:5 | 26:15 53:15 | 128:17 130:20 | 176:18 177:9 | 180:13 191:6 |
| **arrested** 23:4 | 214:16 | 189:7 | 196:20 206:18 | 218:10 219:22 |
| **arrive** 47:19 | **assumed** 174:2,4 | **aunt** 18:5,17 | 216:22 | **belongings** |
| **arrived** 177:2 | **assuming** 55:21 | **Austin** 38:11 | **background** | 175:13,16 |
| **artfully** 217:12 | 80:18,22 | **automotive** | 71:17 72:15 | **benefit** 184:19 |
| **Ashland** 193:14 | 130:21,22 | 193:6 | 74:6,14 92:11 | **benefits** 4:21 |
| **Ashley** 17:4 | 175:7 186:18 | **available** 70:23 | **backing** 216:22 | 42:22 43:5 |
| **asked** 13:18 | **assurance** 83:10 | 194:1 | **backup** 95:16 | 112:2,3 117:3 |
| 29:10,11 44:21 | 93:21 | **avenue** 2:7 6:15 | **bad** 43:16 98:18 | 117:7,10,21,22 |
| 62:2 70:18 | **assurances** | 7:10 212:3 | 176:19 187:18 | 117:23 118:2 |
| 72:14,16 74:5 | 102:18 | **average** 187:3 | **Baggett** 207:22 | 119:10 129:6 |
| 76:22 79:9 | **assured** 78:16 | **averaged** 168:19 | **bankruptcy** | 135:4,5,6,8,9 |
| 81:11 83:16 | **as-needed** 34:6 | **avoid** 94:2 | 205:15 | 182:21 199:14 |
| 86:2 91:3 | **Atlanta** 20:1 | **Award** 73:2 | **Baptist** 21:12 | 199:20 |
| 93:17,20 102:7 | **atmosphere** | **awarded** 73:2 | **bare** 184:1 | **Benjamin** 23:21 |
| 102:23 103:4 | 94:7,7 | **awards** 96:6 | 186:17 | 24:8 |
| 110:16 138:11 | **attached** 61:8,21 | 218:4 | **base** 158:22 | **best** 9:13 46:9 |
| 158:2,2 159:22 | 64:3 65:13 | **aware** 57:10 | 159:8 185:14 | 62:14 68:3 |
| 160:3,11 | 66:18 67:4 | 93:13 170:9,11 | 185:15 | 81:23 91:10 |
| 161:22 162:4 | 108:19 109:13 | 170:19,21 | **based** 112:21 | 92:15 103:15 |
| 162:11 173:22 | 113:16 117:14 | 200:21 201:19 | 115:20 159:2 | 106:4,12 |
| 176:18 189:12 | 121:8 123:23 | 202:3,18 207:2 | 184:15 187:2 | 108:13 110:2 |
| 190:20 209:3 | 127:12 128:7 | **awful** 74:22 | 190:22 206:10 | 114:6 119:7 |
| 213:9,19 | 130:9,19 | 162:14 167:9 | 209:8 | 125:2 126:8 |
| 217:12 | 131:18 132:4 | **a.m** 2:9 7:12 | **basically** 73:12 | 137:20 138:20 |
| **asking** 8:23 | 168:11 174:23 | | 126:14 165:9 | 139:22 177:2 |
| 69:15 87:6 | 181:6 182:8 | **―――― B ――――** | 166:11 | 183:9 186:1 |
| 94:16 114:17 | **attack** 32:12 | **B** 4:8 5:1 | **basis** 77:3 116:8 | 192:5 |
| 125:18 160:17 | 38:6 | **Baby** 180:13 | 156:19 191:4 | **better** 28:4 |
| 162:2 210:16 | **attorney** 6:5 | **bachelor's** 26:2 | 216:3 | 116:21 125:20 |
| **aspect** 97:11 | 61:18 62:1,8 | 26:8 | **Bates** 135:15 | 150:23 162:16 |
| 202:5 | 63:8,19 174:17 | **back** 23:2 25:20 | **beat** 161:21 | 182:18 188:14 |
| **aspects** 197:2 | 182:3 | 25:21 45:13 | **beating** 220:5 | 188:18 191:18 |
| **ass** 149:10 180:7 | **attorney's** 62:2 | 64:23 68:16,17 | **beg** 106:10 | 192:12 218:13 |
| **asserting** 100:8 | **at-large** 194:3 | 90:14 91:17,21 | **began** 63:12 | 218:13 |
| **assign** 3:1 | **Auburn** 20:7 | 92:4 101:19 | **beginning** 38:20 | **beverages** 10:5 |
| **assistant** 12:10 | 24:4,10 25:5,6 | 105:8 106:10 | 44:10 54:23 | **big** 48:16 73:1 |
| 12:22 13:7 | 25:11 27:4 | 106:11 107:13 | **believe** 12:19 | 170:18 |
| 107:1 166:20 | 193:17,18 | 107:17,20 | 20:8 62:4 | **bill** 198:16 |
| 196:9,12,13 | 195:13 | 108:1 114:8 | 65:14 67:19 | **bills** 168:18 |
| 197:10 198:11 | **August** 109:4,19 | 120:11 156:20 | 81:20 116:9 | 192:18 198:20 |
| **assisting** 145:7 | 109:21,21 | 158:21 164:8 | 119:16 140:20 | **bimonthly** 88:12 |

# FREEDOM COURT REPORTING

Page 223

**Birmingham** 2:7
6:16 7:10
18:18 19:5
**birth** 10:12
**birthday** 79:15
**biscuit** 147:10
**bit** 202:2
**blah-blah-blah**
42:18 48:22
68:7
**blah-blah-bla...**
198:6
**blank** 99:4
148:1,8
**bleak** 206:15
**blood** 15:19
17:11 18:12
**Bluestill** 39:8
**Blythe** 4:5 6:4
37:8 57:15
64:14 117:4
120:1,4,8,14
123:16 125:14
136:12 155:22
182:13 183:15
189:3 206:3
209:5 210:1,5
220:1
**boat** 199:13
**boating** 204:12
**body** 84:10
**Bolin** 17:12
**bolts** 157:20
**bonus** 44:17
45:13,15,19,23
46:2,10 66:19
83:7,20 88:19
103:13 111:20
111:22 115:14
115:20 116:5,8
120:23 121:12
123:7 124:8,14
125:22,22,23
126:6,19,22

153:16 185:15
188:14,19
213:22 214:16
**bonuses** 46:8
88:16 199:10
199:12
**book** 80:2,16,17
80:22
**born** 11:4
**boss** 96:19
155:18,21
177:15 201:12
202:13
**bottom** 128:15
130:5 131:5
132:21
**bought** 11:2
169:8
**bounds** 198:3
**Bowman** 51:6
51:17
**branch** 70:1
137:15 206:23
**brand** 174:11
**breach** 185:23
**break** 25:17
57:16,18,19
89:9 120:3,10
120:18 123:17
180:19,23
206:2,4
**Breakdowns**
167:9
**breaks** 199:3
**brick** 179:7
**brief** 48:3
**briefly** 92:9
210:10 212:18
**bring** 102:7
182:1
**Brittany** 21:5
**broad** 15:13
**broke** 25:16
140:2 169:4

177:6
**broken** 175:23
**Brooks** 2:5 6:13
7:8
**brother** 16:19
21:20 193:12
194:10
**brothers** 16:17
17:7
**Bryant** 2:2 3:8
7:1
**budget** 170:16
**build** 42:14
193:11
**built** 43:7
139:17
**bumping** 179:6
**bunch** 216:15
**busiest** 204:18
**business** 26:9
27:19,23 29:6
42:15 50:14
60:20 71:10
76:12 77:7
96:22 105:15
166:18 187:20
187:20 188:4
197:21 207:8,8
**busy** 204:10
**buyer** 31:17
**buying** 8:10
31:18

─────── **C** ───────

**C** 6:1
**cabin** 196:23
**Cabinet** 193:9
193:15
**cabinetry**
193:12
**calendar** 62:23
63:1
**Calera** 43:10
102:5 105:16

139:18 140:8
206:23
**call** 8:8 24:20
31:10 145:9,13
149:2 195:2
217:17
**called** 22:12
23:9 24:16
46:22 68:17
69:14 79:14
89:22 101:20
154:3 171:11
180:11 188:13
188:16,21
189:6 192:11
202:6
**calling** 189:1
**calls** 69:14
**Calvary** 21:12
**Cameron** 19:21
20:1
**candid** 96:1
**candidate** 84:5
**candy** 31:19
**capable** 218:17
**car** 8:10 27:19
27:23 28:8
29:5 70:16
180:3 191:20
**care** 49:5,8
147:2 192:19
**cared** 96:7
**career** 185:3
**Carla** 17:2
**Carolina** 169:10
**carpenter** 30:9
**carriages** 169:20
**carry** 91:3
**carrying** 104:20
**cars** 29:8,16,22
30:5
**case** 22:14,15,16
49:10 62:5
78:16 96:3,4

103:15 182:10
183:19,19,22
184:10 185:17
186:4,14 187:6
188:1 190:18
200:22 201:5,7
201:22,23
202:9,22
203:19 205:8
211:7 215:13
219:23
**cases** 185:4
214:6
**Casey** 19:22,23
160:12 162:18
203:22
**cashing** 192:15
192:16
**categories** 44:12
44:14
**categorized**
136:7
**category** 136:6
**cause** 7:14
**CDs** 192:16
**cell** 178:16
180:4
**Center** 12:2,9,12
**Central** 13:8
24:16
**CEO** 12:11
**certain** 29:23
40:19 44:9,13
44:15 48:9
72:18 93:6
161:1 184:11
**certainly** 80:6
84:2
**certification**
95:8
**certified** 94:16
95:3,6,14,16
**certify** 7:4
**chain** 107:4

# FREEDOM COURT REPORTING

chances 209:13 209:15
change 29:13 129:4 143:13
changed 42:2 52:10
changes 196:15 207:1
charge 23:9 49:16 73:18,21 76:11
Charles 8:4,11 8:11
cheaper 168:23
check 4:23 66:8 88:13 89:5 123:20 124:6 124:12,14
checked 110:21
checkup 169:17
checkups 200:16
chicken 53:10 92:19
children 11:18 16:15,16 17:3 18:3 19:17 20:18
chitchat 202:10
choice 146:3
chronological 27:9
church 21:9
circumstances 40:19 110:18 184:11
City 6:7 10:21 12:13 15:15 16:10 17:13 18:16 20:15 21:13,16 23:23 24:2,5,13,18 30:17 38:4,13 40:9 41:11,12 41:20,22 42:11

42:23 43:4,11 44:18 49:14,22 50:2,10,18,23 59:17 60:5,20 74:8,15,19,22 81:13 107:10 166:6,9 206:13 210:11,13,19 210:22 211:14
Civil 1:5 3:6 7:5
claim 8:21 9:1 23:14 85:11 87:10 98:7 111:10 190:7,9 190:11 191:7
claiming 85:8 87:2 88:4 100:5,7 124:13 124:15 158:6
claims 62:5 65:15 205:12
Clanton 19:6 74:22 102:5 108:2 139:16 139:21 163:22
clean 174:11 179:17
cleanliness 173:19
climate's 204:11
clock 165:14
clock-ish 165:4
close 43:11 198:17 200:11
closed 53:7 90:13
closer 74:18,20
clubs 21:16
clue 69:12 180:2
cog 72:23
cold 95:13
collarbone 25:16

college 24:13,15 24:17,18 25:4 25:7
come 34:23 36:5 43:19 49:9 53:8 64:23 70:20,21 79:22 80:6 84:22 85:2 91:17 93:6 99:11 100:4,10 101:2 120:11 144:19 145:4 156:12 157:14 158:7 158:13,23 162:19 163:6 163:21 164:1,7 169:10,12 176:18 179:8 182:23 188:4 212:11 216:14 216:21
comfortable 171:1
coming 50:17 79:16 94:23 149:16 156:19 160:14 165:3 165:11 177:20 178:22 192:18 211:9,16
commencing 2:9 7:11
comments 202:20
commission 23:11 199:13
Commissioner 7:4
commitment 115:7
committed 29:14 45:3
Community

24:17
commute 77:5 107:12 108:1
comp 23:13
companies 195:22
company 30:17 30:18 31:23 33:11 59:21 60:2,6 67:17 68:3 69:13,16 70:9 82:21 112:1 130:3 134:5 138:18 139:4,7 140:14 141:14 169:10 171:15 175:10 188:3 217:8 219:14
comparatively 54:19
compare 30:21 46:5 49:23 50:11
compared 146:22 153:11 182:23 185:2
compensation 79:3
competing 193:13
complaint 5:16 182:4,9 190:2
complete 47:6 108:9
completed 139:21 185:3
compliance 2:15
computer 47:22 63:14,21 64:11
concluded 84:13
concur 127:2
condition 33:3 173:7,19

conditions 210:11 212:19 213:23 214:5 219:10
conducive 204:12 208:17
conduct 71:1
conducted 157:20
conference 90:13 177:10
confidence 107:2 201:11
confusing 136:18
consequences 211:4
consider 177:20
considered 99:21 175:19
Constangy 2:5 6:13 7:8
constant 176:9
constantly 167:9
constitutes 185:22
constraints 148:11
construction 29:1 139:20
contact 183:10
contacted 67:16 183:11 195:4,6
contain 64:17 219:8
contend 214:12 214:12
continually 151:11
continue 13:23 101:12 177:7
continued 5:1 162:16
contract 93:1

# FREEDOM COURT REPORTING

Page 225

185:23
contracts 92:19
contributed
184:16
contrived 100:9
control 48:8
82:8 94:19
95:12 212:4
controlled
167:22 171:2
conversations
62:19 63:3
69:8 98:21
148:6 171:8
202:8 203:23
convinced
168:13,20
coordinator
95:9
Coosa 21:21
copied 171:3
copy 64:4 81:1
174:19 182:9
core 81:22
corner 91:15
corporate 60:12
60:15,19 95:19
96:1,21 167:22
171:4
Corporation
27:6
correct 12:19
47:3 64:21
67:7 89:17,20
114:6 122:12
127:17 128:19
212:22,22
213:2
Corresponden...
4:18
costs 208:21
counsel 1:23
2:21,23 7:7
counteroffer

44:19
counterpart
163:9 207:21
County 20:8
21:21
couple 34:3,13
38:21 52:20
77:18,18 80:10
101:20 105:12
123:15 141:16
142:13,14,23
150:6,10
153:23 164:10
179:2 185:19
197:15 210:2
217:2
course 49:4 54:6
69:1 98:15
121:14 147:18
151:12 154:17
169:14,16
217:22
court 1:1 2:3,16
3:14,15 7:1 9:9
22:8,10,18
cover 18:22
136:3,3
covered 76:22
220:2,4
coworker 86:14
credentials 84:6
crew 48:2,14,16
53:8 55:4
75:13,14
criteria 44:10
194:7,8
critical 94:19
crow 106:9
cruisers 196:22
196:23
crying 104:20
104:23 105:1
cumulatively
15:2

current 115:10
115:21 208:15
currently
196:14 216:2
curvy 74:23
custom 193:11
customers 49:9
196:21
cutting 210:8

_____

## D

D 4:1
dad 19:9
Dadeville 18:10
damage 49:6
damaged 191:6
191:8
date 7:4 10:12
13:5 14:3
32:22 71:4
72:4 93:7,8,8
109:4 114:5
130:4 132:9,15
132:21 133:3
142:6 166:2,2
dated 109:19,20
110:1 121:3
128:17 130:4
130:12,15,20
131:14,23
132:7 133:9,12
135:18 168:4
175:6
dates 14:7 125:8
daughter 11:7
11:11 17:4
18:7 19:22
daughters 20:20
day 2:8 3:11
7:12 28:12
31:2 33:21
39:7 41:4 42:9
43:15,16 46:16
46:19 47:17,18

47:21 48:13
51:3,8 54:4,12
55:5,6 56:20
56:21 57:2,20
57:21 67:22
70:12 71:1
73:6 74:10,13
75:20 76:3,5
78:9 79:2,14
80:13,13 81:21
82:9,13,18
90:18,20,21
93:2,13,16
95:4 97:4
98:17,23
100:17 103:17
103:18,23
104:3,16 107:8
110:4 111:3
137:6 138:6,15
143:19,22
144:11,12
145:5,7 148:23
149:20 150:7
156:10 160:1,8
160:17 162:4
164:8,17,18
165:4,8,10,11
166:17 174:16
176:1,22 177:2
178:3,9 179:11
183:10 186:18
201:16 204:21
207:18,20
208:1 216:11
days 52:19 54:2
56:17 66:7
68:17 69:10
79:11,13,17
98:4 101:20
112:17 150:10
159:18,20
160:22 161:4,7
161:15,16,22

162:6 166:12
173:5 177:2
193:1 204:4
205:2 207:21
daytime 53:15
day-to-day
82:12 137:5
196:16 216:3
deadheading
208:22
deal 75:7 86:12
154:18 160:14
195:1
dealership 28:1
28:7,22 29:23
30:4 193:8,8
197:1,18
dealing 165:21
deceit 183:6
decent 120:7
decide 27:22
157:14 176:20
decided 104:9
105:5
decision 91:8
102:17 104:11
104:22 106:7
114:8 158:23
159:8 190:22
209:8
decision-maki...
168:22
deem 177:14
DEFENDANT
6:10
Defendants 1:13
4:10
Defendant's
61:4,6 63:18
64:1,22 65:8
65:11 66:11,16
66:23 67:2
108:15,17
109:7,11,14

# FREEDOM COURT REPORTING

113:12,14
116:23 117:12
121:2,6 123:19
123:21 127:6
127:10 128:2,5
130:1,7,14,16
130:17 131:8
131:12,15,16
131:22 132:2
132:11,14,17
132:20 133:19
135:2,12 168:3
168:9 174:14
174:21 181:2,4
182:5,6 215:5
215:10 219:6
**definitely** 85:5
96:17 172:14
218:16
**definitively**
61:14
**defrauded**
189:22 190:17
**degree** 24:19
25:3,10 26:2,8
26:10 202:4
**deliver** 157:8
**delivering** 3:8
209:1
**delivery** 137:8
**denied** 40:5
179:2
**dentist** 69:4
**denying** 161:19
**department**
27:11 82:3
194:11 195:19
197:1
**departments**
96:16
**depend** 84:4
**depended** 46:13
**depending**
44:11 52:10

165:7
**deposition** 1:16
2:1,12,13 3:3
4:11 9:7 10:1
61:5 215:9
220:8
**depositions** 2:17
**Derrick** 6:4
61:15 64:5
183:11,14
217:10
**describe** 109:8
**described** 135:6
212:21 217:6
217:16
**description**
196:15
**desk** 67:21
178:15,17
179:18
**despite** 162:17
**details** 187:9
198:7
**determination**
112:20 149:22
**determined**
68:10
**development**
12:18 198:1
**deviated** 52:16
**deviation** 158:20
**dictated** 96:22
**died** 18:5 39:11
166:13
**difference** 60:4
185:5 217:16
**different** 53:19
60:8 133:15
136:2 154:3
178:11 185:9
210:11,20
212:1,20
216:17 217:15
**diploma** 26:10

**direct** 51:5,10
137:12
**direction** 96:8
101:11
**directly** 94:10
**director** 12:22
13:16 45:9
82:11 86:3
91:9 103:23
163:17 171:5
175:4
**directory** 194:13
**disability** 23:17
119:16
**disarray** 152:23
**disciplinary**
211:5
**discipline** 94:8
147:6,14,15
211:18 212:5
212:10,13
**discovery** 61:19
**discretion** 129:7
**discrimination**
23:9 142:2
**discuss** 83:15
177:12 212:9
**discussed** 86:6
219:8
**discussing** 177:4
**dispute** 111:20
123:3
**disrupt** 156:15
**disruption**
156:16
**dissatisfied** 86:9
**distraught**
179:20 192:4
**distribute**
198:14
**distribution**
166:6 188:4
**distributor**
30:20 69:16

71:14
**District** 1:1,2
18:21
**divers** 149:5
**divide** 88:12
**DIVISION** 1:3
**divorce** 15:3
22:8
**divorced** 14:22
**dock** 95:13
**docks** 196:19
**doctors** 200:12
200:15
**document** 4:12
4:21 63:19
64:8,20 117:18
127:7 174:17
**documents**
61:21,22 62:3
62:4,7,9
113:11 200:21
**doing** 73:7,11
86:18 93:10
105:21 144:1
145:1 148:16
166:6 186:14
187:20 191:23
192:1 196:11
215:19 216:18
218:17
**dollar** 186:3
**dollars** 43:2
146:23
**Don** 70:7 71:22
92:5 98:8
99:20 134:8,10
134:14,18,22
145:9 157:18
157:21 213:4
216:6 217:7
218:19 219:9
**door** 75:16
90:13 98:19,20
116:14 192:11

**Doug** 51:11,21
51:22 52:5,9
**downright**
100:21
**drafted** 182:4
**draw** 185:1
**drawer** 62:12
**drawing** 184:23
**drawn** 185:3
**drive** 10:20 69:3
**driven** 69:1
95:23 98:15
**driver** 82:22
139:7 209:1
**drivers** 55:15,17
55:19 81:23
149:6 154:11
154:16,23
155:5 175:19
175:21 176:9
176:11,13,16
**driver's** 10:14
**drive-through**
147:12
**driving** 55:2
**dry** 48:17
196:19 197:23
**duly** 7:19
**duties** 137:4
207:23 215:19
**duty** 22:13
32:17
**Dykes** 3:9 4:4
6:12 7:22 8:1
27:21 57:17,20
64:13,15,16
117:6,9 119:22
120:2,6,9,17
120:19 123:13
123:18 125:12
136:13,16
180:22 181:1
182:11,14
206:1,5 209:22

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 227

214:2 215:8
217:20 219:3
220:7

**E**

E 4:1,8 5:1 6:1,1
**earlier** 95:18
135:7,10
148:15,18
179:2 206:17
216:12 219:17
**early** 47:20
104:17 106:9
147:9 148:21
165:11
**earn** 45:15
83:22 88:21
**earned** 82:17
**earnings** 4:14
66:13
**easier** 208:16
**easy** 217:3
**eat** 106:9 120:16
192:5
**eating** 191:13
**Economic** 12:18
13:4 14:3
**economy** 206:12
**Eddie** 45:4,6
52:6 96:19
104:17
**education** 26:22
194:6
**effect** 2:14 9:7
**effective** 3:7
168:23
**effort** 157:22
**efforts** 162:17
**eight** 44:12
49:18 75:19,19
76:2,2 84:20
111:2 121:19
141:11 153:20
164:5 184:6

**eight-hour** 77:8
144:2
**either** 70:1
75:23 140:22
220:7
**Eldridge** 17:12
18:2
**element** 40:18
**eligible** 111:19
111:21 115:19
119:9,12
122:11,23
194:8 199:10
**eliminate** 129:4
**Ellis** 201:13
**employ** 193:10
**employed** 39:6
129:21 195:10
**employee** 4:23
5:8,11,13 40:7
40:13 86:14
89:23 94:10
97:12 118:3,13
118:21 123:20
129:9,22
130:14 131:13
131:23 132:7
132:16 133:2,8
133:11 135:16
135:18 136:8,9
165:23 184:19
194:12
**employees** 39:1
40:15 104:14
104:14 117:1
118:11 145:3
146:19 147:1
147:20 153:1
157:12 165:22
184:20 194:2
210:23
**employee's**
131:7
**employment**

4:17 5:4 23:10
27:2 62:10
98:22 108:16
124:2 127:22
128:4 134:11
136:6 139:6
140:10 141:1
164:22 175:20
195:16
**empty** 48:1
216:16
**encompasses**
194:22
**ended** 97:20
141:1
**engaged** 15:9
**enjoy** 97:12
**enjoyed** 60:13
96:19 182:20
**enrolled** 26:1
**ensued** 98:22
**ensure** 165:16
**entered** 47:7
215:5 219:6
**entice** 100:10
**entire** 38:17
**entitled** 118:1
**entity** 171:14
**equal** 23:10
189:14
**equals** 125:23
**equate** 45:20
89:7
**equates** 126:21
126:22 199:8
**equipment**
100:21 167:6,8
168:2,8,18
169:4,5,14,18
170:6,22
173:10,16
174:12 213:15
**errors** 151:1
**especially**

107:21
**Esq** 3:9 6:4,12
**essence** 30:23
107:10
**et** 1:12
**etched** 187:1
**eventually** 107:9
168:13
**Everett** 28:23
29:3 30:8,14
**everybody** 157:2
157:11 204:19
**evidence** 3:3
**exact** 64:4 81:20
195:19
**exactly** 45:17
52:21 64:8,21
88:1 168:16
202:15
**examination** 4:3
7:14,22 210:5
**examined** 7:19
**excel** 44:13
**excellent** 81:21
174:11
**excess** 168:19
186:16
**excuse** 18:9
**excused** 90:12
**executive** 12:10
13:7 107:1
**exempt** 89:22
136:8
**Exhibit** 61:5,6
63:19 64:1,22
65:8,11 66:11
66:16,23 67:2
108:15,17
109:8,11,14
113:13,14
117:1,12 121:2
121:6 123:19
123:21 127:6
127:10 128:3,5

130:2,7,14,16
130:17 131:8
131:12,15,18
131:23 132:2
132:14,17,20
133:20 135:3
135:13,17
168:4,9 174:15
174:21 181:2,4
182:5,6 215:6
215:10 219:7
**exhibits** 3:12
132:11 136:18
**existed** 173:1
**existing** 105:15
194:2
**exit** 4:20 113:18
**expect** 75:18
77:17 80:6
116:10,15
173:12 178:7
184:11 215:2
**expected** 36:2
75:9 80:5
82:10 83:8
118:15 151:17
155:3 211:1,2
211:3 219:19
**expecting** 98:19
167:3,5 172:7
219:19
**expense** 208:18
**expenses** 207:13
**expensive**
169:21,22
**experience**
73:16 74:1,14
92:18 183:9
**experienced**
96:10
**expiration** 93:8
**explain** 72:17
99:23 126:2
**explained** 72:21

# FREEDOM COURT REPORTING

73:5 75:12
79:10,15 92:21
93:12 173:23
179:4
**explaining**
116:4
**explains** 117:23
**exploratory**
42:19
**exponentially**
185:16
**expound** 184:8
**extend** 57:4
**extended** 164:6
**extremely** 95:22
143:10,12
218:6
**ex-employees**
147:11
**e-mail** 5:12
168:4,12
170:10 171:9
**e-mails** 86:13

---

**F**

**faces** 55:19
**facility** 40:8,23
42:14 59:8
100:20 139:15
139:17 140:2,5
167:7 173:9,12
174:6,11 180:1
181:18 193:9
207:13 208:4,6
213:14
**fact** 96:12
135:22 170:20
**factor** 170:14
**factored** 209:12
214:6,7
**factors** 40:18
191:10
**fair** 136:10
187:16

**faith** 156:14
**Fame** 73:2
**familiar** 93:3
**family** 17:22
19:8 21:7
59:18 77:10
97:8,11,14
98:12 99:12,18
99:21 102:14
103:21 104:9
104:15 105:4
159:5 160:14
161:8 162:1
209:11
**family-owned**
59:21 60:1,6
60:20
**far** 8:10 13:22
19:4 26:21
33:4 34:22
42:23 43:23
59:23 61:11
72:3,14 73:7
76:16,17 77:4
82:3 87:12
88:7 89:5
92:11 93:6
136:3 137:3
145:2 165:21
166:16 187:22
199:16 200:17
207:2 208:3
213:11 218:3
**farm** 21:21
**fast** 210:9
**Faulkner** 26:1,3
**faxed** 61:20
**February** 124:5
125:15
**fed** 178:20
**Federal** 2:6 6:14
7:9
**feel** 180:12,13
187:16 215:13

**feet** 80:9
**felt** 155:14 183:7
192:12
**female** 86:13
**Fifth** 2:6 6:15
7:10
**figure** 84:6
89:13 109:18
158:10 186:3
**figured** 106:11
182:11 192:9
**figures** 186:13
**file** 201:20
**filed** 3:15 8:22
21:22 22:1
23:8,13 182:10
182:15 185:6
205:14
**fill** 31:15 110:9
129:20 194:4
217:1
**filled** 92:10
109:23 110:3
129:17,22
194:15
**finally** 168:20
169:8 191:13
**financial** 182:22
191:19
**financially**
104:8 208:17
**find** 36:17 42:20
86:22 120:16
149:14 173:12
192:23 193:2
**fine** 18:19 57:18
84:23 91:2
102:10 103:7
120:8,9 180:22
**fingers** 101:3
**finish** 34:23
134:2
**finished** 73:13
75:15

**finite** 184:21
**fire** 99:5,7,15
141:6 148:1,2
148:15 149:10
149:19,23
212:13
**fired** 141:5
142:1,4,9
163:12 165:18
166:8,9 211:10
211:11,21,22
**fires** 58:13
**first** 7:19 20:23
34:5 45:8 68:4
75:7 88:20
92:16 98:17
99:10 100:17
108:8 110:3
121:10 122:21
123:11 124:20
125:3 150:6
152:9 159:23
178:4 196:1
217:2
**fiscal** 44:10
**fishing** 21:18
**fit** 47:2 217:8
**five** 43:17 48:3
49:1 99:13
121:19 146:23
151:5 160:22
187:2
**five-day** 205:2
**five-year** 35:15
**five-year-old**
173:9
**fix** 35:20 36:16
36:19,21 37:3
37:17,23 38:7
58:1,17 59:1
76:13 159:17
167:15
**fixed** 35:20 58:3
58:8 59:9,11

59:12 76:8
169:19 171:3
**fixing** 177:12,18
**flexibility** 85:6
**flexible** 84:15
**floor** 92:9,13
95:13
**Florida** 67:18
160:14 161:8
208:10,15
**fold-out** 105:14
207:4
**folks** 49:15 54:4
60:16 156:23
158:11 195:21
203:16 205:7
**follow** 74:3
**followed** 34:11
211:6
**following** 7:15
57:1,4 137:9
**follows** 7:20
**follow-up** 210:2
**follow-ups**
210:7
**food** 30:19 42:2
42:15 68:3
69:16 77:7
166:6 173:3
188:3
**Foods** 41:21
**Foodservice**
1:12 6:11 8:21
21:23 30:22
50:1,12,22
60:17 61:2
62:10 63:4,10
65:4 67:9,14
71:8 74:18
92:19 105:8
108:3 114:1
117:2,11
120:22 124:4
127:21 128:3

---

# FREEDOM COURT REPORTING

129:3 137:1,18
143:5 152:5
158:8 176:21
188:6 189:1,6
189:8 196:3
199:21 200:6
200:14 202:14
203:17,20
206:19
**force** 2:14 9:7
81:12,18,20
83:11 85:21
87:22,23
134:22,23
197:11 212:4
**Ford** 28:1,6,21
**foreclosure**
205:18
**foregoing** 7:6
**foreseeable**
191:16
**forever** 102:20
156:17
**forget** 218:23
**forklift** 54:22
105:19 146:21
207:19
**forklifts** 55:2
**form** 2:22 28:11
132:8 155:23
189:4 209:6
211:17 214:2
217:20
**formal** 26:21
43:18 196:4
**former** 116:5
**forms** 81:4
**formula** 45:18
46:1
**forte** 82:8
**forth** 44:9 108:1
**fortunately**
184:23
**forwarded**

61:15
**forwarding**
170:12
**found** 68:23
71:10 142:8
145:20 146:9
156:10 172:5
172:13 183:22
206:11
**four** 99:13
121:19 138:22
140:16 151:5
152:19 172:18
184:5
**four-page** 194:5
**frame** 32:22
33:4 143:11
**frames** 106:18
**fraud** 185:23
191:4
**fraudulent**
183:5
**fraudulently**
158:7,12,13
**free** 207:15
**Freedom** 67:18
**freight** 46:20
48:9,23 137:6
**French** 185:8
**fresh** 53:10,11
94:21,22
**Friday** 28:12
57:1,4 80:11
204:7,15,22
**Fridays** 162:12
**Fried** 92:18
**friend** 28:2
201:17
**friendly** 202:10
**friends** 54:21
104:15
**front** 172:12
176:8
**frustrated**

161:21
**full** 2:14 8:4
47:12 48:2
196:17 203:21
217:4
**Fuller** 34:10
**fully** 218:15
**full-time** 24:5
32:4 49:2
197:4,8,13,16
**function** 154:22
**functioning**
153:3
**further** 2:10,18
19:5 71:3

_____
## G

**gainfully** 195:10
**garner** 92:23
**gas** 196:18
**gazed** 133:23
**general** 70:1
72:14 137:16
155:20
**generally** 14:8
**Geneva** 105:18
208:2,7 209:3
209:12
**George** 39:8,11
166:13
**getting** 35:18
41:16 89:18
120:21 124:19
124:19 143:8
168:7
**get-go** 156:15
178:20
**give** 78:1 79:21
80:10,15 89:1
102:20 123:14
143:11 159:10
159:11 161:14
166:1 194:7
215:16

**given** 10:1 33:1
36:5 62:1,8
76:12 77:2
84:17 103:15
103:20 104:8
130:23 146:3
146:11,13,16
148:10 163:15
167:7 169:22
174:6 175:17
184:11 189:10
191:15 208:15
214:7,11
**giving** 129:8
**glad** 14:18 92:7
**Gloria** 18:8,8
**glue** 101:15
**go** 8:12 17:20
21:9,11 23:20
24:10 25:2,17
25:20,21 27:4
27:22 28:21
29:2 31:7
35:18 36:20
37:8 41:19
42:7,21 45:13
47:20 48:5
53:11 69:2,15
72:1 80:11
86:8,11,20
87:3 88:19
91:20 94:9,11
104:3,18 105:8
106:10 107:3
112:23 120:5
123:15 133:18
146:4 147:7,8
154:19 155:23
161:7 162:4
164:8 180:1
185:18 189:5
190:23 191:15
193:21 194:23
195:15 200:12

200:16 202:5
206:18 207:7
209:6 211:14
214:3 217:2
219:19
**goes** 92:20 125:9
172:11
**going** 8:23 9:11
10:23 14:4
15:13 26:6
31:10 36:3
41:17 42:13
44:2,5 47:23
50:17 52:11
56:15 61:4
63:18 64:19
65:7 66:9,10
66:22 67:9
68:2,11,13
69:8,18 70:10
70:23 71:1,6
71:23 72:1
77:21 78:3,5
79:21 81:11
82:14 83:17,20
89:1 90:1,4
99:16 101:10
101:12 102:8
102:15,20
103:22 105:2
105:22 107:23
108:1,14 109:7
109:8 112:7
113:4,10
114:14 116:10
116:23 120:4
120:15 121:1
123:14,18
127:6 128:2
130:1,13 131:2
131:22 134:15
139:13 141:6
143:7 145:21
155:22 156:13

# FREEDOM COURT REPORTING

158:21 162:11
162:20 165:12
168:3 169:15
169:23 170:14
171:3,17
172:15,16,17
174:4,14 177:7
178:9,12 179:9
179:10 180:2,5
181:1 182:4
186:12,15
189:3,4 191:11
191:18,22
192:22 197:19
198:10,11
200:10 201:19
207:6,7,16
209:5 210:1,9
211:19 212:12
214:17 215:16
219:22
**good** 9:11 28:2
43:15 57:15
59:22 81:22
86:18 91:6
96:6 97:16
133:18 144:12
155:17,19,21
171:13 180:16
182:19,21
183:19 202:2
**good-bye** 104:20
**gotten** 69:14
95:7 136:19
179:1 206:14
**grade** 194:18
**gradually**
162:16
**graduate** 24:7
**graduated** 24:11
**grand** 103:14
**grandparents**
209:11
**grass** 165:20

**great** 81:19,21
82:7 83:5,10
83:11 96:5,18
156:21 182:20
**green** 165:20
**greet** 157:23
**grew** 166:19
**groceries** 31:2
139:19 208:22
**grocery** 31:18
**ground** 140:2
**grounds** 3:1
**group** 42:3
81:22
**growing** 198:3
**grown** 197:21
**guaranteed**
184:7
**guess** 12:4 13:20
14:5,6 15:1,5
18:14 19:3
20:22 24:6
26:23 27:18
30:6,23 36:17
37:6 40:17
42:14 43:5
49:21 50:4
54:9 59:3,5
60:2 65:21
69:11 70:17
83:21 87:14
92:13 94:18
98:12 105:12
106:8 108:8
125:18 126:18
129:16 137:22
172:8 187:20
192:4 197:16
198:2 212:18
213:8
**guessing** 141:17
**guidance** 159:11
**guideline** 40:17
**guy** 39:7 67:22

82:7 83:3
84:19 86:8,9
86:17 95:11
98:2 156:21
166:12,12
170:2 207:17
207:18
**guys** 77:20 85:4
91:5 105:20
146:21
**guy's** 116:3

—————————————
**H**
**H** 4:8 5:1
**HACCP** 94:16
94:17 95:2,5,7
95:9,14
**Hal** 69:21,23
70:15 71:22
75:4,9 79:21
81:6 84:9 85:9
85:12 86:4
87:10,10 90:11
90:12 92:6,9
98:1 101:13,20
114:11,12
116:1 118:6,14
118:18 122:22
137:11,17
143:17 148:4,9
155:11,17
156:4 157:2,3
157:3,12,17,19
158:17 159:3,6
159:9,11
160:13,21
161:10,11
167:16,16,19
167:19 171:21
173:15 174:8
177:11,11,15
177:16,17
203:7,8,9,21
212:21 213:22

214:18 215:17
216:9 218:18
219:9
**half** 11:1 28:12
75:20 76:3
151:13 169:3,3
187:3
**halfway** 102:3,5
**Hall** 73:2
**Hal's** 110:7
158:3
**hand** 114:9
178:15 208:5
**handbook** 5:7,8
5:10,11 40:8
40:14 80:18,23
81:2 130:3,11
130:15 131:13
131:23 132:7
132:16 133:2,9
133:11,15,21
133:22 135:4
135:16,18,19
135:23 136:2
136:17 160:20
**handbooks**
158:22
**handed** 64:9
178:14
**handle** 48:23
72:21 150:22
**handled** 72:18
**handles** 207:4
**handling** 92:20
94:21 169:11
**hands** 41:1 92:7
147:4,14
**handshakes**
97:21
**hands-on** 40:23
**handwriting**
110:13
**hang** 90:23 99:6
99:9 212:14

**Hannah** 11:11
11:16
**happen** 142:3
211:20
**happened** 33:3
35:22 36:6
57:23 58:10
63:3 67:11,20
70:11 71:21
72:7,8,11 86:2
87:7 90:11
92:4 101:17
106:20 141:10
141:23 142:5
160:2 171:16
183:20 200:13
209:19 215:12
**happening** 36:8
36:13 149:4
**happens** 211:19
**happy** 80:10
93:17 206:7
**hard** 9:21 14:7
102:1 106:12
156:20 192:17
**Hardee's** 147:9
147:11
**hardest** 104:10
104:22
**Harrington** 82:5
138:5,17
**hazard** 94:18
**head** 8:18 21:10
179:7 205:22
206:20
**heading** 37:11
61:11
**heads** 82:4
**heal** 192:9
**health** 119:17
**hear** 87:13
93:17 157:6
**heard** 173:2
218:1

## FREEDOM COURT REPORTING

heart 32:12,15 38:6
Heights 21:12
held 74:12 107:2 171:15 201:10
help 9:17 13:13 29:17 30:4 34:23 35:20 162:19,21 200:18 205:8
helped 35:1 163:3
helping 163:1
Henson 69:21 85:9 118:6 137:11 158:17 159:3,7 160:13 203:21
Henson's 69:23
Hey 212:12
high 23:20 47:1 47:2 83:18 173:2
higher 33:15
highest 187:2
highly 209:13
Highway 194:11
hilly 74:23
hinted 86:4
hire 91:8 152:7 176:11,12 193:10
hired 26:17 31:9 32:3 89:22 108:11 118:11 118:15 120:21 129:17 136:20 152:3 163:20 166:21 197:8 197:13,16 202:3 212:8
hiring 84:18 149:5 176:8
history 4:23

27:2 92:12 123:20 124:2
hit 170:18
hold 101:16 196:8
holidays 112:16 119:5
home 8:10 77:10 77:11 98:15 101:19 107:13 107:17
Honda 193:7,8 193:16
honest 96:2 139:12 162:15
hope 185:18 188:1
hoped 146:2 202:23
hopefully 106:13
hopes 29:21
hoping 180:9
horrendous 153:2
horse 220:5
hospital 12:11
hot 198:2
hour 43:16,16 90:6 91:1 111:5 120:12 120:15 147:1 214:6
hourly 118:13
hours 29:17 30:1,2 39:18 41:6 47:17 52:20 56:12 75:8,20 76:3 76:16,17 84:21 85:19 87:19 89:8,10,12 90:7 111:1,3 112:6 114:14

134:14 143:5 143:13 145:10 145:14 149:20 164:14,16,22 166:3 172:15 178:2,8 179:9 204:1,5,10
house 11:3,5 54:18 55:1 105:17 191:20
houses 73:4 94:3
HR 13:16 175:3
hugging 104:23
Hugh 34:8 44:21 59:22
Huh-uh 8:18
human 40:18
hunting 21:18
husband 19:16
husband's 16:12
hypothetical 59:4 72:20 209:18
Hyundai 193:7

_____ I _____
idea 14:8 37:12 55:16 91:6
identical 74:21
identification 61:7 64:2 65:12 66:17 67:3 108:18 109:12 113:15 117:13 121:7 123:22 127:11 128:6 130:8,18 131:17 132:3 168:10 174:22 181:5 182:7
identified 67:23
immediately 178:13 192:12
implement

77:23
important 172:19
impressed 73:10 218:2,16
impression 218:15
improve 115:9 115:15,17
improvements 77:22
improving 115:21,21 116:13
inaccurate 87:15 88:6
inappropriate 86:13
inbound 46:20 48:8 49:6 137:6
incapacitated 25:19
incentive 4:22 41:10 44:6 115:6 121:2
incidence 142:4
including 110:20 112:16
income 103:21
incorrect 98:8
increase 189:17 199:7
increased 166:23
incrementals 88:13
indentation 121:22
indicate 217:7 217:14
indicated 149:7
indicates 119:11
individual 116:6

156:14
indoctrination 144:3
induced 158:7 158:13
industry 173:3,4
information 65:23 66:4,5 67:6 112:3 129:19 189:11 190:23
initial 183:10
inside 70:21
instance 210:19
instances 159:23 160:3
instant 103:16
insurance 119:10,17 171:13
integrity 157:9
interested 68:2 68:14,19 119:18 195:7 216:20
interim 45:10 165:17
Internet 71:9 185:22 186:2
interrogatory 65:17
interrupt 66:10
Interruption 27:20
interview 4:20 13:22 60:17 68:21 69:6,8 69:18 70:10,13 70:14 71:2,6 72:2,9,12 76:20 78:12 79:6 81:8 83:13 84:9,12 85:10,12 87:7

# FREEDOM COURT REPORTING

Page 232

| | | | | |
|---|---|---|---|---|
| 90:11 91:19 | 170:23 | 147:7 149:12 | 93:9 176:9 | 55:10,14,20 |
| 94:14 97:19 | **items** 31:18 93:6 | 149:18 179:22 | 202:10 | 57:6,12,14 |
| 98:2,9,16 | 94:23 | 180:8 182:18 | **Kelly** 21:4,4 | 58:5,14,21 |
| 99:18 100:10 | ———— | 182:19,19,20 | 82:19 138:6 | 59:23 60:7 |
| 101:9,18 | **J** | 188:20 189:9 | 139:3 140:9 | 61:23 62:13,22 |
| 112:22 113:18 | **J** 3:8 6:12 | 192:23 193:2,4 | **Kenny** 51:5,9,16 | 63:10,16 68:1 |
| 120:20 122:10 | **Jackson** 163:10 | 194:9 196:7,15 | 51:18 | 68:8,14,18 |
| 150:12 157:21 | 178:4 | 199:15,21 | **Kentucky** 92:18 | 71:2,13,18 |
| 159:3 167:18 | **Jack's** 102:6 | 203:4 206:7,14 | **kept** 64:19 | 72:13,16,20,21 |
| 171:23 172:3 | **James** 152:9,12 | 206:22 207:3 | 192:18 | 73:5,9,13,17 |
| 173:16,20 | **January** 132:1,7 | 207:19 208:1,5 | **keys** 178:14,16 | 73:20 75:8,11 |
| 181:13 196:1,4 | 132:9,10 | 209:14 211:8 | **KFC** 92:18,20 | 75:13 77:12,17 |
| 203:3 213:5 | 135:18 139:21 | 212:8 215:18 | **kids** 107:13,18 | 78:23 80:8 |
| 214:19 215:21 | 160:19 161:3 | 217:23 218:17 | **kill** 91:16 | 81:10,13,15,17 |
| 218:7,18 | **Jason** 82:19,20 | 219:9 | **killing** 104:19 | 81:17 82:7,10 |
| **interviewed** | 138:6 139:3 | **jobs** 26:16 61:1 | **kind** 15:13 | 82:13 83:9 |
| 188:7 189:18 | 140:9,22 149:8 | 148:17 186:5 | 17:21 18:15 | 84:2,21 85:1,3 |
| 203:4 212:7 | **Jean** 17:17 18:2 | 194:20 206:9 | 22:14 27:1 | 85:5 86:5,17 |
| 216:7 | 18:4 20:13 | 208:3 | 31:20 34:15 | 89:9 90:20 |
| **interviewing** | **Jeff** 198:6,7 | **John** 34:11,11 | 35:4 46:13 | 91:4 92:17 |
| 215:15 | 201:12,15 | **joined** 91:19 | 54:14 101:10 | 93:5,9,14,18 |
| **interviews** | **Jerry** 19:16 | **jot** 62:23 | **Kinsey** 138:15 | 94:11,15 95:3 |
| 195:20 | **Jimmy** 167:20 | **Joyce** 19:12 | 142:18 201:16 | 95:23 96:4,13 |
| **intrigued** 216:19 | 167:21 168:5,7 | **July** 56:10 | **kiss** 180:7 | 96:15 97:6,9 |
| **introduced** 7:23 | 168:13 170:4 | 176:23 | **knew** 48:9 55:17 | 97:10,13,14,15 |
| **introductions** | 170:10,19 | **jumped** 78:14 | 56:14 90:3 | 97:17,21 98:1 |
| 92:6 | **Jo** 16:2 | 78:15 205:6 | 94:17 98:17 | 99:2,7,12,20 |
| **inventories** | **job** 9:17 13:6,14 | **June** 160:11 | 107:23 113:9 | 102:8,13,16,17 |
| 154:1 | 13:18 29:14 | 161:6 | 135:22 156:11 | 102:19,22 |
| **inventory** 47:8 | 30:16 31:7,21 | **junior** 24:13,15 | 180:4 191:14 | 103:1,6,7,11 |
| 78:21 82:8 | 37:23 42:7 | 24:18 25:4,7 | 191:23 210:23 | 103:12,13,17 |
| 95:12 154:1,2 | 45:5,6 46:16 | **jury** 17:19,20,23 | 211:8,16 | 103:22 104:21 |
| 154:4,5,7 | 47:14 48:22 | 22:12,13,16 | **knitted** 27:10 | 105:20 106:3,6 |
| **invested** 99:14 | 51:7,14 67:14 | 187:23 | **know** 8:9 9:18 | 106:8,11,19 |
| **invoice** 170:5 | 69:23 74:1,16 | **J-O** 16:3 | 14:6,16 15:1,2 | 107:3,13,16,20 |
| **involved** 22:3 | 77:14 81:10 | ———— | 17:19,21,22 | 110:7 111:8 |
| 47:22 74:10 | 83:16 86:18 | **K** | 22:7 23:1 31:1 | 116:11,16,20 |
| 77:6,14 93:10 | 96:5,7,9 98:17 | **keep** 45:1 48:12 | 32:21 33:6 | 119:14,14,23 |
| 115:8 213:5 | 99:9 100:17 | 63:1 82:14 | 34:22 41:6 | 126:2 129:19 |
| **involvement** | 101:21 102:13 | 93:5 101:10 | 42:17 43:5 | 133:16 137:17 |
| 13:20 | 102:23 106:10 | 158:21 165:10 | 44:11 46:6 | 139:9 141:16 |
| **IRS** 205:20 | 107:9 108:2 | 191:23 196:21 | 48:13 51:12,23 | 144:4,11,17 |
| **isolated** 160:8 | 110:4 112:20 | 220:4 | 52:9 53:2 | 147:3,6,13 |
| **issues** 34:21 | 113:9 137:4,13 | **keeping** 85:14 | 54:14,15,18,23 | 148:9 149:3 |

# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

150:11 151:7
153:5,11,15
154:5 157:10
157:10,23
158:21 159:15
160:5,7,15
162:10 163:2,4
163:7 165:7,8
165:22 166:19
173:1,22 174:3
174:3 176:8
177:16 179:3
179:17,20
180:17 182:3
183:2,13,16,19
183:20,21,23
184:1,17,22
185:21,23
186:11 187:5
187:15,15
188:22 189:11
189:14 191:10
191:12,22
192:1,2,9,10
192:19 194:7
194:22,23
195:16 196:18
196:22 197:9
199:2,6 200:18
200:19 201:3,5
202:1,7 203:6
203:14 204:3,9
204:17,21
206:13,17
207:17 208:4
208:11,22
209:13,19
211:10 213:9
213:16 214:5
214:23 216:1,9
216:15,18
217:22 218:4,9
218:10 219:18
**knowing** 203:12

**knowingly**
175:18
**knowledge**
52:13 53:3
62:15 68:4
99:19 110:3
138:21 203:18
203:22 205:7
**known** 37:15
41:22
**knows** 201:13
201:15 203:13

**L**

**L** 1:20
**Labor** 136:10
204:20
**lack** 182:17
**laid** 178:16
**lake** 12:17 198:2
204:11
**Lambert** 19:22
**Lands** 195:5
196:5
**Langford** 19:15
19:21
**large** 2:4 7:3
40:20 159:6
**larger** 46:7
196:22
**largest** 46:2,6
**Larry** 19:12
**late** 58:1 107:17
152:23
**Laura** 11:9,23
13:17,19 14:21
15:7,10,11
102:14 103:9
107:16 201:11
**Laura's** 107:4
**law** 6:5 183:8
187:22
**laws** 2:15
**lawsuit** 21:22

22:4 65:16
85:8 100:6
182:16 185:7
201:20
**lawsuits** 22:1
**lawyer** 182:3
201:2,4 203:15
**lay** 178:6
**layer** 47:2
**layman's** 94:18
186:1
**lead** 165:19
166:21 218:9
**leader** 101:10
**leadership** 115:8
156:22
**leading** 2:22
**leaps** 198:3
**learn** 31:13
**learned** 42:22
48:21
**learning** 32:9
**leave** 14:13
25:15 27:22
29:2,9,10
30:14 35:21
42:11 52:4,20
58:4 104:17
106:16 107:19
166:18 167:1
176:20 180:7
**leaving** 44:22
106:18 144:15
147:22 183:23
**led** 116:8 156:18
189:19
**left** 14:1 25:4
27:3 34:12
42:6 48:20
50:6 51:19
52:19,23 53:3
54:7,8 55:23
58:15,21 90:14
98:6 101:19

104:16 105:7
106:17,20,21
139:1 141:21
142:11 143:2
144:7 175:14
175:16 176:13
176:23 179:22
183:10 193:1
196:2 197:14
200:6 201:19
202:7,13
206:19 207:5
208:4 210:13
218:14
**legal** 8:9,14
63:12
**length** 103:10
139:5
**letdown** 216:23
**letdowns** 47:9
47:21 73:7
218:3
**letter** 4:19 5:15
106:4 108:5
109:9,15,20
111:7,10,11,14
112:5,8,9,12
112:13,21
113:6,20 114:1
114:10,13,16
115:5,13
117:21 178:18
179:16 181:3
181:11 218:22
219:7
**letting** 97:22
**let's** 15:20 27:1
36:13 75:2
121:17 123:13
188:23
**level** 33:15,17
**levels** 44:13
**levy** 205:20
**liable** 171:15

**license** 10:14
**lied** 156:11
178:21
**lies** 183:5
**life** 24:2 104:12
104:23 119:10
156:15,16,17
172:23 179:22
183:1
**lift** 48:20 49:2
**lifted** 180:15
192:13
**light** 191:16
**Lightsey** 39:10
**liked** 94:5 96:20
157:2,3,10
218:1
**limited** 33:1
36:6
**limited/light**
32:17
**Lincoln** 193:16
**line** 208:10
**Lisa** 20:4,19
**list** 193:23
194:17,21,21
195:7,16
**listed** 175:21
**lists** 194:5,19
**little** 43:15 48:4
59:14 63:15
96:8 102:4,6
105:3 161:22
186:10 210:2
**live** 10:17 15:14
15:22 16:9,18
17:11 18:18
19:10 20:14,22
21:1 77:5
**lived** 10:22 24:1
**lives** 11:5 15:17
15:18 16:19
17:13 18:8,9
19:23 20:1,4

# FREEDOM COURT REPORTING

Page 234

| | | | | |
|---|---|---|---|---|
| 20:15 | 144:7 165:9 | **machinery** | 136:22 137:1 | 66:17 67:3 |
| **living** 29:5 77:4 | 173:11 211:23 | 167:17 171:22 | 137:15,16 | 108:18 109:12 |
| 192:15,16 | 213:14 | 172:3 | 138:4,8 139:8 | 113:15,20 |
| **local** 68:3 | **looking** 13:17 | **Macon** 20:8 | 139:10 145:16 | 117:4,13 121:7 |
| 204:11 | 67:13 103:14 | **mad** 179:20 | 149:13,22 | 123:22 127:11 |
| **Locally** 193:5 | 110:15 111:7 | **magic** 101:4 | 151:8,15,16,19 | 128:6 130:8,18 |
| **location** 140:7 | 121:10 123:6 | **maintenance** | 152:4,11,16 | 131:17 132:3 |
| **lodges** 21:18,19 | 131:8 133:6,19 | 167:11,22 | 155:1,6 166:7 | 168:10 174:22 |
| **logistical** 107:21 | 135:15,17 | 168:14,17 | 166:21 196:9 | 181:5 182:7 |
| **loner** 107:6 | 173:10 185:22 | 169:9,13 | 196:12,13 | 215:5 219:6 |
| **long** 10:22 12:3 | 187:11 200:9 | **making** 43:3 | 197:11 198:4,5 | **market** 206:14 |
| 12:6 13:23 | 206:8,9,11,16 | 100:2 103:14 | 198:8,11 207:3 | **marketing** 96:15 |
| 14:15 25:13 | **looks** 64:8 109:6 | 103:16 105:5 | 208:1 211:15 | **married** 11:21 |
| 26:4 27:17 | 121:15 122:14 | 106:7 107:11 | **managers** 39:3 | 14:16,17 15:6 |
| 32:14 33:6 | 123:7 | 145:17 146:22 | 80:5 82:4 | 16:13,14,22 |
| 43:13 69:7 | **lose** 39:3 148:12 | 170:11 174:1 | 138:1,3,11 | 17:14 19:22 |
| 88:19,23 | 186:15 206:22 | 188:5 200:8 | 148:16 149:15 | 20:9,16 |
| 137:17 138:17 | 211:8 | 215:20 216:2 | 149:17 206:22 | **Marshall** 6:6 |
| 139:3,9,15 | **losing** 102:19 | **man** 156:20 | **managing** 197:2 | **Martin** 12:17 |
| 140:13 141:9 | 149:6 208:3 | 191:20 | **mandate** 95:19 | 198:2 |
| 141:13 142:20 | **lost** 107:7 147:7 | **management** | 96:1,21 | **match** 124:8 |
| 143:9 164:21 | 207:3,7 | 99:1,1,2 | **mandatory** | 154:5 |
| 180:9 208:17 | **lot** 50:7 62:22 | 105:19 210:18 | 179:10 | **matched** 184:18 |
| **longer** 29:5,16 | 84:4 93:9 | 211:1 | **Mandy** 2:2 3:8 | **matches** 132:15 |
| 59:14 76:9 | 95:22 96:5 | **manager** 31:5 | 7:1 | **material** 159:1 |
| 111:1 140:17 | 107:3 140:1 | 32:9,11,21 | **manual** 80:3 | **matter** 39:18 |
| 143:15 144:18 | 147:8 156:13 | 33:7,9,13,14 | **man's** 99:13 | 56:12 62:14 |
| 163:3,5 164:14 | 172:15 202:1 | 33:18,20 34:1 | **marina** 196:10 | 120:13 |
| 191:15 204:1 | **love** 102:10,15 | 34:9,12 35:3 | 196:16,17 | **maxed** 83:7 |
| **longevity** 184:15 | **loved** 104:12,13 | 35:17 36:2,16 | 198:8 204:19 | **maximum** 45:15 |
| **long-run** 169:1 | 104:13 | 36:23 37:21,23 | **mark** 39:10,12 | **McDonald's** |
| **long-term** | **low** 55:21 83:17 | 38:4,5,10,12 | 61:4 63:18 | 146:21 |
| 119:15 184:20 | **lower** 54:17 | 38:19 39:8,9 | 65:7 66:9,10 | **Meadows** 29:1,3 |
| **look** 66:4 109:9 | **lunch** 102:9 | 39:14 43:4 | 66:22 108:14 | 30:8,15 |
| 121:17 122:13 | 107:7 114:7,11 | 51:8,15 53:15 | 109:7 113:4,10 | **mean** 8:9 15:19 |
| 124:5 125:20 | 120:3 177:7,8 | 57:7,21 58:6 | 116:23 121:1 | 18:15 23:2 |
| 132:6 136:5 | 177:9 | 58:20 59:7,10 | 123:19 127:6 | 24:4 27:9 |
| 144:5 193:3 | **lured** 182:18 | 70:1,2 74:2,7,9 | 128:2 130:1,13 | 34:18 36:15 |
| 206:18 215:7 | 183:3 | 74:17 76:7,11 | 131:11,22 | 37:10 40:16,17 |
| 218:23 | **L.L.C** 2:5 6:13 | 78:2 82:6,15 | 166:14 168:3 | 41:3 46:7 |
| **looked** 60:14 | 7:9 | 82:20 83:1,3 | 174:14 181:2 | 50:16 52:12,13 |
| 61:10,16 71:9 | | 97:5 103:18,19 | 182:5 | 54:20 55:3 |
| 100:23 133:21 | **M** | 103:20 104:4 | **marked** 61:7 | 58:3,12 59:3 |
| 135:7,9,19 | **machine** 210:15 | 116:17 118:14 | 64:2 65:12 | 60:8 61:12,15 |

# FREEDOM COURT REPORTING

Page 235

64:7 67:13
75:14 81:3
85:18 86:23
94:3 100:4,20
100:23 106:2
110:2 111:11
117:17 119:9
126:2 128:13
132:23 133:14
138:21 144:2,9
144:16 146:5
146:20 148:23
149:18,19
151:16 152:23
153:2 154:14
155:20 158:12
169:21,23
188:10 190:20
200:16 202:18
203:11 206:10
210:13 213:6
217:21 218:14
**means** 98:13,13
**meant** 59:13
115:11
**Medical** 12:1,9
12:12
**medications**
10:4
**meet** 77:19,20
91:4 92:8,8
102:2,10
157:22
**meeting** 48:4
160:12 177:3
**meetings** 54:16
154:11 155:6
**Melanie** 175:3
**member** 21:15
**memo** 117:1,8
117:10,22
135:9
**men** 165:19
166:21

**mental** 191:12
192:2
**mentally** 161:21
179:5 192:4
**mention** 96:12
114:13 116:12
219:16
**mentioned**
84:17 158:1
216:10,12
219:17
**merchandise**
46:23 47:5
**Merchants** 1:12
6:10 8:20
21:23 30:22
49:23 50:7,12
50:14,18,22
60:16 61:2
62:10 63:4,9
65:3 67:9,14
68:23 69:1
71:7 73:12
74:18 75:19
79:18 80:19
86:7,11,20
92:22 97:8
105:7,13
106:19,20,21
108:3 110:11
114:1 117:2,11
120:22 124:4
127:21 128:3
129:3 130:3
134:4,6 137:1
137:18 139:22
140:11 142:21
143:4 152:5
155:11 157:15
158:8 159:1
166:11 171:13
175:16 176:21
187:19 188:6
188:11 189:7

196:2 199:20
200:6,14 202:2
202:13 203:17
203:19 206:19
210:12,17,21
212:3,19
213:23 216:17
217:15 219:11
219:21
**Mercier** 6:20
69:21
**merit** 194:1
**merited** 188:1
**Merle** 171:4
**mess** 37:13,15
101:7 143:21
**message** 144:17
187:18
**messed** 154:2
**met** 44:21 102:3
**Middle** 1:2
18:21
**mighty** 200:11
**miles** 19:2 43:12
193:14 208:11
**mile-wise** 74:20
**million** 105:21
105:23
**mind** 32:3 99:11
**mine** 28:2 95:20
**minimal** 146:19
**minimum** 48:12
184:1,3,6
186:17 194:8
**minute** 8:1
131:3
**minutes** 43:17
47:20 48:4
90:23 91:16
120:12
**mismanaged**
100:19
**mispicks** 150:16
**missed** 60:19

121:21 147:3
**missing** 105:1
**Mississippi**
71:12
**mistake** 98:18
**mistakes** 214:6
**mistreated**
101:1
**mom** 15:22 19:9
**Monday** 28:11
53:12 103:6,8
204:7,14
**Mondays** 162:12
**monetarily**
191:5
**money** 28:5
188:14,18
192:17,22
202:23
**monstrous** 73:1
**Montgomery**
16:19 18:15,22
20:7 26:1 69:3
69:5 140:19
193:17
**month** 14:9
122:16 168:19
170:18 197:15
**months** 12:5,7
14:5 80:10
105:12 141:12
142:14,15
148:22 151:13
161:12,17
170:17 180:17
192:15 193:2
204:14
**mop-up** 157:22
**morning** 35:1
47:19 53:12
61:19 137:9
147:9 164:19
177:4
**mother** 15:17

107:15
**move** 103:4
105:5 204:16
207:14,15
209:3
**moved** 11:3
107:20 141:18
166:14 195:6
**mulling** 185:20
**murder** 22:16

_____
**N**
_____

**N** 1:20 4:1 6:1
**Nabors** 34:8
**name** 8:3,4 11:8
11:10 12:19
16:1,4,5,12,20
17:1,16 19:23
34:7 38:9,11
42:2 67:17,23
83:3 114:5
116:3 152:8,9
152:9 163:11
170:21 214:23
219:21
**named** 18:7
45:11 139:11
163:14
**names** 8:7,14
19:11,20 20:22
21:2 194:23
**nastier** 100:20
**nasty** 100:21
**national** 154:20
**necessarily**
129:8 157:7
**necessary** 2:20
115:9
**need** 17:21
70:20 72:2
78:19 80:13
107:19 115:15
115:17 144:18
170:14 180:19

# FREEDOM COURT REPORTING

Page 236

| | | | | |
|---|---|---|---|---|
| 182:1 212:14 | 174:12 207:8 | **nods** 21:10 | **oath** 9:4 | 18:20 19:1,20 |
| 213:15 220:2 | 207:12 208:6 | **nonproductive** | **object** 155:22 | 20:2,9,21 21:2 |
| **needed** 32:6,16 | 208:18 | 165:14 | 189:3 209:5 | 22:17,22 23:8 |
| 34:22 35:19 | **newer** 140:5 | **non-union** 94:4 | 214:2 217:20 | 24:22 25:22 |
| 58:16 71:3 | 167:7 174:6 | 94:7 | **objections** 2:20 | 26:7 30:3,11 |
| 72:4 76:8 | **nice** 193:9 | **normal** 47:18 | 3:1 | 31:12 33:19 |
| 101:9,15 | **night** 31:3 33:22 | **normally** 8:12 | **observe** 77:20 | 34:13 37:18 |
| 102:21 103:1,2 | 35:2 39:9 | 51:18 75:15 | 162:21 163:22 | 40:12,22 41:5 |
| 143:14 144:1 | 47:10 53:22 | 165:6 204:23 | **obstacle** 154:17 | 42:7,10 48:6 |
| 145:6 146:11 | 54:13,16 55:8 | **north** 2:7 6:15 | **occasion** 85:4 | 49:12,14 53:2 |
| 148:10 150:19 | 55:12 61:20 | 7:10 19:4,5 | 178:1 | 54:1 55:7 |
| 150:20 155:8 | 73:8 74:10 | **NORTHERN** | **occasionally** | 56:16 58:20 |
| 155:14 159:17 | 76:22 77:1,13 | 1:3 | 36:9,14 | 59:13 63:7 |
| 163:4 165:5 | 77:15,19 78:4 | **Notary** 2:3 7:2 | **occasions** | 64:6,10,15,23 |
| 167:20 169:20 | 78:9,17 81:22 | **Notasulga** 20:5 | 133:16 146:18 | 65:7,20 66:12 |
| 178:2 195:8 | 83:2,4,5 85:3 | 21:1 | **October** 14:19 | 66:22 67:8 |
| **needing** 163:2 | 93:14 99:2 | **notes** 63:1,2 | 121:3 | 70:7 71:16 |
| 204:1 | 134:19 137:7 | 64:18 85:15 | **offer** 43:19 44:2 | 72:7,13 78:7 |
| **needs** 59:9 | 138:8 143:22 | **notice** 4:11 | 77:23 101:22 | 79:4 80:21 |
| 187:18 | 147:21 149:21 | 28:17 61:5 | 102:13,23 | 81:5 84:8,14 |
| **negatively** 8:19 | 151:8,10,12,14 | 129:9 215:9 | 108:5 109:9,15 | 85:7,18 86:1 |
| **neglect** 169:23 | 151:15,18,19 | **November** 197:7 | 109:20 111:7,9 | 86:15 87:12,17 |
| **neither** 11:20 | 152:3,22 153:3 | **number** 9:12 | 111:11,14 | 87:23 88:15 |
| 171:8 | 153:6 164:9 | 10:10,15 48:9 | 112:5,8,9,12 | 89:4 94:13 |
| **never** 23:16 40:5 | 165:6,10 | 54:20 126:19 | 112:13,21 | 95:17 98:5,11 |
| 57:9 60:14 | 166:17,20,20 | 187:6 219:1 | 113:5 114:11 | 99:6,19 104:7 |
| 75:21,23 80:4 | 169:3 172:18 | **numbers** 46:15 | 114:13,15 | 106:1 108:12 |
| 80:5 96:9 | 174:16 176:1 | 83:6 103:11 | 115:5,13 116:5 | 108:14 110:5 |
| 100:19 114:15 | 178:10 207:9 | 116:16,20 | 207:9,10 | 110:12 111:13 |
| 156:8 160:18 | 207:10 216:13 | 125:20 150:13 | 217:23 218:22 | 111:19 113:1 |
| 162:15 166:9 | 217:1 | 150:23 153:5,8 | 219:7 | 114:12 117:19 |
| 166:17 167:1 | **nights** 35:10 | 154:4 170:18 | **offered** 3:3 | 118:5 119:21 |
| 172:22 173:2 | 53:16,18 73:21 | 176:7 215:1 | 29:12 30:16 | 120:9,17 |
| 179:22 183:2 | 77:10,19 85:21 | **numbers-wise** | 44:23 88:8 | 121:21,23 |
| 184:4 186:20 | 112:11 115:3 | 50:11 | 188:5,18 | 122:1,9 123:3 |
| 188:21 195:8 | 138:16 150:3,9 | **numerous** | 189:20 209:14 | 123:13 124:3 |
| 198:4 205:19 | 150:21 151:7 | 146:18 | **offering** 163:1 | 124:11,17,21 |
| 209:18 211:10 | 152:20,21 | **nuts** 157:20 | 188:13 | 125:4 126:12 |
| 211:11,21 | 164:10 166:13 | **nutshell** 65:6 | **office** 144:13,14 | 127:1,14,20 |
| 213:20 | 166:13,22 | **Nyla** 16:5 | **officer** 171:14 | 131:11 133:4,7 |
| **new** 28:8 82:10 | 173:6 179:11 | **N-Y-L-A** 16:5 | **offices** 2:4 7:8 | 133:19 134:13 |
| 91:9 100:22 | 204:3,3 | ————————— | **okay** 9:20 14:20 | 138:13 140:4 |
| 105:17 117:1 | **nine** 121:16,20 | **O** | 15:12,21 16:14 | 142:10 148:20 |
| 118:14,21 | **nodding** 206:20 | **O** 1:20 | 17:10 18:6,19 | 150:8 154:21 |

# FREEDOM COURT REPORTING

156:6 158:18
160:2 162:22
164:3 171:6
173:14 176:14
181:17 183:18
190:2 191:2,5
195:11 200:1
200:20 202:12
202:17 205:4
209:16,22
210:18 213:3
213:21 214:18
215:4 218:22
219:5,13
old 11:14,16
  17:5 173:10
  186:22
omission 213:8
omitted 213:7
once 35:14 47:6
  63:16 170:13
  181:19 211:14
  217:6,13
ones 55:17,22
  121:21
online 193:22
  195:15
on-the-job 27:1
Opelika 20:1
open 30:1,4
  32:15 35:16
  53:6 92:13
  107:10
opening 105:18
operated 152:13
operating 140:3
operation 137:5
  159:12
operational
  115:16,22
  167:13
operations 31:5
  32:8,11,21
  33:7,9,20,22

33:22 35:3,17
36:2,15,23
37:5,21,23
38:3,5,10,12
38:18 39:14
45:9,12 46:14
51:15 57:7
59:7,9 74:2,7,9
74:16 76:7,10
78:2 82:6,15
86:3 91:9 97:4
103:19 104:1,4
116:17 136:22
136:23,23
138:4 145:16
145:18 149:13
151:16 152:11
152:16 155:1,6
162:10,19
163:17 211:15
operator 57:21
operators 48:20
  49:3 54:22
  207:19 217:1
opinion 214:14
opportunities
  195:17
opportunity
  23:10 83:19,22
  97:23
opposed 77:1,13
ops 33:13 34:1
  43:3 52:7 58:6
  58:20 82:11
oral 3:10 7:14
order 27:8,9
  109:19 198:13
  198:17
orders 49:8
  198:17
ordinary 152:15
orientation
  159:5
oriented 97:14

98:12 99:12,18
99:21 102:15
original 3:9
originally 69:20
ought 183:7
outgoing 107:5
outside 26:20
  106:23
outweighed
  42:23
out-and-out
  156:11 183:5
overall 15:1
Overhill 10:20
overtime 48:12
  110:20 136:10
overview 162:13
owned 59:18
  196:17
owner 28:1
  33:11,12 34:7
  40:22,23
ownership 60:7
owns 60:9
O'Connor 45:4
  45:7 52:6
  96:19

———————
P
———————
P 1:20 6:1,1
pack 93:8
package 117:17
  135:6,8
page 4:3 108:23
  110:17 114:4
  121:10 122:14
  125:17 135:2
  136:5,12,13
paid 39:15 56:5
  83:20 89:11,11
  89:13,15,19
  146:18,22
  170:4 189:12
  198:20 199:13

pallet 47:6
palletize 46:23
pallets 48:10
panhandle
  208:14
paper 63:16
  183:8
paperwork
  129:23
paragraph
  115:5 128:23
  129:1
pardon 185:8
Parrish 16:6
part 17:23 31:17
  73:14 76:21
  87:15 117:16
  123:1 126:4
  145:5 157:11
  168:21
participate
  154:17,20
participated
  119:19
particular 24:23
  26:7 117:18
  159:22 168:12
  170:6
parties 1:22
  2:23
partner 107:7
parts 193:6
  198:5,13,16
  215:17
passed 198:18
passes 217:2
pat 156:20
pawning 107:14
pay 28:4 29:13
  41:16 43:1
  44:2 66:2 68:9
  68:13 81:11
  83:13,17 88:2
  88:5 111:15

127:5,5,15,15
129:6 207:13
paycheck 56:9
  90:2,5
paychecks 5:3
  127:8
payment 124:1
  191:20,21
Payne 18:8
pedestal 106:23
penance 185:2
pension 184:13
  184:14 185:1,6
  186:23
pension's 187:1
people 8:8 48:21
  49:1,13 50:21
  95:4 96:6
  98:12 101:10
  105:19 148:12
  193:10,11
  201:10 212:14
percent 45:15
  50:14 83:19,22
  93:21 103:13
  111:20,21
  115:20 116:7
  121:12,12,13
  122:3 125:22
  125:22 173:5
  184:3 185:16
  187:3 213:1
  214:17 215:1
percentage
  44:15,16
  125:23 126:20
  126:22
period 16:16
  32:14 35:11,15
  122:14,17
  123:6,8 124:9
  125:7,9,18,20
  125:21 126:1,5
  126:7,15

# FREEDOM COURT REPORTING

Page 238

143:10 144:2
163:23 164:7
170:15 197:12
**periodontist**
69:3
**periods** 88:20
**person** 35:9 49:5
49:7 107:5
211:11
**personal** 79:13
115:7
**personally** 55:10
156:9
**perspective** 97:2
97:3 98:11
99:17
**Peterson** 19:12
20:13
**Phillip** 83:2,6
138:7 140:13
140:16,21,23
142:11,15
149:9,23 151:2
151:6 152:19
**Phillip's** 165:2
165:15
**phone** 67:22
99:9 101:23
171:7 178:16
180:4
**phone-in** 49:8
**Photocopy** 4:15
5:3
**phrase** 183:6
185:9
**physical** 78:21
**physically**
161:21 179:5
192:3
**pick** 49:9 216:13
216:16 217:1
217:17
**picking** 217:3
**picture** 206:15

**piece** 169:18
**pieces** 101:14
170:6,22
**pinning** 33:4
**pitching** 163:1
**place** 2:6 6:14
7:9 34:16
36:10,12 37:13
57:16 63:16
81:19 82:3
93:4,13 96:7
101:15 106:3
125:19 140:8
140:19 143:21
149:17 161:19
179:23
**placed** 9:4
205:20
**places** 53:21
173:1
**Plaintiff** 1:8 6:3
**plan** 118:2
184:13,14
**planned** 90:22
**plant** 43:7 167:2
193:13,16
208:18
**plays** 192:21
**Please** 3:13
**pleasure** 92:8
**plenty** 102:21
**plus** 185:5
**PM** 167:11
**PMs** 167:10
**point** 37:11,12
74:11 93:16
98:14 99:3
112:19 146:1
147:23 148:8
148:19 150:9
160:16 162:18
164:16 170:7
214:10,11
218:6

**points** 94:19
**policies** 40:13,14
129:5 136:21
**policy** 79:18
80:20 184:2,22
**posed** 41:3 90:8
**position** 32:2
84:18 104:1
106:22 186:5
186:21 195:14
196:8 207:12
**positions** 193:23
194:1,14
**possession** 63:5
**possibility** 41:15
**possible** 90:19
213:21
**possibly** 83:18
211:6
**postdated** 110:6
**potential** 121:11
121:14 122:2
**potentials**
103:12
**poultry** 94:22
**practices** 129:5
**practicing** 95:9
**predecessor**
214:22
**predecessor's**
139:12
**predominantly**
52:18 197:19
**Predominately**
157:19
**preferred** 94:6
**prepare** 201:14
**prepared** 63:20
**preparing** 47:10
73:7
**prerequisite**
129:20
**PRESENT** 6:3
6:10,19

**presented**
212:21 214:19
**preshift** 48:4
**president** 13:8
45:11 70:6,8
107:1 134:4
**pressure** 95:23
96:10 180:4
**pretty** 24:1
52:17 65:2,19
75:9 84:10
103:3 147:5
187:1 215:11
**prevent** 10:6
110:18 111:4
**preventing**
111:1
**preventive**
167:10 169:9
**previous** 38:10
74:15
**previously** 215:4
219:5
**pride** 106:8
**primarily** 82:11
82:18 94:21
157:16
**print** 123:15
**printing** 27:11
47:23
**prior** 3:4 12:15
71:6 129:18
136:2
**privy** 62:13
**probably** 19:2
26:16 33:8
49:13,19 50:3
50:3,13 51:19
53:16 54:12
55:3 109:22
130:23,23
135:21 140:21
151:5 156:5
182:12 192:7

**problem** 35:19
35:21 36:18,19
36:19,21 37:4
37:22 58:16,23
59:2,8 60:1
76:8,13 165:3
165:16 176:9
**problems** 34:21
36:5 38:7
57:22 58:2,7
167:2 181:18
218:19 219:14
**Procedure** 3:6
7:6
**procedures**
94:20
**proceed** 215:13
**proceedings**
7:15
**process** 42:20
47:11 67:11
92:22 116:2
120:21 122:10
137:7,9 150:12
168:22 181:13
197:22 213:5,7
214:20
**produce** 53:11
94:21
**produced**
113:11
**product** 53:11
**productivity**
115:16,22
**Profit** 214:7
**program** 4:22
25:8 41:10
44:6 45:14
47:23 112:2,3
115:6 117:21
121:3 168:15
**progressed** 72:3
**progression**
31:21

# FREEDOM COURT REPORTING

Page 239

progressively 178:23
promised 160:18
promises 157:5 158:20
promoted 82:23 83:1 165:19 166:19 186:20
promotion 103:17 104:2 207:15 208:5 209:14
proper 94:20
prorated 122:16 123:1 161:2
proud 218:5,6,8
proverbial 179:12
provided 43:6 65:9 67:5 112:16
provides 129:1
providing 115:8
Provision 30:17 38:4,14 40:9 41:11,12,20,23 42:12 43:1,4 44:18 49:15,23 50:2,10,23 59:17 60:5,21 74:8,15 81:14 166:10 210:12 210:14,20,22 211:14
provisions 136:10
psychiatric 200:18
Public 2:3 7:2
publication 42:18
pulling 138:19
pumps 196:18

punitive 187:14 187:22
purpose 40:20
pursestrings 167:23
pursuant 7:5
pursued 189:18
put 54:19 63:13 63:22 96:10 99:7 101:13 114:21 156:13 178:14 183:8 185:13 186:2 186:12 187:6 192:5 194:17 213:12,17
putting 47:4 58:13 103:11 170:21
put-aways 47:4
puzzle 101:15
P-A-R-I-S-H 16:7

**Q**
qualifications 194:6
qualified 146:7 146:12,14 194:15 207:11
qualify 89:1
quarter 25:18
quarters 25:14
question 9:14 14:16 15:13 29:19 30:7 41:2 60:3 68:4 75:10,10 90:8 92:16 93:20 125:5,19 131:3 132:19 149:2 155:23 189:4 190:13,19 216:6 217:10

questions 2:21 2:22 9:1,12,13 18:2 72:14 73:15 75:3 129:14 158:1 190:21 209:23 210:8 213:18 213:19
quick 103:3 120:3 171:18 206:2
quit 149:23 151:3,4,6 152:19 166:7 178:17 180:6 180:12 192:10
quite 68:10
quo 116:13

**R**
R 6:1 161:23,23
radius 68:7
raise 56:11 184:3
ran 38:21 162:13 175:7 210:14
Randy 82:4,5,6 82:14 138:5,17 138:23 140:22 149:10 151:9,9 152:1
rang 67:22
rate 54:17 147:17 172:23
rates 173:2 174:16
raved 83:5
read 111:8 128:11,20 134:1
reading 2:12 64:7 119:13 136:3

reads 115:6
ready 35:18 103:4
real 38:22 90:14 107:4 172:19 174:5,11 183:19 193:9 217:3
realize 14:7 15:12 117:19
really 60:13,18 81:9 85:15 90:17,21 93:18 97:11,12 99:12 101:1,22 182:20 188:22 192:2 199:5 219:18
reason 17:18 66:2 95:21 99:3 162:7 166:18 176:17 215:2 219:21
reasons 77:4 165:5
recall 32:13 85:17 117:17 162:7 163:14
receipt 5:6,9 130:13
receivable 198:19
receive 79:2,17 112:2 113:5 115:14 118:4 118:13,23 127:22 134:9 134:13,17,21
received 93:7 109:15 111:12 111:13 119:6 122:15 123:4 126:9,10 127:7 127:15 130:3

131:13 133:10 133:11,15 135:20 184:4
receivers 48:19 49:2 105:20
receiving 46:21 55:2 95:5 117:10,15 122:20 123:10 124:12 126:11
recognition 73:3
recognize 108:20 121:5 127:9 128:8 130:5,16 131:14 132:1 181:7
recognizes 115:6
recollection 46:9 81:23 119:7 125:2 126:8 137:20 139:23 153:7
recommendati... 158:3 183:12
record 8:2 93:7 93:9
recordings 62:17
records 93:5
recoup 49:4 185:7 187:11
recovery 202:21
red-flagged 170:5
referring 80:17 174:20
refers 117:21
refrigerated 94:23
regarding 117:2 117:3 134:10
regardless 60:9
Regional 12:18

| | | | | |
|---|---|---|---|---|
| regular 58:11 | repercussions | response 67:5 | 101:11,14 | 82:9,18 101:5 |
| 77:2,13 116:8 | 147:4,21 | responses 61:19 | 102:16 106:23 | 101:6 116:6 |
| 164:4 | replace 207:7 | responsibilities | 110:21 111:17 | 148:7,8,13 |
| rehashing 220:3 | replaced 39:11 | 197:10 | 113:21 114:2 | 165:21 169:2 |
| related 62:9 | 116:3 163:11 | responsibility | 119:1,4 122:4 | 196:16 |
| 65:15 | 163:12 169:21 | 95:15 149:14 | 122:6,7 125:13 | runs 192:22 |
| relating 2:16 | replenishments | responsible | 129:3 158:18 | Russell 12:1,8 |
| relative 15:18 | 47:9 216:11 | 33:21 35:4,7,9 | 159:1 187:16 | 12:12 23:21 |
| 15:19 | report 5:14 | 55:8 58:7,9 | 189:13 190:5 | 24:8 27:5,7,15 |
| relatively 55:21 | 33:10 51:3,5,9 | 78:3,5 82:12 | 200:23 203:2 | 27:22 195:5 |
| relatives 15:14 | 51:10 52:5 | 145:17 | 204:15 208:9 | 196:5 |
| 17:11 18:12 | 137:10,12 | rest 13:21 | 208:10 209:22 | |
| relied 159:7 | 175:8 | Restaurant | 217:11 | **S** |
| relief 31:11 32:6 | reported 52:6 | 102:6 | road 75:1 140:1 | S 1:20,20 4:8 5:1 |
| relying 158:3 | Reporter 2:3 | Rester 171:4 | Roberson 38:11 | 6:1 8:11 |
| remarried 14:23 | 3:15 7:2 | result 200:13 | rodeo 154:9,15 | sacrifice 115:7 |
| remember 11:2 | repossessions | 206:23 | 154:18,20 | safety 169:4 |
| 13:5 14:2 21:3 | 205:17 | resume 13:19 | Rodney 83:3 | 170:8,10,22 |
| 27:8 43:21 | represent 8:20 | retail 31:18 | 138:9,16 | 171:5 |
| 45:17 76:19 | 121:11 124:1 | retained 3:14 | 141:13,16,20 | salaried 90:3 |
| 78:11 79:5,8 | request 40:5 | retains 129:3 | 165:18 | 136:8 |
| 81:7 84:1,9 | 67:6 110:7 | rethink 106:6 | role 32:6,18 | salary 39:15,17 |
| 85:15,22 92:15 | 159:20 161:7 | retire 184:8 | 53:20 195:18 | 41:14,17 43:5 |
| 94:13,15 97:18 | require 36:22 | retired 197:5,6 | roll 199:19 | 44:3,17 45:21 |
| 102:4 104:16 | required 37:3 | retirement | 200:3 | 56:6,8,11,13 |
| 106:18 108:13 | 95:4 154:6 | 184:2 | rolled 122:21 | 56:18 65:21 |
| 113:5 114:6 | requires 78:22 | returned 32:16 | roof 150:17 | 66:3,5 83:12 |
| 116:2 117:9,15 | research 71:7 | 32:23 | room 90:13 | 83:23 88:7,11 |
| 122:19,20,21 | researched | reunion 161:8 | 177:10 | 103:13 107:11 |
| 123:10 124:12 | 186:1 | reversal 32:18 | rotated 152:1 | 116:5 120:23 |
| 124:18,19 | resident 24:6 | 53:20 | rotates 205:5 | 121:13 182:21 |
| 125:1 126:11 | resignation 4:19 | revise 129:4 | rough 81:16 | 185:5,12,14,15 |
| 126:13,15,16 | 5:15 106:5 | Rhonda 19:15 | routes 31:13,16 | 186:15 187:3 |
| 126:17 142:5 | 113:7,17,20 | Rick 197:6,14 | routinely 116:7 | 189:16 198:21 |
| 148:5 154:13 | 114:10 178:18 | ride 74:22 | 214:23 | 198:23 199:6,7 |
| 162:23 168:16 | 179:16 181:3 | Ridge 196:9 | Rs 16:8,9 | sales 28:8 32:4,7 |
| 177:3 179:15 | resigned 86:21 | right 9:23 18:11 | Rule 3:5 | 33:18,18 34:9 |
| 179:17 181:22 | 113:9 141:5,10 | 21:6 50:5 53:5 | rules 2:16 3:6 | 34:12 96:14 |
| 181:23 183:9 | 191:13 | 56:1,14 64:12 | 7:5 129:5 | 115:15,21 |
| 187:7 195:14 | resigning 86:10 | 64:20 66:19 | run 31:16 34:19 | 157:5 197:11 |
| 195:18 211:13 | respective 1:23 | 69:4 75:2 | 36:12 38:14 | 197:17,20 |
| repair 168:18 | respond 195:8 | 79:11 81:5 | 91:14 159:12 | 198:10 |
| repairs 168:15 | responded 171:9 | 85:17 88:10,17 | 167:14 208:17 | salesman 197:14 |
| 168:20 169:22 | 195:9 | 91:6 92:3 96:9 | running 36:4,10 | salesmen 28:19 |

# FREEDOM COURT REPORTING

Page 241

salespeople
 31:14
salesperson
 31:11 197:5,8
 197:9,17
Samlip 193:5
sat 106:22 114:9
 177:11
Saturday 28:13
 53:7 78:18,23
 79:2,5 80:12
 154:8,8,10
 204:16,18,20
Saturdays 35:13
 35:15,16 78:20
 115:3 153:18
 153:22 155:12
 172:18
save 192:17
 208:20
saw 61:10 70:17
 100:16 167:1
saying 52:14
 53:4 84:1 87:9
 87:15 118:18
 124:18,23
 125:1 126:9,10
 127:3 146:1
 157:17 181:12
says 26:10 77:16
 80:2,2,3,4,17
 110:7 112:1
 115:19
scale 156:2
scan 47:6
scanned 136:1
scenario 103:15
 184:10 185:17
 186:4,14 187:7
 211:7
schedule 28:9
 34:2,14 51:16
 52:10,14,18
 77:14,15 84:15

85:6,20 87:19
 165:9 178:12
 204:2 205:3
scheduled 48:13
 58:11 69:20
 70:13 110:19
 154:1 167:10
 168:14 169:12
scheduler 49:6
scheme 108:8
school 23:20
 24:4 25:17
 27:3 77:12
 107:15,18,19
schooling 25:22
 26:12
scope 58:11
 208:15 214:8
Scott 160:12
 162:18 163:12
 177:10,12,18
 177:21,23,23
 179:2 203:22
 207:21,23
Scott's 177:1
scrabbles 63:15
screen 27:10
screwed 149:1
screwing 203:2
seafood 94:22
Search 67:18
searching
 149:21
season 204:9
 205:5
second 18:5 89:2
 114:4 122:13
 123:14
secure 81:18
Security 4:13
 10:9 23:17
 65:8
see 37:10 42:17
 66:6 71:3,4

72:4 77:21,21
 85:3 105:3
 123:13 125:21
 126:21 136:1
 147:10 150:21
 158:5 189:19
 195:1
seeing 119:13
 125:17
seek 63:12
 187:23
seeking 200:17
seen 61:9 69:2
 114:15 183:2
select 31:2 84:5
selecting 47:13
 216:15
selection 47:11
 137:7
selector 141:18
 207:10
selectors 165:13
 216:23
sell 30:5 199:12
selling 29:8,16
 29:21
send 13:19
 170:4 187:13
 198:19
sending 86:12
Seneca 138:15
 142:16,17,22
 145:4 201:16
 201:17,21
 202:20 203:3
sent 63:20 113:6
 174:18 187:18
 194:16
sentence 129:1
separated 14:21
September
 121:4 197:6
serve 203:1
served 22:13

service 42:15
 173:3 184:20
 196:17 197:1
 198:4,5,12,13
set 34:2,14 44:9
 68:21 69:6
 84:19 205:1
setting 85:6
seven 121:19
 141:11
several-month
 170:15
sewing 210:15
sexual 142:1
shaking 8:18
 179:19 205:22
shambles 161:20
 213:13
shape 167:6
 170:1
shared 207:22
She'd 107:18
shift 33:21,22
 35:1,2 39:8
 42:9 46:16,19
 47:11,17 48:5
 48:7 51:4,8
 53:22 54:4,12
 54:13,16 55:5
 55:6,8 57:21
 57:21,23 73:6
 73:8 74:10,10
 74:13 76:22
 77:1,13,15,19
 78:4,9,9,17
 81:21,22 82:9
 82:13,18 83:4
 85:4 93:2,14
 93:14,16 95:4
 97:4 98:23
 99:2 103:18,18
 103:23 104:3
 137:6 138:6,15
 143:22,22

145:5,7 147:16
 147:21 150:7
 151:8,12,14
 152:22 153:4,6
 165:4,6,11,12
 165:21 166:17
 166:17 172:18
 174:16 176:1,1
 178:9,10
 179:11 186:19
 201:16 207:9
 207:11,19,20
 208:1 216:12
 216:13
shifts 77:8,9,18
shift's 83:6
ship 31:3
shipping 137:7
 139:19
shook 92:7
short 90:15
 119:15 143:10
 143:12 144:3
 147:19 153:1
 197:12
shorthanded
 143:23 147:17
shortly 11:4
 75:16 98:22
 163:13 197:14
shorts 150:15
short-term
 207:6
shotgunning
 210:7
shoulders
 180:15 192:14
show 48:2
 127:14
showed 48:10
 70:13 165:17
shows 66:3,19
 124:6 130:11
shut 204:13

# FREEDOM COURT REPORTING

Page 242

shuttle 55:18
shuttling 208:12
  208:13,21
siblings 17:9
  19:14 20:3,11
sic 58:9 117:1
  186:11
side 48:17
sign 170:3
signature 2:11
  109:1,2 128:14
  128:16 131:4,7
  131:9,20
signed 81:4
  109:21 113:23
  114:7,10
  117:20 129:12
  132:10 136:20
significantly
  46:7
signing 47:22
  128:11,20
  133:7 170:8,20
similar 174:5
simple 169:19
sir 56:4 61:3
sister 15:18
  19:15 20:4,13
sisters 16:18
  17:7
sister's 16:4
sit 70:21
site 193:22
sitting 9:9 14:18
  67:21 70:17
  85:14 144:14
situations 72:18
six 14:5 44:12
  48:18,19 54:12
  121:19 146:23
  164:5
Size-wise 49:22
sleep 85:1
  107:17 192:6

sleeping 77:11
  191:14
slips 196:21
  197:23,23
slot 47:3 197:23
slots 47:12 48:1
  216:13,16
  217:2,3,18
small 46:10
  71:13 72:23
  185:1
smaller 166:10
Smith 2:5 6:13
  7:8
smooth 34:20
  38:22 81:15
  144:13
smoothly 38:15
  145:18,22
snack 91:15
snap 101:3
snuff 171:18
social 4:13 10:9
  21:15 23:17
  65:8
sole 209:8
solely 184:15
solve 150:23
somebody 41:1
  69:15 99:7,8
  144:10 149:12
  151:20 152:2
  188:13,16
son 11:4,7
son's 11:10
sort 34:4,5 78:18
  107:5 191:21
  195:1 198:7
  207:22
sorts 81:4
sought 23:16
sound 28:3
  123:8 163:18
sounds 14:10

south 208:13
southeast 208:9
Spain 34:11
speak 13:18
  53:21 63:13
  92:14 96:15
  150:17 167:23
  169:18 187:14
speaking 54:19
  59:4
special 110:17
specific 166:1
specifically
  219:13
specifics 72:10
  122:19
speeding 23:1
spell 51:12
spelled 211:17
spend 161:23
  164:9
spent 31:17
  185:21
split 198:7
splitting 105:15
spoke 82:4
spot 63:23 81:16
  166:14 198:2
  217:23
spread 170:16
spring 25:17
stability 81:12
  134:23
stack 196:19
staff 77:20 83:10
  91:7 157:5
  166:23 172:19
  174:13 197:17
standards
  115:10,16,22
  136:11
standpoint 93:3
  94:9 106:8
  107:21 157:9

169:1,5 187:14
  187:23 191:19
start 15:20 35:1
  44:3 47:11,12
  88:9 103:11
  132:18,19
  134:2 145:5
  149:21 150:8
  150:14,19,21
  151:7 168:14
  179:9 209:1
  211:5 216:14
started 13:3,11
  14:3 31:9
  42:19 47:18
  48:18,19 50:12
  55:4,22 71:12
  81:2 82:21
  88:8 127:20
  134:3,6 137:19
  139:19 140:14
  141:15 143:4,7
  150:2,4 153:6
  153:9 159:9
  161:3 165:1
  166:4 167:4
  169:13 178:5
  181:19 186:6,8
  186:9 192:23
  196:14 197:4,5
  199:1
starting 43:1
  136:22 145:8
  198:9 208:18
state 2:4 7:2 8:2
  187:21 191:12
  193:17,19
  194:11 195:12
stated 176:22
statement 4:13
  4:14 65:9
  66:13 100:1
  160:21 174:13
  177:18 187:13

212:23 213:4
statements
  100:3 158:20
  174:9 177:19
  183:5 190:14
  198:20 211:20
states 1:1 71:15
  160:20
status 5:5
  116:13 127:23
  128:4 136:6
stay 29:12 35:20
  35:23 36:7
  38:7 44:20
  58:1,10,17
  59:1 76:9,13
  144:18 164:6
  165:5,16
stayed 59:11
  186:18 209:2
staying 58:8
  59:14 186:21
steady 81:18
Steve 1:7,17 2:1
  7:13,18 8:8,12
  70:19 121:3
  178:5 210:6
  212:18 217:5
Steven 8:4,11
Steve's 220:4
steward 94:12
STIPULATED
  1:21 2:10,18
stipulation 7:6
Stitt 83:2 138:7
  140:13 142:11
  151:3
stocking 216:13
stone 184:21
  187:1
stood 178:13
stop 192:20
stopped 152:4
storage 196:19

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

196:20 198:12
store 29:21
straw 179:13
Street 6:6
strictly 49:20
69:11 74:13
strike 113:3
190:13
strong 101:9
struck 22:15
structure 29:13
60:12,15,19
121:1
stuck 62:12
stuff 8:10 13:22
32:10 58:4
62:23 71:17
72:17 73:6
83:7 92:12
119:18 150:16
155:14 159:5
169:2,19 170:3
170:12 179:14
196:23 200:16
202:4
styles 210:19
Suber 69:22
70:23 84:6
90:16 91:18
92:14,15 97:7
134:8,10 145:9
Suber's 70:7
subject 136:9
substantial
185:4,6 188:2
189:16
sudden 105:22
suffered 211:4
suggested 91:14
150:18,20
Suite 2:6 6:14
7:9
sum 215:11
summarize 65:2

summary 215:6
Sunday 53:9,10
56:17 57:11
80:12 204:13
204:18,20
Sundays 53:13
57:6
super 82:7
supervision
115:9
supervisor
27:13 28:14
30:12 42:9,10
43:2 46:17
51:4 74:13
82:23 83:4
93:3 94:9
103:18,23
104:3 138:9,10
139:7 141:19
166:1,8,22
177:16 186:19
201:17 207:20
supervisors
28:18 35:7
39:4 53:22
138:14 165:20
supervisory
195:18 207:12
support 62:4
200:22 203:18
205:11
supports 65:15
supposed 70:14
89:6,8 117:7
sups 166:20
sure 35:4 59:10
74:3,5 81:3
87:8,18 103:7
108:4 113:8
117:16 123:16
133:23 134:1
145:17 155:4
157:9 172:10

201:9,11 206:3
217:9
surgery 32:15
surplus 207:5
surprised 58:22
surprising 37:2
suspension
211:7
sworn 7:19
synopsis 172:8
SYSCO 12:23
13:2,6,8,10
14:1,13 41:21
42:8,13,17
43:7,18 45:14
45:16 46:17
47:15 51:4
53:6,17,19
54:5,18,21
56:5 57:22
60:5,6,14 66:1
66:14 69:4
72:18,22 73:4
73:17 74:12,16
75:12 79:11,12
79:14 81:16
90:20 93:1
94:1,3,4 95:3
95:22 96:4,18
97:10 103:16
104:12,13
105:9,13
106:16,17
107:6,12 113:7
113:18 139:18
140:7 146:4,23
166:5,16 174:5
182:22 183:23
185:4,14 186:4
186:19 188:6,9
188:17 199:20
206:18 207:4
208:12 209:2
210:20,23

211:12,14
215:18,22
216:11 217:7
219:20
SYSCO's 74:11
—————
**T**
T 1:20,20 4:8
5:1
take 11:20 23:16
26:4 29:14
40:3 43:13
44:23 45:4
49:5 57:1,16
57:17 82:16
91:21 112:20
120:3,10,14
166:14 169:23
170:17 175:12
179:6 180:19
201:13 206:1
207:9 208:5
taken 2:2 3:10
10:4 57:19
90:20 120:18
123:17 176:15
180:23 206:4
talk 54:15 67:8
75:2 83:12
84:14 88:2
90:18 99:14
145:10 167:16
167:17 173:15
173:18 182:1
201:8 202:21
215:17 216:8
talked 60:23
81:5 85:16,19
90:10 95:18
97:7 103:9
111:14 118:5
120:22 146:17
159:18 167:19
173:14 174:15

177:21 181:10
181:14,17,21
188:8,10,19
189:8,21 190:4
191:3,5 200:20
201:3,5,6,18
201:21 202:1
203:15 205:10
206:17 209:10
talking 26:23
38:13,16 63:22
66:14 68:15
73:16 81:8
87:18 120:20
167:20 168:6
205:6
Tampa 95:6
Tankersley
152:10,12
tape 62:16
taxes 200:10
tears 63:15
tech 170:7
techs 198:15
telephone
171:11
tell 9:15 13:19
44:22 45:2
46:17 60:16
67:20 68:5,20
71:21 72:11
73:23 75:11,21
76:1 78:8 79:8
82:2 92:3
93:23 101:8
137:2 143:18
178:11 179:8
180:7 182:15
191:11 192:7
202:12 203:10
209:20 210:6,8
212:15 213:7
213:12 218:19
telling 163:4

# FREEDOM COURT REPORTING

temporarily 192:14
ten 25:23 40:2 49:2 83:22 121:20 122:2 151:13,14 156:2 161:11 161:17
tend 164:11,14
tenure 139:12 147:19 184:5
term 119:15 182:18
terminated 147:19 176:16
termination 142:6
terminology 95:20
terms 31:21 65:4 74:4 94:18 112:14 127:4 147:14 156:22 158:14,15 168:7 175:20 186:2 201:22 201:23 211:4
terrible 172:21 210:17 213:15
testified 7:20 148:14
testify 203:23
testifying 10:6
testimony 1:16 3:10 9:8
thanking 97:21
therapists 200:13
therapy 200:18
thereto 3:4
they'd 90:17 98:3
thing 9:17 81:9 81:20 85:22

97:16 98:10,13 176:22 184:12 187:9 198:11
things 35:5 38:14 60:9 61:10 63:3 71:2 73:12 85:9,11 86:20 116:6 123:15 126:3 144:12 145:6,22 146:8 148:7 152:13 157:13,15,16 157:17 170:6 172:13 177:4 177:13 178:6 181:11,15 190:3,8 191:16 191:17,21 201:15 208:16 210:3 213:6 218:2
think 14:18 24:20 26:5 32:3,13 36:1 36:15 39:23 49:1,18 53:19 54:8 68:11,22 71:11,14 76:10 78:13 92:11 95:21 97:6,7 100:2,12,14,16 101:2,13 102:23 103:1 104:11 105:16 109:22 117:6 121:22 136:16 139:6 140:16 140:18 145:21 146:7,10,13,15 148:5 152:8 153:14 154:9 154:12 155:17 155:21 157:2,4

158:2,11 160:11,20 163:10,19 168:21 175:22 175:22 179:15 183:18 184:4 185:11 187:9 189:22 190:15 190:20 193:7 203:17 205:7 205:13 206:2 206:14 208:8 214:4,9,13,15 217:22 220:1,3 220:5
thinking 68:11 124:22 137:14 142:14
third 105:17 125:17 126:15
thought 42:16 74:6 82:17 84:12 87:5 91:10 97:14 99:11 130:21 138:10 147:22 148:14 149:16 155:9 157:6,7 159:16 188:1
thousand 43:2
three 40:1 48:18 77:8 79:21 83:21,23 101:20 105:12 121:19 122:5 122:14 125:21 140:15 147:20 148:22 156:5,7 159:22 172:17 184:3,7 185:16 194:4,20
three-fourths 55:3
three-plus 33:8

throw 159:4
Thursday 80:11 204:22,23
tie 47:1 160:6
tied 147:5,14
till 32:2 50:6 58:17 59:1 84:22 85:2 91:11 164:19 186:21 197:8
time 3:2,2 22:13 22:17 24:3 31:17 32:15,22 33:3 35:11 38:17 39:12,14 42:16 47:15 48:11 50:6 52:15,16,17 54:6 58:11 61:1 63:11 70:5 71:5,14 72:5 73:4 76:15,21 80:7 80:15 82:5 87:20,21 89:2 90:15 91:13,18 91:20,21 93:18 102:21 103:1 106:18 109:18 118:16 119:22 120:10 122:21 129:7 136:19 139:5 140:6,21 142:11 143:10 143:11 144:5,7 145:2,3 146:1 148:19 160:10 160:16 161:2 161:10,14,18 161:23 162:2 162:11,14 164:1,7 166:3 166:16 170:15 172:17 178:4

179:3 180:9 184:6 185:21 187:3 190:23 192:9 197:12 201:14 204:18 211:12 214:10 214:11
times 36:6 44:17 62:22 81:14 83:21,23 122:5 162:3 180:6 201:18
Time-wise 74:20
title 45:6 51:7 69:23 82:14 137:13 163:15
tobacco 31:19
Tobias 3:9 6:12
Toby 8:1
today 8:23 9:12 10:7 55:20 181:10 189:23 205:11
told 13:16 37:15 65:5 67:23 70:19,22 71:22 75:23 77:2,3 78:13 81:6,19 82:19 85:4,9 85:12 87:10 88:5 89:11,15 90:19 91:1,7 92:7,23 94:1 95:2 96:18 99:4 101:23 102:12 104:17 116:1,4 118:6 118:18,22 122:10 126:17 143:14,16 144:4 148:1,3 148:9,15 149:17 150:11 150:20 156:9

# FREEDOM COURT REPORTING

Page 245

| | | | | |
|---|---|---|---|---|
| 156:17 157:14 | 33:23 56:3 | 106:12 193:15 | 137:21 139:13 | **ultimately** 35:8 |
| 159:3,7,16,19 | 73:18 74:11 | 193:19 204:23 | 147:19 148:22 | **unattended** 58:4 |
| 160:4,9,22,23 | 78:10 82:20 | **trying** 14:8,17 | 159:23 160:3 | **uncle** 17:12 |
| 161:9,10,12,13 | 83:1 99:1 | 36:21 37:11,17 | 161:4,7,15,22 | 18:17 |
| 162:1,5,8 | 137:8 138:7 | 42:20 49:18 | 162:3 165:19 | **uncleanliness** |
| 167:19 171:7 | 139:10 143:22 | 87:8,17 92:22 | 169:4 172:16 | 173:8 |
| 171:11 172:16 | 149:3 155:7 | 104:19 109:17 | 180:17 192:14 | **uncle's** 18:7 |
| 177:11,15,23 | 176:2,4,6 | 109:18 133:12 | 192:23 193:1 | **understand** 9:3 |
| 178:1,17,19,22 | 208:21 | 145:2 158:10 | 194:19,19 | 9:6,14 29:18 |
| 180:6,11 | **transportatio...** | 163:10 176:11 | 197:18 201:9 | 37:20 41:2 |
| 181:12 183:14 | 93:15 | 176:12 192:23 | 215:17 | 50:5 61:13 |
| 183:21 190:3,8 | **trial** 3:2 17:20 | **Tuesday** 160:8 | **two-lane** 75:1 | 86:7,17 87:9 |
| 190:9,12,12,15 | **trick** 109:17 | **tune** 97:11 | **two-part** 216:6 | 89:23 90:9 |
| 194:13 195:6 | 133:13 | **tunnel** 191:17 | **two-year** 25:8,9 | 93:19 115:14 |
| 201:10 202:15 | **tried** 29:12 30:3 | **turmoil** 161:19 | **type** 9:21 22:22 | 118:17 125:16 |
| 202:16 203:1,7 | 47:19 48:8,11 | **turn** 101:4 | 26:11,14 30:18 | 126:3 129:2,10 |
| 203:7,8,10,12 | 99:22 106:3 | 106:13 108:23 | 32:10 33:14 | 144:17 145:23 |
| 212:7 213:22 | 160:6 165:10 | 135:2 146:11 | 41:6,9 51:16 | 154:14 182:2 |
| 214:21 217:13 | 193:5,12,15,16 | 146:14 198:18 | 55:11,14 94:6 | 190:19 217:9 |
| **ton** 202:23 | **Triggs** 167:20 | 208:23 | 150:16 154:17 | **understanding** |
| **top** 71:13 73:3 | 167:21 168:5,8 | **turned** 106:4 | 195:1 | 40:12 64:10 |
| **total** 153:20 | **trim** 27:11 | 146:8 181:13 | **typical** 48:6 76:4 | 70:3 76:6 85:7 |
| **totally** 14:5 | **trip** 154:19 | 183:4 | 164:17,18 | 115:18,23 |
| 169:6 172:20 | **trouble** 29:15 | **turnover** 5:13 | **typically** 48:14 | 118:9,12,20 |
| 172:20,20 | 149:5 | 38:23 54:3,14 | 52:22 58:15 | 126:6,19 190:5 |
| 198:9 212:1 | **truck** 154:11,11 | 54:17 55:11,15 | 75:18 164:23 | **understood** |
| 216:16 | 154:16 155:5 | 147:17 172:23 | | 88:22 89:21 |
| **touch** 98:3 168:7 | 191:20 | 173:2,5 174:15 | _____ | 90:1,4 91:13 |
| **tough** 14:16 | **trucks** 46:23 | 176:5 | **U** | **unemployed** |
| **tour** 91:4,21 | 50:17 147:22 | **twice** 78:21 | **U** 1:20 | 185:20 200:3 |
| 93:4 173:22 | 150:15 153:1 | **two** 14:9,22,23 | **uh-huh** 9:2,16 | **unfortunately** |
| **town** 102:4 | 208:13 | 15:4 16:8,9 | 9:18 11:13 | 86:19 |
| **trade** 42:17 | **true** 85:10,13 | 17:9 19:19 | 14:12 19:9 | **unhappy** 86:9 |
| 53:21 | 86:23 87:3 | 20:19 24:14 | 30:10 34:17 | **union** 94:3,3 |
| **traffic** 22:19,20 | 198:4 201:12 | 25:14 35:14 | 40:10 52:8 | **United** 1:1 71:14 |
| 22:22 23:5,6 | 213:4 | 39:23 40:1 | 75:5 110:22 | **University** |
| **training** 26:15 | **trust** 98:16 | 48:3 53:19 | 111:16 113:22 | 193:18 195:13 |
| 26:19 27:1 | **truthful** 181:14 | 66:7 77:8 | 118:8 122:8 | **unload** 46:22 |
| **transcript** 3:10 | **truthfully** 10:7 | 78:20 79:12,13 | 124:7,10 | **unsafe** 169:6 |
| **transpire** 32:5 | 209:20 | 81:16 88:19 | 127:19 128:10 | **untrue** 87:16 |
| **transpired** 50:7 | **try** 29:16,20 | 93:2 121:18 | 132:12 134:7 | **untruth** 99:17 |
| 84:11 92:10 | 37:3,23 44:20 | 125:7,9,18,20 | 142:19 158:9 | **updated** 130:21 |
| 158:4 | 78:1 99:15 | 126:5 127:5,8 | 181:20 190:6 | **use** 161:15 |
| **transportation** | 100:3 105:8 | 127:16 133:15 | 201:1 206:20 | **usual** 112:16 |
| | | | **ultimate** 35:8 | |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 246

**U.S** 188:23
189:6

---

**V**

**vacation** 31:13
39:20 40:3
66:7 79:10,12
79:17,20,22
81:7 90:21
112:14,17
114:23 118:7
118:10 119:3
134:18 135:4,5
159:18 161:4
161:16
**vacations** 85:20
159:20
**valuable** 97:8
**varies** 204:8
**various** 31:14
**vary** 187:5
**verbatim** 52:15
134:2
**verge** 141:4
**Vertein** 51:11
51:21
**Vertein's** 52:9
**vested** 184:23
**vice** 45:11 70:5
**videos** 62:19
**view** 74:12
93:16
**viewed** 104:5
**violation** 23:5
**violations** 22:19
22:20,23 170:8
170:10
**voluntarily**
14:13 29:9
**volunteer**
213:11,16
**volunteered**
213:20
**VP** 52:7

**vs** 1:10
**V-E-R-T-E-I-N**
51:13

---

**W**

**wad** 63:13
**wages** 205:21
**wait** 52:3 91:11
195:1
**waiting** 216:23
**waived** 2:13
**walk** 31:20
67:10 116:14
**walked** 70:15,18
95:13 98:19,20
144:13 180:1
183:21 192:11
214:8
**wall** 179:7
**wand** 101:4
**want** 17:23 28:3
37:6,9 45:13
59:10,12 61:23
67:8 69:10
72:10 77:23
80:15 82:16
84:23 86:16
89:9 93:10
99:5,8 101:22
106:9 120:2,11
131:11 141:11
142:22 149:11
156:3 160:7
161:15 183:6
183:13,16
201:3 203:14
205:11 208:9
**wanted** 40:4
49:9 65:18
68:1,18 81:9
81:17 84:21
86:6 92:17
93:20 101:2
111:6 145:4

157:3,3,6,10
160:15 169:15
170:19 178:19
216:1
**wanting** 94:15
100:13 148:4
**Ware** 83:4 138:9
138:16 141:13
**warehouse** 31:1
32:8,10 34:19
47:5,10 53:12
73:8 91:4,22
93:4 95:1
100:18 101:5
149:21 173:7,8
173:20,22
210:14 213:13
219:20
**wasn't** 29:8 32:6
58:12 78:16
81:14 86:22
87:2,11 95:8
96:2,17,21
102:19 106:2
107:6,22
119:18 139:23
149:4,14
151:11,21
156:16 160:17
165:12 167:5
167:13 170:23
171:1,14
172:16 184:15
184:16,17
191:13,13
203:5 218:10
**water** 196:17,22
**wave** 101:3
**way** 32:4 36:10
36:11 41:3
53:2 58:5
73:11 75:1
82:22 88:22
90:8,17 93:10

94:2,5 96:13
96:14,18
101:13 104:5
144:1 148:7
149:9 150:14
153:2 155:19
156:3 158:5
173:23 185:9
185:13 187:18
190:16 191:15
192:5 203:12
207:3 211:22
212:12,20
214:4 216:17
217:5,16
**Wayne** 34:10
**ways** 105:3
189:22 191:7
**Web** 193:22
**Wednesday**
160:9 204:23
**week** 39:23
45:21 56:20,22
57:3 79:23
90:2,5 142:7
164:2 178:8,9
179:9,11,12
186:8,9 199:8
204:4,4
**weekend** 57:2,5
103:5,10 160:7
162:5 204:22
**weekends** 53:6
85:20 110:20
**weekly** 199:5
**weeks** 40:1
79:12,22 127:5
127:16 150:7
151:5,10,14
152:20,21
164:5 169:17
179:2 185:19
**week's** 79:20
**weight** 180:14

192:13
**Weldon** 21:5
**Wellborn** 193:8
193:12,15
**went** 22:8 24:12
24:17 25:5,5
27:19 28:23
31:4,22 37:14
45:8 50:6
56:16,17 61:1
71:3 82:2
87:13 101:19
110:10 139:18
143:20 144:13
155:13 172:13
173:13 176:11
177:10 186:3,7
194:14 195:4
210:16 219:18
**weren't** 52:22
55:7 56:1,2
57:12 58:21
70:23 71:22
73:18,21 85:10
104:14 107:14
118:21 148:16
169:2 190:12
**wet** 80:9 196:20
**we'll** 64:23
112:23 195:2
**we're** 8:22 18:21
53:7 66:14
95:22 120:15
170:14 196:17
197:21 198:1
204:10 212:12
**we've** 21:20
85:16,18 90:10
118:5 136:19
173:14 190:4
191:3,5 196:19
196:20 197:17
197:20 198:4
200:20 220:2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 247

| | | | | |
|---|---|---|---|---|
| whatsoever 218:21 | 30:9 32:14,23 | 198:17 201:14 | 114:14 115:2 | 134:18 179:15 |
| wheel 72:23 | 34:22 35:10,13 | 203:16 204:1,6 | 127:20 134:3 | **writings** 64:18 |
| whichever 199:2 | 36:22 37:3,14 | 210:16 212:4 | 138:23 140:9 | **written** 184:21 |
| Whitman 20:4 | 39:20 41:4,19 | 219:19 | 140:23 143:6 | 211:5,17 |
| 21:4 | 42:21 43:19 | **worked** 12:3,17 | 145:11,14 | **wrong** 36:9,11 |
| wholesale 30:19 | 44:8 45:8 48:5 | 27:5,10,11 | 147:11 150:2,3 | 121:15 123:12 |
| wife 11:7 18:5 | 51:17 52:11 | 28:10,11,18 | 150:8,19,21 | 153:17 154:6 |
| 19:7 20:2,11 | 53:9,13,16,23 | 30:2 32:7 33:6 | 151:7 152:4 | 159:15,16 |
| 21:6 102:7 | 54:2,21 61:2 | 34:2,4 39:4,18 | 156:23 164:17 | 190:4,16 |
| 106:16 180:4 | 67:9 68:2 75:9 | 41:7 46:3 | 164:23 165:1 | **wronged** 185:10 |
| 192:7,12 200:5 | 75:19,22 76:2 | 47:15 53:18 | 167:4 169:3,14 | 185:12 187:12 |
| 201:4 209:9 | 76:23 77:6,7,8 | 55:18 56:13 | 172:6 175:9 | 187:17,17 |
| **wife's** 11:8 17:1 | 77:12,18 78:20 | 57:3,7,9,11 | 178:2 179:9 | **wrote** 114:9 |
| 17:16 | 79:1,5,22,22 | 68:1 71:19 | 180:18 181:19 | **W-I-L-L-I-E** |
| Willa 17:17 18:2 | 80:7 81:12,18 | 72:15,16 79:19 | 182:22 186:12 | 16:2 |
| 18:4 | 81:20 83:11 | 81:13 82:22 | 188:17 192:20 | **W-2** 67:6 200:9 |
| William 16:21 | 84:22 85:2,21 | 84:20 85:19 | 200:5 204:5 | **W-2s** 4:15 65:18 |
| Willie 16:2 | 87:13,22,23 | 87:19 88:16 | 206:6 208:14 | 66:1,23 |
| willing 187:13 | 89:12 92:12 | 90:6,7 96:3 | 210:10 212:19 | |
| Willis 18:9 | 96:16 100:4,11 | 111:5 122:17 | 219:10 | |
| will-call 49:7,11 | 102:1 106:15 | 138:1 140:18 | **works** 12:1 | **X** |
| window 147:12 | 110:10,19 | 140:20 145:18 | 32:10 46:1 | X 4:1,8 5:1 |
| windows 84:20 | 111:6 112:11 | 147:17 150:7 | 194:10 204:19 | |
| wins 154:18 | 118:15 134:15 | 151:5,9,13,23 | **world** 180:14 | **Y** |
| winter 204:10 | 134:19,22,23 | 152:20 153:20 | 192:13 | yeah 22:21 24:4 |
| 204:14 | 139:18 143:20 | 159:11,21 | **worry** 78:23 | 26:18 32:1 |
| wintertime | 144:6 145:22 | 164:5 166:5 | 80:1 102:19 | 40:21 46:15 |
| 204:12 | 146:4,6,13 | 172:22 187:4 | 171:12,19 | 54:10 56:11 |
| wise 106:7 | 147:2,3,7 | 192:17 203:19 | **worse** 153:14 | 57:17 58:19 |
| wish 218:11,12 | 148:10 149:15 | 211:12 | 162:17 179:1 | 59:13 66:5 |
| 218:13 | 151:8,18 | **workers** 23:13 | 184:9 185:17 | 72:11 78:6 |
| witness 2:12 | 152:12,21 | **working** 13:10 | 186:3,14 187:6 | 84:13 87:12 |
| 7:13 21:10 | 153:19,21 | 14:1 32:4 | 206:14 211:7 | 90:3,9 97:3 |
| 22:5 136:14 | 156:12,19 | 37:21 39:13 | **worth** 126:1 | 100:15 101:13 |
| won 96:5 | 158:8,23 163:3 | 42:4 50:10,21 | **wouldn't** 18:1 | 102:9 104:6 |
| wondering | 163:4,8,8 | 59:20 60:1,4 | 37:16 57:12,14 | 108:22 109:6 |
| 192:21 | 164:12 171:17 | 60:11,13,18 | 68:5 80:4,6 | 111:18 117:6 |
| word 136:4,4 | 172:14,15,17 | 76:15 77:1,10 | 91:6 97:9 | 118:19 119:19 |
| words 182:15,17 | 173:13 176:12 | 78:22 89:8,10 | 102:18 113:8 | 120:8 123:2 |
| work 11:23 | 176:18 178:7,9 | 94:6 96:20 | **write** 219:1 | 131:9 132:23 |
| 12:15,23 13:2 | 178:23 179:10 | 97:10,13 | **writer** 198:5 | 133:1,6,14,14 |
| 27:1,4,17 | 180:10 185:18 | 102:15 104:13 | **write-ups** | 135:11,11,11 |
| 28:23 29:16 | 186:7 195:5 | 110:19 111:1,2 | 198:14 | 138:10 144:21 |
| | 197:18 198:17 | 111:5 112:7 | **writing** 134:10 | 150:5 156:21 |
| | | | | 158:16 180:21 |
| | | | | 180:21 182:13 |

# FREEDOM COURT REPORTING

183:15,16
188:12 199:4
199:18 217:19
**year** 14:10 24:7
26:6 32:13
39:22 41:16
44:4,11 45:10
45:18,22 78:20
78:22 79:16,17
79:19,23 80:8
83:21,23 89:16
103:14 105:21
105:23 118:16
121:14 122:5
130:22 160:22
160:23 161:3
185:17 186:7
186:10,11
187:4 199:1
200:11 204:9
**years** 11:1 14:22
14:23 15:2,4
23:2 24:14
25:23 33:8
34:3,14 38:21
40:1 53:20
71:11 93:2
99:14 137:21
138:22 139:14
140:16,16
141:17 142:23
169:22 173:10
186:20,22
187:2 208:20
**year's** 184:6
**year-wise**
100:23
**yesterday** 65:10
113:12 127:7
174:18
**y'all** 14:15 15:3
15:15 40:7
83:12 84:14
88:2 119:6

120:2 152:3,7
173:18
**y'all's** 98:9

___

## Z

**Zac** 10:23 11:10
11:11,12
**zero** 125:23
126:21

___

## $

**$10,000** 45:20
168:19
**$300,000** 187:8
**$40,000** 44:4
**$400,000** 186:16
**$62,000** 103:12
**$62,500** 89:16
111:15
**$700** 186:8
**$734.78** 122:15
**$992** 45:21

___

## 0

**04** 122:15
**05** 125:10,11
161:3

___

## 1

**1** 4:11 61:5,6
121:3 125:15
129:1 130:20
132:1,7,9
135:18 160:19
196:15 215:6,8
**1st** 56:10
**1/27/05** 131:14
**1:00** 177:9
**10** 4:22 45:23
66:21 69:10
117:1 121:2,6
**10,000** 46:5
**10,531.50** 66:20
**10:00** 85:2
**10:20** 2:9 7:12

**10:30** 177:5
**10:45** 177:5
**100** 71:11 90:7
93:21 196:20
213:1
**104** 126:1
**104.25** 126:22
**108** 4:17
**109** 4:18 125:22
**109.9** 126:20
**11** 4:23 17:6
123:19,21
178:2
**11th** 109:4,20
110:1,12
**11/28/58** 10:13
**113** 4:20
**115** 105:23
**117** 4:21
**12** 5:3 17:6
48:19 49:17,18
69:10 79:11
127:6,10 178:2
**12th** 176:23
**12:00** 53:9
**12:30** 120:1
**121** 4:22
**123** 4:23
**126** 6:6
**127** 5:3
**128** 5:5
**13** 5:4 128:3,5
**130** 5:7,8
**131** 5:10
**132** 5:11
**14** 5:6 11:17
12:5,7 130:2,7
131:8 132:20
**15** 3:7 5:8 47:19
49:13 130:14
130:16,17
132:14,17
133:20 135:3
**16** 5:9 49:13

**131**:12,15,16
132:11
**168** 5:12
**175** 5:11 10:23
11:12 79:17
131:23 132:2
132:11 135:15
135:17
**174** 5:14
**18** 5:12 11:1,1
15:2 16:15
18:3 19:18
20:18,20 116:7
168:4,9 214:23
**181** 5:15
**1819** 2:6 6:15
7:10
**182** 5:16
**19** 5:13 174:15
174:21
**1977** 24:9
**1984** 27:18
**1986** 14:19
**1998** 3:7
**1999** 13:3

___

## 2

**2** 4:12 63:19
64:1,22 110:17
115:5 215:10
215:11
**2,604.17** 127:18
**2,606** 126:1,23
**2,606.34** 124:6
**2,606.35** 123:7
**2:00** 84:22
**2:06-CV-0070...**
1:5
**2:30** 48:14 75:15
**2:45** 48:15 75:15
**20** 5:15 23:2
49:19 71:13
116:7 173:10
181:2,4 186:20

**208**:11 214:23
**20th** 109:21
**20-year-old**
213:14
**200** 105:21
**200-plus** 173:5
**2002** 130:20
**2003** 67:1
**2004** 67:1 109:5
110:12 113:21
114:2 121:4
128:18 131:1
189:7
**2005** 67:1 121:4
123:7,8 124:5
124:9 125:7
126:5 132:1,7
132:9,10
135:18 168:5
**2006** 67:1
**2007** 2:8 3:11
7:13
**21** 5:16 182:5,6
**210** 4:5
**22** 74:22
**23rd** 109:21
113:21 114:2
**24** 149:20
**24th** 128:17
**25** 23:2
**25th** 14:19 124:5
**26** 127:18
**26th** 168:5
**27th** 132:10
**28** 49:19

___

## 3

**3** 4:13 65:8,11
**3:00** 58:15 75:17
**30** 83:19 103:13
111:20,21
115:20 121:11
121:12,13
208:11 214:17

## 367 VALLEY AVENUE

# FREEDOM COURT REPORTING

**30th** 121:4
**31** 125:9,11,15
**35** 49:19 50:13
  186:6 193:14
**35,000** 186:9
  199:1 200:10
**35010** 6:7
**35203** 2:7 6:16
  7:11
**3763951** 10:16

---
**4**

**4** 4:14 66:11,16
  136:5,13,14
**4th** 2:8 3:11 7:12
**4,200** 46:10
**4:00** 58:18
**4:30** 143:8
**40** 50:13
**400** 193:10,11
**400-plus** 173:6
**401-K** 184:17
  192:16 199:17
  199:18
**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**
  10:11
**45** 90:23 91:16
  120:11
**450** 197:22

---
**5**

**5** 4:15 46:11
  66:23 67:2
  135:2
**5(d)** 3:5
**5:00** 51:22 52:1
  52:3 53:4
  58:13,23
  144:15 204:6
**5:15** 164:19
**5:30** 164:19
**5:45** 75:13,14
**50-mile** 68:7
**52,000** 45:22

---
**6**

**6** 4:16 108:15,17
  219:2,3
**6:00** 47:19 48:2
  59:1 75:14
  84:22 85:2
**6:45** 164:18
  165:4
**60** 19:3 68:12
  83:18 84:3
  178:8 179:9
**60-hour** 204:2
**61** 4:11
**62** 43:12
**62-5** 88:9
**64** 4:12
**65** 4:13 83:18
  84:3
**65,000** 68:12
**66** 4:14
**67** 4:15 186:22

---
**7**

**7** 4:4,18 109:8
  109:11,14
  219:3,4,7
**7,000** 46:12
**7/1/2005** 175:6
**7:00** 51:19 165:4
**7:30** 143:7
**7:45** 70:14
**700** 186:9,10
**72** 73:3
**721.15** 199:8

---
**8**

**8** 4:19 113:13,14
**8/1/02** 130:4,12
  131:5 132:15
  132:17,21
  133:3,9,12,17
  133:17,20
  135:3
**8/1/2002** 130:15

**8:00** 51:22,23
  53:4,9 70:15
  204:6
**80** 103:14

---
**9**

**9** 4:21 117:5,7,7
  117:12 135:13
**90** 19:2
**900** 2:6 6:14 7:9
**93** 15:5
**931** 10:20
**95** 15:5
**98** 139:19
**99** 139:21 140:3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

STEVE ADAMS,  )
                      )
          Plaintiff,  )
                      )
v.                    )     CIVIL ACTION NO.
                      )     2:06-cv-00707-ID-CSC
MERCHANTS FOODSERVICE, et al.,  )
                      )
          Defendants.  )

**DEFENDANT'S EXHIBIT**

**/**

## NOTICE OF DEPOSITION AND
## REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

Please take notice that, beginning at 10:00 A.M. on April 4, 2007, defendant

Merchants Foodservice will take the deposition of plaintiff **Steve Adams** before an

officer authorized by law to administer oaths and record testimony at the office of

Constangy, Brooks and Smith, LLC, 1819 Fifth Avenue North, Birmingham,

Alabama 35203.

Pursuant to the Federal Rules of Civil Procedure, defendant requests that

plaintiff bring the following documents with him to the deposition:

1.    Any documents, writings, notes, tapes (video or audio), or

correspondence which plaintiff contends support his claims.

150464.1

2.    Any documents, writings, notes, tapes (video or audio), or correspondence which plaintiff has that relate to or concern his employment with defendant.

3.    Any and all documents, writings, notes, or correspondence reviewed by plaintiff or utilized by plaintiff to refresh his recollection in preparation for his deposition and/or the allegations in his Complaint.

4.    All income tax returns filed by plaintiff for the last four years or any and all other documents or writings, including but not limited to W-2 forms, which show plaintiff's wages, earnings and hours worked for the last four years.

Thomas A. Davis (ASB-5877-S56T)
E-mail: tdavis@constangy.com
Direct Dial No.: (205) 226-5465
J. Tobias Dykes (ASB-0483-E66J)
E-mail: tdykes@constangy.com
Direct Dial No.: (205) 226-5469
**CONSTANGY, BROOKS & SMITH, LLC**
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Facsimile:   (205) 323-7674

**Attorneys for Defendant**

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record by United States Mail, postage prepaid, and addressed as follows:

> Derrick Blythe, Esq.
> 126 Marshall Street
> Alexander City, AL 35010

This 15th day of February, 2007.

_____
Counsel for Defendant

3

150464.1



DEFENDANT'S
EXHIBIT

2

What I am sure we can accomplish is to prove that I was lured away from a good job, ( **a job that I was secure in, well compensated for, a career from which I could have retired from, reaped the benefits of annual raises & the financial security of a good pension when I did retire. A job that I really enjoyed, the hours worked, the working conditions, my employees, etc.... . In essence, a job I could have worked at & enjoyed until retirement** ) under fraudulent pretense, false promises, lies & deceit. Nothing I was told during the interview or job offer turned out to be true.

I was first contacted about the position at Merchants FoodService by Freedom Search ( a head hunter org. ) working on behalf of Merchants. I was contacted while at work ( for SYSCO ). I had never entertained the idea of working anywhere but SYSCO until contacted by Freedom Search. All contacts about the Merchants job were instituted by or on behalf of Merchants. They actively pursued me to come to work for them. I agreed to an interview once Freedom told me the potential salary range and " lucrative" bonus ' potential. If certain CRITERIA WERE THE SAME, I thought I could better provide for my family financially if I took this position. This was the only reason I ever considered leaving SYSCO.

An interview was scheduled for me to meet with Hal Henson – Branch Manager, Andy Mercier – VP, & Don Suber – Pres. I was to meet them @ Merchants in Clanton @ 8:00 AM. When I arrived Hal greeted me and told me that Andy & Mr. Suber had been delayed and that he would conduct the interview by himself. He said if necessary, I could meet with them at a later date. During the interview ( approx. 60 mins. ) Hal questioned me on my experience, qualifications, etc.... I answered all of his questions as thoroughly as possible, giving examples of how I had addressed certain situations in the past. I explained how at SYSCO, we did most of our let-downs on dayshift and alleviated night shift from becoming bottle-necked at the start of a shift. This was different from how Merchants was doing it and he seemed impressed at our (SYSCO's) success and cases per selection hour. I told Hal of the numerous corporate wide awards our warehouse had received at the Calera facility. Again he was impressed and said so.

Hal concluded his questions and asked if there any questions or concerns on my part. Since I was gainfully & happily employed I had prepared a short list of important questions I did need answered. The answers to these questions would be the basis for my decision if I were offered the job. I needed every assurance that I was making a sound decision if I chose to leave SYSCO.

(1ST)What hours would this job require? Hal answered my question with a question. Asked me to describe my typical day at SYSCO. I answered that I arrive for work @ 5:45, the crew @ 6:00. The crew normally finished at 2:30 – 2:45 and I was gone by 3:00. Hal's reply – so you normally work 8 to 8 ½ hours per day. Answer- Yes. Hal – that would be a typical day at Merchants. Hal also stated that given this position I would have the flexibility of scheduling my own working time. Neither came to fruition during my tenure with Merchants. From the beginning I worked 9 – 9 ½ hrs a day. Progressively Merchants became more and more demanding and my week became longer and longer. I would arrive @ 6:45 – 7:00 AM and when I would start to leave at 5:00 PM, Hal (if he saw me walking out) would say – you leaving already. I eventually started trying to stay until Hal left, even though he seldom came to work

before 7:30 or 8:00. I was told on 6/28/05 (Scott Casey and Hal Henson) that if I was
not willing to work 55-60 hrs / week then I was not committed enough or loyal enough
to work at Merchants. That schedule would be 11-12 hrs / day. Living in Alex City, I
have a 2 hr round trip commute. That plus 12 hrs a day would require me to be away
from my family for 14 hrs a day, five days a week. I would never for any amount of
money knowingly accept a job that required this much time. Had Hal been truthful this
would have taken me out of the running for the Merchants' job. While we were
discussing hours, I asked Hal about night shift and if he ever saw me needing to work
at night. Hal asked if I were opposed to working night shift. I explained that I had
worked all the night shift (on a regular basis) that I cared to. I stated that when I
worked nights I never saw my wife or children. They would be at home while I was
working, and they would be at work/school when I was home. I was upfront and told
Hal that I would not be interested in a position that required any regular night shift
schedule. Hal – No, no, nothing like that. All that would be necessary would be a '
couple of nights to get acquainted with the night shift staff and observe the night shift
operation to see if there were any improvements that I could recommend. I stated that I
certainly didn't have a problem with that. During my 10 ½ months of employment at
Merchants I was required to work 10 complete weeks on night shift. The day I quit
7/12/05 I was told by Hal & Scott that beginning immediately I would be required to
work 60 hours a week. I would work dayshift one week then nightshift the next. That
would be my schedule until I was told different. I immediately informed them that I
was turning in my resignation. Gave them my keys and cell phone and walked out.
    Hal mentioned in the interview that I would be required to work 2 Saturdays a
year for inventory. He stated that when I worked one of these Saturdays that I would
receive a day off the following week as compensation. I worked a total of 8 Saturdays
during my tenure and never received a single comp day for these Saturdays. Every pay
check (see enclosed) I received shows 87.00 hours per pay period. I was bi – monthly
(paid on 1st & 15th) so this should back up the promise of 40 hrs per week. Again, I
would never have considered, much less accepted a job that required this much time
per week or night shift work…**under any circumstances.**

(**2ND**) The next question I asked Hal had to do with vacation. I told Hal that I currently
received 12 days vacation with SYSCO and that in little over a year I would receive 17
days. Hal stated that Merchants' policy was 5 days after 1 year. I stated that I would
not give up 17 days to wait a year before I received any time off. Hal told me not to
worry about time off. He stated that he had always (for managers) in the past and
certainly would for me give me plenty of time off. He stated that after a couple of
months, he would give me a couple of days to go with a weekend. After that I could
have a day here and a day there. All I had to do was ask. Hal seemed so sincere and
honest, I had no reason at the time not to believe him. He stated that he didn't expect
any new member of his management team not to have time off for a year. During 10 ½
months I was given 0000 days off. I was turned down on all 3 requests for time off.
The last time I asked off (2days) with a weekend, I was told that now was not the time
to be asking off. When I stated that I hadn't had a day in 10 months, I was told that
maybe I could get 1 day in August. I actually had accrued 2 vacation days at the start

of 2005, (showed on my check stub), but was never allowed any time off. As previously stated, I would have never have considered a job that does not allow any time off for this length of time.

(3ʳᵈ)  My other concern and question was the stability of the workforce. This would weigh heavily in my decision making process. I asked Hal if Merchants had a steady, secure workforce. Hal's reply – Yes we do. We have a very good dayshift, an excellent nightshift, and a good core group of driver's. How about management was my follow up. Randy Harrington was in charge of dayshift – better at inventory control than running dayshift but all in all an excellent employee. Hal stated that the new Director of Ops would primarily be responsible for dayshift day to day and that while Randy would keep the title of ops mgr he would primarily be inventory control. Jason Kelley was the trans mgr. Started as a driver, then promo to spvr., then assumed mgr position. Philip Stitt was night mgr and Rodney Ware was spvr. Hal stated that night shift numbers were excellent and that Philip routinely maxed out on his bonus potentials. Hal further stated that Merchants had all the right pieces to the puzzle in place and that all that was needed was the glue (dir of ops) to hold them in place. I asked if Hal could tell me what had happened to the last director of operations. He said he would even though he shouldn't. He wanted me to understand that Merchants had to let him go, and that he had not resigned but was fired. Hal stated that he had been sending inappropriate e-mails to a female co-worker and had to be released. He stated that he had done a good job but had to be released for fear of Merchants being involved in a discrimination lawsuit. After accepting the job I found out that the workforce was anything but stable. Discipline was basically non existent. Turnover rate was atrocious*** See attached turnover analysis report. Both Philip and Rodney had been suspended themselves for sexual harassment. Rodney was subsequently fired for repeat offense. Philip was on the verge of being fired for absenteeism when he resigned. Night shift was a shambles. Had the stability of the work force been remotely conveyed to me with any accuracy, I would have never even considered, much less accepted this position. I would still be happily and gainfully employed with SYSCO Foods.

Hal asked if I had any other questions and I asked about the salary range. He said somewhere between 60 and 65k with a 30% bonus potential. I said that sounds good but I hope its 65 rather than 60. He said the ultimate decision would lie with the right candidate's qualifications and Andy and Mr. Suber. I said well that's all I've got. Hal asked if I would excuse him for just a second and that he would be right back. I said sure. When he returned he said that Andy and Mr. Suber were on their way and that they would really like to talk to me today if possible. I explained that I had taken a vacation day from SYSCO and that I could hang around until they got there. He said it would probably be about 45 min to an hour and suggested that I could go get a snack down the road. I asked if he could take me on a tour of the warehouse and meet the guys that were there that day. Hal stated that he would prefer not to do that just yet. He said that no one had been told that they were hiring a new director and it would be better to wait until after the announcement. I said I understood. After I was hired I then

realized the real reason he didn't want me to see the facility. Although it was newer than the SYSCO facility (in Caleara) that was built in 1998, it was a mess. I have never seen a nastier facility. This would have been a dead give away as to the mismanagement and lack of care and pride on the part of the employees.

When I returned from my break, Hal met me and escorted me back to the conference room. I met Andy Mercier and Don Suber at this time. After pleasantries were exchanged, Hal filled them in on my experience, present employment, and opened the floor for their questions. Mr. Suber asked about my experience with KFC (knowing that SYSCO had once held the contract to service all KFC accounts). I stated that I had the knowledge of participating in the whse inspections, the record keeping process that KFC requires of its vendors, etc...Most of my knowledge dealt with dayshift ops. He mentioned that Merchants was on a short list to become their next supplier and that they wanted to land and keep this large account. (Merchants had recently sought a similar account with the U S military. I knew this because SYSCO Alabama had also interviewed and been awarded this contract instead of Merchants). Mr. Suber seemed pleased that I indeed had KFC experience. His next statement was a comment rather than a question. He wanted my assurance that I was 100% anti-union. Andy asked about my experience with HACCP – ( hazard analysis & critical control points – safe handling procedures for fresh seafood & meat products ). He was happy to hear that I was currently HACCP certified. Next Andy asked me how I liked working for SYSCO. I told him that they were a great company and that I really enjoyed working there. He questioned me about the amount of pressure exerted on management by the "Corporate driven mandate" that all SYSCO houses operated under. He stated that I would really enjoy working for Merchants, because unlike SYSCO and their corporate mandate, Merchants was extremely family oriented. He said that Merchants realizes the value an employee places on their family and the need to spend time with them. An employee needs security in their employment and peace of mind while at work. Yes, we expect our employees to do their best, but we don't put undue demands or put pressure on our employees to get our desired results. For some reason Andy thought SYSCO's work environment was extremely high pressure and he went out of his way to convince me that Merchants was not that way. I again stated that was not the case, at least not in my experience with the ops. dept. where I worked. I stated that it might be that way in sales or marketing but not in operations. I told him that I had a great boss in Eddie O'Coonor. I've never felt pressured or driven by any mandate, but did tell him that we had been extremely successful in distinguishing ourselves as one of the best operating warehouses in all of SYSCO. But if Merchants is very family oriented, then that can only be a positive. Again, he assured me that was the case.

As mentioned in several examples above Merchants could have cared less about my family or the quality of the life we had together. All they were concerned with was somehow turning a mess of a company around at any cost to any and all employees. After accepting this position I had many conversations with Andy about the management team at the Clanton facility. He told me on numerous occasions that if Randy, Jason, or Philip were not the right man for the job, "fire them" and hire someone who is. Andy concluded by saying that Merchants had all the right people in

place & that they just needed a strong leader to keep everyone headed in the right direction. Amazingly similar to what Hal had said just a couple of hours earlier. At the time I thought this was just coincidental, but after accepting the job and seeing what I had stepped into, I believe that the whole interview had been orchestrated in advance. I believe Merchants was desperate to hire a director who they thought could straighten out all the problems that were prevalent at the Clanton facility. I believe they thought that hiring a SYSCO guy would somehow miraculously solve all their problems. Every time I was introduced during my first few weeks of employment. Hal or Andy (whoever was making the introduction) would always say he's from SYSCO and he's going to have us running just like them in no time. This was really stressed at the first monthly sales meeting I attended. Sales people peppered Hal with constant problems of mis-picks and items short on orders. Hal introduced me as the guy from the "Evil Empire" then laughed and said but they do do it right and now so will we. When I was introduced to Mr. Tatum ( principal owner ), Andy said this is the guy we hired away from SYSCO.

Interview Concluded with handshakes, thanks, and we will be in touch after interviewing one more candidate. Hal called a few days later with a job and salary offer. $62.5k plus 30% bonus potential. I asked if I could have a few days to discuss and think it over. Hal agreed but asked me to do it quickly. I said I would let him know on Monday after the weekend. Laura and I discussed this for hours on end and ultimately decided based on all that I had been told that this was indeed a great offer for me. It would provide me with even more financial security and opportunities to better provide for my family. So I did the hardest thing I've done in my working career and said goodbye to SYSCO ( See attached letter of resignation and exit interview ) and accepted the job at Merchants.

a reveal identity theft—protect your Social Security number

# Your Social Security Statement

| DEFENDANT'S EXHIBIT |
| --- |
| 3 |



**Prepared especially for Charles S. Adams**

July 13, 2005

SO R 0192          000551278 01 AT   0.292

CHARLES S. ADAMS
931 OVERHILL DR
ALEX CITY AL 35010-4425

See inside for your personal information →

**What's inside ...**

▼ Your Estimated Benefits .................. 2
▼ Your Earnings Record ................... 3
▼ Some Facts About Social Security .......... 4
▼ If You Need More Information ............. 4
▼ To Request This *Statement* In Spanish ...... 4
   (*Para Solicitar Una Declaración en Español*)

## ▼ What Social Security Means to You

This *Social Security Statement* will help you understand what Social Security means to you and your family. This *Statement* can help you better plan for your financial future. It gives you estimates of your Social Security benefits under current law. Each year, we will send you an updated *Statement* including your latest reported earnings.

Be sure to read this *Statement* carefully. If you think there may be a mistake, please let us know. That's important because your benefits will be based on our record of your lifetime earnings. We recommend you keep a copy of this *Statement* with your financial records.

**Social Security is for people of all ages ...**
It can help you whether you're young or old, male or female, single or with a family. It's there for you when you retire, but it's more than a retirement program. Social Security also can provide benefits if you become disabled and help support your family when you die.

**Work to build a secure future ...**
Social Security is the largest source of income for most elderly Americans today. It is very important to remember that Social Security was never intended to be your only source of income when you retire. Social Security can't do it all. You also will need other savings, investments, pensions or retirement accounts to make sure you have enough money to live comfortably when you retire.

**About Social Security's future ...**
Social Security is a compact between generations. For more than 60 years, America has kept the promise of security for its workers and their families. But now, the Social Security system is facing serious future financial problems, and action is needed soon to make sure that the system is sound when today's younger workers are ready for retirement.

Today there are almost 36 million Americans age 65 or older. Their Social Security retirement benefits are funded by today's workers and their employers who jointly pay Social Security taxes — just as the money they paid into Social Security was used to pay benefits to those who retired before them. Unless action is taken soon to strengthen Social Security, in just 12 years we will begin paying more in benefits than we collect in taxes. Without changes, by 2041 the Social Security Trust Fund will be exhausted.* By then, the number of Americans 65 or older is expected to have doubled. There won't be enough younger people working to pay all of the benefits owed to those who are retiring. At that point, there will be enough money to pay only about 74 cents for each dollar of scheduled benefits. We will need to resolve these issues soon to make sure Social Security continues to provide a foundation of protection for future generations as it has done in the past.

**Social Security On The Net ...**
Visit *www.socialsecurity.gov* on the Internet to learn more about Social Security. You can read our publications, use the *Social Security Benefit Calculators* to calculate future benefits, apply for retirement, spouse's or disability benefits, or subscribe to *eNews* for up-to-date information about Social Security.

*Jo Anne B. Barnhart*
Jo Anne B. Barnhart
Commissioner

* These estimates of the future financial status of the Social Security program were produced by the actuaries at the Social Security Administration based on the intermediate assumptions from the Social Security Trustees' Annual Report to the Congress.

# ▼ **Your Estimated Benefits**

To qualify for benefits, you earn "credits" through your work — up to four each year. This year, for example, you earn one credit for each $920 of wages or self-employment income. When you've earned $3,680, you've earned your four credits for the year. Most people need 40 credits, earned over their working lifetime, to receive retirement benefits. For disability and survivors benefits, young people need fewer credits to be eligible .

We checked your records to see whether you have earned enough credits to qualify for benefits. If you haven't earned enough yet to qualify for any type of benefit, we can't give you a benefit estimate now. If you continue to work, we'll give you a benefit estimate when you do qualify.

**What we assumed** — If you have enough work credits, we estimated your benefit amounts using your average earnings over your working lifetime. For 2005 and later (up to retirement age), we assumed you'll continue to work and make about the same as you did in 2003 or 2004. We also included credits we assumed you earned last year and this year.

We can't provide your actual benefit amount until you apply for benefits. **And that amount may differ from the estimates stated below because:**
(1) Your earnings may increase or decrease in the future.
(2) Your estimated benefits are based on current law. **The law governing benefit amounts may change.***
(3) Your benefit amount may be affected by **military service, railroad employment or pensions earned through work on which you did not pay Social Security tax. Visit** *www.socialsecurity.gov/mystatement* **to see whether your Social Security benefit amount will be affected.**

Generally, estimates for older workers are more accurate than those for younger workers because they're based on a longer earnings history with fewer uncertainties such as earnings fluctuations and future law changes.

These estimates are in today's dollars. After you start receiving benefits, they will be adjusted for cost-of-living increases.

▼ ***Retirement***   You have earned enough credits to qualify for benefits. At your current earnings rate, if you stop working and start receiving benefits...

At age 62, your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  1,202  a month
If you continue working until. . .
  your full retirement age (66 and 8 months), your payment would be about . . $  1,738  a month
  age 70, your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  2,247  a month

▼ ***Disability***   You have earned enough credits to qualify for benefits. If you become disabled right now...

Your payment would be about . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  1,480  a month

▼ ***Family***   If you get retirement or disability benefits, your spouse and children also may qualify for benefits.

▼ ***Survivors***   You have earned enough credits for your family to receive the following benefits if you die this year.

Your child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  1,152  a month
Your spouse who is caring for your child . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  1,152  a month
Your spouse who reaches full retirement age . . . . . . . . . . . . . . . . . . . . . . . . . . . $  1,536  a month
Total family benefits cannot be more than . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  2,687  a month

Your spouse or minor child may be eligible for a special one-time death benefit of $255.

▼ **Medicare**   You have earned enough credits to qualify for Medicare at age 65. Even if you do not retire at age 65, be sure to contact Social Security three months before your 65th birthday to enroll in Medicare.

***Your estimated benefits are based on current law. Congress has made changes to the law in the past and can do so at any time. The law governing benefit amounts may change because, by 2041, the payroll taxes collected will be enough to pay only about 74 percent of scheduled benefits.**

**We based your benefit estimates on these facts:**

Your date of birth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . November 28, 1958
Your estimated taxable earnings per year after 2004 . . . . . . . . . . . $67,874
Your Social Security number (only the last four digits
  are shown to help prevent identity theft) . . . . . . . . . . . XXX-XX-1240

# ▼ Help Us Keep Your Earnings Record Accurate

You, your employer and Social Security share responsibility for the accuracy of your earnings record. Since you began working, we recorded your reported earnings under your name and Social Security number. We have updated your record each time your employer (or you, if you're self-employed) reported your earnings.

Remember, it's your earnings, not the amount of taxes you paid or the number of credits you've earned, that determine your benefit amount. When we figure that amount, we base it on your average earnings over your lifetime. If our records are wrong, you may not receive all the benefits to which you are entitled.

▼ **Review this chart carefully** using your own records to make sure our information is correct and that we've recorded each year you worked. You're the only person who can look at the earnings chart and know whether it is complete and correct.

Some or all of your earnings from **last year** may not be shown on your *Statement*. It could be that we still were processing last year's earnings reports when your *Statement* was prepared. Your complete earnings for last year will be shown on next year's *Statement*. **Note:** If you worked for more than one employer during any year, or if you had both earnings and self-employment income, we combined your earnings for the year.

▼ **There's a limit on the amount of earnings on which you pay Social Security taxes each year.** The limit increases yearly. Earnings above the limit will not appear on your earnings chart as Social Security earnings. (For Medicare taxes, the maximum earnings amount began rising in 1991. Since 1994, **all** of your earnings are taxed for Medicare.)

▼ **Call us right away** at **1-800-772-1213** (7 a.m.–7 p.m. your local time) if any earnings for years **before last year** are shown incorrectly. If possible, have your W-2 or tax return for those years available. (If you live outside the U.S., follow the directions at the bottom of Page 4.)

### Your Earnings Record at a Glance

| Years You Worked | Your Taxed Social Security Earnings | Your Taxed Medicare Earnings | Years You Worked | Your Taxed Social Security Earnings | Your Taxed Medicare Earnings |
|---|---|---|---|---|---|
| 1975 | $  873 | $  873 | 1990 | $ 14,180 | $  14,180 |
| 1976 | 2,156 | 2,156 | 1991 | 18,194 | 18,194 |
| 1977 | 3,596 | 3,596 | 1992 | 20,800 | 20,800 |
| 1978 | 4,380 | 4,380 | 1993 | 21,560 | 21,560 |
| 1979 | 5,164 | 5,164 | 1994 | 25,510 | 25,610 |
|      |       |       | 1995 | 29,950 | 29,950 |
| 1980 | 6,689 | 6,689 | 1996 | 31,710 | 31,710 |
| 1981 | 11,801 | 11,801 | 1997 | 33,610 | 33,610 |
| 1982 | 10,904 | 10,904 | 1998 | 35,170 | 35,170 |
| 1983 | 11,574 | 11,574 | 1999 | 45,373 | 45,373 |
| 1984 | 12,085 | 12,085 |      |        |        |
| 1985 | 13,018 | 13,018 | 2000 | 53,773 | 53,773 |
| 1986 | 14,907 | 14,907 | 2001 | 50,726 | 50,726 |
| 1987 | 22,818 | 22,818 | 2002 | 54,872 | 54,872 |
| 1988 | 23,023 | 23,023 | 2003 | 57,141 | 57,141 |
| 1989 | 20,668 | 20,668 | 2004 | 67,874 | 67,874 |

**Total Social Security and Medicare taxes paid over your working career through the last year reported on the chart above:**

| Estimated taxes paid for Social Security: | | Estimated taxes paid for Medicare: | |
|---|---|---|---|
| You paid: | $43,923 | You paid: | $10,298 |
| Your employers paid: | $43,923 | Your employers paid: | $10,298 |

**Note: You currently pay 6.2 percent of your salary, up to $90,000, in Social Security taxes and 1.45 percent in Medicare taxes on your entire salary. Your employer also pays 6.2 percent in Social Security taxes and 1.45 percent in Medicare taxes for you. If you are self-employed, you pay the combined employee and employer amount of 12.4 percent in Social Security taxes and 2.9 percent in Medicare taxes on your net earnings.**

3

▼ **Some Facts About Social Security**

**About Social Security and Medicare ...**

Social Security pays retirement, disability, family and survivors benefits. Medicare, a separate program run by the Centers for Medicare and Medicaid Services, helps pay for inpatient hospital care, nursing care, doctors' fees and other medical services and supplies to people age 65 and older, or to people who have been receiving Social Security disability benefits for two years or more. Your Social Security covered earnings qualify you for both programs. For more information about Medicare, visit *www.medicare.gov* or call **1-800-633-4227 (TTY 1-877-486-2048** if you are deaf or hard of hearing).

*Here are some facts about Social Security benefits:*

▼ **Retirement** — If you were born before 1938, your full retirement age is 65. Because of a 1983 change in the law, the full retirement age will increase gradually to 67 for people born in 1960 or later.

Some people retire before their full retirement age. You can retire as early as age 62 and take your benefits at a reduced rate. If you continue working after your full retirement age, you can receive higher benefits because of additional earnings and special credits for delayed retirement.

▼ **Disability** — If you become disabled before full retirement age, you can receive disability benefits after six months if you have:
— enough credits from earnings (depending on your age, you must have earned six to 20 of your credits in the three to 10 years before you became disabled); and
— a physical or mental impairment that's expected to prevent you from doing "substantial" work for a year or more or result in death.

▼ **Family** — If you're eligible for disability or retirement benefits, your current or divorced spouse, minor children or adult children disabled before age 22 also may receive benefits. Each may qualify for up to about 50 percent of your benefit amount. The total amount depends on how many family members qualify.

▼ **Survivors** — When you die, certain members of your family may be eligible for benefits:
— your spouse age 60 or older (50 or older if disabled, or any age if caring for your children younger than age 16); and
— your children if unmarried and younger than age 18, still in school and younger than 19 years old, or adult children disabled before age 22.
If you are divorced, your ex-spouse could be eligible for a widow's or widower's benefit on your record when you die.

**Receive benefits and still work ...**

You can continue to work and still get retirement or survivors benefits. If you're younger than your full retirement age, there are limits on how much you can earn without affecting your benefit amount. The limits change each year. When you apply for benefits, we'll tell you what the limits are at that time and whether work would affect your monthly benefits. When you reach full retirement age, the earnings limits no longer apply.

**Before you decide to retire ...**

Think about your benefits for the long term. Everyone's situation is different. For example, be sure to consider the advantages and disadvantages of early retirement. If you choose to receive benefits before you reach full retirement age, your benefits will be permanently reduced. However, you'll receive benefits for a longer period of time.

To help you decide when is the best time for you to retire, we offer a free booklet, *Social Security — Retirement Benefits* (Publication No. 05-10035), that provides specific information about retirement. You can calculate future retirement benefits on our website at *www.socialsecurity.gov* by using the *Social Security Benefit Calculators*. There are other free publications that you may find helpful, including:

▼ *Understanding The Benefits* (No. 05-10024) — a general explanation of all Social Security benefits;

▼ *How Your Retirement Benefit Is Figured* (No. 05-10070) — an explanation of how you can calculate your benefit;

▼ *The Windfall Elimination Provision* (No. 05-10045) — how it affects your retirement or disability benefits;

▼ *Government Pension Offset* (No. 05-10007) — explanation of a law that affects spouse's or widow(er)'s benefits; and

▼ *Identity Theft And Your Social Security Number* (No. 05-10064) — what to do if you're a victim of identity theft.

We also have other leaflets and fact sheets with information about specific topics such as military service, self-employment or foreign employment. You can request Social Security publications at *www.socialsecurity.gov* or by calling us at **1-800-772-1213.**

---

**If you need more information**—Visit *www.socialsecurity.gov/mystatement* on the Internet, contact any Social Security office, call **1-800-772-1213** or write to Social Security Administration, Office of Earnings Operations, P.O. Box 33026, Baltimore, MD 21290-3026. If you're deaf or hard of hearing, call **TTY 1-800-325-0778.** If you have questions about your personal information, you must provide your complete Social Security number. If your address is incorrect on this *Statement,* ask the Internal Revenue Service to send you a Form 8822. We don't keep your address if you're not receiving Social Security benefits.

**Para solicitar una *Declaración* en español, llame al 1-800-772-1213**

04/03/2007   16:21   2562342044                    DERRICK BLYTHE                    PAGE   12



SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA, AL 35040

**Earnings Statement**

Period Ending:      09/04/20
Pay Date:           09/10/20

DEFENDANT'S
EXHIBIT
4

Taxable Marital Status:  Married
Exemptions/Allowances:
    Federal:      1
    AL:

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010

Social Security Number:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Vacation | | 16.00 | 397.17 | 397.17 |
| Regular | | | | 34,964.28 |
| Bonus | | | | 10,531.50 |
| **Gross Pay** | | | **$397.17** | 45,892.95 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | | 44.89 |
| Float Balance | | 8.00 |
| Vacation Bal | | 0.00 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -15.19 | 4,587.86 |
| | Social Security Tax | -24.62 | 2,844.06 |
| | Medicare Tax | -5.76 | 665.14 |
| | AL State Income Tax | -14.82 | 1,912.47 |
| | **Other** | | |
| | Direct Deposit | -305.01 | |
| | 401K % Matched | -23.83* | 2,287.83 |
| | 401K(Unmatched) | -7.94* | 205.96 |
| | A D & D Ins | | 65.90 |
| | **Net Pay** | **$0.00** | |

*LAST — SYSCO
CHECK — FOR 2 DAYS
FOR
VACATION*

* Excluded from federal taxable wages
Your federal taxable wages this period are $365.40

— ⊗ — BONUS NOT
   INCLUDED IN SALARY
   EXPOUNDMENT — ONLY USED BASE SALARY

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM   © 2000 ADP, Inc.

SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA, AL 35040

Advice number:   00000370281
Pay date:        09/10/2004

Deposited to the account of
CHARLES S ADAMS

| | account number | transit ABA | amount |
|---|---|---|---|
| | 91633 | 2622 8551 | $305.01 |

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

**DEFENDANT'S EXHIBIT**

5

| | |
|---|---|
| 1 Wages, tips, other comp. 55116.54 | 2 Federal income tax withheld 7589.46 |
| 3 Social security wages 55812.32 | 4 Social security tax withheld 3460.36 |
| 5 Medicare wages and tips 55812.32 | 6 Medicare tax withheld 809.28 |

a Control number 026546 15/M8P  Dept. 431001  Corp.  Employer use only A    6

c Employer's name, address, and ZIP code

RUSSELL LANDS INC &
SUBSIDIARY
2544 WILLOW POINT ROAD
ALEXANDER CITY AL 35010-6218

| b Employer's FED ID number 63-0455368 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 D 695.78 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay  X |

e/f Employee's name, address and ZIP code

STEVE ADAMS
931 OVERHILL DR
ALEXANDER CITY, AL 35010

| 15 State AL  Employer's state ID no. 058397 | 16 State wages, tips, etc. 55116.54 |
|---|---|
| 17 State income tax 1940.90 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**Federal Filing Copy**
**W-2 Wage and Tax Statement 2006**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

04/03/2007  16:21    2562342044    DERRICK BLYTHE    PAGE  09

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 43378.15 | 4587.86 |
| 3 Social security wages | 4 Social security tax withheld |
| 45871.94 | 2844.06 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 45871.94 | 665.14 |

| a Control Number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000135 70/SB1 | 707210 | | T    525 |

c Employer's name, address, and ZIP code

SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA AL 35040

2004

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 76-0527338 | 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| | C        44.89 |
| 14 Other | 12b D        2493.79 |
| | 12c |
| | 12d |
| | 13 Stat emp/Ret plan/3rd party sick pay   X |

a/f Employee's name, address and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY,AL 35010

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 359516 | 43378.15 |
| 17 State income tax | | 18 Local wages, tips, etc. |
| 1912.47 | | |
| 19 Local income tax | | 20 Locality name |

**Federal Filing Copy**
# W-2  Wage and Tax Statement  2004
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

---

Copy C For EMPLOYEE'S RECORDS
(See Notice to Employee on back of Copy B.)

**2004**  OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 15908 | 22002.16 | 2625.91 |
| | 3 Social security wages | 4 Social security tax withheld |
| b Employer ID number | 22002.16 | 1364.13 |
| 64-0202800 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 22002.16 | 319.03 |

c Employer's name, address, and ZIP code

MERCHANTS FOODSERVICE
1100 EDWARDS STREET
P O BOX 1351
HATTIESBURG, MS 39403-1351

2004

d Employee's social security number

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

e Employee's name, address, and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE

ALEXANDER CITY, AL 35010

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code  See inst. for box 12 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | | 12c Code |
| Third-party sick pay | | 12d Code |

| AL | 197494 | 22002.16 | 888.19 |
|---|---|---|---|
| 15 State  Emplr's state I.D. # | | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name | |

Form W-2 Wage and Tax Statement    Dept. of the Treasury - IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty/other sanction may be imposed on you if this income is taxable and you fail to report it.

04/03/2007  16:21    2562342044    DERRICK BLYTHE    PAGE  10

**Left W-2:**

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 8960.39 | 690.38 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 8960.39 | 555.54 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 8960.39 | 129.93 |

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 026546 15/M8P | 431001 | | A    5 |

c Employer's name, address, and ZIP code

RUSSELL LANDS INC &
SUBSIDIARY
2544 WILLOW POINT ROAD
ALEXANDER CITY AL 35010-8218

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 63-0455398 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|

| 14 Other | 12b |
| 2005 | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STEVE ADAMS
931 OVERHILL DR
ALEXANDER CITY, AL 35010

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 058397 | 8960.39 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 276.30 | |

| 19 Local income tax | 20 Locality name |
|---|---|

**W-2** Wage and Tax Statement **2005**
Federal Filing Copy
Copy B to be filed with employee's Federal Income Tax Return.
OMB No. 1545-0008

---

**Right W-2:**

Copy B To Be Filed With Employee's
Federal Tax Return

**2005** OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 15908 | 34833.00 | 4099.05 |

| b Employer ID number (EIN) | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 64-0202800 | 34833.00 | 2159.65 |

| | 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|---|
| | 34833.00 | 505.08 |

c Employer's name, address, and ZIP code

MERCHANTS FOODSERVICE
1100 EDWARDS STREET
P O BOX 1351
HATTIESBURG, MS 39403-1351

| d Employee's social security number |
|---|
| 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 |

e Employee's name, address, and ZIP code

CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY, AL 35010

2005

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|

| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code   See inst. for box 12 |
|---|---|---|

| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan    X | | 12c Code |
| Third-party sick pay | | 12d Code |

| 15 State | Empl'r state I.D. # | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|---|
| AL | 197494 | 34833.00 | 1411.24 |

| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|

Form W-2 Wage and Tax Statement
This information is being furnished to the Internal Revenue Service.

Dept. of the Treasury - IRS

| | |
|---|---|
| 1  Wages, tips, other comp. 54618.94 | 2  Federal income tax withheld 5893.74 |
| 3  Social security wages 57141.60 | 4  Social security tax withheld 3542.78 |
| 5  Medicare wages and tips 57141.60 | 6  Medicare tax withheld 828.55 |

| a  Control Number  000135 70/SB1 | Dept. 707210 | Corp. A | Employer use only 606 |
|---|---|---|---|

c  Employer's name, address, and ZIP code

**SYSCO FOOD SERVICES
OF CENTRAL ALABAMA
1000 SYSCO DRIVE
CALERA AL 35040**

*2003*

| b  Employer's FED ID number 76-0527338 | d  Employee's SSA number 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 |
|---|---|
| 7  Social security tips | 8  Allocated tips |
| 9  Advance EIC payment | 10  Dependent care benefits |
| 11  Nonqualified plans | 12a  See instructions for box 12  C  59.40 |
| 14  Other | 12b  D  2522.66 |
| | 12c |
| | 12d |
| | 13  Stat emp. Ret. plan 3rd party sick pay  X |

e/f  Employee's name, address and ZIP code

**CHARLES S ADAMS
931 OVERHILL DRIVE
ALEXANDER CITY,AL 35010**

| 15  State  AL  Employer's state ID no. 359516 | 16  State wages, tips, etc. 54618.94 |
|---|---|
| 17  State income tax 2372.12 | 18  Local wages, tips, etc. |
| 19  Local income tax | 20  Locality name |

**Federal Filing Copy
W-2  Wage and Tax
Statement    2003**
OMB No. 1545-0008
Copy B to be filed with employee's  Federal Income Tax Return.

**DEFENDANT'S EXHIBIT**



6



# THE MERCHANTS COMPANY
## APPLICATION FOR EMPLOYMENT
### (The Merchants Company is an Equal Opportunity Employer)

*1. This application must be completed by the applicant.*
*2. All Questions must be fully answered.*

(STEVE)

Your Name In Full: _ADAMS_        _CHARLES_        _STEVEN_
                   (Last)          (First)          (Middle)

Telephone #: _205 668 7025_   _256 329 0179_   Social Security # _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_
              (Day)            (Night)

Address: _931 OVERHILL DR.   ALEXANDER CITY, AL.   35010_
         (Street Address)    (City)    (State)    (Zip Code)

*Please Note: The fact that you have been asked to complete this detailed application indicates our interest in your qualifications. You can aid us in making a fair appraisal of those qualifications by answering each questions as accurately as possible. We assure you that this application will be considered a confidential record.*

Are you at least 18 years old? (✓) Yes   ( ) No

Are you eligible to be employed in the United States?  (✓) Yes  ( ) No

How do you plan to get to work? _PERSONAL   VEHICLE_

Have you ever been convicted of a crime other than a minor traffic violation: ( ) Yes  (✓) No

If so, please give the details, including dates, location and circumstances: _____

_____

How many days have you missed from scheduled work during the past two years?   _1_

If you are employed by The Merchants Company, will you work a second job at any time? ( ) Yes  (✓) No

If so, detail: _____

Do you have any relatives, friends, or acquaintances employed with The Merchants Company, if so, please list their names and department working in below: _NO_

_____

_____

In case of an emergency, who will always know how to get in touch with you (give name, address, and telephone number):
_LAURA ADAMS   (WIFE)_
_931  OVERHILL  DR._
_ALEXANDER  CITY,  AL.  35010_          _256-329-0179_

Position applied for: _OPERATIONS   MANAGER_

Do you want to work full time? _YES_ _____   Or part time? _____

                                              _2 WEEKS_
If hired, on what date will you be available to start work? _NOTICE_ Rate of Pay Expected? _OPEN_

What made you decide to work with The Merchants Company? _OPPORTUNITY FOR GROWTH WITH A WELL ESTABLISHED INDUSTRY LEADER_

Have you ever worked for The Merchants Company before? ( ) Yes (✓) No. If so, when and why did you leave? _____

Do you have any special circumstances which might prevent you from working all scheduled work and overtime including weekends? ( ) Yes (✓) No. If so, please detail: _____

Do you have any special skills or experience which would make you more qualified to work for The Merchants Company than other applicants? (X) Yes ( ) No. If so, please detail: _ALMOST 14 YEARS MGMT EXPERIENCE IN FOOD SERVICE OPERATIONS_

| INSTITUTION | NAME & LOCATION OF SCHOOL | NUMBER OF YEARS ATTENDED | COURSES TAKEN | DEGREES ACQUIRED |
|---|---|---|---|---|
| Grade School | ALEX CITY MIDDLE ALEX CITY, AL | 3 | | XXXXXXXX |
| High School | BENJAMIN RUSSELL ALEX CITY, AL | 3 | | XXXXXXXX |
| College | CENTRAL ALABAMA | 2 | | ASSOC. |
| | FAULKNER UNIVERSS MONTGOMERY, AL | 2 | | BACHELOR |
| Other Training | | | | XXXXXXXX |

Did you work outside of school hours? ( ) Yes ( ) No   Describe: _____

Do you attend school now? ( ) Yes (✓) No   If not, do you intend to? ( ) Yes ( ) No
If so, when? _____

Employment: Please list all previous employment and begin by listing your last or present employment first.
IF MORE SPACE IS NEEDED, PLEASE USE BACK OF APPLICATION FORM)

| EMPLOYMENT DATE FROM | TO | Company Name & Location & Immediate Supervisor's Name | Give Your Title & Specific Duties of Position | Rate of Pay | Reason for Leaving |
|---|---|---|---|---|---|
| 12-98 | PRESENT | SYSCO FOOD - CHEEM KENNY BOWMAN | WHSE SUPVR | | CURRENTLY EMPLOYEED |
| 2-91 | 12-98 | ALABAMA FOOD GROUP ALEX CITY, AL HUGH NEIGHBORS III | OPERATIONS MGR | | EMPLOYMENT WITH SYSCO |
| | | | | | |
| | | | | | |
| | | | | | |

**Unemployment:** Account for all unemployed time of two months or more after leaving school and between positions held.

| UNEMPLOYMENT DATES FROM   TO: | STATE WHAT YOU WERE DOING | PERSONAL REFERENCE WHO CAN VERIFY THIS INFORMATION:  NAME AND ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Have you ever served in the Armed Forces of the U.S.? ( ) Yes  ✓ No  If so:

Branch of service: _____    From: _____    to: _____

Rank or rating: _____

Reason for leaving the Armed Forces: _____

References (Other than relatives or former employers):

| Name | Address | Occupation | Years Known |
|---|---|---|---|
| 1. HELEN MARTIN | 1913 PINEVIEW DR ALEX CITY, AL | RETIRED. | 45 |
| 2. BOBBY SCOTT | ELKAHATCHEE RD ALEX CITY, AL. | OWNER- SCOTT ACCOUNTING | 25 |
| 3. HOWARD BISHOP | HWY 22 ALEX CITY, AL. | INDUSTRIAL ENGINEER | 31 |

I represent that each answer to a question in this application and all other information otherwise furnished is true and correct.  I further represent that such answers and information constitute a full and complete disclosure of my knowledge with respect to the question or subject to which the answer or information relates.  I understand that any incorrect, incomplete, or false statement or information furnished by me will subject me to discharge at any time, in the event that I am employed by The Merchants Company. I agree to abide by all its orders, rules, and regulations, and agree not to disclose any confidential information regarding operating and trade secrets.  I authorize my former employers to give any information regarding my employment with them, and in addition, to furnish any other information they may have concerning me.

_____    8-11-04
Applicant's Signature                              Date

*THANK YOU for completing this application form and for your interest in employment with The Merchants Company.  We would like to assure you that your opportunity for employment with The Merchants Company would be based only on your merit without regard to race, creed, color, religion, sex, age, national origin, or handicap/disabled status.  In particular, we wish to note that, although we have asked you for information on your age, we conform to all laws prohibiting discrimination.  To be kept active, this application must be renewed every sixty days from the date completed.*

# MERCHANTS FOODSERVICE

## Serving Your Favorite Restaurants!

Post Office Box 2096
Clanton, AL 35046
(800) 844-0633  Fax: (205) 280-1748

August 20, 2004

**DEFENDANT'S EXHIBIT**

7

Steve Adams
Alexander City, AL

Dear Steve:

I enjoyed having you visit our Clanton Distribution Center and am pleased that you took the time to do so. Without exception, each of the individuals with whom you spoke during your visit feel that you will do very well at Merchants Foodservice. I hope you found your visit interesting and worthwhile, and you were able to gather the information you desired about Merchants Foodservice, our potential and how it matches your individual goals.

I am pleased to extend you an offer to join our company as Operations Manager of the Clanton Distribution Center. Your annualized salary will be $62,500. In addition to your base salary, you will be eligible for up to a 30% bonus based on improving sales and improving current operational and productivity standards. Our incentive program recognizes the personal sacrifice and commitment involved in providing leadership and the necessary supervision to improve on current standards. Bonuses are paid three times a year within 30 days after physical inventory.

The Company offers a benefits program which in addition to the usual holidays, includes vacation days, group health and dental insurance, life insurance, short term and long term disability plan, pension plan and a matching 401(K) plan.

When you combine our starting salary, bonus program and benefits package, I think you'll agree we offer a very attractive financial package.

We are very interested in having you join us for what we hope will be a long and successful career. Your future professional development should parallel with the development and expansion of Merchants Foodservice.

# MERCHANTS FOODSERVICE

### Serving Your Favorite Restaurants!

Mr. Steve Adams
August 20, 2004
Page Two

Post Office Box 2096
Clanton, AL 35046
(800) 844-0633 Fax: (205) 280-1748

As you consider this offer, keep in mind that Merchants Foodservice is a family owned company offering you a personal relationship with your employer while offering the growth of a much larger corporation.

Steve, I sincerely hope you will decide to join us and look forward to hearing from you in the near future regarding your decision. If you have any further questions or desire additional information about Merchants Foodservice or the benefits we offer, please call me at (205) 280-1710.

Very truly yours,

MERCHANTS FOODSERVICE

Hal Henson
General Manager
Clanton Distribution Center

HH/mra

**TO INDICATE ACCEPTANCE** of our offer, please sign and date the attached copy of this letter and return in the enclosed envelope.

I accept your offer as outlined above.

STEVE ADAMS

8-23-04

DATE

**DEFENDANT'S EXHIBIT**
**8**

SYSCO Food Services of Central Alabama

## EXIT INTERVIEW

It is our company policy to conduct an exit interview with each employee upon separation. We would appreciate your honest opinions about your employment with our company. Your objective feedback can help us to improve workplace conditions and make this company a better place to work for. Please complete the front page of this questionnaire and return it to the administrator. Thank you for your valued opinion.

Employee Name __STEVE ADAMS__ _____ Separation Date __9-24-04__
Position title __DAYSHIFT WHSE SUPVR__ Dept __OPERATIONS__

Check which best describes your feelings about the following aspects of your employment important at our company.

| | Very Important | Neutral | Unimportant | Very Unimportant |
|---|---|---|---|---|
| Nature of the Job | X | | | |
| Professionalism of skills and experience | X | | | |
| Professional aspiration | X | | | |
| Training, orientation and development programs | X | X | | |
| Opportunities for advancement | X | | | |
| Salary treatment | X | | | |
| Supervision | X | | | |
| Company policies | X | X | | |
| Workload | X | | | |
| Benefits programs | X | | | |
| Overall, as a place to work | X | | | |

If you have marked dissatisfied or very dissatisfied please explain why. _____

The main reason I am leaving this company are: __IMMEDIATE PROMOTION - ALLOWS__
__ME TO BETTER PLACE FINANCIALLY FOR MY FAMILY__

If you are leaving to accept other employment, please list the new employer's name, the title of your new position, your starting salary and any benefits that you will be receiving that you did not receive at your present __AND PAYMENTS__
__PRESTIGE - PLANT M. - DIRECTOR OF OPERATIONS -__
__SUBSTANTIAL SALARY INCREASE - BENEFITS THE SAME__

If you are leaving to accept other employment, describe how your new position will be different from the job you held at our company. __SUPV - DAYSHIFT OPERATING__
__DIRECTOR - DAYSHIFT, NIGHTSHIFT, TRANSPORTATION__

Please describe your relationship with your supervisor and how it could have been improved. __NO IMPROVEMENT__
__NEEDED GREAT RELATIONSHIP - REALLY ENJOYED WORKING__
__WITH ALL THREE KENNY, DOUG, EDDIE__

Was our company and/or your supervisor provided enough recognition for your work achievement? If not, please describe how you would have preferred to have been recognized. _____

Would you recommend this company as a place to work?  Yes __✓__  No ____  If not, why? ____

Employee Signature __Steve Adams__ Date __9-13-04__
__LEAVING SYSCO WAS THE HARDEST DECISION I'VE EVER HAD TO MAKE__
__REALLY CARE FOR ALL MY CO-WORKERS (SYSCO FAMILY), SYSCO__
__"S" A GREAT PLACE TO WORK. TAKES GREAT CARE OF__

xc: DPD
    DR
    ED
    β/β'/β'

---

AUGUST 23, 2004

EDDIE, DOUG, KENNY

    I WOULD LIKE TO THANK
EACH OF YOU FOR THE OPPORTUNITY
YOU GAVE ME ALMOST 6 YEARS
AGO WHEN YOU HIRED ME TO WORK
FOR SYSCO FOOD SERVICES OF CENTRAL
ALABAMA. I HAVE REALLY ENJOYED
WORKING WITH YOU AND FOR YOU
OVER THAT PERIOD OF TIME. IT'S
ALWAYS HARD TO LEAVE SOMETHING
YOU REALLY CARE ABOUT, AND I
DO REALLY CARE ABOUT MY SYSCO
FAMILY. EACH OF YOU HAS BEEN
ROCK SOLID, GOOD AS GOLD, TO ME
AND I APPRECIATE THAT, HOWEVER;
I'VE BEEN OFFERED AN OPPORTUNITY
WITH ANOTHER COMPANY, AND AFTER
MUCH CONSIDERATION AND PRAYER HAVE
DECIDED IT'S TIME FOR ME TO
MOVE ON. PLEASE ACCEPT THIS
LETTER AS MY NOTICE OF RESIGNATION
EFFECTIVE 9-7-04. MAY GOD
CONTINUE TO BLESS EACH AND EVERY-
ONE OF YOU HERE AT SYSCO.
                    SINCERELY,
                    Steve Adams

# MERCHANTS FOODSERVICE

**BIG** **FROSTY ACRES**

## Serving Your Favorite Restaurants!

To:       **New Employees**
From:    **Human Resources**
Subject: **Benefits**

**DEFENDANT'S EXHIBIT**

9

---

**PERSONNEL FILES:** These files are kept in the Hattiesburg Office. If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify the Human Resource Department in writing.

**VACATION:** Vacation benefits are as follows:  5 days after January 1st of the first full year, 10 days after 3 years, and 15 days after 15 years.  Vacation time does accrue the first month you are employed and you will be eligible to take vacation time on or after January 1st following date of employment.

**HOLIDAYS:** Merchants Foodservice observes the following holidays:

**New Years Day (January 1)**
**Memorial Day (Last Monday in May)**
**Independence Day (July 4)**
**Thanksgiving (Fourth Thursday in November)**
**Christmas (2 days – to be scheduled by supervisor)**

**BEREAVEMENT:** Merchants Foodservice does grant 2 days bereavement leave in case of death in the immediate family.  See handbook for definition of "immediate family."

**LIFE INSURANCE (HM Life Insurance Co.):** You automatically have a life insurance policy with Merchants Foodservice after you have been employed 30 days. Merchants Foodservice pays the premium for you.  Your life insurance is based on your annual salary.  This amount is limited to $50,000.00.  Your life insurance includes accidental death on yourself only.  The amount of your accidental death insurance is equal to the amount of your life insurance.

There is no accidental death on dependents.  Spouse insurance is $2,000.00 and children are $1,000.00.

**VOLUNTARY LIFE INSURANCE (Aetna):** If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  You may elect up to $100,000 of coverage without answering health questions or having a physical. You may also cover your spouse for $35,000 and your children for $5,000 or $10,000 of coverage.  You may choose to go over those amounts on yourself or your spouse but would be subject to answering health questions and possibly a physical.  The cost of this coverage is based on your age.

**HEALTH INSURANCE (Blue Cross Blue Shield of MS):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment. Your premium will begin to be deducted the first pay check of that month. Family coverage is $323.20 per month and single coverage is $145.88 per month. You will receive a summary plan description, welcome packet, and health insurance card (which includes prescription card) when your coverage takes effect.  This is deducted from pre-tax dollars under the cafeteria plan.

**DENTAL INSURANCE (Genworth Financial):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Family coverage is 52.04 per month, employee and spouse is 35.92 per month, employee and child(ren) is 32.00 per month and employee only is 14.60 per month.  You will receive a dental card and plan description after you become eligible.  This is deducted from pre-tax dollars under the cafeteria plan.

**SHORT TERM DISABILITY (UNUM Provident):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Our STD policy is also through UNUM Insurance.  The premium for this benefit is based on your annual salary.  In the case of an illness, surgery, etc, this benefit will start paying 60% of your salary on the 8th day of doctor approved leave and will pay for up to 90 days.

**LONG TERM DISABILITY (UNUM Provident):**  If you elect coverage, your effective date will be the first day of the month following 3 months of employment.  Our LTD policy is through UNUM Insurance.  The premium for this benefit is based on your annual salary.  In the case of disability, this benefit will start paying after you have been out of work for 90 days and will pay 60% of your salary.

**FLEXIBLE SPENDING ACCOUNT (Ceridian):**  If you elect this benefit it will go into effect the first day of the month following 3 months of employment.  We have a medical reimbursement plan with maximum election of $2000 annually.  This is deducted from pre-tax dollars under the cafeteria plan. This is basically a savings account for you to use on un-reimbursed medical or dental expenses, such as co-pays, deductibles and non-covered expenses.

**401K PLAN (Principal Financial Group):**  Enrollment dates for 401K are January 1 and July 1.  You become eligible after your have been employed for one year prior to these dates. Merchants Foodservice will match 50% of your contribution up to 6% of your salary.  You must be employed for 5 years to be 100% vested.

**SCHOLARSHIPS:**  Tatum Development Corporation and its subsidiaries offer forty (40) $1,000 scholarships to be awarded to students meeting certain eligibility requirements.  Your children or relatives may be eligible to receive a scholarship to the school of their choice.  If you have an interest, please ask for an application.



**STEVE ADAMS**

**DIRECTOR OF OPERATIONS - INCENTIVE PROGRAM**

**OCTOBER 1, 2004 THROUGH SEPTEMBER 30, 2005**

- For attaining period budget, you will earn as follows: 1% annual salary for attaining goal on throughput per warehouse hour.

|      | 1st Period | 2nd Period | 3rd Period |
|------|-----------|-----------|-----------|
| 1%   | 38        | 38        | 38        |
| 1%   | 40        | 40        | 40        |

- 1% annual salary for averaging 2-5 errors per 1000 or less shipping accuracy.

  Additional 1% for averaging 2 errors per 1000 or less shipping accuracy.

- 2% for having less warehouse overtime dollars than prior year.

- 1% annual salary for not exceeding budget for inventory shrinkage/damage (0.5% of sales)

- 2% annual salary for attainment of company wide net profit budget.

- 1% annual salary for attaining AIB Inspection Score 900.

- Paid 3 times a year on previous 4-month performance.

PAYMENT: Payment will be made based on the amount earned as outlined above multiplied by the % of branch sales achieved compared to budget.

NOTE: You must be employed throughout the entire period to receive payment of any incentive compensation.



DEFENDANT'S EXHIBIT

10

**Steve Adams**
**Clanton Operations Manager**

| | Budget | Actual | Bonus Percentage | | Bonus |
|---|---|---|---|---|---|
| | | **Period 3 - 2004** | | | |
| Throughput per hour | 35.0 | 34.4 | 2.00% | | |
| Second Level | 38.0 | 34.4 | 1.00% | | |
| Shipping Accuracy Per 1,000 | 3.00 | 2.10 | 1.00% | Y | $625.00 |
| Second Level | 2.00 | 2.10 | 1.00% | | |
| DSR Sales @97% | $11,836,991 | $11,698,471 | 1.00% | | |
| Inventory Losses | 0.50% | 0.63% | 1.00% | | |
| AIB Score | 860 | 910 | 1.00% | Y | $625.00 |
| Second Level | 900 | 910 | 1.00% | Y | $625.00 |
| Company Wide Profit | | | 2.00% | Y | $1,250.00 |
| Total Bonus | | | | | $3,125.00 |
| Branch Sales | $20,766,859 | $19,531,496 | 94.1% | | $2,939.11 |
| Pro-rated for one month @ 25% | | | | | $734.78 |

Bonusws  10/26/04

**Steve Adams**
**Clanton Operations Manager**

Period 1 - 2005

| | Budget | Actual | Bonus Percent | | Bonus Dollars |
|---|---|---|---|---|---|
| Whse Throughput per hour | 38.00 | 36.47 | 1.00% | | |
| Second Level | 40.00 | 36.47 | 1.00% | | |
| | | | | | |
| Shipping Accuracy Per 1,000 | 2.50 | 2.10 | 1.00% | Y | $625.00 |
| Second Level | 2.00 | 2.10 | 1.00% | | |
| | | | | | |
| Reduced Whse O/Time $ | $54,434 | $33,369 | 2.00% | Y | $1,250.00 |
| | | | | | |
| Inventory Shrink / Damage | 0.50% | 0.68% | 1.00% | | |
| | | | | | |
| AIB Score | 900 | 900 | 1.00% | Y | $625.00 |
| | | | | | |
| Company Wide Profit | | | 2.00% | | |
| | | | | | |
| Total Bonus | | | | | $2,500.00 |
| | | | | | |
| Branch Sales | $21,603,708 | $22,522,670 | 104.25% | | $2,606.35 |

**Steve Adams**
**Clanton Operations Manager**

Period 2 - 2005

| | Budget | Actual | Bonus Percentage | Bonus |
|---|---|---|---|---|
| Throughput per hour | 38.0 | 37.1 | 1.00% | |
| Second Level | 40.0 | 37.1 | 1.00% | |
| Shipping Accuracy Per 1,000 | 2.50 | 2.72 | 1.00% | |
| Second Level | 2.00 | 2.72 | 1.00% | |
| Less Whse OT Dollars vs PY | $22,415 | $56,476 | 2.00% | |
| Inventory Losses | 0.50% | 0.51% | 1.00% | |
| AIB Score | 900 | 0 | 1.00% | |
| Company Wide Profit | | | 2.00% | |
| Total Bonus | | | | $0.00 |
| Branch Sales | $24,082,571 | $26,469,557 | 109.9% | $0.00 |

Incentive 7/5/05

```
DATE  3/29/2007   2:29 PM                      MERCHANTS FOODSERVICE                    COMPANY : 01
PR0R57RPT                                     EMPLOYEE CHECK HISTORY                          PAGE   1
                                           FROM 1/01/2004 TO 12/31/2005                       OS,Inc1
```

| CHECK NUMBER | CHECK DATE | PAY PERIOD DATE | GROSS EARNINGS | FEDERAL TAXES | FICA/MEDC TAXES | STATE/ SUI W/H | OTHER TAXES | MISC DEDS | NET AMOUNT | HOURS PAID | PAY RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EMPLOYEE | 15908 | CHARLES S ADAMS | | | | | DIV/DEPT: 12619 | RECEIVING & SHIPPING | | | |
| 108194 | 9/15/04 | 9/15/04 | 3,038.19 | 409.96 | 232.42 | 122.45 | .00 | .00 | 2,273.36 | 87.00 | 2,604.170 |
|  | 9/30/04 | 9/30/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | .00 | .00 | 1,988.41 | 87.00 | 2,604.170 |
|  | 10/15/04 | 10/15/04 | 2,604.17 | 310.83 | 199.21 | 105.71 | .00 | .00 | 1,988.42 | 87.00 | 2,604.170 |
| 108270 | 10/27/04 | 10/27/04 | 734.78 | 40.14 | 56.21 | 25.77 | .00 | .00 | 612.66 | 87.00 | 2,604.170 |
|  | 10/29/04 | 10/29/04 | 2,604.17 | 310.83 | 199.23 | 105.71 | .00 | 518.01- | 2,506.91 | 87.00 | 2,604.170 |
|  | 10/31/04 | 10/31/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | .00 | .00 | 1,988.41 | 87.00 | 2,604.170 |
|  | 11/15/04 | 11/15/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | .00 | .00 | 1,988.41 | 87.00 | 2,604.170 |
|  | 11/30/04 | 11/30/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | .00 | 23.12 | 1,965.29 | 87.00 | 2,604.170 |
|  | 12/15/04 | 12/15/04 | 2,604.17 | 310.83 | 199.22 | 105.71 | .00 | 105.53 | 1,882.88 | 87.00 | 2,604.170 |
|  | 12/31/04 | 12/31/04 | 2,604.17 | 310.20 | 199.22 | 105.74 | .00 | 28.12 | 1,960.89 | 87.00 | 2,604.170 |
|  | 1/15/05 | 1/15/05 | 2,604.17 | 310.20 | 199.22 | 105.74 | .00 | 117.11- | 2,105.53 | 87.00 | 2,604.170 |
|  | 1/31/05 | 1/31/05 | 2,604.17 | 310.20 | 199.22 | 105.74 | .00 | 28.12 | 1,960.89 | 87.00 | 2,604.170 |
|  | 2/15/05 | 2/15/05 | 2,606.35 | 310.53 | 199.39 | 105.83 | .00 | 2.20 | 1,986.81 | 87.00 | 2,604.170 |
|  | 2/25/05 | 2/25/05 | 2,604.17 | 310.20 | 199.21 | 105.74 | .00 | 9.49 | 1,979.52 | 87.00 | 2,604.170 |
| 108558 | 2/28/05 | 2/28/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 28.12 | 1,960.89 | 87.00 | 2,604.170 |
|  | 3/15/05 | 3/15/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 26.16- | 2,063.81 | 87.00 | 2,604.170 |
|  | 3/31/05 | 3/31/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
|  | 4/15/05 | 4/15/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
|  | 4/30/05 | 4/30/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
|  | 5/13/05 | 5/13/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 73.50- | 2,111.16 | 87.00 | 2,604.170 |
|  | 5/31/05 | 5/31/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 150.64 | 1,887.02 | 87.00 | 2,604.170 |
|  | 6/15/05 | 6/15/05 | 2,604.17 | 283.08 | 185.38 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
|  | 6/30/05 | 6/30/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
|  | 7/15/05 | 7/15/05 | 2,604.17 | 283.08 | 185.39 | 98.05 | .00 | 208.96 | 1,828.69 | 87.00 | 2,604.170 |
| EMPLOYEE TOTALS: | | | 58,462.72 | 6,724.96 | 4,347.89 | 2,299.43 | .00 | 760.17 | 44,330.27 | 1,827.00 | 1,827.00 |

END OF COMPANY 1


DEFENDANT'S EXHIBIT

THE MERCHANTS COMPANY
P O BOX 1351
HATTIESBURG, MS 39401



DEFENDANT'S
EXHIBIT

12

NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE
Direct Deposit Information

CHARLES S ADAMS                    Account            Amount
931 OVERHILL DRIVE                 00009163317        $1,828.69
ALEXANDER CITY, AL 35010

# NON-NEGOTIABLE

|  | CO# | Div/Loc | Dept | Shift |
|---|---|---|---|---|
|  | 01 | 19 | 12619 | 1 |

Period Date:    6/30/2005
Check Date:     6/30/2005

Emp #:      15908

MERCHANTS FOODSERVICE            CHARLES S ADAMS
1100 EDWARDS STREET              931 OVERHILL DRIVE
P O BOX 1351                     ALEXANDER CITY, AL 35010
HATTIESBURG, MS 39403-1351

Exemptions/Allowances
Federal: M/00 State: AL: S/00

| Earnings | Hours | Current | | | Current | YTD |
|---|---|---|---|---|---|---|
| SALARY | 87.00 | 2604.17 | | Benefits | | |
| | | | | HLTH-FAMILY | 154.82 | 1238.56 |
| | | | | LIFE INS | 5.97 | 71.64 |
| | | | | | | |
| | | | | Ben Ttl | 160.79 | 1310.20 |

GROSS HOURS/PAY        87.00   2604.17

| Taxable Earnings | Current | YTD | | Vac/Sick/Pers/Other | | |
|---|---|---|---|---|---|---|
| Gross | 2604.17 | 33856.39 | | VACATION | | 16.00 |
| Fed | 2423.33 | 32409.67 | | | | |
| FICA | 2423.33 | 32409.67 | | | | |
| State | 2423.33 | 32409.67 | | | | |

| Deductions | Current | YTD | | Deductions Cont | Current | YTD |
|---|---|---|---|---|---|---|
| Federal | 283.08 | 3815.97 | | | | |
| FICA | 185.39 | 2479.34 | | | | |
| State | 98.05 | 1313.19 | | | | |
| HLTH | 154.82 | 1238.56 | | | | |
| Dental | 26.02 | 208.16 | | | | |
| STD | 10.10 | 121.20 | | | | |
| LTD | 13.02 | 156.24 | | | | |
| United Way | 5.00 | 60.00 | | | | |
| MEALS | | 51.42- | | | | |
| HOTEL/TRAVEL | | 569.03- | | | | |

|  |  |  |  | Ded Ttl | $775.48 | $8,772.21 |
|---|---|---|---|---|---|---|
| Net Pay: | $1,828.69 | Dir Dep | $1,828.69 | Chk Amt | $.00 | |

04/03/2007  16:12    2562342044              DERRICK BLYTHE                    PAGE  15

THE MERCHANTS COMPANY
P O BOX 1351
HATTIESBURG, MS 39401

NON-NEGOTIABLE     NON-NEGOTIABLE     NON-NEGOTIABLE     NON-NEGOTIABLE
                                         Direct Deposit Information

CHARLES S ADAMS                      Account                    Amount
931 OVERHILL DRIVE                   00009163317                $1,986.81
ALEXANDER CITY, AL 35010

# NON-NEGOTIABLE

| | | | | |
|---|---|---|---|---|
| | CO# | Div/Loc | Dept | Shift |
| | 01 | 19 | 12619 | 1 |

Period Date:     1/31/2005
Check Date:      1/31/2005

Emp #:        15908

MERCHANTS FOODSERVICE                CHARLES S ADAMS
1100 EDWARDS STREET                  931 OVERHILL DRIVE
P O BOX 1351                         ALEXANDER CITY, AL 35010
HATTIESBURG, MS 39403-1351

Exemptions/Allowances
  Federal: M/00 State: AL: S/00

| | | | Current | YTD |
|---|---|---|---|---|
| Earnings | Hours | Current | Benefits | |
| SALARY | 87.00 | 2604.17 | LIFE INS | 5.97 | 11.94 |

| | | | Current | YTD |
|---|---|---|---|---|
| | | | Ben Ttl    5.97 | 11.94 |

| | | | |
|---|---|---|---|
| GROSS HOURS/PAY | 87.00 | 2604.17 | |
| Taxable Earnings | Current | YTD | Vac/Sick/Pers/Other |
| Gross | 2604.17 | 5208.34 | VACATION            16.00 |
| Fed | 2604.17 | 5208.34 | |
| FICA | 2604.17 | 5208.34 | |
| State | 2604.17 | 5208.34 | |
| Deductions | Current | YTD | Deductions Cont    Current    YTD |
| Federal | 310.20 | 620.40 | |
| FICA | 199.22 | 398.44 | |
| State | 105.74 | 211.48 | |
| STD | 10.10 | 20.20 | |
| LTD | 13.02 | 26.04 | |
| United Way | 5.00 | 10.00 | |
| HOTEL/TRAVEL | 25.92- | 25.92- | |

| | | | | |
|---|---|---|---|---|
| | | | Ded Ttl | $617.36    $1,260.64 |
| Net Pay: | $1,986.81 | Dir Dep | $1,986.81 | Chk Amt    $.00 |



# MERCHANTS FOODSERVICE
**Serving Your Favorite Restaurants!**

Post Office Box 1351
Hattiesburg, MS 39403-1351
(800) 844-FOOD  Fax: (601) 582-5333

DEFENDANT'S
EXHIBIT

13

# MERCHANTS FOOD SERVICE
## ACKNOWLEDGMENT OF EMPLOYMENT STATUS

I understand that as a condition of my being employed with Merchants Foodservice, I am being employed on an at-will basis for an indefinite period of time without any type of contract of employment (excepting the sales representatives agreement for sales persons), either actual or implied. I further understand that as an at-will employee, my employment can be terminated at any time by either me' or by Merchants Foodservice with or without cause and/or with or without notice. In addition, I understand that Merchants Foodservice retains the right to alter, revise, change, and/or eliminate any of its policies, practices, or rules and/or any of its pay or benefits at its discretion at any time without necessarily giving me or any other employee advance or actual notice.

I also understand that I may be required to take and pass a physical examination including screening for alcohol and drugs in a manner no inconsistent with any applicable law, as a part of the employment process and at any time during my employment with Merchants Foodservice and its representatives and/or agents.

I also understand that any property or possession, including my automobile, which I bring onto the property of Merchants Foodservice, or into any vehicle owned or operated by Merchants Foodservice, is subject to search by Merchants Foodservice with or without notice and/or with or without reasonable or probable cause.

I have read, or had read to me, the above Acknowledgment of Employment Status in its entirety; I fully understand all of its provisions and/or I have had the opportunity to ask any questions which I might have about any of its provisions; and I agree to abide by all of its provisions as a condition of being employed by and continuing to be employed by Merchants Foodservice.

_8-24-04_
Date

_Chrul S Ad_
Signature

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED THE MERCHANTS COMPANY HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1.  CONTACT PERSONNEL MANAGER LOCATED IN THE HATTIESBURG OFFICE.

2.  REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

DEFENDANT'S
EXHIBIT

14

8/01/02

# THE MERCHANTS COMPANY
## FOOD SERVICE DISTRIBUTOR
*Delivering an extra measure of service since 1904*



# EMPLOYEE HANDBOOK

## August 1, 2002

DEFENDANT'S
EXHIBIT

15

# INTRODUCTION

This handbook is designed to acquaint you with The Merchants Company and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by The Merchants Company to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As The Merchants Company continues to grow, the need may arise to change policies described in the handbook. The Merchants Company, therefore, reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. Employees will, of course, be notified of such changes as they occur.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of The Merchants Company.

1

## GENERAL EMPLOYMENT POLICY

The Merchants Company believes that the work conditions, wages, and benefits it offers to its employees are competitive with those offered by other employers in this area and in this industry. If employees have concerns about work conditions or compensation, they are strongly encouraged to voice these concerns openly and directly to their supervisors.

Our experience has shown that when employees deal openly and directly with supervisors, the work environment can be excellent, communications can be clear, and attitudes can be positive. We believe that The Merchants Company amply demonstrates its commitment to employees by responding effectively to employee concerns.

## EQUAL EMPLOYMENT OPPORTUNITY

In order to provide equal employment and advancement opportunities to all individuals, employment decisions at The Merchants Company will be based on merit, qualifications, and abilities. Except where required by law, employment practices will not be influenced or affected by an applicant's or employee's race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law.

## EMPLOYMENT AND PERSONNEL RECORDS

An employment and personnel record is maintained for each employee. All new employees must complete the necessary personnel forms in the personnel office before starting work.

To insure you are receiving the benefits to which you are entitled under all conditions of employment, it is important your records be kept up-to-date at all times. If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify the personnel office in writing.

2

## EMPLOYMENT CLASSIFICATION

**Regular Full Time Employees:**
Employees who are regularly scheduled to work The Merchants Company's full time schedule generally, are eligible for The Merchants Company's benefit package, subject to the terms, conditions, and limitations of each benefit program.

**Regular Part Time Employees:**
Employees who are not assigned to a part time status and who are regularly scheduled to work less than the full time work schedule but at least 20 hours per week are eligible for some of The Merchants Company's benefits.

**Part Time Employees:**
Employees who work less than 20 hours per week and are hired as interim replacements to temporarily supplement the work force, or to assist in the completion of a specific project retain that status of part-time unless and until notified of a change. While part-time employees receive all legally-mandated benefits (such as workers' compensation insurance and Social Security), they are ineligible for The Merchants Company's other benefit programs.

## PROBATIONARY PERIOD

All new and rehired employees work on a probationary basis for the first 90 calendar days after their date of hire. The Merchants Company uses this period to evaluate employee capabilities, work habits, and overall performance. Either the employee or The Merchants Company may end the employment relationship at will at any time during or after the probationary period, with or without cause or advance notice.

3

# PERFORMANCE EVALUATION

Supervisors and employees are strongly encouraged to discuss job performance and goals on an informal, day-to-day basis. Additional formal performance reviews are conducted to provide both supervisors and employees the opportunity to discuss job task, identify and correct weaknesses, encourage and recognize strengths, and discuss positive, purposeful approaches for meeting goals.

The performance of all employees is generally evaluated according to an ongoing 12-month cycle.

# EMPLOYMENT TERMINATION

Termination of employment is an inevitable part of personnel activity within any organization. Since employment with The Merchants Company is based on mutual consent, both the employee and The Merchants Company have the right to terminate employment at will, with or without cause, at any time. Employee benefits will be affected by employment termination in the following manner. All accrued, vested benefits that are due and payable at termination will be paid. If the terminated employee is eligible under the COBRA law, then it will be at the expense of the employee. The employee will be notified in writing of the benefits that may be continued and of the terms, conditions, and limitations of such continuance.

# RESIGNATION

Resignation is a voluntary act initiated by the employee to terminate employment with The Merchants Company. Although advance notice is not required, The Merchants Company requests at least two weeks' written resignation notice from all employees.

If an employee does not provide advance notice as requested, the employee will be considered ineligible for rehire and may not be paid any accrued vacation time.

4

# EMPLOYMENT BENEFITS AND ALLOWANCES

Eligible employees at The Merchants Company are provided a wide range of benefits. A number of the programs (such as Social Security, workers' compensation, and unemployment insurance) cover all employees in the manner prescribed by the law.

Benefits eligibility is dependent upon a variety of factors, including employee's classification, and your supervisor can identify the programs for which you are eligible. Details of many of these programs can be found in the original policy manual located in the Personnel Office. Some benefit programs require contributions from the employee (such as Medical Insurance, 401K plan, long term disability) but most are full paid by The Merchants Company, including Life Insurance.

# VACATION BENEFITS

Vacation time off with pay is available to eligible employees to provide opportunities for rest, relaxation and personal pursuits. Employees in the following employment classification(s) are eligible to earn and use vacation time as described in this policy:

Regular full-time employees
Regular part-time employees

The amount of paid vacation time employees receive each year increases with the length of their continuous employment as shown below:

Upon initial eligibility.............5 days
After 3 years ....................10 days
After 15 years ...................15 days

The length of eligible service is based on the number of years you are employed with The Merchants Company. With The Merchants Company, you will be eligible to take vacation time on or after January 1st following date of employment. Anyone hired before April 1st will have a full 5 days vacation which they may take any time in the following calendar year. Anyone hired during April or May will have 4 days which they may take any time in the follow-

5

## BEREAVEMENT LEAVE

An eligible employee, (Regular full-time and Regular part-time) may be granted up to two days, at the time of the death, of paid bereavement leave in case of death in the immediate family. The Merchants Company defines "immediate family" as the employee's spouse, parent, child, sibling; the employee's spouse's parent, child or sibling; the employee's child's spouse; grandparents or grandchildren.

## LEAVES SUBJECT TO FAMILY AND MEDICAL LEAVE ACT OF 1993

The Family and Medical Leave Act of 1993 allows The Merchants Company to grant unpaid family or medical leave for specific circumstances. For an employee to be eligible to take leave, the employee must have worked for The Merchants Company for at least 12 months and for at least 1,250 hours during the year preceding the start of the leave and the employee must request the leave for one of the following reasons:

1. Because of the birth of a son or daughter of the employee and in order to care for such son or daughter;

2. Because of the placement of a son or daughter with the employee for adoption or foster care;

3. In order to care for the spouse, or a son, daughter or a parent of the employee, if such spouse, son, daughter or parent has a serious health condition; or

4. Because of a serious health condition that makes the employee unable to perform the functions of his or her position.

Depending on the circumstances, employees requesting leaves for one of these reasons may be eligible for up to 12 weeks of unpaid leave during any twelve-month period. Employees must give 30 days notice to their immediate supervisor of need for unpaid leave when leave is foreseeable for birth, placement, foster care, or planned medical treatment. If 30 days' notice is not practicable, notice must be given "as soon as practicable," meaning one or two

7

---

ing calendar year. Anyone hired during June or July will have 3 days which they may take any time in the following calendar year. Any one hired in August or September will have 2 days which they may take any time in the following calendar year. Anyone hired in October or November will have 1 day which they may take any time in the following calendar year. Anyone hired in December will not have any vacation until January 1st of the second year. Vacation time will not be earned during leave of absence except military leave of absence. (See individual leave of absence policies for more information.)

Paid vacation time can be used in minimum increments of one day. To take vacation, employees should request advance approval from their supervisors at least two weeks prior to taking vacation time. Requests will be reviewed based on a number of factors, including business needs and staffing requirements.

Upon termination of employment, employees will be paid for unused vacation time that has been earned through the last day of work. (However, if The Merchants Company, in its sole discretion, terminated employment for cause, or if an employee does not give a two week notice, forfeiture of unused vacation time may result.)

## LEGAL HOLIDAYS

The Merchants Company will grant holiday time off to all eligible employees, regular full-time and regular part-time, on the holidays listed below:

New Years Day (January 1)
Memorial Day
Independence Day (July 4)
Labor Day (first Monday in September)
Thanksgiving (fourth Thursday in November)
Christmas (December 25)

To be eligible for holiday pay, nonexempt employees must work the last scheduled day immediately proceeding and the first scheduled day immediately following the holiday. If the day before or after holiday is a scheduled day off Branch Manager can approve pay for holiday.

6

working days. Requests covered by the Family and Medical Leave Act will be administered in accordance with the terms of such act.

## BENEFIT PROGRAM PARTICIPATION

Employees on approved leave of absence under any of the foregoing provisions may continue to be covered by The Merchants Company's health and life insurance plans, provided that any insurance premiums or contributions due from the employee are kept current during the approved leave.

## LEAVE OF ABSENCE

The Merchants Company provides medical leaves of absence without pay to eligible employees who are temporarily unable to work due to a medical disability, up to a maximum of 90 calendar days every two years.

A military leave of absence will be granted to employees to attend scheduled drills or training, or if called to active duty with the U.S. Armed Services. The leave will be unpaid. However, employees may use any accrued vacation time off for the absence.

## WAGES AND SALARIES

Salespersons and nonexempt employees are paid weekly every Friday for the week ending on the previous Saturday at midnight. EXEMPT employees are paid semi-monthly on the 15th and LAST day of the month. Each paycheck will include earnings for all work performed through the end of the previous payroll period.

In the event that a regularly scheduled payday falls on a day off (e.g., a weekend or holiday), employees will receive pay on the last day of work before the regularly scheduled payday.

8

## PAY DEDUCTIONS AND SETOFFS

The law requires that The Merchants Company make certain deductions from every employee's compensation. Among these are applicable federal, state, and local income taxes. The Merchants Company also must deduct Social Security taxes on each employee's earnings up to a specified limit that is called the Social Security "wage base." The Merchants Company matches the amount of Social Security taxes paid by each employee.

The Merchants Company offers programs and benefits beyond those required by law. Eligible employees may voluntarily authorize deductions from their paychecks to cover the cost of participation in these programs.

Pay setoffs are pay deductions taken by The Merchants Company, usually to help pay off a debt or obligation to The Merchants Company or others.

If you have questions concerning why deductions were made from your paycheck, or how they were calculated, your supervisor can assist in having your questions answered.

## REST AND MEAL PERIODS

Each workday, nonexempt employees are provided with two rest periods of 15 minutes in length. Since this time is counted and paid as time worked, employees must not be absent from their workstations beyond the allotted rest period time.

All full-time OFFICE employees are provided with one meal period of 60 minutes in length each workday. Eating will not be permitted at desk. Snacks or drinks occasionally will be permitted, but full course meals, such as breakfast or lunch are to be eaten in the designated areas provided. The only item permitted at the receptionist desk in the lobby will be a drink such as coffee or a soft drink.

All full-time night WAREHOUSE employees will have one meal period of 30 minutes in length each workday. All full-time day WAREHOUSE employees will have one meal period of 60 minutes in length each workday. Supervisors will schedule meal periods to

9

## USE OF E-MAIL AND INTERNET

1. Use of both systems should be for business only. Private use of the Internet or the e-mail system should be done on personal time, not company time. Corresponding with relatives that live at a distance is not prohibited but should be done on personal time.

2. E-mail containing joke material are considered inappropriate and should not be passed around or sent to other parties in or out of the office.

3. Use of company equipment to view, access or distribute pornographic material is strictly forbidden.

4. Employees with access to e-mail must complete an acceptable use policy agreement.

## USE OF PHONE AND MAIL SYSTEMS

Employees will be required to reimburse The Merchants Company for any charges resulting from their personal use of the telephone.

The use of The Merchants Company paid postage for personal correspondence is permitted, if you reimburse THE MERCHANTS COMPANY for postage costs.

## SMOKING

In keeping with The Merchants Company's intent to provide a safe and healthful work environment, smoking is prohibited except in pre-designated areas. Smoking is only allowed on personal time or break time.

This policy applies equally to all employees, customers, and visitors.

11

---

accomm. .te operating requirements. All full-time DRIVER employees will have one meal period of 30 minutes in length each workday. It will be up to the Driver as to what time of day he takes it.

Employees will be relieved of all active responsibilities and restrictions during meal periods and will not be compensated for that time.

## SAFETY

SAFETY IS EVERYBODY'S BUSINESS! Make everyday a safe day.

To provide a safe and healthful work environment for employees, customers, and visitors, The Merchants Company has established a workplace safety program. This program is a top priority for The Merchants Company. The Safety Director has responsibility for implementing, administering, and evaluating the safety program. Its success depends on the alertness and personal commitment of all.

The Merchants Company provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, memos, or other written communications.

Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment. Two (2) worker's compensation incidents that are the employee's fault results in a 3-day suspension without pay. Three (3) worker's compensation incidents that are the employee's fault result in termination.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the Safety Director or the appropriate supervisor. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

10

# PROGRESSIVE DISCIPLINE POLICY

The purpose of this policy is to state The Merchants Company's position on administering equitable and consistent discipline for unsatisfactory conduct in the work place. The best disciplinary measure is the one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.

The Merchants Company's own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.

Disciplinary action may call for any of four steps – verbal warnings, written warnings, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of occurrences. There may be circumstances when one or more steps are bypassed.

Progressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal or written warning; a second offense may be followed by a written warning or suspension; and still another offense may then lead to termination of employment. The Merchants Company recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or in extreme situations, termination of employment, without going through the usual progressive discipline steps.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both employee and The Merchants Company.

12

# ATTENDANCE AND PUNCTUALITY

It is expected that all employees report to work every workday, and it is also expected that they report to work at the scheduled reporting time.

The Merchants Company also realizes that at times employees will not be able to work because of illness or injury or will be late for some unforeseen reason.

When employees are going to be late or absent, it is their responsibility to call in **personally** and report the reason to their immediate supervisor. If an employee needs to leave early, they must notify their supervisor.

Excess or continued tardiness, early departures and absenteeism can result in disciplinary action up to and including discharge, based upon the following guidelines.

Employee's absences during probationary period:

1st absence – verbal warning
2nd absence – written notice
3rd absence – termination

Full time or part time employee's tardies, early departures and absences in a rolling calendar year. Example: Occurrence in June 2001 would drop off in June 2002. Absences will be treated separately for early departures and tardies.

1 occurrence – verbal warning
2-3 occurrences – written warning
4 occurrences – 3-day suspension
5 occurrences – termination

If an employee fails to call his/her supervisor for two consecutive days, the employee will be considered to have voluntarily quit.

13

# EMPLOYEE CONDUCT AND WORK RULES

To assure orderly operations and provide the best possible work environment, The Merchants Company's expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment.

- Theft or inappropriate removal or possession of property
- Falsification of time keeping records
- Fighting or threatening violence
- Boisterous or disruptive activity
- Negligence or improper conduct leading to damage of employer owned or customer-owned property
- Insubordination or other disrespectful conduct
- Violation of safety or health rules
- Smoking in prohibited areas
- Sexual or other unlawful harassment
- Possession of dangerous or unauthorized materials, such as explosives or firearms
- Excessive absenteeism or any absences without notice
- Unauthorized use of telephones, mail system, or other employer owned equipment
- Unauthorized disclosure of business "secrets" or confidential information
- Violation of personnel policies
- Distribution of pornographic materials
- Unsatisfactory performance or conduct

14

# SEXUAL HARASSMENT POLICY

The Merchants Company believes sexual harassment is a form of employee misconduct, which undermines the integrity of the employment relationship. It is the policy of The Merchants Company that sexual harassment will not be tolerated. Violators of this policy are subject to severe disciplines, up to and including discharge of the offending employee or employees.

Sexual harassment occurs when sexual advances, request for sexual favors, or any conduct of a sexual nature is made a condition of employment, results in advantages if agreed to or losses if rejected, interferes with job performance, or results in a hostile, intimidating or offensive work environment. The Merchants Company's expressly prohibits sexual harassment of any nature.

Any complaints or inquires regarding sexual harassment should be brought to the immediate attention of the Human Resources Department or the appropriate Supervisor and the company will fully investigate such claims promptly, without regard to the identities or positions held by either the complaining employee or the employee charged with the sexual harassment. If for any reason an employee wishes to complain or inquire regarding sexual harassment but feels it would not be appropriate to raise such issues with the Human Resources Department or Supervisor, such employee may inquire or complain to any management level employee of the company, and such inquires or complaints will receive the same prompt investigation.

Employees will not be disciplined or discriminated against in any way for sexual harassment inquiries or complaints made in good faith.

15

# DRUG AND ALCOHOL POLICY

Employees are The Merchants Company's greatest assets. The Merchants Company loses when a valued employee is hurt or must be terminated for drug abuse. To protect the reputation of the Company as a good corporate citizen, drug trafficking or use by employees cannot be tolerated.

The illegal use, possessions of, or trafficking in illegal drugs or controlled substances (drugs) on the job or on the Company's property (owned or leased) is a violation of federal law, as well as against the policies of the company. It is an offense which can lead to dismissal. The consumption of alcoholic beverages by employees during the workday shall constitute grounds for disciplinary action, which may include suspension and/or dismissal.

## PERSONAL APPEARANCE

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image The Merchants Company presents to customers and visitors.

During business hours, employees are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Employees who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, employees will not be compensated for the time away from work.

The following will apply to all employees:

1. All wearing apparel must be neat and clean, whether it is required uniform or otherwise.

2. All shirttails must be worn inside trousers.

3. If an employee has a beard, it must be kept neatly trimmed and clean. If an employee has long hair, it must be kept clean.

4. Every employee should realize the importance of personal hygiene, since we are handling and selling food product. Body odors, dirty hands, faces, even fingernails, can be an indicator of

16

the quality of our products. Personal pride alon... ...ould prevent any of these from reflecting on our product. Extreme care should be taken to prevent such.

## UNIFORMS

The following will apply to Drivers, Warehouse and Shipping Personnel:

1. Delivery Drivers must wear The Merchants Company uniform shirts during work hours.

2. Shoes should be a dress or work shoe. Certain canvas shoes are acceptable if made on the order of a work shoe. Tennis shoes, sneakers, track shoes, etc., are not permissible.

3. Shoes, like uniforms should be clean.

4. Employees who prefer to wear caps, should wear Merchants Company Caps.

## OFFICE DRESS CODE

The following will not be permitted as office attire:

1. Midriff tops or tops that do not meet your pants or shirt.

2. Shorts (Professional Business Skort Sets are okay)

3. T-shirts (with or without writings or slogans)

4. Tennis Shoes

5. Shirts with no collar (Men)

6. Blue Jeans

Friday has usually been a relaxed day in the office and will continue to be. Neatness is still required. Blue jeans may be worn on Fridays only as long as they are neat in appearance.

17

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between The Merchants Company and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at The Merchants Company's sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED THE MERCHANTS COMPANY HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT PERSONNEL MANAGER LOCATED IN THE HATTIESBURG OFFICE.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____

EMPLOYEE SIGNATURE

_____

WITNESSED BY

8/01/02

19

18

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED MERCHANTS FOODSERVICE HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT HUMAN RESOURCES LOCATED IN THE HATTIESBURG OFFICE AT 601-584-4046.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____
EMPLOYEE SIGNATURE

_____
WITNESSED BY

_____
DATE

*1-27-05*

DEFENDANT'S
EXHIBIT
16

1/01/05

23



# MERCHANTS FOODSERVICE

**Serving Your Favorite Restaurants!**

# EMPLOYEE HANDBOOK

## January 1, 2005

www.merchantsfoodservice.com



DEFENDANT'S EXHIBIT

17

# INTRODUCTION

This handbook is designed to acquaint you with Merchants Foodservice (hereinafter referred to as "Merchants" and/or the "Company") and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. This handbook will serve as a guideline for decision-making. Therefore, you should read, understand, and comply with all provisions of the handbook.

No employee handbook can anticipate every circumstance or question about policy. As Merchants continues to grow, the need may arise to change policies described in the handbook. Therefore, Merchants reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. Employees will be notified of such changes as they occur.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the President of Merchants.

1

# EQUAL EMPLOYMENT OPPORTUNITY

Merchants is an Equal Employment Opportunity Employer. The Company affords equal employment opportunity in all of our employment practices, including the selection, hiring, promotion, transfer and compensation of all qualified applicants and employees without regard to race, color, religion, sex, national origin, age, marital status, citizenship status, disability, or any other protected status in accordance with the requirements of all federal, state, and local laws. Merchants expects every employee and manager to reflect the spirit of this commitment and philosophy with our fellow employees, our customers and our vendors.

# EMPLOYMENT AND PERSONNEL RECORDS

An employment and personnel record is maintained for each employee. All new employees must complete the necessary personnel forms in the personnel office before starting work.

To insure your receiving the benefits to which you are entitled under all conditions of employment, it is important your records be kept up-to-date at all times. If there is a change in your marital status, number of dependents, address, telephone number, insurance beneficiary or legal name, please notify Human Resources in writing.

3

# EMPLOYEE RELATIONS PHILOSOPHY

Merchants is committed to achieving outstanding operating results. We believe these results can best be achieved by:

- Providing employees with the opportunity to succeed

- Providing employees with the tools and resources necessary to complete their jobs

- Managing employees fairly and impartially

- Requiring employees to be accountable for their own success

The Company places a high value on the desire to work, on the ability to produce the desired results with efficiency and high quality, and on the willingness of employees to accept responsibility for their own success.

# EMPLOYMENT AT-WILL

It is the Company's policy that all employees are employed at the will of the Company for an indefinite period. Merchants may terminate the employment relationship at any time, for any reason, with or without notice or cause. Employees may resign from the Company at any time, for any reason, and with or without notice. Employment with the Company does not constitute a contractual relationship and may be terminated according to applicable local, state and federal laws.

Completion of the ninety (90) day introductory period does not change the employee's status as an at-will employee or in any way restrict the Company's right to terminate such an employee or change its terms of employment.

2

# ...MPLOYMENT STATUS CATEGORIES

Merchant's employees are categorized into a particular status to define their job and the type of work that they perform. These statuses determine several important performance criteria (e.g., benefit eligibility, etc.). Merchant's employees are classified in *one of* the following categories:

- **Exempt Employee** – a salaried employee who is not subject to the overtime provisions of the *Federal Fair Labor Standards Act of 1938*, as amended.

- **Non-Exempt Employee** – an hourly employee who is eligible to be paid for overtime pay hours worked in excess of 40 hours per week and whose overtime pay is calculated at one and a half times their regular hourly rate ("time-and-a-half").

  Note: Overtime pay provisions may vary due to state laws.

- **Regular Full-time Employee** – An employee who is normally scheduled to work forty (40) or more hours a week. Regular Full Time Employees are eligible for all Company benefits.

- **Regular Part-Time Employee** – an employee who is normally scheduled to work twenty (20) hours or more per week but not more than forty (40) hours. Regular Part-Time employees may be eligible for some of the Company's benefits.

- **Part-Time Employee** – An employee who is normally scheduled to work less than twenty (20) hours per week. Part-Time Employees are not eligible for Company benefits.

These statuses do not guarantee employment for any specific length of time. Employment is at the mutual consent of the employee and the Company and can be terminated at will by the employee or the Company.

# INTRODUCTORY PERIOD

For every new employee, the first ninety (90) days of employment are an introductory period for both the employee and the Company. During this time, you will have the opportunity to learn about the Company, your job, and your new surroundings. The Company will then evaluate your performance and make a decision concerning your continued employment.

While we are optimistic and hopeful that your time with us will be long and mutually beneficial, it may be that you or the Company will decide during the introductory period that the relationship is not satisfactory. If so, the employee or the Company may terminate the relationship for any reason without prior notice.

# PERFORMANCE EVALUATION

Merchants believes that every employee should receive objective, accurate feedback regarding their job performance. Performance reviews are one the tools the Company uses to formalize and document employee performance. The employee's annual evaluation provides a vehicle for effective communication between the employee and management.

# EMPLOYMENT TERMINATION AND RESIGNATION

It is the Company's policy that all employees are employed at the will of the Company for an indefinite period. Merchants or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

In cases of resignation, the employee must give two weeks notice if they expect to receive severance benefits. Vacation time may not be used to advance the termination date. On the last work day employees must return all Company property in their possession to the supervisor.

## EM.  OYMENT BENEFITS AND ALLOWANCES

Eligible employees at Merchants are provided a wide range of benefits. Eligibility for these benefits is dependent upon a variety of factors, including but not limited to the employee's classification. A supervisor can identify the programs for which you are eligible. Please contact Human Resources to learn the details of these programs.

The Company reserves the right, in its sole discretion, at any time to change, modify, delete, add, or discontinue without prior notice any of the employee benefits currently being offered to its employees.

## VACATION BENEFITS

Eligible employees (Regular full-time and Regular part-time) will earn and can use vacation time. Vacation time is calculated, as set forth below, based upon the employee's continuous employment with the Company:

```
Upon initial eligibility..........5 days
After 3 years ................10 days
After 15 years ...............15 days
```

The length of eligible service is based on the number of years you are employed with Merchants. With Merchants, you will be eligible to take vacation time on or after January 1st following date of employment. Anyone hired before April 1st will have a full 5 days vacation which they may take any time in the following calendar year. Anyone hired during June or July will have 3 days which they may take any time in the following calendar year. Any one hired in August or September will have 2 days which they may take any time in the following calendar year. Anyone hired in October or November will have 1 day which they may take any time in the following calendar year. Anyone hired in December will not have any vacation until January 1st of the second year. Vacation time will not be earned during leave of absence except military leave of absence. (See individual leave of absence policies for more information.)

Paid vacation time is encouraged to be used in wee.    ncrements, however, may be used in minimum increments of one day. To take vacation, employees should request advance approval from their supervisors. Requests will be reviewed based on a number of factors, including business needs and staffing requirements.

Upon termination of employment, employees will be paid for unused vacation time that has been earned through the last day of work.  (However, if Merchants, in its sole discretion, terminated employment for cause, or if an employee does not give a two-week notice, forfeiture of unused vacation time may result.)

## LEGAL HOLIDAYS

Merchants will grant holiday time off to all eligible employees (regular full-time and regular part-time) on the holidays listed below:

Effective January 1, 2005:

• New Years Day (January 1)

• Memorial Day (Last Monday in May)

• Independence Day (July 4)

• Thanksgiving (fourth Thursday in November)

• Christmas (2 days, as scheduled by your shift supervisor)

To be eligible for holiday pay, nonexempt employees must work the last scheduled day immediately proceeding and the first scheduled day immediately following the holiday. If the day before or after holiday is a scheduled day off your General Manager can approve pay for holiday.

## BEREAVEMENT LEAVE

An eligible employee, (Regular full-time and Regular part-time) may be granted up to two days, at the time of the death, of paid bereavement leave in case of death in the immediate family. Merchants defines "immediate family" as the employee's spouse, parent, child, sibling; the employee's spouse's parent, child or sibling; the employee's child's spouse; grandparents or grandchildren.

7

6

## MILY AND MEDICAL LEAVE POLICY

### GENERAL STATEMENT

The Company's Family and Medical Leave policy is intended to provide employees a greater opportunity to balance their work and family responsibilities. Under the Family and Medical Leave Act ("FMLA"), all eligible employees are entitled to 12 weeks of leave during a defined 12 month period. In order to be eligible for FMLA leave, the employee must have worked for the Company for at least 12 months since the most recent hire date, and the employee must have worked at least 1,250 hours during the preceding 12-month period. In some situations, employees may use the FMLA leave intermittently (e.g., take a day or partial day periodically when needed during the year) to reduce the work week or work day, resulting in a reduced schedule. In all cases, the FMLA leave may not exceed a total of 12 weeks over a 12-month period. Intermittent or reduced leave under the FMLA require prior approval by Human Resources.

### TYPES OF LEAVE COVERED

In order to qualify as FMLA leave under this policy, the employee must be taking leave for one of the following reasons:

1. The birth and care of a newborn child;

2. The placement of a child for adoption or foster care;

3. The care for a spouse, child, or parent with a serious health condition; or

4. The employee's own serious health condition renders him or her incapable of performing the essential functions of the job.

Employees with questions about what illnesses or situations are covered under this FMLA policy should contact Human Resources.

### APPLICATION FOR LEAVE

Employees requesting leave must complete a "Request for Family and Medical Leave" form and return it to Human Resources. The completed application must include the reason for and expected duration of the requested leave.

8

### NOTICE OF LEAVE

An employee intending to take Family and Medical Leave because of an expected birth or placement of a child, or because of a planned medical treatment, must submit an application for leave at least 30 days before the leave is to begin. If a 30-day notice is not possible, an employee must give notice to Human Resources as soon as practical.

### MEDICAL CERTIFICATION OF LEAVE

An application for Family and Medical Leave must also be accompanied by a "Physician's Certification Statement" form completed by the applicable health care provider. The certification must state the date on which the health condition commenced, the probable duration of the condition, and the appropriate medical facts regarding the condition.

Failure to comply with the medical certification requirements of this policy may result in the denial of FMLA leave request. Employees must provide certification no later than 15 days after being requested. The Company may request that additional certification be provided every 30 days during the leave period.

### RETURN TO WORK

After the 12-week leave period allotted under the FMLA expires, the employee will be expected to return to work. Merchants Foodservice may require the employee to provide medical certification that the employee is able to perform the essential functions of his or her job at this time. If the employee does not return to work upon expiration of their FMLA leave, his/her re-employment rights under the FMLA terminate.

9

# MILITARY LEAVE OF ABSENCE

A military leave of absence will be granted to employees to attend scheduled drills or training, or if called to active duty with the U.S. Armed Services. At the completion of the military leave period, the employee may return to the Company, subject to the requirements set forth in the Uniformed Services Employment and Reemployment Act ("USERRA"). If you have questions, please contact Human Resources.

# WAGES AND SALARIES

Salespersons and nonexempt employees are paid weekly every Friday for the week ending on the previous Saturday at midnight. EXEMPT employees are paid semi-monthly on the 15th and last day of the month. Each paycheck will include earnings for all work performed through the end of the previous payroll period.

In the event that a regularly scheduled payday falls on a day off (e.g., a weekend or holiday), employees will receive pay on the last day of work before the regularly scheduled payday.

10

# REST AND MEAL PERIODS

Each workday, nonexempt employees are provided with two rest periods of 15 minutes in length. The shift supervisor determines the specific time for the rest period. Since this time is counted and paid as time worked, employees must not be absent from their workstations beyond the allotted rest period time.

The meal period time allotments are as follows:

## OFFICE

Full time employees are provided with one meal period of sixty (60) minutes each workday. Eating full course meals, such as breakfast or lunch, is not permitted at an employee's workstation. These meals are to be eaten in the designated areas provided. Snacks and/or drinks are occasionally permitted at an employee's workstation.

## WAREHOUSE

Full time night employees will have one meal period of thirty (30) minutes each workday.

Full time day employees will have one meal period of thirty (30) minutes each workday. Supervisors will schedule meal periods to accommodate operating requirements.

## TRANSPORTATION

Full time driver will have one meal period of thirty (30) minutes each workday. It will be up to the driver as to when he/she take this period.

Employees will be relieved of all active responsibilities and restrictions during meal periods and will not be compensated for that time.

11

## SAFETY

SAFETY IS EVERYBODY'S BUSINESS! Make everyday a safe day.

To provide a safe and healthful work environment for employees, customers, and visitors, Merchants has established a workplace safety program. Its success depends on the alertness and personal commitment of all.

Merchants provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, memos, or other written communications.

All employees should observe all posted safety rules, adhere to all safety instructions provided by your supervisor and use safety equipment where required. Your workplace should be kept neat, clean and orderly. Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify an appropriate supervisor or Human Resources. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

12

## USE OF THE COMPUTER SYSTEM NETWORK

The Company's computer system and e-mail network are the property of the Company and are only to be used for business purposes. Examples of prohibited, non-business purposes include, but are not limited to:

- Use of the Company's computer system to write personal letters, resumes or other documents unrelated to the Company's business

- Use of the Company's computer system to run computer games or other personal software

- Use of the Company's computer system to copy software

- Use of the Company's e-mail network as a forum for gossip or personal communications

- Use of the Company's e-mail network to convey insensitive, improper, derogatory, offensive, insulting, threatening, or harassing language and remarks

All information, data and communications prepared or stored in the computer system or on the e-mail network are assumed to be business-related. The Company reserves the right to monitor, and will periodically monitor, the computer system and e-mail network to ensure compliance with this policy and to maintain efficient use of the computer system and e-mail network. Employees should not consider any materials stored in the computer system or any e-mail communications to be private.

## USE OF PHONE AND MAIL SYSTEMS

Employees will be required to reimburse Merchants for any charges resulting from their personal use of the telephone.

The use of the Company's paid postage for personal correspondence is permitted, if you reimburse Merchants for postage costs.

13

# ATTENDANCE AND PUNCTUALITY

It is expected that all employees report to work every workday, and it is also expected that they report to work at the scheduled reporting time.

Merchants also realizes that at times employees will not be able to work because of illness or injury or will be late for some unforeseen reason.

When employees are going to be late or absent, it is their responsibility to personally call the Company and report the reason to their immediate supervisor. Certain special circumstances may exist that prevent an employee to personally call their immediate supervisor. In these special instances, the employee should make sure someone notifies his or her immediate supervisor of the absence. If an employee needs to leave early, they must notify their supervisor prior to leaving the work premises.

Excess or continued tardiness, early departures and absenteeism can result in disciplinary action up to and including discharge, based upon the following guidelines.

Employee's absences during introductory period:

      1st absence – verbal warning
      2nd absence – written notice
      3rd absence – termination

Full time or part time employee's tardies, early departures and absences are calculated in a rolling calendar year. Example: Occurrence in November 2004 would drop off in November 2005. Absences will be treated separately from early departures and tardies.

      1st occurrence – verbal warning
      2 occurrences – written warning
      3 occurrences – 3-day suspension
      4 occurrences – termination

If an employee fails to call his/her supervisor for two consecutive days, the employee will be considered to have voluntarily quit.

15

# SMOKING

In keeping with the Company's intent to provide a safe and healthful work environment, smoking is prohibited except in pre-designated areas. Smoking is only allowed on personal time or break time.

This policy applies equally to all employees, customers, and visitors.

# PROGRESSIVE DISCIPLINE POLICY

Merchants recognizes that its own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.

Disciplinary action may call for any of four steps – verbal warnings, written warnings, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of occurrences.

Progressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal or written warning; a second offense may be followed by a written warning or suspension; and still another offense may then lead to termination of employment. Merchants recognizes that there are certain types of employee problems that are serious enough to justify either a suspension or termination of employment, without going through the usual progressive discipline steps.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both employee and Merchants.

14

# EMPLOYEE CONDUCT AND WORK RULES

To assure orderly operations and provide the best possible work environment, Merchants expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment. Please note that this is not an exhaustive list.

- Theft or inappropriate removal or possession of property
- Falsification of time keeping records
- Fighting or threatening violence
- Boisterous or disruptive activity
- Negligence or improper conduct leading to damage of employer owned or customer-owned property
- Insubordination or other disrespectful conduct
- Violation of safety or health rules
- Smoking in prohibited areas
- Sexual or other unlawful harassment
- Possession of dangerous or unauthorized materials, such as explosives or firearms
- Excessive absenteeism or any absences without notice
- Unauthorized use of telephones, mail system, or other employer owned equipment
- Unauthorized disclosure of business "secrets" or confidential information
- Violation of personnel policies
- Distribution of pornographic materials
- Unsatisfactory performance or conduct

16

# NO HARASSMENT

Merchants does not and will not tolerate any type of harassment of our employees, applicants, customers, or vendors. The term "harassment" includes, but is not limited to, slurs, jokes, and other verbal, graphic, physical, or electronic (e-mail) conduct relating to an individual's race, color, gender, religion, national origin, citizenship, age, or disability. "Harassment" also includes sexual advances, requests for sexual favors, offensive touching, and other verbal, graphic, physical, or electronic (e-mail) actions of a sexual nature involving either members of the opposite or the same sex.

Note: Employees who violate this policy are subject to disciplinary action up to, and including the termination of their employment.

Note: Even if an employee does not complain, it is a manager's responsibility to investigate any conduct that is reported to the manager, or of which the manager is aware, if there is any possibility that this conduct violates our policy. All such incidents should be immediately reported to Human Resources.

If an employee feels that they are being harassed in any way by an employee, manager, customer, or vendor, they must immediately make their feelings known to their manager or Human Resources:

- The matter will be thoroughly investigated, and where appropriate, disciplinary action will be taken.
- If the employee does not feel they can discuss the matter with their manager, or if they are not satisfied with the way the complaint has been handled, they may contact Human Resources.
- The employee will not be penalized in any way for reporting such conduct concerning themselves or another person.

Employees should not assume that the Company is aware of the problem. It is the employee's responsibility to bring complaints and concerns to the attention of management so that they may be resolved. Note the following:

17

## WORKPLACE VIOLENCE

Merchants recognizes that workplace violence is a growing concern across the country. The Company is committed to providing a safe, violence-free workplace and strictly prohibits employees, consultants, customers, visitors or anyone else on Company property or engaging in a Company-related activity from behaving in a violent or threatening manner.

Workplace violence includes:

- Threats of any kind

- Threatening, physically aggressive, or violent behavior (e.g., intimidation of or attempts to instill fear in others, etc.)

- Other behavior that suggests a propensity towards violence, including belligerent speech, excessive arguing or swearing, sabotage, or threats of sabotage of Company property, or a refusal to follow Company policies and procedures

- Defacing Company property or causing physical damage to the facilities

- Bringing weapons or firearms of any kind on Company property, or while conducting Company business

Employees are required to report any instances of workplace violence to their supervisors or Human Resources. All reports will be taken seriously and will be promptly and thoroughly investigated.

19

- The C...pany understands that there are issues that affect an employee's work environment that they may not be comfortable reporting to their manager. For these issues, employees can report these issues directly to Human Resources or to any other manager at the Company.

- Managers who receive complaints must immediately inform Human Resources.

- Human Resources will investigate the allegation and take the appropriate action to protect the rights of the charging employee and the charged employee, and to carry out the legal obligations of Merchants.

- Investigations will be conducted as quickly as possible and all concerned parties will be notified of the findings in writing.

If an investigation confirms that harassment has occurred, Merchants will take corrective action, up to and including the immediate termination of the offending employee(s). Findings of assault or the threat of assault will result in immediate termination.

Note that certain information, including the identity of principle parties and specific allegations raised, will likely be disclosed during the course of investigation to potential witnesses, Human Resources Department employees, and Merchants management team.

Note: Merchants will not tolerate retaliation against any employee for cooperating in an investigation or for reporting an incident of harassment.

State laws vary with regard to posting, training, and reporting avenues for harassment. If you have any questions regarding these issues in your area, please contact Human Resources.

18

# DRUG AND ALCOHOL POLICY

Merchants' is concerned about the effect of illegal drug use and the abuse of alcohol (commonly defined as "substance abuse") upon the health and safety of its employees. Substance abuse leads to increased accidents, theft, unnecessary medical claims, and inattention to work duties and responsibilities. Substance abuse also leads to the destruction of an employee's health and adversely affects their personal life.

Merchants' employees are prohibited from possessing, using, selling, or purchasing any alcoholic beverages or other mind-altering substances on Company property. In light of these concerns, the Company intends to maintain a work place that is free of the problems associated with substance abuse. The Company also encourages the rehabilitation of employees and applicants with problems associated with the abuse of drugs and alcohol.

All drivers must comply with the Federal Motor Carrier Safety Regulations.

# PERSONAL APPEARANCE

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image Merchants presents to customers and visitors.

During business hours, employees are expected to present a clean and neat appearance and to dress according to the requirements of their positions. Employees who appear for work inappropriately dressed will be sent home and directed to return to work in proper attire. Under such circumstances, employees will not be compensated for the time away from work.

The following will apply to all employees:

1. All wearing apparel must be neat and clean, whether it is required uniform or otherwise.

2. All shirttails must be worn inside trousers.

3. If an employee has a beard, it must be kept neatly trimmed and clean. If an employee has long hair, it must be kept clean.

4. Every employee should realize the importance of personal hygiene, since we are handling and selling food product. Body odors, dirty hands, faces, even fingernails, can be an indicator of the quality of our products. Personal pride alone should prevent any of these from reflecting on our product. Extreme care should be taken to prevent such.

## UNIFORMS

The following will apply to Drivers, Warehouse and Shipping Personnel:

1. Delivery Drivers must wear Merchants uniform shirts during work hours.

2. Shoes should be a dress or work shoe. Certain canvas shoes are acceptable if made on the order of a work shoe. Tennis shoes, sneakers, track shoes, etc., are not permissible.

3. Shoes, like uniforms should be clean.

4. Employees who prefer to wear caps, should wear Merchants Caps.

## OFFICE DRESS CODE

The following will not be permitted as office attire:

1. Midriff tops or tops that do not meet your pants or skirt.

2. Shorts (Professional Business Skort Sets are okay)

3. T-shirts (with or without writings or slogans)

4. Tennis Shoes

5. Shirts with no collar (Men)

6. Blue Jeans

Friday has usually been a relaxed day in the office and will continue to be. Neatness is still required. Blue jeans may be worn on Fridays only as long as they are neat in appearance.

22

---

Policies set forth in this handbook are not intended to ...eate a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Merchants and any of its employees. The provisions of the handbook have been developed at the discretion of management and may be amended or canceled at any time, at Merchants' sole discretion.

**I ACKNOWLEDGE THAT I HAVE RECEIVED MERCHANTS FOODSERVICE HANDBOOK AND FURTHER ACKNOWLEDGE THE IF I WISH ADDITIONAL INFORMATION OR DETAILS OF PERSONNEL POLICIES I HAVE THE FOLLOWING OPTIONS:**

1. CONTACT HUMAN RESOURCES LOCATED IN THE HATTIES-BURG OFFICE AT 601-584-4046.

2. REFER TO PRINTED MANUAL POSTED ON BULLETIN BOARD IN THE CENTRAL OFFICE AND / OR THE BRANCH OFFICE BULLETIN BOARDS.

_____

EMPLOYEE SIGNATURE

_____

WITNESSED BY

_____

DATE

23

1/01/05

04/03/2007  16:21    2562342044                    DERRICK BLYTHE                    PAGE  06

Page 1 of 1

## Steve Adams

| | |
|---|---|
| **From:** | Steve Adams |
| **Sent:** | Thursday, May 26, 2005 11:03 AM |
| **To:** | Jimmy Triggs; Merle Rester |
| **Cc:** | Hal Henson |
| **Subject:** | Equipment Needs |

Jimmy,

I sent you the information (Interdepartmental Mail) from Carolina Handling on what has been done so far and what remains to be done on our equipment. As we discussed yesterday, some items can wait to be repaired, while all safety issues need to be addressed ASAP. However, when I signed the write-ups, the Safety Issues are high-lighted in red and I had to initial that I was made aware of them. Since I am not the person responsible for making the call on these expenditures, I need you to instruct me on how to proceed in the continued use or non-use of these pieces of equipment. Please respond.

Thanks,
Steve

**DEFENDANT'S EXHIBIT**

18



7/7/2005

DEFENDANT'S EXHIBIT

19

```
DATE 7/01/2005 10:49 AM                      MERCHANTS FOODSERVICE                  COMPANY#: 02          PAGE     1
PR0R78                              EMPLOYEE TURNOVER ANALYSIS REPORT                                    OS.Inc1
USER: MELANIE                            FROM 1/01/2003 TO 6/30/2005
```

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|---|

**DIV :**

**DEPT#- 12719 Receiving**

| EMPLOYEE NUMBER | EMPLOYEE NAME | TITLE | EMPLOYEE STATUS | DATE | | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16076 | WILLIAM P CARTER | BUILDING MAINT. | FULL-TIME | 7/16/03 | H | 6/15/04 | 12 | FIRED-ATTENDANCE |
| 16778 | RANDY M DAVIS | LIFT-FIR | FULL-TIME | 2/18/05 | H | 3/23/05 | 1 | QUIT-NO NOTICE |
| 19702 | CASSAUNDRA S DENTON | RECCLERK | FULL-TIME | 7/22/02 | H | 12/12/03 | 17 | FIRED-ATTENDANCE |
| 16792 | TERRI E DEVER | RECEIVING | FULL-TIME | 2/25/05 | H | 5/25/05 | 3 | QUIT-NO NOTICE |
| 16342 | ANGELIA M DIXON | INV CONTROL CLE | FULL-TIME | 2/20/04 | H | 3/04/05 | 13 | RESIGNED W/NOTICE |
| 16760 | BRADFORD H EDWARDS | RETURNS | FULL-TIME | 1/30/05 | H | 2/20/05 | 1 | QUIT-NO NOTICE |
| 16630 | JERRY B ESTRADA | RECEIVING | FULL-TIME | 10/05/04 | H | 3/18/05 | 6 | RESIGNED W/NOTICE |
| 16077 | DAVE P GALASSI | RECEIVING | FULL-TIME | 7/16/03 | H | 9/07/03 | 2 | QUIT NO CALL/NO SHOW |
| 19617 | LLOYD C GODWIN | DAY SUP | FULL-TIME | 10/02/01 | H | 7/23/03 | 22 | FIRED |
| 16770 | STEPHANIE M GRAY | LIFT-FIR | FULL-TIME | 2/08/05 | H | 2/14/05 | 0 | QUIT-NO NOTICE |
| 16848 | CYNTHIA M HATCHER | LIFT-FRZ | FULL-TIME | 4/06/05 | H | 5/23/05 | 1 | FIRED-ATTENDANCE |
| 15946 | YVONNE HUGGINS | RECEIVING | FULL-TIME | 2/10/03 | H | 3/04/03 | 1 | FIRED-ATTENDANCE |
| 19713 | TRAVIS W JACKSON | BLDMAINT | FULL-TIME | 8/28/02 | H | 4/28/03 | 9 | QUIT NO CALL/NO SHOW |
| 16078 | THOMAS B KELLEY | RECEIVING | FULL-TIME | 7/16/03 | H | 1/03/05 | 19 | QUIT-NO NOTICE |
| 15996 | TERRANCE KENNEDY | RECEIVING | FULL-TIME | 4/07/03 | H | 7/20/04 | 15 | |
| 19639 | SENECA KINSEY | TMLDR | FULL-TIME | 11/26/01 | H | 9/16/03 | 23 | TRANSFER TO SALARY |
| 16259 | TRAVIS E MARLER | LIFT-FRZ | FULL-TIME | 12/08/03 | H | 1/23/04 | 2 | QUIT-NO NOTICE |
| 16144 | JERIE L MCDANIEL | RECEIVING | FULL-TIME | 9/15/03 | H | 11/13/03 | 2 | FIRED-ATTENDANCE |
| 26584 | DANTE G MILLINER | LIFT-DRY | FULL-TIME | 9/07/04 | H | 3/02/05 | 7 | QUIT-NO NOTICE |
| 16814 | MATTHEW C MORGAN | LIFT-DRY | FULL-TIME | 3/15/05 | H | 5/23/05 | 2 | RESIGNED W/NOTICE |
| 16430 | CHRISTOPHER H POWELL | RETURNS | FULL-TIME | 6/21/04 | H | 1/07/05 | 8 | RESIGNED W/NOTICE |
| 19696 | LINDA S REEVES | RECEIVING | FULL-TIME | 7/09/02 | H | 1/30/03 | 7 | FIRED-INSUBORDINANT |
| 16085 | CHRISTOPHER E REID | RECEIVING | FULL-TIME | 7/21/03 | H | 11/14/03 | 4 | QUIT-NO NOTICE |

DATE 7/01/2005 10:49 AM
PROR78          USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 2
DS,Inc!

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|

** DIV : 19

DEPT#- 12719 Receiving

| EMPLOYEE NUMBER | EMPLOYEE NAME | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|
| 19608 | DONALD C RUSH | RECEIVING | FULL-TIME | 9/17/01 H | 3/30/03 | 19 | QUIT-NO NOTICE |
| 16596 | EARNEST D SCOTT | DRIVER CHECK IN | FULL-TIME | 9/12/04 H | 6/06/05 | 10 | FIRED-THEFT |
| 16650 | KEVIN D SELIX | LIFT-DRY | FULL-TIME | 10/18/04 H | 1/03/05 | 4 | QUIT-NO NOTICE |
| 16251 | VANESSA N SOWELL | RECEIVING | FULL-TIME | 12/03/03 H | 2/23/05 | 15 | FIRED-ATTENDANCE |
| 16239 | TREMAYNE A STOUDEMIRE | LIFT-DRY | FULL-TIME | 11/18/03 H | 12/15/03 | 1 | FIRED--DRUG SCREEN |
| 16212 | JOHN T TINSLEY JR. | RECEIVING | FULL-TIME | 10/27/03 H | 10/13/04 | 12 | QUIT NO CALL/NO SHOW |
| 16652 | DEFERIO M VARNER | RECEIVING | FULL-TIME | 10/18/04 H | 2/09/05 | 5 | QUIT-NO NOTICE |
| 16331 | CHRISTOPHER WALDEN | FORKLIFT | FULL-TIME | 2/09/04 H | 2/20/04 | 0 | QUIT NO CALL/NO SHOW |
| 16540 | SATACO WARE | SEL-PIR | FULL-TIME | 8/12/04 H | 10/01/04 | 2 | FIRED-ATTENDANCE |
| 16573 | FRANKLIN L WASHINGTON | FORKLIFT | FULL-TIME | 9/02/04 H | 9/14/04 | 0 | QUIT-NO NOTICE |
| 16381 | WENDELL K WRIGHT | LIFT-FRZ | FULL-TIME | 3/29/04 H | 8/27/04 | 5 | RESIGNED W/NOTICE |
| 19559 | RHONDA ZAFFINA | RECCLERK | FULL-TIME | 6/05/01 H | 1/29/03 | 20 | QUIT-NO NOTICE |

** DEPT: 12719 TOTALS ** ACTIVE EMPLOYEES = 15     TERMINATED EMPLOYEES = 35     PERCENT TURNOVER = 233.33 %

** DIV : 19   TOTALS ** ACTIVE EMPLOYEES = 15     TERMINATED EMPLOYEES = 35     PERCENT TURNOVER = 233.33 %

*** COMPANY 02 TOTALS *** ACTIVE EMPLOYEES = 15     TERMINATED EMPLOYEES = 35     PERCENT TURNOVER = 233.33 %

***

(11)

DATE 7/01/2005 10:49 AM
PROR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE        1
GS,Inc1

** DIV :
DEPT#- 13419 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 19715 | AARON T AKERS | | SEL-DRY | FULL-TIME | 8/29/02 H | 5/12/03 | 10 | QUIT NO CALL/NO SHOW |
| 16858 | AGNES E ANELLO | | CHECKER | FULL-TIME | 4/12/05 H | 4/24/05 | 0 | FIRED-ATTENDANCE |
| 19437 | JOSEPH P BARBOUR | | TM LDR | FULL-TIME | 8/15/00 H | 12/31/04 | 52 | TRANSFER TO SALARY |
| 15930 | LEON BARLEY JR. | | LOADER | FULL-TIME | 1/18/03 H | 2/17/03 | 1 | FIRED-ATTENDANCE |
| 16859 | CASSANDRA A BOGAN | | CHECKER | FULL-TIME | 4/12/05 H | 5/24/05 | 1 | QUIT NO CALL/NO SHOW |
| 16050 | CHARLES D BOLDING | | LOADER | FULL-TIME | 7/09/03 H | 8/10/03 | 1 | QUIT NO CALL/NO SHOW |
| 16288 | SOLOMON T BOSTIC | | SEL-FRZ | FULL-TIME | 2/11/04 H | 3/07/04 | 2 | QUIT-NO NOTICE |
| 16404 | MARK A BRADLEY | | SEL-FRZ | FULL-TIME | 4/18/04 H | 5/09/04 | 1 | QUIT-NO NOTICE |
| 19725 | BILLY J BRADSHAW | | SEL-FRZ | FULL-TIME | 9/22/02 H | 1/12/03 | 5 | QUIT-NO NOTICE |
| 16668 | BILLY J BRADSHAW | | SEL-FRZ | FULL-TIME | 10/25/04 H | 12/16/04 | 2 | FIRED-COMPANY POLICY |
| 15977 | JONATHAN L BROWN | | SEL-DRY | FULL-TIME | 3/16/03 H | 4/21/03 | 1 | QUIT NO CALL/NO SHOW |
| 16119 | MARLON K BROWN | | SEL-DRY | FULL-TIME | 8/14/03 H | 1/29/04 | 6 | QUIT NO CALL/NO SHOW |
| 16200 | RONALD D BROWN | | LOADER | FULL-TIME | 10/19/03 H | 10/24/03 | 0 | FIRED-POOR PERFORMAN |
| 16071 | SONYA R BRYANT | | CHECKER | FULL-TIME | 7/14/03 H | 9/05/03 | 2 | RESIGNED W/NOTICE |
| 15907 | MARK A CALLINES | | SEL-DRY | FULL-TIME | 1/05/03 H | 1/31/03 | 0 | QUIT-NO NOTICE |
| 16797 | TERRANCE A CASH | | SEL-FRZ | FULL-TIME | 3/02/05 H | 3/07/05 | 0 | QUIT NO CALL/NO SHOW |
| 16516 | GREGORY L CASON | | SEL-FRZ | FULL-TIME | 7/25/04 H | 8/17/04 | 1 | QUIT NO CALL/NO SHOW |
| 16796 | RICHARD K CHAMBERS | | SEL-FRZ | FULL-TIME | 2/28/05 H | 3/14/05 | 0 | FIRED-ATTENDANCE |
| 16442 | ROBERT L CHANEY, JR | | LOADER | FULL-TIME | 7/01/04 H | 7/08/04 | 0 | FIRED-ATTENDANCE |
| 16720 | WILLIE L CHATTMAN | | LOADER | FULL-TIME | 12/06/04 H | 4/21/05 | 5 | QUIT-NO NOTICE |
| 16222 | WILLIE L CHATTMAN JR. | | LOADER | FULL-TIME | 11/02/03 H | 4/14/04 | 6 | QUIT NO CALL/NO SHOW |
| 16484 | COREY L CHILDERS | | LOADER | FULL-TIME | 7/19/04 H | 9/09/04 | 2 | FIRED-ATTENDANCE |
| 16714 | DANNY C COOPER | | LIFT-FRZ | FULL-TIME | 12/02/04 H | 4/04/05 | 5 | QUIT-NO NOTICE |

```
DATE  7/01/2005 10:49 AM                    MERCHANTS FOODSERVICE              COMPANY#: 02              PAGE    2
PRGR78        USER: MELANIE           EMPLOYEE TURNOVER ANALYSIS REPORT                                 OS.Inc!
                                          FROM 1/01/2003 TO 6/30/2005
```

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYER STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|

**, DIV : 19
DEPT#- 13919 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | TITLE | EMPLOYER STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|
| 16515 | CHARLES E COTTRELL | SEL-FRZ | FULL-TIME | 7/26/04 H | 1/02/05 | 7 | QUIT-NO NOTICE |
| 16070 | CHRISTINE N CRAIG | CHECKER | FULL-TIME | 7/15/03 H | 9/23/03 | 2 | QUIT-NO NOTICE |
| 15912 | DEDERICK A CROOM | SEL-DRY | FULL-TIME | 1/14/05 H | 3/05/05 | 2 | QUIT NO CALL/NO SHOW |
| 16758 | JAMES M DAVIS | SEL-FRZ | FULL-TIME | 1/23/05 H | 2/06/05 | 1 | QUIT-NO NOTICE |
| 16049 | THOMAS C DAVIS | SEL-DRY | FULL-TIME | 7/09/03 H | 10/15/03 | 3 | QUIT-NO NOTICE |
| 16667 | THOMAS C DAVIS | SEL-DRY | FULL-TIME | 10/24/04 H | 2/09/05 | 5 | FIRED-INSUBORDINANT |
| 16817 | THOMAS C DAVIS | SEL-FRZ | FULL-TIME | 3/14/05 H | 6/08/05 | 3 | QUIT-NO NOTICE |
| 19396 | KATHY L DEAVERS | SEL-FRZ | FULL-TIME | 7/09/00 H | 9/25/03 | 38 | QUIT NO CALL/NO SHOW |
| 16177 | WARREN DENNIS | LOADER | FULL-TIME | 10/07/03 H | 11/11/03 | 1 | QUIT-NO NOTICE |
| 16088 | MICHAEL C DERAMUS | SEL-FRZ | FULL-TIME | 7/21/03 H | 8/10/03 | 1 | QUIT NO CALL/NO SHOW |
| 16755 | PHILLIP R DOWNS | LOADER | FULL-TIME | 1/23/05 H | 6/20/05 | 5 | QUIT NO CALL/NO SHOW |
| 16029 | JAMES M DUTTON | SEL-FRZ | FULL-TIME | 6/22/03 H | 8/13/03 | 2 | FIRED-PREV ACCIDENT |
| 16142 | JAMES E EDWARDS | LOADER | FULL-TIME | 9/11/03 H | 10/01/03 | 1 | FIRED-POOR PERFORMAN |
| 16340 | JAMIE L EDWARDS | SEL-DRY | FULL-TIME | 2/18/04 H | 4/04/04 | 2 | QUIT NO CALL/NO SHOW |
| 19744 | MICHAEL W FAY | SHIPCLK | FULL-TIME | 12/01/02 H | 6/10/03 | 7 | QUIT NO CALL/NO SHOW |
| 16407 | ANTROINE L FEAGIN | LOADER | FULL-TIME | 4/20/04 H | 5/31/04 | 1 | FIRED-ATTENDANCE |
| 16256 | GREGORY S FLOYD | LOADER | FULL-TIME | 12/04/03 H | 12/14/03 | 0 | QUIT-NO NOTICE |
| 16763 | JACOB P FOSTER | LOADER | FULL-TIME | 2/01/05 H | 2/24/05 | 0 | FIRED-POOR PERFORMAN |
| 16730 | ADRAIN T FREEMAN | SEL-DRY | FULL-TIME | 12/13/04 H | 1/26/05 | 2 | QUIT-NO NOTICE |
| 16143 | CONSTANCE R FREEMAN | CHECKER | FULL-TIME | 9/09/03 H | 9/15/03 | 0 | QUIT NO CALL/NO SHOW |
| 15994 | JERRY L FULMER | LOADER | FULL-TIME | 3/30/03 H | 6/13/05 | 27 | RESIGNED W/NOTICE |
| 16122 | READIS J GARNER III | SANITATI | FULL-TIME | 8/20/03 H | 2/04/05 | 19 | RESIGNED W/NOTICE |
| 16197 | BRET GILMORE | CHECKER | FULL-TIME | 10/15/03 H | 11/10/03 | 1 | FIRED-ABANDONED JOB |

DATE 7/01/2005 10:49 AM
PROR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 3
OS.Incl

** DIV : 19
DEPT#- 13419 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16079 | HOWARD A GILMORE | | SEL-DRY | FULL-TIME | 7/20/03 H | 7/31/03 | 0 | FIRED-ATTENDANCE |
| 16464 | DANIEL J GLOVER | | LOADER | FULL-TIME | 7/11/04 H | 8/05/04 | 1 | FIRED-POOR PERFORMAN |
| 19695 | IVAN E GORDON | | SEL-DRY | FULL-TIME | 7/08/02 K | 3/09/03 | 9 | FIRED-ATTENDANCE |
| 16158 | MICAH A GRISHAM | | LOADER | FULL-TIME | 9/23/03 K | 11/13/03 | 2 | QUIT-NO NOTICE |
| 16027 | DULCE M GUTIERARZ | | CHECKER | FULL-TIME | 6/22/03 H | 10/13/03 | 4 | QUIT-NO NOTICE |
| 16445 | ROBERT J GUYON | | SEL-FRZ | FULL-TIME | 7/05/04 H | 8/11/04 | 1 | FIRED-ATTENDANCE |
| 16296 | KEVIN V HARRIS | | SEL-FIR | FULL-TIME | 1/11/04 K | 2/11/04 | 1 | QUIT NO CALL/NO SHOW |
| 16884 | RODNEY C HARTLEY | | SEL-FRZ | FULL-TIME | 4/24/05 K | 5/10/05 | 1 | QUIT NO CALL/NO SHOW |
| 19440 | WILLIAM R HAYES | | SEL-FIR | FULL-TIME | 8/27/00 H | 9/12/03 | 37 | RESIGNED W/NOTICE |
| 15995 | JAMES R HEADLEY | | LOADER | FULL-TIME | 3/31/03 H | 6/09/03 | 1 | QUIT NO CALL/NO SHOW |
| 16028 | BRADLEY D HODGES | | LOADER | FULL-TIME | 6/22/03 H | 7/07/03 | 1 | QUIT-NO NOTICE |
| 16824 | THOMAS HOSECLOTH | | SEL-DRY | FULL-TIME | 3/09/05 H | 3/29/05 | 0 | QUIT-NO NOTICE |
| 19746 | ERIC M HOWARD | | SEL-FRZ | FULL-TIME | 12/01/02 K | 2/27/04 | 15 | RESIGNED W/NOTICE |
| 16851 | ANTWAN D HUDSON | | SEL-FRZ | FULL-TIME | 4/07/05 H | 5/08/05 | 1 | FIRED-POOR PERFORMAN |
| 16490 | JEREMY C INGRAM | | SEL-FRZ | FULL-TIME | 7/20/04 H | 10/27/04 | 3 | QUIT-NO NOTICE |
| 16253 | NATHAN V JEFFERSON | | SEL-FRZ | FULL-TIME | 12/03/03 H | 12/08/03 | 0 | QUIT NO CALL/NO SHOW |
| 16264 | NATHANIAL V JEFFERSON | | LOADER | FULL-TIME | 12/08/03 H | 12/08/03 | 0 | QUIT NO CALL/NO SHOW |
| 16299 | CEDRIC M JOHNSON | | SEL-FRZ | FULL-TIME | 1/13/04 H | 4/04/04 | 3 | QUIT NO CALL/NO SHOW |
| 16401 | JOHANTHAN JOHNSON | | SEL-FRZ | FULL-TIME | 4/15/04 K | 5/03/04 | 1 | QUIT-NO NOTICE |
| 16333 | WILLIAM B JOHNSON III | | SEL-FIR | FULL-TIME | 2/11/04 H | 4/11/04 | 4 | QUIT NO CALL/NO SHOW |
| 16553 | FREDTON T JONES | | LOADER | TEMPORARY | 8/18/04 H | 12/12/04 | 4 | QUIT NO CALL/NO SHOW |
| 19674 | JIMMY L KENDRICK | | TMLDR | FULL-TIME | 6/27/02 K | 12/31/04 | 30 | TRANSFER TO SALARY |
| 16278 | JOE L KENNEDY | | SEL-FRZ | FULL-TIME | 1/04/04 K | 4/27/04 | 3 | QUIT-NO NOTICE |

DATE 7/01/2005 10:49 AM
USER: MELANIE
PROR78

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 4
OS,Inc!

** DIV : 19
DEPT#- 13419 Shipping

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|
| 16595 | JOE L KENNEDY | | SEL-FRZ | TEMPORARY | 9/13/04 H | 2/07/05 | 6 | QUIT-NO NOTICE |
| 16258 | LEON KENNEDY | | SEL-DRY | FULL-TIME | 12/09/03 H | 8/12/04 | 9 | RESIGNED W/NOTICE |
| 16169 | FRANKIE L KNIGHT | | SEL-FRZ | FULL-TIME | 9/28/03 H | 10/01/03 | 1 | FIRED-ATTENDANCE |
| 16159 | CARMEN M LAMAR | | SHIPCLK | PART-TIME | 9/21/03 H | 10/26/03 | 1 | QUIT NO CALL/NO SHOW |
| 15953 | ANTHONY M LAM | | LOADER | FULL-TIME | 2/28/03 H | 5/29/03 | 3 | RESIGNED W/NOTICE |
| 16565 | SAMMY L LEWIS | | SEL-DRY | FULL-TIME | 8/25/04 H | 9/27/04 | 1 | QUIT NO CALL/NO SHOW |
| 16138 | JAMES E LYKES | | CHECKER | FULL-TIME | 9/10/03 H | 10/13/03 | 1 | FIRED-POOR PERFORMAN |
| 16010 | BRANDON H MATHIS | | SEL-DRY | FULL-TIME | 5/21/03 H | 2/05/04 | 10 | QUIT-NO NOTICE |
| 19747 | ELLIS R MCMILLIAN | | LOADER | FULL-TIME | 12/10/02 H | 1/13/03 | 2 | FIRED-POOR PERFORMAN |
| 16707 | CATHY A MIMS | | LIFT-DRY | FULL-TIME | 11/21/04 H | 3/20/05 | 5 | QUIT-NO NOTICE |
| 16587 | MICHAEL E MOORE | | SEL-DRY | FULL-TIME | 9/05/04 H | 10/03/04 | 1 | QUIT-NO NOTICE |
| 16362 | BRANDON G MORROW | | SEL-DRY | FULL-TIME | 3/09/04 H | 6/22/04 | 3 | QUIT-NO NOTICE |
| 16872 | JAMES L MORROW | | LIFT-FRZ | FULL-TIME | 4/17/05 H | 4/25/05 | 0 | FIRED-PROPERTY DAMAG |
| 16489 | HENRY T NUNN | | LOADER | FULL-TIME | 7/19/04 H | 1/19/05 | 7 | FIRED-COMPANY POLICY |
| 16564 | JASON PARKER | | SEL-DRY | FULL-TIME | 8/23/04 H | 8/29/04 | 0 | QUIT NO CALL/NO SHOW |
| 16719 | JEROME PARKER | | SEL-DRY | FULL-TIME | 12/05/04 H | 2/17/05 | 3 | QUIT NO CALL/NO SHOW |
| 19496 | SANDRA G PARKER | | SEL-PIR | FULL-TIME | 11/13/00 H | 1/05/04 | 39 | QUIT NO CALL/NO SHOW |
| 16335 | RONALD PETTWAY | | SEL-DRY | FULL-TIME | 2/16/04 H | 3/15/04 | 1 | QUIT-NO NOTICE |
| 16757 | PATRICK J PHELPS | | LIFT-FRZ | FULL-TIME | 1/24/05 H | 2/01/05 | 1 | QUIT-NO NOTICE |
| 15916 | CEDRIC D PRICE | | LOADER | FULL-TIME | 1/20/03 H | 2/24/03 | 1 | FIRED-ATTENDANCE |
| 16527 | ERIK RAY | | LIFT-FRZ | FULL-TIME | 8/01/04 H | 10/03/04 | 2 | QUIT-NO NOTICE |
| 16807 | CHRIS G REDMON | | CHECKER | FULL-TIME | 3/08/05 H | 3/11/05 | 0 | QUIT NO CALL/NO SHOW |
| 16867 | FARRIN D REED | | SEL-FRZ | FULL-TIME | 4/14/05 H | 3/25/05 | 1 | QUIT NO CALL/NO SHOW |

DATE 7/01/2005 10:49 AM
PROR78
USER: MELANIE

MERCHANTS FOODSERVICE
EMPLOYEE TURNOVER ANALYSIS REPORT
FROM 1/01/2003 TO 6/30/2005

COMPANY#: 02

PAGE 5
OS,Inc.

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|

**DIV : 19**

**DEPT#- 13419 Shipping**

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|---|
| 15989 | KEINO S REED | | LOADER | FULL-TIME | 3/23/03 | H | 6/15/03 | 3 | FIRED-ABANDONED JOB |
| 19739 | CHRISTOPHER B ROBERTS SR. | | LOADER | FULL-TIME | 11/10/02 | H | 1/13/03 | 3 | QUIT NO CALL/NO SHOW |
| 19550 | CHARLES ROBINSON | | LIFT-DRY | FULL-TIME | 3/20/01 | H | 10/16/03 | 31 | QUIT-No NOTICE |
| 16563 | NEAL ROBINSON | | LOADER | FULL-TIME | 8/23/04 | H | 9/26/04 | 1 | FIRED-POOR PERFORMAN |
| 16485 | TYRONE ROBINSON | | LOADER | FULL-TIME | 7/19/04 | H | 7/25/04 | 0 | FIRED-POOR PERFORMAN |
| 16575 | DONALD R ROLLINS | | SEL-DRY | FULL-TIME | 9/01/04 | H | 9/12/04 | 0 | QUIT NO CALL/NO SHOW |
| 16653 | KELVIN ROLLINS | | SEL-DRY | FULL-TIME | 10/17/04 | H | 10/31/04 | 0 | QUIT NO CALL/NO SHOW |
| 16254 | DARRICK S SATCHER | | LOADER | FULL-TIME | 12/02/03 | H | 12/05/03 | 0 | QUIT NO CALL/NO SHOW |
| 16815 | MORGAN W SCARBROUGH | | LIFT-FRZ | FULL-TIME | 3/07/05 | H | 3/25/05 | 0 | QUIT NO CALL/NO SHOW |
| 16267 | EARNEST D SCOTT | | SEL-FRZ | FULL-TIME | 12/17/03 | H | 5/09/04 | 4 | RESIGNED W/NOTICE |
| 19724 | JAMES A SECKMAN | | SEL-FRZ | FULL-TIME | 9/22/02 | H | 11/28/03 | 14 | QUIT-NO NOTICE |
| 16109 | JASON L SHELL | | SEL-FRZ | FULL-TIME | 7/31/03 | H | 8/24/03 | 1 | RESIGNED W/NOTICE |
| 16216 | STEVEN M SHIMEK | | CHECKER | FULL-TIME | 10/28/03 | H | 11/24/03 | 1 | QUIT NO CALL/NO SHOW |
| 19647 | JOHN W SHIVER | | LIFT-FRZ | FULL-TIME | 12/11/01 | H | 3/07/03 | 16 | RESIGNED W/NOTICE |
| 16777 | KRISTI G SHUFF | | CHECKER | FULL-TIME | 2/13/05 | H | 4/07/05 | 2 | FIRED-ABANDONED JOB |
| 19679 | TERRY A SIMS | | LIFT-FRZ | FULL-TIME | 6/30/02 | H | 10/02/03 | 16 | QUIT-NO NOTICE |
| 19735 | JAMES M SMART | | SEL-FRZ | FULL-TIME | 10/30/02 | H | 3/09/05 | 30 | QUIT-NO NOTICE |
| 16463 | JAMES M SMART | | SEL-FRZ | FULL-TIME | 11/11/04 | F | 4/06/05 | 6 | QUIT-NO NOTICE |
| 15947 | GREGORY T SMITH | | SEL-FRZ | FULL-TIME | 2/13/03 | H | 5/12/03 | 3 | QUIT NO CALL/NO SHOW |
| 16679 | PATRICK SMITH | | FORKLIFT | FULL-TIME | 10/31/04 | H | 12/29/04 | 2 | QUIT-NO NOTICE |
| 16176 | SCOTT T SMITH | | CHECKER | FULL-TIME | 10/05/03 | H | 1/25/04 | 4 | RESIGNED W/NOTICE |
| 19736 | TERRY A SMITH | | LOADER | FULL-TIME | 10/28/02 | H | 5/12/03 | 8 | QUIT-NO NOTICE |
| 15932 | PAUL K SOLISHICK | | CHECKER | FULL-TIME | 2/03/03 | H | 4/20/03 | 2 | QUIT NO CALL/NO SHOW |

```
DATE 7/01/2005 10:49 AM                    MERCHANTS FOODSERVICE                    COMPANY#: 02                         PAGE    6
PROR78      USER: MELANIE            EMPLOYEE TURNOVER ANALYSIS REPORT                                                   QS.Inc|
                                        FROM 1/01/2003 TO 6/30/2005
```

| EMPLOYEE NUMBER | EMPLOYEE NAME | JOB CLASS | TITLE | EMPLOYEE STATUS | DATE | TERM DATE | NUMBER MONTHS | TERMINATION REASON |
|---|---|---|---|---|---|---|---|---|

**DIV : 19**

**DEPT#- 13419 Shipping**

| 16127 | MARTY D SPENCE | | SEL-PIR | FULL-TIME | 8/28/03 H | 2/18/04 | 7 | QUIT NO CALL/NO SHOW |
| 16297 | MICHAEL P SPIGNER | | LIFT-FRZ | FULL-TIME | 1/11/04 H | 6/06/05 | 17 | FIRED-THEFT |
| 15951 | MICHAEL R STIGER | | LIFT-DRY | FULL-TIME | 2/23/03 H | 5/04/03 | 3 | QUIT-NO NOTICE |
| 16849 | KYLE L STRENGTH | | SEL-DRY | FULL-TIME | 4/03/05 H | 5/02/05 | 1 | QUIT NO CALL/NO SHOW |
| 16030 | SUE A TAYLOR | | SHPCLK | FULL-TIME | 6/22/03 H | 9/05/03 | 3 | QUIT NO CALL/NO SHOW |
| 16059 | LONZA B TINSLEY | | LOADER | FULL-TIME | 7/13/03 H | 5/29/04 | 11 | QUIT-NO NOTICE |
| 16756 | LATASHIA V TUCKER | | CHECKER | FULL-TIME | 1/23/05 H | 2/01/05 | 1 | FIRED-ATTENDANCE |
| 16444 | JERRY J TYUS | | LOADER | FULL-TIME | 7/05/04 H | 7/30/04 | 0 | QUIT-NO NOTICE |
| 19594 | RODERICK M UNDERWOOD | | SEL-DRY | FULL-TIME | 8/07/01 H | 1/21/04 | 30 | QUIT NO CALL/NO SHOW |
| 16405 | LEROY K VARNER | | LOADER | FULL-TIME | 4/18/04 H | 12/05/04 | 8 | QUIT-NO NOTICE |
| 15957 | PATRICK N VINSON | | LOADER | FULL-TIME | 3/02/03 H | 3/09/03 | 0 | FIRED-POOR PERFORMAN |
| 19371 | RODNEY O WARE | | SEL-FRZ | FULL-TIME | 4/23/00 H | 2/14/03 | 35 | TRANSFER TO SALARY |
| 16268 | JARVIS L WATKINS | | LOADER | FULL-TIME | 12/17/03 H | 1/09/04 | 2 | FIRED-ABANDONED JOB |
| 16346 | VEARDELL WATKINS | | SEL-FRZ | FULL-TIME | 2/22/04 H | 5/20/04 | 3 | QUIT-NO NOTICE |
| 16214 | MARCUS C WEAVER | | LIFT-FRZ | FULL-TIME | 10/27/03 H | 5/04/04 | 8 | QUIT NO CALL/NO SHOW |
| 15913 | HENRY J WHITE | | SEL-DRY | FULL-TIME | 1/15/03 H | 2/09/03 | 1 | QUIT NO CALL/NO SHOW |
| 16369 | DONNELL WILLIAMS | | LIFT-DRY | FULL-TIME | 3/15/04 H | 5/13/04 | 2 | FIRED-POOR PERFORMAN |
| 16185 | PHILLIP D WILLIAMS | | CHECKER | FULL-TIME | 10/14/03 H | 6/29/04 | 9 | RESIGNED W/NOTICE |
| 19619 | CEDRIC K WORKS | | CHECKER | FULL-TIME | 10/14/01 H | 7/09/03 | 22 | FIRED |
| 16117 | BRODERICK S WRIGHT | | LOADER | FULL-TIME | 8/13/03 H | 2/18/04 | 7 | MEDICAL REASONS |
| 16186 | CURTIS W WYATT | | LOADER | FULL-TIME | 10/14/03 H | 4/07/05 | 19 | FIRED-ABANDONED JOB |

```
**  DEPT: 13419 TOTALS **   ACTIVE EMPLOYEES =  32    TERMINATED EMPLOYEES =  136   PERCENT TURNOVER =  425.00 %

**  DIV : 19      TOTALS **  ACTIVE EMPLOYEES =  32    TERMINATED EMPLOYEES =  136   PERCENT TURNOVER =  425.00 %

*** COMPANY 02 TOTALS ***   ACTIVE EMPLOYEES =  32    TERMINATED EMPLOYEES =  136   PERCENT TURNOVER =  425.00 %
```

**DEFENDANT'S EXHIBIT**

**20**

July 11, 2005

PLEASE ACCEPT THIS LETTER AS MY NOTICE OF RESIGNATION. I WILL WORK WHATEVER NOTICE YOU REQUIRE.

I CAN NO LONGER TOLERATE WORKING UNDER THE STRESS & PRESSURE THAT SEEMS TO BE A DAILY OCCURRENCE. NOTHING I WAS TOLD DURING THE INTERVIEW PROCESS HAS TURNED OUT TO BE TRUTHFUL. HOURS EXPECTED OR REQUIRED TO BE WORKED, TIME OFF, STEADINESS & SECURE WORKFORCE. ETC... LEAVING SYSCO TO COME TO WORK HERE WAS THE BIGGEST MISTAKE I'VE EVER MADE.

Steve Adam



IN THE CIRCUIT COURT OF CHILTON COUNTY
AT CLANTON, ALABAMA

STEVE ADAMS,                                 )
                                             )
        Plaintiff,                           )
                                             )
v.                                           )
                                             )    Case No. _CV-06-204 B_
                                             )
MERCHANTS FOOD SERVICES,                     )
DON SUBER, ANDY MERCIER,                     )
AND HAL HENSON,                              )
                                             )
        Defendants.                          )

**DEFENDANT'S EXHIBIT**

21

## COMPLAINT

COMES NOW the Plaintiff, Steve Adams, who shows unto this Honorable
Court the following, to wit:

1. On or about the 15th day of August, 2004, the Plaintiff was contacted by
Defendant Merchants Food Services (herein Defendant Merchants) about possible
employment with Defendant Merchants. Defendant Merchants contacted Plaintiff
while he was still employed with Sysco Foods.

2. Defendant Merchants persistently pursued Plaintiff, and Plaintiff finally
agreed to an interview once he learned of the potential salary with the new
position.

3. Defendant Hal Henson (herein Defendant Henson), General Manager,
Defendant Andy Mercier (herein Defendant Mercier), Corporate Vice President,
and Don Suber (herein Defendant Suber), Corporate President, interviewed
Plaintiff on or about the 28th day of August, 2004. During the interview,
Defendants Henson, Mercier, and Suber made certain representations about certain
aspects of the employment to Plaintiff, including, but not limited to, the following:

 a. Plaintiff would only be required to work 8 to 8.5 hours a day or 40 to 42 hours a week;

 b. Plaintiff would have flexibility in setting his own hours;

 c. Plaintiff would only have to work a few nights on the night shift to get acquainted with that shift and the crew working that shift;

 d. Plaintiff would only have to work two (2) Saturdays per year for the purpose of physical inventory, and if Plaintiff did have to work a Saturday for anything other than the purpose of the inventory, he would be compensated with a day off; and

 e. Plaintiff was told that he would not have to worry about vacation time at Merchants and that he would not have to wait the usual 12 months before receiving time off, since he was giving up 17 days of vacation a year with his then current employer, Sysco – Defendant Henson told Plaintiff that he would allow him to take vacation time.

4. After an official offer of employment, including salary, was made to Plaintiff, he decided to accept the offer extended by Defendant Merchants, based on the aforementioned representations made by the Defendants to Plaintiff.

5. Once Plaintiff accepted employment with Defendant Merchants and began his tenure there, he learned that the representations that Defendants had made to him during his interview (¶ 3, supra) were false and misleading, as evidenced by, but not limited to, the following:

 a. Throughout his 10.5 month employment with Merchants, Plaintiff was required to work 9 to 9.5 hours a day;

 b. Plaintiff was not allowed the flexibility of setting his own hours;

 c. Throughout his employment with Merchants, Plaintiff worked a total of 10 weeks on the night shift;

 d. Throughout his employment with Merchants, Plaintiff was required to work a total of 8 Saturdays (6 more than what Plaintiff was told

during his interview), without being compensated either monetarily or with any time off from work, as he was promised; and

e. Throughout his employment with Merchants, Plaintiff was not allowed any time off, as was promised during his interview.

## COUNT I

6. Plaintiff hereby adopts those statements contained in the previous paragraphs and incorporates them herein as though set out in their entirety.

7. At all times relevant hereto, Defendants had a duty to Plaintiff to speak the truth regarding his possible employment with Defendant Merchants and the aforementioned aspects of his employment.

8. Defendants intentionally, recklessly, and/or innocently made certain false representations of material existing facts prior to Plaintiff's employment with Defendant Merchants, in an effort to induce Plaintiff's action on the false representations.

9. In fact, Plaintiff did act on the false representations of material existing facts.

10. As a proximate result of Defendants' false representations, Plaintiff has suffered, and continues to suffer, harm, loss, and/or damage.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount determined by an enlightened trier of fact, plus costs and interest. In addition, Plaintiff seeks any other remedies at law or equity that are available to him but not specifically set out herein.

## COUNT II

11. Plaintiff hereby adopts those statements contained in the previous paragraphs one through 10 and incorporates them herein as though set out in their entirety.

12. A confidential relationship and/or special relationship existed between Plaintiff and Defendants by virtue of the superiority of Defendants' knowledge

concerning the true facts surrounding the inducement of Plaintiff and the truth concerning the aspects of Plaintiff's employment with Defendant Merchants.

13. As a result of this relationship, Defendants had a duty to disclose the aforementioned material facts (¶¶ 3 and 5, supra).

14. As a proximate consequence of the suppression and/or misrepresentation of material facts as alleged and Plaintiff's reliance on such, Plaintiff was caused to suffer pecuniary loss, missed employment opportunities, expenses, and mental anguish.

15. Plaintiff demands punitive damages of the Defendants due to the intentional, reckless, and gross actions and/or omissions of the Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount determined by an enlightened trier of fact, plus costs and interest. In addition, Plaintiff seeks any other remedies at law or equity that are available to him but not specifically set out herein.

DATED this the ___13___ day of ___June___, 2006.

Derrick Blythe (BLY 002)
Attorney for Plaintiff
126 Marshall Street
Alexander City, Alabama 35010
(256) 234-4101

*Exhibit B*

# AFFIDAVIT

TALLAPOOSA COUNTY        )
                                )
STATE OF ALABAMA           )

      I, STEVE ADAMS, the undersigned, hereby swear and affirm that the following is true and correct to the best of my knowledge:

      On or about August 15, 2004, I was contacted by the Defendant, Merchants Food Services (herein Defendant Merchants) about possible employment with Defendant Merchants. Defendant Merchants contacted me while I was still employed with Sysco Foods.

      Defendant Merchants persistently pursued me, and I finally agreed to an interview once I learned of the potential salary with the new position.

      Defendant Hal Henson (herein Defendant Henson), General Manager, Defendant Andy Mercier (herein Defendant Mercier), Corporate Vice President, and Don Suber (herein Defendant Suber), Corporate President, interviewed me on August 28, 2004. During the interview, Defendants Henson, Mercier, and Suber made representations about certain aspects of the employment to me, including, but not limited to, the following:

        a. I would only be required to work 8 to 8.5 hours a day or 40 to 42 hours a week;

        b. I would have flexibility in setting my own hours;

        c. I would only have to work a few nights on the night shift to get acquainted with that shift and the crew working that shift;

        d. I would only have to work two (2) Saturdays per year for the purpose of physical inventory, and if I did have to work a Saturday for anything other than the purpose of the inventory, I would be compensated with a day off; and

        e. I was told that I would not have to worry about vacation time at Merchants and that I would not have to wait the usual 12 months before receiving time off, since I was giving up 17 days of vacation a year with my then current employer, Sysco – Defendant Henson told me that he would allow me to take vacation time.

      After an official offer of employment, including salary, was made to me, I decided to accept the offer extended by Defendant Merchants, based on the aforementioned representations made by the Defendants to me.

Once I accepted employment with Defendant Merchants and began my tenure there, I learned that the representations that Defendants had made to me during my interview were false and misleading, as evidenced by, but not limited to, the following:

    a. Throughout my 10.5 month employment with Merchants, I was required to work 9 to 9.5 hours a day;

    b. I was not allowed the flexibility of setting my own hours;

    c. Throughout my employment with Merchants, I worked a total of 10 weeks on the night shift;

    d. Throughout my employment with Merchants, I was required to work a total of 8 Saturdays (6 more than what I was told during my interview), without being compensated either monetarily or with any time off from work, as I was promised; and

    e. Throughout my employment with Merchants, I was not allowed any time off, as was promised during my interview.

Put plainly, I was lied to about the job and its conditions. These lies made me give up a great job.

Further the affiant sayeth not.

_Steve Adams_
STEVE ADAMS

STATE OF ALABAMA

COUNTY OF TALLAPOOSA

    I, _Ronda H. Blythe_ the undersigned authority, a Notary Public in and for said State and County, do hereby certify that STEVE ADAMS whose name is signed to the foregoing instrument and who is known to me, acknowledged before me this day, that being informed of the contents of this instrument he executed the same voluntarily on the day same bears date.

    Witness my hand and seal this the _11th_ day of _July_, 2007.

_Ronda H. Blythe_
Notary Public
Expiration: _03-10-08_